1  SUPREME COURT OF THE STATE OF NEW YORK

2  BRONX COUNTY : CRIMINAL TERM : PART 98

3  ------------------------------------

4  THE PEOPLE OF THE STATE OF NEW YORK

5                    -against-                    Indictment No.
                                                  3349-2012
6  RICHARD DIAZ, JOSE MELENCIANO
   & AMAURI SANTANA,

7
                         Defendants.              Mapp/Huntley
8                                                 Dunaway/Wade
                                                  Hearings
9  ------------------------------------

10                                    JULY 6, 2015

                                      Bronx Supreme Court
11                                    265 East 161 Street
                                      Bronx, New York
12

13

B E F O R E:      HONORABLE RALPH FABRIZIO      **FILED**
14                Justice of the Supreme Court

15                                              OCT -5 2016

A P P E A R A N C E S:                          SUP COURT, APP. DIV.
16                                              FIRST DEPT.

17                ROBERT JOHNSON, ESQ.
                  District Attorney, Bronx County
                  BY:  NEWTON MENDYS, ESQ.
18                     Assistant District Attorney

19                PAT BONANNO, ESQ.
                  Attorney for Defendant DIAZ
20

                  BRIAN WILSON, ESQ.
21                Attorney for Defendant MELENCIANO

22                GOLDSTEIN & WEINSTEIN
                  BY:  BARRY WEINSTEIN
23                     Attorney for Defendant SANTANA

24                         Laura Rosen
                           Senior Court Reporter
25

1                    (Whereupon, following the initial trial

2          proceedings stenographically recorded but not transcribed

3          herein, the following proceedings took place.)

4                    (Whereupon, the following took place in open court

5          in the presence of the Court, all three defendants, Spanish

6          language interpreter, defense counsel and the assistant

7          district attorney.)

8                    THE COURT:  Call your witness.

9                    MR. MENDYS:  Judge, the People call to the stand

10         Detective Chris Rodriguez from Internal Affairs Bureau.

11                   MR. WILSON:  Judge, did I hear you order daily

12         copy for the attorneys?

13                   THE COURT:  I did.

14                   MR. WILSON:  Thank you.

15                   MR. WEINSTEIN:  Your Honor, I'm retained.  Will I

16         still get it also?  Can I still --

17                   THE COURT:  Are you ordering it?

18                   MR. WEINSTEIN:  I can't afford to pay it.  My

19         client hasn't paid me for the trial.

20                   THE COURT:  Hold just one minute.  Can you stand

21         up, Mr. Weinstein, please?

22                   MR. WEINSTEIN:  Yes, your Honor.

23                   THE COURT:  You're retained.  Your law firm's been

24         retained and your client can't afford daily copy?

25                   MR. WEINSTEIN:  Your Honor, right.  He hasn't paid

lr-a          Det C. Rodriguez - People - Direct

1         me a nickel for the trial either.

2                  THE COURT:  He hasn't paid you for the trial?

3                  MR. WEINSTEIN:  Right.

4                  THE COURT:  You'll file the authorization.  You

5         can have it daily copy, 18b rates.

6                  MR. WEINSTEIN:  Thank you.

7                  THE COURT:  So everyone is on the same level,

8         okay.  Let's go.

9                  COURT OFFICER:  Witness entering.

10                 (Whereupon, the witness entered the courtroom and

11        took the witness stand.)

12  DETECTIVE  C H R I S   R O D R I G U E Z,  Shield No. 6522,

13        New York City Police Department, Internal Affairs

14        Bureau, called as a witness on behalf of the People,

15        having been first duly sworn, was examined and testified

16        as follows:

17                 COURT OFFICER:  Have a seat.  Please state your

18        name, shield and command for the record.

19                 THE WITNESS:  Detective Chris Rodriguez, shield

20        number 6522, Police Impersonation Investigation Unit,

21        Internal Affairs Bureau.

22                 THE COURT:  Police Impersonation --

23                 THE WITNESS:  Investigation Unit.

24                 THE COURT:  Okay Detective, if you can keep your

25        voice up.  Maybe, you know, move the microphone a little

lr-a          Det C. Rodriguez - People - Direct

1          closer to you.

2                    THE WITNESS:   Sure.

3                    THE COURT:   Then Mr. Mendys, you may inquire.

4                    MR. MENDYS:   Thank you, Judge.

5     DIRECT EXAMINATION

6     BY MR. MENDYS:

7          Q     Good morning, Detective.

8          A     Good morning.

9          Q     How long have you been with the police department?

10         A     A little over 11 years.

11         Q     And what is your current assignment?

12         A     I work for the Police Impersonation Investigation Unit

13    for the Internal Affairs Bureau.

14         Q     What are your responsibilities there?

15         A     To investigate police impersonations, robberies,

16    larcenies, and other major crimes.

17         Q     So crimes where it is alleged that the suspects or

18    defendants impersonated the police during the course of the

19    crime?

20         A     Yes.

21         Q     Now how long have you been a detective?

22         A     A little less than three years.

23         Q     So I want to direct you specifically to October 17th of

24    2012.  Were you working that day or night?

25         A     I was working the afternoon that day.

lr-a          Det C. Rodriguez - People - Direct


1     Q     And that day were you assigned an investigation

2  relating to a robbery that occurred in the early morning hours

3  that same day within the confines of the 46 Precinct?

4     A     Yes, I was.

5     Q     And that's here in the Bronx, correct?

6     A     Yes.

7     Q     Specifically, it was Walton Avenue?

8     A     Yes.

9     Q     Now, that day did you have occasion to speak to an

10  individual named Jose Melenciano?

11     A     Yes, I did.

12     Q     And about what time was that?

13     A     I would have to look at my notes to --

14          THE COURT:  You may consult your notes to refresh

15     your recollection.

16          MR. MENDYS:  Okay, one moment.  Is there anything

17     specifically that you're looking for?

18          THE COURT:  You don't have anything with you?  I'm

19     sorry.

20          THE WITNESS:  Yes, I do.

21          THE COURT:  You can pull out whatever you need to

22     refresh your recollection.  Is this a spiral note or

23     something?

24          THE WITNESS:  No.

25          THE COURT:  The case file?

lr-a          Det C. Rodriguez - People - Direct


1                    THE WITNESS:  Yeah.

2                    THE COURT:  Okay.

3                    MR. MENDYS:  Detective, I have a DD5.  Would

4          that --

5                    THE WITNESS:  That's what I was looking for.

6                    THE COURT:  All right.  Well, if you want the ADA

7          to hand up the DD5 to refresh your recollection.

8                    THE WITNESS:  Please.

9                    THE COURT:  That's fine.

10                    MR. MENDYS:  Judge, would you like it marked for

11          identification?

12                    THE COURT:  No, just refreshing recollection.

13          Doesn't have to be shown to anyone as long as it's been

14          turned over.

15                    MR. MENDYS:  It's been disclosed.

16                    THE COURT:  It's a refreshing recollection

17          document.

18                    (Whereupon, the referred to item was handed to the

19          witness.)

20     A     At 1625 hours, which is 4:25 in the afternoon.

21     Q     Now, during the course -- now prior to speaking to Mr.

22     Melenciano, what was your understanding as to what transpired

23     during the course of the robbery?

24                    MR. BONANNO:  Objection.

25                    THE COURT:  Yes, assumes a lot.  Rephrase your

lr-a          Det. C. Rodriguez - People - Direct

1      question.

2      Q      Did you -- had you spoken to anyone regarding what

3   transpired that night?

4      A      I was notified in regard to a police-impersonation

5   robbery that occurred in front of 2315 Walton Avenue in the

6   confines of the 46 where there were three subjects who, who

7   attempted to rob four individuals, and two out of the three

8   subjects were apprehended.  I actually received the case as an

9   enhancement, to find the third outstanding subject.

10     Q      So when you -- by the time you had been assigned the

11  original case, two people were already in custody?

12     A      Yes.

13     Q      And was Jose Melenciano one of those individuals?

14     A      Yes.

15     Q      And who is the second individual?

16     A      Amauri Santana.

17     Q      Do you see those two individuals here in court?

18     A      Yes, I do.

19     Q      If you could identify something that they're wearing to

20  identify them?

21              THE COURT:  Yes, differentiate between the two.

22              THE WITNESS:  Jose Melenciano has, I believe, a

23      green shirt, button-down, and Amauri Santana has a T-shirt

24      on with a multi-colored front pocket.

25              THE COURT:  Indicating each of those defendants

lr-a          Det C. Rodriguez - People - Direct

1           has been identified in court.

2        Q    Okay.  Now, you just testified that your responsibility

3    was to try and determine who the third individual was?

4        A    Yes.

5        Q    And when you spoke to Mr. Melenciano, did you receive

6    any information as to the third individual?

7        A    Yes.

8        Q    What information did you receive?

9        A    The nickname Villajuana.  A description as well.

10        Q    Based on that information, with that information what

11    did you do?

12        A    My sergeant called over to my command.  We engaged, we

13    then -- my sergeant was texted a photo.  Based on that

14    description and the nickname Villajuana, a photo was shown to Mr.

15    Melenciano who positively I.D.'d a Richard Diaz as the third

16    subject.

17        Q    And at that point did you, did you create a photo

18    array?

19        A    Yes, based on that information.

20        Q    What is a photo array?

21               THE COURT:  Slow down.  You're stepping on the

22          answers and the questions.

23               Did you create a photo array?

24               THE WITNESS:  Yes, I did.

25               THE COURT:  Next question.

lr-a          Det C. Rodriguez - People - Direct

1     Q     What is the photo array, Detective?

2     A     A photo array is an identification procedure which is

3    when photos -- it's prepared with six photos.  One of the photos

4    will contain the subject's photo along with five additional

5    fillers, and then will be shown to one of the complainants for

6    identification purposes.

7     Q     Okay.  And who did you show the array to or -- well,

8    I'm sorry.

9          Did you create a photo array regarding this individual

10   Villajuana, otherwise known as Richard Diaz?

11    A     Yes, I did.

12    Q     And just for the record, do you see Richard Diaz here

13   in court?

14    A     Yes, I do.

15    Q     Can you identify something that he is wearing for the

16   record?

17    A     He's actually wearing a short sleeve what appears to be

18   a Polo shirt, either white or cream in color.

19          THE COURT:  Indicating the defendant Diaz.

20    Q     Now, do you recall who you wanted to show the array to?

21    A     Yes, one of the complainants.

22    Q     Specifically?

23    A     Esmeraldy Rodriguez.

24    Q     And when did you show the array to her?

25    A     Again, I would have to look at my records to know.

1r-a          Det C. Rodriguez - People - Direct

1              THE COURT:  You could consult whatever record you

2        want.  Is there something you --

3        Q     Can I refresh your recollection with the array?

4        A     Yes.

5              THE COURT:  The array would refresh your

6        recollection?  Okay, show the witness.

7              (Whereupon, the referred to item was handed to the

8        witness.)

9        A     The photo array was on October 17, 2012, at 2055 hours,

10   which is 8:55 in the evening.

11       Q     How did you come to create the array?

12       A     I obtained Richard Diaz's P.I.M.S. photo which is in

13   photo manager, and once -- there's a section on the photo manager

14   you could select in any position.  It came and was inserted into

15   any position.  I also clicked on it again and put similar images,

16   which popped up additional photos of other arrestees that would

17   have similar features of Mr. Diaz, and through that I was able to

18   select the next five fillers, which were also inserted at random

19   just with the computer.  And once I had six photos that I liked,

20   I saved it, printed it out and showed it to the complainant.

21       Q     So when you say you clicked on similar images, those

22   would be images that are similar to the descriptive features of

23   Richard Diaz?

24       A     Yes.

25       Q     And those come up via the computer?

lr-a            Det C. Rodriguez - People - Direct

1        A     Via the computer, yes.

2        Q     You pare it down to the five fillers that you, that you

3    like the most?

4        A     Yes.

5        Q     What is your goal when you create the array?  What are

6    you trying to do?

7        A     To have similarities.

8        Q     Okay, so similar?

9        A     Features, facial features, skin tone.

10       Q     Now, what position was Mr. Diaz in in the array?

11       A     He was in position number four.

12       Q     And is that -- what position is that as you're looking

13   at the array; top right, bottom left?

14       A     It's the bottom left.

15       Q     Now, how did you get in touch with Miss Rodriguez about

16   viewing the array?

17       A     I just went to her, where she resides.

18       Q     And is that where you showed her the array?

19       A     Yes.

20       Q     Now, when you showed her the array, were there any

21   other officers or detectives or members of service with you?

22       A     My sergeant.

23       Q     And who is that?

24       A     Sergeant Michael DeCandido, D-E-C-A-N-D-I-D-O.

25       Q     And when you met with Miss Rodriguez to view the array,

lr-a            Det C. Rodriguez - People - Direct

1    was she with anyone else when she viewed the array?

2        A    No.

3        Q    What instructions did you provide to her when she

4    viewed the array?

5        A    I informed her that I was going to show her some

6    photos, that I was gonna ask her three questions:  Did she

7    recognize anyone; if she does, what number does she recognize;

8    and from where did she recognize that person from.

9        Q    Now, did Miss Rodriguez speak English or Spanish?

10       A    She spoke Spanish.

11       Q    Do you speak Spanish?

12       A    Yes, I do.

13       Q    So you were providing these instructions in Spanish?

14       A    Yes.

15       Q    Now, the photos specifically of Mr. Diaz, that was a

16   photo from a previous arrest?

17       A    Yes.

18       Q    And that would be the same for the fillers as well?

19       A    Yes.

20       Q    Arrest photos, okay.

21            So upon instructing Miss Rodriguez, did she make an

22   identification?

23       A    Yes.

24       Q    What position did she identify?

25       A    Position number four.

lr-a            Det C. Rodriguez - People - Direct


1       Q    And that was who?

2       A    Richard Diaz.

3       Q    And where did she recognize him from?

4       A    From the incident that occurred at 2315 Walton Avenue.

5       Q    Did you have her document her selection in any way?

6       A    Yes.

7       Q    How so?

8       A    She circled the picture and wrote down, gave her

9  signature on top of it and also wrote a statement in Spanish.

10      Q    In Spanish?

11      A    Yes.

12      Q    Now, did you sign that document as well?

13      A    Yes, I did.

14      Q    Now did you -- upon when you instructed her or when you

15  were speaking to her, did you direct her to anyone in particular?

16      A    No, I didn't.

17      Q    In the array?

18      A    No.

19      Q    Did you suggest anyone to her in any way?

20      A    No, I did not.

21           MR. MENDYS:  In the array?  Okay.

22           I would ask that the array be marked for

23       identification as People's 1 and shown to defense counsel.

24           THE COURT:  Show it to the defense attorneys

25       first.

lr-a           Det C. Rodriguez - People - Direct

1                      (Whereupon, the referred to item was handed to the

2           defense counsel.)

3                      (Whereupon, People's Exhibit 1 was marked for

4           identification.)

5                      COURT OFFICER:   People's 1 for identification so

6           marked.

7                      MR. MENDYS:   Could you show that to the witness,

8           please?

9                      (Whereupon, the referred to item was handed to the

10           witness.)

11      Q    Detective, do you recognize that document?

12      A    Yes, I do.

13      Q    What is that?

14      A    This is the photo array I prepared.

15      Q    And is that the one that was completed by you and Miss

16   Rodriguez after the viewing?

17      A    Yes.

18      Q    And it has her signature on it?

19      A    Yes, it does.

20      Q    And your signature on it?

21      A    Yes, it does.

22      Q    If you can tell, is that an original or a copy?

23      A    This is a copy.

24      Q    And is that in color?  Are the pictures in color?

25      A    Yes, they are.

lr-a          Det C. Rodriguez - People - Voir Dire(Bonanno)

1      Q      Does that photo array, the pictures specifically, does

2    that fairly and accurately reflect the array that Miss Rodriguez

3    viewed, and then later signed and documented?

4      A      Yes.

5              MR. MENDYS:  At this point I would ask that to be

6         moved into evidence as People's 1.

7              THE COURT:  Any objection?

8              MR. BONANNO:  Judge, I would just object.  If I

9         could have an opportunity to voir dire?

10             THE COURT:  You want to voir dire?  Go ahead.

11   VOIR DIRE EXAMINATION

12   BY MR. BONANNO:

13     Q      Detective, I'm gonna ask you a few questions.  If you

14   don't understand, please let me know so I could rephrase them.

15             You spoke about this P.I.M.S. photo.

16     A      Yes.

17     Q      What are P.I.M.S. photos?

18     A      Photo Imaging Manger System.  It's a database that the

19   NYPD carries where it shows arrestees' photos.

20     Q      And so, is it safe to assume that the other five photos

21   in that photo array are also people that have been arrested?

22     A      Yes.

23     Q      People who have been arrested for robberies?

24     A      It's just similar imaging.  It wouldn't tell me exactly

25   unless I dug deep into it what they were arrested for.

lr-a            Det C. Rodriguez - People - Voir Dire(Bonanno)


1       Q      But they've been arrested before?

2       A      Yes.

3       Q      Do you know if they've been convicted?

4       A      I do not know that.

5       Q      If you know, if they've been arrested for police

6    impersonation?

7       A      I don't know that.

8       Q      So you did no other investigation as to the five other

9    photos that were in that photo array?

10      A      I did not.

11      Q      Isn't it true that there was a time in the police

12   department that the fillers, as we call them, those five other

13   photos, were actually police officers employed by the City of New

14   York?

15              MR. MENDYS:   Judge, I would object.   I think we're

16          beyond reasonable voir dire.

17              THE COURT:   The objection is sustained.   I'm not

18          sure how this goes to the admissibility of the array.   He

19          testified to how it was created.   What voir dire is there,

20          how does this relate to the admissibility of a piece

21          physical evidence?

22              MR. BONANNO:   I just believe that showing a

23          complaining witness, and we haven't even established that

24          she's a complaining witness, a photo with five other

25          previously arrested individuals --

1          THE COURT:  The foundational requirement here is

2     whether this is the array that was created and shown to the

3     witness.

4          MR. BONANNO:  I understand.

5          THE COURT:  And you're challenging that this array

6     is not -- this is something different?  This is a voir dire

7     for the admissibility on the People's direct case of a piece

8     of evidence.

9          MR. BONANNO:  I'm challenging that it's tainted in

10    its nature and shouldn't be admitted.

11         THE COURT:  So in other words, it should never

12    come in because it's tainted?

13         MR. BONANNO:  That's my --

14         THE COURT:  And so can you cite a case where that

15    is actually a rule of evidence, that the physical evidence

16    doesn't come in because the court is making a finding

17    without even examining it, without having the ability to

18    look at the array, that it's tainted in someway?

19         MR. BONANNO:  Off the top of my head I don't have

20    one, Judge, but I'm just creating the record that I believe

21    that that is a tainted photo array, and that is my

22    objection.

23         THE COURT:  The objection to admissibility?

24         MR. BONANNO:  Yes.

25         THE COURT:  Tainted in that it's not a true and

1r-a         Det C. Rodriguez - People - Voir Dire(Bonanno)

1    accurate copy in someway of what was shown to the witness?

2              MR. BONANNO:  I'm not objecting to that portion of

3    it, I'm objecting to the portion that it contains possible

4    other felons in there that have been arrested for police

5    identification, and the identification process is tainted as

6    a result of that.

7              THE COURT:  In terms of the root admissibility

8    that I must make, that is an objection that does not lie

9    under any rules of evidence and the objection -- is there

10   any other objection?

11             MR. BONANNO:  And that's certainly a result --

12             THE COURT:  Any other objection?

13             MR. BONANNO:  There is no other objection.

14             THE COURT:  This is in evidence as People's 1, and

15   we'll mark it.

16             (Whereupon, People's Exhibit 1 was received in

17   evidence.)

18             COURT OFFICER:  People's 1 in evidence so marked.

19   Judge, would you like to see it?

20             THE COURT:  You can give it back to the DA.

21             MR. MENDYS:  Thank you.

22   Cont'd DIRECT EXAMINATION

23   BY MR. MENDYS:

24   Q    Now, Miss Rodriguez was present at the, during the

25   robbery?

lr-a              Det C. Rodriguez - People - Direct

1      A      I'm sorry, could you say that again?

2      Q      Miss Rodriguez, the person who viewed the array?

3      A      Yes.

4      Q      Was present during the course of the robbery?

5      A      Yes.

6      Q      From your conversations with her?

7      A      Yes.

8      Q      Now, so after Miss Rodriguez identified Mr. Diaz, the

9   defendant, in the array, what did you do in attempt to locate

10  him?

11     A      I issued a wanted card for Mr. Diaz, and also a wanted

12  poster was generated and disseminated.

13     Q      Does the wanted card, does that have a particular name

14  within the New York City Police Department?

15     A      It has his -- the wanted card is just a wanted card,

16  and I think I have an I-card.

17     Q      An I-card?

18     A      Yes.

19     Q      Okay.  And what is an I-card?

20     A      An I-card lists all pedigree information of the person

21  that's wanted, and if that person has any police interaction and

22  they run him over their central database, he'll show that he has

23  an active I-card, a warrant.

24     Q      It notifies all members of service within the five

25  boroughs that if Mr. Diaz were to be arrested on something

lr-a          Det C. Rodriguez - People - Direct

1     else --

2        A        If they run him, they'll see this active I-card in the

3     system.

4        Q        And then he would be then brought, it would be brought

5     to your attention?

6        A        It would be brought to my attention.   I would be

7     notified.

8        Q        Okay.   Now why did you -- also you submitted a wanted

9     poster?

10       A        Yes.

11       Q        And what is the point of that?

12       A        To let the commands know this person's wanted.   It was

13    actually sent over to the 34 Precinct.   One of his addresses is

14    in Manhattan where he might have resided.

15       Q        Okay.   And how does that assist you or assist other

16    members of service beyond just the I-card?

17       A        Well, it could assist me if he's seen by patrol,

18    whoever has seen the wanted poster, they would know that he is

19    wanted.

20       Q        He's seen on the street by an officer who's previously

21    seen the wanted poster, there may be a recognition there that

22    would not necessarily -- so that he could be arrested without

23    necessarily being arrested on something else?

24       A        He would, it would be known that he's wanted for a

25    crime.

1r-a        Det C. Rodriguez - People - Direct


 1                    MR. MENDYS:  So at this point I'm going to show

 2         this to defense counsel, and ask it be marked People's 2.

 3                    THE COURT:  People's 2 for identification.

 4                    (Whereupon, the referred to item was handed to

 5         defense counsel.)

 6                    (Whereupon, People's Exhibit 2 was marked for

 7         identification.)

 8                    COURT OFFICER:  People's 2 for identification so

 9         marked.

10                    MR. MENDYS:  If that can be shown to the witness,

11         please.

12                    (Whereupon, the referred to item was handed to the

13         witness.)

14                    MR. MENDYS:  Thank you.

15         Q     Detective, do you recognize that document?

16         A     Yes.

17         Q     What is that?

18         A     This is the wanted poster that was generated for

19 Richard Diaz.

20         Q     And is that in color?

21         A     Yes, it is.

22         Q     Is that, if you can tell, an original or photocopy?

23         A     This is a photo copy.

24         Q     Does that fairly and accurately represent the wanted

25 poster as it was submitted by you to other, to the New York City

lr-a          Det C. Rodriguez - People - Direct

1   Police Department back on October 2012?

2        A    Yes.

3               MR. MENDYS:  At this point I would ask it be moved

4        into evidence as People's 2.

5               THE COURT:  Any objection?

6               MR. WILSON:  No objection.

7               MR. BONANNO:  None, Judge.

8               MR. WEINSTEIN:  No.

9               THE COURT:  In evidence, without objection,

10       People's 2.

11              (Whereupon, People's Exhibit 2 was received in

12       evidence.)

13              COURT OFFICER:  People's 2 in evidence so marked.

14       Q    Now Detective, I want to direct your attention to

15   November 22nd of 2012.  Did there come a point in time on that

16   day -- well, were you working that day?

17       A    Yes, I was.

18       Q    Do you recall what your tour was or what your

19   assignment was?

20       A    I could look at my records, but off the top of my head

21   I could say I was working the detail in Sandy in the Rockaways.

22       Q    Now, did there come a point in time that day when you

23   became, where you learned that Mr. Richard Diaz had been

24   apprehended?

25       A    Yes.

lr-a          Det C. Rodriguez - People - Direct

1      Q     And as you sit here now -- well, are you familiar with

2    the circumstances of how he was apprehended?

3      A     Yes.

4      Q     How was he apprehended?

5      A     He was actually arrested by PO Walters from the 34

6    Anticrime Unit.

7      Q     Was that based on the wanted poster or the I-card?

8      A     Yes, it was.

9      Q     There were no other charges that were filed against

10   him?

11     A     There was, he was also in possession -- Mr. Walters

12   informed me he was in possession of two pills.

13     Q     But he was not stopped for those pills?

14     A     No.

15     Q     He was stopped based on the wanted --

16     A     On the wanted card, yes.

17     Q     Now, did you -- what did you do when you became aware

18   he had been apprehended?

19     A     I was notified from my sergeant that Mr. Diaz was

20   arrested and I was post changed.

21     Q     So you were taken off the Sandy detail?

22     A     Yes.

23     Q     And you were instructed to deal with the arrest?

24     A     Yes.

25     Q     Now, do you recall about what time he was arrested?

lr-a          Det C. Rodriquez - People - Direct

1      A      I would have to look at my notes.

2      Q      Would the arrest report refresh your recollection?

3      A      Yes.

4             (Whereupon, the referred to item was handed to the

5      witness.)

6      A      He was arrested at 1:50 in the morning on November 22,

7      2012.

8             THE COURT:   I'm sorry?

9             THE WITNESS:   1:50 a.m.

10            THE COURT:   A.m., okay.

11     Q      Now, how was it that you, that you took custody of Mr.

12     Diaz?

13     A      I drove to the 34 Precinct, obtained custody of Mr.

14     Diaz and transported him back to the 108 Precinct in Queens to be

15     processed for an arrest.

16     Q      Why the 108?

17     A      My office is close to the 108 Precinct.

18     Q      So approximately can you estimate about what time it

19     was that you took him into custody?

20     A      If I could look at my activity log entries, I have the

21     exact times.

22     Q      Is that something you have --

23     A      Yes, I do.

24     Q      -- direct access to?

25            THE WITNESS:   I'm going to refer to my records, if

lr-a          Det C. Rodriguez - People - Direct

1     that's okay.

2                THE COURT:   Yes.

3     A     I was at the 34 Precinct at 0330 hours, that's in the

4     a.m.  I transported Mr. Diaz to the 108 Precinct at 3:38 and I

5     was at the 108 Precinct at 4 a.m. to process the arrest.

6     Q     And when you say process the arrest, what does that

7     entail?

8     A     Obtain his pedigree information.  If I have to voucher

9     anything I get, you know, get everything rolling with that as far

10    as safeguarding his property or, you know, submitting paperwork

11    to the desk.

12    Q     Okay.  Was anything, was anything recovered from his

13    person?

14    A     There was two pills that were given to me by Officer

15    Walters that I vouchered.

16    Q     And how were they -- where were they found on Mr. Diaz?

17    A     Again, I would have to look at my notes.

18    Q     Would the voucher do the job?

19    A     Yes.

20    Q     Would that refresh your recollection?

21    A     Yes.

22                (Whereupon, the referred to item was handed to the

23          witness.)

24    A     It says the above items were recovered from PO Walters,

25    34 Precinct, from defendant's right jean change pocket.  The

lr-a          Det C. Rodriguez - People - Direct


1    above items are being vouchered as arrest evidence.

2        Q      And you completed that voucher?

3        A      Yes.

4               MR. MENDYS:   Thank you.

5        Q      Now, when you brought Mr. Diaz back to the precinct --

6    well, when you took custody of him at the 34 Precinct, was he in

7    a cell?

8        A      Yes.

9        Q      Was he by himself, if you remember?

10       A      I don't recall.

11       Q      You took -- you say you brought him back to the 108 for

12   processing.   Where did you put him specifically in the 108?

13       A      In a cell.

14       Q      By himself?

15       A      Again, I don't recall if someone else was there or not.

16       Q      Okay.   Was he handcuffed in the cell or no?

17       A      Handcuffed in the cell, no.

18       Q      Now, at approximately 9:50 that morning, did you have

19   occasion to conduct a line-up involving Mr. Diaz?

20       A      Yes, I did.

21       Q      Prior to 9:50 in the morning was he in the cell that

22   entire time?

23       A      Unless he had to use the restroom, I don't --

24       Q      Did you have any discussions with him prior to the

25   line-up?

lr-a          Det C. Rodriguez - People - Direct

1     A     No, I did not.

2     Q     He had not been interviewed or spoken to up to that

3     point?

4     A     No, I did not interview him.

5     Q     I'm sorry?

6     A     I did not interview him.

7     Q     So at 9:50 in the morning you conducted a line-up.

8     What is a line-up, for the record?

9     A     A line-up is also an identification procedure where Mr.

10    Diaz was placed in with five additional fillers.  They go into a

11    room which has a one-way mirror, you can't see outside the room

12    on the opposite side.  The victim will stand there and when she's

13    able to see through that one way mirror and see if she can

14    identify anybody anyone in that room.

15    Q     Now did -- where was that line-up conducted?

16    A     108 Precinct.

17    Q     And who did you want to view the line-up?

18    A     Argelia Rosario.

19    Q     Argelia Rosario?

20    A     Argelia Rosario.

21    Q     And did you have occasion to speak with her?

22    A     Yes.

23    Q     And did she inform you that she was present during the

24    course of the robbery?

25    A     Yes.

1      Q     And she, like Miss Rodriguez, was patted down and

2    frisked during the course of the robbery?

3      A     She was stopped based on her statements, yes.

4      Q     Now how did you get in touch with Miss Rosario?

5      A     I also showed up at her residence.

6      Q     And did she speak English or Spanish?

7      A     She speaks both.

8      Q     Do you recall what language you spoke to her in?

9      A     It was both, English and Spanish.

10     Q     Okay.  Now did you tell -- you obviously told her you

11   wanted to take her to the 108 Precinct.

12     A     Yes.

13     Q     What did you tell, what explanation, what reasoning did

14   you give her for going to the 108?

15     A     I informed her she needed to come with me to view a

16   line-up.

17     Q     Did you inform her that anyone was in custody?

18     A     No, I just said she needed to view a line-up.

19     Q     And when you -- so you brought her to the 108.  Where

20   did you take her within the 108 Precinct when you arrived?

21     A     I put her in a room by herself.

22     Q     Now, what did you do while she was in the waiting room?

23     A     We prepared the line-up room.

24     Q     Did you have other people for the line-up at that point

25   in time?

lr-a          Det C. Rodriguez - People - Direct

1    A      I don't recall that time if my sergeant gathered most

2    of the people for the line-up and then we prepared the room.  We

3    had people --

4    Q      Where did the other people in the line-up, where did

5    they come from?

6    A      They were other officers as well.

7    Q      So they were other employees of the police department?

8    A      Yes.

9    Q      Now, would Miss Rosario, from where she was sitting,

10   have an opportunity to view either Mr. Diaz or any of the fillers

11   prior to her going to view the line-up?

12   A      No.

13   Q      Where was Mr. Diaz while she was in the waiting room?

14   A      I believe in the cell area and then he was brought over

15   to the line-up room.

16   Q      And both of those areas are not viewable from the

17   waiting room where Miss Rosario --

18   A      Where she was, no.

19   Q      So once you had fillers and Miss Rosario was in the

20   waiting room, how do you go about choosing positions and creating

21   the line-up?

22   A      I ask Mr. Diaz what position he would like to sit in,

23   picking a number one through six.

24   Q      And what position did he chose?

25   A      If I could look at the photo array, I could tell you

lr-a          Det C. Rodriguez - People - Direct

1    exactly.

2                    (Whereupon, the referred to item was handed to the

3          witness.)

4                    THE WITNESS:  Mr. Diaz selected position number

5          three.

6    Q      And the other fillers, are they situated in any way in

7    particular or just told to fill in the gaps?

8    A      They sit down and they're seated.

9                    THE COURT:  Did you have any part in selecting the

10          positions of the other fillers?

11                    THE WITNESS:  Again, I don't recall if I moved

12          people around that day, but if I looked at the line-up and

13          it looked fair to me, so I might have just, you know, kept

14          it the way it was.

15    Q      Now these fillers, the officers, how were they

16    selected?

17    A      They were obviously called by my sergeant, and then I

18    looked to see if they had similarities to Mr. Diaz and then we

19    used them.

20    Q      Similarities such as?

21    A      Facial features, skin color, skin tone.

22    Q      Now when the line-up is created, ultimately viewed, are

23    the people in the line-up, are they sitting or standing?

24    A      They're sitting.

25    Q      Why is that?

lr-a          Det C. Rodriguez - People - Direct

1      A     To make everyone the same level, the same height.

2      Q     And what about are they recovered in any way?

3      A     Yeah.  I actually used a torn, ripped plastic bag,

4    garbage bag, and went across.

5      Q     Why did you do that?

6      A     Because I want the victim to just focus on, you know,

7    their face, nothing else.

8      Q     So once the array or the line-up is created, did you go

9    get Miss Rosario?

10     A     Yes.

11     Q     And was she brought to the viewing room?

12     A     Yes.

13     Q     Now can you describe, I guess, how the viewing area,

14   what the setup is for the viewing area versus the line-up room,

15   and how the line-up is actually viewed?

16     A     Again, the viewing area is a dark room that you enter

17   with a one-way mirror that can only see outside of.  And then the

18   door shuts behind her and I'll begin to ask her, you know, three

19   questions.

20     Q     Now, what instructions did you provide her upon going

21   into the viewing room?

22     A     I informed her also I want to ask you three questions:

23   Do you recognize anybody; if you do, what number do you

24   recognize; and from where do you recognize that person.

25     Q     Did you, when she viewed the line-up did you suggest

lr-a             Det C. Rodriguez - People - Direct

1    anyone to her?

2        A    No, I did not.

3        Q    Did you direct her to anyone in particular?

4        A    No, I did not.

5        Q    Did she make ultimately make an identification when she

6    viewed the line-up?

7        A    Yes.

8        Q    What position did she pick out?

9        A    The person in position number three.

10       Q    That was?

11       A    Richard Diaz.

12       Q    Now who else -- was anyone else present for the line-up

13   besides you and Miss Rosario?

14       A    My sergeant was present.

15       Q    DeCandido?

16       A    Yes.

17       Q    All right.  And where did Miss Rosario recognize Mr.

18   Diaz from?

19       A    From the robbery.

20       Q    From October 17, 2012?

21       A    Yes.

22       Q    And did you, did you have her sign anything in relation

23   to viewing the line-up?

24       A    Yes.

25       Q    And did she -- did you sign that as well?

lr-a        Det C. Rodriguez - People - Direct


1      A      I would have to look at the document.

2                    (Whereupon, the referred to item was handed to the

3          witness.)

4                    THE WITNESS:  Yes, I did.

5      Q      Okay.  And did she --

6                    MR. WEINSTEIN:  May we --

7                    THE COURT:  You haven't seen this before?

8                    MR. WEINSTEIN:  No, the interpreter was --

9                    THE INTERPRETER:  Your Honor, I just went to get

10         something.

11                   THE COURT:  That's okay.  Go ahead.

12     Q      Did you have her document or write down where she

13     recognized --

14     A      Yes.

15     Q      -- Mr. Diaz from?

16     A      Yes.

17     Q      Did she do that in English or in Spanish?

18     A      In Spanish.

19     Q      Did, or were photographs taken of the line-up?

20     A      Yes, they were.

21     Q      Were those photos taken before or after Miss Rosario

22     viewed the line-up?

23     A      Before.

24                   MR. MENDYS:  At this time I'm going to ask these

25         be marked for identification People's 3 and 4, after they're

1r-a          Det C. Rodriguez - People - Direct

1        shown those defense counsel.

2                    (Whereupon, the referred to items were handed to

3        defense counsel.)

4                    (Whereupon, People's Exhibits 3 & 4 were marked

5        for identification.)

6                    COURT OFFICER:   People's 3 and 4 marked for

7        identification, being shown to the witness.

8                    MR. MENDYS:   Thank you.

9                    (Whereupon, the referred to items were handed to

10        the witness.)

11        Q     Detective, do you recognize those two documents?

12        A     Yes.

13        Q     What are they?

14        A     These are photos of the line-up that was conducted on

15   November 22.

16        Q     Are those color photos?

17        A     Yes.

18        Q     And are they -- well, do they fairly and accurately

19   reflect how the line-up appeared when Miss Rosario viewed it?

20        A     Yes.

21                    MR. MENDYS:   At this point I ask they be moved

22        into evidence as People's 3 and 4.

23                    THE COURT:   Any objection or voir dire as to these

24        photos?

25                    MR. WILSON:   No objection.

lr-a          Det C. Rodriguez - People - Direct

1                    MR. BONANNO:  No.

2                    MR. WEINSTEIN:  No.

3                    THE COURT:  In evidence without objection.

4                    (Whereupon, People's Exhibits 3 & 4 were received

5          in evidence.)

6                    COURT OFFICER:  People's 3 and 4 now marked in

7          evidence.

8          Q     Now, one thing I meant to ask you about People's 1 in

9     evidence, the photo array, if I can just show it to you.

10                   (Whereupon, the referred to item was handed to the

11         witness.)

12         Q     Did you write anything or cover anything on the photos

13    that appear within the array?

14                   THE COURT:  I'm sorry, write or cover is two

15         questions.

16         Q     Did you, did you alter the photos in any way prior to

17    Miss Rodriguez viewing it?

18         A     Yes, I did.

19         Q     How so?

20                   THE COURT:  Well, wait, this is in evidence.  Of

21         what he did prior to putting the photo array together?

22                   MR. MENDYS:  This question -- the array is in

23         evidence.

24                   THE COURT:  Yes, I know, but now you're asking

25         questions about what he did before he prepared --

lr-a          Det C. Rodriguez - People - Direct


1              MR. MENDYS:  In creating the array, the question I

2         forgot to ask.

3              THE COURT:  You altered the photographs?

4              THE WITNESS:  Yes.

5              THE COURT:  How did you alter the photographs?

6              THE WITNESS:  Mr. Diaz, in his photo manager

7         photo, was wearing earrings.  So in order to make it, you

8         know, fair and accurate, I penned in each of each person's

9         ears to make it appear that everyone had the same black mark

10        so Mr. Diaz wouldn't stick out so it could be fair when it

11        was shown.

12        Q    That was done on Mr. Diaz as well as all fillers within

13   the array?

14        A    Yes.

15             THE COURT:  Wait.  In the array, because -- just

16        let me take a look at it because I -- hold on.

17             So you put black marks, these dark black circles

18        you put on each of those pictures of the other people?

19             THE WITNESS:  Yes.

20             THE COURT:  And Mr. Diaz has earrings in his?

21             THE WITNESS:  Yes.

22        Q    And you covered in the ears of Mr. Diaz and --

23             THE COURT:  Wait, he didn't say he covered the

24         earrings.

25        Q    He covered the earlobes.

1r-a          Det C. Rodriguez - People - Direct


1     A     The bottom part where the earrings were I covered with

2     the black pen on each of the photos, including Mr. Diaz.

3                    THE COURT:  Mr. Diaz' earrings are not visible?

4                    THE WITNESS:  You can't see it, no.

5                    (Whereupon, the referred to item was handed to the

6         Court.)

7                    THE COURT:  You put black marks -- oh, I see them

8         now.  Okay.

9     Q     And the reason you did that was?  I'm sorry, just to

10    elaborate for the record the scene --

11                   THE COURT:  Why did you do it?

12                   THE WITNESS:  To make it fair.  If Mr. Diaz was

13        the only one wearing earrings, it would maybe draw attention

14        to him, so I made everyone have the same black dots on their

15        ears so it would be unison.

16                   THE COURT:  Was the description that the

17        perpetrator had been wearing earrings at the time?

18                   THE WITNESS:  I don't recall.

19                   THE COURT:  Next question.

20                   MR. MENDYS:  Okay.  Perhaps it will be helpful,

21        I'm gonna ask that this be marked People's 5 for

22        identification, after it's shown to the attorneys.

23                   (Whereupon, the referred to item was handed to

24        defense counsel.)

25                   (Whereupon, People's Exhibit 5 was marked for

lr-a          Det C. Rodriguez - People - Direct

1          identification.)

2                    COURT OFFICER:  People's 5 is now marked for

3          identification, being shown to the witness.

4                    (Whereupon, the referred to item was handed to the

5          witness.)

6     Q     Detective, do you recognize that document?

7     A     Yes.

8     Q     What is that?

9     A     This is the printout of the names of the other five

10    fillers along with Mr. Diaz.  It provides their date of birth and

11    their NYSID numbers.

12    Q     And that also contained photos of those

13    identifications?

14    A     Yes, it does.

15    Q     Are those photos the same photos that appear in the

16    array?

17    A     Yes.

18    Q     And are they in the same, are they setup in the same

19    way, same positions?

20    A     Yes.

21    Q     And are those photos, do those photos also include the

22    black dots that you made?

23    A     No, this one doesn't.

24    Q     So those are the original photos?

25    A     Yes, how they --

lr-a          Det C. Rodriguez - People - Direct


1       Q     Does that fairly and accurately reflect how the picture

2     appears prior to you making the dots?

3       A     Yes.

4             MR. MENDYS:  I would move this in evidence as

5         People's 5.

6             THE COURT:  It's been shown to all the attorneys?

7             COURT OFFICER:  Yes.

8             THE COURT:  Any objections?

9             MR. WILSON:  No.

10            MR. BONANNO:  None.

11            MR. WEINSTEIN:  No.

12            THE COURT:  In evidence as People's 5.

13            (Whereupon, People's Exhibit 5 was received in

14        evidence.)

15            COURT OFFICER:  People's 5 previously marked for

16        identification is now marked in evidence.

17      Q     Now, People's 1 with the dots, that was the array that

18    was shown to Miss Rosario -- Rodriguez?

19      A     To Miss Rodriguez, yes.

20      Q     Now after, after the array or the line-up was conducted

21    back -- moving ahead again back to November 22, 2012, did you

22    make any attempts to speak to him?

23      A     Did I make any attempt to speak to who?

24      Q     Mr. Diaz?

25            THE COURT:  After the array was conducted?

lr-a          Det C. Rodriguez - People - Direct

1       Q     After the line-up was conducted?

2             THE COURT:  After the line-up, I'm sorry.

3       A     My partner, Detective Bell, spoke to Mr. Diaz.

4       Q     You were not involved in that?

5       A     No, she interviewed him.

6       Q     Where was Mr. Diaz taken after the line-up was

7    conducted?

8       A     So he stayed there.  Where he was interviewed is where

9    the line-up was conducted, so he stayed in that room.  After I

10   brought the complainant to write up the complaint, he was

11   interviewed by Sergeant DeCandido and my partner, Detective Bell,

12   at the 108 Precinct interview room.

13            MR. MENDYS:  Just one moment, Judge.

14            THE COURT:  Yes.

15            MR. MENDYS:  No further questions.

16            THE COURT:  Okay.

17            (Continued on the next page...)

18

19

20

21

22

23

24

25

(mmB)     Det. Rodriguez/People/Cross (Wilson)     41

1                     MR. WILSON:  Judge, my client would like a five

2          minute break.

3                     THE COURT:  Yes, take five minutes.

4                     (Recess.)

5                     THE COURT:  All right, are we ready to proceed with

6          cross-examination?

7                     MR. WILSON:  Yes.

8                     MR. WEINSTEIN:  Yes, sir.

9                     THE COURT:  Mr. Wilson, do you have any questions

10         of this witness?

11                    MR. WILSON:  Yes, I do, Judge.

12                    THE COURT:  Okay.

13    CROSS-EXAMINATION

14    BY MR. WILSON:

15         Q.    Good afternoon, Detective.

16         A.    Good afternoon.

17         Q.    Detective, you testified in the Grand Jury in this

18    case, is that correct?

19         A.    Yes, I did.

20         Q.    Do you know on how many occasions?

21         A.    On this case?  I believe twice.

22         Q.    And did you testify in any other proceeding in

23    connection with this case?

24         A.    I don't recall.  I don't think so, no.

25         Q.    You're not sure?

(mmB)     Det. Rodriguez/People/Cross (Wilson)     42

1       A.   I'm not sure, no.

2       Q.   Is there any other proceeding you might have testified

3   to with regard to this case?

4       A.   I testified in the Grand Jury, and that was, from my

5   recollection, that's all I can recall.

6       Q.   Did you yourself make any tape recorded statements

7   concerning this case?

8       A.   Tape recorded statements?

9       Q.   Yes.

10      A.   No, I did not.

11      Q.   Did you take tape recorded interviews from any of the

12   witnesses in this case?

13      A.   No, I did not.

14      Q.   Do you recall what paper work you filled out in

15   connection with the case?

16      A.   Numerous amounts of paper work.

17      Q.   Can you go through it for me?

18      A.   On-line booking sheets; UF-61s, complaint reports;

19   pedigree sheets; lineup paper work; any notes I took.

20      Q.   You took notes?

21      A.   Yes.

22      Q.   Is that in a spiral notebook?

23      A.   Yes.

24      Q.   And you turned that over to the Assistant District

25   Attorney --

(mnB)     Det. Rodriguez/People/Cross (Wilson)     43

1     A.   Yes.

2     Q.   -- I assume?

3          And you filled out DD-5's in connection with this case?

4     A.   Yes, I did.

5     Q.   How long -- do you know how many DD-5's you filled out?

6     A.   No, I don't.

7     Q.   Now, did you number your DD-5's in this case?

8     A.   I can look on my records and see if they are --

9     Q.   I apologize, I'm having trouble hearing you.

10    A.   I can look on my records and see if they are numbered.

11    Q.   Please do.

12               (Witness perusing.)

13               MR. MENDYS:  Judge, I'm going to object.  I think

14    I've given Mr. Wilson some leeway.  This really isn't part

15    of the hearing.

16               THE COURT:  You know something?  Attorneys like to

17    satisfy themselves that they have received all of those

18    Rosario materials.  I understand that's your position you

19    turned over everything, but I'm still going to allow the

20    attorney to do what every attorney does in every one of the

21    hearings, to ask the officer what he wrote and whether he

22    numbered them and things like that.  So the objection is

23    overruled.

24    A.   The DD-Fives aren't numbered.

25               THE COURT:  So you didn't number them?

(mmB)      Det. Rodriguez/People/Cross (Wilson)     44

1                         THE WITNESS:  No, I did not.

2                         THE COURT:  Okay.

3          Q.    Do you know how many DD-Fives there were?

4                         THE COURT:  That he created?

5          Q.    That you created, yes?

6          A.    I can count them.

7          Q.    If you wouldn't mind.

8          A.    17.

9          Q.    And did you secure a written consent from

10    Mr. Melenciano to search a telephone of his?

11         A.    Yes.

12         Q.    And do you recall at what time you did that?

13         A.    I don't recall the time.  I can look at my notes again.

14         Q.    If you have something that would refresh your

15    recollection, please.

16                         MR. WILSON:  With the Court's permission?

17                         THE COURT:  Yes.

18                         (Witness perusing.)

19         A.    17:30 hours.

20         Q.    And do you recall where that took place?

21         A.    Inside Central Booking.

22         Q.    And did you take Mr. Melenciano to Central Booking, if

23    you recall?

24         A.    No, I did not.

25         Q.    Do you know what time he went to Central Booking?

1      A.   No, I do not.

2      Q.   When you spoke to Melenciano in Central Booking

3   regarding that phone, did you have anybody with you?

4      A.   Yes, I had my sergeant, Sgt. Michael DeCandido.

5      Q.   And to the best of your recollection, at that time what

6   did you say to Mr. Melenciano and what did Mr. Melenciano say to

7   you?

8                   THE COURT:   In terms of?

9      Q.   The telephone.

10      A.   He just allowed me to go through his phone, gave

11   permission.  I don't recall the exact details of the conversation

12   we had.

13      Q.   I may be assuming something that's not correct, but I

14   assume you said something to him before he gave his consent?

15      A.   Yeah, I don't recall what I had asked him.

16      Q.   Did you prepare the writing that he signed or did he

17   prepare it?

18      A.   He wrote it.

19      Q.   And did you tell him what to write or did he just make

20   something up?

21      A.   He wrote down what he said giving me permission.

22      Q.   So you didn't instruct him on anything to write down?

23      A.   I just told him if you're going to give me permission,

24   you have to write down that you're giving me permission.

25      Q.   And did you speak to him in English or Spanish?

(mmB)      Det. Rodriguez/People/Cross (Wilson)      46

1       A.   In Spanish.  He spoke both.

2       Q.   I'm sorry?

3       A.   He spoke both.  I spoke to him in Spanish.  He

4    responded sometimes in English and sometimes in Spanish he spoke.

5       Q.   Did you receive that consent and seize that telephone?

6       A.   Yes.

7            THE COURT:  Did you take the telephone from him or

8       was it already vouchered?

9            THE WITNESS:  I, I don't recall.  I don't recall.

10      Q.   Did you ever search the telephone?

11      A.   Again, I don't, I don't recall.

12      Q.   Do you have any documents or anything that would

13   refresh your recollection concerning that?

14      A.   Other than --

15           THE COURT:  About whether he searched the phone?

16           THE WITNESS:  About whether he searched the

17      telephone, yes.

18      A.   Not off the top of my head.  I don't recall.  I don't

19   have any document that would say that.

20      Q.   Now at the time you spoke to Mr. Melenciano, were you

21   aware of how long he had been in custody?

22      A.   I know he wasn't arraigned yet.

23      Q.   Now did you remove him from Central Booking to talk to

24   him or you talked to him in a cell with all the other people?

25      A.   No, he was in a separate cell.

(mmB)      Det. Rodriguez/People/Cross (Wilson)      47

1      Q.   Did you remove him to that cell or he was by himself

2   when you got there?

3      A.   I think he was, I don't recall exactly, but I believe

4   he was brought to that cell by himself.

5      Q.   And do you know if Mr. Melenciano had anything to eat

6   at that point in time since his arrest?

7      A.   I'm sorry, could you just repeat the question.

8      Q.   Do you know if at that point in time Mr. Melenciano had

9   had anything to eat since his arrest?

10      A.   I don't know.  I know when you go into Central Booking,

11   first thing they do is give you sandwiches, a milk or juice,

12   whatever is there.

13      Q.   But you don't know if he had anything to eat?

14      A.   I'm unaware of that.

15              THE COURT:  But you're offered food, everyone who

16       goes to Central Booking is offered food?

17              THE WITNESS:  When I've lodged prisoners in the

18       past, they've had food and something to drink when they're

19       in there.

20      Q.   But while you were doing your investigation, you didn't

21   offer him anything to eat?

22      A.   No.

23      Q.   Now, did you have occasion to speak to any of the

24   officers who were in the van who allegedly arrested

25   Mr. Melenciano?

1      A.   Again, I don't recall speaking to any of the arresting

2   officers.

3      Q.   Do you recall whether or not you had an opportunity to

4   speak to any of the alleged four witnesses who were present at

5   this incident?

6      A.   I did speak to the witnesses.

7           THE COURT:  I'm sorry, you did?

8           THE WITNESS:   I did speak to the witnesses.

9      Q.   Did you have occasion to speak to Yohn Contreras?

10     A.   Yes.

11     Q.   Did Yohn Contreras tell you anything about the

12   incident?

13          MR. MENDYS:  I object.  I specifically didn't go

14      into the probable cause --

15          THE COURT:  Detective, can you step down for a

16      minute.

17          (Witness exits courtroom.)

18          THE COURT:  All right, the basis for your

19      objection is what?

20          MR. MENDYS:  Basis of my objection is I

21      specifically did not go into specifically the interview with

22      Mr. Contreras, the witness that Mr. Wilson is referring to,

23      because I'm not establishing probable cause through this

24      witness, so I didn't direct on it.  I think it's beyond the

25      scope of my direct.

1            THE COURT:  Actually it's not beyond the scope

2       because while you may not have gone into a specific witness,

3       he did say that he spoke with people and learned what had

4       transpired about a police impersonation robbery at Walton

5       Avenue, that there were three suspects involved, and you did

6       bring something out about it.  So, the specifics about

7       Mr. Contreras I don't know what he said, but what is the

8       specific objection to bringing out what he learned and who

9       he learned it from?

10           MR. MENDYS:  My specific objection is it's beyond

11      the scope of my direct.

12           THE COURT:  Well, if that's the objection --

13           Go ahead, Mr. Wilson.

14           MR. WILSON:  Well, I would say, Judge, there is a

15      Dunaway aspect to this and I think I'm allowed to test any

16      witness that is called that has information relating to

17      probable cause.

18           THE COURT:  But the question is at the moment he's

19      in a cell in a precinct and has already been lodged there,

20      you're saying that there was no probable cause prior to this

21      particular witness talking to this officer?

22           See, this is what the relevance I'm trying, I mean

23      are you saying he's not under arrest yet when he's in the

24      precinct?

25           MR. WILSON:  No.

1                THE COURT:  So what does it matter whether someone

2        told him after the fact, after he's there in his cell in

3        custody?

4                MR. WILSON:  Well, for instance Judge, using a

5        hypothetical situation, if the witness Yohn Contreras had

6        told the arresting officer you know, that guy just took

7        money from me and then tells this officer oh, no, that the

8        guy didn't take money from me, I never said it, it's

9        certainly relevant to whether probable cause actually

10       exited.

11               THE COURT:  It's not relevant because people can

12       lie to the police.  And the question of probable cause, what

13       was known to the police at the time of the arrest, gave them

14       a reason to take someone in custody.  The other part is a

15       trial issue.

16               MR. WILSON:  Or vice-versa, Judge, the witness

17       could have told the arresting officer that guy didn't do

18       anything then told this officer that he did.

19               THE COURT:  But do you have a, you probably have a

20       statement from Mr. Contreras here that you want to question

21       this officer about.  So I'm asking you for an offer of proof

22       how it would relate to the legal determination that I'm

23       going to have to make which, I'm presuming, will involve

24       whether when someone face to face told the police officer

25       something happened and that person was taken by van and put

(mmB)     Det. Rodriguez/People/Cross (Wilson)    51

1      into a cell in a precinct, whether that first officer had

2      probable cause --

3                  MR. WILSON:  Well, we haven't heard anything yet,

4      Judge --

5                  THE COURT:  That's the point.

6                  MR. WILSON:  -- about what the witness has said.

7                  THE COURT:  What I'm saying to you from this

8      witness, he didn't talk to any of the arresting officers.

9      That's what he said.  Okay?  He spoke to witnesses at the

10     precinct.  But at that point if he is already in custody,

11     it's already too late.  Suppose the flip side was they only

12     learn what happens after he is in custody.

13                  MR. WILSON:  Even assuming that the witness gave

14     inconsistent versions of what took place, that's certainly

15     relevant for the Court to consider when it's determining the

16     issue of cause later on.

17                  THE COURT:  Why?  What case says that?  If a guy's

18     already in custody --

19                  MR. WILSON:  Right.

20                  THE COURT:  -- and a witness changes his story

21     later on, and he's already in custody, what are you seeking

22     to suppress here?  I mean --

23                  MR. WILSON:  The identifications.

24                  THE COURT:  The identification and when was the

25     identification made?

(mmB)      Det. Rodriguez/People/Cross (Wilson)     52

1              MR. WILSON:  I believe they were made at the

2      scene.  We have yet to hear that.

3              THE COURT:  This is all after the fact.

4              MR. WILSON:  But the witness has said things to

5      the police officers at the scene regarding the, the alleged

6      suspects.

7              THE COURT:  If they made an i.d. at the scene,

8      that's done, if they changed their minds later on, I don't

9      see how that's relevant to the probable cause, number one.

10             MR. WILSON:  It's relevant to your Honor making a

11     determination about their credibility in terms of probable

12     cause.

13             THE COURT:  Whose credibility?

14             MR. WILSON:  If they made inconsistent statements.

15             THE COURT:  I'm going to be determining

16     credibility?  In what universe does a judge -- these are

17     citizen informants who come forth.  If the person changes

18     their mind, I'm not going to see them, they're not subject

19     to cross-examination, what am I going to say, which --

20             MR. WILSON:  At some point you might based on the

21     inconsistencies, by saying I'm no longer granting you a

22     bifurcated hearing, Mr. Mendys, I need to hear from these

23     witnesses.  I mean the basis of probable cause is what the

24     police were told by the witnesses, Judge.

25             THE COURT:  Correct, but prior to the arrest,

(mmB)    Det. Rodriguez/People/Cross (Wilson)    53

1    So how long do we go, let's say they came into the

2    DA's office and recanted, let's say they recant in front of

3    the Grand Jury, how far do you go at a probable cause

4    hearing?

5    MR. WILSON:  Who are at the same precinct while

6    the arrest is being processed the same day.

7    THE COURT:  I'm not granting it because it's

8    beyond the scope of the direct-examination, I'm granting it

9    because at this point you haven't articulated a reason to me

10    other than your desire to get some sort of discovery to

11    maybe perhaps impeach someone later on at a trial when the

12    jury would be determining their credibility.  I don't see

13    how this is going to relate to the fact that they've already

14    made an arrest, that there was already an identification.

15    Is that correct, Mr. Mendys?

16    MR. MENDYS:  Yes.

17    THE COURT:  It was a showup identification?

18    MR. MENDYS:  Point-out showup, yes, on scene.

19    THE COURT:  Whatever it is, I don't know what

20    happened.  But there was a robbery, the police moved in, the

21    witnesses were there and there was some sort of

22    identification.

23    And is this person, Mr. Contreras an identifying

24    witness?

25    MR. MENDYS:  Yes.

1            THE COURT:  So whatever he told the police then,

2      is what gave them the ability to bring them into the

3      precinct.  There is no other evidence after the showup that

4      you are seeking to suppress, because I'm hearing something

5      about a phone that I don't know anything about here.

6            MR. WILSON:  There was a lot of physical evidence

7      that was seized from my client by --

8            THE COURT:  Was it seized by this detective?

9            MR. WILSON:  That's what I'm trying to find out,

10     Judge, I've already got the phone, I gather there were other

11     things.

12           THE COURT:  What other items were seized?

13           MR. WILSON:  From client's car, numerous things

14     inside the car, a baseball bat, there were a variety of

15     things in the car.

16           THE COURT:  They were seized by this detective or

17     someone else?

18           MR. WILSON:  I think so.  I'm trying to find out.

19           THE COURT:  You don't have the vouchers?

20           MR. WILSON:  I do but --

21           THE COURT:  Did he voucher the car?

22           MR. MENDYS:    I thought I read something about

23     him going back to the car, Judge.

24           THE COURT:  Well, one of the things you're seeking

25     to suppress are the results of the search, if it occurred,

1     of the memory of the cell phone, whatever's in the cell

2     phone.

3               MR. WILSON:  Whatever was in it, although it

4     doesn't sound like they did anything --

5               THE COURT:  Did you move to suppress it?

6               MR. WILSON:  Judge, I was not the attorney, the

7     Mapp motion seemed rather vague in terms of what it actually

8     was moving to suppress, and it was granted so --

9               THE COURT:  Okay.

10              MR. MENDYS:  Judge, just for the record, a lot of

11    this is vouchered for safekeeping.  If Mr. Wilson wants to

12    question him about it, fine.

13              THE COURT:  What evidence are you seeking to

14    produce at trial through this defendant?

15              MR. MENDYS:  The car.

16              THE COURT:  I'm sorry?

17              MR. MENDYS:  The car.

18              THE COURT:  But the car was vouchered,

19    photographed, and that was post-arrest, a baseball bat is

20    not something relevant to this --

21              MR. MENDYS:  That was vouchered as safekeeping, in

22    other words a bat, like beach chairs, you know, stuff that

23    you find in a car.

24              THE COURT:  So I really want to get to the crux of

25    what would be subject to suppression, which would be

(mmB)        Det. Rodriguez/People/Cross (Wilson)      56

1    physical evidence, which the People are speaking to

2    introduce on their direct case recovered from this defendant

3            MR. WILSON:  A bat.  If the People are only

4    seeking, if all they're seeking to introduce is the car,

5    I'll confine my questions, Judge.

6            THE COURT:  Is that it?

7            MR. MENDYS:  Yes, as to this defendant.

8            THE COURT:  Yes, as to this defendant?  He's only

9    crossing about his client.

10           MR. MENDYS:  Yes, as to this defendant, just the

11   car.

12           THE COURT:  Just the evidence of a particular car.

13   Okay.

14           MR. MENDYS:  No telephone.

15           THE COURT:  No telephone, no record or any kind of

16   search of memory of the telephone or anything like that?

17           MR. MENDYS:  No.

18           THE COURT:  And after the investigation has

19   ceased, the phone is still in custody?

20           MR. MENDYS:  I believe, well one particular phone.

21           THE COURT:  Which phone was recovered from this

22   defendant?

23           MR. MENDYS:  It's -- yes.

24           THE COLOUR:  No one subpoeaned records for

25   anything from this phone?

(mmB)     Det. Rodriguez/People/Cross (Wilson)     57

1              MR. MENDYS:  No.

2              THE COURT:  Okay, so what the witness has told

3     this detective after he's in custody are irrelevant.  The

4     People are conceding they're in custody in the precinct,

5     these individuals.  Is that going be an issue?

6              MR. MENDYS:  No.

7              THE COURT:  They're identified in the street,

8     brought in the police car, I'm assuming handcuffed on the

9     way if not at the scene, and put in a cell, and he's in

10    Central Booking so he's pretty much in custody under any

11    analysis, so the relevance of what the witnesses then told

12    this detective is just not of concern to this Court for my

13    legal analysis.  It's going to be an impeachment at trial

14    and you will just confine the testimony to what was seized

15    and when.

16             MR. WILSON:  Please note my exception as to your

17    Honor's rulings regarding cross-examination regarding

18    statements by civilian witnesses.

19             I gather your ruling would be the same if I were

20    to ask the officer about the other three witnesses?

21             THE COURT:  Unless there is some relevance you can

22    demonstrate to me.

23             You have the statements, right?

24             MR. WILSON:  Yes.

25             THE COURT:  You have what they say.

1                    Okay, let's recall the detective.

2                    (Witness resumes.)

3                    THE COURT:  Okay, you may continue.

4    BY MR. WILSON:

5        Q.   Detective, did you have occasion to voucher or

6    participate in vouchering a car belonging to Mr. Melenciano?

7        A.   Not that I recall.

8        Q.   Now, did you conduct any identification proceeding with

9    regard to Mr. Melenciano?

10       A.   Identification procedure?  No.

11                   MR. MENDYS:  Mr. Melenciano.

12       Q.   I'm sorry, Mr. Melenciano?

13       A.   No.

14       Q.   You never showed his photo to anybody?

15       A.   Not that I recall, no.

16       Q.   And you never conducted a lineup with regard to

17   Mr. Melenciano?

18       A.   No, I did not.

19       Q.   Were you ever present when anybody else conducted any

20   identification procedure with regard to Mr. Melenciano?

21       A.   No, I was not.

22       Q.   Were you ever present when anybody showed any witnesses

23   in this case, to your knowledge, any photographs concerning

24   Mr. Melenciano?

25       A.   No.

(mnB)      Det. Rodriguez/Cross (Weinstein/Bonanno) 59

1                   MR. WILSON:  I think that's all I have, Judge.

2          Thank you.

3                   THE COURT:  All right, thank you.

4                   Mr. Weinstein.

5    CROSS-EXAMINATION

6    BY MR. WEINSTEIN:

7          A.   Detective, did you have any interaction what

8    Mr. Santana at all?

9          A.   No.

10         Q.   So that you took nothing from him, nothing?

11         A.   I had no interaction with Mr. Santana.

12                  THE COURT:  Mr. Bonanno.

13                  MR. BONANNO:  Briefly.

14   CROSS-EXAMINATION

15   BY MR. BONANNO:

16         Q.   Detective, there came a time when you had a

17   conversation with Jose Melenciano regarding this alleged robbery,

18   is that correct?

19         A.   Yes, sir.

20         Q.   Isn't it true that Jose Melenciano gave you the name

21   Villajunna?

22         A.   Yes.

23         Q.   What did you do with that information?

24         A.   My sergeant called my lieutenant who was currently in

25   the office and my lieutenant did some, made some phone calls and

(mnB)        Det. Rodriguez/Peo/Cross(Bonanno)        60

1  he was able to provide my sergeant a photo of Mr. Diaz, which he

2  either texted or emailed to my sergeant, which was shown to

3  Mr. Melenciano who positively i.d.'d Mr. Diaz as a third

4  outstanding subject.

5        Q.   So you showed Mr. Melenciano a photo of Mr. Diaz?

6        A.   Yes, on my sergeant's phone.

7        Q.   You didn't put that into a photo array, is that

8  correct?

9        A.   No.

10        Q.   So is it correct to assume without Mr. Melenciano's

11  information, you would have never known who Richard Diaz was?

12                    MR. MENDYS:   Objection.   Calls for speculation.

13                    THE COURT:   No, it's overruled.

14                    At that point, would you have known?

15                    THE WITNESS:   No, I would not have.   No.

16        Q.   So it's correct to say that while Esmeraldy Rodriguez

17  has not at that point independently verified that Richard Diaz

18  was at the scene?

19        A.   I'm sorry, can you ask the question again.

20        Q.   Is it correct to assume at this point in your

21  investigation Ms. Rodriguez could not have independently verified

22  that Mr. Diaz was at the scene of this robbery?

23                    MR. MENDYS:   Objection.

24                    THE COURT:   To the form of the question, yes.

25                    MR. BONANNO:   I withdraw that.

(mnB)          Det. Rodriguez/Peo/Cross(Bonanno)          61

1        Q.   At this time in your investigation --

2                  THE COURT:  Wait.  When he showed the photo of

3        Mr. Diaz to Mr. Melenciano, is that correct?

4                  THE WITNESS:   Correct.

5                  THE COURT:  Go ahead.

6        Q.   Could Miss Rodriguez have i.d. independently Mr. Diaz?

7                  MR. MENDYS:  Objection.

8                  THE COURT:  Sustained.

9        Q.   You ultimately had a conversation with Miss Rodriguez,

10   is that correct?

11       A.   Yes.

12       Q.   Was she the complaining witness in this matter?

13       A.   She was one of the complainants.  There was four

14   complainants.

15       Q.   Did she have property taken from her?

16       A.   No, she did not.

17       Q.   What was her role in this alleged incident?

18       A.   She was stopped by Mr. Diaz.

19       Q.   Was anything taken from her?

20       A.   I said no.

21       Q.   Was she stopped by Mr. Diaz specifically?

22       A.   Both females in this case were stopped by Mr. Diaz.

23       Q.   And what if anything did Mr. Diaz allegedly do to these

24   two?

25       A.   He stated he was a police officer, he displayed a

(mnB)        Det. Rodriguez/Peo/Cross(Bonanno)        62

1    shield around his neck.

2        Q.    But he took no property from them?

3        A.    Took no property.

4        Q.    Did he frisk them?

5        A.    They told me that they were searched.

6              THE COURT:  I'm sorry?

7        A.    They informed me they were searched.

8              THE COURT:  By Mr. Diaz?

9              THE WITNESS:  By Mr. Diaz.

10       Q.    And do you know if Miss Rodriguez ultimately signed a

11   supporting deposition?

12             MR. MENDYS:  Objection.

13             THE COURT:  If he knows.

14             Do you know?

15       A.    I don't know.

16             THE COURT:  Okay.

17       Q.    Do you know if Mr. Diaz was ever indicted for the

18   robbery of Ms. Rodriguez?

19             MR. MENDYS:  Objection.

20             THE COURT:  Sustained.

21       Q.    Do you know if Mr. Diaz was ever indicted for any kind

22   of action against Miss Rodriguez?

23             MR. MENDYS:  Objection.

24             THE COURT:  Would you step down again.

25             (Witness exits courtroom.)

(mnB)                Det. Rodriguez/Peo/Cross(Bonanno)        63

1              THE COURT:  Could I have the whole file at this

2       time.  Without knowing exactly the scope of the hearing,

3       what I mean, I know that your client has a Mapp, Wade, his

4       involvement in any kind of action against Miss Rodriguez, so

5       that what is -- Dunaway, so what is the purpose of asking

6       this witness about whether someone was indicted for a

7       robbery?

8              MR. BONANNO:  Judge, at best she's a possible

9       eyewitness when she's purported to be here a complaining

10      witness.

11             THE COURT:  He spoke with two women who said this

12      is what had happened, he spoke to them himself about what

13      your client's involvement was.  Right?  That's what you've

14      elicited.

15             MR. BONANNO:  I believe that is correct, I don't

16      recall independently.

17             THE COURT:  And what would, why would a decision

18      made by a Grand Jury to indict or not indict be relevant?

19             MR. BONANNO:  Well, if they were subjects of --

20             THE COURT:  Why would that be relevant or

21      irrelevant, Grand Juries have all sorts of functions,

22      including mercy functions they also can have.  I don't know

23      why this is relevant.

24             MR. BONANNO:  The two females here are the two key

25      eyewitness allegedly.

(mnB)            Det. Rodriguez/Peo/Cross(Bonanno)        64

1                     THE COURT:  Right, once they've made their

2        statements about what happened to them, and I haven't heard

3        anything other than one photograph, there's not two

4        identifications?

5                     MR. MENDYS:  In terms of Mr. Diaz?

6                     THE COURT:  Yes.

7                     MR. MENDYS:  One photo array, one lineup.

8                     THE COURT:  From one witness?

9                     MR. MENDYS:  One witness views a photo array, a

10       separate witness views the lineup.

11                    THE COURT:  Okay.  So, right, right.  Okay.

12                    So, again, those, the identification procedures

13       are certainly at issue.  Whether there was probable cause to

14       arrest your client is certainly at issue because he's taken

15       into custody as a result of a photo array identification for

16       a lineup and is arrested after the lineup.  So I'm not sure

17       what anything that has to do with a Grand Jury would have to

18       do with issues that I'm deciding at this hearing.

19                    MR. BONANNO:  Judge again, either they're

20       complaining witness or they are just i.d. witnesses to this

21       incident, and I'm just trying to elicit --

22                    THE COURT:  You cannot question about anything to

23       do with who wasn't indicted, who didn't show up, who did a

24       supporting deposition, that's all after the fact.  Okay?  If

25       something happened, unlike the other defendants who are

1       already in custody, if there is something that happened

2       between the date of the crime and the date they're arrested

3       that could be, that I could consider in determining whether

4       there's probable cause as to anything, you may go into that.

5       But once the arrest has happened, once the case is presented

6       to a Grand Jury, I don't know what happened in the Grand

7       Jury, nor is it the function of this Court at this pre-trial

8       hearing to make such a determination.

9                    Okay, let's recall the detective.

10                   (Witness resumes.)

11                   THE COURT:  You may continue.

12                   MR. BONANNO:  Thank you, Judge.

13      Q.    Detective, you then took the photo that you had gotten

14  of Mr. Diaz and put that into a photo array, is that correct?

15      A.    Yes.

16      Q.    And you had to alter that photo array, is that correct?

17      A.    Yes, I did, sir.

18      Q.    And you altered, explain how you altered the photo

19  array to me.

20      A.    Mr. Diaz in the photo had two earrings, and in the

21  photo, in the photo array he was the only one wearing earrings.

22  So I took him a black pen, I circled where the earrings were on

23  his ears, and then I did it to every other filler in that photo

24  array.

25      Q.    And that a standard police procedure to do things of

(mnB)        Det. Rodriguez/Peo/Cross(Bonanno)        66

1   that nature?

2          A.   Standard procedure is to make it fair.  I thought it

3   was making it fair by doing that.

4          Q.   Well, you said that a few times about being fair.

5   That's at your discretion what's fair?

6          A.   Yes.

7          Q.   Was there any review by a supervisor as to what was

8   fair?

9          A.   My sergeant saw the photo array.

10         Q.   Was there any New York City Patrol Guide direction as

11  to what is fair?

12         A.   I couldn't tell you that.

13         Q.   So is it fair to assume you did it in your own

14  independent discretion?

15         A.   Yes.

16         Q.   And you showed that photo array to Mr. Rodriguez, is

17  that correct?

18         A.   Yes, I did.

19         Q.   And did you ever determine if there was any kind of a

20  relationship between Mr. Melenciano and Miss Rodriguez?

21                    MR. MENDYS:  Objection.

22                    THE COURT:  At the time?

23                    MR. BONANNO:   Prior to Mr. Diaz' arrest.

24                    THE COURT:  When he spoke with Ms. Rodriguez?

25                    MR. BONANNO:  Yes.

(mnB)          Det. Rodriguez/Peo/Cross(Bonanno)        67

1                    THE COURT:  No, the objection is overruled.

2          A.    What's the question, sir?

3          Q.    Did you ever determine, make an inquiry as to any type

4    of a relationship between Mr. Melenciano, the man who supplied

5    you with the original photo of Mr. Diaz, and Ms. Rodriguez who

6    ultimately allegedly i.d.'d the photo in the array?

7          A.    So you're asking me if Mr. Melenciano and the

8    complainant had any kind of relationship?

9                    THE COURT:  Miss Rodriguez, yes?

10         A.    I wouldn't have known that.

11                   THE COURT:  It's difficult --

12                   Did you ascertain anything like that?

13                   THE WITNESS:  That they had a relationship?

14                   THE COURT:  Yes.

15                   THE WITNESS:  No.

16         Q.    Do you know if anyone else made an inquiry of that

17    nature?

18         A.    I don't know.

19         Q.    And based upon Miss Rodriguez' actions, you then

20    proceeded to conduct a lineup, is that correct?

21         A.    Yes.

22         Q.    Now in the lineup you used also five fillers, is that

23    correct?

24         A.    Yes.

25         Q.    And those five fillers were employees of the New York

(mnB)        Det. Rodriguez/Peo/Cross(Bonanno)        68

1   City Police Department, is that correct?

2          A.   Yes.

3          Q.   Is there a reason why you didn't use five employees of

4   the New York City Police Department in the photo array?

5          A.   When a photo array is created, like I said, we go into

6   photo manager, which is a data base, where people who have been

7   arrested, their photos are there.  So I was able to pull Mr.

8   Diaz' photo from there and then a selection via the computer of

9   similar images.  It won't allow me to pull up uniform members of

10  the Service.  That would be a separate data base.

11         Q.   Is that separate data available to you?

12         A.   Yes.

13         Q.   But you chose not to use  it in the photo array?

14         A.   I used a photo array data base that I had availability

15  to.

16         Q.   To have a fair photo array, is that correct?

17         A.   Yes.

18         Q.   And you wanted to have a fair lineup, is that correct?

19         A.   Of course.

20         Q.   So you used police officers in the lineup as opposed to

21  police officers in the photo array, is that correct?

22         A.   Yes.

23         Q.   Now in the photo in the lineup, was Mr. Diaz wearing

24  earrings?

25         A.   I don't recall.

(mnB)            Det. Rodriguez/Peo/Cross(Bonanno)      69

1                       MR. BONANNO:   Do you have a copy of it?

2                       THE COURT:   Lineup photo is in Evidence.

3                       MR. BONANNO: I think it's 3 and 4.

4                       MR. WILSON:   Three and four.

5                       THE COURT:   Three and four are in Evidence.

6                       MR. BONANNO:   I'd like to see it for just one

7          second.

8                       (Court officer handing to Mr. Bonanno.)

9                       MR. BONANNO:   Thank you.

10                      THE COURT:   Are you withdrawing the question?

11                      MR. BONANNO:   No.

12                      THE COURT:   Do you know whether he had an earring

13         on at the time of the lineup?

14                      THE WITNESS:   I don't know.  I have to look at the

15         lineup.

16                      MR. BONANNO:   Yes.  I ask you to show it to him.

17                      (Court officer complies.)

18         A.    To me it appears he's not wearing earrings in the

19    lineup.

20                      THE COURT:   And he's wearing an earring in the

21         courtroom, a rather large one.  Neither of the other two

22         defendants are wearing earrings.

23                      There are no earrings in the lineup photo?

24                      THE WITNESS:   No.

25                      THE COURT:   Thank you.

(mnB)          Det. Rodriguez/Peo/Cross(Bonanno)        70

1          Q.   Are you sure about that or what appears?

2          A.   It appears.

3          Q.   And had Mr. Diaz been wearing earrings on that date, on

4     that day of the lineup?

5                    THE COURT:  Or had he been asked to remove the

6          earrings before the lineup was conducted?

7                    MR. BONANNO:  I was going to get to it.

8                    THE COURT:  Had he been wearing earnings when he

9          was apprehended to your knowledge?

10                   THE WITNESS:   Again, I don't recall.

11                   THE COURT:  Okay.

12         Q.   Is it possible he was the only one wearing earrings in

13    that lineup?

14                   THE COURT:  Is it possible?

15                   MR. MENDYS:  Objection.

16                   THE COURT:  Sustained.

17         Q.   Do you know if he was the only one wearing earnings in

18    that lineup?

19                   MR. MENDYS:  Objection.

20                   THE COURT:  Sustained.

21         Q.   Did you make a video recording of the lineup?

22         A.   No.

23         Q.   Is that standard procedure?

24         A.   To make a video recording?

25         Q.   Yes.

(mnB)        Det. Rodriguez/Peo/Cross(Bonanno)        71

1        A.   No, I never did.  I'm sorry, I take that back.  Just

2   recently I made an arrest that there was video of an interview.

3                    THE COURT:  An interview?

4                    THE WITNESS:  Of an interview.

5                    THE COURT:  He's asking about a lineup.

6        A.   No.  The lineup was not recorded.

7        Q.   Is there a Patrol Guide procedure that governs the

8   process of lineups?

9        A.   I'm sure there is.

10        Q.   But you're not familiar with it?

11        A.   No, I'm not.

12        Q.   So you're not familiar if you used that procedure?

13        A.   What's the question, sir?

14        Q.   You're not familiar as to whether you used the Patrol

15   Guide procedure that governs lineups?

16        A.   No, I'm not familiar.

17        Q.   Now, you spoke with, you brought another complaining

18   witness to the lineup, is that correct?

19        A.   I'm sorry, sir, can you repeat the question.

20        Q.   Who was the complainant --

21                    MR. BONANNO:  I withdraw that question.

22        Q.   Who was the complainant witness you brought to the

23   lineup?

24        A.   Argelia Rosario.

25        Q.   Miss Rosario?

(mnB)        Det. Rodriguez/Peo/Cross(Bonanno)        72

1        A.    Yes.

2        Q.    And you said you spoke to her in Spanish, is that

3    correct?

4        A.    Yes.

5        Q.    She couldn't understand English?

6        A.    A little bit of English here and there.

7        Q.    But you were speaking with her mainly in Spanish?

8        A.    Mainly in Spanish, but again, she spoke broken English.

9        Q.    Are you a certified instructor in the Spanish language?

10       A.    No, I am not.

11       Q.    And again, your goal was to make the lineup fair, is

12    that correct?

13       A.    Yes.

14       Q.    And who was the one who determined whether it was fair

15    or not?

16       A.    My sergeant, that's why he supervises the lineup.

17       Q.    Again, is there a Patrol Guide procedure that

18    determines the fairness?

19               THE COURT:  Determines fairness?

20               MR. BONANNO:  In the lineup.

21               THE COURT:  The objection is sustained. It's up to

22       the Court to make a legal determination as to whether the

23       procedure is fair.

24               MR. BONANNO:  No further questions, Judge.

25               THE COURT:  Any redirect?

(mmB)      Det. Rodriguez/People/Redirect                    73

1   REDIRECT-EXAMINATION

2   BY MR. MENDYS:

3       Q.   Detective, are there documents created that provide

4   instructions in how to conduct a lineup?

5       A.   Yes.

6       Q.   And are those part of the documents that Miss Rosario

7   and yourself signed after the lineup is completed?

8       A.   Yes.

9       Q.   Did you follow those instructions?

10      A.   Yes, I did.

11              MR. MENDYS:  Nothing else.

12              THE COURT:  Any recross on this?

13              MR. WILSON:  No.

14              MR. BONANNO:  No -- just quickly.

15  RECROSS-EXAMINATION

16  BY MR. BONANNO:

17      Q.   The documents that you're referring to, who drafted the

18  documents?

19      A.   It's lineup standard forms.

20      Q.   Do you know if those documents are drafted based upon

21  any N.Y.P.D. procedure?

22      A.   They come off their data base.

23      Q.   Did you pull it from  N.Y.P.D. data base?

24      A.   I have copies, I obtained copies, these are the copies

25  I use for all my lineups.

(mnB)      Det. Rodriguez/People/Redirect              74

1                    THE COURT:  You follow the procedure on the

2      N.Y.P.D. data base?

3                    THE WITNESS:  Whatever it is, it gives

4      instructions on how to do a lineup.

5      Q.    Is it not accurate you personally got it off the data

6      base?

7      A.    No, I obtain it.

8                    MR. BONANNO:  Nothing else.

9                    THE COURT:  You can step down, sir.  Thank you.

10                   Have a good day.

11                   Well, it's about ten of.  Why don't we break for

12     the afternoon before we get to the next witness, say 2:30.

13                   MR. MENDYS:  She'll be brief on my end.

14                   THE COURT:  Okay.

15                   MR. MENDYS:  What time Judge?  I'm sorry.

16                   THE COURT:  2:30.

17                   (Luncheon recess.)

18

19

20

21

22

23

24

25

lr-c                              Proceedings

1          A  F  T  E  R  N  O  O  N    S  E  S  S  I  O  N

2                    (Whereupon, the following took place in open court

3          in the presence of the Court, defendant DIAZ, Spanish

4          language interpreter, defense counsel and the assistant

5          district attorney.)

6                    THE CLERK:  Add-on to the calendar, 3349 of 2012;

7          Amauri Santana, Jose Melenciano, Richard Diaz.

8                    MR. WILSON:  Brian Wilson for Mr. Melenciano.

9          Good afternoon, your Honor.

10                    THE COURT:  Good afternoon.

11                    MR. WEINSTEIN:  Barry Weinstein, Goldstein and

12          Weinstein, for Mr. Amauri Santana.

13                    MR. BONANNO:  Good afternoon, your Honor.  Pat

14          Bonanno for Mr. Diaz, who is here.

15                    MR. MENDYS:  Newton Mendys for the office of the

16          district attorney.

17                    THE COURT:  So it's about ten of three, and has

18          anyone seen Mr. Melenciano?

19                    MR. WILSON:  I have not, Judge.  I did not go down

20          and check the line, but I have not seen him.

21                    THE COURT:  Mr. Santana?

22                    MR. WEINSTEIN:  I have not seen him since we broke

23          for lunch.

24                    THE COURT:  Mr. Diaz is in the courtroom.  May I

25          ask, Mr. Bonanno, did Mr. Diaz have any encounter, any

lr-c                         Proceedings

1       problems coming into the building with lines or anything?

2                   MR. BONANNO:  No.  He says no.

3                   THE COURT:  I don't know that there are lines.  Oh

4       wait, someone's coming in.  Oh, the record should reflect

5       that we do have -- the case has been called in, yes.

6                   COURT OFFICER:  Sorry.

7                   THE COURT:  We're on the record.  Mr. Melenciano

8       and Mr. Santana have just entered the courtroom at ten of

9       three.  I will ask each of the attorneys to please give me

10      an explanation for why they are late.

11                  MR. WILSON:  May I please, with the interpreter,

12      Judge?

13                  THE COURT:  Sure.

14                  (Whereupon, counsel and defendant Melenciano

15      confer.)

16                  MR. WILSON:  Mr. Melenciano had no money to

17      purchase lunch, Judge, so he went home to eat in Manhattan,

18      and it took -- to his house, and it took longer for him to

19      get back than he expected.

20                  THE COURT:  Do you have a cell phone number for

21      your client?

22                  MR. WILSON:  He does not have a number for me to

23      contact him.

24                  THE COURT:  He's just reaching into his pocket

25      there.  He doesn't have any contact number?  That looks like

lr-c                        Proceedings

1      a phone to me.

2                  MR. WILSON:  He has a phone, it doesn't work.

3                  THE COURT:  He just carries it around for what?

4                  MR. WILSON:  I guess he can put numbers in his

5      phone, Judge, but he can't call anybody or receive any

6      calls.

7                  THE COURT:  He could put numbers in?  I don't

8      quite understand.

9                  MR. WILSON:  I guess the directory works, but he

10     doesn't have any actual service.

11                 THE COURT:  Why is he carrying it around?  That

12     doesn't make any sense.

13                 MR. WILSON:  He put phone numbers into it, Judge,

14     and I guess he can -- I don't know, Judge.

15                 THE COURT:  Phone numbers check-in but they don't

16     check-out?

17                 MR. WILSON:  Apparently.

18                 THE COURT:  So you have no way of contacting your

19     client?

20                 MR. WILSON:  Other than by mail, Judge.

21                 THE COURT:  Really?  You have his mailing address?

22                 MR. WILSON:  Yes.

23                 THE COURT:  It's in Manhattan?

24                 MR. WILSON:  Yes.  And he works in Yonkers, Judge.

25                 THE COURT:  He works?

lr-c                              Proceedings

1                  (Whereupon, counsel and defendant Melenciano

2          confer.)

3                  MR. WILSON:  I'm sorry, Judge, I misspoke.  He

4          went to his mother's apartment in Manhattan for lunch.  She

5          made them lunch.  He lives in Yonkers.  And we discussed

6          this the last time, he works in the restaurant in Manhattan,

7          correct?  Yeah.

8                  THE DEFENDANT:  Washing dishes.

9                  MR. WILSON:  What's the name of the -- he showed

10         you the card last time.  I believe it's a restaurant you are

11         familiar, with John George?  I'm not.

12                 THE COURT:  On Columbus Circle.  He works at

13         Columbus Circle.

14                 MR. WILSON:  He lives in Yonkers, Judge.  He went

15         to his mother's in Manhattan for lunch and --

16                 THE COURT:  His mother lives -- so the address you

17         have to contact him is -- he works at one of the most

18         expensive places that the public can dine at in the entire

19         world.

20                 MR. WILSON:  As a dishwasher.

21                 THE COURT:  I assume that they pay their dish

22         washers.  He has no money for lunch?  I don't mean to, you

23         know, so he went to his mother's and what street does his

24         mother live on?  Not the address, just the street.

25                 MR. WILSON:  Post Avenue.

lr-c                              Proceedings

1              THE COURT:  Post Avenue.  It's in the Inwood

2       section, upper Manhattan.  Yeah, it's very close, although

3       it's not really easily accessible from here by subway.  I'm

4       not even sure how you would get there by public

5       transportation from here because it's all the way at the tip

6       of Manhattan.  You have to go south to go north.  It's not a

7       good idea.

8              And how about Mr. Santana?

9              MR. WEINSTEIN:  He went to lunch with his

10      co-defendant.

11             THE COURT:  He went to lunch together with all the

12      people that were in here, their friends, all four of them

13      went.  Nobody had any money.  They all, they took their

14      MetroCards and went down into Manhattan.  Yes, I see his

15      MetroCard, yes.

16             MR. WEINSTEIN:  My client's phone was cut off.  He

17      doesn't even have a phone with him.  His phone service was

18      cut off.

19             THE COURT:  His phone service was cut off so you

20      have no way of contacting him either?

21             MR. WEINSTEIN:  Other than by mail, an address on

22      Longfellow in the Bronx.

23             THE COURT:  Longfellow.

24             MR. WEINSTEIN:  130 Longfellow, apartment 1R as in

25      Robert.

lr-c                                    Proceedings

1               THE COURT:  Different than where he used to live.

2               MR. WEINSTEIN:  Since July of '13.

3               THE COURT:  He used to live with his mother when

4       he was arrested.  I know how long ago that is.  So you have

5       no -- he has no phone, no means of communication.

6               MR. WEINSTEIN:  No.  Communication is after the

7       call we tell him where to be.  We told him come to the

8       office on Thursday.  He was in the office, told him to come

9       here.  So our communication is here.

10              THE COURT:  Okay.  Well, I have not issued a

11      warrant for either of their arrests yet because I called the

12      case into the record a few minutes before they walked in.  I

13      was trying to ascertain, you know, why they could be late.

14      There were no lines.  I now know that their attorneys have

15      no way of really contacting them to find out where they

16      might be on a court date, which of course is problematic if

17      this were to happen again.

18              But Mr. Melenciano and Mr. Santana, when the judge

19      says be in the courtroom at a certain time, you're supposed

20      to be here at that time.  So whatever you need to do, you

21      need to follow those directions.  And if you don't and we

22      have to proceed -- and I was going to actually have to do

23      like now a Parker Hearing to find out where you were.  We

24      have a witness ready to go, I'm not looking forward to do

25      anything like that.  I've already told you that you could

lr-c                          Proceedings

1       forfeit your right to be here if you choose voluntarily not

2       to show up.

3              I'm also going to tell you that you risk your bail

4       status.  That you're each out on five thousand dollars in

5       this case and you risk that if you show up late again.  If

6       you're not here when I tell you to be here and we have

7       delays, and this goes for any of the defendants, if there

8       are any delays and I issue a warrant for your arrest, when

9       that warrant is vacated I'm going to entertain an

10      application by the district attorney.

11             Do you understand that, Mr. Melenciano?

12             DEFENDANT MELENCIANO:  (In English) Yes.

13             THE COURT:  Mr. Melenciano spoke again in English.

14             And Mr. Santana, you understand that?

15             DEFENDANT SANTANA:  (In English) Yes.

16             THE COURT:  Again.

17             MR. MENDYS:  Judge?

18             THE COURT:  Yes.

19             MR. MENDYS:  I can tell where you are gonna go,

20      but if you're willing to entertain it, I will make that

21      application now.

22             THE COURT:  I hadn't issued a warrant for their

23      arrest.  Had I issued a warrant, I would hear the bail

24      application now, but I'm not going to hear it right now.  I

25      warned them and --

1r-c                                    Proceedings

1          MR. MENDYS:  I understand.  I just think there's a

2     history that goes back with each of them.

3          THE COURT:  How far does the history go back?  I

4     don't really --

5          MR. MENDYS:  Mr. Santana every time I've stood up

6     on the case --

7          THE COURT:  Mr. Santana?

8          MR. MENDYS:  Is constantly late, if he appears.  I

9     know a warrant was issued for him recently, in the recent

10    past.

11         THE COURT:  He had some proof of hospitalization.

12    He was at Montefiore.  I know he got arrested outside the

13    courtroom.  This is since I'm on the case.

14         MR. MENDYS:  I'm sure that arrest violated the

15    terms of his bail.

16         THE COURT:  I'm not going to entertain the bail

17    application now.  If I were, I would be denying it this one

18    time.  So this is not going to happen again, okay.  I'm not

19    going to put up with it.

20          If you are convicted, you would begin serving your

21    sentence during the trial and then you would know when

22    you're going to come and what time you're arriving because

23    the Department of Corrections would be delivering you, not

24    have to wait for you to decide when you show up on your own.

25    So let's just proceed.

lr-c          Det. A. Bell - People - Direct

1                    You have your next witness to call?

2                    MR. MENDYS:  Yes.

3                    THE COURT:  Go ahead.

4                    MR. MENDYS:  People call Detective Anna Bell from

5          the Internal Affairs Bureau.

6                    COURT OFFICER:  Witness entering.

7                    (Whereupon, the witness entered the courtroom and

8          took the witness stand.)

9      DETECTIVE  A N N A    B E L L ,  Shield No. 1504, New York

10          City Police Department, Internal Affairs Bureau, called

11          as a witness on behalf of the People, having been first

12          duly sworn, was examined and testified as follows:

13                    COURT OFFICER:  Have a seat.  For the record state

14          your name, spelling your first and last name, your shield

15          number and your command.

16                    THE WITNESS:  My name is Anna, last name Bell,

17          B-E-L-L, Internal Affairs Bureau, and my shield number is

18          1504.

19                    THE COURT:  Thank you, Detective.  If you could

20          just use the mic, keep your voice up.

21                    ADA Mendys, you may inquire.

22                    MR. MENDYS:  Thank you, Judge.

23      DIRECT EXAMINATION

24      BY MR. MENDYS:

25          Q    Good afternoon, Detective.

lr-c          Det. A. Bell - People - Direct

1     A     Good afternoon.

2     Q     How long have you been with the police department?

3     A     Thirteen years.

4     Q     And what is your current assignment?

5     A     I am in the Internal Affairs Bureau.

6     Q     Specific to that bureau?

7     A     I am working in the command center assessing complaints

8     now.

9     Q     And how long have you been a detective?

10    A     I've been a detective approximately four years now.

11    Q     Back in October of 2012, were you working for the

12    Police Impersonation Unit?

13    A     Yes, sir.

14    Q     And what were your responsibilities back then with that

15    unit?

16    A     In the Police Impersonations Unit we took cases of

17    defendants that would pretend to be police officers while

18    committing robberies, home invasions, rapes, during the

19    commission of a crime.

20    Q     So I want to direct your attention specifically to

21    November 22nd of 2012, at around 11 a.m. that morning.  Were you

22    working for the police department that day?

23    A     I was.

24    Q     Do you recall what specific tour you had?

25    A     I know that I was working the Sandy detail when I was

lr-c          Det. A. Bell - People - Direct

1    notified of the arrest.

2        Q    Now, that day were you tasked with assisting Detective

3    Rodriguez, Chris Rodriguez with an arrest?

4        A    Yes.

5        Q    And had you assisted him previously with the

6    investigation in this case?

7        A    I did.

8        Q    Now, on that day, November 22, did there come a point

9    when you, when you attempted to speak to an individual by the

10   name of Richard Diaz?

11       A    Yes, sir.

12       Q    And was he the person that you were assisting Detective

13   Rodriguez arrest?

14       A    Yes.

15       Q    And do you see Mr. Diaz sitting here today?

16       A    Yes.

17       Q    If you could identify an article of clothing?

18       A    He's the gentleman sitting towards the right wearing a

19   white shirt and earrings.

20            THE COURT:    Indicating defendant Diaz.

21       Q    Now when you -- how did you first come into contact

22   with Mr. Diaz that day?

23       A    Like I said, we were in the Rockaways due to the

24   Hurricane Sandy, and my partner Rodriguez got a phone call and

25   was informed that there was an arrest of Richard Diaz and that 34

lr-c          Det. A. Bell - People - Direct

1    Precinct had picked him up.

2        Q    Now, did you go with Detective Rodriguez to pick up Mr.

3    Diaz?

4        A    Yes, we went to the 34 Precinct.

5        Q    And where was he taken from there?

6        A    He was transported to the 108 Precinct.

7        Q    And at around 11 o'clock that morning -- well, where

8    was he taken within the 108? Specifically was he in a cell, was

9    he --

10       A    He was in a cell.  At first I believe he was downstairs

11   on the first floor, and then the squad opened up and we took him

12   upstairs.

13       Q    When you -- it was your responsibility to attempt an

14   interview of Mr. Diaz?

15       A    Yes.

16       Q    Was Detective Rodriguez, was Chris Rodriguez present

17   with you during the interview?

18       A    He was there.  I was there with Sergeant DeCandido and

19   myself.  I recall myself and Sergeant DeCandido being there.

20       Q    When you say Detective Rodriguez was there, you mean he

21   was working?

22       A    Yeah, he was working.

23       Q    But in terms of conducting the interview, that was --

24       A    That was me and Sergeant DeCandido.

25       Q    All right.  Now where did you, where did you bring Mr.

lr-c            Det. A. Bell - People - Direct

1    Diaz to be interviewed?

2        A     Second floor in the 108 debriefing room.

3        Q     Can you describe that room?

4        A     It's a small room.  It has a table, small table, a

5    bench and chairs.

6        Q     Now was Mr. Diaz, was he handcuffed while he was in

7    that room?

8        A     No, he wasn't.

9        Q     And this was around 11 in the morning?

10       A     Yes.

11       Q     Prior to him being brought to that room was he, was he

12   given the opportunity to use the bathroom?

13       A     Yes, he was.

14       Q     Was he offered anything to eat?

15       A     Yes.

16       Q     Was he, did he appear to you to be under the influence

17   of anything?

18       A     No.

19              THE COURT:  Of any?

20              MR. MENDYS:  Drugs?

21              THE COURT:  Controlled substances, alcohol or

22        anything?

23              THE WITNESS:  No.  No, sir.

24              THE COURT:  Thank you.

25       Q     So when you went to go sit with him and try to speak to

lr-c          Det. A. Bell - People - Direct

1    him, did you have your firearms on you?

2        A    No, we don't have our firearms whenever we deal with

3    prisoners.  We don't put them -- what I mean is, when we put them

4    in a cell, for safety reasons we don't put our, you know, we

5    don't have our gun.  Our guns are secured in a gun locker and we

6    did not have any contact with them in a debriefing room with a

7    firearm.  That's why they're uncuffed.

8        Q    Now, did Mr. Diaz, did he speak English or Spanish?

9        A    Spanish.

10       Q    And do you speak Spanish?

11       A    Yes, sir.

12       Q    Are you fluent?

13       A    Yes.

14       Q    So when you were engaging with him you were speaking

15   with him, you were speaking to him in Spanish?

16       A    In Spanish.

17       Q    Now, when you sat down with him what -- did you say

18   anything to him about why he was here, what was going on?  How

19   did the conversation go?

20       A    We asked him if he knew why he was there.  He made some

21   statements that I documented on a DD5.

22       Q    Was he, prior to that point was he advised of his, what

23   are commonly known as Miranda Rights?

24       A    Yes, I read him his Miranda that were in Spanish.  I

25   asked him to verbally say either yes, if he understood.  If he

lr-c          Det. A. Bell - People - Direct


1    had any questions, he verbally said yes, as to which I wrote yes

2    after every question.  And after the last question he was asked

3    to read them, to read the questions, and if he had any questions

4    to ask us or ask me.  And he signed at the bottom of the Miranda

5    as well as myself.

6                   MR. MENDYS:  So I'm going to ask that this be

7            marked People's 6 for identification.

8                   THE COURT:  Show it to the defense attorneys.

9                   (Whereupon, the referred to item was handed to

10           defense counsel.)

11                  THE COURT:  We'll mark this for identification as

12           People's 6.

13                  (Whereupon, People's Exhibit 6 was marked for

14           identification.)

15                  COURT OFFICER:  So marked People's 6 for

16           identification.

17                  MR. MENDYS:  If that would be handed to the

18           witness, please.

19                  (Whereupon, the referred to item was handed to the

20           witness.)

21      Q    Detective, do you recognize the document that has been

22   marked People's 6 for identification?

23      A    Yes, I do.

24      Q    What is that document?

25      A    It's the Miranda Warnings in Spanish that Richard Diaz

lr-c          Det. A. Bell - People - Voir Dire(Bonanno)


1   signed and I signed as well.

2       Q     Is that a photocopy or the original?

3       A     That's a photocopy, sir.

4       Q     And does that document fairly and accurately reflect

5   the content of the Miranda Warnings and the responses provided by

6   Mr. Diaz, and your signatures as they appeared backed on November

7   22, 2012?

8       A     Yes, sir.

9             MR. MENDYS:  At this point I would move People's 6

10        to be entered into evidence.

11             THE COURT:  Any objection or voir dire?

12             MR. BONANNO:  Judge, just briefly?

13             THE COURT:  Go ahead.

14   VOIR DIRE EXAMINATION

15   BY MR. BONANNO:

16       Q     Detective, I'm gonna ask you a couple of questions.  If

17   you don't understand, let me know so I rephrase them.

18             The photocopy of those Miranda Warnings, where did you

19   get the original of those Miranda Warnings?

20       A     I don't recall that, sir.

21       Q     Was that on your person that card or did you take it

22   from someone in the precinct?

23       A     I don't recall exactly.

24       Q     You carry those Miranda Warnings in Spanish on your

25   person?

lr-c          Det. A. Bell - People - Voir Dire(Bonanno)

1    A    We do.  This day I didn't have them with me.

2    Q    So then safe to say you got it from someone else?

3    A    I would say we got it from the 108, 108 Precinct.

4    Q    108 Precinct?

5    A    Yes, sir.

6              MR. BONANNO:  I have nothing further.

7              THE COURT:  Is there an objection?

8              MR. BONANNO:  She claimed that that's a true and

9         accurate representation of the Miranda Warnings she read,

10        but yet she doesn't know where they came from, whether it

11        came from an actual police official or it came from, you

12        know, Staples photocopy.

13             THE COURT:  I'm not clear exactly what your

14        evidentiary challenge is.

15             MR. BONANNO:  Is that those may not be the exact

16        Miranda Warnings that are --

17             THE COURT:  That she read that day?  Is that what

18        your challenge is?

19             MR. BONANNO:  If it's a photocopy of it, yes.

20             THE COURT:  Okay.  So the objection is sustained

21        on the best evidence rule grounds.  Where's the original is

22        the objection, so you may continue to voir dire trying to

23        satisfy it or not.

24   Cont'd DIRECT EXAMINATION

25   BY MR. MENDYS:

lr-c            Det. A. Bell - People - Direct


1          Q      Detective, do you have the original?

2          A      I don't have the original.  It might be in my partner's

3     case folder.

4          Q      Is that, is that document, People's 6 for

5     identification, is there anything different from that than the

6     original?

7          A      No, it has my signature on it.  I signed, I did sign

8     this document.

9          Q      But the original has your signature on it as well?

10         A      Yes, it's a copy of my signature.

11         Q      And the original has Mr. Diaz' signature on it as well?

12         A      Yes, sir.

13         Q      And all the markings on it the original would have as

14    well?

15         A      Yes, sir.

16                MR. MENDYS:  At this point I would move again for

17         People's 6 to be entered into evidence.

18                MR. BONANNO:  Judge, I don't know if the best

19         evidence rule is satisfied.  The evidence is available.

20                THE COURT:  Can you step down, please?

21                (Whereupon, the witness was excused.)

22                THE COURT:  You can continue.  Go ahead.

23                MR. BONANNO:  Again, I don't know if the best

24         evidence rule is satisfied.  It appears --

25                THE COURT:  What's missing?  What is the specific

1          objection?

2                    MR. BONANNO:   The specific objection is the

3          original document is evidently available, and to, you know,

4          have that in her possession, have her testifying from that

5          is not unduly burdensome to the People, and they could have

6          produced it today.

7                    THE COURT:   Mr. Mendys?

8                    MR. MENDYS:   Judge, the witness has testified that

9          everything on this document is the same as what's on the

10         original.  There's no prejudice.

11                   THE COURT:   Why is -- is it admissible under what

12         -- it's a copy of an original.  Under what legal, what legal

13         basis is it admissible?  There's an objection raised.  What

14         is the legal basis for the admissibility of a copy of an

15         original document where the original still does exist?

16                   MR. MENDYS:   Well, she is -- she's testifying to

17         the fact that it is the same.  It is --

18                   THE COURT:   Based on what?

19                   MR. MENDYS:   Based on her recollection of her

20         memory.  The fact that she was the one who read the rights

21         to him, to the defendant.

22                   THE COURT:   And what is the legal basis for it

23         being a photocopy of an original into evidence?  What

24         foundational requirements have to be satisfied?

25                   MR. MENDYS:   That it is a fair and accurate

1        representation of the original and of the rights that were

2        provided to the defendant.

3                 THE COURT:   There's also another foundational

4        requirement.

5                 MR. MENDYS:  Business record?

6                 THE COURT:   No, it's not a business record.

7                 MR. MENDYS:  Well, that's, I'm not --

8                 THE COURT:   You know, but that's the point.  I

9        mean, look.  While it is a very rare objection in this day

10       and age to challenge the admissibility of the photocopy,

11       because the CPLR does provide for the admission of

12       photocopies, there is also a strict foundational requirement

13       for what you need to do when a photocopy is offered in lieu

14       of an original.

15                You don't have the original with you?

16                MR. MENDYS:  I do not have it.

17                THE COURT:   You don't know how -- how did you get,

18       how was this copy that you have, how was that provided to

19       you?

20                MR. MENDYS:  This case was reassigned to me and it

21       was provided already.

22                THE COURT:   So you have no idea who made the copy?

23                MR. MENDYS:  I do not.  Detective Bell might.

24                THE COURT:   You want to recall her and ask her

25       that?

lr-c                        Det. A. Bell - People - Direct

 1                    MR. MENDYS:  Sure.

 2                    THE COURT:  Recall the detective.

 3                    COURT OFFICER:  Witness entering.

 4                    (Whereupon, the witness entered the courtroom and

 5             took the witness stand.)

 6       Cont'd DIRECT EXAMINATION

 7       BY MR. MENDYS:

 8          Q    Detective Bell, do you know who made the photocopy of

 9       the original?

10          A    My partner.

11          Q    Detective Rodriguez?

12          A.   Detective Rodriguez, yes.

13                    MR. MENDYS:  At this point I would move again for

14            People's 6 to be entered into evidence.

15                    THE COURT:  Any voir dire?

16                    MR. BONANNO:  Yes, briefly, Judge.

17       VOIR DIRE EXAMINATION

18       BY MR. BONANNO:

19          Q    Were you there when Detective Rodriguez made that

20       photocopy?

21          A    No, I wasn't.

22          Q    Do you know if there are any different changes to the

23       original as opposed to that photocopy?

24          A    No.

25          Q    Is that yes or no?

1r-c        Det. A. Bell - People - Voir Dire(Bonanno)

1      A      There are no changes.   There are no changes to this.

2    Richard Diaz signed it first, then I signed my name and then I

3    printed underneath my signature.

4      Q      When was the last time you saw that original of that

5    Miranda Warning?

6      A      I haven't seen the original in a while, but this is my

7    handwriting.

8               MR. BONANNO:   My objection stands based upon the

9         prior objection.

10              THE COURT:   I will admit it subject to connection

11         with the, to satisfy the requirements of both the CPLR and

12         the best evidence rule.   You may continue.

13   Cont'd DIRECT EXAMINATION

14   BY MR. MENDYS:

15     Q      Detective, what is contained in People's 6?   Those are

16   the rights that you read to Mr. Diaz?

17     A      Yes, sir.

18     Q      Did you read them from People's 6?

19     A      I did.

20     Q      Verbatim?

21     A      Yes.

22     Q      In Spanish?

23     A      In Spanish.

24     Q      And after each question, did Mr. Diaz indicate to you

25   whether he understood or not?

lr-c                     Det. A. Bell - People - Direct

1    A    I asked him prior to reading the Miranda Warnings to

2  him verbally saying yes or no, obviously in Spanish.  That a nod

3  for yes or no is not enough, I would verbally have to hear yes or

4  no.  And if he had any questions, in regards to the questions

5  that I was asking him in explaining them, the Miranda, I did let

6  him know that at any time he can stop me, ask me whatever

7  question.  If he doesn't understand, I would clarify it for him.

8    Q    Okay.  Did you receive an answer from him, a yes or no

9  after each right was read to him?

10    A    I did.

11    Q    And in each case what was the answer?

12    A    It was yes and I, I wrote "yes" next to each question.

13    Q    Yes he understood?

14    A    Yes he understood.

15    Q    Now, at any point did he ask you any questions, any

16  follow-up questions for any clarification, anything like that?

17    A    No.

18    Q    So after you finished reading him, going through each

19  of the rights, did you ask him if he was willing to answer

20  questions?

21    A    I did.  I also did explain to him that if at any point

22  there was a question that he did not want to answer, that that

23  was his right as well.

24    Q    And?

25    A    And he understood that and --

1r-c                        Det. A. Bell - People - Direct


1      Q     And with being advised of these rights, was he willing

2    to answer questions?

3      A     Yes, sir.

4      Q     And did you ask him questions?

5      A     Yes, we did.

6      Q     All right.  And, but after reading the rights, that's

7    when you gave him the form to sign, People's 6?

8      A     Yes.

9      Q     The original of People's 6.  And then you signed it as

10   well?

11     A     I signed underneath his name.

12     Q     Now when you spoke to Mr. Diaz substantively about what

13   transpired on the 17th of October, did you -- can you explain to

14   the Court how that conversation went?  Was it a question or

15   answer or did you just let him talk?

16     A     At first it was a question and answer, and then he was

17   willing to tell us bits and pieces of what had happened that

18   night.

19     Q     Now did you make, was anything -- was that conversation

20   documented in any way?

21     A     It was.  I typed a DD5, a follow-up complaint report

22   the next day.

23     Q     Aside from that, was it documented in any way?

24     A     No.

25     Q     Did you offer Mr. Diaz the opportunity to write his own

lr-c                    Det. A. Bell - People - Direct

1    statement?

2        A    I did.  He disagreed.  He did not want to write a

3    written statement.

4                    THE COURT:  He declined the opportunity?

5                    THE WITNESS:  Yes, he did, he declined.

6        Q    So do you recall specifically what -- well, the

7    documentation in the DD5 that you made, is that, was that a sum

8    and substance --

9        A    Yes.

10       Q    -- of what he said, not verbatim; correct?

11       A    Right.

12       Q    Do you recall specifically what it is that he said that

13   day?

14       A    I remember him naming nicknames.  He never mentioned

15   his co-defendants as their government names, he used nicknames

16   such as Lapi, Homeboy, Hombre.  He never used names.  He did

17   state that one of his co-defendants, I don't recall, however it

18   is documented in my DD5, that one of the co-defendants knew that

19   the victim had approximately three thousand dollars, and that

20   that victim was coming into the city allegedly to buy narcotics.

21                    And Mr. Richard Diaz had also stated that he had been a

22   former security guard and had been in possession of a shield

23   which was affixed to a beaded chain which he stated he had that

24   the date of the incident.  He states that he had seen the police

25   officers when he had the victims up against the wall, and when

lr-c                    Det. A. Bell - People - Direct

1    the officers had stopped their vehicle he walked off.  He

2    explained that he had the shield and he threw the shield.  I

3    believe it was on Walton Avenue.  And that's, that's what I

4    recall.

5                    (Continued on the next page...)

Det. Bell/People/Direct                    100

1          MR. MENDYS:  Okay.  I'm going to ask that

2     this be marked People's 7 for identification and shown to

3     the witness.

4          THE COURT:  Show it to defense.

5          (Court officer complies.)

6          THE COURT:  Mark this for Identification as

7     People's 7.

8          (Marked by reporter, People's Exhibit 7 for

9     Identification, this date.)

10         COURT OFFICER:  So marked People's 7 for

11    identification.

12         MR. MENDYS:   Can you hand it to the witness

13    please.

14         (Court officer complies.)

15         THE WITNESS:  Thank you.

16    Q.   Detective, do you recognize that document?

17    A.   Yes.

18    Q.   What does that appear to be?

19    A.   It's the complaint follow up informational report that

20    I typed up the next day, the 23rd, on 11-23-2012.

21    Q.   Recording Mr. Diaz' statement?

22    A.   Yes, sir.

23    Q.   And does your signature appear on that document?

24    A.   Yes, at the bottom.

25    Q.   And is that a fair and accurate representation of how

Det. Bell/People/Direct                101

1    you documented the statement?

2        A.    Yes.

3        Q.    Anything different about it?

4        A.    No.

5        Q.    Is there anything within, I want you to take a look at

6    it, is there anything within that statement that you failed or

7    neglected to mention earlier when you testified?

8        A.    Next to the nicknames, I wrote the government names of

9    Lappy, and Homeboy.

10       Q.    You wrote those in?

11       A.    Yes.

12             THE COURT:  But he didn't tell you the

13       names?

14             THE WITNESS:  No, he didn't.  I added the

15       names when we found out who the nicknames belonged to.

16       Q.    And just for the record, who is Lappy?

17       A.    Lappy is Santana, Amauri.

18       Q.    And Homeboy?

19       A.    Homeboy is, I don't know how to pronounce it, I'm sorry

20   Melenciano, Jose.

21       Q.    Aside from that, is there anything additional that you,

22   just take a look at that and make sure you have everything?

23       A.    He mentions a nickname of Hombre, which I don't have a

24   government name for.  States that Homeboy knew that the victim

25   had money on him, which I believe I explained, three thousand

1    dollars.

2         Q.   Okay.  And anything else you can think of?

3         A.   No.

4         Q.   All right.  Now, at any point during the course of

5    Mr. Diaz' statement, did he ever ask for an attorney?

6         A.   No.

7         Q.   Did he ever indicate that he wanted to stop talking and

8    --

9         A.   No.

10        Q.   -- exercise his right to remain silent?

11        A.   No, he didn't.

12        Q.   Did you ever threaten him in any way?

13        A.   No.

14        Q.   Did you ever make any promises to him --

15        A.   No.

16        Q.   -- in exchange for his statement?

17        A.   No.

18        Q.   What I'd like you to do, Detective, is I know

19   originally you testified that you read Mr. Diaz his rights

20   in Spanish?

21        A.   Uh-hum.

22        Q.   Correct?

23        A.   That's correct.

24        Q.   What I would like you to do is, for the record,

25   in English indicate for the record what rights you read to

1    him?

2         A.    I read his Miranda warnings.

3         Q.    Specifically could you read them for the record?

4               THE COURT:  What exactly, what warnings did you

5         exactly gave him, yes.

6               THE WITNESS:  I read him the Miranda warnings.

7               Read them in Spanish?

8               MR. MENDYS:  English.

9               THE COURT:  No, it has to be in English.

10              THE WITNESS:   I don't have them in English.  Do

11        you want me to translate?

12              MR. MENDYS:  If you're able to.

13        A.    Okay.  You have the right to remain silent, and not

14   to answer any questions.   Do you understand?

15              Anything you say can be used against you in a court of

16   law.  Do you understand?

17              You have the right to consult with an attorney before

18   speaking to the police and to have an attorney present during any

19   interrogation now and in the future.  Do you understand?

20              If you do not have money to pay for a lawyer, one shall

21   be appointed to you without cost.  Do you understand?

22              If you do not have an attorney at your disposition,

23   your right to remain silent until you have the opportunity to

24   consult with a lawyer.  Do you understand?

25              Now that I have explained your rights, do you wish to

(mmD)        Det Bell/People/Cross(Wilson)              104

1   answer questions?

2        Q.   Okay.  So those were the rights that you advised him in

3   Spanish?

4        A.   Yes.

5        Q.   After each one he indicated that he understood?

6        A.   Yes.

7                  MR. MENDYS:   All right, no further questions.

8                  THE COURT:  Cross-examination.

9                  MR. WILSON:    Thank you, Judge.

10  CROSS-EXAMINATION

11  BY MR. WILSON:

12       Q.   Good afternoon, Detective.

13       A.   Good afternoon, sir.

14       Q.   Detective, in the statement you were describing, that

15  is People's 7 in evidence --

16                 THE COURT:  Well, it's not in evidence.  It's only

17       for Identification.  Seven was not admitted into evidence.

18                 MR. WILSON:  Withdrawn.

19       Q.   You were describing in People's 7 for

20  identification.you mentioned that you made a couple of notations

21  in the statement?

22       A.   Yes.

23       Q.   And I believe you wrote in the name of a person that

24  was known to you at that time as Homeboy?

25       A.   Yes.

(mmD)        Det Bell/People/Cross(Wilson)                    105

1          Q.   And what name did you write in with regard to him?

2          A.   Melenciano.

3          Q.   Where did you get that information from to write it

4     into the statement?

5          A.   Through our investigation.

6          Q.   Okay.  Can you be a little more specific?

7          A.   I, Det. Rodriguez, Sgt. DeCandido, through our

8     investigation, these were the names that we got.

9          Q.   Well, could you tell us what in the investigation

10    resulted in getting the names?

11         A.   I don't recall, sir, I'm sorry, I don't remember

12    exactly how we found out.  I had nicknames.

13              I don't remember, it was such a long time ago, I don't

14    know how we obtained that name.

15              THE COURT:  Do you know whether when the suspects

16         were apprehended, they were asked pedigree nicknames?

17              THE WITNESS:  I believe so.  I know that before

18         interviewing Mr. Diaz, we already knew what the names of

19         these were, but he used, he didn't use government names, he

20         used nicknames.

21              THE COURT:  But you have no idea of the original

22         source of --

23              THE WITNESS:  No, I don't, your Honor.

24              THE COURT:  -- of a particular nickname and the

25         government name, as you say?

1                    THE WITNESS:   Yes.

2          Q.    Forgetting the original source for a minute, do you

3    recall who your source was for putting that in the statement, do

4    you recall who told you?

5          A.    Chris Rodriguez and my Sgt. DeCandido.

6          Q.    So Det. Rodriguez and Sergeant --

7          A.    Sgt. DeCandido.

8          Q.    Was there a third name you gave me?

9          A.    No.

10         Q.    Those two?

11         A.    Yeah.

12         Q.    So they gave the name Jose Melenciano as Homeboy?

13         A.    Yes.

14         Q.    And you don't know where they got it from?

15         A.    I don't know.   I don't remember that.

16         Q.    Now, did you ever tape record any statement of any

17   witness in connection with this case?

18         A.    No.

19         Q.    Did you yourself ever provide a tape recorded statement

20   to anybody in this case?

21         A.    No.

22         Q.    Did you testify in the Grand Jury in this case?

23         A.    No.

24         Q.    Did you fill out any paper work other than the

25   statement which is marked as People's 7 for identification?

1      A.   No.

2      Q.   And did you have any involvement in the case prior to

3   November 22nd of 2012?

4      A.   Just picking up witnesses.  That's it.

5      Q.   And obtaining video?

6               THE COURT:  What?

7               MR. WILSON:  Obtaining video.

8               THE COURT:  Obtaining video?

9      A.   Yes, that's all.

10     Q.   When you say obtaining video, you're talking about

11   surveillance video?

12     A.   Yes.  The date that this occurred was on video, I went

13   with my partner to that location,

14     Q.   So you weren't involved on the day it occurred?

15     A.   Not the date it occurred.  Throughout the

16   investigation, I believe it happened in October of 2012 through

17   November, I don't recall exactly when Det. Rodriguez went to the

18   incident location to obtain video, but I do know that I did go to

19   that location to help look at video and obtain video.

20               THE COURT:  Did you physically obtain the video or

21        were you with others?

22               THE WITNESS:  Yeah, I was with my partner.

23               THE COURT:  Okay.

24               THE WITNESS:  And myself.

25     Q.   And did you ever participate in seizing, searching, or

(mnD)           Det. Bell/Peo/Cross(Weinstein)              108

1    vouchering an automobile in connection with this case?

2         A.    No.

3         Q.    Did you ever have an occasion to show photographs of

4    Jose Melenciano to anybody in connection with this case?

5         A.    No.

6         Q.    Were you ever present when any other law enforcement

7    official showed photographs of Jose Melenciano to anybody in

8    connection with this case?

9         A.    No.

10        Q.    And were you present when any lineup was conducted with

11   regard to Jose Melenciano in regard to this case?

12        A.    No.

13        Q.    And did you ever speak to Jose Melenciano?

14        A.    No, never.

15             MR. WILSON:  I have nothing else, Judge, thank

16        you.

17   CROSS-EXAMINATION

18   BY MR. WEINSTEIN:

19        Q.    You have the name Amauri Santana in the document that

20   you typed up?

21        A.    That's correct, sir.

22        Q.    What nickname did you associate that?

23        A.    Lappy.

24        Q.    Lappy?

25             THE COURT:  Can you spell Lappy.

1              THE WITNESS:  L A P P Y.

2              THE COURT:  Okay.

3       Q.   Where did you get that connection that Lappy was

4  Santana?

5       A.   Again I don't recall exactly.  I would say it was Chris

6  Rodriguez and Sgt. DeCandido that had these defendants' i.d. by

7  government names.  However, Mr. Diaz referred to them by their

8  nicknames during the interview.

9       Q.   Did you ever, the sergeant, or Det. Rodriguez ever meet

10  Amauri Santana or speak to Amauri Santana?

11      A.   I don't, I can't answer that question, I don't recall.

12      Q.   You have no idea how they got the information?

13      A.   I don't recall, sir, I'm sorry.

14      Q.   When you put it down on your document that you typed up

15  did the Sergeant or Det. Rodriguez tell you to add, as you call

16  it, the government name?

17      A.   I don't recall that.  That was something I added in.

18      Q.   In your conversation with Mr. Diaz, did you ask him

19  what the real name or the government name was of those people?

20      A.   I did.  He was unable to give me the government name.

21  My DD-Five has quotes "Lappy."  I quoted because those are the

22  nicknames he provided us with.  He never gave us any government

23  names.  He stated he didn't know the government names.  He just

24  gave me nicknames, sir.

25      Q.   How did you decide which one was Lappy and which one

(mnD)               Det. Bell/Peo/Cross(Weinstein)              110

1  was supposed to be Homeboy --

2       A.    I don't remember, sir, I don't --

3       Q.    -- is it arbitrary?

4       A.    I don't remember how I got the names.  Sgt. DeCandido

5  and Rodriguez provided them.  How they go about getting these

6  names, I really do apologize, it was so long ago, I don't recall.

7       Q.    You can't recall the accuracy of the government names

8  for the nicknames?

9             THE COURT:  Beyond the scope of this hearing.

10      Q.    The gentleman in the middle, Amauri Santana, have you

11  ever seen him outside of court?

12      A.    Never.

13      Q.    Never took a statement from him?

14      A.    I never seen him.  Today was actually the first day I

15  saw him.  I seen him in pictures, that's about it.

16      Q.    You never showed his picture to anybody, did you?

17      A.    No.

18            MR. WEINSTEIN:  Thank you.

19            MR. BONANNO:  Just briefly.

20  CROSS-EXAMINATION

21  BY MR. BONANNO:

22      Q.    Detective, when you saw Mr. Diaz in the 108th precinct,

23  he was already under arrest, is that correct?

24      A.    Yes, he was.  We picked him up in the 34, sir.

25      Q.    Do you know if he had been read his Miranda rights

1  pursuant to that?

2       A.   No.

3       Q.   Did you inquire as, to anybody, as to whether his

4  Miranda rights were read to him?

5       A.   No, I never asked anyone if his Miranda rights were

6  read to him.

7       Q.   And you said you read him the Miranda rights in

8  Spanish, is that correct?

9       A.   Yes.

10      Q.   But are you a certified Spanish interpreter?

11      A.   No, I' not.

12      Q.   Where did you learn your Spanish from?

13      A.   My mom.

14      Q.   When you, no disrespect, when you read those Miranda

15  warnings just now, you had a little difficulty reading some

16  phrases, did you not?

17      A.   I did a little bit.   I think I did pretty good.

18      Q.   Afterwards, when you were speaking with Mr. Diaz after

19  you read him the Miranda, did you keep any personal notes?

20      A.   I didn't write notes, no.

21      Q.   Is that a standard procedure for interrogation?

22      A.   Not always.   I will sometimes write notes; other times

23  I don't.   The names, like it's not like a long DD-Five.

24  Nicknames like Lappy, Homeboy, or Hombre are kind of easy to

25  remember.

(mnD)          Det. Bell/Peo/Cross (Bonanno)          112

1        Q.   You said you added that information to your DD-Five

2   about the government names?

3        A.   The government names, yes.

4        Q.   Was that standard for you to do in drafting the

5   DD-Five?

6        A.   I did it for my own understanding later on with the

7   case.  I kind of wanted to know who Lappy was instead of just a

8   nickname.

9        Q.   When did you conclude your interview with Mr. Diaz?

10       A.   Exactly what time?

11       Q.   Yes.

12       A.   It was some time, I don't remember exactly what time it

13  was, I don't recall  I think some time around eleven o'clock.

14       Q.   You said you wrote that DD-Five the next day?

15       A.   That's correct.

16       Q.   Do you know what time you wrote that DD-Five?

17       A.   I don't remember.  I don't remember what tour I worked

18  the next day.

19       Q.   So you did it from just your memory?

20       A.   Yes, sir.

21       Q.   No notes to refresh your recollection?

22       A.   No, sir.

23       Q.   It is true that Lappy and Homeboy were already in

24  custody when Mr. Diaz was making these alleged statements?

25       A.   I don't recall who was in custody at the time, sir, I'm

1    sorry.

2         Q.   You claim that Mr. Diaz made statements to you

3    regarding a shield that he possessed, is that true?

4         A.   Correct.

5         Q.   He said that he had been employed by a security firm,

6    is that true?

7         A.   Security, he was never specific as to what security,

8    but he did state he was employed by a security.

9         Q.   Did you make any follow-up inquiries as to his past

10   employers?

11        A.   I did not.

12        Q.   So you don't know if in fact he was ever employed by

13   security?

14        A.   I don't know.

15                    MR. BONANNO:   Nothing further.

16                    THE COURT:   Anything redirect?

17                    MR. MENDYS:   No, Judge.

18                    THE COURT:   You can step down.   Thank you, very

19        much.

20                    (Witness excused.)

21                    THE COURT:   Okay.   Before we get to anything, I

22        want to talk about the schedule for the rest of this

23        hearing.

24                    How many additional witnesses are you calling?

25                    MR. MENDYS:   We're not going to be dealing with

(mmD)                    Proceedings              114

1    the Harris issue with regard to Melenciano during the course

2    of this hearing,  so just one will be available Wednesday

3    morning.

4              THE COURT:  And that is.

5              MR. MENDYS:  That is Police Officer Edgar Mangual

6    who is the responding and apprehending officer for

7    Melenciano and Santana.

8              THE COURT:  So he's RDO today.  He has a personal

9    day tomorrow, and then he works Wednesday through the rest

10   of the week to your knowledge?

11             MR. MENDYS:  That is my understanding, yes.

12             THE COURT:  So, he's available Thursday?

13             MR. MENDYS:  That is my understanding.

14             THE COURT:  Well, I'm going to accommodate,

15   reluctantly, Mr. Weinstein for Wednesday, although again,

16   I'm not -- but I'm also not certain now about the trial.

17   And how, you know, I hear this last statement, which has all

18   sorts of aspects to it implicating the other defendants, and

19   what is your intention about introducing this statement?

20             MR. MENDYS:  Judge, my intention should the court

21   find that it is admissible, my intention essentially is to

22   heavily redact it.

23             THE COURT:  When you say heavily redact it, what

24   would you be heavily redacting?

25             MR. MENDYS:  What I want to offer into evidence is

(mmD)                    Proceedings                    115

1    essentially the last portion where the defendant stated he

2    had a security shield around his neck affixed to a beaded

3    chain on the date and time of the incident, defendant stated

4    he was employed as a security guard for a few months, the

5    defendant stated when he saw the police drive up, he turned,

6    walked quickly way from the location and threw the shield

7    under a vehicle on Walton Avenue.  That's it.

8               THE COURT:  So you're not intending to introduce

9    anything about the other part of the statement?

10              MR. MENDYS:  No, I do not.

11              THE COURT:  Where he says about Lappy and Homeboy

12   and mentioning someone name Hombre who had some information

13   that he knew the victim had three thousand dollars and was

14   going to buy drugs?

15              MR. MENDYS:  That is correct.

16              THE COURT:  Okay.

17              Well, is there any legal issue anyone wants to

18   raise that I should be addressing now?  Because it will

19   impact on the trial, the length of the trial, possibly how

20   many trials we'll have, anything like that, while we have

21   that opportunity.

22              MR. WEINSTEIN:  I cannot think of -- Bruton is not

23   an issue now, Harris is out.

24              THE COURT:  So if this defendant were to take the

25   stand --

(mnD)                    Proceedings                    116

1            MR. MENDYS:  Mr. Melenciano.

2            THE COURT:  No, Mr. Diaz, the statement that we

3     are discussing now.  Mr. Melenciano is different because

4     that's something that I would have to have, I've now heard

5     there will be a Harris hearing as well as the Huntley

6     hearing.  If he were to take the stand, you will seek to

7     confront him if he denied a lot of things with the rest of

8     the statement.  Am I correct about that?

9            MR. MENDYS:  You are.

10           THE COURT:  And I was with these two other

11    individuals, would you be seeking to prove the identity of

12    the nicknames?

13           MR. MENDYS:  I think most likely, yes.

14           MR. WEINSTEIN:  My question would be how.

15           THE COURT:  I don't know that answer.

16           Do you have any idea about pedigree or how you

17    don't know how, you have no information about how Homeboy

18    would be tied to your client as a nickname?

19           WEINSTEIN:  Lappy.

20           THE COURT:  Lappy, I'm sorry you have no idea how

21    that would be tied?

22           MR. WEINSTEIN:  I'm going back over the on-lines,

23    your Honor, to see.

24           MR. MENDYS:  Judge --

25           THE COURT:  Go ahead.

(mmD)                    Proceedings              117

1            MR. MENDYS:  -- I'm just not, you know, I'm trying

2       to predict the future of things.  I would ask, I'm trying to

3       give the Court enough information to make an educated

4       decision about how to proceed with the case.  You know, I

5       think my practice would be to be over-inclusive as opposed

6       to under inclusive in terms of things I would ask.

7            THE COURT:  I would expect if any defendant were

8       to testify, you would use any method of cross-examination

9       that is legally available to confront them if they denied

10      things or to impeach them, I would expect that of any

11      attorney.  But my question now is the statement from

12      Mr. Melenciano actually implicates the other two defendants,

13      actually implicates them by name, not nickname, correct?

14            MR. MENDYS:  Correct.

15            THE COURT:  So if he testified, you'd be trying to

16      impeach him -- in fact, didn't you tell the police you were

17      there, but you were there with him and him, and that would

18      subject him to cross-examination by the other defendants at

19      that point.  And everyone understands that in essence you've

20      withdrawn statement notice but are reserving the right to

21      impeach him and enjoin a trial with the other defendants.  I

22      haven't heard anyone raise any challenge to that.

23            This defendant again, should the statement be

24      admissible, you're agreeing that you would not on your

25      direct case introduce anything where, inferentially or

(mmD)                    Proceedings                118

1    otherwise, he specifically, even using nicknames, that he

2    says he was there with two individuals and then you would be

3    linking that to the co-defendants?

4              MR. MENDYS:  Correct.

5              THE COURT:  But you would use that if you wanted

6    to on cross-examination, depending on what happens.  It's

7    all about predicting and not predicting.  Nobody knows.  But

8    I'm trying to avoid at this point, and I want the record to

9    be very clear, that should the statements be admissible and

10   we have three defendants on trial, they could be admissible

11   for impeachment purposes, even though they implicate the

12   other defendants, and you do have a way of establishing that

13   Mr. Santana is Lappy, and Mr. Melenciano is Homeboy.  And I

14   don't know if you've ever identified who Hombre might be.

15             MR. MENDYS:  No to the last question.

16             THE COURT:  And as I stand here now, I do not

17   specifically recall the link, how the link was determined.

18   It's not through pedigree?

19             MR. MENDYS:  I don't recall specifically.

20             MR. WEINSTEIN:  I'm going through the arrest

21   reports and I don't see any reference to nicknames for

22   either one of the defendants.

23             THE COURT:  Okay, well again it would have to be

24   through admissible evidence.

25             MR. WEINSTEIN:  I take it back, Judge, it's to

1    impeach -- well no, they don't put the names together.  The

2    interview by Melenciano he states that it's Lappy who told

3    him certain things.

4              THE COURT:  Mr. Melenciano's statement he says his

5    friend Lappy told him?

6              MR. WEINSTEIN:  Lappy, yes.

7              THE COURT:  So Mr. Melenciano refers to Lappy in

8    his own statement.

9              And Homeboy, how does that, is that in any

10   pedigree for Mr. Melenciano?

11             MR. WILSON:  Not that I know of, Judge.

12             Judge, just with regard to the question you had

13   thrown out initially about Bruton, I'm inclined to agree

14   with Mr. Weinstein that there's no issue now.  However, I

15   would like the opportunity just to check if there's anything

16   hot off the press to give it to you at our next session if I

17   should discovers something new.

18             THE COURT:  Okay.

19             MR. BONANNO:  I have no objection to the Bruton

20   issue.

21             I do have scheduling issues though.  Thursday  I

22   have to do an order to show cause in the Supreme Court in

23   Dutchess County that's been scheduled with a bunch of

24   witnesses.  I can be here Thursday afternoon.  I also have a

25   matter Friday that I can put off if we have to go through

1    Friday to accommodate the rest of the hearing, but Thursday

2    morning for sure, Judge.

3              THE COURT:  You're going to be here from Dutchess

4    County?

5              MR. BONANNO:  Sure, I'll be here by 1:30,

6    absolutely.  Thursday if possible, I really need 20, to 25

7    minutes to handle something in Judge Barrett's part.

8              THE COURT:  Things can be handled in that part in

9    20 to 25 minutes?

10             MR. BONANNO:  I'll keep my fingers crossed.

11   Miracles happen.

12             THE COURT:  He says that.  I'll get those minutes

13   of course.

14             Well, all right.  If I can reschedule my

15   sentencing from Wednesday afternoon to Wednesday morning,

16   which I won't know now, but might know by tomorrow, would

17   you be able to be here Wednesday afternoon?

18             MR. BONANNO:  Wednesday afternoon I do have a

19   sentencing --

20             MR. WEINSTEIN:  He's talking to me.  8:30 before

21   Justice Herricks up in Albany.

22             THE COURT:  You told me --

23             MR. WEINSTEIN:  And even if it goes on trial.  So

24   even if it goes to ten o'clock, I'll be here by one o'clock.

25   I don't expect it to go even that long.

1            THE COURT:  Let me notify all of you, I won't know

2       this until I go back to chambers and until I hear from the

3       D.A. because that case, as I said, there are people coming

4       in, multiple people, to give victim impact statements at the

5       sentencing, it's a murder, a conviction after trial, of

6       course, if I can do it in the morning but I don't think --

7       if I can adjourn that or have it moved up to like 11:30, it

8       would be great, then we can do it, we would have the

9       afternoon and then you can continue Thursday afternoon if we

10      have to, and that would make it -- but I'll know that

11      tomorrow.  Otherwise, it will be Thursday afternoon.

12            But let me also talk about if we're going have a

13      joint trial, which it sounds like we are.  How many total

14      witnesses are you calling?

15            MR. MENDYS:  There are four civilians who were

16      involved.  I would, you know, reserve the right to call them

17      all, but I don't know that I will.  Detective Rodriguez,

18      Officer Mangual, Det. Bell, well, realistically I think

19      that's probably it.

20            THE COURT:  So tops, seven, seven witnesses.

21      Okay.

22            Other than potentially your client, Mr. Wilson,

23      are you aware at this moment there are other witnesses you

24      would want to have called or you yourself are calling?

25            MR. WILSON:  At this point, Judge, I anticipate

1    none. There is one of the four witnesses, civilian witnesses

2    Mr. Mendys referred to, whose identity and contact

3    information have been withheld from us.

4             THE COURT:  Is there a protective order?

5             MR. WILSON:  Not that I know of.  But again, I'm

6    very recent in the case.  I didn't see anything in the file

7    about it.  If he's not going to call that witness, I'm

8    asking for the information, not to reveal to my client, but

9    to have my investigator attempt to contact that witness and

10   speak to them.

11            THE COURT:  What would the basis of such a request

12   be?

13            MR. WILSON:  It is a witness who was at the scene,

14   Judge, it's allegedly a complaining witness and eyewitness.

15   If he's not calling that witness, Judge, the witnesses in a

16   criminal case belong to either side, and again, the identity

17   has been shielded.

18            THE COURT:  I'm not sure why, when you start

19   talking about Hurricane Sandy, you know, this is an old

20   case.  This is an old case where a lot of other judges and a

21   lot of other attorneys have been involved and even another

22   prosecutor or two.  So I'm not so worried it's been withheld

23   because we don't have an order of protection for that

24   person, number one, we only have three orders of protection.

25            MR. MENDYS:  I guess my question is it sounds to

(mmD)                    Proceedings                    123

1    me like Mr. Wilson wants to call her, he wants that

2    information.  If I don't call her, he wants that

3    information.

4                 THE COURT:  So, you know, three witnesses, and

5    you're saying the fourth's name has been withheld.  Who did

6    you ask and --

7                 MR. WILSON:  All the documentation is turned over.

8    That individual's name is obviously redacted where the

9    others are not.

10                THE COURT:  That's interesting. Okay.

11                MR. MENDYS:  I'll take a look.  I didn't --

12                THE COURT:  Are you withholding --

13                MR. MENDYS:  No.

14                THE COURT:  -- any names of any potential civilian

15   witness?

16                MR. MENDYS:  I'm not.

17                THE COURT:  How many orders of protection is

18   there?

19                MR. MENDYS:  I know there's one.

20                THE COURT:  One?  Do you have any problem

21   disclosing the names?

22                MR. MENDYS:  No.

23                THE COURT:  There's actually -- there's an order

24   of protection for Yohn Contreras, Argelia, A R G E L I A,

25   Rosario, Jose Rodriguez.

1              Now, Yohn Contreras also known as Yohn, Y O H N,

2    Garcia.  I'm not sure if it's a different person, but it

3    probably is not.  So there are three names that have orders

4    of protection and those three names you're aware of.

5              MR. WILSON:  Yes.  The second female witness,

6    there's two male witnesses and two female witnesses

7    allegedly and the second female's name has been redacted

8    from everything from in the case.

9              MR. MENDYS:  She was mentioned today.

10             THE COURT:  There was a lineup, so one woman

11   viewed the lineup, and one woman viewed the photo array.  So

12   the name is already on the record.

13             MR. WILSON:  I missed that.

14             THE COURT:  They're close, the two names sound

15   alike.

16             MR. MENDYS:   Rosario and Rodriguez.

17             THE COURT:  They are both, one is Argelia --

18             MR. MENDYS:  Different first names but --

19             MR. WILSON:  There was a male witness named

20   Rodriguez, there's also a female Rodriguez.

21             MR. MENDYS:  Correct, unrelated I believe.

22             MR. WILSON:  Apparently that information is

23   available to me, Judge.

24             THE COURT:  And Esmeraldy Rodriguez.

25             MR WILSON:  I thought there was a mispronunciation

1      of the other name.

2                   THE COURT:  Argelio Rosario.

3                   You know something, I thought the first names, I

4      haven't gotten the transcript, so every name is there.

5                   What else?

6                   MR. WILSON:  That's it for me.

7                   THE COURT:  Other than potentially your client?

8                   MR. WEINSTEIN:  I have no other witnesses.

9                   THE COURT:  Mr. Bonanno?

10                  MR. BONANNO:  I have nothing, Judge.

11                  THE COURT:  Vacations.  You're leaving when?

12                  MR. WEINSTEIN:  July 31st.

13                  THE COURT:  Your last date is July 31st and?

14                  MR. BONANNO:  I haven't had one in ten years.

15                  THE COURT:  Mr. Wilson?

16                  MR. WILSON:  Well my last day here is August 10th.

17                  MR. MENDYS:  I'm not taking any long vacation, I

18      recently moved, as I'm sure you're aware --

19                  THE COURT:  You closed.

20                  MR. MENDYS:  -- new houses come with stuff, so I

21      envision the unforseen day potentially, I'm not saying it

22      will happen, I hope it doesn't, but I'm just, it would be a

23      possibility; but beyond that, I'm good.

24                  MR. WEINSTEIN:  We saw the two detectives today,

25      their testimony is probably more extensive in the hearing

(mmD)                        Proceedings                    126

1    than for the trial.

2              Mr. Wilson and I have basically nothing to say to

3    those officers at all.  They're pertaining to Mr. Wilson.

4    And my client and the civilians are what they are.  Jury

5    selection, it can be done in two days --

6              THE COURT:  You say two, there's three defense

7    attorneys.  It can be a week.

8              MR. WEINSTEIN:  But some of the witnesses don't

9    pertain to us.

10             THE COURT:  No.  I understand the witnesses today

11   mostly are relevant to Mr. Diaz and I'm not sure how much

12   cross there would be for trial on either one of them.

13             MR. WILSON:  While you're asking about scheduling,

14   Judge, I need one additional day.

15             THE COURT:  What day is that?

16             MR. WILSON:  July 16th.

17             THE COURT:  And I need July 24th.

18             So you think that we can pick a jury and have this

19   case get to a jury by the 28th of July?

20             MR. WEINSTEIN:  Pick a jury?  Are we picking a

21   jury on the 13th, I am assuming, Judge, on the 13th.

22             THE COURT:  Yes, start Monday.  No way we can pick

23   a jury, unless --

24             MR. WEINSTEIN:  It's a "D" felony.

25             THE COURT:  I know your peremptory challenges are

1   shared, I know.

2          MR. WEINSTEIN:  Two days to pick a jury and police

3   officers should not be more than one day.  Police officers.

4   We did two today and we did only one in a couple of hours,

5   and the civilians.

6          MR. MENDYS:  Judge, do you have a calendar day?

7          THE COURT:  It's not really a big calendar

8   anymore, so it's not something that's going to interrupt

9   this.

10          It is an extremely old case and it has had a lot

11   of delays, and it would be great if we can do it, I don't

12   want there to be a mistrial under any circumstances, so,

13   let's just take it one step at a time.

14          I will contact each of you.  What I'm going to do

15   is put the case on for July 8th at a 2:15 call.  However,

16   you need be able to get in touch with your client.

17          MR. WEINSTEIN:  After the discussion we had,

18   he said he's going to pay his phone bill and reactivate

19   it.

20          THE COURT:  I want to be sure they don't show up

21   unnecessarily if they don't have to.

22          I'm adjourning the case to Wednesday at 2:15.

23   Have your witnesses contacted, if I call you tomorrow and

24   say forget about it because that sentencing is going to be

25   very, it will be long and it will be dramatic, as they

1    usually are, it's going to be a tough one, so I don't want

2    to, you know, have you come in for half an hour on

3    Wednesday.  Otherwise, we'll put it over for the ninth at

4    2:15 and then whatever we need to do after that, we'll do.

5    I'll let you know.

6              Right now we stand adjourned for that date.

7              You can comment when we see each other next about

8    any type of severance application which you may have, which

9    it doesn't sound like there is going to be one now.  Okay?

10             Orders of protection are all extended.

11             2:15 sharp Wednesday, and if not then, Thursday

12   afternoon.

13             (Case on hearing adjourned to June 8, 2015 at

14   2:15 p.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1    SUPREME COURT OF THE STATE OF NEW YORK
      BRONX COUNTY : CRIMINAL TERM : PART 98
 2    -------------------------------------x
      THE PEOPLE OF THE STATE OF NEW YORK
 3
              -against-
 4                                          Ind. No.
      AMAURI SANTANA, JOSE MELENCIANO       3349-2012
 5    & RICHARD DIAZ,
 6                    Defendants.
      -------------------------------------x
 7                                          265 East 161 Street
                                            Bronx, New York 10451
 8                                          JULY 8, 2015
 9    B E F O R E:
10              THE HONORABLE RALPH FABRIZIO
                Justice of the Supreme Court
11
                (Appearances same as previously noted.)
12
                                            LAURA ROSEN
13                                          SENIOR COURT REPORTER
14        *       *       *       *       *       *       *       *
15              (Whereupon, the following took place in open court
16        in the presence of the Court, all three the defendants,
17        Spanish language interpreter, defense counsel and the
18        assistant district attorney.)
19              THE CLERK:  Part 98 is back in session.  Calendar
20        number 11, Amauri Santana, Jose Melenciano and Richard Diaz.
21        All three defendants are before the court.  The interpreter
22        is required and present.
23              Appearances, please.
24              MR. WILSON:  Brian Wilson for Mr. Melenciano.
25        Good afternoon, your Honor.
```

1r-a                         Proceedings

1              MR. WEINSTEIN:  Good afternoon, your Honor.

2      Goldstein and Weinstein by Barry Weinstein for Amauri

3      Santana.

4              MR. BONANNO:  Good afternoon, your Honor.  Pat

5      Bonanno for Mr. Richard Diaz.

6              MR. MENDYS:  Newton Mendys for the office of the

7      district attorney.

8              THE COURT:  Before we continue, I'm going to ask

9      the defendants to make sure they have their headphones on,

10     because the interpreter will be speaking to you through a

11     microphone and you'll be listening to the translation

12     through the headphones.  I want to make sure that they're

13     all in working order.

14             Can the interpreter confirm this?  Mr. Melenciano,

15     can you hear?

16             THE INTERPRETER:  Everyone's hearing me, your

17     Honor.

18             THE COURT:  Terrific.  Actually, this is better

19     for the interpreting anyway than having the interpreter not

20     with a microphone.  This is much better.

21             So we're continuing the hearing.  And Mr. Mendys,

22     go ahead.  What you want to tell me?

23             MR. MENDYS:  Yes, Judge.  At this point -- well,

24     on Monday afternoon there was an issue regarding Exhibit 6,

25     which has been conditionally admitted into evidence, the

lr-a                    Proceedings

1        Miranda Warnings that were provided to Mr. Diaz.  I obtained

2        the original of the Miranda card, and at this point I would

3        seek to recall Detective Rodriguez to, I guess, fully admit

4        Exhibit 6 and/or admit this new exhibit, unless Mr. Bonanno

5        wants to just look at it, see that it's the same.

6                THE COURT:  You have the original here?  This is

7        the original in your hand?

8                MR. MENDYS:  This is the original.

9                THE COURT:  You show it to Mr. Bonanno and he can

10       compare it with what the copy was.  I mean, of course you

11       can recall the witness.  It was an objection based on the

12       lack of production of the original.

13                (Pause in proceedings.)

14                MR. BONANNO:  Judge, it may be necessary to

15       call --

16                THE COURT:  You want to call him?  All I'm

17       asking --

18                MR. BONANNO:  Yes, it may --

19                THE COURT:  Call the witness.

20                MR. MENDYS:  People recall Detective Chris

21       Rodriguez from Internal Affairs Bureau.

22                COURT OFFICER:  Witness entering.

23                (Whereupon, the witness entered the courtroom and

24       took the witness stand.)

25   DETECTIVE   C H R I S   R O D R I G U E Z,  New York City

lr-a          Det. C. Rodriguez - People - Direct


1          Police Department, Internal Affairs Bureau, called as a

2          witness on behalf of the People, having been first duly

3          sworn, was examined and testified as follows:

4                    COURT OFFICER:  Have a seat.

5                    THE COURT:  Good afternoon, again, Detective

6          Rodriguez.

7                    THE WITNESS:  Good afternoon, your Honor.

8                    THE COURT:  Mr. Mendys, you may inquire.

9                    MR. MENDYS:  Thank you, Judge.

10    DIRECT EXAMINATION

11    BY MR. MENDYS:

12         Q     Good afternoon, Detective.

13         A     Good afternoon.

14         Q     You were here the other day to testify about an

15    investigation you were assigned relating to a robbery that

16    occurred on October 17, 2012; correct?

17         A     Yes.

18         Q     And during the course of your investigation, did you

19    come to receive any documents from Detective Bell in relation to

20    an interview of one of the defendants, Richard Diaz?

21         A     Yes.

22         Q     And what documents did you receive from her?

23         A     A DD5 and Miranda Warnings.

24         Q     And do you recall exactly when it was that you received

25    these documents?

lr-a                    Det. C. Rodriguez - People - Direct

1    A      I believe it was the following day when I came into

2    work.

3    Q      So that would be November 23rd of 2012?

4    A      Approximately.

5    Q      Now I'd like to -- before I get to that, is it the

6    business of the New York City Police Department to keep and

7    maintain all of your records?

8    A      Yes.

9    Q      All paperwork such as a Miranda card?

10   A      Yes.

11   Q      And is it the business of the New York City Police

12   Department to make copies of any paperwork to provide later to

13   the district attorney's office for discovery and/or trial?

14   A      Yes.

15   Q      And is that something that you did in this case?  You

16   maintained those records, you kept those documents?

17   A      Yes.

18   Q      And did you provide copies in the regular course of

19   business to the district attorney's office?

20   A      Yes, I did.

21   Q      And is the Miranda card, specifically relating to

22   Richard Diaz, is that something you copied and then provided to

23   the district attorney's office?

24   A      Yes.

25            MR. MENDYS:  I'm gonna show you two documents.

lr-a                    Det. C. Rodriguez - People - Direct

1        One is pre-marked, is already marked People's 7 -- 6, I

2        think.

3                THE COURT:  People's 7 for identification -- 6 for

4        identification, I'm sorry.

5                MR. MENDYS:  And this will be marked People's 8

6        for ID after it's shown to defense.

7                THE COURT:  Well, I believe it was shown already.

8        I'm going to deem this one marked 8.  I'm not going to

9        physically mark this one for the purposes of hearing.

10       People's 8 deemed marked.

11               (Whereupon, the referred to item was handed to the

12       witness.)

13   Q     Okay Detective, the one that is marked People's --

14   well, the one that is unmarked, do you recognize that?

15               THE COURT:  It's got the punch holes.

16   Q     With the punch holes, do you recognize that document?

17   A     Yes.

18   Q     What is that?

19   A     These are the Miranda Warnings.

20   Q     Is that the original?

21   A     Yes, it is.

22   Q     That's the one that Detective Bell provided to you back

23   in November of 2012?

24   A     Yes.

25   Q     Where has that been since it was provided to you in

lr-a                Det. C. Rodriguez - People - Direct

1    November of 2012?

2        A    In my case folder.

3        Q    And is that in the same condition as it was when

4    Detective Bell provided it to you?

5        A    Yes.

6        Q    Anything different about it?

7        A    Other than me punching holes in it, no.

8                THE COURT:  Why did you punch the holes?

9                THE WITNESS:  It goes to the case folder.

10               THE COURT:  Oh, the binder.  Okay, thank you.  Go

11        ahead.

12       Q    And is that the form that you then copied to provide to

13   the district attorney's office?

14       A    Yes.

15       Q    And looking at People's 7 which has been conditionally

16   marked, or People's 6, is that the same as the original that you

17   just testified about?

18       A    Yes, minus the holes.

19       Q    Anything different about it?

20       A    Nothing.

21               MR. MENDYS:  At this point I would offer People's

22        8 into evidence, as I would offer People's 6 fully into

23        evidence.

24               THE COURT:  Any objection or voir dire?

25               MR. BONANNO:  Yes, I do, Judge.

lr-a               Det. C. Rodriguez - People - Voir Dire(Bonanno)

1                    THE COURT:  Go ahead.

2    VOIR DIRE EXAMINATION

3    BY MR. BONANNO:

4         Q     Detective, I'm just gonna ask you some questions

5    briefly.  When the document that you've just produced today, the

6    one with the punch holes in it?

7         A     Yes.

8         Q     When that was read to Mr. Diaz, were you present during

9    that?

10        A     No, I was not.

11        Q     Were you present when he signed his name allegedly on

12   that?

13        A     No, I was not.

14        Q     And it is only from Detective Rodriguez -- Detective

15   Bell that you received that document?

16        A     Yes.

17        Q     A day later?

18        A     Yes.

19        Q     So you weren't there when the actual warnings were read

20   to Mr. Diaz?

21        A     No, I was not.

22        Q     Do you know it they were read in English or Spanish?

23        A     The Miranda card is in Spanish.

24        Q     But do you know if they were read to Mr. Diaz in

25   Spanish?

lr-a                Det. C. Rodriguez - People - Voir Dire(Bonanno)

1      A      I don't know that.

2      Q      Do you know if, and the only reason you know that

3   that's the original is because Detective Bell told you that's the

4   original?

5      A      Well, plus it's in ink.

6             THE COURT:  Oh, it is a different color ink?

7             THE WITNESS:  Yeah, it's different than the copy.

8      Q      But again, the only reason you know that is because

9   Detective Bell told you that was the original?

10     A      No, she just left it in my case folder.  I mean on top

11   of my desk.  And this was Miranda card.

12     Q      She never even personally handed it to you, she just

13   left it for you?

14     A      I had it on my desk, yes.

15            MR. BONANNO:  My objection is really the same as

16        it was before, Judge, that it may not satisfy the best

17        evidence rule.  I don't know if this detective has the

18        capacity to testify that it is the original having not had

19        the custody and control of it when it was read, signed,

20        executed and then placed onto his folder file for a day.

21            THE COURT:  Okay.  I am granting the application

22        for the original, which is People's 8, into evidence.  I'm

23        denying People's 6 because the best evidence rule doesn't

24        allow for a copy to come in when the original exists and is

25        prepared.  But it's linked up together through testimony

 1              that they're the same documents that are being viewed, and

 2              that's something that I am considering as evidence in this

 3              case and People's 8 is in evidence as the original.

 4                      The testimony, all the testimony referred to about

 5              People's 6, including the English translation which the

 6              Court would be required to have on the record, I could never

 7              just look at Spanish language Miranda warnings and say these

 8              are appropriate because we're an English language court,

 9              that is all in evidence through Detective Bell who

10              testified.

11                      So it's the document in evidence is People's 8.

12              People's 6 just remains not in evidence, but everything that

13              was testified to about People's 6 is part of the record in

14              this case, okay?

15                      Anything further for this?

16                      MR. MENDYS:  No, further questions.

17                      THE COURT:  Okay, Detective, thank you very much.

18                      MR. MENDYS:  I don't know if they want to cross

19              him.

20                      THE COURT:  Oh, I'm sorry.  Any cross-examination?

21                      MR. WEINSTEIN:  No.

22                      THE COURT:  This was, the only purpose he was

23              called for -- I'm sorry, you know something, I considered

24              that.  Any cross from any of the defense attorneys,

25              including Mr. Bonanno about this?

lr-a          PO E. Mangual - People - Direct

1              MR. BONANNO:  That's fine, Judge.  Just note my

2        respectful objection.

3              THE COURT:  Okay, thank you.  Step down.

4              (Whereupon, the witness was excused.)

5              THE COURT:  Your next witness?

6              MR. MENDYS:  The People call to the stand police

7        officer Edgar Mangual.

8              COURT OFFICER:  Witness entering.

9              (Whereupon, the witness entered the courtroom and

10        took the witness stand.)

11    POLICE OFFICER    E D G A R    M A N G U A E L,      Shield No.

12        23880, New York City Police Department, Transit District

13        12, called as a witness on behalf of the People, having

14        been first duly sworn, was examined and testified as

15        follows:

16              COURT OFFICER:  Have a seat.  Please state your

17        name, shield and command for the record.

18              THE WITNESS:  Yes.  Edgar Mangual, shield number

19        23880.  I'm Transit District 12.

20              THE COURT:  Okay.  Make yourself comfortable.

21        Please speak into the microphone.  And you may inquire.

22              MR. MENDYS:  Thank you, Judge.

23    DIRECT EXAMINATION

24    BY MR. MENDYS:

25        Q    Good afternoon, Officer.

lr-a            PO E. Mangual - People - Direct

1        A      Good afternoon.

2        Q      How long have you been with the police department?

3        A      I've been over 15 years.

4        Q      And where are you currently assigned?

5        A      Transit District 12.

6        Q      How long have you been working there?

7        A      District 12 since February.

8        Q      Prior to that, where were you?

9        A      Yankee Stadium and Bronx Task Force.

10              THE COURT:  Yankee Stadium?

11              THE WITNESS:  Yes, as a detail.  It's a seasonal

12       assignment.

13       Q      Now I want to direct you to October 17, 2012.  Were you

14       working that evening?

15       A      Yes, I was.

16       Q      And where were you assigned on that day?

17       A      On that day I was assigned to cover the confines of the

18       46 Precinct.

19       Q      Were you out of a task force that day on a --

20       A      I was still assigned to the Yankee Stadium detail.

21       Q      Was there a game that night?

22       A      No.

23              THE COURT:  In November?

24              THE WITNESS:  October.

25              THE COURT:  October, rather.  Yes, they haven't

lr-a          PO E. Mangual - People - Direct

1      had too many October games.

2      Q      How would it work if you were assigned to the Yankee

3      Stadium detail but there was no game?

4      A      When there's no game, pretty much they'll assign us to

5      a command that is shorthanded and have more officers for

6      coverage.

7      Q      That night you were assigned to the 46?

8      A      Yes.

9      Q      Now, around midnight October 16th going into October

10     17, did you have occasion to be in the vicinity of 2315 Walton

11     Avenue here in the Bronx?

12     A      Yes.

13     Q      And why were you in that area?

14     A      We were actually in route.  It was the end of our tour,

15     in route back to the stadium.

16                 THE COURT:  If you could slow down for the

17           interpreter?  Can you just slow down when you speak?

18                 THE INTERPRETER:  I'm sorry.

19                 THE COURT:  You want to repeat the last answer?

20                 (Whereupon, the court reporter read the requested

21           portion of the record.)

22     Q      And that night how were you, or were you in uniform?

23     A      Yes, I was.

24     Q      And did you have any partners?

25     A      Yes, I did.

lr-a          PO E. Mangual - People - Direct

1     Q      Who were your partners that night?

2     A      Officer Pachot and Officer Colon.

3            THE COURT:  Is it P-A-C-H-A-T?

4            THE WITNESS:  O-T.

5            THE COURT:  O-T, okay.

6     Q      Now, were those officers, Pachot and Colon, were they

7  your normal partners?

8     A      I've worked with them occasionally.

9     Q      And how were the three of you traveling that night?

10    A      In a marked department van.

11    Q      So, and do you recall who was driving?

12    A      I was.

13    Q      Now, okay, so you were on your way back to Yankee

14  Stadium when you passed by 2315 Walton Avenue?

15    A      Yes.

16    Q      And is Yankee Stadium where, even though you're not

17  working a game, that's where you turn out of every night?

18    A      Out of the stadium, yes.

19    Q      So did anything, did you notice anything when you drove

20  by 2315 Walton?

21    A      Yes.

22    Q      What did you see?

23    A      I observe observed four people lined up against a wall

24  and three other people frisking.

25    Q      And what did you originally -- well, what did you do at

lr-a          PO E. Mangual - People - Direct

1    that point when you saw them?

2        A     At that point I slowed down to observe because

3    initially I did think they were cops.

4             THE COURT:  Slow down your speech a little bit

5        too.

6        A     Initially I did think they were cops, but as I got a

7    better look and I got closer, the way they were dressed actually,

8    it pretty much they didn't look like cops.  The way their attire

9    was wasn't the way we would actually dress when we're in

10   plainclothes.

11       Q     Can you elaborate on that?  What specifically did you

12   see that led you to believe that they weren't actually police

13   officers?

14       A     Yes.  I noticed two of the guys, their pants were

15   hanging way below their waist, and there's no way that you'd be

16   able to hold a gun belt or any equipment with the clothes in that

17   manner.

18       Q     Did you see them with any equipment?

19       A     No.

20       Q     So once you -- now were you still in the van when you

21   realized this?

22       A     Well, at that point when I realized that I actually

23   stopped the van.  I was initially just coasting slowly.

24       Q     So once you realized this or once you saw this, what

25   did you do?

lr-a          PO E. Mangual - People - Direct

1       A       I stopped the van.  I brought it to the attention of my

2   partners and we exited the vehicle and started heading towards

3   them.

4       Q       What happened as you approached this group of people?

5       A       As soon as we realized, as soon as they realized we are

6   there, they split into different directions.

7       Q       And well, what did you do?

8       A       Well, I followed the one that went south.  Santana.

9       Q       You mentioned the name Santana?

10      A       Yes.

11      Q       Do you see that person, the person that you followed,

12  sitting here in court today?

13      A       Yes.

14      Q       Could you identify something that he's wearing?

15      A       Light-skinned gentleman in the middle with the black

16  T-shirt.

17              MR. MENDYS:  Indicating defendant Santana?

18              THE COURT:  Indicating defendant Santana, yes.

19      Q       Now, as you approached him you indicated he was heading

20  south?

21      A       Yes.

22      Q       What about -- now, you said there were -- I'm sorry,

23  strike that.

24              You said there were four people up against the wall?

25      A       Yes.

lr-a          PO E. Mangual - People - Direct

1        Q      Three people frisking them?

2        A      Yes.

3        Q      Was the defendant Santana, was he one of the people

4     frisking them?

5        A      Yes.

6        Q      Now, what about the other two people who were frisking

7     them, did you see what happened to them?

8        A      I got a look at one of the two.  The third one I didn't

9     get a good look at.

10       Q      Did you see what happened to him?  Where he went?

11       A      Two of them went south -- I mean, sorry, correction.

12    North.

13       Q      Two of them went north?

14       A      Yes.  The first one that went -- one went before the

15    other.  The first one that went, I didn't get a look at him.  And

16    then, correct me if I'm wrong, but the name Melenciano.

17       Q      Melenciano?

18       A      Melenciano started heading north as well, and my

19    partners grabbed him.

20       Q      Now, as you were approaching Santana, did you, did you

21    hear anything from any of the people who were up against the

22    wall?

23       A      Yes.  One of them yelled out that they just took his

24    money and they said they were police.

25       Q      And did he, did that person, did you later learn his

lr-a          PO E. Mangual - People - Direct

1    name?

2        A    Yes.

3        Q    Who was that?

4        A    Contreras.

5        Q    Yohn Contreras?

6        A    Yes.

7        Q    Had you ever met Mr. Contreras before?

8        A    No.

9        Q    And you said they just took my money, did he gesture to

10   anyone in particular when he's indicating that?

11       A    Yes, he pointed at both of them.  Initially Santana,

12   then he also pointed at Melenciano.

13       Q    Do you see the person he pointed at as Melenciano

14   sitting here in court today?

15       A    Yes.  The gentleman in the far left with the pink

16   shirt.

17            THE COURT:  Indicating defendant Melenciano.

18       Q    And defendant Melenciano, you said, was stopped by your

19   partners?

20            MR. WILSON:  Objection to the leading.

21       Q    Who was defendant Melenciano stopped by?

22       A    By my partner.

23       Q    Okay.  So after you heard that from Mr. Contreras, what

24   did you do?

25       A    I grabbed -- I continued following Santana.  I grabbed

lr-a          PO E. Mangual - People - Direct

1    him, I put him against the, I put him against the black vehicle

2    that was double-parked and I cuffed him and frisked him.

3         Q     Now before you move any further, when Mr. Contreras

4    identified the two of them, Melenciano and Santana, were either

5    of them in custody at that point?

6                    MR. WILSON:  Objection to the leading.

7                    THE COURT:  Sustained.

8         Q     Were either Melenciano or Santana in custody when Mr.

9    Contreras identified them?

10        A     No, not yet.

11                   MR. WEINSTEIN:  Objection.  Assuming he identified

12        him.

13                   THE COURT:  Well, that's something I have to --

14        the objection is sustained.

15        Q     You testified before -- tell the Court again what did

16   Mr. Contreras say as you approached Mr. Santana?

17        A     As I approached Santana, Contreras pretty much yelled

18   out and pointed at Santana and Melenciano that these guys just

19   took my money and said they were police.

20                   THE COURT:  Oh, and he added, he said they were

21        police?

22                   THE WITNESS:  Yes.

23                   THE COURT:  Okay.

24        Q     And he pointed at each of them?

25        A     He pointed.

lr-a            PO E. Mangual - People - Direct


1               MR. WILSON:  Objection to the leading.

2               THE COURT:  Sustained as to the leading.  Yes,

3        he's testified to what happened.  You can go on.  Move on.

4        Q     So now that, when that happened, when Mr. Contreras

5   said that, were either of them in custody Santana or Melenciano?

6        A     Not at that moment.

7        Q     After Mr. Contreras said that?

8        A     I continued behind Santana.  I grabbed him, I pulled

9   him over to the vehicle.  I cuffed him and frisked him at that

10  point.

11       Q     And did you find anything or did you recover anything

12  from Mr. Santana?

13       A     Yes, I did.

14       Q     What did you find?

15       A     A wad of money in his left jacket pocket.

16       Q     Can you describe how that wad of money was packaged or

17  bound, if it was in any way?

18       A     It was rolled up in rubber bands.

19               THE COURT:  In a rubber band?

20               THE WITNESS:  Rubber bands.

21       Q     What did you do with the money once you found it?

22       A     I initially put it back in his pocket.

23               THE COURT:  In Mr. Santana's?

24               THE WITNESS:  In Santana's pocket.

25       Q     Why did you do that?

lr-a          PO E. Mangual - People - Direct

1      A     I did that so it wouldn't be misplaced until I figured

2    out everything that was going on.

3      Q     So after -- now at that point Mr. Santana was in cuffs?

4      A     Yes.

5      Q     What did you do at that point once you had found the

6    money and he was handcuffed?

7      A     Shortly after I walked Mr. Santana to the van where

8    Melenciano was already placed in the van by my partner.

9      Q     And was Mr. Melenciano handcuffed at that point?

10     A     Yes.

11     Q     Once they were in the van, what did you do?

12     A     I went back and I spoke to the complainant, excuse me a

13   second.  I'm drawing a blank with the name, I'm sorry.

14     Q     Mr. Contreras?

15     A     Contreras, Mr. Contreras, and then he continued giving

16   me the story of what happened.

17            THE COURT:  Mr. Contreras, and who's the second

18      person?  There was more than one person you spoke with.

19            THE WITNESS:  Well, Contreras and Rodriguez.

20            THE COURT:  Rodriguez.

21     Q     That with be Joel Rodriguez?

22     A     Yes.

23     Q     When you spoke to Mr. Contreras, were the two -- well,

24   strike that.

25            When you spoke to Mr. Contreras and Mr. Rodriguez, were

lr-a          PO E. Mangual - People - Direct

1    they together?

2        A     Yes, they were.

3        Q     When you spoke to them were they speaking in English or

4    in Spanish, if you remember?

5        A     Honestly, I don't recall.  I speak both and sometimes

6    people speak to me -- it's been three years, I don't remember if

7    it was English or Spanish.

8        Q     What did Mr. Contreras say to you when you spoke to him

9    at that point?

10       A     He told me that they pulled up in the vehicle, they

11   came out of the car, they said they were police and they put him

12   against the wall, and then he took his money.

13             THE COURT:  Slow down, please, for the

14       interpreter.

15             THE WITNESS:  He said they came out of the

16       vehicle.  After coming out of the vehicle they put them all

17       against the wall and they then started searching them.  And

18       then he said Santana pulled out his money from his pockets.

19       Q     Did he indicate, did Mr. Contreras indicate to you how

20   much money was taken from him?

21       A     Yes, he did.

22       Q     How much was it?

23       A     He said it was $6000.

24       Q     Now, did you speak to Mr. Rodriguez as well?

25       A     Yes, I did.

lr-a          PO E. Mangual - People - Direct

1     Q      And did he provide anything additional?

2     A      Not much.  He just reiterated what Contreras said.

3     Q      So after you had this conversation with Mr. Contreras

4   and Mr. Rodriguez, what did you do at that point?

5     A      I went back to the van and I removed the money from

6   Santana's pocket.  Then I asked him how much money was there.

7   His reply was 16,000.

8     Q      Sixteen thousand?

9     A      Sixteen.

10    Q      When you asked him that question, did you ask him

11  anything or did he say anything else?

12    A      He said the money was his.  That this was owed to him.

13    Q      Now, had you had Mr. Santana or Mr. Melenciano been

14  read their rights at that point?

15    A      No.

16    Q      And they were both handcuffed in the van?

17    A      They were both handcuffed in the van.

18    Q      After Mr. Santana said that, what did you do with the

19  money?

20    A      I put it in my pocket and held onto it so I can voucher

21  it later.

22    Q      Did Mr. Melenciano say anything at that point?

23    A      Yes.

24    Q      What did he say?

25    A      He said --

1r-a        PO E. Mangual - People - Direct

1           MR. WILSON:  Objection, Judge.  We had a colloquy

2      the other day.  I understood no statements were going to be

3      offered against Mr. Melenciano.

4           THE COURT:  Well, if this is for the probable

5      cause part of the hearing, I assume that this is for the

6      Mapp part?

7           MR. WEINSTEIN:  It should have been established

8      before this.

9           THE COURT:  You withdrew statement notice.  I

10     don't even know when the statement was alleged to have been

11     made, if this is what --

12          MR. MENDYS:  I did withdraw statement notice, and

13     my intention is not to use the statement that the witness is

14     about to testify to.  But in the interest of economy in

15     terms of if Mr. Melenciano were to testify later, this is an

16     additional witness that would have to be if there were to be

17     a Harris hearing and this is something I may want to use.

18          THE COURT:  Well.

19          MR. MENDYS:  I figured I would ask it now.  If you

20     don't want me to, I won't.

21          THE COURT:  I didn't say I want you to.  There's

22     an objection here.

23          MR. WILSON:  I'm objecting.  If it's not being

24     used, Judge --

25          THE COURT:  On direct, but it may be, he's

1r-a          PO E. Mangual - People - Direct

1     reserved the right to use it if your client takes the stand

2     for cross-examination.  So as I am going to be the trial

3     judge and there may have to be an additional witness called

4     for a reason that I'm not aware of at the moment about a

5     statement that your client made, and the only issue as to

6     whether it was voluntarily made and not Mirandized or

7     anything but whether it was beaten out of him, because

8     that's what the Harris hearing really is, even if he were to

9     sustain a burden that on, on a custodial statement in the

10    absence of Miranda it still comes in to impeach unless it's

11    beaten out of the defendant from the person who made the

12    defendant, it still comes in.

13          So if this is when it was made and this is the

14    statement, it's relevant to cross-examination and I will

15    hear the testimony now, okay, but I understand that I'm not

16    ruling on its admissibility on the People's direct case.  Go

17    ahead.

18    Cont'd DIRECT EXAMINATION

19    BY MR. MENDYS:

20    Q     Did Mr. Melenciano say anything to you at that point?

21    A     Yes.  He said the money was owed to them.

22                THE COURT:  He said the money?

23                THE WITNESS:  The money.

24                THE COURT:  Was owed to him?

25                THE WITNESS:  To them.

lr-a          PO E. Mangual - People - Direct

1                       THE COURT:  To them?

2                       THE WITNESS:  To them.

3                       THE COURT:  Okay.

4        Q     Did you ask Mr. Melenciano any questions prior to him

5   saying that?

6        A     No.

7        Q     Did you, did you threaten either Mr. Melenciano or Mr.

8   Santana before that?

9        A     Not at all, no.

10       Q     Did they appear to be under the influence of any drugs

11  or alcohol when they made those statements?

12       A     No.

13       Q     Were they threatening you in any way?

14       A     No.

15       Q     So after Mr. Melenciano made that statement, what did

16  you do at that point?

17       A     At that point I continued -- I closed the door and then

18  I continued helping the guys pretty much look for any evidence.

19       Q     Did you recover -- was anything recovered from, not

20  from Mr. Melenciano's person but from his custody?

21       A     Yes.  His vehicle was there on the scene.

22       Q     And what kind of vehicle was that?

23       A     It was a black Acura.

24       Q     A sedan or?

25       A     Sedan.

1r-a             PO E. Mangual - People - Direct

1       Q      A sedan.  And where exactly was that parked?

2       A      In front of the location.

3       Q      Is that the vehicle that you referenced that he placed

4    Mr. Santana up against?

5       A      Yes, it is.

6       Q      Now, how did you determine that that vehicle belonged

7    to Mr. Melenciano?

8       A      I ran it through Finest and, which is a system we use,

9    and it came back to his name the registration.

10      Q      And did any of the witnesses indicate to you anything

11   about the car?

12      A      They said that's the vehicle that the defendants came

13   out of.

14                   THE COURT:  The three people?

15                   THE WITNESS:  They didn't specify, they just

16        mentioned the two.

17                   THE COURT:  These two defendants, okay.

18                   THE WITNESS:  Yes.

19      Q      What did you do with the car?  Well, what did you do,

20   ultimately what did you do with the car?

21      A      I vouchered it.

22      Q      And what did you do with the money that was recovered

23   from Mr. Santana?

24      A      I vouchered that as well.

25      Q      And when you voucher something, for the record what

lr-a         PO E. Mangual - People - Direct

1    does that mean?

2        A    The police department takes it into custody for

3    safekeeping or arrest evidence.

4        Q    Now, did you have to make any additional notifications

5    to other parts of NYPD in relation to this case?

6        A    Yes, I did.  I had to notify IAB.

7        Q    Why is that?

8        A    It's just a procedure that we must do when it comes to

9    impersonating any type of a government agencies.

10       Q    Now, did you speak -- did you later learn anything

11   about the involvement of the third person?

12       A    Yes.  I learned they actually caught him later.

13       Q    Well, did you learn anything from the witnesses,

14   complaining witnesses?

15              THE COURT:  At what point are you talking about?

16              MR. MENDYS:  That night.

17              THE COURT:  You spoke to the complaining witness

18        about the third person?

19              MR. MENDYS:  Yes.

20              THE COURT:  Okay.  Did you speak to them about the

21        another person other than these two defendants?  Either Mr.

22        Contreras or Mr. Rodriguez or both of them?  Did you speak

23        to those people about another individual's involvement?

24              THE WITNESS:  Not really, no.  I don't recall.

25       Q    Did they, did they -- did the complainants indicate to

lr-a          PO E. Mangual - People - Cross(Wilson)

1    you that a third person was involved?

2              MR. WILSON:  Objection.

3         A    They did initially.

4              THE COURT:  I'm overruling it.  What did they say?

5              THE WITNESS:  They did initially, but they didn't

6         continue with it.

7              THE COURT:  But they didn't do any elaboration on

8         it or they said there was only two?

9              THE WITNESS:  Initially they said there were three

10        and then as we were doing the process I stopped asking and

11        they stopped mentioning.  They were just focusing on the two

12        that we had at that point.

13             MR. MENDYS:  No further questions.

14             THE COURT:  Okay, Mr. Wilson, cross-examination.

15   CROSS-EXAMINATION

16   BY MR. WILSON:

17        Q    Good afternoon, Officer.

18        A    Good afternoon.

19        Q    Did you testify in the grand jury in this case?

20        A    Yes, I did.

21        Q    And do you know if it was on one occasion or more than

22   one occasion?

23        A    I don't recall.

24        Q    And what paperwork did you fill out in connection with

25   this case?

1r-a            PO E. Mangual - People - Cross(Wilson)

1        A       Initially I did an arrest report, complaint report and

2    some vouchers.  A lot of vouchers.

3        Q       Anything else?

4        A       To my recollection that's it.

5        Q       And did you ever give a tape-recorded statement in

6    connection with this case?

7        A       A what statement?

8                    THE COURT:  Did you make a tape-recorded --

9                    THE WITNESS:  Negative, no.

10       Q       Did you ever testify at any other proceeding in

11   connection with this case besides the grand jury?

12       A       No.

13       Q       Did you have occasion to be shown a videotape of this

14   alleged incident prior to your testifying today?

15       A       Yeah.  Yes, I did.

16       Q       So you saw the videotape yesterday?

17       A       No, I wasn't here yesterday.

18       Q       I'll try again.  Have you seen a videotape of this

19   alleged incident?

20       A       Yes, I have.

21       Q       And when was that?

22       A       I saw one this morning and I saw one weeks ago.

23       Q       The one you saw this morning, do you recall about what

24   time you saw it?

25       A       About 10 o'clock.

lr-a          PO E. Mangual - People - Cross(Wilson)

1      Q     And do you recall where you saw it?

2      A     At the DA's office.

3      Q     Was it one tape or was it multiple tapes?

4      A     It was, I would say, multiple.  It was in segments of

5      --

6                  THE COURT:  Different camera angle views?

7                  THE WITNESS:  Two different camera angles but the

8           video was --

9                  THE COURT:  On one?

10                 THE WITNESS:  Yes.

11                 THE COURT:  But it's two different angles.

12                 THE WITNESS:  Two different angles.

13     Q     Did you watch the tapes once or more than once this

14     morning?

15     A     Once.

16     Q     And several weeks ago where did you see the tapes?

17     A     Same place.

18     Q     The district attorney's office?

19     A     Yes.

20     Q     And did you see the tapes once or more than once on

21     that occasion?

22     A     Once.

23     Q     And are those the two times you looked at the tapes in

24     connection with this case?

25     A     I've seen them once before, months ago.  Probably last

lr-a          PO E. Mangual - People - Cross(Wilson)

1    year I would say, actually.

2        Q    I'm sorry, I didn't hear you.

3        A    Months ago or last year.  I don't remember, it's been a

4    while.

5        Q    Would that have been prior to your testimony in the

6    grand jury?

7        A    No.

8        Q    So you saw them on a third occasion after the grand

9    jury?

10       A    Yes.

11                  THE COURT:  I just want to ask, did you ever see

12            them before you testified in the grand jury?

13                  THE WITNESS:  It's been almost three years, I

14            don't remember if it was before or after.

15                  THE COURT:  Okay.

16       Q    As you were driving down the block that night and you

17   first saw the incident that you testified to, about how far away

18   from the incident were you when you first noticed it?

19       A    I would say maybe two or three car lengths.

20       Q    Now, were you the first one in that automobile of the

21   three officers who were there to say something about the

22   incident?

23       A    Yes.

24       Q    And did either of your brother officers say anything

25   about the incident to you before you exited the car?

lr-a            PO E. Mangual - People - Cross(Wilson)

1       A       No.  I brought it to their attention when I saw it.

2       Q       Okay.  And what did you say to them?

3       A       I looked at them.  I told them, what's wrong with this

4    picture?

5       Q       And about how many feet away from these individuals

6    were you at this time?

7       A       At that point I was maybe two car lengths.

8       Q       From the individuals?

9       A       Yeah.

10      Q       All right.  And then you got out of your car?

11      A       We exited the vehicle.

12      Q       All right.  And what did you do?

13      A       At that point we started walking towards them.

14      Q       Now what did you do?

15      A       I started walking towards, towards the scene.  As I got

16   to the parked vehicles they split in different vehicle

17   directions.  I guess at that point they realized we were behind

18   them.

19      Q       Now when you say they split, who are you referring to?

20      A       Santana and Melenciano.

21      Q       All right.  And you arrested Santana?

22      A       Yes.

23      Q       And where was he located when you arrested him?

24      A       He was, he was next to the black Acura.

25      Q       And did you see where Mr. Melenciano went?

lr-a          PO E. Mangual - People - Cross(Wilson)


1       A     Yes.  He was actually in front of the address and my
2    partners had him.
3       Q     And how far was Mr. Melenciano from the people who were
4    up against the wall at that point?
5                  THE COURT:  At what point?
6       Q     At that point in time he was stopped by your partner?
7       A     Oh, he was actually at the curve of the street right in
8    front of the building.
9       Q     Can you estimate how many feet that was from the other
10   individuals?
11      A     Fifteen feet.
12      Q     Now, where were you located at the time the first
13   individual at the scene spoke to you?
14      A     I was actually in the street, he was on the sidewalk.
15   I was on the opposite side of the vehicle, parked vehicle.
16      Q     And can you estimate how far you were from Mr.
17   Melenciano at that point?
18      A     Maybe one car length.
19      Q     And --
20      A     Or two.  Maybe one or two car lengths.
21      Q     What was the first thing you heard any of these
22   individuals say to you?
23      A     Which individuals?
24      Q     The individuals, the first person that spoke to you
25   after you got out of the van?

lr-a          PO E. Mangual - People - Cross(Wilson)

1      A      Repeat the question?

2      Q      What was the first thing that somebody said to you

3      after you exited the van?

4      A      These guys just took my money and they said they were

5      police officers.

6      Q      Who was that?

7      A      That was -- I'm sorry, I keep forgetting his name.

8      With a "C".

9             THE COURT:  Is there something that would refresh

10         your recollection?

11            THE WITNESS:  Yes.  Can I have something to

12         refresh my memory?

13     Q      If you have something that would refresh your

14     recollection, please look at it.

15     A      I don't have it on me.

16            THE COURT:  The memo book?

17            THE WITNESS:  No.

18            THE COURT:  No?  But that's what you would --

19            THE WITNESS:  Oh yes, yes, yes.

20            THE COURT:  You can show him if there's a copy

21         somewhere.

22     Q      You don't have your original memo book with you?

23     A      No, I don't.

24     Q      Is there any reason for that in particular or --

25            THE COURT:  Doesn't really matter whether he does

lr-a          PO E. Mangual - People - Cross(Wilson)

1       or he doesn't, but he said if there's something, if there's

2       a --

3                   THE WITNESS:  Contreras.

4                   THE COURT:  To refresh his recollection.

5                   THE WITNESS:  It was Contreras.

6                   THE COURT:  Okay.  Mr. Contreras said that to you?

7                   THE WITNESS:  Yes.

8                   THE COURT:  Okay.

9       Q      May I just ask, Judge, if somebody directed you not to

10      bring your memo book today?

11      A      No.  I forgot it.

12      Q      All right.  Mr. Contreras was the first person who

13      spoke to you?

14      A      Yes.

15      Q      And how far was he from you at the time he made that

16      statement?

17      A      He was on the opposite side of a parked vehicle.

18      Q      And did he -- did he say anything else to you at that

19      time or that's all he said?

20      A      That's all he said, and that was enough that I needed

21      to stop Santana and cuff him.

22      Q      And who was the next person you spoke to at the scene?

23      A      I spoke, each time I spoke to him.  It was mainly, I'm

24      sorry, Contreras and Rodriguez.

25      Q      Well, let me ask you this.  After you spoke to Mr.

lr-a          PO E. Mangual - People - Cross(Wilson)

1   Contreras the first time, who was the next person you spoke to at

2   the scene after that?

3       A    Rodriguez.

4       Q    And what did Mr. Rodriguez say to you?

5       A    He just reiterated what Contreras said.

6       Q    What did you say to Mr. Rodriguez and what did he say

7   to you?

8       A    I didn't ask him anything.  He just spoke and told me

9   that these guys just said they were cops and they had us against

10  the wall.

11      Q    And at that point in time where was Mr. Melenciano?

12      A    He was in the van.

13      Q    Did Mr. Rodriguez say anything else to you at that

14  time?

15      A    No.

16      Q    And who was the next person you spoke to at the scene

17  after Mr. Rodriguez?

18      A    That's it, that was enough speaking.  I spoke to both,

19  they told me what I needed to know.  The defendants were in the

20  van.  At that point I was just waiting for my supervisor.

21      Q    So of the four civilians who were at the scene, you

22  spoke to two?

23      A    Yes.

24      Q    Never spoke to the two other?

25      A    The others spoke, but I really didn't ask them any

lr-a          PO E. Mangual - People - Cross(Wilson)


1     questions.  I don't recall exactly what we spoke of.

2          Q     So putting aside Mr. Contreras and Mr. Rodriguez for a

3     minute.

4          A     Okay.

5          Q     You spoke -- the other two people spoke to you, but you

6     didn't speak to them?

7          A     They were telling me what happened.  It's been three

8     years, I don't remember exactly what --

9          Q     The question calls for a yes or no answer.

10                THE COURT:  No, no, let's not step on the question

11          and the answer.

12                MR. WILSON:  I'm sorry.

13                THE COURT:  Is the question whether he -- I mean,

14          it's an argumentative question.  They spoke to you and you

15          didn't speak to them is not really a question.

16                MR. WILSON:  I'll rephrase it, Judge.

17                THE COURT:  Yes.

18          Q     You spoke to Mr. Contreras?  You spoke to Mr.

19     Rodriguez?

20          A     Yes.

21          Q     You spoke to each of them one time?

22          A     No, negative.

23          Q     All right.  Well, let's back up then.  Tell me what Mr.

24     Contreras said to you -- well, withdrawn.  Withdrawn.

25                You spoke to Mr. Contreras the first time; is that

lr-a            PO E. Mangual - People - Cross(Wilson)

1    correct?

2        A      Initially he spoke to me.  He told me before I even got

3    to speak to him.

4        Q      Did you speak to him again?

5        A      Yes, I did.

6        Q      And how long after the first time you spoke to him did

7    you speak with him a second time?

8        A      Matter of minutes.

9        Q      What did he tell you the second time?

10       A      He just reiterated these guys put us against the wall.

11   They said they were police.  They searched us and they took my

12   money.

13       Q      And he said that on the second occasion you spoke to

14   him?

15       A      Yes.

16       Q      All right.  And where was Mr. Melenciano at that point

17   in time when you spoke to Mr. Contreras the second time?

18       A      At that point Melenciano was in the van cuffed.

19       Q      Now, did you speak to Mr. Contreras again after that?

20       A      Of course I did.

21       Q      Where did you speak to him on the third occasion?

22       A      I spoke to him countless times.  I spoke to him at the

23   scene and I spoke to him at the precinct.

24       Q      Other than what you've just related Mr. Contreras said,

25   did he say anything else to you at that time?  At any of those

1    times?

2         A     No.

3                    THE COURT:  You mean anything other than --

4                    THE WITNESS:  Other than what happened.

5         Q     Well, that's what I'm trying to find out.  Did Mr.

6    Contreras say anything to you other than what you had already

7    related to me on cross-examination?

8         A     No.  He just mentioned he pointed them out.  He said

9    they put him against the wall, they frisked them.  Santana took

10   the money out of his pocket and that's it.

11                   (Continued on the next page...)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(mnB)            PO Mangual/Peo/Cross(Wilson)                    168

1    Q.   No further conversations beyond those words?

2    A.   At the precinct we did this.

3              THE COURT:  You went to the precinct?

4              THE WITNESS:  We went to the precinct.

5    Q.   So at the scene the next person you spoke to after

6    Mr. Contreras and Mr. Rodriguez --

7              THE COURT:  After the first conversation?

8              MR. WILSON:   Yes, I'm sorry.

9              After the first conversation with

10   Mr. Contreras, the next person he spoke to.

11   A.   They were both speaking to me at once, they were both

12   together and they were both reiterating, telling me over and over

13   what happened and what they did?

14   Q.   What did Mr. Rodriguez say to you the first time you

15   spoke with him?

16   A.   You asked me that.  Rodriguez told me the same thing

17   that Contreras said.  They came out of the vehicle, put them

18   against the wall, identified himself as a police officer and

19   started searching them.

20   Q.   Did you speak to Mr. Rodriguez again after that?

21   A.   At the precinct he reiterated, he told me the same

22   thing.

23   Q.   Did he tell you anything else?

24   A.   No.

25   Q.   Did you speak to either of the two females at the same

1   time?

2       A.   They both spoke to me, they were telling me the same

3   thing, what happened, and I kept my questions within limits

4   because I was focused on the two main complainants.

5       Q.   Let's speak about Esmeraldy Rodriguez, what did she

6   tell you at the scene?

7       A.   I don't recall exactly what she said.

8       Q.   And the other female, did she tell you something at the

9   scene?

10       A.   I don't recall exactly what she said.

11       Q.   And at the time you spoke to Mr. Rodriguez, am I

12   correct in understanding Mr. Melenciano was already in the van?

13       A.   Yes.

14       Q.   And at the time that you spoke to the two females who

15   were at the scene, am I correct in understanding Mr. Melenciano

16   was already in the van?

17       A.   Yes.

18       Q.   Thank you.  Now, you said initially that Mr. Melenciano

19   moved from the location where you first saw him when you stopped

20   the van?

21       A.   Yes.

22       Q.   Where did he move?

23       A.   He started walking away and my partner grabbed him.  He

24   started walking northbound.

25       Q.   How far did he walk?

1      A.   I'm not exactly sure.  I was focused on Santana.

2      Q.   And when you spoke to Mr. Melenciano in the van, please

3    tell me again what you said to him and he to you?

4      A.   I didn't say anything to him.  After his, after

5    Santana, after I took the money from Santana and Santana told me

6    that it was his money, Melenciano said the money was owed to

7    them, repeating after Santana who said it was his money, that he

8    owed him the money.

9      Q.   And this conversation took place about how long after

10   Mr. Melenciano had been handcuffed?

11     A.   I'm not exactly sure.

12     Q.   How long did you remain at the scene before you

13   returned to the precinct?

14     A.   I'm not sure.  I had to wait for my supervisor before I

15   can actually move.  We did a quick canvass in the area to see if

16   they dumped any weapons or the shield that they said that was

17   illegally displayed.

18     Q.   So you don't know what time you left?

19     A.   No.

20     Q.   Did you make any notations in your memo book about what

21   time you left?

22     A.   No.

23     Q.   Can you describe how large this area in the back of the

24   van was where the prisoners had been placed?

25     A.   It's rows, it's three rows.

1      Q.    Three rows of seats?

2      A.    Three rows of seats.

3      Q.    Including like the square footage, four by four, six by

4    six, do you know --

5      A.    No.

6      Q.    -- whatever it was approximately?

7      A.    No.

8            THE COURT:  I'm sorry, did you say it was a marked

9       police van?

10           THE WITNESS:  Marked Department vehicle, yes.

11           THE COURT:  Okay.

12     Q.    Sort of like a Ford Econoline van, something like that?

13           THE COURT:  A van.

14     A.    It was a van.

15           THE COURT:  I get the picture.

16     Q.    And you can't estimate or even attempt to estimate the

17   area in the back where the prisoners were.

18     A.    I can tell you you can fit eleven, 12 people in there.

19     Q.    Now, when the three of you first stopped the van, you

20   said you went toward one person, another officer went toward

21   another person; do you know what the third officer did at that

22   point in time?

23     A.    One of them most likely went to speak with the

24   complainants.

25     Q.    I'm sorry?

1      A.   One of them most likely went to speak to the

2  complainants.  I'm not a hundred percent sure which one did.  I

3  was focused on Santana.

4      Q.   Do you know who that officer was?

5      A.   Which one?

6      Q.   The one you just referred to that went to speak to the

7  complainants?

8      A.   I don't know which one spoke to the complainants

9  initially.

10     Q.   Do you know who took Mr. Melenciano into custody?

11     A.   I don't recall which one grabbed him.

12     Q.   Did you yourself hear any of the conversations that

13  either of your two partners had with any of the civilian

14  witnesses?

15     A.   No, I was too far away.

16     Q.   Now, with regard to Mr. Melenciano, did you ever have

17  occasion to show photographs of him to any of the witnesses in

18  this case?

19           THE COURT:  At what time are you talking about?

20     Q.   At any time did you ever show photographs of him to any

21  of the witnesses in this case?

22           THE COURT:  Is that a subject of this hearing?

23           MR. WILSON:  It's a Wade hearing, Judge.

24           THE COURT:  Was your client identified in a

25    photographic array?  Did you serve notice?

1                   MR. WILSON:  No.  I'm just trying to find out what

2          happened.

3                   THE COURT:  We are not going into anything that

4          isn't the subject of this hearing.  If there are other

5          identification procedures that took place, that's not the

6          subject of this hearing.  I don't know what -- I assume that

7          you moved to suppress the identification for which the

8          People gave notice.

9                   MR. WILSON:  I've been in situations, Judge, where

10         all of a sudden at trial another photographic showing comes

11         up.

12                  THE COURT:  Is there another photographic showing

13         that the People know about?

14                  MR. MENDYS:   No.

15                  THE COURT:  Go on.  I'm not allowing this to be a

16         discovery device.  This is a specific hearing addressed  to

17         issues raised and for a case that's three years old with all

18         of the discovery and everything that's been turned over, I

19         would thank if there was another procedure, it would be in

20         the paper work.  I also assume it wouldn't be done by the

21         police officer but by a detective.

22                  After you processed the arrest, did you have any

23         involvement at all in anything else?

24                  THE WITNESS:  Not at all.

25                  THE COURT:  Thank you.

1            Move on.

2       Q.   Were you ever present when anybody, including the

3   Assistant District Attorney, showed photographs to the witnesses

4   in this case?

5       A.   No.

6       Q.   And the automobile in question, do you recall at what

7   time you ran the automobile to determine who it belonged to?

8       A.   The exact time, no, I don't.

9       Q.   What information did you have that led you to run the

10  plate if in fact you ran the plate?

11      A.   I did run the plate.

12      Q.   What information did you have at that time that led you

13  to run the plate?

14      A.   I had the vehicle.

15      Q.   I understand that that's what you had, you had a car in

16  the street?

17      A.   I had a car with plates and a VIN number, I have to run

18  the plates before I voucher the vehicle so I can determine the

19  owner.  The owner's name did come back to the defendant.

20      Q.   So at the point in time you ran the plate, you had no

21  further information about that car other than it was a car in the

22  street?

23      A.   Repeat the question.

24      Q.   At the time you ran the plate of that vehicle, what

25  information did you have or had you been given about that

1  automobile?

2       A.   I ran the plate long after the defendants were in

3  custody.

4       Q.   That's not my question.  At the time you ran the plate,

5  what information did you have about that car that led you run to

6  the plate?

7       A.   Honestly I don't recall.  I think I might have had an

8  insurance card from the defendant or maybe --

9            THE COURT:  I think that the question is more

10       about had you received any information from anybody about

11       the relevance of that particular car?

12       A.   Yes, I said it earlier, the complainant did state that

13  they exited the vehicle.

14       Q.   When you say the complainant, who are you referring to?

15            THE COURT:  These two individuals you spoke with?

16            THE WITNESS:   Yes.

17            THE COURT:    Thank you.

18       Q.   Now, I had asked you earlier if you had any further

19  conversation with Mr. Contreras, and you hadn't mentioned that

20  vehicle.  At what point in time did Mr. Contreras tell you about

21  the vehicle?

22       A.   I did say earlier that the complainant did point at

23  them and say that they came out, well he did tell me that they

24  did come out of the vehicle, exited the vehicle, they put them

25  against the wall, they frisked them and took his money.  He did

(mnB)      PO Mangual/Peo/Cross(Weinstein)            176

1   say they did exit the vehicle.

2         Q.   At what point in time did Mr. Contreras tell you that?

3               THE COURT:  What point in your investigation.

4         A.   After, after, after I put Santana in the van.

5               MR. WILSON:  Judge, can I have just a moment.

6               THE COURT:  Sure.

7               (At this time an off the record discussion is held

8         between defense counsel, Mr. Weinstein and Mr. Wilson.)

9               MR. WILSON:  I have nothing else, Judge.

10              THE COURT:  Okay.  Mr. Weinstein.

11              MR. WEINSTEIN:  Thank you, your Honor.

12   CROSS-EXAMINATION

13   BY MR. WEINSTEIN:

14        Q.   Officer, what time was it that you stopped your van and

15   saw something happen on the other side of the street?

16        A.   Shortly after midnight.

17        Q.   Two minutes, five minutes after?

18        A.   About a quarter after, more or less.

19        Q.   About a quarter after.

20             And what time did you place Mr. Santana under arrest?

21        A.   The actual arrest time, I don't recall.

22        Q.   You don't recall?

23        A.   I don't recall.  He was, he was placed in custody maybe

24   a minute after the stop.

25        Q.   Is there a reason you put down 12:26 as your arrest

1    time?

2              THE COURT:  Did you put that down somewhere if you

3         know.

4         A.   That's probably the time that Central gave me as the

5    arrest time.  Before I even put it over the radio, I had to make,

6    I had to call my supervisor and let him know what we had.  So by

7    the time I got through to Central, that's the time Central gave

8    me as an arrest time.

9         Q.   So you don't have any idea what time you actually

10   placed my client under the physical control of yourself?

11        A.   It would be approximately a minute or so after I put it

12   over.

13        Q.   So it wouldn't be at 12:26?

14        A.   No, it would be shortly before.

15        Q.   So you put it over to Central before you even

16   apprehended my client?

17        A.   No, I apprehended your client prior to putting it over.

18        Q.   You were on the east side of Walton Avenue?

19        A.   I was in the street.

20        Q.   The north side, south --

21             THE COURT:  At what point, Mr. Weinstein -- hold

22        on.

23             At what point?

24        Q.   While you were in the van.

25        A.   Walton is a one-way street that goes southbound.

(mnB)            PO Mangual/Peo/Cross(Weinstein)                178

1        Q.   It goes?

2        A.   Southbound.

3        Q.   North and south, right?

4        A.   No, it's one direction.

5        Q.   Goes from the north to the south?

6        A.   Yes, I'm sorry.  Yes.

7        Q.   And there are the sides of east and west, correct?

8        A.   Yes.

9        Q.   The west side is towards the Jersey side, the east side

10   is towards the rest of the Bronx, right, which side --

11              THE COURT:  He said yes.

12              What's your question?

13       Q.   What side of the street, west side or east side, was

14   your van stopped?

15              THE COURT:  He said he was in the middle of the

16       street.

17       Q.   Middle of the street on which side --

18       A.   So it was on the west side of the street.

19       Q.   West side of the street.  Okay.

20            How many lanes is Walton Avenue?

21       A.   One lane.

22       Q.   One lane?

23       A.   One lane.  It's a one-way street.

24       Q.   Well, there's parking on both sides of the street,

25   correct?

1      A.   We don't count that as a lane.

2                THE COURT:   Maybe Mr. Weinstein does.   Let's hear

3           what he says.

4      Q.   You have two parking lanes, right?

5      A.   Yes.

6      Q.   And one traveling lane?

7      A.   Yes.

8      Q.   So three lanes?

9      A.   No, one is parking.

10     Q.   Can you travel in that lane?

11               THE COURT:   He's calling the sides parking lanes

12          and the middle, so there's not a divided -- in the middle

13          where --

14               THE WITNESS:   If you're counting the cars, the

15          cars that are parked, three lanes.

16     Q.   You were in the westward lane, correct?

17     A.   West side of the street.

18     Q.   West side of the street?

19     A.   We were in the center because vehicles were parked on

20    both the east and west side of the street and --

21     Q.   I'll start again.   Your vehicle is on the west side of

22    the street?

23     A.   No, it's in the center.   I just walked on the west side

24    the street so it's in the center.

25     Q.   The people are on what side of the street?

1    A.   The west side of the street.

2              THE COURT:   On what side of the street?

3              THE WITNESS:   The west side of the street.

4    Q.   How long did you observe these people before stopping

5  your van?

6    A.   Less than a minute.

7    Q.   And were you the driver, the recorder, the rear

8  passenger; where were you?

9    A.   I was the driver.

10   Q.   You were the driver?

11   A.   Yeah.

12   Q.   So that means you're the person furthest away from

13 these people on the west side of the street, correct?

14   A.   Yes.

15   Q.   And somebody's sitting next to you on the front seat?

16   A.   Yes.

17   Q.   Where was the third partner?

18   A.   Sitting right behind us.

19   Q.   And you were the one who noticed it as opposed to the

20 person closer to you who's closer to them, right?

21   A.   Yes.

22   Q.   You said hey, guys, I think something's going on, then

23 what do you?

24   A.   Initially I slow the vehicle, what we normally do where

25 we see plain clothes officers, just to make sure they're all

1   right.  As I get closer, I realized their dress attire and at

2   that point I stopped and I told them what's wrong with this

3   picture and we exited the vehicle.

4        Q.   When you got out of your car, you were the first one

5   out?

6        A.   I think so, yes.

7        Q.   What?

8        A.   Yes.

9        Q.   But you had to go around the car to get to where they

10  were, correct?

11       A.   Yes, I did.

12       Q.   By the time you got around the car, was your partner

13  who was in the front seat with you, was he out of the van?

14       A.   I don't recall which one was in the front.

15       Q.   Whichever one it was, did he get out before you to the

16  west side of the street?

17       A.   Yes.

18       Q.   What?

19       A.   Yes.

20       Q.   So you weren't the first one over there?

21       A.   You asked which one was the first one out of the

22  vehicle.  I was the first one out of the vehicle.

23       Q.   The first out the vehicle but not the first to the west

24  side of the street because --

25       A.   I said at the same time more less.

(mmB)          PO Mangual/Peo/Cross(Weinstein)          182

1       Q.   The question was, were you the first one out of the

2   vehicle?

3       A.   Yes, the first one out of the vehicle.

4       Q.   You were the first one to get to the people on the west

5   side?

6       A.   I didn't even go on the sidewalk initially.

7       Q.   You were the first, who was the first one to get to the

8   civilians?

9       A.   It would have to have been one of my partners.

10       Q.   It was not you?

11       A.   No, I went after Santana after he started walking away

12   and --

13                   THE COURT:   Hold on, the both of you, and not only

14           for the reporter, we've already had this for the

15           interpreter, who is having a hard time because questions and

16           answers are being stepped on and rapid-fire questioning does

17           not work with a Spanish language interpreter, and rapid-fire

18           answers do not work this way for either, they don't work for

19           the reporter as well when making a record.  Please slow the

20           entire process down.  Okay?

21                   MR. WEINSTEIN:  Okay.

22       Q.   You went after Santana without doing anything else,

23   correct?

24       A.   Initially, no.

25       Q.   What?

1      A.    Initially yes I mean.

2      Q.    When you started going after Santana, had you had any

3   conversation with Contreras?

4      A.    No.

5      Q.    What about with Rodriguez?

6      A.    No.

7      Q.    What about with any of the --

8      A.    No one.

9      Q.    Let me finish.

10           THE COURT:   Let the question be finished before

11     you answer.

12     Q.    So, it is true that you went after Mr. Santana without

13   having spoken to any of the four civilians, correct?

14     A.    When I originally exited the vehicle and walked in the

15   direction of Santana, yes.

16     Q.    How long did it take to apprehend Mr. Santana?

17     A.    Less than a minute.

18     Q.    Couple of seconds, right?

19     A.    Less than a minute.

20     Q.    Was it a couple of seconds?

21     A.    Couple of seconds would be two seconds, so less than a

22   minute.

23     Q.    Five seconds?

24     A.    As I walked out of the vehicle, I walked in the

25   direction of Santana because he was walking away from the scene.

1   As I was walking in that direction, the complainant pointed at

2   him yelling from the other side of the park, the vehicle's on the

3   west side of the street, he's yelling "they just took my money,"

4   he's pointing at him, and he said they were police officers,  so

5   I continued walking after him.

6        Q.   So as you're getting out of the vehicle, this civilian

7   is saying those words, correct?

8        A.   As I get on the front of my van, yes, as I'm walking

9   towards Santana.

10       Q.   Your two partners didn't run for Mr. Santana?

11       A.   No.

12       Q.   They were closer to the civilians than you were,

13   correct --

14       A.   Yes.

15       Q.   -- they were closer on the west side.

16            You said which civilian said it, could you see or you

17   just heard voices?

18       A.   It was --

19       Q.   Are you going to tell us Contreras?

20       A.   Contreras, yes.

21       Q.   Could you tell which one Contreras was at the time?

22       A.   I that point I didn't know who was who.

23       Q.   At that point you didn't know who said it, correct?

24       A.   No.

25            THE COURT:  You didn't know the name of the person

1        or you didn't know --

2                  THE WITNESS:  I didn't  know the names.

3        Q.   Could you tell which one of the four people said it

4   initially?

5        A.   It was one of the males.

6        Q.   One of the men?

7        A.   One the men.

8        Q.   You didn't know which of the men said it?

9        A.   I didn't know their name.

10       Q.   Did you know which one as opposed to their name, which

11   one said it?

12       A.   I don't remember who said it initially.

13                 THE COURT:   I'm confused now.  You've identified

14       Mr. Contreras as the person --

15                 THE WITNESS:  As the main complainant, yes.

16                 THE COURT:  -- as the first person you heard

17       speaking.

18                 THE WITNESS:  Yes.

19                 THE COLOUR:  Do you recall after learning the name

20       of Mr. Contreras if he was the person --

21                 THE WITNESS:  After hearing the name, I learned

22       who he was and who was saying what.

23                 THE COURT:  After you learned the name, you put

24       the name together --

25                 THE WITNESS:  I put the name with the people who

1    are speaking it --

2              THE COURT:  Let's slow down and let's not finish

3         the question with an answer.  Okay?

4              I'm sorry to the reporter.  I'm doing the best I

5         can do.

6              Go ahead.

7    Q.   When you grabbed Mr. Santana, did he try to get away

8    from you; did he struggle with you, fight with you?

9    A.   He is just walking.

10   Q.   So my question is did he struggle with you, did he

11   fight with you --

12   A.   No.

13   Q.   -- yes or no?

14   A.   No.

15   Q.   He didn't run away either, did he?

16   A.   Say again.

17   Q.   He didn't run away, did he?

18   A.   No.

19   Q.   The words out of this person's mouth were "they took my

20   money," correct?

21   A.   As he pointed in their direction, yes.

22   Q.   Was there anybody else in the direction of Santana when

23   he pointed to him?

24   A.   To the left was Melenciano.

25   Q.   Of Santana?

(mmB)              PO Mangual/Peo/Cross(Weinstein)              187

1      A.    Yes.

2      Q.    How far was Melenciano to his left?

3      A.    Maybe a car and a half length.

4      Q.    Car and a half length.

5            How long is a car by your estimation?

6      A.    15 feet.

7      Q.    So about 21, 22 feet was where Santana was?

8      A.    Give or take?

9      Q.    And he is pointing at my client 20, 22 feet away from

10   Melenciano, correct?

11     A.    Give or take, yes.

12     Q.    And he's saying they took my money, correct?

13     A.    Well he might have said, he might have said they,

14   initially he's just pointing at them, he said "my money was

15   taken."  I followed --

16     Q.    Your testimony was "they took my money?"

17     A.    Yes, they did.

18     Q.    They pointed at one person who you're saying was my

19   client, correct?

20     A.    Yes.

21     Q.    And the next person was 22 feet away, correct --

22     A.    Yes.

23     Q.    -- in the opposite direction, correct?

24     A.    Yes.

25     Q.    The vehicle was south of the civilians?

1      A.  Yes.

2      Q.  And the road goes from the north to the south?

3      A.  Yes.

4      Q.  And did Mr. Contreras or any of the other civilians

5  tell you how many people got out of that vehicle?

6      A.  At some point they did say it was three.

7      Q.  Three people got out of the vehicle?

8      A.  Yes.  Initially they said three, then they said two,

9  it was a mix up, so we weren't sure exactly how many.

10      Q.  Well, were you able to discern from the four witnesses

11  whether it was two people that got out of that car or three

12  people that got out of that car?

13      A.  Three.  The three actually had them against the wall.

14      Q.  How many people got out of the car?  My question is how

15  many people were you told that got out of that car?

16      A.  I don't recall if they said two or three.

17      Q.  No, no --

18              THE COURT:  He said he doesn't recall.

19      A.  I'm not sure.

20      Q.  Did Contreras ever use my client's name when talking to

21  him?

22      A.  No.

23      Q.  Did he ever tell you or any other officers in your

24  presence that he knows my client or any of the other --

25      A.  No.

(mmB)          PO Mangual/Peo/Cross(Weinstein)          189

1      Q.    -- men?

2      A.    No.

3      Q.    You were told by my client that it was his money, it

4   was owed to him, something like that?

5      A.    Yes.

6      Q.    Did you ask Contreras hey, is it this guy's money, did

7   you owe him that money?  Did you ask him that question?

8      A.    I don't recall.

9      Q.    You don't recall?

10     A.    I don't recall.

11     Q.    Isn't that an important question to know whose money it

12  is?

13     A.    It is.

14     Q.    Did you see the money taken from Contreras?

15     A.    No.

16     Q.    When you saw these people, the four civilians, were

17  they facing towards you or away from you?

18     A.    The civilians were facing away from me.

19     Q.    What?

20     A.    The civilians were facing away from me.

21     Q.    So you saw four backs?

22     A.    Four backs.

23     Q.    And other backs too?

24     A.    Yes.

25     Q.    Now, you said Contreras told you "they took my money,"

1  and at a later time he told you it was six thousand dollars,

2  correct?

3      A.   Yes.

4      Q.   When did he tell you it was six thousand dollars,

5  before or after you gave the money back to Mr. Santana?

6      A.   That would have been after.

7      Q.   Okay.   Now, correct me if I'm wrong, but you grab

8  Mr. Santana and put him in handcuffs and search him, correct?

9      A.   Yes.

10     Q.   And he was handcuffed for what reason?

11     A.   Because since it was the appearance of robbery, what

12 appeared to be a robbery which is a violent crime, which is for

13 everyone's safety.

14     Q.   Did  you see the robbery, see anything taken from

15 anybody?

16     A.   No.

17     Q.   Did you see any weapons displayed?

18     A.   No.

19     Q.   Did you see anybody hit anybody?

20     A.   No.

21     Q.   But my client is arrested for robbery, correct?

22     A.   Yes.

23     Q.   And when you searched him, other than the big wad of

24 money, was there anything else --

25     A.   I don't recall.

1    Q.   Robberies a lot of times involve money, right?

2    A.   Yes, and weapons.

3    Q.   You didn't find a weapon on my client or --

4    A.   I didn't know if he had one or --

5    Q.   No, you searched him, you didn't find one?

6    A.   No.  After the search, no.

7    Q.   And you found the money on him.  Turned out a big wad

8    of money, a lot of money, right?

9    A.   Yes.

10   Q.   And when you have a robbery suspect, is it common

11   practice to give the money back to a robbery suspect?

12   A.   Well, at that point I didn't know what was going on, I

13   left it in his pocket to avoid any confusion.

14   Q.   So, it would be less confusing to give money back to

15   the robbery suspect than for you to hold it yourself, is that

16   what you're telling us?

17   A.   They were both telling me it was their money.  I left

18   it in his pocket till I can confirm what was going on.

19   Q.   When Mr. Contreras and Mr. Santana say "it's my money,"

20   you at that point decide to give the money back to Santana,

21   correct?

22   A.   I left it in his pocket.

23   Q.   You gave it back to him.

24            THE COURT:  Let's not argue with the witness.  He

25   said he put it back in his pocket.

(mmB)              PO Mangual/Peo/Cross(Weinstein)                    192

1       Q.    You put it back in his pocket --

2                    THE COURT:    That's what he said.

3       Q.    -- correct?

4       A.    Yes.

5       Q.    And Contreras told you it was his money before that,

6    correct?

7       A.    Yes.

8       Q.    But you decided to give it to my client, correct?

9       A.    I left it in his pocket.

10      Q.    So when you're apprehending my client and you're

11   putting him in handcuffs, you didn't know whose money that was,

12   did you?

13      A.    No.

14      Q.    So my client was under arrest for having money in his

15   pocket?

16      A.    No.   For complainant pointing him out after I did

17   observe them having them in a frisked position, which cops

18   do.

19      Q.    But you said you didn't know whose money it was, you

20   gave it back to my client?

21      A.    The stop wasn't for the money.

22      Q.    What?

23      A.    We didn't stop because we saw money.

24            When we rolled up in the vehicle, we saw four people

25   against the wall being frisked but they weren't police officers.

1    That was enough probable cause for me to investigate and see what

2    was going on.

3         Q.   Try now to answer the question.  Did you see anything

4    taken?

5         A.   Once again, no.

6              THE COURT:  Asked and answered.

7         Q.   Did you see my client put anything in his pocket?

8              THE COURT:  Did you see him put anything in his

9         pockets?

10        A.   No.

11             THE COURT:  Okay.

12        Q.   How many people do you observe frisking these four

13   people?

14        A.   Actually frisking I only really saw two guys and the

15   other guy, I just saw his back, I couldn't see what he was doing.

16        Q.   Did you hear any of the people you arrested say

17   anything to these four civilians?

18        A.   Initially, no.

19        Q.   At any time?

20        A.   No, I didn't.

21        Q.   At any time?

22        A.   I don't recall.

23        Q.   You said that there came a point in time when Contreras

24   told you that he or they took my six thousand dollars, correct?

25        A.   He said "they took my money."

1    Q.   "Took my money."  At this point in time He told  you

2    six thousand dollars, correct?

3    A.   Yes, I asked him.

4    Q.   Did you write down in your memo book that Contreras

5    told you that money was taken from him?

6    A.   I don't recall.

7    Q.   Would it help to look at your memo book and see if it

8    refreshes your recollection?

9    A.   Sure.

10          I did voucher it.

11          THE COURT:  No, no.  Try to answer the questions.

12   Q.   Answer the question --

13          THE COURT:  You're going to look at your memo book

14   and see if it refreshes your recollection.  Let us know when

15   you finish looking at your memo book.

16          (Witness perusing.)

17          THE WITNESS:   Yes.

18          THE COURT:  You looked at it.  Is your

19   recollection refreshed.

20          THE WITNESS:  Yes, it is.

21          THE COURT:  Question.

22   Q.   Did you write down in your memo book anywhere that

23   Contreras told you that money was taken from him?

24   A.   I didn't write that he told me --

25   Q.   No?

1          A.    No.

2          Q.    Nothing at all.

3                You also filled out an OMNI systems arrest form?

4          A.    Yes.

5          Q.    In that form there's  a section where it says details,

6    correct?

7          A.    Yes.

8          Q.    And in details you write down what happened, correct?

9          A.    Yes.

10         Q.    Did you put down in the details anywhere that Contreras

11   told you --

12                MR. WEINSTEIN:   Withdraw that for the moment.

13         Q.    Were you in uniform that night?

14         A.    Yes, I was.

15         Q.    And the van was a marked van?

16         A.    Yes, it was.

17         Q.    You don't have your lights on?

18         A.    I don't recall.

19                THE COURT:  The turret lights, you mean?

20                MR. WEINSTEIN:  Yes.

21         Q.    That area of Walton Avenue, what was the lighting

22   conditions?

23         A.    There was some lights from the apartment buildings in

24   front.  It wasn't great, but everything was visible.

25         Q.    There came a point in time when you had a conversation

1   with my client, Mr. Santana, correct?

2          A.   Conversation?

3          Q.   Yeah, you talked to him?

4          A.   Yeah, in the van.

5          Q.   In the van.  And this was how long after he was

6   arrested?

7          A.   Well, I spoke to him when I cuffed him, but not much.

8          Q.   What did you say to him when you cuffed him?

9          A.   I had to say something.  I'm not exactly sure what I

10  told him.  I don't remember exactly what I told him.  I'm sure I

11  said something.  I don't know what it was, but the conversation I

12  had with him in the car about the money was right in the car.

13         Q.   Let's go back when you first cuffed him, what

14  conversation did you have?

15         A.   I don't remember exactly what I said.

16         Q.   Well, sum and substance?

17         A.   I'm sure I said something.  I'm cuffing the guy.

18         Q.   Why?

19         A.   I don't remember.   It's three years.

20         Q.   You had a conversation about whose money it is,

21  correct?

22         A.   Possibly.

23         Q.   But didn't you tell us that he told you --

24              THE COURT:  At this time, at the time he cuffed

25         him?

1      Q.   After you cuffed him, you gave my client back the six

2    thousand dollars, correct, put it in his pocket?

3      A.   Yes, I did.

4            THE COURT:  That was in the van?

5            MR. WEINSTEIN:  No, before the van.

6            THE COURT:  The cuffs were put on in the street?

7            THE WITNESS:   The cuffs were put on in the

8      street.

9      Q.   While on the street, you put the money back in my

10   client's pocket, correct?

11     A.   Yes.

12     Q.   What?

13     A.   Yes.

14     Q.   And was there a conversation related to the fact that

15   you put the many money back in his pocket?

16     A.   I don't recall exactly what if anything was said, what

17   was said.

18     Q.   Well, why did you put the money back in his pocket if

19   nothing was said?

20     A.   Because I wasn't sure whose money it belonged to then.

21   I left it in his pocket, the pocket I took it out of until I can

22   figure out what was going on.

23     Q.   Was that because you asked him if it was his money and

24   he told you yes, it's my money?

25     A.   It's possible.

1    Q.   You don't remember that?

2    A.   It's been three years.

3    Q.   You remember what Mr. Contreras told you, right?

4    A.   Yes.

5    Q.   But you don't remember what my client told you that

6    precipitated putting the money back in his pocket?

7    A.   No, it's been three years.  I spoke to him at that one

8    location and that's it.

9    Q.   You had a conversation with him in the van also?

10   A.   I took him to the precinct in the van, yes, when I

11   asked him how much money was in the wad of money, I ask him how

12   much --

13   Q.   Let's start off what did you ask --

14   A.   Why did I ask him?

15   Q.   No, what did you ask him, not why.  What did you ask

16   him?

17   A.   I asked him how much money was here.

18   Q.   This was after you spoke to Contreras and he told you

19   it was six thousand dollars?

20   A.   Yes.

21   Q.   Why are you asking my client how much money was there?

22   A.   Well, he said it was his money, so he should know how

23   much is in there.

24   Q.   Did you count the money?

25   A.   Later on at the precinct, yes.

1      Q.  At the scene did you count the money?

2      A.  No.

3      Q.  So you didn't ask my client how much money there was at

4  the scene?

5      A.  No.

6      Q.  You said he told you 16 and Contreras said six?

7      A.  Yes.

8      Q.  Are you sure my client didn't say also six or you

9  didn't write down or you misheard six and wrote down 16?

10     A.  I know it was 16.  There was no way there was 16

11  thousand, it couldn't be 16 there.

12     Q.  My client was already under arrest, correct?

13     A.  Yes, he is in the van, he's in custody.

14     Q.  Did you give him his Miranda warnings then?

15     A.  No.

16     Q.  Why not?

17     A.  Because I wasn't asking him any questions.

18     Q.  You just asked him about the money?

19     A.  I just asked him how much was in there.

20     Q.  The money was the subject of this alleged robbery,

21  correct?

22     A.  Yes.

23     Q.  You asked him how much money there was, so, you could

24  determine whether or not that money was stolen from Contreras,

25  correct?

1       A.   I asked him to verify if it was his money.

2       Q.   To find out whether or not if it was stolen from

3   Contreras, correct?

4       A.   To verify if it was his money.

5       Q.   He told you it was his money?

6       A.   If it was his money, he would know how much --

7       Q.   He told you 16 right, and the other guy six?

8       A.   Yes.

9       Q.   At that time did you know how much money was there?

10      A.   No.

11      Q.   So why didn't you let my client go then?

12               THE COURT:  Let him go where?

13               MR. WEINSTEIN:  Release him.

14               THE COURT:  Why didn't you let him go?

15               MR. WEINSTEIN:  Yes.

16               THE COURT:  The objection which isn't before me is

17      sustained.

18      Q.   You were trying to verify whose money that was,

19   correct?

20      A.   Yes.

21      Q.   Well, my client told you it was his?

22      A.   Okay.

23      Q.   Obviously you didn't believe him, correct?

24      A.   Correct.

25      Q.   And you were not asking him that question so he would

1    say, okay, if you give me a number that I believe, I'm letting

2    you go, correct?

3                   MR. MENDYS:  Objection, speculation.

4                   THE COURT:  Sustained.

5         Q.   You wanted to see if he would implicate himself by not

6    giving you the correct number?

7         A.   Negative.  I wanted him to verify if it was his money.

8    Sixteen thousand dollars would be a bigger stack than six

9    thousand.

10        Q.   How big a stack is it?

11        A.   I don't remember exactly now.

12        Q.   What were the denominations?

13        A.   Actual money amount was six thousand dollars.

14        Q.   No, the denominations, twenties, fifties, hundreds?

15        A.   It was a combination of hundreds, twenties and fifties.

16        Q.   At the scene did you look to see what the denominations

17   were?

18        A.   I don't recall.

19        Q.   You didn't, did you?

20        A.   I don't recall, it's been three years.

21        Q.   Do you recall if there were hundred dollar bills in

22   there, 50 dollar bills in there, singles, did you unwrap the wad

23   of money at the scene?

24        A.   At the scene, no.

25                   THE COURT:  Next question.

1    Q.   You had no idea how much money was in that wad at the

2    scene?

3    A.   No.

4    Q.   And the questioning of my client without his Miranda

5    warnings was intended to incriminate him, correct?

6              MR. MENDYS:   Objection.

7              THE COURT:   Sustained.

8    Q.   Was there a number that my client told you you would

9    have let him keep that money and let him go?

10             MR. MENDYS:   Objection.

11             THE COURT:   Sustained.

12   Q.   When you say you were trying to verify whose money that

13   was, tell us how that verification was going to work?

14   A.   When I got --

15             MR. MENDYS:   Objection.

16             THE COURT:   Overruled.

17   Q.   How was that going to work?

18   A.   That would have worked when I got back to the precinct

19   and actually counted it.

20   Q.   If my client also said six thousand dollars, what would

21   you have done then?

22   A.   At that point I would have been taking the money,

23   regardless, and everybody would be going back to the precinct.

24   Q.   Taking the money?

25   A.   I would be taking the money from him regardless and

1   taken everyone back to the precinct.

2              THE COURT:   Taking everyone back --

3              THE WITNESS:  Not to arrest --

4              THE COURT:  Yes, but you took everyone --

5              THE WITNESS:   Took everyone back to the precinct

6        --

7              THE COURT:   -- including the complainants?

8              THE WITNESS:  Yes.

9        Q.   Why were the complainants being taken back to the

10  precinct?

11             THE COURT:  Everybody stop.

12             Number one and most important is the reporter and

13  the record.  If this reporter has to keep interrupting

14  people all the time, there's nothing to review, that's

15  number one.

16             Number two, the interpreter needs to interpret and

17  you're standing right in front of the interpreter and I

18  don't usually allow the questioning from this part of the

19  well, usually behind the table.  I'm letting you do it at

20  the table but the record we are creating, the interpreter

21  doesn't even have the last answer because you're arguing

22  with each other about what the procedure should be in this

23  courtroom, and I told you time and again everyone is to stop

24  talking over each other and let the record be made.

25             Now, can you tell me, I'm asking the reporter

(mmB)                PO Mangual/Peo/Cross(Weinstein)              204

1    what's the last thing you have down as testimony in this

2    case and then we can make the record appear as it should be.

3              (Requested portion of stenographic minutes read by

4    reporter.)

5              THE COURT:  I don't even know what question was

6    posed and I don't even know what answer was given and it's

7    not on the record.  So that's not anyone's fault but the

8    people who are just interrupting everyone as we're making

9    that record.

10             Mr. Weinstein, stand behind the table during your

11   questioning.  That is where you will be during the trial

12   which is what my practice is and you will not be blocking

13   the interpreter and you, Officer, will answer questions

14   after the entire question is posed and so the interpreter

15   can get it down.  I can't do anything else but tell the

16   lawyer who's client is benefitting to stop the rapid-fired

17   questions and interrupting the rapid-fired answers.  This is

18   your client who has to hear what's happening and you are

19   disobeying the Court's directives, again by interrupting and

20   arguing and your client's not able to hear things because

21   the interpreter can't interpret things.  So that's all, I

22   don't want there to be a problem on appeal.

23             Once again, I'm going to tell you slow down, don't

24   interrupt, wait for objections to be ruled on, and let's

25   proceed.

1              MR. WEINSTEIN:  Your Honor, I think the witness

2         has been --

3              THE COURT:  I told the witness also.  I told

4         everybody.

5    Q.   Officer, did you ever give my client his Miranda

6    warnings?

7    A.   No.

8    Q.   Were you ever in the presence of anybody who gave my

9    client his Miranda warnings?

10   A.   No.

11   Q.   Are you aware of any identification procedure of my

12   client?

13   A.   At the scene.

14   Q.   And what was that?

15   A.   A point out.

16   Q.   That was Mr. Contreras saying "they took my money?"

17   A.   Yes, and he pointed at them.

18   Q.   He pointed at my client --

19   A.   Yes.  Pointed to each of them.

20   Q.   -- who was walking in a southbound direction, correct?

21   A.   Yes.

22             MR. WEINSTEIN:  May I have one moment, Judge.

23             THE COURT:  Yes.

24             (Pause)

25             MR. WEINSTEIN:  No other questions.

(mnB)                    PO Mangual/Peo/Cross(Bonanno)                    206

1                    THE COURT:  We're going to take a five minute

2          recess before the next cross to give everyone a chance to

3          recover.

4                    MR. BONANNO:  I'm only going to be two minutes.

5                    THE COURT:  You have a short cross?

6                    MR. BONANNO:  Very, very short.

7                    THE COURT:  Then we'll take the break after this

8          cross.

9                    You said two minutes.  I'm going to hold you to

10         two minutes.

11                    MR. BONANNO:  Very Short, Judge.

12                    THE COURT:  Yours have gone on longer than anyone

13         else's and I did this for a reason.

14                    MR. BONANNO:  Maybe three or four questions.

15   CROSS-EXAMINATION

16   BY MR. BONANNO:

17        Q.   Officer, I'm just going to ask you a few question.  If

18   you don't understand, please let me know so I can rephrase them.

19                    When you said Mr. Contreras said "these guys just took

20   my money," he was indicating Mr. Melenciano and Mr. Santana, is

21   that correct?

22        A.   Yes.

23        Q.   And when Mr. Rodriguez said "these guys said they were

24   cops and had us against the wall," he was talking about

25   Melenciano and Mr. Santana, is that correct?

(mnB)          PO Mangual/Peo/Cross(Bonanno)               207

1        A.   Yes.

2        Q.   And when you said that you came up on the scene and

3    you saw two guys frisking four people on the wall, those two

4    people were ultimately Mr. Melenciano and Mr. Santana, is that

5    correct?

6        A.   Yes, that's what I got a look at.

7        Q.   You also said at least eight to ten times it's been

8    over three years since this incident, correct?

9        A.   Almost three years.

10       Q.   And isn't it true that you refreshed your recollection

11   with the D.A. prior to coming here?

12       A.   Yes.

13       Q.   And you did that by looking at some documents?

14       A.   Yes.

15       Q.   And you looked at photos?

16       A.   Yes.

17       Q.   And you looked at photos of the defendants?

18       A.   Yes.

19       Q.   And isn't it true that you probably wouldn't have

20   recognized those people in court today had you not looked at

21   those photos?

22                    MR. MENDYS:   Objection.

23                    THE COURT:   Sustained.

24                    MR. BONANNO:   I have  no further questions.

25                    THE COURT:   We'll take our break.

207A

1          Is there going to be redirect?

2          MR. MENDYS:   No.

3          THE COURT:   There is no redirect.

4          Then we are done.   You can step down.

5          (Witness excused.)

6          (Recess)

lr-c                        Proceedings

1              (Whereupon, the following took place in open court

2        in the presence of the Court, all three defendants, Spanish

3        language interpreter, defense counsel and the assistant

4        district attorney.)

5              THE CLERK:  Back on the record, hearing continued.

6        The defendants are before the court.  Appearances remain the

7        same.

8              THE COURT:  All right.  So are the People resting?

9              MR. MENDYS:  Yes.

10             THE COURT:  Are the defendants calling any

11       witnesses?

12             MR. WILSON:  The defendant Melenciano is not.

13             MR. WEINSTEIN:  Santana is not.

14             MR. BONANNO:  Diaz is not.

15             THE COURT:  Okay.  So I will hear arguments at the

16       close of the hearings on each of the legal issues that apply

17       to each of the particular defendants.

18             Mr. Wilson, you can go first.

19             MR. WILSON:  Judge, might I pose the question

20       first?  The indictment that served notice of identification

21       with regard to my client noticed two identifications by

22       unnamed witnesses.  Can I ask at this point in time who the

23       alleged identifications that the People are alleging made

24       are?  Who those people are, before I make my argument?

25             THE COURT:  Because there were four people that

1r-c                          Proceedings

1          were --

2                    MR. WILSON:  Correct.

3                    THE COURT:  -- allegedly on the street and spoke

4          to this police officer?  Well, that's fair.

5                    MR. WILSON:  Correct.

6                    THE COURT:  I think the testimony was the

7          point-out.  I know it wasn't your cross but I believed he

8          said the point-out was from --

9                    MR. MENDYS:  From Contreras.

10                   THE COURT:  Only Contreras.

11                   MR. MENDYS:  That's my understanding.

12                   MR. WILSON:  Yes.

13                   THE COURT:  Go ahead.  Well, you served two.

14         Well, not you, whoever served it said there were two.

15         What's the basis of that?

16                   MR. MENDYS:  Yes.  Judge, I'm not sure.  I'm not

17         sure.

18                   THE COURT:  Well, the situation is what it is in

19         terms of the apprehension who was present.  So you're,

20         although ID notice was served that two individuals in what

21         is described as a point-out in the notice.

22                   MR. MENDYS:  Yes.

23                   THE COURT:  Identified.

24                   MR. MENDYS:  A non --

25                   THE COURT:  Corporeal.

lr-c                        Proceedings

1              MR. MENDYS:  Corporeal non line-up.

2              THE COURT:  Non line-up for Mr. Melenciano, you

3      believe you only went forward with one point-out?

4              MR. MENDYS:  That is what I did, yes.

5              THE COURT:  Okay.  So I don't, so then I guess

6      there's no evidence of a second point-out.

7              MR. WILSON:  Very good, Judge.

8              THE COURT:  Okay.

9              MR. WILSON:  My first argument, Judge, would be

10     that the People have failed to meet their burden of going

11     forward with regard to even the single identification that

12     was allegedly made, because on cross-examination I asked the

13     officer over and over again if the witness, any of

14     witnesses, particularly Mr. Contreras, said anything else to

15     him, and he insisted that they said nothing.  He said

16     nothing other than they took my money.  So I submit there is

17     a credibility issue with regard to the officer that requires

18     you to suppress that identification, unless the Court or the

19     People want to conduct a bifurcated hearing, want to call

20     the complaining witness to testify.

21              There is also no probable cause to arrest Mr.

22     Melenciano.  Mr. Melenciano apparently was handcuffed,

23     although the testimony is very vague.  This officer wasn't

24     even sure who handcuffed him or who stopped him, and I think

25     at what point in time is fairly vague.  So I think the

1       People have not met their burden of going forward with

2       regard to the probable cause of Mr. Melenciano's arrest

3       also, but there was no allegation of criminality with regard

4       to Mr. Melenciano at the time he apparently was seized and

5       handcuffed, although the time is fairly vague.

6               Additionally, the officer testified he didn't know

7       whose money it was.  Consequently, I don't think he had any

8       reasonable cause to believe a crime was committed, and

9       there's no probable cause with regard to this.  I ask you to

10      suppress the alleged identification with regard to Mr.

11      Melenciano on those grounds.

12              With regard to the automobile that was seized

13      Judge, again, there was no probable cause to seize that

14      automobile.  And if there was probable cause, Judge, there

15      were certainly no exigent circumstances that justified the

16      officer not getting a search warrant to seize that car.

17              THE COURT:  Wait.  To search the car?

18              MR. WILSON:  To seize the car.

19              THE COURT:  Wait, wait.  There was nothing

20      recovered inside the car.  You're saying you need a warrant

21      to actually take a car parked on a street?

22              MR. WILSON:  Sure.

23              THE COURT:  What's the --

24              MR. WILSON:  If there's, if there's no exigent

25      circumstance that requires taking it at that point in time,

lr-c                           Proceedings

1        Judge.

2                  THE COURT:  Why isn't it any different than any

3        search incident to any arrest?  I mean, the fact is that

4        happens to be something that you can't put in your pocket.

5                  MR. WILSON:  I think cars are different, Judge.

6                  THE COURT:  You need -- is there a case that says

7        that?

8                  MR. WILSON:  I think the case law that talks about

9        the seizure and searches of automobiles talk about the fact

10       that there are no grounds if there is no exigency and

11       there's time to go get a warrant, the warrants are

12       preferred.  There's certainly no reason why that officer

13       couldn't got a warrant.  The car was there.  It could easily

14       be safeguarded, Judge.  For them to take it into custody

15       essentially meant they were going to ultimately have to

16       search it and --

17                  THE COURT:  But there is no, there's no evidence

18       that the car itself was searched; the interior of the car,

19       the trunk of the car.  Is that, would that be --

20                  MR. WILSON:  There's no evidence at the hearing.

21       I mean, clearly it was, the assistant district attorney

22       indicated prior to taking testimony or I guess during taking

23       testimony, but he was not gonna seek to introduce any of the

24       items in the car.

25                  THE COURT:  Except -- well, I'm not sure what

lr-c                        Proceedings

1        evidence was recovered.

2                    MR. MENDYS:  The car itself.

3                    THE COURT:  The car itself is what --

4                    MR. MENDYS:  Yes.

5                    THE COURT:  -- was the subject of the hearing?

6                    MR. WILSON:  Correct.

7                    THE COURT:  That there is this car.  It is this

8        car parked on the street that the officer seized, physically

9        seized.  And then is the car still in custody at the pound?

10                   MR. MENDYS:  I would imagine.

11                   THE COURT:  You don't know if it was ever

12       returned?

13                   MR. WILSON:  I believe it was not.

14                   THE COURT:  No request to return the car has

15       either been made?

16                   MR. WILSON:  I believe not, Judge.

17                   THE COURT:  But the car, the car is what you're

18       seeking to suppress?

19                   MR. WILSON:  Correct.

20                   THE COURT:  The physical car.  Okay.

21                   MR. WILSON:  And just also, there was obviously no

22       consent to seize the car and no testimony regarding consent,

23       Judge.  So for those reasons I'd ask to suppress that also.

24                   THE COURT:  Okay.  Mr. Weinstein?

25                   MR. WEINSTEIN:  Thank you, your Honor.

lr-c                          Proceedings

1           I also would argue that the People have not met

2    their burden.  There was no probable cause to arrest my

3    client.  Officer Mangual testified he didn't know what was

4    going on.  There is some sort of point-out prior to the

5    arrest where my client and his co-defendant are 22 feet

6    apart, one going south, one going north, and he says they

7    took my money, or someone said they took my money.

8           From what we can tell is my client is then

9    apprehended by Mangual.  Mangual handcuffs him, searches

10   him, finds no weapon, no shield, no indicia that he made

11   believe he was a police officer, but finds a huge wad of

12   money.  My client tells him it's his.  And what the officer

13   does with respect to someone saying it's my money is gives

14   it back to him.  But we're left with where the situation was

15   contrary, says he took my money, he asked my client who's

16   money is it?  It's mine, so he gives it back to him.

17          Then Mangual decides, well, let me see if there's

18   some sort of test I can subject Mr. Contreras and Mr.

19   Santana to, to determine who's telling me the truth.  How

20   much money is there?  Contreras says 6,000.  He says, my

21   client says 16,000.  I submit to the Court it was most

22   likely he said 6,000.  Also it's not weird that they would

23   have the same number in there.  He says, well, I believe

24   Contreras then tries to tell us that because the size of the

25   wad it was probably six not 16, but he never looked at the

lr-c                            Proceedings

1      wad and had no idea of the denominations, if they're all

2      hundreds or if they were singles, fives, tens or what.

3      Mangual had no idea what had happened there.  He did not see

4      my client take anything from anybody.  He did not see my

5      client put anything in his own pocket.

6              And before they walk away he watches for some

7      period of time.  And he is watching from the driver's seat

8      which is the furthest away, but he advised his partners, the

9      one sitting next to him who is closer of something

10     transpiring.  They don't know what and they kept them under

11     an observation.  First they drove slowly, then they stopped.

12     They were not that far away.

13             So in that time when they were observing, he says

14     a car or two car lengths away, he doesn't see anything

15     taken.  And then it just so happens to when they get out, my

16     client starts walking away in a southward direction.  And if

17     you just robbed somebody and there's police standing there,

18     you take off.  You just don't start walking away, it's my

19     money.

20             And Mangual, I think, does not support the

21     People's case at all.  I think it was, to put it mildly, a

22     bit all over the place.  He was not the most credible, even

23     though he was prepared by the prosecutor, reviewing his

24     documents, the video, he could not establish what really

25     happened.  He kept on fluctuating, two people or three

1r-c                              Proceedings

1    people got in the car.  Two people searching, three people

2    searching.  They said they were cops.  There's no indicia to

3    show that they were cops.  There's nothing there.

4          And my client to Mr. Contreras comes up with the

5    same denomination, which I believe six and 16 really are the

6    same in that if this officer misheard it, or let's give him

7    the benefit of the doubt, he misheard it, six and 16 can

8    sound very similar, because he was talking about earlier

9    what languages were being spoken and he didn't know if they

10   were English Spanish, Spanish English.  So we don't know

11   what language was spoken to my client.

12         Also, the statement he takes from my client in the

13   van, I believe, should have been preceded by his Miranda

14   warnings.  It's a custodial interrogation.  He's asking

15   about the money to find out whether or not it belongs to Mr.

16   Contreras.  If it belongs to Mr. Contreras, my client's

17   answer is therefore incriminating himself.  And by his

18   answer, which he says 16, he therefore determines that my

19   client was the one who was untruthful and he was arrested as

20   opposed to Contreras making a false report.  Thank you.

21               THE COURT:  Thank you.

22               Mr. Bonanno?

23               MR. BONANNO:  If I may inquire, Judge.  Thank you.

24               Just briefly, Judge.  I also join in the

25   co-counsel's application as, specifically as to Mr. Diaz

lr-c                      Proceedings

1       that there was no probable cause to arrest Mr. Diaz.

2       Clearly, he was never identified by anyone at that scene,

3       not Mr. Contreras, not Mr. Joel Rodriguez.

4               THE COURT:  He wasn't arrested at the scene.

5               MR. BONANNO:  But he wasn't identified as being at

6       the scene.

7               THE COURT:  But he wasn't at the scene.  You mean

8       by who?

9               MR. BONANNO:  By the complaining witnesses or by

10      Police Officer Mangual who saw allegedly three people at the

11      scene.

12              THE COURT:  No, no, but I thought the whole point

13      of your client's hearing, or not the whole point but a major

14      point, is that there was an identification that he was at

15      the scene that took place later on.  One photo and one

16      line-up.

17              MR. BONANNO:  I will get to that, Judge.

18              THE COURT:  Why doesn't that provide probable

19      cause?

20              MR. BONANNO:  I will get to that portion of it.  I

21      am just adding to it that had he been at that scene, the

22      complaining witnesses, Mr. Contreras and Mr. Joel Rodriguez,

23      would have been shouting up and down about this third

24      person.  They weren't.  This testimony from Officer Mangual

25      was these guys, who were Melenciano and Santana.  Later on a

lr-c                          Proceedings

1      coconspirator allegedly says Mr. Diaz, through a nickname,

2      is also in on this, and it's through that information that

3      the police developed Richard Diaz.  In fact, there was not

4      testimony here today, but there was a 911 call that there

5      was a third person --

6              THE COURT:  That's not before me and you could

7      have put any evidence in.  If you wanted me to consider a

8      911 call, you should have asked to have it played.

9              MR. BONANNO:  I understand that, Judge.  In any

10     event, the police develop a lead from information given by a

11     coconspirator, and then they take a photo and then they

12     alter a photo and put it into a photo array.  They put marks

13     on this photo and give it to an alleged complaining witness.

14     Whether they were, you know -- and it certainly wasn't a

15     true and accurate representation of all the faces that were

16     in that photo.  And he is ID'd allegedly based upon that

17     altered photo.

18              Then they put him in a line-up and a separate

19     independent witness goes in and ID's him.  You heard

20     testimony from Officer Rodriguez, Detective Rodriguez that

21     Mr. Diaz was wearing earrings in the photo and --

22              THE COURT:  In where?

23              MR. BONANNO:  In the photo.

24              THE COURT:  In the line-up photo?

25              MR. BONANNO:  In the photo array.

lr-c                          Proceedings

1              THE COURT:  I understand that.  You're talking

2    about a line-up by a separate person now.

3              MR. BONANNO:  The second line-up that was viewed

4    by Miss Rodriguez of Mr. Diaz, the detective couldn't

5    remember whether he had earrings or not.

6              THE COURT:  But the photograph was, is in

7    evidence.

8              MR. BONANNO:  The photograph that's in evidence

9    was altered.  That independent ID was based upon a tainted

10   identification based upon the alteration of those photos.

11             THE COURT:  But it was from a different witness.

12             MR. BONANNO:  Exactly.

13             THE COURT:  So witness one, you're saying that has

14   to be suppressed.  Well, I'm not suppressing a photo array

15   because photo array evidence is not admissible.  But you're

16   saying that any subsequent identification by witness number

17   one is based on a tainted photo array?

18             MR. BONANNO:  Any identification from witness one,

19   who I believe was Miss Rosado, should be tainted based upon

20   the altered photo.

21             THE COURT:  What about the line-up?

22             MR. BONANNO:  The line-up which was witnessed by

23   Miss Rodriguez, as I understand it and remember, should also

24   be suppressed.  Mr. Diaz, as you can plainly see, has been

25   wearing earrings here all the time.  The detective couldn't

1r-c                              Proceedings

1    remember whether he was wearing earrings at that time, and

2    he couldn't remember whether he took precautions to make

3    sure that other witnesses, other people in that line-up,

4    fillers, five police fillers, had earrings or had removed

5    theirs earrings.  He did take the precaution to put a

6    plastic bag across the front of them and to make them look

7    fair in their representation.  Again, Judge, you stated it,

8    you're the one that determines what was fair.

9                THE COURT:  Right, but I have a photograph, in

10   fact more than one photograph of that line-up.  So is there

11   anything in that photograph that shows that he's wearing

12   earrings?

13               MR. BONANNO:  Judge, I took a look at that

14   photograph and it's not super enhanced and I couldn't tell

15   whether any of them were wearing earrings or not wearing

16   earrings.

17               THE COURT:  Including your client?

18               MR. BONANNO:  Judge, I couldn't tell.

19               THE COURT:  Okay.

20               MR. BONANNO:  But it's quite different from

21   looking at someone in person than a grainy photograph that's

22   not well enhanced.  So on that, that photo -- excuse me,

23   that line-up was tainted and the identification therefrom

24   must also be suppressed.

25               As to the Miranda statements and to the statement

lr-c                          Proceedings

1        that he gave, Detective Bell's rendition of what exactly

2        happened during the reading of his rights, the understanding

3        of his rights was clearly tainted by her speaking to him in

4        Spanish.  She claims that her mother taught her Spanish.

5        Well, there's different dialects in Spanish.  There's, you

6        know, a Puerto Rican dialect, there's a Dominican dialect.

7        My client is Dominican.  I didn't inquire --

8                  THE COURT:  Do you have any evidence of that in

9        front of me?  Did you present any evidence?

10                 MR. BONANNO:  I did not, Judge.

11                 THE COURT:  So if you're asking me to speculate

12       that your client couldn't understand the Miranda Warnings

13       because he speaks a different dialect, is that what you're

14       asking me to do?

15                 MR. BONANNO:  Judge, I think my inquiry of the

16       witness was whether she clearly articulated through her

17       rendition of the Spanish language to my client, and I

18       believe she showed the Court that her reading of the Spanish

19       language into English was quite tense.

20                 THE COURT:  But see, this is what I'm a little

21       confused, and I don't want to, she read the -- the testimony

22       was she read what was printed in the Spanish language.

23       Whatever it says there in the Spanish language was read

24       verbatim from a Miranda card that contains warnings that

25       have been translated into the Spanish language.  She didn't

lr-c                          Proceedings

1       speak English to him.  She didn't translate them to him.  In
2       fact, there would be no reason if he spoke English he would
3       read them in English.
4                   MR. BONANNO:  I understand.
5                   THE COURT:  So her translation was for the Court's
6       benefit to translate from Spanish to English what the card
7       says because I can't evaluate whether the warnings are
8       accurate in a foreign language that is not the official
9       court language, which is English.
10                  MR. BONANNO:  I understand.
11                  THE COURT:  I could never do that.
12                  MR. BONANNO:  I understand.
13                  THE COURT:  So her only English reference was when
14      she was asked to tell, say in English to translate what is
15      on the card.
16                  MR. BONANNO:  Again Judge, if she spoke to him in
17      Spanish, there are many different dialects, and this
18      Court --
19                  THE COURT:  That's speculative.
20                  MR. BONANNO:  Judge, this Court can take judicial
21      notice of that.
22                  THE COURT:  No, I can't.  I can't.  I can't
23      because I have to take judicial notice of the fact that your
24      client speaks some dialect that I don't know about.
25                  MR. BONANNO:  In any event, Judge, I request that

lr-c                              Proceedings

1        that evidence also be suppressed.  I have nothing further.

2                  THE COURT:  Mr. Mendys?

3                  MR. MENDYS:  Judge, I'm gonna break this down by I

4        think procedure, by ID -- by statements.  We'll do this that

5        way.

6                  In terms of the identification, well, in terms of

7        the probable cause, the People have established, the People

8        have established credible evidence through Officer Mangual

9        and through Detective Rodriguez that probable cause existed

10       to apprehend each of the defendants.

11                 Officer Mangual testified to his own observations

12       of individuals, the defendants Melenciano and Santana, who

13       he initially believed to be police officers stopping,

14       frisking with four individuals that were up against the

15       wall.  He later received information that Melenciano and

16       Santana stole or took an amount of money from Mr. Contreras,

17       the complaining witness.  Lo and behold, he found a large

18       amount of money on Mr. Santana, an amount of money which

19       ended up being different than the amount of money Mr.

20       Santana claimed it would be.  All of these facts create

21       probable cause for the arrest, the apprehension of Mr.

22       Santana and Mr. Melenciano.

23                 In terms of Mr. Diaz, Detective Rodriguez

24       testified to what the information he received from both

25       Esmeraldy Rodriguez and Argelia Rosario, the fact that both

lr-c                          Proceedings

1        of these women were present on October 17, 2012 during the

2        course of this incident in which all of the defendants

3        claimed to be the police and that a robbery occurred.  Miss

4        Rodriguez identified defendant Diaz in a photo array and was

5        later identified in a line-up.  Through this evidence, the

6        People have met their burden of providing credible evidence

7        and the defense has not met their burden of showing any kind

8        of, creating any kind of doubt as to probable cause that

9        exists.

10              In terms of the identification procedures, it is

11       the People's burden to go forward with the credible

12       evidence.  It is then upon the defense to show that there is

13       some unnecessarily suggestive means that were used to elicit

14       the identifications that occurred.  Here, we have none of

15       that.  There was no evidence put forth by either of the

16       defendants, and the testimony reflects that both Santana and

17       Melenciano were identified by Mr. Contreras immediately

18       without any prompting from the police, without any

19       questioning from the police.

20              THE COURT:  Let me just interrupt for one minute

21       about the issue raised by Mr. Wilson.  I am only dealing

22       with a, with the possibility of testimony at trial from one

23       witness called by the People that that witness identified

24       the defendant, the two defendants at the scene in police

25       custody.  You're not proffering any other evidence, even

lr-c                          Proceedings

1      though you've served notice, that there was some other

2      identification made at the time?  I'd like to know because I

3      don't, you know, this was just raised and I'm not the person

4      who granted the hearing and I'm not the person who reviewed

5      the motions, but that seems to be what this hearing is

6      about.   Two witnesses who would be testifying and only two

7      witnesses who would be testifying about an out-of-court

8      police-arranged identification procedure that notice was

9      served by the People, and then nothing else.

10               So is that what -- so it's just that witness who's

11      going to testify I saw them in police custody at the time or

12      is there something else?

13               MR. MENDYS:  At -- no, Judge.  I think as we, as

14      we sit here today the -- Mr. Contreras will come in and

15      testify that he identified both individuals at the scene.

16               THE COURT:  And no other witness who's going to be

17      called by the People are going to say that they told the

18      police at the scene that these individuals who were

19      apprehended were part of the --

20               MR. MENDYS:  Judge, if I'm going forward only on

21      Mr. Contreras' identification, then my understanding is that

22      I would be precluded from doing that in terms of --

23               THE COURT:  I just want to make -- if that's your

24      position, you're precluded.  If there was some other

25      identifications done, you're agreeing that there cannot be

lr-c                      Proceedings

1          any identification in court, or otherwise, of these two

2          individuals other than by Mr. Contreras?

3                    MR. MENDYS:  That's correct.

4                    THE COURT:  Okay.

5                    MR. MENDYS:  Well, the -- just so we're all clear,

6          the witnesses, additional witnesses may get up and point to

7          them in court and say those are the men that did it.

8                    THE COURT:  Well.

9                    MR. MENDYS:  But they will not be testifying to

10         the, to anything that occurred at the scene.

11                   THE COURT:  No, no, that's why you would have an

12         independent source hearing.  If you're precluded, and that

13         preclusion is a different remedy than suppression which is a

14         whole other thing, so I mean, basically you're conceding I

15         have to suppress another, and I don't know who it is and

16         neither do you --

17                   MR. MENDYS:  Right.

18                   THE COURT:  -- person who made an on-scene

19         identification for which notice was given, and so

20         suppression is suppression and that's it.  There can't be

21         any in-court ID without a separate hearing.

22                   MR. MENDYS:  Then I apologize for using incorrect

23         language, but I would concede suppression as to that, as to

24         that ID of that individual.  But as to the other two who,

25         that did not or did not take place there was no ID.

lr-c                          Proceedings

1              THE COURT:  So other people will not testify that

2      they saw them in police custody, but they'll make in-court

3      ID's.

4              MR. MENDYS:  Correct.

5              THE COURT:  Okay.  Go ahead.

6              MR. MENDYS:  So Mr. Contreras identifies the two

7      defendants unprompted pointing them both out and saying that

8      they just took my money, they claimed to be police officers.

9      The officers investigated.  They did not jump to

10     conclusions, they investigated the case.  They detained the

11     defendants, spoke to the witnesses and moved forward.  So

12     the identification by Mr. Contreras, the point-out at the

13     scene, I don't think that the defense has met their burden

14     in terms of suppression.

15             In terms of the photo array and the line-up for

16     Mr. Diaz, the photo array and the picture speak for

17     themselves that are in evidence.  In terms of the photo

18     array, the detective took exceedingly cautious steps to

19     ensure the fairness of this procedure by dotting out the

20     ears of each of the individuals to ensure that Mr. Diaz was

21     not identified just based on his earrings.  This is

22     something that defense should be applauding as opposed to

23     questioning.

24             THE COURT:  Well, I don't think the reporter can

25     get applause on the record.

1            MR. MENDYS:  Perhaps I'm being a little lengthy.

2   The line-up, there's is no evidence whatsoever, and I don't

3   think there's really an argument that there was any

4   suggestivity by the police beyond, I guess, the earring

5   issue.  But beyond that, Judge, there's nothing to suggest

6   that these were unfair.  The photos speak for themselves.

7            In terms of the statements, Judge, Mr. Diaz'

8   statement Detective Bell testified to credibly, I would

9   submit, that she read him his rights in Spanish.  The form

10  is signed by Mr. Diaz, by Detective Bell.  She indicated

11  that he indicated, she indicated that he understood each of

12  the his rights and that he voluntarily made a statement.

13  There is no argument before the Court regarding any type of

14  coercion or anything that would, would permit such a

15  conclusion.

16           In terms of Mr. Santana's statements, Judge, I

17  would argue that it was investigatory at the time, and I

18  think the record supports me on that.  Officer Mangual had

19  received brief information that money was taken from Mr.

20  Contreras.  He detained and handcuffed and put Mr. Santana

21  into the van and spoke to Mr. Contreras again, learned the

22  specific amount.  He then went to Mr. Santana to find out

23  whether in fact that was the amount, and Mr. Santana said it

24  was 16,000.  And he later learned through counting and

25  vouchering the money that it was actually $6,000.  It was

lr-c                                Proceedings

1        investigatory questioning.  It happened at the scene where

2        there was a claim by both parties that the money belonged to

3        them, and it was something that needed to be resolved.

4                And the case law, I think, backs us up, going back

5        to People v Huffman is the traditional case cited for

6        investigative questioning, 1976 Court of Appeals case.  So I

7        would cite the case law that goes back to Huffman and all

8        its progeny.

9                So I think I've covered everything.  In terms of,

10       well, I think I've covered everything.  Mr. Melenciano's

11       statement was voluntary.  It was totally spontaneous.  So I

12       would submit that the People have met their burden and

13       defense motion should be denied, save for the

14       identification.

15               THE COURT:  Okay.  I will be issuing a written

16       findings of fact and conclusions of law -- you want to say

17       something?

18               MR. WILSON:  Could I say one thing, Judge?  I have

19       a problem with one thing Mr. Mendys said.  If there was a

20       second identification noticed and he doesn't know who that

21       person was, yet he intends to ask -- if I'm reading between

22       the lines of what he's saying correctly -- if he intends to

23       ask one of these other witnesses to possibly make an

24       in-court identification of my client, you may be right, it

25       may be an application to preclude at some point in time, but

lr-c                          Proceedings

1       I would ask the Court to suppress any identifications, in

2       court or otherwise, by the other three witnesses we haven't

3       heard from.

4               THE COURT:  Well, see, that's --

5               MR. WILSON:  If he wanted to do a bifurcated

6       hearing --

7               THE COURT:  This is actually something that you

8       did raise and I wanted to clarify, because Mr. Mendys did

9       say, when you raised the argument the first time that he

10      only did go forward with the one witness and he doesn't know

11      who else made an identification, that would be subject to

12      suppression, okay.  Subject to suppression.  And he's

13      agreeing that it is subject to suppression.  So you're

14      right, whoever that person is, both an out-of-court and

15      in-court identification has to be suppressed.  And he's

16      agreeing to that.  That's what he's saying, so there is no

17      other argument.  He's saying that, that gets suppressed.

18              MR. WILSON:  This is my problem.

19              THE COURT:  Yes, who is the witness?

20              MR. WILSON:  If we get to trial and there's

21      witness two, three and four, and he says, oh, it was witness

22      number two now that I consented to suppression on and I'm

23      going to ask witness three and four to make an in-court

24      identification, that's really very unfair, and I -- that's

25      why I think the Court has no option if he's doing a

lr-c                          Proceedings

1        bifurcated --

2                 THE COURT:  To suppress all three.

3                 MR. WILSON:  But to suppress all three.

4                 MR. WEINSTEIN:  I join in Mr. Wilson's

5        application.

6                 MR. BONANNO:  As do I.

7                 THE COURT:  Your client wasn't identified except

8        through a show-up and a -- except through a photo array or a

9        line-up.  Those notices only apply to Mr. Diaz.  I'm

10       assuming Mr. Melenciano and Mr. Santana, was the same notice

11       given for both of them?

12                MR. WILSON:  I think so.

13                MR. WEINSTEIN:  Yes.

14                THE COURT:  I could go look at it, but I'm

15       assuming that it's --

16                MR. WILSON:  It's the same, yeah.

17                THE COURT:  The same time they're under arrest so

18       I'm not sure if it's anything different.  Let me just see.

19       They're even indicted separately.  That's right, there were

20       separate notices given.  So there's two for Amauri Santana

21       and two for Jose Melenciano.  Right.  And they're both the

22       same, to Officer Mangual in a corporeal non line-up at about

23       12:15 a.m., right, which is about the time the officer

24       testified he came upon the scene and it all began to unfold,

25       that the identifications happened pretty much

lr-c                          Proceedings

1          contemporaneously with the apprehension.  So you want me to

2          say why --

3                    MR. WILSON:  In a bifurcated --

4                    THE COURT:  Why are the other two -- since you're

5          raising this, let's say hypothetically the two witnesses are

6          Rodriguez and Contreras.  Let's just say hypothetically the

7          second person is Rodriguez, I'm not saying that that's what

8          happened, and the other two individuals who could testify

9          are the two women who viewed the line-up and the show-up,

10         what grounds would I have to suppress the women's

11         identification at all?

12                   MR. WEINSTEIN:  If I may, Judge?

13                   THE COURT:  You could go next.

14                   MR. WILSON:  In the situation where Mr. Mendys

15         would have said to the Court the second witness is

16         Rodriguez --

17                   THE COURT:  I'm not asking, I'm not saying that.

18         You're asking me that, the presumption you're saying there

19         are three additional witnesses, Mr. Rodriguez, Miss

20         Rodriguez and Miss Rosario, is that --

21                   MR. MENDYS:  Yes.

22                   THE COURT:  Yes, those are the three other

23         potential witnesses because those are the other people who

24         were at the scene who are alleged to be victims of this

25         crime.  So you're asking me to suppress all three of them.

lr-c                          Proceedings

1                   MR. WILSON:  Correct.

2                   THE COURT:  What would be the grounds to suppress

3          the two identifications for which notice was not given no

4          matter who they are?

5                   MR. WILSON:  We don't know who they are.

6                   THE COURT:  Well, we know who was at the scene.

7                   MR. WILSON:  Right, but we don't know --

8                   THE COURT:  So assuming it's there can only be --

9          you're asking me to suppress four people, the identification

10         testimony both out-of-court and in-court of four people.  I

11         understand that there's nothing that says they made any ID

12         on the street, but let's face it, you got police officers

13         there, you've got a rapidly unfolding scene, you've got two

14         guys in handcuffs put into the back of van.  It's all

15         happening in front of everybody who's there who's speaking

16         to Officer Mangual.  It would be hard to believe that all

17         four people didn't get a glimpse of your client and Mr.

18         Santana.  It would be really difficult to believe that

19         didn't happen in this case because the two women then later

20         identify Mr. Diaz.

21                  So there's no evidence that the women left, that

22         they weren't there.  So what, what would be the basis for me

23         to suppress your, the application you're making, all

24         identification evidence?

25                  MR. WEINSTEIN:  Your Honor, if I may?  Let me get

1         back here.

2                 THE COURT:   No, you can stay where you are.

3         That's fine.   Go back to where you were.   Really, just go

4         back there.

5                 MR. WEINSTEIN:   Judge, there is a suggestion that,

6         from all the discovery, the two women, Mr. Wilson's client

7         and Mr. Diaz were the ones who were together and Diaz was

8         not with the males.

9                 THE COURT:   Okay, so that's something that I'm not

10        aware of.

11                MR. WEINSTEIN:   And that we have a fairly dark

12        area where their backs are turned.   Diaz is with the women,

13        if you're facing the back's to the right and two men to the

14        left where supposedly my client and Mr. Wilson's client are,

15        and there was no interaction with the women with our

16        clients.

17                THE COURT:   So then if that's the case, then there

18        would be no reason for me to suppress any kind of

19        identification proceeding, but it would be a question of

20        credibility if they said, oh, and those two guys were there

21        too at trial.

22                MR. WEINSTEIN:   Also, your Honor, it would be

23        bifurcating the hearing to see whether or not those two

24        women had the ability to observe whatsoever the two

25        defendants.

1r-c                         Proceedings

1           THE COURT:  Even if they did, what would be the

2     basis for me to suppress their, their viewing of your

3     clients in police custody?

4           MR. WEINSTEIN:  Well, we don't know that they ever

5     did.

6           THE COURT:  Well then, I'm speculating that they

7     did, but if they viewed them, what would be the legal basis

8     for suppression?

9           MR. WEINSTEIN:  Well, the suggestibility.  It's

10    one's a one-on-one show-up.

11          THE COURT:  It's not a show-up.  No one said

12    there's a show-up.

13          MR. WEINSTEIN:  Judge, they have these people in

14    custody.  Assuming from our prospective that they never had

15    an opportunity to observe because of darkness with Diaz and

16    whatever, and then all of a sudden these two men are in

17    custody, Mr. Diaz isn't there anymore, oh yeah, it's them.

18    Where if there was an independent source hearing and the

19    Court found, well, they didn't have the opportunity to see

20    them, they gave no description, they didn't tell the police.

21          THE COURT:  Is this a police-arranged

22    identification procedure?  That's the whole basis for this

23    hearing.

24          MR. WEINSTEIN:  Well.

25          THE COURT:  That's the whole basis for everything.

1r-c                           Proceedings

1           MR. WEINSTEIN:  Yes, your Honor.

2           THE COURT:  And quite frankly, at ten of five I'm

3      tired of bantering.  I want to know the legal basis.  If the

4      police are holding people in handcuffs, if the witness is

5      credible, that he sees what he says he sees, which I'm going

6      to find that he sees people lined up being frisked against

7      the wall in a street by people he believes first to be

8      undercover police officers, but then their droopy drawers

9      and other things alerted them to the fact that they couldn't

10     be police officers, this must be something else and it looks

11     like they'll be held up, and they grab two people and

12     everybody's there and sees them grabbing them, where is the

13     police-arranged identification procedure?

14          MR. WEINSTEIN:  Judge, I'll tell you what.

15          THE COURT:  Where is it?

16          MR. WEINSTEIN:  That's a series of facts --

17          THE COURT:  He's conceded I have to suppress all

18     of them.  He's conceding I have to suppress because he

19     didn't call another witness, so that's fine.  You conceded

20     that this is a police-arranged identification procedure

21     because that's the whole basis for suppression.  If there is

22     no identification, if it's a show -- if it's a viewing

23     incident to a rapidly unfolding thing, there is nothing that

24     the police did to suggest anything except take people into

25     custody, and that's the law.

Proceedings

1             But you, you've advocated something else, Mr.

2     Mendys, that you had to bring this witness forward and

3     that's why we're on the record for a half an hour trying to

4     figure out what you don't even know who the other person who

5     notice was served about would be.

6             MR. WILSON:  If I might finish, Judge?  Could I

7     just finish?  I got cut-off.

8             THE COURT:  I would hope somebody would.

9             MR. WILSON:  Mr. Melenciano was arrested by

10    another officer, not this officer.

11            THE COURT:  They were all taken into custody at

12    the same time, same place, feet away from each other.

13            MR. WILSON:  He was some distance away from the

14    other.  Officer Mangual said he didn't really see what

15    happened.  That other officer could have turned him around

16    to those witnesses and said, is this the guy or this is the

17    guy?  We don't know because that witness didn't testify.

18            THE COURT:  Well, you never argued that before

19    either, and you didn't ask me to say that another witness

20    had to testify.  You said based on what happened here, based

21    on what happened here.

22            MR. WILSON:  I said based on the fact he requested

23    a bifurcated hearing we don't have the testimony of those

24    witnesses.

25            THE COURT:  People ask for things all the time and

1       I don't know that we need to have them.  I didn't know that

2       we needed to have any other witness testify for a Harris

3       Hearing for the other statement that your client is there

4       because there is no issue about the voluntariness of that

5       statement.  It's voluntary in a non-Miranda sense beyond a

6       reasonable doubt, so it would come in to impeach anyway.

7               And I don't need to hear anything else about that,

8       although I'm not going to stay here and -- I want to know

9       right now, you believe that these are police-arranged

10      identification procedures as they are defined by the New

11      York Court of Appeals, that what happened with your client

12      at that scene, Mr. Melenciano, was a police-arranged

13      show-up?  That a person was brought to the scene or they

14      brought a defendant to where the complaining witness was at

15      the scene of an arrest, where they brought the defendants

16      back to the scene of the crime and had a police-arranged

17      identification procedure?  That's what happened in this

18      case?

19              MR. WILSON:  To back up, Judge, I believe the DA

20      hasn't met his burden of proof because the officer, I gave

21      him multiple chances --

22              THE COURT:  You are not answering my direct

23      question.  When a judge -- no, I want to hear from Mr.

24      Wilson and I'll hear from you.  It's a direct question.

25      Under what law, under what case, under what statute, under

lr-c                              Proceedings

1        what ruling is what happened in this case a police-arranged

2        identification procedure from the evidence at this hearing

3        for anybody, despite the DA's concession?

4                MR. WILSON:  Again, Judge, with regard to these

5        other three witnesses, we don't know.

6                THE COURT:  I'm finding as a matter of fact that

7        any and all identifications took place at the scene of the

8        alleged robbery in close proximity to the victims.  They

9        hadn't gotten very far.  They hadn't gone blocks away, they

10       had gone steps away.  And you can quibble about 10 feet, 20

11       feet, 30 feet.  This is they are apprehended in view of

12       people at the scene.  Whatever happened there, it's done.

13               And what grounds is there to suppress that

14       evidence when the apprehension occurs at the time and place

15       of the commission of a crime?

16               MR. WILSON:  With regard to those other three

17       witnesses, Judge, there's no evidence presented by the

18       People, and I --

19               THE COURT:  There's evidence that they were all

20       there.  There's evidence they were all there.

21               MR. WILSON:  Yeah, but --

22               THE COURT:  You didn't cross about anything else.

23               MR. WILSON:  There's no testimony about whether or

24       not those other officers displayed my client or not to the

25       witnesses.

1           THE COURT:  There's no display.  This is -- what

2    could they possibly have done to make it a police-arranged

3    identification procedure?

4           MR. WILSON:  We don't know because there was no

5    testimony.

6           THE COURT:  I'm asking you what the legal basis

7    is, that I'm not hearing anything.

8           MR. WILSON:  The basis is, Judge, that my client,

9    Mr. Melenciano, was arrested some distance away.  He said he

10   didn't see what happened very well, all right.  There's no

11   testimony that any of those three witnesses --

12          THE COURT:  I found that there's plenty of

13   testimony here about who was there, what happened, and that

14   the officer had conversations with the women.  They

15   confirmed the same thing.  They spoke, he spoke to Mr.

16   Rodriguez.  He says these two guys.  I have no idea how

17   that's not an identification by Mr. Rodriguez as he's

18   pointing them out.  I really don't know why that's not an

19   identification procedure.  I don't know why that's not the

20   record too.

21          It's mind-boggling that I'm hearing the DA saying

22   I only have evidence of one here, I don't know who made

23   another identification, when there's evidence of four people

24   talking to a police officer at the scene and all of them are

25   telling him these are the guys.

1              MR. WILSON:  I don't think that's the testimony

2      now before you, Judge.

3              THE COURT:  I know that's the testimony that --

4              MR. WILSON:  Judge, in the alternative, Judge, I

5      would move to preclude those three identifications.

6              THE COURT:  And what would be the grounds for

7      preclusion?

8              MR. WILSON:  The notice.  There's no notice.

9              THE COURT:  Why is there notice required under the

10     facts that are before me?

11             MR. WEINSTEIN:  Judge, may I say one thing?

12             THE COURT:  No, I want to hear that answer first.

13             MR. WILSON:  Judge, I don't even know what type of

14     proceeding took place with regard to my client.

15             THE COURT:  It's very clear what took place.

16             Mr. Weinstein, go ahead.

17             MR. WEINSTEIN:  Very simply, we don't know if the

18     women said to the police there, I didn't get a look at their

19     faces.  We don't know if they told the police I can or

20     cannot identify them at the scene.  That's what we don't

21     know.  There was no testimony as to what they said.  If they

22     said we don't know, they said, you know, I was so scared I

23     didn't see anybody's face.  That we don't know.  We don't

24     know.  He had the guys say those are them.  We don't know

25     what the women said, that's my issue.  There's no testimony

lr-c                          Proceedings

1        if the women were asked --

2                THE COURT:  Well, I guess this trial will proceed

3        in September because I will have to now go review the

4        record, review the case law, and I will have to decide, Mr.

5        Mendys, you have actually conceded an awful lot here about,

6        you know --

7                MR. MENDYS:  Well.

8                THE COURT:   -- suppression.  No, I'm not going

9        into it again because, you know something, I allowed lawyers

10        to come in and make arguments, and I listened to them and I

11        say what are your grounds and I rule on a record.  And you

12        made the record that you don't even know who the notice is

13        about.  And this is not something that you come into a

14        hearing and say I'm prepared to go and you don't even know

15        the answer to the question who is that other identifying

16        witness.

17                And then not only that, but you concede that there

18        cannot be an identification in or out of court by whoever

19        that witness is, and the defendant can even know who it is

20        who they're talking about.  That's the record that you have

21        chosen to make here, and that's a very difficult record for

22        me to deal with as the trial judge in determining what

23        testimony, and who can testify and who can make in-court

24        ID's and who can't make in-court ID's because of your

25        failure to go forward with a hearing that you conceded you

Proceedings

1      had to call a witness to establish that there was a

2      police-arranged identification procedure that was

3      nonsuggestive.  And you didn't meet that burden because you

4      don't know who the witness is, and it's a very difficult

5      position.

6             So we will reconvene tomorrow and I will continue

7      to hear arguments about this.  We're not going to call the

8      jury panel which I've reserved for tomorrow afternoon to get

9      a head start on the jury selection because that was all

10     taken care of in the one hour and the forty minutes that

11     I've heard this with no one really giving me a solid answer

12     about the state of the law and what I should be doing.  And

13     I thought I knew it, but everyone is so convincing in their

14     arguments that it's making me question whether I really

15     understand the law of suppression and preclusion for

16     identification witnesses.

17            So I'm going to have to take a break and go do my

18     research, and we will see you tomorrow at 2:15 in this

19     courtroom.  Orders of protection are extended.  It's 5

20     o'clock.

21            (Whereupon, the case was adjourned to July 9,

22     2015.)

23            (Continued on the next page...)

24

25

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     BRONX COUNTY : CRIMINAL TERM : PART 98
 2   -------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK
 3
            -against-
 4                                      Ind. No.
     AMAURI SANTANA, JOSE MELENCIANO       3349-2012
 5   & RICHARD DIAZ,
 6                    Defendants.
     -------------------------------------x
 7                                      265 East 161 Street
                                        Bronx, New York 10451
 8                                      JULY 9, 2015
 9   B E F O R E:
10            THE HONORABLE RALPH FABRIZIO
              Justice of the Supreme Court
11
              (Appearances same as previously noted.)
12
                                   LAURA ROSEN
13                                 SENIOR COURT REPORTER
14       *       *       *       *       *       *       *       *
15       A   F   T   E   R   N   O   O   N     S   E   S   S   I   O   N
16            (Whereupon, the following takes place in open
17       court in the presence of the Court, all three defendants,
18       Spanish language interpreter, defense counsel and the
19       assistant district attorney.)
20            THE CLERK:   Calendar number two, Amauri Santana,
21       Jose Melenciano, and Richard Diaz.  All three defendants are
22       before the Court.  Spanish interpreter required and present.
23                 Appearances, please.
24            MR. WILSON:   Brian Wilson for Mr. Melenciano.
25            THE COURT:   I said to please wait until all the
```

lr-a                          Proceedings

1       defendants are hooked up to their listening devices before

2       we make a record.

3                   MR. WILSON:  I'm sorry, Judge.

4                   THE COURT:  Mr. Melenciano's earphones are not

5       even on his ears, so he's here with a Spanish interpreter.

6       If Mr. Melenciano does not need the interpreter, I would

7       like to know that.

8                   MR. WILSON:  He does need her, Judge.

9                   THE COURT:  Let's put the appearances on the

10      record.  Go ahead.

11                  MR. WILSON:  Brian Wilson for Mr. Melenciano.

12      Good afternoon, Judge.

13                  MR. BONANNO:  Good afternoon, Your Honor.  Pat

14      Bonanno for Mr. Diaz.

15                  MR. WEINSTEIN:  Barry Weinstein, Goldstein and

16      Weinstein, for Mr. Santana.

17                  MR. MENDYS:  Newton Mendys for the office of the

18      district attorney.  Good afternoon.

19                  THE COURT:  Good afternoon.  All right, the Court

20      has heard all parties.  You have all had a lengthy and

21      significant opportunity to be heard at the close of the

22      hearings, and then to be heard again even after I began to

23      make my ruling.  And I have researched and I have read the

24      records and I have gone back, and I am going to now read

25      into the record my findings of fact and conclusions of law

lr-a                    Court's Decision

1      on this hearing.  All arguments have been concluded in this

2      Court's opinion.  Please be seated.  Be seated.

3              MR. WILSON:  Could I be heard, Judge?

4              THE COURT:  No.  You've all had an extensive

5      opportunity to be heard, and I was here quite a long time

6      last night reviewing the files, the motions, the record and

7      the law.  And I am now doing what I tried to do yesterday

8      before we got into extended additional arguments.

9              First of all, I want to reserve the, I want to

10     review the motions and the hearings and the grounds, and

11     what was ordered in this case more than two years ago by

12     Judge Gross.  And I understand that none of the defense

13     attorneys present here were the attorneys who made the

14     motions, and I also understand that Mr. Mendys was not the

15     DA who responded to any of the motions.  I will note that in

16     each case the district attorney consented to Mapp, Huntley,

17     Dunaway and Wade Hearings for all defendants.

18             In terms of Mr. Melenciano, the motion filed by

19     the Legal Aid Society sought to suppress identification of

20     any testimony of the defendant of an identification in

21     violation of state or federal constitutional rights, or for

22     a hearing.  Mr. Melenciano also sought suppression of, and

23     the DA consented to, a hearing to suppress money taken from

24     Mr. Santana.  Mr. Witty conceded that the money had been

25     taken from Mr. Santana.  He said Mr. Santana had -- Mr.

lr-a                    Court's Decision

1      Melenciano had standing to suppress that, and the DA agreed

2      to have a hearing.

3              And in addition, a Huntley Hearing was requested

4      and a lengthy statement was summarized, which is not wholly

5      consistent with the officer's testimony about what Mr.

6      Melenciano actually said, but that is not a suppression

7      issue.  It may be an issue of what actually was said, but

8      what is summarized as to what the notice was is not

9      necessarily what happened at the hearing.

10             And in terms of --

11             THE INTERPRETER:  Your Honor, he doesn't know what

12     you're saying.

13             THE COURT:  Mr. Melenciano, the defendant, argued

14     -- I'm sorry?  What's the matter?

15             THE INTERPRETER:  He's not understanding what is

16     being said.

17             THE COURT:  Tell me what is going on because we're

18     making a record.  I can't have someone say, your Honor --

19     can I ask the interpreter?

20             THE INTERPRETER:  He's not understanding through

21     the headphones.

22             THE COURT:  Is it he can't hear through the

23     headphones?

24             THE INTERPRETER:  He's not understanding me

25     specifically.

lr-a                    Court's Decision

1                    THE COURT:  He's not understanding you?

2                    THE INTERPRETER:  Yes.

3                    THE COURT:  As an interpreter, an official

4        interpreter?  Can we put your appearance on the record?  I'm

5        sorry, can I have the appearance?

6                    THE INTERPRETER:  He said it sounded very bad.

7                    THE COURT:  The headphones are bad?

8                    THE INTERPRETER:  Yes.

9                    THE COURT:  Let me ask this.  If Mr. Santana alone

10       removes his headphones and you are speaking to him in a

11       louder voice, can he hear and understand you now?

12                   THE INTERPRETER:  Yes.

13                   THE COURT:  Well, I'm actually, because we have an

14       equipment problem and I don't want to spend time trying to

15       remedy it, and this is a hearing, I'm going to ask that he

16       not have the headphones on and you speak loudly enough for

17       him to hear it, but the other defendants can use their

18       headphones as they're not complaining.  Okay.

19                   In terms of Mr. Melenciano's request for a Wade

20       Hearing, in the affirmation it alleged that the

21       identification was secured after the defendant was arrested

22       without probable cause, and that the People had indicated at

23       some point, perhaps at the criminal court arraignment, that

24       it was merely a confirmatory identification procedure.  And

25       as I said, the DA consented to each hearing based on each

1       allegation that was raised, and Judge Gross wrote hearings

2       granted on consent.  The People had absolutely no, no

3       discussion factually or legally about any issue.

4               As far as Mr. Diaz is concerned, once again the DA

5       consented to a Mapp Hearing, Huntley, Wade, Dunaway on

6       consent.  The defense attorney in that case, Mr. Alemany,

7       alleged that he wasn't sure if any property had been

8       recovered from Mr. Diaz, but to the extent that any was

9       recovered, he sought a Mapp Hearing, and the DA consented to

10      a Mapp Hearing.

11              In terms of an application for a Wade/Dunaway

12      Hearing, Mr. Alemany said that the basis for the hearing

13      that he was requesting was that the defendant was improperly

14      detained and should suppress the line-up and the show-up.

15      And as far as the Huntley Hearing is concerned, he alleged

16      that the statements were taken in violation of his

17      constitutional rights.

18              In terms of Mr. Santana, the motion actually was

19      filed by Mr. Feck, James Feck.  This was the -- first of

20      all, the motions filed and this decision actually was

21      January 10, 2013, three-and-a-half years ago.  Again, the

22      People consented, without any discussion of any facts or any

23      law, to a Huntley, Mapp, Dunaway and Wade Hearing.

24              Mr. Santana alleged in terms of the Huntley

25      Hearing that he was questioned in Spanish without Miranda

1    Warnings and that the statement was taken in violation, was

2    custodial in violation of his rights, that he didn't

3    understand it.

4         Mr. Santana also added in the motion additional

5    facts that the People made no comment on of any kind.  And I

6    don't know if this is a statement that was ever made by the

7    defendant, but it's a, certainly a statement made,

8    attributed to the defendant by his attorney that he has

9    provided the DA with paperwork that the $6,000 recovered

10   from Mr. Santana was part of a $25,000 settlement he had

11   received following a lawsuit from the Nationwide Insurance

12   Company, and that's the source of the money.

13        Now, I have looked at the file and I see no such

14   notice of any statement made to police in any form, and

15   certainly I never heard any of that at the trial.  I mean at

16   the hearing, rather.  But it is something that was mentioned

17   in the motion and it will be something that I will address

18   because I'm not sure what that is doing there, and whether

19   that was a statement that suppression was sought for or

20   whether it was a statement that his attorney made to the DA

21   and that Mr. Santana didn't make to any law enforcement.

22        Mr. Santana's request for a Mapp Hearing that the

23   money was seized without probable cause, that there was no

24   probable cause for arrest, and in his scenario he alleged

25   facts, again the People said nothing, he denied that he had

1    ever frisked anyone.  He denied that the police had seen him

2    frisking anyone.  He made all sorts of specific factual

3    statements denying what happened.

4         In terms of the Wade Hearing, it was kind of

5    interesting because it was not, the motion was not made to

6    suppress on the grounds of any suggestiveness, but that,

7    "the point-out procedures conducted were performed in

8    accordance with an illegal arrest."  And that was the

9    procedural posture and the hearings were ordered, and other

10   things happened at the hearings and I will discuss them.

11        Now, the following constitutes the Court's

12   findings of fact in this case.  The People called three

13   witnesses; Police Officer Edgar Mangual, Detective Ana Bell,

14   and Detective Christopher Rodriguez.  I credit the testimony

15   of each of these witnesses in their entirety and make the

16   following findings of fact following a fully litigated

17   hearing on the issues.

18        On October 17, 2012, Officer Mangual, who was

19   assigned to a detail at Yankee Stadium, was in uniform and

20   driving a marked police van that had front seats and three

21   rows of back benches.  At about 12:15 a.m. he was driving

22   that van and two of his partners were in the van at the

23   time, an Officer Pachot, P-A-C-H-O-T, and Officer Colon.

24   They were heading south on Walton Avenue, a one-way street.

25        As they approached the vicinity of 2315 Walton

lr-a                    Court's Decision

1        Avenue, Officer Mangual saw four people lined up standing

2        against the wall and saw three other people frisking those

3        four individuals who were standing against the wall.

4        Officer Mangual understandably believed that when he first

5        looked that the people doing the frisking were plainclothes

6        police officers and he had happened upon the scene of a

7        possible arrest or possible police action.

8                He slowed the van down initially to make sure that

9        the police were safe, the people he believed the police were

10       safe and, okay, but as he got closer he realized, based on

11       his observations, that the men doing the frisking were not

12       police officers, and this was based on their manner of

13       dress, their pants were hanging below their waist.  There

14       was no equipment that he would have expected to see

15       plainclothes police officers in possession of.  And so he

16       now believed that the four individuals standing against the

17       wall were in the process of being robbed.  So he stopped the

18       marked van and he and his two partners in uniform got out of

19       the van.

20               As the van stopped, the three individuals who were

21       frisking ran.  Two of the men ran in one direction, one went

22       into another direction.  Officer Santana got a good look at

23       two of those individuals at that time, and they were

24       defendants Melenciano and defendant Santana.  The third man

25       who was identified at a later date by two other individuals

1      as defendant Diaz, he did not get a good look at him.

2           Now they -- Mr. Santana and Mr. Diaz fled

3      northbound.  Mr. -- I'm sorry, Mr. Santana headed

4      southbound, Mr. Melenciano and Mr. Diaz began heading north.

5      Mr. Melenciano was apprehended steps away from the scene by

6      one of Officer Santana's partners, but he couldn't recall

7      which of the two other individuals made that apprehension.

8      I'm sorry, Officer Mangual's partners.  Officer Mangual

9      headed toward Mr. Santana and grabbed him, and the other

10     police officer went to the four complaining witnesses.

11          Now, as Officer Mangual apprehended Santana and

12     the other officer apprehended Mr. Melenciano, two of the

13     individuals, Mr. Gonzalez and Mr. Rodriguez, told -- were

14     pointing and said, in substance, that these two individuals

15     had pretended to be police officers took their money.  Two

16     women who were present, Miss Rosario and Miss Rodriguez,

17     basically were saying the same thing, although Officer

18     Mangual was unable to recall anything more specific about

19     what the two women told him.

20          Mr. Santana and Mr. Melenciano were handcuffed and

21     placed in -- were handcuffed at the scene.  However, before,

22     and while still at the scene, Officer Mangual pulled a large

23     wad of money wrapped in a rubber band from Mr. Santana's

24     pocket.  Mr. Santana and Mr. Melenciano at the time each

25     said in substance that the money was theirs.

1           They were taken to a van.  Mr. Gonzalez and Mr.

2   Rodriguez elaborated more on the story telling the officers

3   that the people had gotten out of a black car that was

4   parked at the scene, that they had pretended to be police

5   officers, and that the amount of money taken was $6,000.

6   Officer Mangual went back to the van and asked Mr. Santana

7   how much money he believed he had, and Mr. Santana said

8   $16,000.  Mr. Santana was not read any Miranda Warnings

9   prior to that questioning.

10          During questioning later that day Mr. Melenciano

11  indicated that the other individual involved had a nickname

12  and that the police ascertained that that individual was

13  co-defendant Mr. Diaz.  The officers got a photograph of Mr.

14  Diaz and it was shown to Mr. Melenciano on a cell phone and

15  Mr. Melenciano said, yes, that's the other man we were with.

16  Officer Christopher Rodriguez -- I'm sorry, Detective

17  Christopher Rodriguez prepared a photo array with that

18  photograph.

19          The original arrest photo or the actual arrest

20  photo shows Mr. Diaz wearing earrings.  He prepared an array

21  with photographs that were selected by photo manager in

22  which he looked at and he believed were the most likely in

23  appearance to Mr. Diaz in the photographs.  The problem was

24  none of the other photographs of any individual showed them,

25  the other individuals, wearing earrings.

1        So prior to showing the photo array, the detective

2    took a marker and made black marks on the earlobes of Mr.

3    Diaz covering those earrings, but he also made nearly

4    identical black marks on the earlobes of the photographs of

5    the other five individuals.

6        The photo array was shown to Miss Rodriguez.  She

7    was given instructions.  The photo array is in evidence.

8    She identified the photograph of Mr. Diaz as being one of

9    the individuals involved in the robbery.

10       A wanted card was prepared, and on November 22,

11   2012, Mr. Diaz was apprehended somewhere in the confines of

12   the 34 Precinct in Manhattan.  Officer Rodriguez was

13   notified, Detective Rodriguez was notified and he was with

14   Detective Ana Bell.  They were on a detail after Hurricane

15   Sandy, which, of course, underscores how old this case is,

16   in the Rockaways, and they went to 108 Precinct to conduct a

17   line-up.

18       A line-up was prepared, fillers were selected.

19   Mr. Diaz picked his position as number three, and another

20   witness named Argelia Rodriguez, I'm sorry, Argelia -- the

21   photo array was not Mr. Rodriguez, this is Miss Rosario

22   would be the photo array.  Argelia Rodriguez identified --

23       MR. MENDYS:  Argelia Rosario.

24       THE COURT:  Argelia Rosario, I'm sorry.  Thank

25   you.  This is Argelia Rosario is the line-up.  She

1    identified Mr. Diaz in the line-up.  There was nothing

2    suggestive about the line-up.  The photographs, there are

3    two, they may be blurry but they certainly are not blurry

4    enough to indicate that Mr. Diaz is wearing earrings or

5    anyone in the line-up is wearing earrings.

6           Miss Rosario was kept separate.  The fillers are

7    substantially similar in appearance to the defendant.

8    Everyone was seated and precautions were taken to make sure

9    that this line-up was fairly conducted by police.

10          Mr. Diaz was then questioned by Detective Ana

11   Bell.  She speaks Spanish.  She learned Spanish from her

12   mother.  She is what we would call a native Spanish speaker.

13   She read Mr. Diaz Miranda Warnings from a card and the

14   Miranda Warnings on the card are in the Spanish language.

15   She said she read each of those warnings in Spanish to him

16   verbatim, and that he said he understood each of the

17   warnings read in Spanish and that he agreed to make a

18   statement.

19          Detective Bell also provided for the Court a

20   translation of what is on the card into the English

21   language.  And the warnings, as translated in English, are

22   the correct Miranda Warnings advising the defendant about

23   his rights to silence, counsel, assignment of counsel.  They

24   are complete.  And he did say he understood them and he

25   signed the card, and he agreed to speak to Detective Bell.

lr-a                    Court's Decision

1          And he made a statement that, in substance, he

2     told them who was present at the scene of the robbery.  He

3     identified three individuals by nickname; someone named

4     Lappy, someone named Homeboy, and someone named Hombre.  He

5     acknowledged that he had been there and he had a shield

6     hanging around his neck.  That it was a shield that he had

7     from a job he worked as a security officer.  And that he

8     approached the people with the shield displayed and that he

9     saw the police come up with the van, and when the van was

10    stopping, he ran away and the victims were standing against

11    the wall and he ran away and threw the shield away at some

12    point as he fled the scene.

13          Those are the findings of -- I'm sorry, the car.

14    The witnesses identified a black car at the scene, and the

15    car was taken back to the precinct and actually into police

16    custody at the scene, and it was through a check of both the

17    license plate and the VIN number found to be Mr.

18    Melenciano's car.

19          That is the sum and substance of the relevant

20    facts that I am finding, but as I said, I'm crediting each

21    and every part of the officer's testimony.  Here are my

22    conclusions of law.

23          First of all, on the question of probable cause,

24    there was probable cause to arrest both Mr. Santana and Mr.

25    Melenciano at the scene of the crime.  The officer observing

1r-a                    Court's Decision

1    what he believed first to be police officers, but then

2    having no reason to believe that they were police officers

3    at all was witnessing what he could have reasonably believed

4    was a robbery, that's what he said.  But it could have been

5    a lot of other things, could have been many crimes.  There

6    could have been criminal impersonation if they were acting

7    as police officers.  It could have been forcible touching.

8    It could be the beginnings of an assault, but this was

9    criminal activity.  Four people standing with their hands

10   against the wall facing a wall being touched up and down by

11   other individuals gives that officer probable cause when he

12   realizes upon sight that they are not who they are

13   attempting to appear to be.

14            But he moved in with his partners and at that

15   point could not let the situation go, and he grabbed Mr.

16   Santana and a partner grabbed Mr. Melenciano.  And this is

17   all unfolding in the space of a minute or so.  And as he's

18   grabbing Mr. Santana and as he's grabbing Mr. Melenciano,

19   two individuals are pointing and saying they took our money,

20   they committed a crime.  These are face-to-face individuals

21   in the street telling the officer and confirming what he had

22   reason to already believe that a crime was committed, but

23   that the crime involved a theft of money, so he had probable

24   cause to arrest them.

25            At that point he had probable cause to search

lr-a                        Court's Decision

1       incident to that arrest, and so the search of the pockets of
2       Mr. Santana and the initial recovery of the wad of money of
3       $6,000 was constitutionally acceptable as a search incident
4       to a legal arrest.

5               They were handcuffed, taken to the van.  Further
6       questioning at the scene revealed that the car that was
7       parked there had been the vehicle that the defendants, at
8       least two of the defendants, had arrived in.  That they had
9       gotten out of that car and immediately thrown these people
10      up against the wall and began the criminal activity.

11              And the car being the instrumentality of a crime
12      certainly could be, could be taken into custody incident to
13      an arrest.  But unlike money or ID cards or small items, the
14      only way to take the car away would be to transport it to
15      the precinct.  No warrant was necessary and no search is
16      alleged to have occurred in the car that revealed any type
17      of incriminating evidence.

18              The car itself is evidence and, of course, the
19      evidence of Mr. Melenciano's ownership is the relevance of
20      the car, but there's no reason to suppress the car.  It was
21      parked on a public street.  It was seen on a public street.
22      It was described as the instrumentality of a crime on a
23      public street.  It's arrest evidence and it was taken into
24      custody as arrest evidence, and no warrant was necessary.

25              In terms of the questioning, the initial

lr-a                    Court's Decision

1       questions, the initial statements made by Mr. Melenciano and

2       Mr. Santana were not the subject of custodial interrogation,

3       although they clearly at that moment would have believed

4       that they were in custody.  Either the handcuffs were on or

5       about to be put on, they were held by police officers,

6       people are screaming they just robbed them a few feet away,

7       so the -- a reasonable individual would believe they were in

8       custody at that time.

9               But the statements were not made in response to

10      any question.  They were made when the officer found the

11      money and they spontaneously each believed they had to make

12      some statement to account for what the money was.  And they

13      both said that it was their money or one of their money or

14      both of their money, but that statement is, the statements

15      are not custodial interrogation.

16              Now, the statement made in the van by Mr. Santana

17      when asked how much money he believed he had, and his

18      response was $16,000, is challenged on the grounds that it

19      is custodial interrogation which required Miranda Warnings

20      before the officer could pose the question.  And certainly

21      he is in custody, by any stretch of the law, as he's sitting

22      in that van.  But the officer had been told that it was

23      $6,000.  The defendants had said it's our money.

24              The officers cannot let the defendants go at that

25      time.  They still have to investigate what's happening, and

1  asking the defendant how much he has under a Huffman

2  analysis is investigative questioning of a short term at the

3  scene of the crime to ascertain whether they actually have

4  grounds later on to really trust that it's not the

5  defendants who are the criminals, but perhaps the victims

6  that were.  And so that questioning was investigatory

7  questioning at the scene.

8           In terms of Mr. Diaz, the photo array of Mr. Diaz

9  was not unduly suggestive in any way.  The officer did take

10  steps to make sure it was not suggestive by not only

11  covering a very significant part of the photograph, the

12  earrings, but putting identical dots on the earlobes of

13  everyone else so you really wouldn't know which of these

14  people and why these dots are there.  Plus, there's no

15  information, actually, that I have heard that anyone

16  described Mr. Diaz as wearing earrings at the scene of the

17  crime.

18           No suggestive words were used when the photo array

19  was displayed, and the photo array and the identification by

20  Miss Rodriguez meets constitutional, passes the

21  constitutional tests, although it would not be admissible at

22  trial itself, but Miss Rodriguez will be able to make, if

23  she can, an in-court ID because it would not be tainted by

24  any unconstitutional pretrial identification proceeding, and

25  certainly a photo array constitutes a pretrial

lr-a                    Court's Decision

1    identification proceeding under 710.30 of the Criminal

2    Procedure Law.

3              The line-up viewed by Miss Rosario was also

4    appropriate.  There is nothing suggestive at all about the

5    defendant's appearance, nothing to flag him as the subject.

6    She had not had even herself a prior viewing in a photo

7    sense, so she's viewing a corporeal line-up, which is

8    actually the preferred method of identification, confirming

9    that the police have the right individual, and no suggestive

10   instructions were given.  She was kept away and there is

11   nothing at all suggestive about that, so she will be able to

12   testify both about the prior line-up identification, and if

13   she's able to make an in-court identification, she may do

14   so.

15             The statement made to Detective Bell, the People

16   have met their burden to prove that it was voluntary in

17   every sense of the word.  Certainly, it's custodial

18   interrogation.  Miranda Warnings were read in Spanish.  The

19   Court is satisfied that the warnings that were read to this

20   defendant were the English language Miranda Warnings had

21   they been read in English, but they were read verbatim in

22   Spanish.  The defendant agreed to waive his rights and he

23   made a statement following a knowing and voluntary waiver of

24   Miranda Warnings.

25             There's no evidence before the Court of any

1    duress, any threat, any promises or anything that would

2    cause the Court to have any concern about any part of the

3    voluntariness of that statement.

4              I will now turn to what was a very contentious

5    part of the hearing, and this involves testimony related to

6    what is purported to be identification proceedings at the

7    scene.

8              Now, the record at the hearing is that all four

9    individuals are present as these defendants are taken into

10   custody.  In fact, the officers interrupted the crime.  It

11   was brought out that in preparation for his testimony, the

12   officer actually reviewed a videotape of what occurred,

13   although the Court has never seen the videotape and that

14   there is no, no evidence of what's on the video was ever

15   introduced, so I can't make any findings about whether the

16   video itself actually corroborates the officer's testimony.

17   But I will note that the defense has the videos and there

18   was no even impeachment of the officer's testimony about

19   what happened and what's on the video if there would be any

20   inconsistency based on the videos.

21             But what happened at the scene is police come upon

22   what turns out to be a robbery, a robbery being perpetrated,

23   according to the evidence at the hearing, according to the

24   witnesses who were the victims, by individuals who were

25   posing as police officers and stole their money.  And it was

1    still in the process of going on, the frisking was still

2    occurring.

3          Whether the money had been transferred before or

4    during and the officers didn't see the money at that moment,

5    the frisking was going on and it was going on when the

6    officers stopped the van and everyone took off.  It was

7    still an ongoing crime.  These officers actually witnessed

8    the crime, and they stopped anything further from occurring

9    and they grabbed two of the perpetrators at the scene of the

10   crime with the victims of the crime still at the scene of

11   the crime.

12         Now, the People served 710.30 identification

13   notice saying that there were two individuals who made

14   identifications that were point-out identifications at the

15   time and place of the arrest, and consented to a hearing to

16   determine whether the identification proceedings that they

17   served notice of were unduly suggestive.  Again, it was

18   apparent to me that certainly Mr. Rodriguez and Mr. Gonzalez

19   had both seen these defendants and pointed and said at that

20   moment they robbed us, they robbed us.

21         It was also obvious, although not brought out by

22   the People but brought out by one of the defense attorneys,

23   that there were two women there who were actively engaged in

24   speaking, and that they made statements in substance that

25   mirrored what the two men had said, that they were robbed

1    and these people were pretending to be police officers.

2    Everything is being spoken about at the scene.  It is one

3    identification proceeding, two identification proceedings,

4    three identification proceedings, four identification

5    proceedings.

6            The first part, the colloquy by Mr. Wilson, and

7    you know, as the lawyer he has the right to make this

8    request, pointed out to the Court that there had been two

9    notices and wanted to know which two people this referred

10   to.  Mr. Mendys says I only know of one, and basically at

11   that point conceded that whoever the other person was,

12   whatever else, whatever other identification notice had to

13   be served had to be suppressed, and he wasn't even going to

14   go into it at trial and he moved on.  That was the DA's

15   position.  I didn't dispute it.  I didn't argue.

16           I heard the rest of the attorneys make their

17   arguments.  I heard Mr. Mendys make his arguments.  I

18   addressed Mr. Mendys about other people just to try and

19   clarify that he in fact was agreeing to the suppression of

20   identification evidence from a witness for who no notice was

21   given, and he confirmed that he was.

22           That was the state of the record.  I said thank

23   you and I was not going to do what I'm doing now, because it

24   takes a lot of time, but I was kind of aware of where I was

25   going in this, with this decision, including the People's

1r-a                    Court's Decision

1    concession that I was suppressing -- I was denying the

2    motion to suppress everything but one identification

3    proceeding that the People claimed they didn't know who made

4    the identification proceeding.

5         But then it took off in a different direction and

6    other arguments were made.  Arguments that all

7    identifications had to be suppressed or they had to be

8    precluded because no notice was given.  And lots of back and

9    forth and we concluded the day, and I understood the

10   positions about suppressing a lot of identifications or

11   precluding unnoticed identifications.

12        And so I am now ruling on the motion to either

13   suppress all proceedings, all identification testimony or to

14   preclude unnoticed identifications, because that, although

15   not the subject of the motions in this case developed during

16   the hearing, and it was extra testimony at the hearing.

17        And I also before, I don't want to forget that

18   part of the hearing that was granted was for Mr. Melenciano

19   to suppress the evidence recovered from Mr. Santana, I've

20   already ruled that that evidence was recovered pursuant to a

21   legal arrest, but I also find that he has no standing to

22   even make such a motion.

23        In terms of a Mapp Hearing for Mr. Bonanno that

24   the People, Mr. Bonanno's client Mr. Diaz that the People

25   consented to, I did hear something about some pills that

lr-a                        Court's Decision

1     were recovered, but I am not aware that there are any pills

2     that are the subject of, of any counts in this case, and I

3     do not believe that any relevant evidence was recovered at

4     all from Mr. Diaz to the extent that it refers to pills.  I

5     have no reason to suppress them, but I've heard no argument

6     of any kind about that.

7           But when a judge in a motion part grants a Mapp

8     Hearing on consent of the People challenging the seizure of

9     physical evidence, I, as the hearing judge, am required to

10    rule on every aspect, otherwise there could be an appellate

11    issue.  So I'm actually precluding the introduction of pills

12    because I believe there's no relevance that would be for

13    anything recovered from him, but there is nothing to

14    suppress as the fruits of the crime from Mr. Diaz.

15          Returning to the identifications of the two

16    defendants at the scene, I'm citing a particular case,

17    People v Peterson.  This is from the Appellate Division

18    Third Department, 194 AD2d page 124.  And I specifically

19    want to refer to the part of the decision that can be found

20    at pages 127 to 128, and I believe that this case basically

21    sums up the law on the defense applications to suppress all

22    identifications or to preclude any unnoticed

23    identifications.

24          And it talks about an identification procedure

25    within the meaning of 710.30(1)(b), and it requires notice

1      of "testimony regarding an observation of the defendant

2      either at the time or place of the commission of the

3      offense, or upon some other occasion relevant to the case to

4      be given by a witness who has previously identified that

5      defendant.  As such, the statute contemplates two distinct

6      pretrial viewings of a defendant by an eyewitness.  First is

7      the witness's actual observation of a defendant, either at

8      the time or place of the commission of crime or some other

9      occasion relevant to the case.  This is the observation

10     relevant to and probative of of defendant's guilt or

11     innocence which forms the basis for the witness's

12     prospective trial testimony.

13             Second is a separate police initiated

14     identification procedure such as a line-up, show-up or

15     photographic array which takes place subsequent to the

16     observation forming the basis for the witness's trial

17     testimony and prior to trial.

18             Stated in the simplest terms, this is the occasion

19     where the witness points at a defendant and says that's the

20     one."

21             There are other cases that are relevant.  One I

22     wish to cite, again there are lots of cases, but the matter

23     of Leo T, that's at volume 87 in the Appellate Division

24     second series, page 297, which is a decision by the First

25     Department on pretrial identification proceedings and

1r-a                    Court's Decision

1    suppression, and notice and police arranged identification

2    proceedings.

3              So what I heard at the hearing certainly

4    constituted much about the witnesses, four individuals

5    actual observations of the defendant at the time and place

6    of the commission of the crime and another occasion relevant

7    to the case.  The observations occurred during the crime.

8    They occurred during the immediate apprehension in flight

9    from the crime.  That's what they observed.  That part is

10   there.  That would form the basis of the witness's trial

11   testimony.

12             What I didn't hear about was a separate

13   police-initiated identification procedure such as a line-up,

14   show-up or photographic array.

15             (Continued on the next page...)

16

17

18

19

20

21

22

23

24

25

1        THE COURT:  (Cont'g) If anything, this would be

2    tantamount to an accidental viewing of people in police

3    custody without any intent of the police to have such a

4    viewing.  This is a case where everything happens during the

5    commission of the crime.  There is no subsequent viewing,

6    there is only a contemporaneous viewing.

7        Why there was any consent to a Wade hearing, I

8    can't comment on.  Why there would be an agreement by the

9    District Attorney, after hearing all and presenting their

10   evidence, to suppress testimony of a witness who happens to

11   be one of four people, because there's nobody else here, who

12   said the same thing that the other person said, "these are

13   the guys who just robbed us, that they just grabbed in our

14   presence on the street,' I can't account for either,

15   although that would have been my ruling because of the

16   concession by the District Attorney's Office.

17        I'm not the advocate here, the People are.  When I

18   was asked to take into account other considerations to

19   suppress other people's identifications or to preclude other

20   people's identification or speculate about whether they had

21   an opportunity to observe them, whether they had an

22   opportunity to see them during the time, it's all

23   speculative to me.  But what it does is raise a legal issue

24   that I have to address, raised for the first time by the

25   defense, not in their motion, but at the hearing.  And as a

1  judge, I have to make that ruling because it was an issue

2  preserved for Appellate review.  It was specifically the

3  arguments raised.

4  And my ruling on that is there was no police

5  arranged identification procedures for any of the four

6  individuals that falls under the statute.  The police did

7  not conduct a showup.  They did not conduct a lineup.  They

8  actually didn't even conduct a point out.  This was

9  spontaneous, by the state of the record that was before me,

10  there were spontaneous statements made by the, at the scene

11  of the robbery by the victims of the robbery of what they

12  did, not about who they are.  Identification doesn't even

13  appear to be an issue in this case.  Because the identifying

14  witnesses are the police officers who observed and grabbed

15  them.  And if I were going to suppress anything or preclude

16  things, the People didn't serve notice that Officer Santana

17  identified Officer Melenciano -- I'm sorry, the officer who

18  apprehended the defendant Santana identified Mr. Melenciano

19  in that officer's custody or vice-versa.  Everybody is

20  looking at everything at the same time.

21  We went forward with the hearing, there was a

22  full, complete record made about everything that happened.

23  What the judge ordered to proceed at the hearings, what the

24  People consented to, and what the defense wanted in their

25  motions more or less occurred, although some things that

1    were raised were never touched on, but I've dealt with them,

2    and then it went beyond, because the hearings revealed

3    things that may have led to issues that, well, I only got

4    two notices, I didn't get four, maybe I should be willing to

5    preclude because I didn't get notices of two

6    identifications.  Okay?  But notice was not required and

7    really, the hearings have been held but -- well, I'm just

8    going to leave it at that.

9              The D.A. never elaborated in any way, shape, or

10   form in the motion responses.  These are the most boiler

11   plate responses that anyone could get, that you can put in

12   your computer, hit a button and say consent, consent,

13   consent, consent.   Identical responses to  actually

14   different motions with different scenarios, with different

15   items sought to be suppressed, some of which had nothing to

16   do with the case and some of which even the defense

17   attorneys concede whoever made the motion might not have a

18   right to a hearing about.  But the D.A. just said consent,

19   consent, consent, consent, and the judge did what a judge

20   would do.

21             I don't know what the District Attorney's position

22   is, they're consenting and I'm granting the hearings and I

23   had those hearings and I have ruled on the legal arguments

24   that were raised as part of the record and that constitutes

25   the findings of fact and conclusions of law.

1          The motions to suppress are denied in their

2      entirety.

3          The motions to preclude raised during the hearing

4      are denied.  And that's it.  Okay?

5          And defense has their exceptions and this is the

6      record for review for appeal.

7              MR. MENDYS:  May I say one thing?

8              THE COURT:  No, I find this record is closed.

9          I do not want you adding anything to the record.

10     There is nothing to add to the record and I'm not revisiting

11     this decision unless a written motion is made by someone to

12     reargue and then if that's made, I'll have to consider it.

13     But I have ruled.  We are done.  Okay?

14     CERTIFIED THAT THE FOREGOING is a true

15     and correct transcript of the original

16     stenographic record.

17     _Laura Rosen_____

18

19

20

21

22

23

24

25

1                    INDICTMENT NUMBER 3349-2012

2

   SUPREME COURT OF THE STATE OF NEW YORK
3
   COUNTY OF THE BRONX  :  TRIAL TERM, PART 98
4
   ---------------------------------------X
5
   THE PEOPLE OF THE STATE OF NEW YORK,
6
             - against -
7                                        Sandoval
   RICHARD DIAZ, AMAURI SANTANA,
8  JOSE MELENCIANO,

9                      DefendantS (s)

10 ---------------------------------------X
                        265 E. 161 Street
11                      Bronx, New YorK  10451

12                      July 9, 2015

13 B E F O R E :

14               HON. RALPH FABRIZIO,
                              J U S T I C E.
15
   A P P E A R A N C E S:
16
                 ROBERT T. JOHNSON, ESQ.
17               District Attorney, Bronx County.
                 BY:  NEWTON MENDYS, ESQ.,
18                   Assistant District Attorney.

                                        **FILED**
19               PAT BONANNO, ESQ.,
                 Attorney for Defendant Diaz.  **OCT -5 2016**
20
                 BARRY WEINSTEIN, ESQ.,     **SUP COURT, APP. DIV.**
21               Attorney for Defendant Santana  **FIRST DEPT.**

22               BRIAN WILSON, ESQ.,
                 Attorney for Defendant Melenciano
23

24

25                          LAURA ROSEN,
                            Senior Court Reporter
26

| | |
|---|---|
| 1 | Proceedings                                    2 |
| 2 | (The hearing having been previously transcribed, |
| 3 | proceedings continue in open court as follows:) |
| 4 | THE COURT:  So tell you what, it's now 25 of 4, |
| 5 | what pre-trial evidentiary applications are there in this |
| 6 | case? |
| 7 | MR. MENDYS:  Okay, Judge. |
| 8 | THE COURT:  What are you addressing? |
| 9 | MR. MENDYS:  There are three things I'm prepared |
| 10 | to address right now.  Defense in each of their motions is |
| 11 | moving for Sandoval. |
| 12 | THE COURT:  Okay, so each of the defendants has |
| 13 | Sandoval hearings. |
| 14 | So, Mr. Wilson, if your client is called in terms |
| 15 | of prior convictions that are part of this record, what are |
| 16 | you moving to seek to preclude the People from asking |
| 17 | questions about in order to get each of those defendant's |
| 18 | criminal histories before me, so I know what application it |
| 19 | is you're making as part of Sandoval. |
| 20 | MR. WILSON:  I believe, your Honor, that |
| 21 | Mr. Melenciano had two youthful offender adjudications off |
| 22 | of felony pleas to Penal Law -- |
| 23 | THE COURT:  Two felony Y.O. adjudications? |
| 24 | MR. WILSON:  At the same time, Judge. |
| 25 | THE COURT:  All right.  You're not really supposed |
| 26 | to get that. |

```
1                        Proceedings                    3

2               All right, he has two Y.O.s

3               MR. WILSON:  221.40.

4               THE COURT:  For what?

5               MR. WILSON:  221.40.

6               THE COURT:  That's a misdemeanor.

7               MR. WILSON:  I'm sorry.  They are both

8    misdemeanors.

9               THE COURT:  221.40, sale of marijuana.

10              MR. WILSON:  He received two Y.O. adjudications

11   and a sentence of five days in jail on October 28th of 2004.

12              Of course a Y.O. of the offender is not a

13   conviction, it can't be used against him.  I would ask that

14   you preclude the Assistant District Attorney from

15   cross-examining concerning the underlying facts.  It

16   happened when Mr. Melenciano was 17 years old, eleven years

17   ago, I believe.  It's too remote based on that.  Of course

18   lapse of time bears on credibility.

19              I would cite to the Court People v. Contreras,

20   C O N T R E R A S, for that, 108 AD2d 627, First Department

21   (1975).

22              Additionally, Mr. Melenciano is the sole witness

23   who can testify on his own behalf, Judge, and the courts

24   have suggested that special consideration should be given to

25   limiting the scope of cross-examination in those situations.

26   And I will cite to the Court for that People v. Briggs,
```

```
1                          Proceedings                        4

2      166 AD2d 210, First Department (1990).

3                  I ask the Court preclude cross-examination into

4      either of those.

5                  THE COURT:  Okay.  Mr. Melenciano also has out-of-

6      state convictions on the wrap sheet.  Are you seeking to

7      preclude those convictions?

8                  MR. WILSON:  Judge, I did not receive that

9      information from my predecessor.

10                 THE COURT:  Oh really?  This is part of the court

11     file, it's actually at the very end of the criminal history

12     from the state of Virginia.  And you don't have this?

13                 MR. WILSON:  Could I?

14                 THE COURT:  I'll make a copy for you right now.

15     Hold on a second.

16                 MR. WILSON:  Thank you, Judge.

17                 (Continue on following page.)

18

19

20

21

22

23

24

25

26
```

Proceedings

1          MR. WILSON:  It appears, Judge, that my client has
2   a conviction from September of 2011 to a misdemeanor in
3   Virginia.
4          THE COURT:  Which one are you talking about?
5   Which date?
6          MR. WILSON:  It is appears to be 9/6 of 2011.
7          THE COURT:  Identity theft?
8          MR. WILSON:  Yes.
9          THE COURT:  Right, but isn't there another one
10   there?
11          MR. WILSON:  The other one looks like it's --
12          THE COURT:  No, there's a -- oh, yeah, I see.
13   Right, not prosecuted July 23, 2011 felony, obtaining money
14   under false pretenses.  But he received six months of a
15   suspended sentence for something in Virginia that's called
16   identity theft, obtained ID to defraud, and -- so, go ahead.
17          MR. WILSON:  My client tells me he served no time,
18   Judge.
19          THE COURT:  No, it didn't -- it was a suspended
20   sentence.
21          MR. WILSON:  That's what I think it means, a
22   six-month suspended sentence.  So I mean, based upon the
23   sentence, I suspect it was not a crime of monumental import.
24   Again, I would suggest to the Court that the Court look at
25   the Briggs standard, which I'm sure the Court's familiar

Proceedings

1    with.  My client is the only witness who can testify on his

2    own behalf, and I think a conviction like this might be so

3    chilling as to preclude him from being able to testify.  And

4    I would ask the court to preclude cross-examination on that

5    conviction also, and I thank you for letting me know about

6    it.

7              THE COURT:  Let me first address the defense

8    motion of this defendant's criminal record.  Mr. Mendys?

9              MR. MENDYS:  Judge, should Mr. Melenciano seek to

10   testify there are, I think, three incidents that I would

11   seek to ask him about.  The first, or the most recent we'll

12   say, is from a June 20, 2015 conviction.

13             THE COURT:  Oh, this is something that's not on

14   the rap sheet because this was run -- okay, I'm sorry,

15   because I don't have an updated rap sheet.  You ran an

16   updated rap sheet on this defendant, and so we're going to

17   have to make sure Mr. Wilson knows about this.

18             June 20, 2015, what is it?

19             MR. MENDYS:  That was the arrest date.  It was

20   petit larceny.

21             THE COURT:  He was arrested?

22             MR. MENDYS:  And he was arrested on June 20 for a

23   date that occurred the same day, for an incident that

24   occurred the same day.

25             THE COURT:  What happened in the case?

Proceedings

1              MR. MENDYS:  On June 21 at the arraignment
2      presumably he pled guilty.
3              THE COURT:  To what?
4              MR. MENDYS:  Petit larceny.
5              THE COURT:  He pled guilty to petit larceny.
6              MR. MENDYS:  Yes, sentenced to time served.
7              THE COURT:  Do you know any of the underlying
8      facts of that larceny?
9              MR. MENDYS:  Yes.  He stole $200 from Pathmark,
10     $200 worth of merchandise from Pathmark.
11             THE COURT:  What was the sentence?
12             MR. MENDYS:  Time served.
13             THE COURT:  Okay.
14             MR. MENDYS:  If he were to testify, I would seek
15     to ask about the conviction.
16             THE COURT:  Okay.
17             MR. MENDYS:  I don't feel any, I don't have strong
18     feelings about the underlying facts.
19             THE COURT:  So wait.  If he were to testify what
20     would you seek to ask him about?
21             MR. MENDYS:  I would seek to ask him about whether
22     on June 21st of 2015 he was convicted of a misdemeanor petit
23     larceny in New York County.
24             THE COURT:  It was a misdemeanor and that it was
25     petit larceny?

 1          MR. MENDYS:  Correct.

 2          THE COURT:  Okay.  What's the other thing you want

 3     to ask him?

 4          MR. MENDYS:  On March 20, 2014, the defendant was

 5     arrested for sale of marihuana.  I would seek to ask him --

 6          THE COURT:  So what happened in that case?

 7          MR. MENDYS:  He was convicted of the same on

 8     November 24.

 9          THE COURT:  November 24th of 2014?

10          MR. MENDYS:  Correct.

11          THE COURT:  By plea?

12          MR. MENDYS:  Correct.

13          THE COURT:  That all must have been when Legal Aid

14     represented him.  I don't know about the arraignment on

15     6/20/15, that's certainly after were you assigned to the

16     case, but the November 24, 2014, do you know where that plea

17     took place?

18          MR. MENDYS:  Pardon me?

19          THE COURT:  Do you know where this plea took

20     place?

21          MR. MENDYS:  Also a Manhattan case.

22          THE COURT:  Manhattan.  Oh, these were --

23          MR. MENDYS:  Both of these were Manhattan.

24          THE COURT:  These are New York County cases.  So

25     he was charged with sale of marihuana and on November 24 he

Proceedings

1     pled guilty to?

2           MR. MENDYS:  221.40.

3           THE COURT:  Selling marihuana.

4           MR. MENDYS:  Correct, sentenced to 10 days.

5           THE COURT:  And so if he were to testify, what

6     would you seek to ask him about that?

7           MR. MENDYS:  Once again, that if he testifies,

8     that on November 24, 2014, if he were convicted of, if he

9     pled guilty to Penal Law Section 221.40, selling marihuana,

10    a class A misdemeanor.

11          THE COURT:  Continue.

12          MR. MENDYS:  The final thing I would seek to ask

13    him about is the Virginia matter.

14          THE COURT:  Go ahead.

15          MR. MENDYS:  It was, it occurred -- the

16    information I have is that, I think probably the same that

17    the Court has, we made efforts to get underlying facts, we

18    were unable to do so.

19          THE COURT:  So if he were to testify what would

20    you seek to ask him?

21          MR. MENDYS:  On September 6, 2011, in Fairfax

22    County, Virginia, if the defendant was convicted of identity

23    theft under the statute, which is also a misdemeanor.

24          THE COURT:  Okay, well, but you want to use the

25    words "identity theft".

Proceedings

1          MR. MENDYS:  I do, Judge.

2          THE COURT:  No, I'm not, that's what the -- you

3     said it's under the statute which is on the rap sheet, you

4     know, by the Virginia code.  Do you have the statute?

5          MR. MENDYS:  I do.

6          THE COURT:  Can you just show it to Mr. Wilson and

7     then show it to me?  And Mr. Mendys, also if I could just

8     ask you, although I'm not going to ask Mr. Wilson to comment

9     now but I will give him an opportunity again to be heard,

10     can you just give him whatever you have about the other two

11     convictions so he can just look at?  Do you have like an

12     updated eJustice or something, like what you're reading

13     from?

14          MR. MENDYS:  I think that I do.  One moment.

15          THE COURT:  Just so he could look at it and then,

16     you know, talk to his client, and I'll give each of them an

17     opportunity to speak individually with their clients before

18     I rule on this.

19          MR. MENDYS:  This is printed out June 30th of

20     2015.  I think it may not, I don't think it has the Virginia

21     information.

22          THE COURT:  No, the Virginia, all I'm asking is

23     for you to share it with him, and I will give you an

24     opportunity to address this, Mr. Wilson, but I'm going to

25     say that before I rule on everything, each of the defense

 1    attorneys, but definitely you because this is a surprise,

 2    you should talk to your client alone and then I'll hear you

 3    about, you know, any arguments you want to make about this.

 4              MR. WILSON:  Thank you, Judge.

 5              THE COURT:  All right.  So Mr. Weinstein?

 6              MR. WEINSTEIN:  Yes, your Honor.

 7              THE COURT:  If your client -- well, wait, I'm not

 8    finished, I'm sorry.  Are there any other impeachment type

 9    questions you would want posed to Mr. -- well, you would

10    want to pose to Mr. Melenciano involving prior bad acts of

11    which the defendant may not be aware of?

12              MR. MENDYS:  Involving, well --

13              THE COURT:  For impeachment purposes.

14              MR. MENDYS:  For impeachment purposes the only

15    thing I can foresee would be the statements that were made

16    to the detectives, those do not, may involve bad acts in

17    that it is this case.

18              THE COURT:  Which statement?

19              MR. MENDYS:  Mr. Melenciano made Mirandized

20    statements.

21              THE COURT:  No, I know.  What are you referring to

22    specifically?

23              MR. MENDYS:  Specifically, there were

24    inconsistencies in that he, between those two statements in

25    that in the first statement he denied knowing, I think

Proceedings

1      denied knowing Mr. Diaz specifically, and then in the second

2      statement he identified him, Mr. Diaz.

3                THE COURT:  But those are not prior bad acts.

4                MR. MENDYS:  I understand.

5                THE COURT:  That's not impeachment by prior bad

6      acts.  I'm asking about do you know that he did something to

7      someone somewhere that could be credibility related?

8                MR. MENDYS:  Nothing else.

9                THE COURT:  That's all I'm asking.  That's a

10     separate issue.  All right.

11               So Mr. Weinstein, I'm sorry, let's talk first

12     about you and convictions.  What are you seeking to

13     preclude?

14               MR. MENDYS:  I provided an updated rap sheet to

15     Mr. Weinstein.

16               MR. WEINSTEIN:  Oh, there's another one.  I'd like

17     to know what the People intend to inquire about.

18               THE COURT:  Well, no, Sandoval is the defense

19     moves to preclude, the defense goes first and seeks to

20     preclude, and then the DA.

21               MR. WEINSTEIN:  My client has one prior arrest

22     also in Virginia which he got a misdemeanor on an identity

23     theft four years ago.

24               THE COURT:  Is that, that's a different --

25               MR. WEINSTEIN:  Just found that out now.

Proceedings

1          THE COURT:  Is this the same case?

2          MR. WEINSTEIN:  It may be.

3          THE COURT:  Is this the same case?

4          MR. WEINSTEIN:  What date do you have there for

5     Mr. Melenciano?

6          THE COURT:  9/6, again in Fairfax County.  Is this

7     -- is this the same case?

8          MR. MENDYS:  Yes.

9          THE COURT:  They were arrested and convicted

10    together?

11         MR. MENDYS:  It appears so.

12         THE COURT:  Oh, boy.  Okay, go ahead.

13         MR. WEINSTEIN:  It was a misdemeanor conviction of

14    identity fraud with a six-month suspended sentence.  Seems

15    like all the felony charges were dismissed on a non-pros

16    back on September 6, 2011, and there was a guilty plea to

17    section 18.1-186.3, obtaining goods, intent to defraud goods

18    that were under $200.

19         THE COURT:  That's the extent of your client's

20    criminal history; right?

21         MR. WEINSTEIN:  The only arrest he has other than

22    this case.

23         THE COURT:  Okay.  Well, actually, there were

24    other arrests but they were not prosecuted for him too it

25    looks like.

Proceedings

1          MR. MENDYS:  Well, I think the record I had was
2     that he actually, probably something I should have brought
3     up earlier, he had an open marihuana case in Manhattan.
4          THE COURT:  But you can't ask about an open case.
5          MR. MENDYS:  Right, but there is an outstanding
6     warrant on it.
7          THE COURT:  He has a warrant for his arrest?  When
8     did you discover this?
9          MR. MENDYS:  I created this a couple of days ago
10    so it couldn't have been --
11         THE COURT:  When was the warrant ordered?
12         MR. MENDYS:  I have to look at the sheet.
13         MR. WEINSTEIN:  It's not on here.
14         THE COURT:  We'll run his NYSID see if the
15    warrant's still active.  Can you do that, Veronica?  Thank
16    you.  You have his NYSID?
17         THE CLERK:  I'll find it.
18         THE COURT:  Thank you.
19         So he has a warrant for his arrest?
20         MR. MENDYS:  I read that right there.
21         THE COURT:  That's the other part of the criminal
22    history that you were referring to a new arrest, but a
23    warrant that exists out of Manhattan?  When you said you
24    turned over an updated --
25         MR. MENDYS:  Yes.

Proceedings

1          THE COURT:  Is the -- so, just so I understand,

2     the marihuana case is an un-adjudicated marihuana.  The

3     warrant is for a pending case, not for failing to do some

4     sort of community service?

5          MR. MENDYS:  That's my understanding.  Doesn't

6     indicate a plea.

7          THE COURT:  We'll confirm that, but that's a

8     separate -- so, you know, let me, so that's all of the

9     criminal history that appears to exist is the Virginia

10    conviction and the New York County, although it's an open

11    case which you can't talk about an open case.

12         MR. MENDYS:  Right.  I would not seek to ask about

13    that, but I would seek to make, I will make the same

14    application regarding the Virginia matter.

15         MR. WEINSTEIN:  If this is correct, there's no

16    warrant.  It's seems like there was an original arrest on

17    April 28th of 2015.  It's bench warrant issued May 5, 2015,

18    but he was arraigned on May 14, 2015 for possession of

19    marihuana in the fifth degree.  May have been an appearance

20    ticket, but it says he's arraigned nine days after the

21    warrant was issued.

22         THE COURT:  And I haven't seen it, and thank you

23    for saying that.

24         THE CLERK:  There's nothing in our system.

25         THE COURT:  Yes, so we checked also.  There's no

Proceedings

1      outstanding, okay.  There was, but he returned to court to

2      be arraigned.

3                So let me hear about this Virginia.

4                MR. MENDYS:  Well, it would be essentially the

5      same thing you heard already.  Incident happened, the arrest

6      was on the same date in July of 2011.  The conviction was on

7      the same date on September 6th of 2011.

8                THE COURT:  You haven't been unable to get any of

9      the underlying paperwork and I understand that, but would

10     you be asking, I mean, it's really coincidental, of course.

11     Would you be asking, were you convicted of doing the same

12     crime with your co-defendant as impeachment?

13               MR. MENDYS:  I think I would be.  I don't know

14     that it's necessarily impeachment.

15               THE COURT:  Well, this is the only thing I'm

16     addressing now is Sandoval.

17               MR. MENDYS:  Right.

18               THE COURT:  So I mean, Sandoval is a very limited.

19     It's, you know, considered whether the defendant committed a

20     crime, was convicted of a crime that implicates on their

21     credibility, their placing their interests above other

22     people, but it's not that you did a crime with somebody else

23     for impeachment, that would be something perhaps Molineux

24     like, but you don't impeach a guy and say you did you do

25     with him too because that has all sorts of other

Proceedings

1      implications.  So you're not intending, if they each want to

2      testify you would be asking each of them --

3                  MR. MENDYS:  Individually.

4                  THE COURT:  If they were convicted on the same

5      date?

6                  MR. MENDYS:  Yes.

7                  THE COURT:  In Virginia.  I mean, it would be

8      apparent it was the same date, but you wouldn't

9      cross-reference if they both --

10                 MR. MENDYS:  I would not be asking whether they

11     were acting together or whether that was a co-defendants,

12     anything like that.

13                 THE COURT:  Okay.  And in terms of Sandoval for

14     Mr. Santana, in terms of what is defined as a prior bad act,

15     are there any other bad acts that you are aware of that you

16     would want to question about?

17                 MR. MENDYS:  No.

18                 THE COURT:  Okay.  We'll talk about Mr. Diaz in

19     terms of just Sandoval.

20                 MR. WEINSTEIN:  One thing on that.  He said he's

21     not gonna ask if they were acting together, but if he's asks

22     if it was on the same date, the jury's not stupid.

23                 THE COURT:  Well, I understand all of that, and as

24     I said I'm not making a ruling now.

25                 MR. WEINSTEIN:  Okay.

Proceedings

1              THE COURT:  But I do understand that the

2       implication certainly is that they have been convicted of a

3       crime before, in the same state before, at the same time

4       before with the same charge before, so they must have been

5       accomplices then, and for Sandoval purposes, that's not

6       relevant.  I understand that.

7              All right.  So Mr. Bonanno, in terms of your

8       client, whatever criminal record or history he has, what are

9       you seeking to preclude?

10             MR. BONANNO:  Judge, I believe there's only one

11      prior conviction of a 2006 narcotics arrest, plea of 2007

12      and state time.  I'd seek to preclude any inquiry on that.

13             THE COURT:  This is in 2007?

14             MR. BONANNO:  I believe a 2007 conviction.

15             THE COURT:  He was convicted --

16             MR. BONANNO:  On a plea.

17             THE COURT:  -- of sale of a controlled substance,

18      got 30 months, so two-and-a-half years, and two years

19      post-release supervision.  So what are you seeking to

20      preclude questioning about?

21             MR. BONANNO:  That whole incident, Judge.  As I

22      understand, underlying narcotics convictions tend to be

23      highly prejudicial to a defendant.  They tend to show

24      they're habitual offenders and certainly not even reasonably

25      related to the type of activity alleged in this crime, so

Proceedings

1       I'd ask to seek complete preclusion.

2                 THE COURT:  Mr. Mendys?

3                 MR. MENDYS:  Judge, I would seek to inquire

4       whether the defendant was convicted of felony drug

5       possession on June 1, 2007 in Manhattan.

6                 THE COURT:  Felony drug possession?

7                 MR. MENDYS:  Penal Law Section 220.16, possession

8       with intent to sell.

9                 THE COURT:  Wait.  He was convicted -- you're

10      talking about cycle one.  You want to ask whether he was

11      convicted of May 11, 2007, of possession of a controlled

12      substance with intent to sell.  That's what you want to ask

13      about?

14                MR. MENDYS:  I'm not sure we're looking at the

15      same day, but yes.

16                THE COURT:  This old rap sheet, May 11, 2007?

17                MR. MENDYS:  It is, the conviction I have is from

18      June 1, 2007.

19                THE COURT:  June 1?

20                MR. MENDYS:  It's under indictment 5387 of 2006

21      from New York County.

22                THE COURT:  Now I have he was arraigned November

23      30, convicted upon plea of guilty May 11.  The sentencing

24      date was June 1.  Okay.  I see what you're talking about.

25      Right.  He was sentenced on June 1.

Proceedings

1              MR. MENDYS:  I see what you're saying, yes.

2              THE COURT:  I see.  No, it's here.  So June 1,

3    2007, whether he was convicted of criminal possession of a

4    controlled substance with intent to sell.

5              MR. MENDYS:  Correct.

6              THE COURT:  And you wish to impeach, use this for

7    impeachment purposes to show he placed his interests above

8    that of society?

9              MR. MENDYS:  Yes.

10             THE COURT:  Okay.

11             MR. MENDYS:  I think I would probably refer to the

12   conviction date as May 11.  That appears to be more correct

13   upon you're reading of it.

14             THE COURT:  Okay.

15             MR. MENDYS:  Should -- I understand as a felony

16   it's a very serious charge.  If the Court, you know, I'm

17   amenable to compromise to only ask him about a felony

18   without reference to the charge with the date and the

19   county.

20             THE COURT:  Are you aware of anything from his

21   out-of-state or FBI or other history that you would be

22   seeking to question him about?

23             MR. MENDYS:  I think I would like the opportunity,

24   I'm not saying I would do it, but I would like, I think, the

25   option to inquire of his immigration status.  The

Proceedings

1    information seems to be that he's an illegal alien.

2                THE COURT:   Well, he's not the only one here that,

3    that information is in the rap sheet.  But his rap sheet

4    says deportable alien and indicates that there was some sort

5    of immigration proceeding --

6                MR. MENDYS:   Right.

7                THE COURT:   -- that happened.  You have no idea

8    whether he was ordered deported and is back illegally?

9                MR. MENDYS:   Well --

10               THE COURT:   Based on what's on the rap sheet?

11               MR. MENDYS:   I do not.

12               THE COURT:   No, because others say they're not

13   citizens on the rap sheet.  It's pretty clear.  His is the

14   only one that has something about deportable alien, and I

15   really don't want to ask Mr. Bonanno on the record about

16   this because, quite frankly, I would have hoped this would

17   have been something that would have been explored back in

18   November 23, 2012, at the time of his arraignment, whether

19   he was actually committing a federal crime by having been

20   deported or there was a deportation order that was

21   outstanding, but I have no indication in this record that

22   anyone did any kind of check about that in the last, you

23   know, almost three years.

24               MR. MENDYS:   Judge, that's not something I would

25   ask about.

Proceedings

1           THE COURT:  Okay.  All right, fine.  All right.
2    So do you want to talk to your client for a few minutes?
3           MR. WILSON:  Could I, Judge?
4           THE COURT:  But you want to take the interpreter
5    alone just to talk to him.
6           MR. WILSON:  Thank you.
7           THE COURT:  Why don't you step out, we'll take a
8    little break because you have these new things that came up.
9           (Whereupon, there was a brief recess taken.)
10          (Whereupon, the following took place in open court
11   in the presence of the Court, the defendants, Spanish
12   language interpreter, defense counsel and the assistant
13   district attorney.)
14          THE CLERK:  Back on the record.
15          THE COURT:  So we're back on the record.  Mr.
16   Wilson, you've had an opportunity to speak with your client
17   about the other convictions mentioned by the DA?
18          MR. WILSON:  Yes.  Judge, with regard to all three
19   of these convictions, I would ask you to consider People
20   versus Briggs, the argument I made previously.
21          Additionally, I think it's obvious from what the
22   Court has heard so far about this case that the district
23   attorney has a relatively strong case in terms of evidence,
24   and I'd ask the Court to keep that in mind when its ruling
25   on the Sandoval also, and perhaps for necessity, my client

Proceedings

1    might find himself having to testify.

2        With regard to the Fairfax County conviction for

3    identity theft, I'd ask the Court first to consider the

4    incendiary nature of the charge of identity theft in these

5    times, perhaps to the sensitive ears of jurors who might be

6    very attuned to that happening these days.

7        The second thing is, Judge, with two defendants

8    convicted of the same identity theft crime on the same day,

9    same Fairfax County, if they both testify, I doubt if the

10   jury will assume that's a coincidence, and I think it would

11   show propensity to try to impeach them with something that

12   they had previously done together of a larcenist nature at

13   another time.

14       And with regard to the marihuana conviction, which

15   appears to be a sale conviction which appears to have

16   happened in 2014, and the recent petit larceny, likewise, I

17   think because of the strength of the People's case and the

18   perhaps real necessity for my client to testify, that that

19   might be viewed by the jurors as propensity rather than its

20   intended purposes of impeachment, and I'd ask to preclude

21   all cross-examination on that.

22       THE COURT:  So I'm going to make the rulings for

23   each of the defendants now.

24       MR. WEINSTEIN:  Your Honor, I would join in that

25   application with Mr. Wilson's client, same thing for the

Proceedings

1       Virginia, that my client, Mr. Amauri Santana --

2               THE COURT:  Okay.  I had already understood that,

3       but I just, this is my findings.  And I understand Sandoval

4       is, should a defendant, any defendant take the stand, there

5       are questions permitted about prior criminal conduct for a

6       jury to assess their credibility, and particularly for those

7       crimes which evidence their willingness or their past

8       history of placing their own interests above that of society

9       and crimes that are particularly relevant to their

10      credibility.

11              So in terms of Mr. Melenciano, June 21, 2015, last

12      month he was convicted of a theft crime, petit larceny, and

13      of course, theft crimes are particularly relevant to

14      credibility.

15              THE INTERPRETER:  Excuse me, your Honor?  Judge,

16      the interpreter trying is to get the -- can I get the name?

17              THE COURT:  Mr. Melenciano, sorry.  Theft crimes

18      are particularly relevant to propensity, but given the

19      nature of the allegations in this case which do involve

20      theft, I believe it would be too prejudicial to allow

21      questioning about the name of the crime, although the crime

22      itself is relevant to credibility.

23              So if he testifies, the People will be allowed to

24      ask whether on June 25 -- 21st, rather, 2015, he was

25      convicted of a misdemeanor in New York County.

Proceedings

1          They will also be able to ask whether on November

2    24, 2014, he was convicted of criminal sale of marihuana.

3    Although it is a misdemeanor case, when you sell drugs

4    rather than merely possess drugs, you are placing your

5    interests above that of society.  You're not an addict, you

6    are a dealer.

7          Now, the Fairfax County identity theft, I'm going

8    to address this for both Mr. Santana and Mr. Melenciano,

9    there is no question that identity theft, yes, is a hot

10   button item.  It's also no question that when you steal

11   someone's identity for the purpose of assuming them, you are

12   placing your interests above that of society.  To assume

13   someone else's identity is so relevant to credibility, it's

14   tantamount to lying under oath.  I mean, although it's not

15   under oath, it's like perjury.

16         So the conviction itself is so credibility related

17   that I believe some questioning is appropriate.  The dilemma

18   is it appears that they both are, pled guilty to on exactly

19   the same case to exactly the same crime, and were acting as

20   accomplices in stealing, identity related.  So that is not a

21   Sandoval issue and the Court has to consider the prejudice

22   that would result from having both defendants questioned

23   about that crime.

24         So because of that, number one, I'm only going to

25   allow questioning of one of the defendants as to that crime,

1    and that is not going to be Mr. Melenciano, it's going to be

2    Mr. Santana. And both defendants have a right to know prior

3    to, you know, the case proceeding to jury selection what the

4    scope of cross-examination would be.

5           And I do understand that if Mr. Santana chooses

6    not to testify and Mr. Melenciano does that this prejudice

7    wouldn't be there, but I'm not going to wait until that

8    happens. I'm telling you now my ruling is it will be

9    admissible for Mr. Melenciano.

10          On the other hand, in terms of the crime, once

11   again, this is not just a robbery, this is a robbery with

12   criminal impersonation. This is a robbery not where they're

13   stealing someone's identity but they're pretending to be

14   someone else. So it's not identical in form to the crime in

15   terms of the facts, but again, I'm not certain of the

16   underlying facts but I have read the statute that you're

17   assuming someone's identity in return for obtaining some

18   good, services, property, and you said it's not in excess of

19   $20 for this particular subsection? Someone --

20          MR. WEINSTEIN: Less than $200 it was.

21          THE COURT: So this is, again, the dilemma of

22   balancing the probative value of the questioning against the

23   prejudice to the defendant with the extent of the

24   questioning, and the probative value is high.

25          I will allow the People to ask Mr. Santana whether

1    on September 20, 2011, he had been convicted of a crime in

2    Fairfax County, Virginia.

3             Now I want to stress that if these defendants do

4    testify and they do deny being convicted of any of these

5    crimes, I will allow the DA at that time not to unilaterally

6    go into any underlying facts or underlying names, but I will

7    allow the DA to approach to request going into the names of

8    the crimes, what the statute was, because, you know, or if

9    they have certificates of conviction to introduce those

10   certificates because they can't lie about prior convictions,

11   but it wouldn't be unilateral.

12            So again, Mr. Melenciano, a misdemeanor, June 21,

13   2015; selling marihuana, November 24, 2014.  Mr. Santana

14   convicted of a crime in Fairfax County, Virginia, September

15   20, 2011.

16            MR. MENDYS:  I think it was September 6.

17            THE COURT:  I'm sorry, September 6, 2011.  Thank

18   you.  September 6, 2011.

19            Now, as far as Mr. Diaz is concerned, yes, he only

20   has one conviction that I am aware of and it is in New York

21   State, and it is for a crime that does -- and it is his

22   intent to place his own interests above that of society.

23   This is not a drug possession case, this is possession with

24   intent to sell.  You don't have any underlying facts, but

25   the name of the crime and what he is convicted of and

1    sentenced to a significant state prison time is not a crime

2    that addicts receive but crimes that drug dealers receive

3    for possession of large quantities of controlled substances

4    with intent to sell.

5         So if he is going to testify, this is credibility

6    related and the People would be permitted to ask him whether

7    on May 11, 2007 he was convicted of criminal possession of a

8    controlled substance with intent to sell.

9         I'm not aware of anything else connected to that

10   in terms of underlying facts, nor have I been asked to

11   consider that, but once again, if he denies that conviction,

12   the People will be permitted to re-open the application at

13   that time to approach and then unilaterally put in a

14   certificate of conviction, but to ask what scope they may

15   continue if there is a denial of any of these convictions.

16   Okay?

17        MR. MENDYS:  In terms of Mr. Diaz' conviction, am

18   I permitted to ask whether it was felony or not?

19        THE COURT:  Well, you know, no, not that it was a

20   felony or not.  The name of the conviction is what really

21   makes it a putting his interests above that of society,

22   okay.  All right.  So that's Sandoval.

23        What are your other two applications?

24        MR. MENDYS:  Okay.  My next two applications fall

25   under, I guess, motions in limine.

Proceedings

1                    THE COURT:  Tell me.

2                    MR. MENDYS:  So the first would be to preclude any

3       of the defendants from arguing any sort of claim of right or

4       eliciting testimony regarding claim of right.

5                    THE COURT:  What are you talking about, eliciting

6       testimony from them themselves?

7                    MR. MENDYS:  Judge, the case law seems to

8       indicate, and I've brought it with me, that claim of right

9       is not a defense to a robbery.

10                   THE COURT:  To a robbery?

11                   MR. MENDYS:  Correct.

12                   THE COURT:  But suppose it's coupled with a

13      defense that we didn't rob anybody, we didn't physically, we

14      didn't use force, we didn't do anything and they deny it, we

15      wanted our money back?

16                   MR. MENDYS:  Well, I think there's a couple of

17      things there.  One is that money is fungible, so unless they

18      can show this is the exact money that they had.

19                   THE COURT:  I'm listening.

20                   MR. WEINSTEIN:  Excuse me?

21                   THE COURT:  You're going into two things.  Number

22      one, you want me to preclude a defense, number one.  I have

23      to -- I do have to consider whether the defense itself is a

24      cognizable defense, but I also have to say the defendants

25      have a right to present any defense that they can and

1    present any scenario that they wish to, so to ask me to

2    preclude them from asserting a defense is a pretty tall

3    order.  To ask to preclude asking witnesses, didn't you in

4    fact owe my client $6,000 and aren't you all making this up,

5    what right would I have to do that?

6              MR. MENDYS:  Well, I think that's the point,

7    Judge.  I don't think that, I think a claim of that --

8              THE COURT:  That's their statements.

9              MR. MENDYS:  Well.

10             THE COURT:  You want to put their statements in?

11             MR. MENDYS:  That's another -- well, that's a

12   second part of where I'm going.

13             THE COURT:  What's the second part?

14             MR. MENDYS:  Well, the second part is essentially

15   a motion to preclude any kind of, if I don't seek to elicit

16   testimony of these statements of we owed the money or they

17   owed us money or the money was ours, or anything of that.

18             THE COURT:  You want to preclude the defendants

19   from bringing out their own statements.

20             MR. MENDYS:  Right.

21             THE COURT:  From the police witnesses who took

22   their statement.

23             MR. MENDYS:  Or from them testifying to make --

24   wait, wait, wait, from testifying to making those statements

25   previously.

Proceedings

1        THE COURT:  Okay.

2        MR. MENDYS:  If they testified, that's fine.

3        THE COURT:  Two different applications.  I took

4    the money because it belonged to me and I said to the

5    police, I told that to the police at the time, that's a

6    separate argument.  That's challenging the police

7    investigation.

8            I asked about cross-examining the witnesses who

9    are the victims not the police officers:  Didn't you have my

10   client's money?  Didn't you owe my client $6,000?  Aren't

11   you making all this up about a robbery because you owed them

12   money and you're trying to get your money back?  I mean,

13   that's what you're asking me to preclude.

14       MR. MENDYS:  Well, I mean, my reading of the case

15   law, and I'll cite to -- one moment, People v Pagan, which

16   is a 2012 Court of Appeals case, my reading of it is that

17   claim of right defense does not apply in a robbery.

18       THE COURT:  Right.  You have to prove beyond a

19   reasonable doubt that there was a robbery.

20       MR. MENDYS:  Correct.

21       THE COURT:  What were the facts of the Pagan case?

22       MR. MENDYS:  This was a very unique case, Judge.

23   I can -- would you like a copy?

24       THE COURT:  No, tell me about it.

25       MR. MENDYS:  It was a very unique case involving a

Proceedings

1      cab in which the defendant was a passenger in a cab and she

2      negotiated the price with the driver.  I believe it was a

3      price of $4 for a ride and she gave him a 20.  He gave her

4      change and then she claimed that the change was not, was not

5      sufficient.  And then he gave her the 20 back and said, you

6      know, just get out and give me my change back, and she

7      refused to do it.

8              She was arrested and she essentially argued a

9      claim of right, that the money was hers and there was a

10     distinction, I guess, that was sought between -- I'm sorry,

11     Judge, I haven't read this in a couple of days.  The issue

12     was about what charge to present to a jury, whether a claim

13     of right charge was proper to a jury.

14             THE COURT:  There's a difference, there's a

15     difference between a reasonable view of the evidence that

16     there's a claim of right defense and precluding a defendant

17     from raising a defense.  I mean, defendants try to raise

18     justification; sometimes they get charged, sometimes they

19     don't.  Defendants can raise all sorts of things, but to

20     actually have a judge say you can't, under any

21     circumstances, raise a particular defense, yeah, I mean --

22     look, I haven't seen a video, I don't know what defense

23     strategies are.  I don't know if the video itself depicts a

24     frisking of people against the wall.  I don't know whether

25     there is any real credible defense that could be mounted to

Proceedings

1    show that there wasn't some sort of force being used, which

2    is the elements of robbery versus the elements of larceny,

3    because claim of right is a defense for larceny; correct?

4         MR. MENDYS:  Correct.

5         THE COURT:  Your theory is this is not just a

6    larceny, that this is a forcible stealing.

7         MR. MENDYS:  Correct.

8         THE COURT:  It's also, perhaps, a larceny by

9    deception, although I haven't looked at the indictment, I'm

10   sorry to say, in depth, because part of the theory is we're

11   pretending to be police officers.  But whatever the force

12   that's alleged, if it's depicted on the video and the

13   defendants want to raise it, why shouldn't they be able to?

14   And why shouldn't this just be an issue if it goes to the

15   jury with a charge, why shouldn't it be something addressed

16   at that point?

17        Again, I don't know what the video says and I'm

18   not asking the defendants to tell me what defense they want

19   to present.  I'm just trying to figure out what legal right

20   I have to preclude defendants from taking the stand and

21   saying they took our money and I need to get my money back.

22        MR. MENDYS:  Well, I think that, I mean, maybe I'm

23   just parsing words --

24        THE COURT:  That's all they say and you prove

25   beyond a reasonable doubt that there was forcible taking,

1   then you probably would, if the record is clear and

2   unequivocal, that there was force used, then you wouldn't

3   get the charge.

4           MR. MENDYS:  Well, perhaps at that point, and

5   maybe if I'm being premature with this, but perhaps at that

6   point I would ask then for the jury to be charged in the

7   negative that claim of right in fact is not a defense.

8           THE COURT:  You know, I don't make it a practice

9   to ask defendant's attorneys for offers of proof before

10   their clients testify.  Sometimes I ask about, you know,

11   whether other witnesses are fact witnesses or character

12   witnesses just so I have, you know, an understanding of what

13   the type of testimony is going to be, but if their clients

14   want to testify, and they agree that this is what they want

15   to testify about, fine.

16           And also, if they want to try to impeach the

17   credibility of witnesses by something that they may have a

18   good-faith basis to assert, which is that you took our money

19   or the money was ours, or whatever, I'm not going to

20   preclude that either based on the record.

21           MR. MENDYS:  Okay.

22           THE COURT:  I don't know if you want to be heard,

23   but basically I just ruled that they can't preclude --

24           MR. WEINSTEIN:  I just want to say one thing I

25   forgot to bring up before.  The statement which was

Proceedings

1    mentioned, as the Court mentioned none of us were the

2    original attorneys, would say that the $6,000 came from the

3    lawsuit.  I would like to know from the People whether or

4    not that statement was related to them not only from Mr.

5    Santana's earlier attorney, but it was part of the statement

6    that was received by Mangual, the officer who testified, who

7    may have conveniently left that part out.

8         THE COURT:  Well, let me just -- I'm sorry to

9    interrupt, but certainly there was no notice given of that

10   statement, okay.

11        MR. WEINSTEIN:  Correct.

12        THE COURT:  That's number one.  Number two, you're

13   right, nothing was said at the hearing, so if it were made

14   to a police officer --

15        MR. WEINSTEIN:  Not moving to preclude it, I want

16   it.

17        THE COURT:  You did, so I'm not -- so yes, you win

18   on preclusion.  Whether it was made and not noticed is that

19   what you want to know?

20        MR. WEINSTEIN:  I want to know if it was made and

21   the officer conveniently forgot to mention it at the

22   hearing.

23        THE COURT:  You want to know if it was made and

24   not noticed to a police officer?

25        MR. WEINSTEIN:  Right.

Proceedings

1              THE COURT:   Do you know the answer to that

2       question?

3              MR. MENDYS:   It was not made to the police

4       officer.

5              THE COURT:   Okay.

6              MR. MENDYS:   That is what I've been told.

7              THE COURT:   So it was made basically by his

8       attorney?

9              MR. MENDYS:   I think the first reference of it was

10      at arraignments.

11             THE COURT:   At the actual colloquy at

12      arraignments?

13             MR. MENDYS:   Then at some point the district

14      attorney's office was provided with a letter indicating that

15      there was a settlement of some sort.

16             THE COURT:   Okay.  So at the arraignment was it

17      Mr. Feck?  Was this Feck's?  Yeah, was it Mr. Feck at

18      arraignments.  Well, whoever it was, you have the minutes

19      from the arraignment?

20             MR. MENDYS:   I do not have the minutes.  There's a

21      notation on the file.

22             THE COURT:   The notation on the file is that the

23      defense attorney said that the money found on my client was

24      the proceeds of a lawsuit, and then that's how the People

25      were given notice of that, but not through a police officer

1     who said the defendant himself said that.

2             MR. MENDYS:  Correct.

3             THE COURT:  The only thing that, you know, this

4     defendant said to any police witnesses were, it's my money

5     and it's $16,000?

6             MR. MENDYS:  Correct.

7             THE COURT:  Which is what they claim.

8             MR. MENDYS:  Correct.

9             THE COURT:  Okay, so there you go.

10            MR. WEINSTEIN:  We'll see.  We shall see, Judge.

11            THE COURT:  All right.  So in terms of the, you

12    know, I'm not precluding the defense from going into

13    anything that would be related to the facts of the case.  I

14    don't know that I need to hear arguments about eliciting the

15    defendant's statements from police officers if the People

16    don't put them in because it's pretty clear you can't do

17    that.  And to have the defendants testify that I said this

18    before, which is something that he's asking now, Mr. Wilson?

19            MR. WILSON:  Again, Judge, I don't think he can

20    preclude the defendant from testifying to a defense.

21            THE COURT:  Well, no.

22            MR. WILSON:  If the defendant were to testify.

23            THE COURT:  No, no not the defense, but to say,

24    and I told the police this, which is not the defense.

25            MR. WILSON:  I think to preclude the defendant

Proceedings

1          from being able to say that --

2                    THE COURT:  Well, what could be --

3                    MR. WILSON:  -- would impair his defense.  If

4          that's what he believes his defense is to say, and I told

5          that to the police officer right away, I think that's --

6                    THE COURT:  But how does that, how is that

7          admissible if it's not admissible to have the statements

8          before the jury brought out by the defendant rather than the

9          prosecutor?

10                   MR. WILSON:  It's admissible, Judge, because it's

11         part of his defense, and it's also admissible to rebut what

12         the police officer said happened.

13                   THE COURT:  No, it's not rebuttal because if the

14         police officer's not asked about it and the People chose not

15         to put it on their direct case, then it's going to look like

16         the police officer left something out.  And so it's not to

17         rebut what the police officer said happened, but it's to

18         raise the inference that the police officer lied and he

19         withheld something from the jury.

20                   MR. WILSON:  I think at that point in time a

21         curative instruction by the Court to the jury that the

22         People were precluded from bringing that out on direct is

23         appropriate.

24                   THE COURT:  I'm going to reserve decision on this

25         because I think that it's not admissible, but I want to look

Proceedings

1      up the use of a defendant's own statements by anyone,

2      including the defendants, when they testify.  I understand.

3      I understand your position.

4                  MR. WILSON:  And Judge, that is the, if the

5      defendant testifies, that helps lend credibility to what

6      he's telling the jury.

7                  THE COURT:  No because --

8                  MR. WILSON:  What I said today I said then.  I

9      didn't tell him something, oh, Judge --

10                 THE COURT:  Well, you know, the reason it's not

11     admissible on, the reason you can't bring it out from the

12     police is because it's considered to be self-serving.

13                 MR. WILSON:  Self-serving hearsay, but it's not

14     hearsay when the defendant's on the stand and he's

15     testifying to his statement that he himself made and he's

16     fully subject to cross-examination about it.

17                 THE COURT:  It's no less self-serving at the

18     moment.

19                 MR. WILSON:  But --

20                 THE COURT:  The hearsay part is, it's that I told

21     the police and it implicates the police investigation and

22     the lack, and that -- I'm going reserve decision on it.

23                 MR. WILSON:  Judge, it's self-serving.  The

24     objection to something being self-serving is that it's

25     self-serving hearsay which is not an exception to the

1    hearsay rule, but when the defendant is on the stand

2    testifying and fully subject to cross-examination about the

3    statement, it's no longer hearsay.

4              THE COURT:  Let me look at it, okay, and I'm

5    reserving decision, okay.

6              What's the other application?

7              MR. MENDYS:  Those were it.

8              THE COURT:  That's it?

9              MR. MENDYS:  At this point.

10             THE COURT:  Is there any other in limine from the

11   defense?

12             MR. WILSON:  I have one question, Judge, and I

13   hope you're not angry, just to go back to your decision on

14   the hearing, I believe you said that a statement Mr.

15   Melenciano made to the officer, Officer Mangual, at the

16   scene was admissible.  Now, I objected when that was

17   elicited saying that the --

18             THE COURT:  Wait, if I said about his statement

19   about what?  I don't remember now what I said.

20             MR. WILSON:  I believe it was the statement to the

21   effect that it might not be completely accurate, but you --

22             THE COURT:  You know what?  I'm sorry, I do

23   remember.  They're not subject to suppression, but you're

24   right.  Let me just amend it now.  The People have said that

25   they're not -- it really was in the context of the

1    narrative.  It's not going to be admitted on the People's
2    direct case.
3              MR. WILSON:  Okay.
4              THE COURT:  You're right.  You're right.  I know
5    which statement, that it's my money.  They both said the
6    same thing.
7              MR. WILSON:  Something like that.
8              THE COURT:  Don't worry, it's not coming in
9    because they said it's not coming in.  Your client is
10   actually the one that says "us", and it's Mr. Santana who
11   says it's "my money", so it's a different analysis.
12             Any other defense in limine applications that
13   you're aware of?
14             MR. WEINSTEIN:  No.
15             MR. BONANNO:  No.
16             THE COURT:  We are now set, as far as I know.
17             MR. BONANNO:  Actually, Judge, if I may be heard,
18   I don't know if it's the right time for it, I'd like to
19   renew at this time my application for severance.
20             THE COURT:  Oh well, of course it's the right time
21   for anything and I have to rule on this.  What -- first of
22   all, I'm not even sure that you made an -- you made a
23   written application for severance?
24             MR. BONANNO:  I have not, Judge.
25             THE COURT:  Well then, you're not renewing your

Proceedings

1      application, you're making one.

2                MR. BONANNO:  I'm making an application.  I'm

3      making a new application based upon prior counsel's consent

4      to consolidation of this matter.  We've had previous

5      discussions on this.  I never consented to consolidation.

6                THE COURT:  But consolidation was granted on the

7      grounds that it's the same crime, the same event, the same

8      facts and the same witnesses, and that your client was just

9      apprehended at a different date, place and time.  And that

10     the People, although they had a right to supercede the

11     indictment to put all three on the same indictment, just

12     chose to present one defendant, your client, to a separate

13     grand jury, and I believe every single allegation is -- are

14     all the crimes identical in both indictments?  I didn't look

15     at it.

16                MR. MENDYS:  I think so.

17                THE COURT:  Are you saying that there's some

18     difference in the charging theory here?

19                MR. BONANNO:  No, I'm saying, Judge, there are,

20     the differences in the defense are irreconcilable.

21                THE COURT:  Well then, that's a different

22     situation than legally joinable.  What is your

23     irreconcilable defense in this case?

24                MR. BONANNO:  Judge, it was evident through the

25     hearing testimony that should Mr. --

1           THE INTERPRETER:  The interpreter can't hear
2      because of the conversation, and not to hear because of
3      other conversation.
4           THE COURT:  Thank you for pointing that out.  Just
5      let the interpreter hear.  Go ahead.
6           MR. BONANNO:  Judge, clear and through the hearing
7      testimony was the fact that it appears that Mr. Melenciano
8      will in fact become the second or third prosecutor in this
9      room if he chooses to take the stand.
10          THE COURT:  Mr. Melenciano himself will become a
11     prosecutor?
12          MR. BONANNO:  Judge, the statements were clear to
13     police Mr. Diaz was there.  He gave him up.  Mr. Diaz was
14     not apprehended at the scene.  It was because of that
15     information that they even started an investigation against
16     Mr. Diaz and were able to elicit a photo array and
17     ultimately a line-up.
18          THE COURT:  Let me just stop you there because I
19     understand that, if Mr. Melenciano took the stand and raised
20     a defense other than I didn't do it, but raised the defense
21     that not only wasn't I there, which sounds like it would be
22     hard to do if it's on video, and that Mr. Diaz wasn't there
23     either, and you wanted to impeach him by saying, isn't it a
24     fact you told the police Mr. Diaz was there and identified
25     him as, would you be seeking to do that?  His complaint is

1      that should Mr. Melenciano take the stand and say something

2      that would be at this moment speculative to me, I don't

3      know, but it would somehow result in Mr. Melenciano's

4      testimony implicating his client in a crime?

5              MR. MENDYS:   Implicating Mr. Diaz in a crime.

6              THE COURT:   Mr. Diaz in a crime, yes.   I mean,

7      certainly you could ask all of them weren't you there with

8      Mr. Diaz?   Weren't you there with Mr. Santana?   All of that

9      can come out, but, and everybody has a right to

10     cross-examine, that doesn't make it a necessarily an

11     irreconcilable defense because I'm not sure what the defense

12     is that's irreconcilable here.

13             MR. BONANNO:   The defense is, Judge, that Mr.

14     Diaz, even if he was at the scene, was not part of this

15     activity.   And even the statements that the prosecutor

16     intends to de-Bruton-ize(sic), the sum and substance of that

17     statement have nothing to do with a robbery, maybe have to

18     do with he had a shield and, you know, and he walked away

19     when he saw a police van, nothing to do with any criminal

20     activity other than maybe, you know, an administrative code

21     of possessing a shield.

22             THE COURT:   But, of course your client's

23     statements, all the statements in this case, from where I

24     sit as, are actually the most incriminating of all because

25     not only does he say he was there, he's the guy who admits I

1    had a badge and it was around my neck and I displayed it.

2    And quite frankly, your client gives up the other two people

3    and says I was there, here are their nicknames.

4            MR. BONANNO:  A month or two after he's already

5    nailed.

6            THE COURT:  I understand.  If anything, if

7    anything, if your client was to take the stand, he gives up

8    everyone and everything in this case, both accomplices and

9    the plan.

10           MR. BONANNO:  Judge, it's mutual that they both

11   can come aggressively against each other.

12           THE COURT:  Your motion is to severe your client?

13           MR. BONANNO:  Yes.

14           THE COURT:  From the other two defendants?

15           MR. BONANNO:  Absolutely.

16           MR. WILSON:  I would like join in Mr. Bonanno's

17   application, Judge.  Move to sever Mr. Melenciano's case

18   from Mr. Bonanno's case because of the sort of, just the

19   opposite of what was raised.  I believe Mr. Diaz would in

20   fact become a prosecutor against Mr. Melenciano because the

21   statement was previously made.  And I believe part of his

22   statement was that Mr. Santana and Mr. Melenciano knew that

23   these people were coming to buy drugs and knew they had

24   money, so that is certainly irreconcilable with, yeah -- in

25   fact, I can read it right into record the part that's

1       relevant.

2                   THE COURT:  Mr. Mendys?

3                   MR. MENDYS:  Judge, I still haven't heard really

4       what the defense for either side is gonna be.

5                   THE COURT:  The irreconcilable claims involve the

6       possibility that one or more of these defendants will chose

7       to testify, and when that happens, if it should happen, it

8       would be too late to unring a bell because it would have to

9       be a mistrial.  That's actually pretty much what the law

10      says.

11                  If I don't grant the motion and nobody testifies,

12      we're probably okay, but if one of them chooses to testify

13      and you bring out all sorts of statements that implicate the

14      other two while they're on the stand, I know they have a

15      right to cross-examine.  So it's not a Bruton problem, but

16      then they are, you're forcing them perhaps to change their

17      defense strategy.

18                  So why is that something that's not an

19      irreconcilable difference?  In defense strategy, why, you

20      know, why isn't that prejudicial?

21                  MR. MENDYS:  Well, I don't because it seems

22      speculative to me at this point.  I mean, I know -- there's

23      been no -- I just, if I'm cross-examining, if I'm going to

24      impeach them by nature of impeachment, that is not coming in

25      for the truth.

Proceedings

1          THE COURT:  Well, as loathed as I was to have you

2     return tomorrow, since this is an issue of utmost importance

3     and it's ten of five, we will have this full discussion,

4     legal discussion tomorrow.  We're not going to be doing jury

5     selection, but you will be here say 10 o'clock, and this

6     needs to be resolved because we need to know if we're having

7     one, two or three trials, and everybody has a right to that.

8          We stand adjourned until tomorrow.  Orders of

9     protection extended.

10          MR. WEINSTEIN:  Can we have a little bit later?

11     Eleven?

12          THE COURT:  Eleven o'clock is fine.  Thank you.

13          (Whereupon, the case was adjourned to July 10,

14     2015.)

15          (Continued on the next page...)

16

17

18

19

20

21

22

23

24

25

```
 1    SUPREME COURT OF THE STATE OF NEW YORK
      BRONX COUNTY : CRIMINAL TERM : PART 96
 2    ------------------------------------x
      THE PEOPLE OF THE STATE OF NEW YORK
 3
               -against-
 4                                       Ind. No.
      RICHARD DIAZ, AMAURI SANTANA,       3349-2012
 5    & JOSE MELENCIANO,

 6                    Defendants.
      ------------------------------------x
 7                                       265 East 161 Street
                                         Bronx, New York 10451
 8                                       JULY 10, 2015

 9    B E F O R E:

10             THE HONORABLE RALPH FABRIZIO
               Justice of the Supreme Court
11
               (Appearances same as previously noted.)
12
                                         LAURA ROSEN
13                                       SENIOR COURT REPORTER

14        *        *        *        *        *        *        *        *

15             (Whereupon, the following took place in open court

16        in the presence of the Court, the defendants, Spanish

17        language interpreter, defense counsel and the assistant

18        district attorney.)

19             THE CLERK:  Calendar number five, Amauri Santana,

20        Jose Melenciano and Richard Diaz.  Hearing continued.  The

21        defendants are all before the court.  Spanish interpreter

22        required and present.

23             Appearances.

24             MR. WILSON:  Brian Wilson for Mr. Melenciano.

25        Good morning, Judge.
```

Proceedings

1        THE COURT: Good morning.

2        MR. BONANNO: Good morning, Your Honor. Pat

3   Bonanno for Richard Diaz.

4        MR. WEINSTEIN: Goldstein and Weinstein by Barry

5   Weinstein. Good morning.

6        MR. MENDYS: Newton Mendys for the office of the

7   district attorney. Good morning.

8        THE COURT: Mr. Mendys, thank you for bringing

9   what I assume to be the video of this case, because I did

10   ask my court attorney to call because it seems that in

11   determining a severance motion, a court has to take into

12   account and have a crystal ball to make a ruling on the two

13   grounds that the Court of Appeals say I have to consider,

14   which the first ground is whether the defense is that I will

15   allow the attorneys to place on the record that they expect

16   to proffer at the trial are, at their core, irreconcilable

17   with the other defendants; and second, whether what's known

18   to me now in terms of what the trial evidence is going to

19   be, whether there's a risk that they would be convicted

20   solely because of what they claim to be the conflict. And

21   I've heard a lot about this video, I've sat in the courtroom

22   while the defendants viewed it during pretrial discussions.

23   I've been told it depicts the crime and the apprehension.

24   Correct?

25        MR. MENDYS: Yes.

Proceedings

1           THE COURT:  And if, I assume, that when a proper

2       foundation is laid that it will be part of the evidence in

3       this case.

4           And by the way, have you had any kind of

5       enhancement done of the video?

6           MR. MENDYS:  No.

7           THE COURT:  Stills?  Nothing?

8           MR. MENDYS:  Nothing.

9           THE COURT:  So the jury, this is what the jury

10      will see in whatever form.  Okay.

11          So first of all, Mr. Bonanno, you were the person

12      who raised the first motion to sever your client from the

13      other two defendants; correct?

14          MR. BONANNO:  That's correct, Judge.

15          THE COURT:  So tell me, what is the defense that

16      you are proffering in this case and the core of that

17      defense?

18          MR. BONANNO:  Judge, in my research last night I

19      found a case exactly on point out of Queens County.

20          THE COURT:  Well, whatever the case is you could

21      tell me, but I want to know what your defense is.

22          MR. BONANNO:  Judge, even if, hypothetically, Mr.

23      Diaz was to admit that he was in the car with these other

24      individuals, he had no knowledge that a robbery was going to

25      take place, he had no knowledge that anyone had money, and

Proceedings

1       he now has knowledge that these two individuals that he

2       unfortunately hung out with that night were convicted of a

3       similar type incident in an out-of-state jurisdiction.

4                  THE COURT:  Which is not coming into evidence in

5       any way, shape or form in this trial.

6                  MR. BONANNO:  Not through the DA's office, but Mr.

7       Diaz has insisted that he has been setup in this, and he

8       will take the stand and he will testify as to his felony

9       conviction, as to the fact that he never had a shield

10      because he has a felony conviction and never worked for a

11      security company.  And these two fellas, now he knows, took

12      him along for a ride to do a robbery.

13                 THE COURT:  No, no, he -- now he's going to

14      testify that he knows about their criminal records?

15                 MR. BONANNO:  He would.

16                 THE COURT:  Well, I actually, that's got to be an

17      in limine motion.  You cannot -- you would be making an

18      application that based on things he knows now in a courtroom

19      and that he never knew these two individuals before, now he

20      knows them and he's heard that they were convicted likely of

21      the same identity-theft crime, you believe you're allowed to

22      ask, he's allowed to testify about things he learned in this

23      courtroom after the fact about the co-defendants?

24                 MR. BONANNO:  I'm certainly going to make that

25      application.

Proceedings

1        THE COURT:  The application is denied.

2        MR. BONANNO:  Okay.

3        THE COURT:  Tell me what the --

4        MR. BONANNO:  I respectfully object.

5        THE COURT:  -- what the core of the defense is.

6        MR. BONANNO:  That is the core of the defense.

7        THE COURT:  Your defense is, I was there but I

8   didn't know they were gonna rob anybody?

9        MR. BONANNO:  That is one of the theories of

10  defense, yes.

11       THE COURT:  What is another defense, because it's

12  your obligation when you're moving to sever, and I have to

13  make a ruling prospectively that I have to understand what

14  the defense is and how at its core, at its core it's

15  completely irreconcilable with the other defense?

16       MR. BONANNO:  Judge, that is it.

17       THE COURT:  Well then, so there is nothing.  Your

18  client -- your defense is at this time as you're proffering

19  to the Court, I was there but I didn't know that there was

20  going to be a robbery.  And by the way, I didn't have a

21  shield, I didn't do anything and that's it.

22       MR. BONANNO:  Judge, again, I'm being asked to be

23  pigeon-holed into a defense right now.

24       THE COURT:  No, no, that's the whole point, and

25  I'm not -- and let me take a step back.  This is, this is

1    not a motion that was made in writing.  This is not a motion

2    that was made pre-hearing.  This is not a motion that's

3    based on anything other than what you've just told me your

4    client learned in this courtroom that couldn't have been

5    known before.  And what your client learned in this

6    courtroom about their prior records is not something he can

7    testify about because he had no knowledge of that at the

8    time.

9          And so you are required to make an application in

10   order -- you're moving for the severance.  You're not saying

11   these cases aren't properly joined for trial because all the

12   charges aren't identical, are you?

13         MR. BONANNO:  No, I can't do that.

14         THE COURT:  Right, so they're properly joined.

15   Every charge in each indictment is identical; time, place,

16   location and name of victims.  Every count is identical, so

17   they are properly joined for trial.  The law is that there

18   is a preference for trying cases --

19         MR. BONANNO:  Absolutely.

20         THE COURT:  -- with the same charges, with the

21   same witnesses, with the same evidence at the same time.

22   And the defense is moving to sever those counts and the

23   severance is based on an antagonistic defense.  In order for

24   the Court to make a ruling, it has to know what the defense

25   is.

Proceedings

1    So I'm not pigeon-holing you, I'm doing exactly

2    what every case says I am required to inquire.  And if you

3    don't want to tell me what your defense is, or you change

4    your mind in the middle of trial, well I can't be held to

5    have said oh, I --

6            MR. BONANNO:  Judge, I believe the case is --

7            THE COURT:  Mahoobian, M-A-H-O-O-B-I-A-N.

8            MR. BONANNO:  Yes.

9            THE COURT:  And what I have stated is chapter and

10   versus of the two-prong test that the Court of Appeals talks

11   about, and it says what the, that the court has to make a

12   discretionary decision.  This is not as a matter of law --

13           MR. BONANNO:  Absolutely, I understand that.

14           THE COURT:  It's my discretion --

15           MR. BONANNO:  Absolutely.

16           THE COURT:  To severe these cases from each other.

17           MR. BONANNO:  Absolutely.

18           THE COURT:  And it's my discretion based -- and if

19   there's going to be a review for an abuse of discretion, I

20   have to know what you're going to say.  You're making the

21   application, you're the moving party.

22           MR. BONANNO:  Judge, then I put forth our position

23   that if he is identified to be there at that time, he had no

24   knowledge that a robbery was taking place.

25           THE COURT:  So his defense is I was there but I

Proceedings

1      didn't have any knowledge that a robbery was taking place.

2      That's his defense?

3                  MR. BONANNO:  That is exactly, yup.

4                  THE COURT:  Fine.  Mr. Wilson, you actually moved

5      for a severance of your client from Mr. Diaz.

6                  MR. WILSON:  Yes.  Mr. Melenciano's moving for a

7      severance from Mr. Diaz, but not from Mr. Santana.

8                  THE COURT:  Okay.

9                  MR. WEINSTEIN:  I join in that motion.

10                 MR. WILSON:  And this is the basis, Judge.

11                 THE COURT:  I just want to make sure it's all here

12     and the interpreter is getting it too.  Mr. Santana's

13     attorney has joined in the -- Mr. Santana's attorney,

14     because it's difficult when everyone is talking not only for

15     the interpreter but for not only for the reporter, which is

16     always the case, but in this case for the interpreter

17     because they have to listen to different conversations,

18     okay.  So I'm just making sure each of the defendants

19     understands what's happening and that the record is clear.

20     That's my only purpose here.  So go ahead.

21                 MR. WILSON:  And I do believe that the core of Mr.

22     Melenciano's defense and Mr. Diaz' defense are so

23     antagonistic as to be repugnant that, such that the jury,

24     upon hearing them, would be inclined to convict based solely

25     upon that evidence.  Now, and I'm just going to put --

Proceedings

1          THE COURT:   What is your client's defense?

2          MR. WILSON:   That's what I'm gonna do now, Judge.

3          THE COURT:   Okay.

4          MR. WILSON:   My client's defense, I believe, will

5     be consistent with his statements that the assistant

6     district attorney has noticed in the indictment, which are

7     as follows.

8          The first statement:   Okay Officer, he owed us

9     money and we came to get it.   This is our money.

10          The second statement being:   I got a call from

11     Amauri Santana asking me to come along so he could pick up

12     some -- I believe it's a typo and money was left out, Judge,

13     but some money he was owed, and to buy a car.   I picked up

14     another friend Villa.   We went with Amauri Santana after he

15     called Villa.   We went to meet him at 183 and Walton.   We

16     got there and parked behind his car.   Villa and I got out of

17     my car.   Amauri Santana was already there speaking calmly

18     with four other people.   Then a police van pulled up and

19     arrested me and Amauri Santana for no reason.   I didn't see

20     Villa leave and I don't know where he went.   I never said I

21     was a cop.   I never took anything from anyone, and I didn't

22     see anyone take any money from anyone else.

23          On the other hand, the statement of Mr. Diaz that

24     I believe this has a little more detail than what was just

25     related to the Court, that was noticed is as follows:

1        I've been friends with Lappy for a year-and-a-half

2   and I've been friends with Homeboy for over five years.  On

3   the date of the incident I was in Homeboy's car and Homeboy

4   was talking to Hombre.  Homeboy and Hombre knew the victim

5   would have money on him, I think it was $3,000, and the

6   victim was going to use it to buy drugs.  I think Hombre

7   knew the victim.  I didn't know any of the victims.  It was

8   Homeboy's idea to go to the location.

9        When we went I had a security shield on a beaded

10  chain around my neck.  I worked as a security guard for a

11  few months and I kept the shield at Homeboy's car.  When I

12  saw the police drive up I walked away quickly from the scene

13  and threw the shield under a car on Walton Avenue.  I have

14  not and the others have not ever impersonated police

15  officers before.

16        THE COURT:  Now, first of all, I have to rely on

17  the defense that Mr. Bonanno -- and Mr. Bonanno's defense at

18  trial is going to be my client didn't know there was going

19  to be any robbery and he didn't participate, and he might

20  have been there but there was no robbery.

21        MR. WILSON:  Well, could I just perhaps throw out

22  a question to Mr. Bonanno?

23        THE COURT:  Of course.

24        MR. WILSON:  I think, if I understand correctly,

25  at some point in time Mr. Bonanno's client learned that

1    these individuals coming in supposedly had money and were

2    allegedly going to be robbed, or at least that is part of

3    his defense, were allegedly going to be robbed by Mr.

4    Santana and Mr. Melenciano.

5              THE COURT:  That's the part of the statement the

6    People are not going to be able to introduce and have

7    already indicated they're not introducing on the direct

8    case.  And in fact, ironically if the case is severed, that

9    all comes in on Mr. Bonanno's client's case on Mr. Diaz

10   because there's no, he will -- the entire defense that he

11   has said which he wants the severance that I didn't know

12   there was going to be a robbery, what you're saying is his

13   statement, that will not be admitted into evidence on the

14   People's direct case implicates not only your client and Mr.

15   Santana, but talks about a robbery being set up, knowledge

16   that money was going to be at the scene, and talks about Mr.

17   Diaz' own role and that your client drove him to the scene.

18   Right?

19             MR. WILSON:  Which is why I was asking Mr. Bonanno

20   just to clarify if it's not a fact a part of his defense

21   will be that at some point in time his client learned that

22   these victims had money, that our clients were planning on

23   robbing them as per the --

24             THE COURT:  And were coming to buy drugs with the

25   money.

Proceedings

1              MR. WILSON:  Yes.

2              THE COURT:  It's not just they learned they had

3       money.

4              MR. WILSON:  Yes.

5              THE COURT:  Money that didn't belong to any of

6       your clients or Mr. Santana, but money that belonged to them

7       that they were going to be using for a drug transaction.

8              MR. WILSON:  I believe --

9              THE COURT:  You think you need to ask him that?

10      Are you going to, is that part of your defense, that your

11      client knew that when he got in the car that they had

12      discussed with him that other people were going to be

13      present and have $3,000 to buy drugs?

14             MR. BONANNO:  Again, Judge, I don't believe he

15      ever knew that there was going to be anyone relieved of any

16      kind of currency at any time.

17             THE COURT:  Right.  So his entire defense is I

18      just was there but I had no idea what anybody was going to

19      do, and I didn't know there was going to be a robbery at

20      all.  I didn't know there was going to be an exchange of

21      money at all.  I don't know anything about anything.  Right?

22      I happened to be there.  That's his defense?

23             MR. BONANNO:  That appears to be.

24             MR. WEINSTEIN:  I think --

25             MR. WILSON:  Once he says that, Judge, he's

Proceedings

1       clearly gonna be cross-examined on statements by the

2       assistant district attorney.

3              THE COURT:   No, no, you're saying should he take

4       the stand --

5              MR. WILSON:   Yes.

6              THE COURT:   And say that.   But of course at that

7       point the statements are not admissible for the truth of

8       what happened, they're only admissible to impeach him, and

9       only to impeach him.   They don't come in in any way against

10      your client or Mr. Santana as evidence in chief.

11             And the jury gets a very strong instruction on the

12      use of a, which is, you know, I asked you if there was a

13      Bruton argument and you said no, so if they took the stand

14      and because you have an opportunity to cross-examine them as

15      well --

16             MR. WILSON:   Right.

17             THE COURT:   At that point.

18             MR. WILSON:   But I think that's really asking the

19      jury to jump through hoops, Judge, to separate all that at

20      that point in time.

21             THE COURT:   But you understand that what he is

22      saying is he does not expect to do anything but present a

23      defense and how he presents it and how it comes in.   I don't

24      ask if he's committing his client to testifying now because

25      his client can change, it's the client's decision.

Proceedings

1          MR. WILSON:  Even to what he said, Judge, in

2     court, he's still, I believe they're still defenses that are

3     irreconcilable based on what he's suggesting.  The core

4     defenses are irreconcilable because, Judge, he's still

5     suggesting that Mr. Weinstein's client and my client were

6     engaged in a robbery, and that's very different than what

7     Mr. Melenciano's defense is.

8          THE COURT:  Well, no.  See, that's a separate --

9     is part of your defense I didn't do a robbery but they did a

10    robbery?

11         MR. BONANNO:  Judge, there's a body seen walking

12    away once the police come up, and when he realizes that this

13    is not right, he's out of there.

14         THE COURT:  Oh, so his defense is they committed a

15    robbery?

16         MR. BONANNO:  Absolutely.

17         THE COURT:  And I didn't?

18         MR. BONANNO:  Absolutely.

19         THE COURT:  Your defense is what you're seeing on

20    the screen, members of the jury, is a robbery by these two?

21         MR. BONANNO:  Absolutely.  I'm a felon, I gotta

22    get out of here.

23         THE COURT:  No, no, that wasn't clear to me.

24         MR. BONANNO:  I'm sorry.

25         THE COURT:  That was definitely not clear to me.

Proceedings

1          MR. BONANNO:  I apologize.

2          THE COURT:  I was there but I didn't know what was

3     going on is different from I was there and I realized that

4     there was a robbery and, but I didn't realize it in advance.

5     I never had, that's -- your defense is going to be they did

6     it, not him?

7          MR. WILSON:  And I think that would clearly,

8     Judge, cause the jury to be inclined to convict our client

9     solely based on that defense.

10          MR. WEINSTEIN:  I agree.  It can't get more

11     antagonistic than that, saying I confess they did it.

12          THE COURT:  Mr. Mendys?

13          MR. MENDYS:  Judge, we're all familiar with the

14     standard here.  I think kind of referenced in one of the

15     main points here is whether the jury, these defenses are so

16     inconsistent that a jury would, there's a risk that the jury

17     would convict based on, based solely or in large part

18     because of inconsistencies here.  The evidence in this case,

19     Judge, I submit, and I will submit to the jury, is

20     overwhelming.

21          THE COURT:  Well, okay, that's part of the reason

22     I want the video here.  But the core of the defense for

23     Santana and Melenciano is yeah, we were there and any money

24     that was taken was because it was owed to us.  Okay?

25     There's nothing necessarily -- if Mr. Diaz doesn't know what

Proceedings

1      they're doing, including that they may be owed money, I

2      mean, I don't see how any person could say just from looking

3      at a video and the evidence alone that Mr. Diaz would say

4      yeah, I realized something was going on because I didn't

5      know anything was going to happen, and there was money

6      exchanged, but whatever the reason was it was unknown to me

7      and I just got out of it.

8               MR. WILSON:  Can I have one other real quick --

9               THE COURT:  No, your defense is not that I wasn't

10     there.

11              MR. WILSON:  Correct.

12              THE COURT:  Not that we didn't take money, but the

13     money that we took was our money or his money.  That's what

14     you said, it's going to track the statement.

15              MR. WILSON:  Yes.  And just one quick point,

16     Judge, as a practical matter too, Judge, there are two very

17     distinct sets of police officers in this case that seem to

18     not cross bounds between what would be the two severed

19     indictments.  Basically in terms of the practicality of

20     trying two separate cases, basically IAD handled the case of

21     Mr. Diaz, and basically the police officers at the scene

22     handled the case for Mr. Santana and Mr. Melenciano.  So

23     just as a practical matter, there's some logical considering

24     also.

25              MR. WEINSTEIN:  Different officers will testify

Proceedings

1      that IAB officers have really, I mean, if we ask each one of

2      them if they had any interaction whatsoever with our two

3      clients there would be the answer, no, they never saw them

4      before.   They would not be testifying about, they wouldn't

5      be testifying at our clients' trial.

6               THE COURT:   Actually, they might because the

7      statements were taken by Detective Christopher Rodriguez

8      that you read into evidence, and if they're used to impeach

9      your client, he not only becomes the detective, and actually

10     there's other things he did in this case, he's the case

11     detective so if -- the People always call the case detective

12     on every case.

13               And yes, IAB was there for an apprehension and one

14     statement was taken from one defendant by one detective, but

15     that happens in many cases that there are statements taken

16     at different times and different arrest dates.   I mean,

17     that's not the standard that, I mean, the evidence, the core

18     evidence in the case is this video, the eyewitnesses at the

19     scene and the apprehending officers.   And the added

20     attraction evidence is that he's identified at a later date

21     but he's not claiming it was he wasn't there, according to

22     his defense.   He's going to admit he was there, that was me,

23     I ran away but I didn't know what was going on.

24               MR. BONANNO:   Actually, Judge --

25               THE COURT:   I mean, that's the defense.

Proceedings

1        MR. BONANNO:  Actually, Judge, you know what, I'm

2    going to try my case, okay?  Thank you, counsel.  Actually,

3    he walked away, Judge.

4        THE COURT:  Whatever it is.  Whatever it is.

5        MR. BONANNO:  There's been a characterization that

6    he ran away.  He never runs.  Nobody ever runs away from

7    this.  So I would like for the video to be actually played.

8        THE COURT:  He gets away, okay.  He gets away.

9        MR. BONANNO:  He got out of there.

10       THE COURT:  So the number of witnesses and who

11   they may be and what their testimony is, and I vouchered

12   this from this guy and I searched that guy and I took a

13   statement from this guy, that happens in every trial with

14   co-defendants so that's not the standard at all.  That would

15   be a challenge to the proper joinder of the cases, and that

16   would be and that would be something, and that's already

17   been consented to by all parties.

18       MR. BONANNO:  Not by me specifically.

19       THE COURT:  You know, Mr. Bonanno, when were you

20   assigned to this case?

21       MR. BONANNO:  In maybe February.

22       THE COURT:  Right, and we're in July.  So did you

23   ever make a written motion or written application?

24       MR. BONANNO:  I did not.

25       THE COURT:  So you didn't.  So we're doing it now,

Proceedings

1   but you've had five months and now I'm doing it as an oral

2   application basically on the eve of trial, okay.  And

3   really --

4              MR. BONANNO:  I greatly appreciate it.

5              THE COURT:  Nothing that hasn't been known

6   already.

7              MR. BONANNO:  I greatly appreciate it.

8              THE COURT:  So go ahead, Mr. Mendys.

9              MR. MENDYS:  So Judge, you know the standard.  We

10  all know what the standard is.  If Mr. Diaz is going to

11  testify --

12             THE COURT:  Let me just stop for a second because

13  what you said was the evidence is overwhelming, and of

14  course I have presided over a hearing.  I heard hearsay

15  testimony of what amounted to super probable cause.  What's

16  overwhelming in your evidence beyond a reasonable doubt that

17  you think I should know about in making a ruling as to

18  whether this is a case where the core defenses are so at

19  odds with each other and so antagonistic to each other in

20  the first place, and I haven't ruled on that at all, but

21  assuming that that happens, it's that which causes the

22  defendants at issue to be convicted.

23             MR. MENDYS:  Judge, when you combine the fact that

24  the witnesses will come here --

25             THE COURT:  Well, what?  Tell me.  Tell me.

Proceedings

1          MR. MENDYS:  The witnesses are going to come here

2     and say, this was specifically Mr. Contreras.

3          THE COURT:  How many witnesses -- well, you're

4     telling me Mr. Contreras is going to testify.  How many

5     witnesses are you calling?

6          MR. MENDYS:  I'm not sure yet.

7          THE COURT:  Well, that's a big thing because now I

8     have to assess this, so if you're not sure and if it's a

9     one-witness ID case, that colors my decision because that's

10    what I have to view this now.  So just as they have to

11    proffer what their defense is, you have to tell me what your

12    evidence is.  And if it's not what it seems to be, we may

13    have a problem.

14         MR. MENDYS:  I submit to the Court that I would

15    call at least one witness who will testify, Mr. Contreras

16    specifically.

17         THE COURT:  At least one witness.  It's still no

18    more than one witness.

19         MR. MENDYS:  I understand that, Judge.

20         THE COURT:  So it's a one-witness case, all right.

21    So go ahead.

22         MR. MENDYS:  It is well beyond a one-witness case

23    when the other evidence is factored in.  The witness, Mr.

24    Contreras, will testify it was his money, he'd never been in

25    involved in any drug transactions, that he doesn't know

Proceedings

1       these individuals, and that he was there with his friends

2       and they had just gotten out of a cab.  And when they did

3       so, the defendants approached them claiming to be police

4       officers with Mr., with one of the defendants, Mr. Diaz,

5       with a shield around his neck, and they were directed to get

6       up against the wall.  And when they did so, all three of

7       them, specifically Mr. Santana, frisked him and took $6,000

8       from his pocket.

9              Couple that with the fact that as this is going on

10      the police arrive at the scene with three defendants -- two

11      of the three defendants frisking two of the victims, and the

12      third walking away from the scene.

13             THE COURT:  Oh, so the police never saw -- the

14      testimony I heard at the hearing was that four people were

15      against the wall and three people were frisking them.

16      That's what I heard at the hearing.

17             MR. MENDYS:  You are correct.  They don't know

18      but --

19             THE COURT:  I know I'm correct about that, but

20      that's not what happens?

21             MR. MENDYS:  They do not know who the third person

22      is.

23             THE COURT:  Right, but when they arrive were there

24      three people engaged in frisking at the time?

25             MR. MENDYS:  There are three people and one of

Proceedings

1      them immediately takes off.

2              THE COURT:  That's very different than the

3      evidence at the hearing.  And I haven't seen the video

4      because, again, if Mr. Diaz is not involved in any frisking

5      and no one sees him frisking, and your evidence is not going

6      to be that he was frisking anyone, that's -- I don't know

7      what the video says yet.

8              MR. WEINSTEIN:  Your Honor, if I may?

9              THE COURT:  Not yet, I'm talking.  No, I don't

10     want -- no, you may not.  The answer is application declined

11     until I finish hearing from the DA.

12             MR. WEINSTEIN:  Okay.

13             THE COURT:  Thank you.

14             MR. MENDYS:  So the officers arrive, and when they

15     do, they apprehend Mr. Santana and Mr. Melenciano, as we all

16     know, and the money is recovered from Mr. Santana.  On top

17     of this evidence -- well, the defendants are then taken back

18     to the precinct, and the Detective Rodriguez would testify

19     that there is information that at a point on that day they

20     received, they learned of a third suspect who was identified

21     or who was named Richard Diaz.

22             THE COURT:  Let me stop you.  What evidence do you

23     have that Mr. Diaz is the person, through any identification

24     procedure that you will have admitted at trial that he is

25     the person who frisked along with the other two individuals?

1      MR. MENDYS:  I expect that a witness will testify

2  to that.

3      THE COURT:  Who is going to testify to that?  It's

4  not expected.  This is, and this is a problem, Mr. Mendys.

5  And I'm telling you right now if you don't -- if this video

6  doesn't show three friskers, which is what I heard at the

7  hearing, which is the state of the record at the hearing

8  which was not corrected by you, if there is nothing that

9  corroborates that at the hearing, it's going to have an

10  effect on the, the severance motion.

11      So I'm not putting up with the I expect I'll hear,

12  maybe, I certainly -- is Mr. Contreras going to testify,

13  because he's the only one that you committed?  And Mr.

14  Contreras did not make any identification of Mr. Diaz at any

15  time prior to the trial.  He was not at the scene.  Mr. Diaz

16  was not shown a photo array, Mr. Diaz was -- Mr. Contreras,

17  rather, was not shown a photo array.  He was not shown a

18  line-up.  And so if you're asking to make an in-court ID and

19  he does, it's not based on any prior showing of anything

20  that I'm aware of.  Was he shown the video?

21      MR. MENDYS:  Not by me.

22      THE COURT:  So he was shown the video?

23      MR. MENDYS:  I don't know the answer to that

24  question.

25      THE COURT:  Oh, well then, that's the answer.  You

Proceedings

1      didn't show him the video but you don't know if someone else

2      showed him the video.

3              MR. MENDYS:  Correct.  Judge, if these three

4      defendants are tried together, my intention would be to call

5      at least Mr. Contreras and Miss Rosario who identified --

6              THE COURT:  So Miss Rosario.

7              MR. MENDYS:  Identified Richard Diaz in the

8      line-up and identified him as one of the people and the

9      person who frisked her.

10             THE COURT:  That he frisked her?

11             MR. MENDYS:  And that he had a shield around his

12     neck and that he was claiming to be the police.  Now, so

13     combine two witnesses' testimony, combine that with the

14     officer's observations as they approach, combine that with

15     the video which the Court will then see, combine that with

16     the statement that Mr. Diaz makes, even the small part that

17     the People seek to admit, and Judge, I submit that there's

18     no denial that a crime took place here and that they will be

19     convicted at least of impersonation.

20             THE COURT:  We're talking about a robbery versus

21     an impersonation here.

22             MR. MENDYS:  What we're talking about for purposes

23     of this, a conviction, and what will be coming or not and

24     the jury will convict based on evidence or based on what

25     these two defendants may say.  And my position is, Judge,

Proceedings

1      that this is a robbery no matter what, to any reasonable

2      view of the evidence when it goes to a jury is gonna show

3      that it's a robbery and not a larceny, and that a claim of

4      right defense shouldn't be, shouldn't apply.  And when those

5      factors all added up, Judge, it's overwhelming evidence of

6      guilt of a robbery.

7                THE COURT:  So do you want to show me the video?

8                MR. WEINSTEIN:  Your Honor, may I respond?

9                THE COURT:  I'll let you respond after I see the

10     video.  I really don't want to continue doing this as a, as

11     someone who is, you know, in the dark about a major piece of

12     evidence.  No, I will allow you to respond after I see the

13     video, and then you can all respond.

14               MR. WEINSTEIN:  It's something about from

15     Mangual's grand jury testimony.  He says, oh, these two

16     defendants were only frisking.

17               THE COURT:  No one impeached him with that from

18     the defense either, so there you go.  Thank you for letting

19     me know what the grand jury testimony is.  Thank you for not

20     obeying my instruction, Mr. Weinstein.  Have a seat.  I'm

21     still the judge.  Put the video on.

22               MR. MENDYS:  Judge, just so you know, there are

23     actually two videos.  There's a video from, two videos from

24     across the street.  This is the first.  It is broken into

25     one-minute segments and I'll start at the point where the

1    victims get out of the car, so it will require me to open

2    different files as we go through.

3            (Whereupon, the referred to video was played in

4    open court.)

5            THE COURT:  You want me to watch these

6    simultaneously, because it's hard.  I don't think a jury

7    could even do this.

8            MR. MENDYS:  Okay.

9            (Whereupon, the referred to video was played in

10   open court.)

11           MR. MENDYS:  I'll show you the other angle now,

12   Judge.

13           (Whereupon, the referred to video was played in

14   open court.)

15           THE COURT:  I'm sorry, could you just -- I know

16   we're not making a record as we would at trial, but why do

17   you keep stopping it when I'm watching it?

18           MR. MENDYS:  Because they're in one-minute

19   segments, the clips, so I have to --

20           THE COURT:  And you have to keep going to the next

21   one?  This is how a jury is going to see this?

22           MR. MENDYS:  It is the only available option in

23   the format it's in right now.

24           THE COURT:  But it's not the only available option

25   with all the technology that exists.  If you think that a

Proceedings

1      jury's going to sit here while you do a minute and a minute

2      and a minute, you better have someone work on this.

3                 MR. MENDYS:  Thank you, Judge.

4                 THE COURT:  You know, this is really --

5                 (Whereupon, the referred to video was played in

6      open court.)

7                 THE COURT:  So I'm sorry, I'm looking at this

8      color video.  Who is it your contention is that individual

9      is?

10                 MR. MENDYS:  The individual who just entered the

11     screen?

12                 THE COURT:  Yes.

13                 MR. MENDYS:  Would be Mr. Diaz.

14                 THE COURT:  Mr. Diaz is the first one at the

15     scene.  According to you, that's Mr. Diaz?

16                 MR. MENDYS:  Yes.

17                 THE COURT:  Okay.  He just threw someone up

18     against the wall.  Go ahead.

19                 (Whereupon, the referred to video was played in

20     open court.)

21                 THE COURT:  Now the second person, who is that?

22     Your contention that individual is?

23                 MR. MENDYS:  Mr. Melenciano.

24                 THE COURT:  Okay, go ahead.

25                 (Whereupon, the referred to video was played in

Proceedings

1        open court.)

2              THE COURT:  And this third individual, who is that

3        your contention, Mr. Santana?

4              MR. MENDYS:  Correct.

5              THE COURT:  Okay.

6              (Whereupon, the referred to video was played in

7        open court.)

8              THE COURT:  I'm looking at a black and white from

9        the other angle now.

10             MR. MENDYS:  Yes, this is from 2315 Walton.

11             THE COURT:  And it's your contention that the

12       person who just come on the screen here is Mr. Diaz who

13       throws one person against a wall?

14             MR. MENDYS:  Yes.

15             THE COURT:  A second person against the wall.  Mr.

16       Melenciano just crossed the sidewalk, that's your

17       contention?

18             MR. MENDYS:  Yes.

19             THE COURT:  He's frisking the two people that Mr.

20       Diaz threw against the wall, this other third and fourth

21       people are there.  And Mr. Santana is there now frisking,

22       and the two are, there are two women on the right with the

23       Mr. Diaz.

24             MR. MENDYS:  Correct.

25             THE COURT:  And the two men are on the left with

Proceedings

1      Mr. Melenciano and Mr. Santana, although not separated by

2      very much space.

3              MR. MENDYS:  Correct.

4              (Whereupon, the referred to video was played in

5      open court.)

6              THE COURT:  So I'm assuming the police van has

7      just arrived.  This, again, is a camera color view and Mr.

8      Diaz is already gone as the van pulls up.

9              (Whereupon, the referred to video was played in

10     open court.)

11             THE COURT:  So when the van pulls up, Mr. Diaz did

12     have his hand on one of the individuals against the wall and

13     then just walked off as the van stops, but the van had been

14     pulling up already.

15             (Whereupon, the referred to video was played in

16     open court.)

17             THE COURT:  Well, okay.  So this is the

18     apprehension and the two men actually chasing the police

19     officers as they're taking what is purported to be Mr.

20     Melenciano and Mr. Santana into custody, and Mr. Diaz is

21     gone.

22             (Whereupon, the referred to video was played in

23     open court.)

24             MR. MENDYS:  Judge, at this point the apprehension

25     has been made.  If the Court wishes to continue viewing at

Proceedings

1    this point -- I'm sorry, the apprehension has been made, if

2    the Court wishes to continue viewing.

3            THE COURT:  No, I don't need to continue viewing

4    it.  I actually, Mr. Diaz is long gone at this time so

5    whatever involvement he has has already been memorialized.

6            MR. MENDYS:  There is --

7            THE COURT:  According to what Mr. Wilson said, his

8    defense is that will mirror the statement.  The statement is

9    that Mr. Santana was there talking calmly to the other three

10   individuals or four individuals, whatever the number was, or

11   the individuals that they weren't named already when he got

12   there, but you're purporting to say that the evidence will

13   be that Mr. Santana is the last one to arrive, and that

14   everybody is either frisking or has their hands on these

15   individuals when the police arrive, which is not wholly at

16   all inconsistent with what the officer said he believed he

17   saw which is four people against the wall and three people

18   frisking them because Mr. Diaz was, did have his hands on

19   that woman at that time and he was, and the other two were

20   frisking.

21           So his assumption is certainly completely

22   consistent with what I've seen on the video today, so

23   there's no real inconsistency in his testimony by reason of

24   the video, although there may have been, and I'm not sure

25   what his attention was focused on during the grand jury

Proceedings

1    whether that's a prior inconsistent statement or not,

2    because when the car stops Mr. Diaz is gone and the frisking

3    is still going on with the other two.

4              But what else do you want to tell me?

5              MR. MENDYS:  There is a second video which is less

6    unwieldy, a little more traditional.

7              THE COURT:  It shows the same thing?

8              MR. MENDYS:  Different angle.

9              THE COURT:  Why don't you put it on because I

10   really, if it is something that's going to corroborate in a

11   clearer form anyone's face or anything, is that, I mean, you

12   know, I will say that we don't have close-ups of any of the

13   defendants that I can make an identification from where I'm

14   sitting.  I've seen videos with faces are blown up and it's

15   unmistakable, but you would have to have corroboration of

16   who came, who came first, and you have eyewitness testimony.

17             MR. MENDYS:  There's only two that I think are

18   really relevant for purposes here.  These are from across

19   the street and I'll go to the relevant points.

20             (Whereupon, the referred to video was played in

21   open court.)

22             MR. MENDYS:  I would direct the Court and defense

23   and all parties to the bottom left corner here.

24             THE COURT:  Could you back that up just a little

25   bit because I --

Proceedings

1              (Whereupon, the referred to video was played in
2       open court.)
3              THE COURT:  This angle really shows who you
4       purport to be Mr. Diaz and the van pulling up, and Mr. Diaz
5       is still there with his hands on someone, whoever it may be,
6       until the van basically comes to a stop.  But he, as the
7       van's approaching he has his hands on someone and he's gone.
8              MR. MENDYS:  At this point everything is out of
9       view in terms of --
10             THE COURT:  Right, and that's fine.  You can turn
11      it off.
12             MR. MENDYS:  There's one more angle.
13             THE COURT:  Oh, there is?  Go ahead.
14             (Whereupon, the referred to video was played in
15      open court.)
16             MR. MENDYS:  I'll direct you to the top right, I
17      think, now.  That will be the defendant's car that just
18      entered the screen.
19             THE COURT:  Now, I have to say it's hard for me
20      when I'm viewing this for the first time, is it your
21      contention that all three defendants got out of the same
22      car?
23             MR. MENDYS:  No, it appears that Mr. Santana got
24      out of the car that was parked.
25             THE COURT:  A different car.

Proceedings

1     MR. MENDYS: Directly in front.

2     THE COURT: Okay.

3     MR. MENDYS: At this point Melenciano and Santana

4  are in custody. Would you like to keep watching, Judge?

5     THE COURT: No, that's fine.

6     So is there anything else you want to say now that

7  I viewed the video --

8     MR. MENDYS: No.

9     THE COURT: Mr. Mendys? All right.

10     Well, Mr. Weinstein, I'll let you go first. Tell

11  me what you want to tell me.

12     MR. WEINSTEIN: Thank you, your Honor.

13  Prosecutor's talking about his ironclad case. Looking at

14  the video a couple of things are obvious. One looks like to

15  be a pre-arranged meeting between two sets of people. The

16  four people get out first in an area where there's a wall

17  and stay there. Defendant's contention is none of them live

18  there, they're not going home. This is a drug deal going

19  down.

20     What you don't see in the video is anything taken

21  from anybody. You don't see anything taken from anybody's

22  pocket or put into anybody else's pocket. You see the

23  police officers stop for 30 seconds before they got out of

24  their car. They had plenty of time to see if something was

25  being taken at that time. The other thing about his

Proceedings

1   ironclad case --

2          THE COURT:  I'm sorry, in terms of the application

3   I'm hearing now, is the defense that your client didn't take

4   any money?

5          MR. WEINSTEIN:  That may be our case.  Let me

6   bring something else up.

7          THE COURT:  No, no, because this is -- I'm not

8   hearing the summation, I'm hearing whether the case is

9   getting tried with all three defendants.

10          MR. WEINSTEIN:  Let me take another step also

11   before that.  My client has documentary proof of how, when

12   and where he got his money.  I would bet dollars to donuts

13   Contreras can't prove how he got a nickel of that money that

14   he claims is his.

15          THE COURT:  That's not relevant to my decision

16   about whether I'm going to sever the cases.  I know what

17   you're saying in terms of what -- so your defense is your

18   client was carrying money that was his all along.  That no

19   robbery occurred whatsoever, no larceny occurred whatsoever,

20   and that's not at all inconsistent with Mr. Diaz saying I

21   was there but I didn't know there was going to be a robbery,

22   because you're saying there wasn't a robbery, but it's

23   somewhat consistent with what Mr. Wilson is saying who

24   doesn't want to be severed from your client, that we took

25   money that was ours and we believed it to be ours.

Proceedings

1      MR. WEINSTEIN:  Judge, money may have been handed

2 without a robbery and there could be a reason for frisking.

3 This is a drug -- let me finish, please.

4      THE COURT:  I only want to just focus on the issue

5 at hand.  I'm not deciding guilt, innocence, and I never

6 will in this case.  I'm deciding whether -- you want, Mr.

7 Wilson and you want the cases to be tried together.  But

8 you're saying there was nothing taken whatsoever and your

9 client came to the scene with money that he can prove he got

10 from a legitimate source and that there is no proof of any

11 money being taken.  And Mr. Wilson's defense is well, yeah,

12 we were there to get money that we were owed.

13      MR. WEINSTEIN:  Your Honor, I'm saying there's no

14 robbery.  I don't think I have to go any further than that.

15 Also --

16      THE COURT:  Well.

17      MR. WEINSTEIN:  There are, this is a drug deal.

18      THE COURT:  Can I --

19      MR. WEINSTEIN:  They wanted to see if he was

20 wearing a wire.

21      THE COURT:  So how is this relevant to the

22 severance application that I have?

23      MR. WEINSTEIN:  The State is talking about an

24 ironclad case.  It's not so ironclad.  And also, one of the

25 things that's interesting that he said he has at least one

1    witness, Contreras.

2         THE COURT:  See, we're back to prong one of the

3    test which has to do with what the defenses are and whether

4    they are antagonistic sufficiently to each other to the

5    other defense as to require a severance.  And then, yes, I

6    understand that if I'm viewing this in light of a defense

7    you're proffering, you're correct, I personally could not

8    see anything taken, but this is a video that hasn't been

9    enhanced.  The angles are where they are.

10         And you know, I don't know, I can't see it, but

11   that's not inconsistent with your arguing to a jury that

12   they couldn't see it either, and that your client came there

13   with $6,000 in his pocket and this is money he has from a

14   legitimate source and here's my receipt, and the only way he

15   can do that if he takes the stand.

16         MR. WEINSTEIN:  Absolutely right.

17         THE COURT:  But that's completely inconsistent

18   with what Mr. Wilson's client's defense as proffered to me

19   is, that we went there to get money that he understood was

20   owed and to pick it up, and that's actually, you know,

21   that's, that's different.

22         MR. WEINSTEIN:  I'm saying my client did not rob

23   anybody and that the money is his.  He did not rob anything.

24   Mr. Diaz is saying that my client, Mr. Wilson's client were

25   robbing these people.  After he found out about it he got

Proceedings

1    out of there.  There was no robbery, that's our defense.

2         THE COURT:  The defense that there was no robbery

3    is completely consistent and not at all antagonistic.  All

4    three defendants are proffering a defense that there was no

5    robbery, so there's nothing antagonistic about that.  What

6    is being suggested by you is an argument based on evidence

7    that you seem to intend to proffer at the trial that your

8    client's money was in his possession when he got there and

9    came from a legitimate source.

10        MR. WEINSTEIN:  All I'm saying is my client's

11   money came from a legitimate source and did not commit a

12   robbery.  Diaz is saying that my client and Wilson's client

13   committed a robbery where when he saw they committed a

14   robbery, he hightailed it out of there.

15        THE COURT:  Well, that's not inconsistent because

16   he may have believed it to be a robbery but he doesn't know

17   it's a robbery because he doesn't know your client has money

18   that is, he claims is his.

19        MR. WEINSTEIN:  He may.  He's also saying he

20   didn't frisk anybody, you know.

21        THE COURT:  That's a different story.  You know

22   what the video shows in terms of the activities of the three

23   defendants is irrefutable.  What defenses are raised and

24   interpretations are going to be raised to the jury and what

25   additional evidence is what we're talking about here, and

Proceedings

1    now that I have seen every angle of this video, and it is

2    what it is in terms of what happened but not necessarily

3    conclusive about who did what and who got there, but you

4    know if Mr. Diaz is going to say I walked away when police

5    got there, which is actually his statement, that the part

6    that's admissible, I walked away when the police got there

7    but I had a shield, well, yeah that's there.  He doesn't say

8    in his statement he didn't frisk anybody.  He doesn't say

9    anything like that.  In his statement on the People's direct

10    case --

11          MR. WEINSTEIN:  Your Honor, what the video doesn't

12    tell us is what was said by whom.

13          THE COURT:  And that's my point.  You're making

14    the same point I'm making.

15          MR. WEINSTEIN:  Your Honor, you're asking me for

16    an offer of proof that you are from the People's, he's

17    having one or two witnesses, he only has one witness and

18    Diaz isn't here, nobody to identify him except for his own

19    statement.  He only has Contreras and nobody identifies him.

20    And the assistant will not confirm to the Court who he's

21    calling as a witness, and that's a big problem.

22          THE COURT:  I didn't say I would weigh in -- what

23    he told me is that he expects at this time at least two

24    people are going to testify, one of whom will be Mr.

25    Contreras, whose version I heard through hearsay statements

Proceedings

1      at the hearing who is one of the individuals depicted on the

2      video who's up against the wall who says he had money that

3      was taken from him.   That's what Mr. Contreras is going to

4      say?

5                MR. MENDYS:   Yes.

6                THE COURT:   And that the money didn't belong to

7      any of the other defendants.   And he's going to call,

8      expects a woman, is it Rosario you said?

9                MR. MENDYS:   Yes.

10               THE COURT:   Who's going to testify that she was

11     one of the women being held and thrown up against the wall.

12     And there was actually something on the video that passed

13     pretty quickly, but before the women got on the wall, it

14     looked like he was patting them down even before they got to

15     the wall in terms of Mr. Diaz.   I mean, he's clearly

16     throwing -- if that's him, four people are being placed up

17     against the wall.   They're being frisked.

18               You want the, you're going to ask the jury to

19     interpret that this is nothing but a pre-arranged meeting

20     for a drug deal gone down?   Well, I'm not sure where that

21     comes from, but that has to come from someone's statements

22     at trial, but it doesn't come from anything I see.

23               MR. WEINSTEIN:   It comes from watching that video.

24     None of people live there.   It's a secluded area.   Well, the

25     video happened at 11 o'clock at night.   We're told it's

1    after midnight.  There may be a time problem on the video,

2    2250 something.

3             THE COURT:  Is your defense it wasn't a robbery

4    and pre-arranged --

5             MR. WEINSTEIN:  Judge, I don't have to proffer my

6    whole defense to you.

7             THE COURT:  This is in the context of a motion to

8    sever which you have made on the grounds of the antagonistic

9    defense, and I can only make a ruling at this time based on

10    what I understand the defense to be and the People's

11    evidence to be.

12             MR. WEINSTEIN:  It's a pre-arranged meeting,

13    Judge.  When we see four people get out of a cab, they don't

14    go anywhere, they stay there.  There's no where to go,

15    they're staying there.  It's midnight.  They're staying

16    there, they're hanging out waiting for another car to show

17    up.  It's a pre-arranged meeting for no legitimate purposes.

18             THE COURT:  Okay, Mr. Wilson, I just want to hear

19    -- I'll let you get to what you want to say.  I'm a little

20    concerned about this the money was there when I got there.

21    And I mean, everyone's saying there's no robbery, which is

22    not at all antagonistic.

23             MR. WILSON:  To clarify, Judge, my client's

24    defense is consistent with the statement I read to the

25    Court, and part of that statement is I never took anything

Proceedings

1    from anyone and I didn't see anyone take any money from

2    anyone else.

3              THE COURT:  Right.

4              MR. WILSON:  Now --

5              THE COURT:  But the rest of the statement is?

6              MR. WILSON:  What I read to the Court before.

7              THE COURT:  About?

8              MR. WILSON:  I got a call from Amauri Santana

9    asking me come along so he could pick up some, there's a

10   blank there, I assume it's money, he was owed and to buy a

11   car.

12             THE COURT:  I saw the statement notice.  Some

13   money he assumed --

14             MR. WILSON:  It's not in the statement, Judge, but

15   I believe that's what the officer testified to.

16             THE COURT:  Some money he was owed, right?  He was

17   there to get money from somebody, not that he was coming

18   with $6,000 that he got from some legitimate source but he

19   was there to get $6,000.

20             MR. WILSON:  He didn't say $6,000, Judge.

21             THE COURT:  Well no, but that's the amount of

22   money we're talking about here.

23             MR. WILSON:  That's what they're claiming was

24   stolen, Judge, I understand, but just to --

25             THE COURT:  That's what the amount of money that

Proceedings

1    was found by the police officers that was vouchered is

2    $6,000.

3              MR. WILSON:  Of course.

4              THE COURT:  In a rubber band, in a wad of money,

5    one pocket, one wad, one -- that's it.

6              MR. WILSON:  Of course, but to bring the defenses

7    down to the nub, Judge, to the core.

8              THE COURT:  Is what?

9              MR. WILSON:  My defense.  And Mr. Weinstein's

10   defense is this was not a robbery.  Mr. Bonanno's defense is

11   that our clients were committing a robbery.  That's as

12   repugnant as two defenses can get, Judge.  It couldn't be

13   any more repugnant.  And a jury is likely to be much more

14   persuaded by a co-defendant eliciting a defense that attacks

15   his two other defenses by a complainant who may have been

16   involved in something shady.  And I think for that reason,

17   Judge, there's a strong likelihood that Mr. Bonanno's

18   defense would rule our conviction in and of itself.

19             THE COURT:  That would be prejudicial to you?

20             MR. WILSON:  Yes.

21             THE COURT:  And his client would be convicted,

22   because to say that in light of having a video showing what

23   purports to be his client, the first one they're shoving

24   people up against the wall, frisking them, I left because I

25   realized something was shady, but he was there for a full

1   minute while the frisking was going on, and he only left

2   when the police van pulled up because he may have been,

3   because the other two were face to the wall, he sees the man

4   so he gets out of there when the van comes, and so he says,

5   I didn't realize that something bad was going on for a

6   minute when four people are against the wall, he put them

7   against the wall and he frisked them.  Your defense is going

8   to be you had no idea what they were doing?

9           MR. BONANNO:  Judge, absolutely not.

10           THE COURT:  And that they were robbing --

11           MR. BONANNO:  Mr. Diaz knows these individuals

12   slightly.  They ask him for a favor.  He goes along not

13   knowing what their intentions were.  Their intentions

14   evidently were to rob somebody so he assists them.  He's a

15   pretty big guy, they need some muscle.  He helps them.  He

16   put people on the wall.  He wasn't frisking anybody, Judge.

17           THE COURT:  He needs to say he's the muscle.

18           MR. BONANNO:  Was retraining somebody, Judge.

19           THE COURT:  For what?

20           MR. BONANNO:  There was no frisking going on in

21   that video that I saw.

22           THE COURT:  Well, it's going to be subject to the

23   jury's interpretation.

24           MR. BONANNO:  He observes, he observes a frisking,

25   he observes something going on that's wrong that can be a

Proceedings

1      robbery.  He sees the police.  I've got a felony record, I'm

2      out of here.

3                THE COURT:  But.

4                MR. BONANNO:  He doesn't run, Judge.

5                THE COURT:  Your accusation of the defense and the

6      one part you can always say, as you're all saying, there was

7      no pre-arranged planned robbery and this wasn't a robbery at

8      all, your defense is it was a robbery and they committed it

9      but I didn't know about it?

10               MR. BONANNO:  Well, he certainly doesn't know what

11     their intentions are, but he then he figured it out.

12               THE COURT:  And Mr. Bonanno, this is why the words

13     that are chosen and the record that is made is very

14     important.  Mr. Wilson, and correct me because this is what

15     you said, your defense is not just that I didn't participate

16     in any robbery and I didn't know that there was going to be

17     a robbery or that any robbery was happening, but yes, there

18     was a robbery and this what you're seeing, members of the

19     jury, is them committing a robbery and my client's not

20     committing a robbery.

21               MR. BONANNO:  That's exactly what Mr. Diaz is

22     going to say.

23               THE COURT:  So then you are going to argue that

24     the two other defendants are guilty of a robbery?

25               MR. BONANNO:  Absolutely.

Proceedings

1       THE COURT:  Okay.

2       MR. BONANNO:  They give him up afterwards.

3       THE COURT:  That's the problem.  And that's the

4   problem.

5       MR. BONANNO:  And it's evidenced by them giving up

6   Mr. Diaz.

7       THE COURT:  That's the problem.  Mr. Mendys,

8   that's the problem.

9       MR. MENDYS:  I just want to clarify to make sure I

10  fully understand this.  Mr. Bonanno's intention or his

11  client's position, his position is that he arrived there

12  with no knowledge, no knowledge and no intent of what was

13  gonna happen, and that only after the fact is when he knew

14  or believed that this would be a robbery?  Or that this was

15  a robbery?

16      THE COURT:  Which is a defense he can raise

17  without putting his client on the stand by arguing to the

18  jury that what they are seeing is a robbery by the other

19  defendants, but not by his client.  And that does not allow

20  you, at that point, to admit the part of the statement which

21  he's alleged to have made which said, yeah, I planned it.

22  Lappy told me, Homeboy told me, I drove there, then we knew

23  there was going to be $3,000, all of which comes in at his

24  stand alone trial but not -- so this is his strategic

25  decision to move for a severance.  And he understands that

Proceedings

1    in doing so and granting the severance the defense he's

2    proffering at a joint trial, which is not just merely that

3    my client is innocent but that the co-defendants are guilty,

4    at a stand alone trial, because I don't want there to be any

5    accusation of ineffective assistance of counsel, at a stand

6    alone trial that whole statement comes in and everything

7    else comes in except statements that say he did it with me.

8         And the People can disprove that the money, that

9    the other people lied too that it's my money.  It's not his

10   money, he said 16.  He's not there to testify it was 6,000.

11   He's not there to testify to anything.  And that's what you

12   want?  And that's because, and that's the defense you want

13   to raise?

14             MR. BONANNO:  That's the application we have.

15             THE COURT:  Severance is granted.  I'm trying the

16   two cases Monday.

17             MR. MENDYS:  Judge?

18             THE COURT:  Yes.

19             MR. MENDYS:  Judge, I think it's, our position is

20   that it's our choice as to who to go forward with first.

21             THE COURT:  Oh well, it is but -- and who did you

22   want to go forward with first?

23             MR. MENDYS:  I think we would need an adjournment

24   to figure out some of the legal issues.

25             THE COURT:  You could tell me Monday and I'll be

1    here to pick either two juries or one jury, but you have the

2    weekend to make that decision.

3              MR. MENDYS:  Two juries or one jury?

4              THE COURT:  No, two defendants or one defendant.

5    We don't have two juries.  Two defendants or one defendant.

6    You have the weekend.  We'll come in Monday.  I've got a

7    call in for a jury panel.  They won't get here until 11:30.

8    You tell me which one you're going forward, and everyone's

9    prepared anyway because we've been doing this for a while

10   and you'll tell me Monday.

11             MR. MENDYS:  I agree, Judge.  I just don't know

12   that one business day, although --

13             -THE COURT:  It's not.

14             MR. MENDYS:  Although the weekend --

15             THE COURT:  You know something, Mr. Mendys, I'm

16   insulted that you think that nobody does work on weekends.

17   You know, I write decisions, I research things.  Every

18   professional lawyer every day is a business day, okay.

19             So you have, it's now a quarter of one.  It's

20   strategic, it's not rocket science.  It's the same evidence,

21   it's the same case.  You have to prove acting in concert, so

22   basically the only difference is that the statements

23   attributable to Mr. Diaz in total won't come in if you were

24   trying the other two defendants.  That's the only difference

25   in terms of your, the witnesses you need.  And it's the same

Proceedings

1       case.  It's the exact same case because when you're proving

2       that, if you are trying to prove Mr. Santana and Mr.

3       Melenciano are guilty of a robbery aided by two other

4       people, including Mr. Diaz, everything about Mr. Diaz comes

5       in in that case.  The ID everything comes in.  Everything.

6             And in the case with Mr. Diaz everything about Mr.

7       Santana and Melenciano comes in, everything except

8       potentially statements that would be considered Bruton.

9       Everything comes in.

10            It's not a big decision and I'm not adjourning it

11      because I also have a responsibility, and I do not consider

12      this to be a decision that -- I'm not happy about the

13      severance from a court's perspective because I would love to

14      do a three-defendant case from 2012, I would love to knock

15      off all three defendants, but Mr. Bonanno has chosen

16      strategically to go forward with a case for his client alone

17      knowing, knowing that his client's statements talk about I

18      did this and I knew this ahead of time and I planned it

19      ahead of time, and I went there ahead of time to do all of

20      this.

21            And then there is, if the jury believes the

22      statements then there's no ambiguity of what's going on on

23      that screen and what he knows about, and that he had a

24      shield.  And I think the end of the statement is I've never

25      impersonated a police officer before.  I believe that's the

Proceedings

1     last thing he said.

2          So you know, that's a strategic decision that

3     counsel is making.  He wants to go with that defense.  The

4     other two defendants can't have a trial where they're

5     blaming their clients, so that's what's happening here.

6     It's an unexpected thing for me, but it's the same case, so

7     you know, it's exactly the same case you're going to try

8     with one less defendant.  No different than if someone had

9     pled out, you're prepared for the same trial.

10          So I'll see you Monday at 10 o'clock and you'll

11     tell everybody and we'll decide how many, you know,

12     defendants are going to be there, and that's our schedule.

13          MR. MENDYS:  Ten o'clock even though -- you want

14     us here 10 o'clock?

15          THE COURT:  I do because they have to know -- I

16     need to know.

17          MR. MENDYS:  Okay.

18          MR. WEINSTEIN:  We have to plan our schedule.

19          THE COURT:  I need to know which trial, which

20     defendants are going forward.  You don't want to make the

21     decision now, I'm putting it on Monday at 10 o'clock.

22          MR. MENDYS:  Okay.

23          THE COURT:  I'll see you then.  Orders of

24     protection extended.

25          MR. BONANNO:  Possible to get a decision from the

Proceedings

1    DA before the end of business?

2            THE COURT:   I'm not asking him, Mr. Bonanno,

3    because, quite frankly, you have caused an eve of trial

4    surprise that the Court is very disturbed about, and

5    basically wasted time and efforts of other cases, because if

6    this were your defense all along, you should have filed this

7    motion.   You should have filed it a long time ago and we

8    shouldn't have had to do this all on the record.   And that

9    this is actually untimely.   But I'm allowing it to happen.

10           MR. BONANNO:   With all due respect, it was

11   formulated after the hearing testimony.

12           THE COURT:   You formulated a defense after the

13   hearing testimony?

14           MR. BONANNO:   Hearing the testimony of the police

15   officers, yes.

16           THE COURT:   Hearing testimony has no difference

17   in -- this is your client's, you've had your client to speak

18   with, and I basically do not understand how anything in the

19   hearing testimony would have changed a defense that they did

20   it and my client didn't because nothing came out at that

21   hearing that suggests that at all.

22           MR. BONANNO:   Conversations with my client brought

23   it forward.

24           THE COURT:   Nothing suggests that at all, and it

25   really is just, you know, we do the best we can with the

Proceedings

1      limited number of judges we have.

2                 MR. BONANNO:  We appreciate that.

3                 THE COURT:  And we ask everybody to make their

4      motions in a timely manner.  And when it happens like this,

5      everything is inconvenienced, okay.  I'll see you Monday.

6                 MR. MENDYS:  Judge, I just want to understand my

7      option in terms of Monday.  If we, if I decide to go forward

8      with the two defendant matter with Mr. Weinstein's schedule,

9      I think his commitment is that as of July 31st if there's no

10     verdict someone will sit?

11                MR. WEINSTEIN:  Judge, you know, I hate to say

12     this, I think it's happening that the prosecutor's been

13     trying to delay this, the case just the two of us now.

14                THE COURT:  You know what, the prosecutor's not

15     trying to delay it.  Let me tell you something.  No, I'm not

16     hearing the invectives about the prosecutor trying to delay

17     anything, because that's the most unfair thing and I'm not

18     listening to it.

19                MR. WEINSTEIN:  Let me tell you why.

20                THE COURT:  I'm not listening to it, Mr.

21     Weinstein.  What I'm saying, Mr. Mendys, it has been said at

22     the bench if it hasn't been said on the record it is, this

23     case is going forward, Mr. Weinstein is leaving on the 31st

24     of July.  He has asked for this trial to go.  And in fact,

25     he has said, assuming it was going to be a three-defendant

Proceedings

1     trial which everybody told me, I didn't expect Mr. Weinstein

2     and Mr. Wilson to make a motion to severe because they were

3     on board, it was only Mr. Bonanno who mentioned something in

4     passing that perhaps somewhere sometime Mr. Weinstein said

5     three defense attorneys, we can -- I'm not going to cross

6     this his witness, his witness has nothing to do with me, but

7     he did assure us that if he's leaving and the case is not

8     finished, he has partners at his firm and they represent the

9     defendant.  The firm is retained not Mr. Weinstein, and

10    someone will be here to take over this case in whatever

11    posture it is on Monday, August 3.

12             And that's the state of the record.  Correct, Mr.

13    Weinstein?

14             MR. WEINSTEIN:  Absolutely.

15             THE COURT:  Thank you very much.  See you Monday

16    at 10.  We're done.

17             (Whereupon, the case was adjourned to July 13,

18    2015.)

19             (Continued on the next page...)

20

21

22

23

24

25

```
 1    SUPREME COURT OF THE STATE OF NEW YORK
      BRONX COUNTY : CRIMINAL TERM : PART 96
 2    --------------------------------------x
      THE PEOPLE OF THE STATE OF NEW YORK
 3
              -against-
 4                                         Ind. No.
      RICHARD DIAZ, AMAURI SANTANA,        3349-2012
 5    & JOSE MELENCIANO,
 6                    Defendants.
      --------------------------------------x
 7                                         265 East 161 Street
                                           Bronx, New York 10451
 8                                         JULY 13, 2015
 9    B E F O R E:
10              THE HONORABLE RALPH FABRIZIO
                Justice of the Supreme Court
11
                (Appearances same as previously noted.)
12
                                        LAURA ROSEN
13                                      SENIOR COURT REPORTER
14         *      *      *      *      *      *      *      *
15              (Whereupon, the following took place in open court
16         in the presence of the defense counsel and the assistant
17         district attorney.)
18              THE CLERK:  Calendar number two, Amauri Santana,
19         Jose Melenciano and Richard Diaz.  Defendants are not before
20         the court.
21              Appearances, please.
22              MR. WILSON:  Brian Wilson for Mr. Melenciano.
23         Good morning, Judge.
24              MR. WEINSTEIN:  Good morning, Your Honor.  Barry
25         Weinstein, Goldstein and Weinstein.  I spoke to my client
```

Proceedings

1   several times.  I first called him about five to ten when I

2   got here.  He reinstated his phone number over the weekend.

3   I said, where are you?  He said, I'm on my way in a cab.  I

4   said you're supposed to be here at 10.  He said no, 11.  I

5   said no, 10.  Friday was 11, today is 10.

6          THE COURT:  It's 10:30.

7          MR. WEINSTEIN:  He thought it was 11 and that was

8   it.  I said no, Friday we were 10, today we were -- Friday

9   11, today we were 10.  And he said he should be here soon.

10   He's in the cab in the Bronx somewhere.

11          THE COURT:  Well, you know, we'll see what

12   happens.  That's not number one.  And so now he's got a

13   phone.  Mr. Wilson?

14          MR. WILSON:  Judge, I can only assume, and I'm

15   assuming a lot I guess, that if Mr. Weinstein's client

16   understood it to be 11, my client understood to be 11 also.

17   I have no independent --

18          MR. BONANNO:  I reached out three times to Mr.

19   Diaz, left him messages, and I've got to assume also he

20   thought it was 11 too.  He's never warranted, he's never

21   been late.  He's been here during the whole proceedings

22   since I've been involved.  Pat Bonanno for Mr. Diaz.

23          MR. MENDYS:  Judge, I'm prepared to go forward

24   today against Mr. Diaz.

25          THE COURT:  So you're choosing to do the

Proceedings

1   one-defendant trial, Mr. Diaz?

2            MR. MENDYS:  Yes.

3            THE COURT:  Okay.  Well, that's number one.  What

4   is your other application?

5            MR. MENDYS:  My other application is I'll be

6   requesting a warrant.

7            THE COURT:  For each of the defendants?

8            MR. MENDYS:  Yes.

9            THE COURT:  That application is granted at 10:30

10  a.m.

11           MR. WEINSTEIN:  Your Honor, I would ask you to

12  hold off for one half --

13           THE COURT:  I'm not holding off for anything.  I

14  have told -- you know something, it was very clear.  It was

15  not, I am -- this is unacceptable and he is -- it's not the

16  first time in front of me, and so the warrants are ordered

17  for all defendants.

18           I guess you have to now go do a Parker hearing for

19  Mr. Diaz because we need to find out where he is if that's

20  the case you're proceeding on, and I'm not going to be

21  calling for a jury panel because of that.  But you know,

22  we'll be doing our Parker hearing and that's the case we're

23  proceeding on, okay.  And that's it.

24           MR. BONANNO:  Judge, I've got to assume he's on

25  his way.  I mean, I know we spoke before we left on Friday.

Proceedings

1        THE COURT:  You called him?

2        MR. BONANNO:  I spoke with him.  I left three

3    messages with him.

4        THE COURT:  He didn't pick it up?

5        MR. BONANNO:  He hasn't picked up.

6        THE COURT:  Right.  Well --

7        MR. WEINSTEIN:  Your Honor, it was clear to us

8    it's 10 o'clock.  We were all here at 10.  I don't know what

9    they understood from the interpreter or not, I don't know.

10   We were all here 10 o'clock.

11       THE COURT:  I think they all pretty much speak

12   English since they've been speaking English to me.  And in

13   terms of Mr. Wilson's client, after telling me his phone

14   didn't work, I believe it was his phone that went off in the

15   middle of the courtroom that very afternoon and started

16   ringing off the hook.  Right?

17       MR. WILSON:  I believe it was.

18       THE COURT:  Right.  So he's lied to me to my face

19   through counsel, whether it's in English or Spanish, that I

20   have no telephone that's working.  All it can do, all I can

21   do is use it kind of, I guess, as an organizer to put

22   people's numbers in.  But he doesn't want me to know he has

23   a working phone number, nor does he want his attorney to

24   know he has a working phone number.  That's a very

25   significant problem that arose that day and was not

1    addressed.

2         But now he's not here and neither is his

3    co-counsel -- co-defendant, rather.  They are facing

4    significant time.  They sat here, they watched that video on

5    a big screen in this courtroom, and that's, you know -- so

6    the warrants are ordered.  And you do, what you need to do

7    is to prepare for a Parker hearing and I'll be around to

8    listen when you're ready to go.

9         MR. WEINSTEIN:  Your Honor, if I think all three

10   of them show up at 11 o'clock, I think there could be a

11   fairly strong presumption all three thought that.  If they

12   arrive separately, then they were all under the impression

13   that it was same time as Friday.

14        THE COURT:  Prepare for your Parker hearing

15   because right now I am not calling for a jury panel, and I

16   am delaying even beginning a case which has a very

17   significant window to try it and then, you know, it's a

18   tight, tight case and it's going to get tighter because the

19   attorneys -- the defendants are not here.  And whether they

20   have a misunderstanding or not, you know what, they

21   misunderstood lunch, they misunderstood 2:30, they

22   misunderstood how long it would take to get back to court.

23   And we'll see what happens when they get here and I'll hear

24   if they get here, if they get here.  So I need to get moving

25   on a Parker hearing.  I need to work the case.

Proceedings

1      MR. WILSON:  Just in terms of logistics, if I wait

2   for my client to appear today, will the Court second call to

3   resolve it?

4      THE COURT:  I have to vacate the warrants that I

5   just issued, it's not a second call.  There are right now

6   warrants that are issued for the arrest of all of these

7   three defendants.  Bail is ordered forfeited for all three

8   of these defendants.  And if you want to wait, you can wait.

9   If you want to leave us a number for whatever, if your

10  client turns up voluntarily, but I can't proceed with

11  anything.  I can't proceed with my Antommarchi discussions

12  now.  I can't proceed with any of the things that I needed

13  to do to get the case ready for jury selection in the next

14  half hour.  Okay?  So that's it.  Warrant are ordered.  Go

15  prepare for your Parker Hearing.

16     MR. WEINSTEIN:  I will wait here for my client's

17  arrival.

18     THE COURT:  You can do whatever you want.

19     (Whereupon, the case was set aside.)

20     (Whereupon, the following took place in open court

21  in the presence of defendant MELENCIANO, Spanish language

22  interpreter, defense counsel, and the assistant district

23  attorney.)

24     THE CLERK:  Step up, please.  Second call,

25  calendar number two, Jose Melenciano.  This is a return on a

Proceedings

1    warrant.  Mr. Melenciano is present.  Spanish interpreter
2    required and present.

3                MR. WILSON:  Brian Wilson for Mr. Melenciano.
4    Good morning again, your Honor.  I move to vacate the
5    warrant.

6                THE COURT:  The warrant is vacated.

7                People?

8                MR. MENDYS:  Newton Mendys for the office of the
9    district attorney.

10               Your Honor, while I recognize the defendant was 40
11   minutes late, a warrant was ordered.  There has been a
12   history of tardiness, inability to follow the Court's
13   instructions.  He's been rearrested multiple times during
14   the pendency of this case, during which he has been out on
15   bail.

16               All these factors put together, plus the fact that
17   we just finished hearings, I'm gonna be asking for $10,000
18   bail, plus an examination of surety.

19               MR. WILSON:  My client misunderstood, Judge.  He
20   thought the case was on for 10:30.

21               With regard to the issue about the phone, Judge, I
22   discussed that with him.  He tells me the phone rings but he
23   can't take any calls so nothing comes up on the face.  He
24   can't actually -- he was demonstrating to me, he can't
25   actually answer anything.

Proceedings

1      THE COURT:  So the phone rings.

2      MR. WILSON:  It rings but --

3      THE COURT:  And people's numbers show up on the

4 phone.

5      MR. WILSON:  No, nothing shows up on the phone.

6      THE COURT:  He doesn't even know.  When it rang in

7 court the other day, when it rang in court the other day

8 after telling me his phone didn't work and all he could do

9 was put numbers in it, I mean it rang and interrupted a

10 hearing.  Rang pretty loudly.

11      And so this is what he's telling you?

12      MR. WILSON:  Yes.

13      THE COURT:  And this is now, let's see, June 10th

14 he didn't show up for a 9:30 call.  At 10:05 a.m. came back.

15 I warned him the last time if he was late, it delayed a

16 hearing from proceeding for a significant period of time

17 because he chose to go to Manhattan.

18      This morning he's the only one who's here.  He

19 says 10:30, someone else said 11 o'clock and, you know, I

20 don't know what's, what issue there is, you know.  And both

21 of them, and they're blaming the interpreter.  Counsel, I'm

22 suppose to say that's the interpreter error and --

23      MR. WILSON:  Again, he is employed, Judge.  He

24 will lose his job.

25      THE COURT:  Sorry?

Proceedings

1          MR. WILSON:  He is employed.

2          THE COURT:  I don't understand how his employer

3     contacts him if he needs to tell him about his schedule.  I

4     don't know how anyone can ever contact this person.  I know

5     exactly where he's employed.  I cannot believe that there is

6     no way anyone, that there's no way of getting in touch with

7     Mr. Melenciano.

8          I have a feeling he just doesn't want to tell us

9     how we can contact him to keep this from ever happening in

10    all cases where, I mean, this is, you know, he shows up,

11    let's see, March 13th bench warrant ordered 10:35 a.m.

12    Warrant vacated 11 a.m.  This is four times in front of me,

13    and I have warned him.

14         And the bail, so they want $10,000.  What do you

15    want to tell me?

16         MR. WILSON:  Again, Judge, my client's employed

17    full-time.  He always does show up in court.  I understand

18    there have been delays, and I don't know if language is one

19    of the reasons.  I don't know.  He had understood it --

20         THE COURT:  And every time that he's come to court

21    and I have said to him this is the last time, don't do it

22    again, what language should that be translated into?

23         MR. WILSON:  I understand that's the case, Judge.

24    Today I believe he showed up approximately six minutes after

25    the case had a warrant issued.

Proceedings

1      THE COURT:  Right, but the case was scheduled for

2  a 10 a.m. call.

3      MR. WILSON:  I understand, Judge.

4      THE COURT:  And specifically so I could prepare

5  and get a jury here, which of course now I'm not, the People

6  are not proceeding with his case first.

7      MR. WILSON:  I understand.

8      THE COURT:  Who posted the bail?  Let me see.

9      MR. WILSON:  For that reason also he's gonna

10  remain in an extended period of time if the Court put him in

11  now because the People are not moving his case based on

12  vacation schedules.

13      THE COURT:  You moved for a severance.

14      MR. WILSON:  I suspect it will not go until

15  September.

16      THE COURT:  You moved for a severance.

17      MR. WILSON:  I did, Judge.

18      THE COURT:  And I don't know based on vacation

19  schedules if that's what --

20      MR. WILSON:  Now I'm saying based on vacation

21  schedules I suspect the case probably won't be tried until

22  September.

23      THE COURT:  Maybe.

24      MR. WILSON:  So I'd ask the Court to give him one

25  more chance.

Proceedings

1           THE COURT:  The bail is exonerated.  This is a

2     taxi driver who posted it.  I don't know who this person is,

3     but bail was posted by a person name Raul Tejeda, who now

4     probably is unaware that on four occasions a judge has said

5     the bail is forfeited and he's out $2500.  I don't know who

6     Mr. Tejeda is, I don't know what his relationship with this

7     defendant is, but I think he has demonstrated through

8     countless chances before me, second, third and beyond.

9           THE DEFENDANT:  Can I speak?

10          THE COURT:  Bail is increased to $10,000 cash or

11    bond.  I'm also ordering a 72-hour examination of surety.

12         MR. WILSON:  If I might with regard to that,

13    Judge, I don't believe there's any reason put on the record

14    or any suggestion of any reason why there should be an

15    examination of surety.

16         THE COURT:  There is based on his prior record

17    from Virginia which I didn't know about.  I know the DA

18    didn't ask for examination of surety.  He has been convicted

19    actually with the other person who is not here of a scheme

20    to defraud identity theft using, getting money that didn't

21    belong to him under a name that didn't belong to him.

22         And what he does is he works, as you told me, for

23    a dishwasher -- as a dishwasher.  I'm not sure, you know,

24    what bondsman is going to be -- I mean, $10,000 he's got to

25    put up $1,000 to get a $10,000 bond.  Someone already put up

Proceedings

1    $2500 cash and I'd like to know where the source of the

2    money is.  So he's going in.  Now I'm putting this on for a

3    control date.

4              MR. WILSON:  Judge, my client is asking to address

5    the Court.  My client is requesting to address the Court.

6              THE COURT:  He says what he says at his peril, and

7    when he addressed me through counsel said he had a

8    non-working phone that then rang in the courtroom and

9    everybody was looking at him.  He could say what he wants,

10   but it's all going to be taken down, and I have no idea what

11   he's going to tell me.

12             MR. WILSON:  May I speak to him first?

13             THE COURT:  Yes, sure.

14             MR. MENDYS:  Judge, I think I did ask for an

15   examination of surety.

16             THE COURT:  Oh, you did?  Oh well, if --

17             THE INTERPRETER:  The interpreter cannot interpret

18   for the defense attorney and the DA, so please respect me,

19   Mr. DA.

20             THE COURT:  Okay.  I apologize for that.

21             (Whereupon, counsel and client confer.)

22             MR. WILSON:  The defendant wanted me to convey to

23   the Court, Judge, that his stepfather's the person who put

24   up the bail.

25             THE COURT:  Okay.  Well, his stepfather, I'm sure,

Proceedings

1      is not a man of significant means if he's driving a cab and

2      giving $2500 cash to secure his release.  And he really

3      didn't seem to care very much about that because when the

4      bail was ordered forfeited, as I recall in the order now, I

5      don't think your stepfather should be penalized and lose

6      $2500 because you repeatedly -- and you know, again, this

7      is, there were warrants before.  March 3rd there was a

8      warrant.  March -- this is March 5th warrant vacated.  March

9      3rd warrant.  October 28, 2013, bail forfeited, warrant

10     ordered, then warrant vacated.  This is a huge pattern.

11             And I mean, I'm only, I can only say what I said.

12     I don't know what the other judges said, but I know that I

13     told him and I know that his failure to appear at the

14     appointed time throughout this case gives me reason to

15     believe that he just does not want to obey my court

16     directives about when to be here, and so that's it.  So I

17     was picking a control date.

18                 MR. WILSON:  I'm sorry, Judge --

19                 THE COURT:  And I'd like to do that.

20                 MR. WILSON:  Judge, I'm sorry, my client is trying

21     to tell me something else.  I can't understand what he's

22     saying.  May I have the interpreter interpret it?

23                 THE COURT:  Go right ahead.

24                 (Whereupon, counsel and client confer.)

25                 MR. WILSON:  Nothing else, Judge.

Proceedings

1           THE COURT:  Control date, July 30.

2           MR. WILSON:  Would either the 29th or the 31st

3      work, Judge?

4           THE COURT:  The 29th is fine.  7/29 for control to

5      set trial date, and that's it.  The order of protection is

6      extended.  The defendant is to be taken.

7           (Whereupon, defendant Melenciano's case was

8      adjourned to July 29, 2015.)

9           (Whereupon, the following took place in open court

10     in the presence defense counsel and the assistant district

11     attorney.)

12          THE CLERK:  Second call, Richard Diaz.  The

13     defendant is not before the court.

14          Appearances, please.

15          MR. BONANNO:  Good afternoon, your Honor.  Pat

16     Bonanno for Mr. Diaz.

17          MR. MENDYS:  Newton Mendys for the office of the

18     district attorney.  Good afternoon.

19          THE COURT:  Good afternoon all.  It's 12:30 and

20     the defendant still hasn't appeared.  Have you heard from

21     him at all, Mr. Bonanno?

22          MR. BONANNO:  Judge, I understand there's to be a

23     Parker hearing for those purposes.  I would not want my

24     recitation of my conversations with or without the defendant

25     part of those Parker hearings.  I don't want to really

Proceedings

1      become a witness.

2              THE COURT:  You're the person -- do you have the

3      defendant's cell phone number?

4              MR. MENDYS:  I do not.

5              THE COURT:  You're the person who said you reached

6      out to him, left him voicemail messages.

7              MR. BONANNO:  Judge, I've contacted him.

8              THE COURT:  He's not here.

9              MR. BONANNO:  I have contacted him.  I understand,

10     but --

11             THE COURT:  And have you heard from him was my

12     question?

13             MR. BONANNO:  I spoke to him actually.

14             THE COURT:  You did?

15             MR. BONANNO:  I did.  And I texted him too.

16             THE COURT:  And when did you speak with him?

17             MR. BONANNO:  Spoke with him around 10:30 this

18     morning.

19             THE COURT:  10:30 is when I called the case.

20             MR. BONANNO:  And I spoke with him just about that

21     time, too.

22             THE COURT:  On the record you said you had left a

23     message, but you hadn't spoke --

24             MR. BONANNO:  Maybe it was 10:45, Judge.  It was

25     soon thereafter.

Proceedings

1          THE COURT:  And so did he indicate to you that he

2     was in a hospital?

3          MR. BONANNO:  No, he did not.

4          THE COURT:  Did he indicate to you that he was

5     unable to come to court for some medical --

6          MR. BONANNO:  He was actually on the way.

7          THE COURT:  Oh, on the way.  So he was fine, at

8     least at that moment.  I don't know if you've had

9     anything -- what, if anything, you've done at this point?

10          MR. MENDYS:  Judge, I went back to my office

11     around 11:15, I spoke to Lieutenant Brumfield in our

12     detective investigator's unit.  I provided him with a rap

13     sheet of Mr. Diaz.  He indicated to me that the case would

14     be assigned to a detective probably this afternoon.

15          THE COURT:  Okay.  So when do you expect to be

16     ready to proceed with the Parker Hearing?  Although you

17     should, I mean, this is quite an interesting development

18     that the defendant actually reached out and said he was on

19     his way here, and that was close to two hours ago.  I don't

20     recall where he lives.  I know he's out on the $25,000 bond.

21          MR. MENDYS:  I think the last address is West 185

22     Street in Manhattan.

23          THE COURT:  Right, so not terribly far.  And Mr.

24     Santana has not appeared again either.

25          MR. BONANNO:  Judge, if I might, I did text him.

Proceedings

1    I'm wondering if he's texting me back.  That's not him, I'm

2    sorry.

3            THE COURT:  Well, okay.  So what I'm going to do

4    is begin jury selection and we'll have the Parker Hearing

5    after, before the final juror is sworn, which is a procedure

6    that is sanctioned by the Court of Appeals.  Especially now

7    since he knows we're looking for him, and for whatever

8    reason after telling his attorney he is not on his way or he

9    was on his way, he's not here.  And I'm going to call for

10   the panel this afternoon to be here at 2:15 and we will

11   begin jury selection this afternoon.

12           At the moment there's no reason for me to have any

13   kind of Antommarchi Hearing because the defendant isn't

14   here.  That is number one.

15           Number two, I'll ask you, Mr. Bonanno, I certainly

16   would do this regardless of the defendant's presence, but do

17   you want me to instruct the jury during voir dire questions

18   that they're not to draw any adverse inference against him

19   if he chooses not to testify?

20           MR. BONANNO:  That would be my application, yes.

21           THE COURT:  I will be advising the jury that he's

22   charged with acting in concert with both Mr. Melenciano and

23   Mr. Santana.  Whatever the, whatever choice the DA made on

24   which case to proceed on, I would be instructing the jury

25   anyway not to draw any inference from the absence of the

Proceedings

1    other defendants.  But now I'm going to have to instruct

2    them not to draw any inference from either the absence of

3    this defendant, unless you want me to say something else,

4    Mr. Bonanno?

5              MR. BONANNO:  I think that's the appropriate thing

6    to say, Judge.

7              THE COURT:  Okay.  And is there anything, anything

8    specifically you want me to cover in voir dire?  I mean, I'm

9    going to go over accomplice liability and give them the

10    instruction that judges give pre-voir dire.

11             MR. MENDYS:  I would ask, I think some judges kind

12    of provided a brief instruction, and sometimes it's when I'm

13    in the middle of my conversation with them, about quality

14    versus quantity of evidence.

15             THE COURT:  It's part of the general instruction.

16             MR. MENDYS:  Okay.

17             THE COURT:  And the only day off we will have now

18    is the Friday the 24th, so we will be proceeding every day

19    up until that date.

20             MR. MENDYS:  Just so the Court is aware, I am,

21    I've been in touch with the witnesses I intend to call.  Two

22    civilians are coming from out-of-state and we are arranging

23    travel for them, and we are trying to schedule for their

24    convenience and for their, to ensure they actually appear we

25    are trying to have them brought in the morning and then

Proceedings

1        leaving the same day.  I recognize --

2                THE COURT:  Both of them?

3                MR. MENDYS:  No, one on one day, another on a

4        second day.  I recognize, obviously, I'm not obviously gonna

5        ask Mr. Bonanno to limit his cross-examination in any way,

6        and if they have to stay over that will be done, but in

7        terms of scheduling, obviously, you know, I'm trying, as it

8        stands now I'm hoping that we can deal with them later in

9        the week, but we're dealing with reservations and travel

10       arrangements and things like that so.

11               THE COURT:  I have not received a list of

12       witnesses or anything from you to even talk to the jury

13       about during voir dire.

14               MR. MENDYS:  I will provide that to you at 2:15.

15       I have it, just not on my person.

16               THE COURT:  I mean, what names are on it?

17               MR. MENDYS:  All the names we've heard already:

18       Yohn Contreras, Esmeraldi Rodriguez, Joel Rodriguez, Argelia

19       Rosario, Detective Chris Rodriguez, Detective Ana Bell,

20       Police Officer Edgar Mangual, police officer or now

21       Detective Wilson Colon, and Police Officer Pachot, whose

22       first name escapes me.

23               THE COURT:  But there were other people mentioned

24       during their testimony, many other names that were

25       mentioned.  I mean, the two, I believe there were -- so

Proceedings

1    Colon who was with Mangual, and Pachot who was with Mangual.

2            MR. MENDYS:  Correct.  Four civilians were

3    altogether.  They were all mentioned.

4            THE COURT:  And --

5            MR. MENDYS:  Sergeant --

6            THE COURT:  Do you have a video technician or

7    someone who's going to sponsor the video?

8            MR. MENDYS:  I believe that will come in through

9    one of the witnesses.  That's my intent.

10           THE COURT:  Are you playing a 911 call?

11           MR. MENDYS:  No, it was a pickup so there was no

12   911.

13           THE COURT:  Well, no, something was mentioned.

14           MR. MENDYS:  Those were radio transmissions

15   between police officers.

16           THE COURT:  Oh, radio transmissions, but there was

17   never a 911 call?

18           MR. MENDYS:  Correct.

19           THE COURT:  So I heard something about listening

20   to the 911 call during argument, but there was no 911 call.

21           MR. MENDYS:  Correct.

22           THE COURT:  Okay.

23           MR. BONANNO:  Are you positive about that?  I'm

24   pretty sure it came in as a robbery.

25           MR. MENDYS:  It was a pickup.

Proceedings

1          MR. BONANNO:  Excuse me, you're right, it was a

2     pickup.

3          THE COURT:  So there was never a caller who made a

4     call about this, even someone, you know, from a window or

5     something?

6          MR. MENDYS:  No.

7          THE COURT:  I understand the sequence of events,

8     yes, from looking at it, but I was under the impression from

9     Mr. Bonanno's --

10          MR. MENDYS:  I think what Mr. Bonanno is referring

11     to a radio transmission between police officers about a

12     possible showup identification.

13          MR. BONANNO:  Showup and the description of the

14     flight, direction of flight.

15          THE COURT:  Oh well, okay.

16          And Mr. Bonanno, do you have names of individuals

17     you believe the jury might hear or you might be calling?

18          MR. BONANNO:  Not at this time, Judge.  I don't

19     anticipate any neither.  As soon as I know, I will let the

20     court know.

21          MR. MENDYS:  Judge, in answering --

22          THE COURT:  Are you aware of, would you like the

23     copy of the bond to give to your detective investigators so

24     -- you can make a copy of this.  We'll make a copy for you,

25     actually, just incase that's something.

Proceedings

1          And I know you mentioned something to me, well not

2     only did you mention but it's on the sheet, that Mr. Diaz

3     has some sort of indication that he may have been deported

4     or subject to deportation.

5          MR. MENDYS:  Yes, yes.

6          THE COURT:  Have you done anything?  Have you made

7     any further inquiries about that since the Sandoval

8     application?

9          MR. MENDYS:  I have not.

10         THE COURT:  Well, again, I believe not only should

11    your DI's be checking to make sure he's not in federal ICE

12    detainer custody, but they should be notified if they are

13    looking for him as well.  You know, that's just something

14    that I believe the DA's office should be doing.

15         MR. MENDYS:  I agree.

16         THE COURT:  All right.

17         MR. MENDYS:  The one in response to your question

18    which, a number of minutes ago about when we would be ready

19    to proceed with the Parker hearing, I haven't spoken to the

20    detective myself yet.  I'm hoping that we could do this at

21    some point tomorrow, but I've never personally never handled

22    this situation myself but, so I'm --

23         THE COURT:  Well, what I've said is the hearing

24    will have to take place before the last juror is sworn and

25    that I just want to make sure that I am making the record of

Proceedings

1       findings before jeopardy attaches with the swearing of the

2       last juror.  But I don't want to hold up the jury selection

3       process, especially since now that I hear his attorney spoke

4       with him.

5               And have you tried to speak with him since then?

6               MR. BONANNO:  I've made numerous attempts to

7       contact him.

8               THE COURT:  And he hasn't returned any calls?

9               MR. BONANNO:  He has not.

10              THE COURT:  Texts?

11              MR. BONANNO:  I texted him and no return.

12              THE COURT:  And he hasn't responded since that one

13      telephone call?

14              MR. BONANNO:  Yeah.

15              THE COURT:  Well, and you say that was about

16      10:45.  Okay.

17              MR. MENDYS:  Judge, may I have the Court of

18      Appeals cite that you referred to just so I can look at it

19      myself?

20              THE COURT:  Sanchez, 65 NY2d 436.  It actually is

21      a number of cases, but let me just see when this is.  This

22      is one of the cases, Maggett, M-A-G-G-E-T-T, which is cited.

23              There's several cases in the Sanchez decision

24      about different things judges did in those cases, and in

25      that case I had indicated that I was calling for a panel

1       this morning on Friday, I recollect that.  I said I want

2       everyone here at 10 o'clock so we could know what defendant

3       was going first, and that the panel wouldn't usually get

4       here until after 11 anyway and we could start jury selection

5       then.

6               And I did not call for a panel this morning.  I

7       did not know, especially since Mr. Melenciano did appear

8       eventually, whether the other two defendants were going to

9       appear at all.  I had a representation at the time the case

10      was on from Mr. Weinstein that Mr. Santana was expected by

11      11.  But now again, it's 12:45 and he hasn't come.

12              And I had a record from Mr. Bonanno at that time

13      that he had left messages and voicemail messages and had

14      reached out to his client and had not heard from him, which

15      is why I just decided to not call for a panel at 11 o'clock

16      for Mr. Diaz.

17              But since that time, now I learn that Mr. Bonanno

18      has had actually reached out to him, and it appears that he

19      has voluntarily absented himself from these proceedings,

20      unless something dire happened to him and your office will

21      find that out.

22              And if it did, then, you know, then we don't have

23      a twelfth juror sworn and we've had our hearing, but in the

24      interim, I don't want to waste anymore time, I would like to

25      just proceed, and I believe that this procedure is fine.

Proceedings

 1    And if he shows up in the middle of it, I think that he's

 2    forfeited his right at any particular time.  People come and

 3    go, they get picked up on warrants, they come in and then,

 4    you know, they're dealt with as they're dealt with.  The

 5    jury's told not to draw any inference.

 6         But if you wish to, you know, let me know

 7    something before we begin the voir dire this afternoon about

 8    your, a legal position, you'll tell me that, Mr. Mendys.

 9    Otherwise, I'll see everyone at 2:15.

10         MR. MENDYS:  Thank you, Judge.

11         (Whereupon, there was a luncheon recess taken.)

12    A  F  T  E  R  N  O  O  N    S  E  S  S  I  O  N

13         (Whereupon, the following took place in open court

14    in the presence of the defense counsel and the assistant

15    district attorney.)

16         THE CLERK:  Part 98 is back in session.  Third

17    call, calendar number two, Richard Diaz.  The defendant is

18    not before the court.

19         THE COURT:  Good afternoon.  It's about twenty

20    after two and Mr. Diaz is not here.  Any further record that

21    anyone wants to make about the his whereabouts, or purported

22    whereabouts?

23         MR. BONANNO:  Judge, I have not heard from Mr.

24    Diaz.  I'm just checking and he has not texted me.

25         THE COURT:  And the last -- but you did have a

Proceedings

1    conversation with?

2            MR. BONANNO:  I did around 10:45 this morning.  I

3    informed him of the circumstances of his being late and

4    issues that had occurred with his co-defendant.

5            THE COURT:  What do you mean by that?

6            MR. BONANNO:  Well, that his co-defendant's bail

7    was set and that he could expect that a warrant had been

8    issued for his arrest and that he should be here to answer

9    those issues.  He thought --

10           THE COURT:  You had this conversation with him in

11   English?

12           MR. BONANNO:  I did.  It's broken English, Judge,

13   I mean, as best I could.  And he told me it was 11 o'clock

14   was the appearance.  I said no, 10 o'clock was the

15   appearance.  And I believe he had heard it from his

16   co-defendant that 11 o'clock was the appearance.  And I said

17   regardless, get here and we'll deal with it when we get into

18   the court, and that was the last I heard.

19           THE COURT:  So he admitted he spoke with a

20   co-defendant?

21           MR. BONANNO:  No, no, he told me that he thought

22   it was at 11 o'clock, and I'm assuming from the last time --

23           THE COURT:  No, you said --

24           MR. BONANNO:  That 11 o'clock that was the date,

25   the time that he was supposed to be here.

Proceedings

1      THE COURT:  But did you say he heard it from

2  co-defendant?

3      MR. BONANNO:  He spoke with Santana, I think.  He

4  said Santana said it was 11.  I said that's not what

5  matters.  I said what matters is you were supposed to be

6  here at 10.

7      THE COURT:  No, actually it may not matter to you,

8  but it is something because Mr. Melenciano said he was told

9  it was 10:30.

10      MR. BONANNO:  I understand.  I understand.

11      THE COURT:  And the record is what the record is.

12      MR. BONANNO:  I understand.

13      THE COURT:  And he wasn't even here at 11 o'clock

14  anyway, or any subsequent time to that.

15      MR. BONANNO:  And I haven't heard from him since.

16      THE COURT:  Right.  Okay, do you want to say

17  anything, Mr. Mendys?

18      MR. MENDYS:  No, Judge.

19      THE COURT:  All right.  So what's the story with

20  the panel, they're getting one together?

21      THE CLERK:  Yes.

22      THE COURT:  They'll call us?

23      THE CLERK:  Yes.

24      (Pause in proceedings.)

25      THE COURT:  Let me just also advise my practice

Proceedings

1    for jury selection.  I have 18 in the box so we're going to

2    need two chairs, one in front of the other there when we get

3    them in the box.  When I do the questioning about scheduling

4    and possible language issues, I do that at the bench with

5    the attorneys on each side, not on the record.

6          I ask that the court officers get the people that

7    want to speak about those issues into a line and send them

8    one by one up to the bench, and then I talk to them when

9    they have their cards in their hand, and then that's just

10   dealt with at that point.  That's just scheduling and

11   language.

12         And then I, you know, who's left goes in the box,

13   18 and then whatever.  The attorneys get no more than 15

14   minutes a piece for voir dire, and that's it.  Okay?  Any

15   questions?

16              MR. MENDYS:  No.

17              (Pause in proceedings.)

18              MR. MENDYS:  Judge, may I add a name to the list?

19              THE COURT:  Yes.

20              MR. MENDYS:  Eric Figueroa.

21              THE COURT:  Okay.

22              MR. MENDYS:  Thank you.

23              (Pause in proceedings.)

24              COURT OFFICER:  Panel entering.

25              (Whereupon, the prospective jurors entered the

1    courtroom.)

2              THE COURT:  All right.  Good afternoon, everyone.

3    Welcome to Supreme Court, Bronx County, Part 98.  I am Judge

4    Ralph Fabrizio.  I preside in this part, and I'm presiding

5    over the trial that we are to begin jury selection in today,

6    which is the case of the People of the State of New York

7    against Mr. Richard Diaz.

8              Now as I said, we're at the very beginning of the

9    jury selection process in this case.  Jurors always have

10   lots and lots of questions, and I am certain that I will

11   have the answers to all of those questions in a very short

12   period of time.

13             Before I proceed further, I'm going to ask our

14   clerk to take attendance to make sure everyone who is

15   supposed to be here is here, and if someone's here who

16   should have been in a different courtroom we'll ask you to

17   go there, and then we're going to swear you in as a panel.

18             THE CLERK:  Good afternoon.  When you hear your

19   name please answer out loud, and excuse me if I mispronounce

20   it.

21             THE COURT:  Just say here or present.

22             (Whereupon, roll call was taken by the Clerk of

23   the Court.)

24             THE CLERK:  Anyone else whose name I did not call?

25             (Pause in proceedings.)

Jury Selection

1           THE COURT:  All right.  So they're all present.

2     Let's ask them to take the oath before questioning.

3           THE CLERK:  Would all prospective jurors please

4     stand, raise your right hand, please.

5           (Whereupon, the prospective jurors were duly sworn

6     by the Clerk of the Court.)

7           THE CLERK:  Thank you.  You may be seated.

8           THE COURT:  All right, so good afternoon again.

9           First I want to introduce you to the attorneys who

10    are in the well who are involved in the case now.  The

11    People of the State of New York are represented by Robert

12    Johnson, the District Attorney of Bronx County, and the case

13    will be tried for the People by Assistant District Attorney

14    Newton Mendys.

15          Mr. Mendys, can you please introduce yourselves to

16    the jury.

17          MR. MENDYS:  Good afternoon everyone.  My name is

18    Newton Mendys.

19          THE COURT:  And Mr. Richard Diaz is represented by

20    his attorney, Mr. Patrick Bonanno.  Mr. Bonanno?

21          MR. BONANNO:  Good afternoon everyone.

22          THE COURT:  Now Mr. Diaz is not present, and you

23    should not draw any inference about that whatsoever.

24          Now does anyone here believe they know either of

25    the attorneys?  No one has raised their hand.

Jury Selection

1              Anyone know me?  You know me?

2              PROSPECTIVE JUROR:  I was with Icon Charter School

3      4.

4              THE COURT:  You were on a jury with me or --

5              PROSPECTIVE JUROR:  Just like the children, my

6      students were doing debates and you were one of the judges.

7              THE COURT:  All right.  And did you form any

8      opinion of, I mean, we don't have a relationship with each

9      other.

10             PROSPECTIVE JUROR:  No.

11             THE COURT:  You just saw me.  Will that affect

12     your ability to be fair in this case?

13             PROSPECTIVE JUROR:  Not at all.

14             THE COURT:  Can I have your name also for the

15     record?

16             PROSPECTIVE JUROR:  Andrew Betances.

17             THE COURT:  Okay, Mr. Betances, thank you.

18             Now, so this is the real jury service.  People

19     call it jury duty.  I'd like to refer to it as jury service

20     because it is something that all Americans have to do.  We

21     have a great country.  A lot of people make all sorts of

22     sacrifices for our democracy, and the willingness to serve

23     as a juror is one of the cornerstone of our democracy.

24     People in other countries are envious and only wish that

25     they had a system of justice like ours where people from the

1    community come in and sit on juries.

2            The jury selection process that we're involved in

3    takes place so that the attorneys can determine which jurors

4    who are present are going to be fair, impartial, and listen

5    to the evidence and be able to deliberate.  There is no

6    special education required to be a juror.  People have been

7    serving on juries since the country was founded, and even

8    before that in different countries.  Jurors were called to

9    act upon all, act upon as fact finders in a particular case

10   and to determine whether based on the facts that they find

11   the People have proven the defendant guilty beyond a

12   reasonable doubt.

13           A jury trial is not a referendum on any kind of

14   social or political issue.  Jurors are required to be fair,

15   to come to court without any preconceived notions whatsoever

16   that would affect their ability to be fair.

17           I'm going to be asking you a series of questions

18   about your background and things to assist the attorneys in

19   determining whether you will meet those qualifications, and

20   the attorneys in turn will be allowed to ask you questions

21   as well.

22           You must always be completely honest when you

23   answer questions.  You just took an oath to that effect.

24   There are no right or wrong answers.  This is not a test.

25   The only correct answer is the honest answer, and it's very

Jury Selection

1   important that you give honest answers.

2           If, at any time, I pose a question or the

3   attornies pose a question to you that you believe you would

4   rather answer without all the other jurors present and just

5   with the parties and myself, well that will be fine, we'll

6   do that as well.

7           Now, one thing jurors are required to do is follow

8   instructions that I give about every legal issues and

9   procedural issues.  You have to accept all of my

10  instructions without any question.

11          Now I'm going to give you an instruction now that

12  applies during the jury selection process and will apply

13  during the trial if you're selected and will apply every

14  time you take a recess in this case, every time you leave

15  the courtroom.  I will refer to them as our recess

16  instructions, and they are here to assure that the trial is

17  conducted fairly.

18          First of all, no one at any time during this trial

19  is permitted to discuss anything of a factual basis with

20  anyone else about this case; family, friend, whatever.  No

21  one, and even other jurors until the time comes to

22  deliberate.

23          You may tell people if you're selected I'm on a

24  jury, this is the days I'm required to be in court to be on

25  for the trial, but nothing of any substance.  No factual,

1    nothing of substance.

2          You're not to accept, agree to accept or discuss

3    accepting any kind of gratuity, money, benefit in return for

4    giving information in this case to anyone else.  And you

5    have to report to me promptly if someone tries to influence

6    you or if you believe another member of the jury is

7    attempting to be influenced.

8          You must not visit any type of scene or location

9    that is relevant to this particular case.  You will be

10   learning about certain places where things are alleged to

11   have happened.  You cannot go to those places in person and

12   you can't visit those places as we do through our smart

13   phones, our laptop, our tablets.  No cyber visits by things

14   like Google Maps, Google Earth, Mapquest, any kind of GPS

15   device.  Nothing.

16         You're not allowed to do any research on any kind

17   of factual or legal issue, whether by speaking with someone

18   else about it or by going to a library or through any

19   internet source whatsoever.

20         You cannot read any accounts that may have been or

21   may be reported about this particular case in any kind of

22   media, printed newspapers or internet publications, anything

23   like that.

24         And you can't kind of contact other people, even

25   Facebook or any kind of social media.  Don't do any research

1    of any of the lawyers or me, nothing like that, okay.

2         Those are instructions that you have to follow and

3    they will apply throughout the entire case.

4         Now I have a couple of questions for the group as

5    a whole and they deal with legal requirements to be on a

6    jury in this county and this type of case.

7         So the first question I have, is there anyone here

8    in this courtroom who's not a United States citizen?  No

9    one's raised their hands.  Fine.

10        Is there anyone here who doesn't currently live in

11   Bronx County?  You don't live in Bronx County?  Where did

12   you get your jury notification?  Could you step up, sir, to

13   the well right here?  Tell me your name.

14        PROSPECTIVE JUROR:  Christopher Nava(ph).

15        THE COURT:  Where -- do we have his card?  You

16   have the whole summons that has, the summons that you have

17   with your, that has an address on it?  You got notified to

18   come here.  There's a big piece of paper that you have or

19   square bigger piece.  May I have those?

20        (Pause in proceedings.)

21        THE COURT:  I'm not going to place the address on

22   the record, but I have your notification.  You receive mail

23   at a Bronx address?

24        PROSPECTIVE JUROR:  Yeah but --

25        THE COURT:  Where do you live?

Jury Selection

1         PROSPECTIVE JUROR:  I live in Washington, D.C.

2         THE COURT:  Washington D.C. full-time?

3         PROSPECTIVE JUROR:  Yeah.

4         THE COURT:  And so are you a student in Washington

5    or a full-time -- you have a Washington D.C. address?

6         PROSPECTIVE JUROR:  Yeah, I was living in the

7    Bronx but only one day.

8         THE COURT:  You lived here and then moved?

9         PROSPECTIVE JUROR:  Yeah.

10        THE COURT:  And you get mail forwarded and you

11   came to -- well, you are under oath.  Do either attorney

12   have a question?

13        MR. MENDYS:  No.

14        THE COURT:  You consent, because he's, Mr.

15   Nava(ph), this is the, actually the first time ever in

16   picking jurors that I have ever had anyone answer that

17   question that they don't live in Bronx County.  Thank you

18   for answering honestly.

19        And I want to commend you, I can't tell you how

20   many people live here who do get those and they kind of like

21   don't even bother showing up.  The jurors may have heard all

22   of that this morning when they were taking attendance in the

23   central jury room.  Thank you.  You need to go down to the

24   central jury room and tell them this is no longer your

25   address.

Jury Selection

1        PROSPECTIVE JUROR:  Okay.

2        THE COURT:  Of course, register with the

3    Washington D.C. people to do jury service there.  Thank you,

4    sir.

5        (Whereupon, the excused prospective juror left the

6    courtroom.)

7        THE COURT:  So let me tell you something about

8    this case in terms of schedule and the scheduling in the

9    courthouse.  Trials in the Bronx County Hall of Justice are

10   conducted Monday through Friday, generally between 9:30 in

11   the morning and 4:30 to 5 o'clock in the afternoon.  We

12   break for lunch every day at 1 o'clock.  Jurors are expected

13   to come back at 2:15 for the afternoon session, and be here

14   until we finish the work for that day.

15       You go home every single night during the trial

16   and you even go home during deliberations.  We don't have

17   sequestration so you go home at night, you go home on

18   weekends.  That's also one of the reasons I tell you those

19   recess instructions because, you know, you're out of here.

20       We are going to have one day off during the

21   pendency of this case and that will be Friday, July 24.

22   Some days may have a later start, some days we break

23   earlier, but I'll let you know that as the case progresses.

24       Now, I've spoken with the attorneys about

25   scheduling and the anticipated length of the trial.  We need

1    to select a jury and that takes time, and you'll understand

2    more of that if you haven't been through the jury selection

3    process before that it doesn't happen that quickly.

4        Now, I expect that the testimony in this case will

5    either begin at the very end of this week right after jury

6    selection finishes or no later than the beginning of next

7    week, and I do expect that the evidence in this case will be

8    presented over a period of no longer than five trial days.

9    Okay?  Five days.  So I expect that the jury will have this

10   case for deliberations no later than July 28.  And in terms

11   of an evidentiary presentation, this is a relatively short

12   trial.

13       Now I've told you that because I have two

14   questions that I'm going to be posing to the group, and the

15   way these questions are going to be answered will be as

16   follows.

17       If the answer to either of these questions is yes

18   and, but only these questions because this is the only thing

19   I can discuss with you at this point, if the answer to

20   either of these questions is yes, then I'm going to ask you

21   to raise your hand, give the sergeant or one of the court

22   officers your name, and then you'll come up and speak to me

23   at the bench with the attorneys present.

24       The questions are as follows.  First, I told you

25   about the schedule, the anticipated length of the trial.  If

1    anyone in this courtroom, for a business or a personal

2    reason, cannot be here during the periods I've outlined and

3    then get the case to deliberate, I want you to raise your

4    hand and let me know about that and I'll see you at the

5    bench.

6            The second question I have for everyone in the

7    audience is, I'd like to know if anyone here cannot speak or

8    understand the English language?

9            So if the answer to either of those questions is

10   yes, raise your hand and then follow the sergeant's

11   instructions and you'll come up to the bench.

12           (Whereupon, prospective jurors were seen at the

13   bench, off the record, in the presence of counsel.)

14           (Whereupon, the following took place in open court

15   in the presence defense counsel and the assistant district

16   attorney.)

17           THE COURT:  All right, good afternoon, again.  I'm

18   going to be telling you something more about the case and

19   about the process, and give you some instructions as well.

20           Now, the case comes to us by way of a document

21   called an indictment and it's something that contains

22   accusations of criminal conduct.  Now, neither the

23   indictment itself, the fact that it exists or has been filed

24   constitutes any evidence whatsoever.  The defendant has

25   answered that he's not guilty of the accusations and the

1    trial is conducted for you to determine whether the
2    defendant is guilty or not guilty.

3         Now, the defendant is charged with crimes
4    including robbery in the second degree, grand larceny and
5    criminal impersonation.  He's charged in this indictment
6    with acting in concert with two accomplices, and I'll give
7    you some instructions about what that means shortly, but
8    those two accomplices are named Jose Melenciano and Amauri
9    Santana.  Now, they're not present either and you're not to
10   speculate as well as to why Mr. Melenciano and Mr. Santana
11   are also not present.

12        Now, it's alleged that the crimes I've told you
13   about occurred here in Bronx County on October 17, 2012, at
14   about 12:15 or so in the morning, shortly after midnight, in
15   the vicinity of an address 2315 Walton Avenue.  And the
16   victim in the case is a person by the name of Yohn
17   Contreras.

18        Now, based on what I've told you so far, which is
19   not very much; it's what the charges are, where they're
20   alleged to have occurred, when they're alleged to have
21   occurred, is there anyone present who believes they know
22   anything at all or have heard anything about this particular
23   case?  No one's raised their hands.

24        Now I'm going to be reading you a list of people
25   who will either be called as witnesses or whose names you

1    may hear during the course of the trial.  And I'm asking you

2    to pay attention to the names because after I read this

3    list, I'm going to ask you if you believe you know any of

4    these individuals, and their names are as follows:

5              Yohn Contreras, Y-O-H-N, by the way.  Jose

6    Rodriguez.  Esmeraldi Rodriguez.  Argelia Rosario.  Eric

7    Figueroa.

8              And the following are from the police department:

9    Police Officer Edgar Mangual.  Detective Wilson Colon.

10   Police Officer Jose Pachot, P-A-C-H-O-T.  Detective Ana

11   Bell.  Detective Chris Rodriguez.  And Police Officer John

12   Walters.

13             Does anyone believe that they know any of the

14   individuals whose names I've just mentioned?  And no one is

15   raising their hands.  Okay, fine.

16             So a jury is composed of 12 people, and in

17   addition to the 12 people I'll be selecting or we'll be

18   selecting to be jurors in this case, we're also going to be

19   selecting a number of people to serve as alternate jurors.

20   And the first person who's selected will serve as the jury's

21   foreperson.

22             Now, the jury's responsibility is to evaluate

23   fairly the testimony and other evidence presented at the

24   trial, to apply the facts as you jurors find them to be to

25   the law that I tell you exists and is relevant in this case,

1    and then to decide whether the People have proven the

2    defendant guilty beyond a reasonable doubt.

3    Now, in your deliberations you may not consider or

4    speculate about any matters related to any sentence or

5    punishment, for example. If there's a verdict of guilty, it

6    will be my responsibility to impose an appropriate sentence.

7    And a verdict may not be based on any kind of bias for or

8    against any parties, or by any sympathy for anyone.

9    Now, my role at the trial and the role of any

10    judge at any trial is to help assure that the trial is

11    conducted in a fair and orderly manner in accordance with

12    the law, and I do that by presiding over the trial. I

13    decide questions of law that arise between the parties and I

14    explain to you, the jury, as I'm doing now, what the law is

15    that the jury must accept and must follow.

16    Thus, we're both judges in the case, but it's

17    important to recognize that we do judge different things.

18    You, the jury, are judges of the facts of the case in order

19    to reach a verdict of guilty or not guilty, and I judge the

20    law.  That means I decide questions of law and I instruct

21    you on the law.

22    Now, it's not my responsibility to judge the facts

23    here, that's yours. You and you alone are the judges of the

24    facts, and you and you alone are responsible for deciding

25    whether the defendant is guilty or not guilty. So nothing

1     that I say and no matter what manner I may say it, and no

2     ruling that I make on the law is intended to be, nor it

3     should be considered by you, as an expression that you

4     believe I have an opinion on the facts of the case about

5     whether the defendant is guilty or not guilty.

6               Now, when you judge the facts you're only to

7     consider the evidence, and the evidence in a case consists

8     of the following, testimony of witnesses.  First of all,

9     this is our witness box.  That's the jury box.  So you'll

10    hear witnesses testify.

11              Evidence also will include exhibits which are

12    physical items; documents, photographs, things like that

13    which are received into evidence.  And they can include

14    something called a stipulation which is an agreement between

15    the parties for you to consider something as evidence

16    without having anyone testify or present it to you in that

17    way.

18              Now I'm going to turn to the three fundamental

19    principles of law that apply in this trial and they apply in

20    all criminal trials, and they are as follows.  They are the

21    presumption of innocence, the burden of proof, and the

22    requirement of proof beyond a reasonable doubt.

23              Now, throughout these proceedings the defendant is

24    presumed to be innocent, and as a result you must find the

25    defendant not guilty, unless on the evidence presented at

Jury Selection

1    this trial you conclude that the People have proven the

2    defendant guilty beyond a reasonable doubt.

3         Now, that the defendant doesn't testify as a

4    witness is not a factor from which any inference unfavorable

5    to the defendant may be drawn.  The defendant is not

6    required to prove he's not guilty.  In fact, the defendant

7    is not required to prove or disprove anything.  To the

8    contrary, the People have the burden of proving the

9    defendant guilty beyond a reasonable doubt.

10        And that means before you can find the defendant

11   guilty of a crime, the People must prove beyond a reasonable

12   doubt every element of that crime, including the fact that

13   the defendant is the person who committed the crime.  That

14   burden of proof never shifts from the People to the

15   defendant.

16        Now, if the People fail to satisfy their burden of

17   proof, you must find the defendant not guilty.  If the

18   People satisfy their burden of proof, you must the find

19   defendant guilty.

20        Now, what does the law mean when it requires proof

21   of guilt beyond a reasonable doubt?  The law uses the term

22   proof beyond a reasonable doubt to tell you how convincing

23   the evidence of guilt must be to permit a verdict of guilty.

24        Now, the law recognizes that in dealing with human

25   affairs there are very few things in this world that we know

1    with absolute certainty, therefore the law does not require

2    the People to prove a defendant guilty beyond all possible

3    doubt.  On the other hand, it is not sufficient to prove

4    that the defendant is probably guilty.  In a criminal case,

5    the proof of guilt must be stronger than that, it must be

6    beyond a reasonable doubt.

7         And a reasonable doubt is an honest doubt of the

8    defendant's guilt for which a reason exists based upon the

9    nature and the quality of the evidence.  A reasonable doubt

10   is an actual doubt, it's not an imaginary doubt.  It's a

11   doubt that a reasonable person acting in a matter of this

12   importance would be likely to entertain because of the

13   evidence that was presented or because of the lack of

14   convincing evidence.

15        Proof of guilt beyond a reasonable doubt is proof

16   that leaves you so firmly convinced of the defendant's guilt

17   that you have no reasonable doubt of the existence of any

18   element of the crime or of the defendant's identity as the

19   person who committed the crime.  And I will be giving you

20   further instructions on this subject throughout the trial

21   and at the end of trial.

22        Now, one of your jobs as judges of the facts is to

23   determine the truthfulness and the accuracy of the testimony

24   of each witness.  You alone must decide whether a witness

25   told the truth and was accurate, or instead, testified

1    falsely or was simply mistaken.  You must also decide what

2    importance to give to the testimony that you accept as

3    truthful and accurate.

4         It is the quality of the testimony that's

5    controlling and not the number of witnesses who are called

6    to testify and I'm going to instruct you further on this

7    subject at the end of the trial, and I'll advise of you some

8    factors that you may consider that are relevant to making a

9    determination of credibility.

10        Now, in this case you will be hearing testimony of

11   police officers, police witnesses.  The testimony of a

12   witness should not be believed solely and simply because the

13   witness is a police officer.  At the same time, a witness's

14   testimony should not be disbelieved solely and simply

15   because the witness is a police officer.  You must and are

16   required to evaluate a police officer's testimony in the

17   same way that you would evaluate the testimony of any other

18   witness.

19        Now I told you that the defendant is charged with

20   acting in concert in this case.  Our law recognizes that two

21   or more individuals can act jointly to commit a crime, and

22   that in certain circumstances each can be held criminally

23   liable for the acts of the others.  In that situation, those

24   persons can be said to be acting in concert with each other.

25        Now, our law has a definition of the circumstances

1   under which one person may be criminally liable for the

2   conduct of another person, and that definition is as

3   follows.

4           When one person engages in conduct which

5   constitutes an offense, another person is criminally liable

6   for such conduct when, acting with the state of mind

7   required for the commission of that offense, that individual

8   solicits, requests, commands, importunes, or intentionally

9   aids such person to engage in such conduct.

10          And I will be giving you further instructions on

11  this at the conclusion of the trial.

12          Now your verdict in the case, whether guilty or

13  not guilty, must be unanimous.  After the trial has

14  concluded, after the attorneys have summed up, after I've

15  instructed you, you will be deliberating to reach a verdict.

16  And a unanimous verdict means that each and every juror must

17  agree to it, and you will render a verdict separately and

18  specifically upon each count that I submit to you for your

19  consideration.

20          Now, since 12 people seldom agree immediately on

21  anything, in order to reach a unanimous verdict you must

22  deliberate with the other jurors.  That means you should

23  discuss the evidence, consult with each other, listen to

24  each other, give each others views careful consideration,

25  and reason together when considering the evidence.  And when

Jury Selection

1    you deliberate, you should do so with a view towards

2    reaching an agreement, if that can be done without

3    surrendering any individual judgment.

4         Each of you must decide the case for yourself but

5    only after a fair and an impartial consideration of the

6    evidence with the other jurors.  You shouldn't surrender an

7    honest view of the evidence simply because you want the

8    trial to end or you happened to be outvoted.  At the same

9    time, you should not hesitate to reexamine your views and

10   change your mind if you become convinced that your position

11   was not correct.  And that's what deliberations are all

12   about.

13        Now, that concludes my opening instructions to you

14   and discussion about the law and some things that apply to

15   this case.  The next part of the jury selection process for

16   this case is your 18 names will be called from a wheel, 18

17   of your names.  You'll be directed to sit in the jury box in

18   the positions in which your names were called and I will be

19   asking you a series of questions.

20        You're going to be given a questionnaire.  Don't

21   write it on, but these are questions I'm going to ask you.

22   These are the same types of questions that judges ask in

23   every courtroom in every courthouse in every part of the

24   country, and basically they, as I told you they're designed

25   to see whether there is anything about you that you feel or

Jury Selection

1    that we should know about that would suggest that you might

2    not be fair and impartial, and therefore not be able to be a

3    fair and impartial juror for this particular case.

4            The questions are not meant to pry into anything

5    of a personal nature.  And as I told you, if there is

6    something that I ask you or the other attorneys ask you

7    during this part of the process, and you do not want to

8    answer that question in the presence of the other jurors,

9    just let me know and you can speak to me outside the

10   presence of the other jurors with the parties present, okay.

11           So just listen for your name and then take your

12   seats, all right?

13           THE CLERK:  Seat number one, Antoinette Gadson.

14           Seat number two, Yvette Smith.

15           Seat number three, Angelica, last name Galarraga,

16   G-A-L-A-R-R-A-G-A.

17           Seat number four, Enid Flores Padilla, E-N-I-D.

18           Seat number five, Dora Florentino.

19           Seat number six, Davida Duckett.  D-A-V-I-D-A,

20   last name D-U-C-K-E-T-T.

21           Seat number seven, Yojane Pena.  First name

22   Y-O-J-A-N-E.

23           Seat number eight, Lorraine Gil, G-I-L.

24           Seat number nine, El Shaddai Davis.  First is E-L,

25   S-H-A-D-D-A-I.

Jury Selection

1            Seat number 10, Wendy Cabrera.

2            Seat number 11, Christine Altsthule,

3     A-L-T-S-T-H-U-L-E.

4            Seat number 12, Julio Pena.

5            Seat number 13, Syed Ali, first name S-Y-E-D.

6            Seat number 14, Julia Galjit, last name

7     G-A-L-J-I-T.

8            Seat number 15, Andrew Betances.

9            Seat number 16, Darlyn Adames.  First name

10    D-A-R-L-Y-N.

11           Seat number 17, Milagros Gonzales.

12           Seat number 18, Eddie Abad, A-B-A-D.

13           THE COURT:  All right.  So for the people in the

14    audience, your names will be called the next time so pay

15    attention to the questions.  Think about your answers you

16    would give me and the attorneys if the questioning were

17    posed to you.  The second round usually goes a lot faster

18    than the first round for that reason.  And can I have the

19    chart?

20           THE CLERK:  Of course, your Honor.

21           THE COURT:  Thank you.

22           So Miss Gadson, you were the first one called.

23    Lucky you.  You're going to show everyone how easy this is,

24    and hopefully painless.  And so again, if there's something

25    that you want to discuss in private, just let me know.

Jury Selection

1              But first of all, just in general tell me what

2       your neighborhood you live in the Bronx.  I don't want your

3       address, even the street.  Just, you know, north, south,

4       east, west.  Morris Heights, you know.

5              PROSPECTIVE JUROR:  I live in the Wakefield

6       neighborhood of the Bronx.

7              THE COURT:  How long have you been at your current

8       address?

9              PROSPECTIVE JUROR:  About 24 years.

10             THE COURT:  Are you living with anyone in your

11      household currently?

12             PROSPECTIVE JUROR:  Yes, my nephew.

13             THE COURT:  Now, you working outside the home?

14             PROSPECTIVE JUROR:  Yes, I do.

15             THE COURT:  What do you do?

16             PROSPECTIVE JUROR:  I work for a physical

17      therapist.

18             THE COURT:  Is your nephew employed?

19             PROSPECTIVE JUROR:  No, he just graduated high

20      school.

21             THE COURT:  Now, have you or anyone close to you,

22      close friend, relative, ever been the victim of any kind of

23      crime where something has happened to you or to them of a

24      criminal nature as a crime victim?

25             PROSPECTIVE JUROR:  I would have to say yes.

1          THE COURT:  And so tell me what happened.  Was it
2    you or someone else?
3          PROSPECTIVE JUROR:  Someone else.
4          THE COURT:  Okay.  How long ago was it?
5          PROSPECTIVE JUROR:  This was February of this
6    year.
7          THE COURT:  Where did it happen?
8          PROSPECTIVE JUROR:  In Mississippi.
9          THE COURT:  You feel comfortable telling me the
10   circumstances of what happened there?
11         PROSPECTIVE JUROR:  One of my nephews was murdered
12   in Mississippi.
13         THE COURT:  Ma'am, I am so sorry.
14         PROSPECTIVE JUROR:  In February.
15         THE COURT:  So so sorry.  Let me explain to you
16   and to the other jurors why some of these questions are
17   asked.
18         People who are crime victims or who have
19   themselves or perhaps had people in their family who were
20   crime victims, this is a criminal case and you have to be
21   able to concentrate and think about these charges without
22   any kind of bias or prejudice about anything whatsoever.
23   And so the question is, as an individual who's had someone
24   in their family as the victim of a very, very, very serious
25   crime, can you promise me that you'll put that aside and

1    judge this case only on the facts of this case?  That you'll

2    be able to listen to these facts and not have any bias in

3    any way because you are the relative of a person who was the

4    victim of a crime?  Can you promise me that?

5              PROSPECTIVE JUROR:  Yes, I can.

6              THE COURT:  Okay.  Have you or anyone close to you

7    ever been charged with, accused of, convicted of, questioned

8    in connection with any kind of criminal activity whatsoever?

9              PROSPECTIVE JUROR:  No.

10             THE COURT:  Do you have any close friends or

11   relatives who work in law enforcement of any kind?

12             PROSPECTIVE JUROR:  No, I don't.

13             THE COURT:  Have you ever been on a jury?

14             PROSPECTIVE JUROR:  Yes, I have.

15             THE COURT:  Now, I thought that might be yes to

16   that question.  How many times?

17             PROSPECTIVE JUROR:  Just once.

18             THE COURT:  Was it criminal or civil?

19             PROSPECTIVE JUROR:  It was a civil case.

20             THE COURT:  Now, did you get to deliberate with

21   the other jurors on this case?

22             PROSPECTIVE JUROR:  Yes, I did.

23             THE COURT:  Without telling me what the result

24   was, did that jury reach a verdict in that case?

25             PROSPECTIVE JUROR:  Yes, we did.

1      THE COURT:  Okay.  Now first of all, I have to

2  advise you, and I told you all that you have to follow my

3  instructions, but particularly when you've been involved as

4  a prior juror in a civil case, if you remember anything the

5  judge told you, which is not likely but maybe it happened,

6  you have to put that aside and you have to promise me to

7  follow my instructions.  Civil cases are very different,

8  instructions in civil cases, so you promise me you're going

9  to be able do that?

10      PROSPECTIVE JUROR:  Yes, sir.

11      THE COURT:  Miss Gadson, you're the first one

12  being questioned and you know what you know about the case.

13  You know what the charges are, robbery, criminal

14  impersonation, theft.  You know yourself better than anybody

15  else.  This goes for all of you.  Is there any reason that

16  if you are selected for a jury to be a juror in this case,

17  any reason that you can tell us that you could not be fair

18  to both sides?

19      PROSPECTIVE JUROR:  No, sir.

20      THE COURT:  Do you promise me that if you are

21  selected you'll be fair to the DA?

22      PROSPECTIVE JUROR:  Yes, I will.

23      THE COURT:  Fair to the defendant?

24      PROSPECTIVE JUROR:  Yes, I will.

25      THE COURT:  And you promise to follow all of my

Jury Selection

1     instructions?

2              PROSPECTIVE JUROR:  Yes, I will.

3              THE COURT:  That's it.  Thank you very much.

4     Those, that's my questions.

5              So Miss Smith, how are you?

6              PROSPECTIVE JUROR:  Fine.

7              THE COURT:  Neighborhood?

8              PROSPECTIVE JUROR:  Mott Haven.

9              THE COURT:  How long have you been at your current

10    address?

11             PROSPECTIVE JUROR:  Thirty years.

12             THE COURT:  You living with anyone in your

13    household?

14             PROSPECTIVE JUROR:  My disabled husband, disabled

15    sister.

16             THE COURT:  Tell me again what do you do you?

17             PROSPECTIVE JUROR:  Hospital care investigator.  I

18    basically investigate insurances.

19             THE COURT:  And anyone else in your household

20    employed?

21             PROSPECTIVE JUROR:  No, they're disabled.

22             THE COURT:  Have you or anyone close to you ever

23    been the victim of any kind of crime?

24             PROSPECTIVE JUROR:  No.

25             THE COURT:  Charged with, questioned in connection

Jury Selection

1        with, convicted, nothing like that?

2                PROSPECTIVE JUROR:  No.

3                THE COURT:  Any close friend or relative who work

4        in any kind of law enforcement job; police, court officer,

5        corrections officers, anything like that?

6                PROSPECTIVE JUROR:  No.

7                THE COURT:  Have you ever been on a jury?

8                PROSPECTIVE JUROR:  Yes.

9                THE COURT:  I thought that might be yes too.  How

10       many times?

11               PROSPECTIVE JUROR:  Once.

12               THE COURT:  Civil or criminal?

13               PROSPECTIVE JUROR:  Civil.

14               THE COURT:  Without -- did you get to deliberate

15       with the other jurors?

16               PROSPECTIVE JUROR:  Yes.

17               THE COURT:  Did that jury reach a verdict?

18               PROSPECTIVE JUROR:  Yes.

19               THE COURT:  You understand what I told Miss

20       Gadson, you promise me you'll follow my instructions and my

21       instructions alone?

22               PROSPECTIVE JUROR:  Yes.

23               THE COURT:  This is a criminal case not a civil

24       case.  You understand that?

25               THE DEFENDANT:  I do.

Jury Selection

1              THE COURT:  Miss Smith, based on what you know

2       about yourself and the information I gave you about the

3       case, and that this is a criminal case, is there any reason

4       that you believe you would not be a fair juror if selected

5       in this case?

6              PROSPECTIVE JUROR:  Well, I don't know.

7              THE COURT:  Is there something you want to talk

8       about?  Something in private?  We can do that.

9              PROSPECTIVE JUROR:  I just don't want to do this.

10             THE COURT:  Are you hesitant or do you think --

11             PROSPECTIVE JUROR:  I mean, I'm honest and I'll

12      give my fair opinion, but I just don't, I mean I don't

13      desire to be here and judge.

14             THE COURT:  Why don't we just talk about this

15      without the other jurors.  I'll talk to you, I'll come back

16      to you at the end.

17             PROSPECTIVE JUROR:  Thank you.

18             THE COURT:  Miss Galarraga?

19             PROSPECTIVE JUROR:  How are you?

20             THE COURT:  Good, thanks.  Neighborhood?

21             PROSPECTIVE JUROR:  West Gun Hill.

22             THE COURT:  How long?

23             PROSPECTIVE JUROR:  Twenty-nine years.

24             THE COURT:  Anyone living in your household with

25      you?

1              PROSPECTIVE JUROR:  Yes.  Mother, father, sister

2       and nephew.

3              THE COURT:  You working?

4              PROSPECTIVE JUROR:  Yes.

5              THE COURT:  What do you do?

6              PROSPECTIVE JUROR:  Clerical associate in a

7       hospital.

8              THE COURT:  Anyone else in your household

9       employed?

10             PROSPECTIVE JUROR:  Yes, my mom.

11             THE COURT:  What does she do?

12             PROSPECTIVE JUROR:  She's a health aide.

13             THE COURT:  Is your dad retired?

14             PROSPECTIVE JUROR:  No.

15             THE COURT:  You or anyone close to you ever been

16      the victim of any kind of crime where something happened to

17      you or someone close to you?

18             PROSPECTIVE JUROR:  Yes.

19             THE COURT:  Who would that be?

20             PROSPECTIVE JUROR:  Myself and my sister.

21             THE COURT:  And how long ago was it?

22             PROSPECTIVE JUROR:  About 13 years ago.

23             THE COURT:  Do you feel comfortable speaking about

24      this with the other jurors present?

25             PROSPECTIVE JUROR:  No.

Jury Selection

1          THE COURT:  We'll talk about that in private.

2          Miss Flores Padilla, we are going to talk about

3     something else also so just hang on.  I'm not going to

4     question you right now because of something you mentioned at

5     the bench.

6          Miss Florentino, how are you?

7          PROSPECTIVE JUROR:  I'm okay.

8          THE COURT:  So, neighborhood?

9          PROSPECTIVE JUROR:  Fordham Road.

10         THE COURT:  And how long?

11         PROSPECTIVE JUROR:  Four years.

12         THE COURT:  Living with anyone in your household?

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  Who would that be?

15         PROSPECTIVE JUROR:  My mom, my husband and my

16    daughters, two daughters and a nephew.

17         THE COURT:  Now you've told me you worked as a

18    waitress is it?

19         PROSPECTIVE JUROR:  Yes.

20         THE COURT:  Anyone else in your household

21    employed?

22         PROSPECTIVE JUROR:  My husband.

23         THE COURT:  What does he do?

24         PROSPECTIVE JUROR:  He's a taxi driver.

25         THE COURT:  Yes, you told me that too.  I'm sorry,

Jury Selection

1    I forgot about that.

2              Anyone else employed in your home?

3              PROSPECTIVE JUROR:  No.

4              THE COURT:  Now have you or anyone close to you

5    ever been the victim of any kind of crime whatsoever?

6              PROSPECTIVE JUROR:  No.

7              THE COURT:  Anyone close to you ever been charged

8    with, accused of, questioned in connection with any kind of

9    criminal activity?

10             PROSPECTIVE JUROR:  No.

11             THE COURT:  Have you -- do you have any close

12   friends or relatives who work in law enforcement?

13             PROSPECTIVE JUROR:  No.

14             THE COURT:  Have you ever been on a jury?  You

15   told me that already at the bench but the answer is no,

16   right?

17             PROSPECTIVE JUROR:  No.

18             THE COURT:  So now as you're sitting here knowing

19   what you know about yourself, understanding what a juror

20   must be able to do to deliberate to be fair, what the

21   charges are in the case, is there any reason whatsoever that

22   you believe you could not be a fair juror if selected in

23   this case?

24             PROSPECTIVE JUROR:  No, no reason.

25             THE COURT:  You promise you'll be fair to the DA?

Jury Selection

1          PROSPECTIVE JUROR:  Yes, I promise.

2          THE COURT:  Promise you'll be fair to the defense?

3          PROSPECTIVE JUROR:  I promise.

4          THE COURT:  Okay.  And you follow all my

5   instructions?

6          PROSPECTIVE JUROR:  Sure.

7          THE COURT:  Thank you, ma'am.

8          Miss Duckett?

9          PROSPECTIVE JUROR:  Right.

10          THE COURT:  How are you?

11          PROSPECTIVE JUROR:  Okay.

12          THE COURT:  Neighborhood?

13          PROSPECTIVE JUROR:  Parkchester.

14          THE COURT:  How long?

15          PROSPECTIVE JUROR:  A year.

16          THE COURT:  Anyone living in your household?

17          PROSPECTIVE JUROR:  I have a roommate.

18          THE COURT:  Now, you working?

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  What do you do?

21          PROSPECTIVE JUROR:  I'm a paraprofessional.

22          THE COURT:  For what kind of --

23          PROSPECTIVE JUROR:  The Department of Education.

24          THE COURT:  Any of your roommates employed?

25          PROSPECTIVE JUROR:  No, she's disabled.

Jury Selection

1          THE COURT:  Okay.  Have you or anyone close to you

2     ever been the victim of any kind of crime?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  Who would that be?

5          PROSPECTIVE JUROR:  My sister, my niece and my

6     younger son.

7          THE COURT:  Do you feel comfortable talking about

8     any of these or all of these with the other jurors present

9     or you want to talk in private?

10          PROSPECTIVE JUROR:  Private.

11          THE COURT:  Okay, we will do that.

12          Miss Pena, how are you, ma'am?

13          PROSPECTIVE JUROR:  Fine, thank you.

14          THE COURT:  Neighborhood?

15          PROSPECTIVE JUROR:  Southern Boulevard.

16          THE COURT:  How long have you been at your current

17     address?

18          PROSPECTIVE JUROR:  Like 12 years.

19          THE COURT:  You live with anyone in your

20     household?

21          PROSPECTIVE JUROR:  Yeah, with my baby.

22          THE COURT:  You working outside the home?

23          PROSPECTIVE JUROR:  Yes.

24          THE COURT:  What do you do?

25          PROSPECTIVE JUROR:  Beautician, beauty salon.

Jury Selection

1          THE COURT:  Have you or anyone close to you ever

2     been the victim of any kind of crime?

3          PROSPECTIVE JUROR:  Yes, my son.

4          THE COURT:  And you feel comfortable talking about

5     this with the other jurors present?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  You want to talk in private about

8     this?

9          PROSPECTIVE JUROR:  Yes.

10          THE COURT:  Okay.

11          Miss Gil, how are you?

12          PROSPECTIVE JUROR:  I'm good, thank you.

13          THE COURT:  Tell me neighborhood?

14          PROSPECTIVE JUROR:  The end of White Plains and

15     Soundview.

16          THE COURT:  How long you've been there?

17          PROSPECTIVE JUROR:  Over 20 years.

18          THE COURT:  Does anyone else live in your

19     household with you?

20          PROSPECTIVE JUROR:  Yes, my parents, my sister and

21     my daughter and my niece.

22          THE COURT:  You working outside the home?

23          PROSPECTIVE JUROR:  Yes.  I work in the DOE system

24     as well, Department of Education.

25          THE COURT:  What do you do, teach?

Jury Selection

1          PROSPECTIVE JUROR:  I'm an internship coordinator.
2          THE COURT:  And anyone else employed in your
3     household?
4          PROSPECTIVE JUROR:  Yes, my father and my sister.
5          THE COURT:  What do they do?
6          PROSPECTIVE JUROR:  My father's a mechanic and my
7     sister's a medical biller.
8          THE COURT:  Has you or anyone close to you ever
9     been the victim of any kind of crime?
10          PROSPECTIVE JUROR:  My grandmother, yes.
11          THE COURT:  You feel comfortable speaking about
12     this?
13          PROSPECTIVE JUROR:  Yes.
14          THE COURT:  So how long ago was it?
15          PROSPECTIVE JUROR:  It was a really long time ago.
16          THE COURT:  Were you present when it happened?
17          PROSPECTIVE JUROR:  No.
18          THE COURT:  You heard about it?
19          PROSPECTIVE JUROR:  Yes.
20          THE COURT:  Did you hear from her or other family?
21          PROSPECTIVE JUROR:  Her and the family.
22          THE COURT:  What happened?
23          PROSPECTIVE JUROR:  She was robbed in the elevator
24     of her building by someone that lived in the building.
25          THE COURT:  So was there any kind of weapon

Jury Selection

1    involved?

2         PROSPECTIVE JUROR:  I don't remember if it was a

3    knife or a gun.  I'm not sure.

4         THE COURT:  Now first of all, do you know if it

5    was reported to the police?

6         PROSPECTIVE JUROR:  It was not.

7         THE COURT:  Do you know why?

8         PROSPECTIVE JUROR:  Once the mother found out she

9    just had her son go and apologize to my grandmother.

10        THE COURT:  So it was someone she kind of knew?

11        PROSPECTIVE JUROR:  They lived in the same

12   building.  They didn't know each other, but when she found

13   out that it was someone at the building, she had him

14   apologize and then he passed away.

15        THE COURT:  So it was enough for you or your

16   grandmother at the time that there was an acknowledgment of

17   they did something wrong and they're sorry?

18        PROSPECTIVE JUROR:  Yeah.

19        THE COURT:  Okay.  Let me ask you something.  Now,

20   you understand the charges in this case, robbery?

21        PROSPECTIVE JUROR:  Right.

22        THE COURT:  Same kind of thing, theft.  It's

23   defined as forcible stealing, actually, a robbery.

24        PROSPECTIVE JUROR:  Okay.

25        THE COURT:  Is the fact that your grandmother was

Jury Selection

1       the victim of a same type of crime many many years ago, that

2       something you could put aside and just listen to the

3       evidence in this case and be fair to the defendant?

4                    PROSPECTIVE JUROR:   Yes.

5                    THE COURT:   You promise me you can do that?

6                    PROSPECTIVE JUROR:   Yes.

7                    THE COURT:   And the answer was yes, right?

8                    PROSPECTIVE JUROR:   Yes.

9                    THE COURT:   I'm sorry, the reporter has to get it

10      down.

11                   PROSPECTIVE JUROR:   Yes.

12                   THE COURT:   That's okay.  And you promise that

13      there's nothing about anything that's connected with that

14      case makes you unfair to anyone; right?

15                   PROSPECTIVE JUROR:   No.

16                   THE COURT:   Has anyone close to you ever been

17      charged with, accused of, questioned in connection with any

18      kind of criminal activity?

19                   PROSPECTIVE JUROR:   No.

20                   THE COURT:   Do you have any close friends,

21      relatives who work in any kind of law enforcement job?

22                   PROSPECTIVE JUROR:   Yes.

23                   THE COURT:   Who?

24                   PROSPECTIVE JUROR:   They're now, I have friends

25      that are police officers, corrections officer.

Jury Selection

1           THE COURT:  NYPD?

2           PROSPECTIVE JUROR:  Yes.

3           THE COURT:  Because the reason this question is

4    asked, I given all this instructions you have to follow

5    about judging the testimony of police witnesses, you have

6    friends that work on the force, you may have an opinion one

7    way other another.  But my question is, based even though

8    you're friends with police officers, do you promise me that

9    you will follow that instruction to judge the testimony of a

10   police officer in the same manner as you judge anyone else

11   testimony?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  Have you ever been on a jury?

14          PROSPECTIVE JUROR:  No.

15          THE COURT:  If you're selected for this jury, is

16   there anything that would prevent you, knowing what you know

17   about yourself and the case and what we need from jurors,

18   anything that would prevent you from being a fair and

19   impartial juror?

20          PROSPECTIVE JUROR:  No.

21          THE COURT:  You promise you'll be fair to the DA?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  And the defense?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  Follow all my instructions?

Jury Selection

1           PROSPECTIVE JUROR:  Yes.

2           THE COURT:  Thank you.

3           And Mr. Davis, how are you, sir?

4           PROSPECTIVE JUROR:  I'm pretty good.  And you?

5           THE COURT:  Okay, thanks.  Neighborhood?

6           PROSPECTIVE JUROR:  Castle Hill.

7           THE COURT:  How long?

8           PROSPECTIVE JUROR:  About eight years.

9           THE COURT:  Are you living with anyone in your

10     household?

11          PROSPECTIVE JUROR:  Yes, my mother, my sister and

12     my nieces.

13          THE COURT:  You working?

14          PROSPECTIVE JUROR:  Not at the moment.

15          THE COURT:  Had you worked?  What was the last,

16     what was -- when you last worked, what do you do?

17          PROSPECTIVE JUROR:  I did community outreach for a

18     chiropractic office.

19          THE COURT:  Anyone in your household currently

20     employed?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  Who would that be?

23          PROSPECTIVE JUROR:  My sisters.

24          THE COURT:  What do they do?

25          PROSPECTIVE JUROR:  She works for NYPD as a --

Jury Selection

1            THE COURT:  NYPD as?

2            PROSPECTIVE JUROR:  A PAA, civilian.

3            THE COURT:  I saw you smile when I said any close

4     friends or relatives who, so you have a relative?

5            PROSPECTIVE JUROR:  Yeah.

6            THE COURT:  Let me go a little forward.  Are you

7     going to be able to judge police testimony in a fair manner

8     in the way I instructed you?

9            PROSPECTIVE JUROR:  Yes.

10           THE COURT:  Have you or anyone close to you ever

11    been the victim of any kind of crime?

12           PROSPECTIVE JUROR:  No.

13           THE COURT:  Charged with, accused of, questioned

14    in connection with any kind of criminal activity?

15           PROSPECTIVE JUROR:  Yes, me.

16           THE COURT:  We can talk about this in private.

17           PROSPECTIVE JUROR:  Yes.

18           THE COURT:  Okay.  This is what I'm going to do.

19    It's twenty-five after four.  There is someone that I know

20    needs to leave, and right now as we are in the jury

21    selection process we're breaking now for the day.  I'm going

22    to give you my recess instructions, not again, I'm reminding

23    you of them, that you're not to discuss the case, keep an

24    open mind.

25           Now the people who asked to speak with me

1    privately so far who were in the front row, Miss Smith, Miss

2    Galarraga.  I do need to speak with Miss Flores Padilla,

3    Miss Florentino, Miss Duckett, Miss Pena and Mr. Davis,

4    actually almost everybody.  You guys I'm going to ask to

5    remain behind for a few minutes.  I want to do this

6    questioning today.  The rest of you will return.

7             MR. BONANNO:  Judge, if might, before the jury is

8    dismissed can we approach for a minute?

9             THE COURT:  Yes, if it relates to scheduling.

10            MR. BONANNO:  Instructions to the jurors.

11            THE COURT:  Yes.

12            (Whereupon, a discussion was held at the bench off

13    the record among the Court and counsel.)

14            THE COURT:  So first of all, tomorrow morning I'm

15    going to ask you to return -- did someone say they have an

16    appointment tomorrow morning?  Not from this group, someone

17    I excused.  I'm going to ask you to come at 9:30, to

18    check-in in the central jury room.  You have to check-in

19    first thing in the morning so that you can be up here and

20    you'll be directed to go to room 601 by the court officers.

21            You can be here by like a quarter of ten so we can

22    continue the process okay.  We can't start until you're all

23    here, so please be aware of everyone else and their

24    schedules because you know you need to be here so we can

25    proceed and we will be here.  So I would like to get on the

1    record again no later than 10 o'clock, but I want you all to

2    be ready to go by 9:45, okay.

3         So the instructions are don't discuss the case.   I

4    also want to advise you we're in an open courthouse.  You're

5    going to see the attorneys, you're going to see witnesses,

6    you're going to see people in and out of hallways,

7    elevators.  They're not allowed to speak to you about

8    anything.  And you're all very nice people and so you might

9    want to say hey, isn't the weather nice today?  Can you

10   believe the rain?  Can you believe who won the home run

11   derby last night?  They can't talk to you about anything so

12   don't put them in an awkward position where they would have

13   to respond to you even with a hello because they're just not

14   allowed to do it.  And you don't want to hold that against

15   them for any reason.

16        So other than the people in the front row that I'm

17   going to speak to privately, everyone else is released for

18   the day and I'll see you tomorrow morning.

19        (Whereupon, the prospective jurors exited the

20   courtroom.)

21        THE COURT:  Now can I just have one of the other

22   court officers, I'm going to need to speak with them one on

23   one for a few minutes.  Keep Miss Smith here and then the

24   others can wait outside.  I'll call them in one by one,

25   okay?

Jury Selection

1           (Whereupon, the remaining prospective jurors

2     exited the courtroom save for Miss Smith.)

3           THE COURT:   All prospective jurors have left the

4     courtroom with the exception of prospective juror number

5     two, Yvette Smith.

6           Now Miss Smith, it was that last question that you

7     are kind of struggling with, and I don't want you to feel

8     uncomfortable about anything that you say, because people

9     say all sorts of things and it's how they feel and it's the

10    truth, and it's important that we know this.

11          So I just want to, first of all, thank you for,

12    you know, understanding that there's something you want to

13    share with us.  It's so important to do it now and not if

14    you're on the jury and you have to go deliberate that all of

15    a sudden you go back there, it's just not fair to you or

16    anybody else.

17          So what's on your mind?

18          PROSPECTIVE JUROR:   Okay.  First off, I did serve

19    almost 30 days in a civil case.

20          THE COURT:   We're not going that long.

21          PROSPECTIVE JUROR:   And I was the foreperson in

22    that case, and I believe what's right is right and what's

23    wrong is wrong, and I believe that the decisions that we

24    make were solely on evidence and so forth.  However, the

25    only problem I had is that I ran into this young lady all

Jury Selection

1       the time.  I work in the hospital.

2                THE COURT:  Ran into the, one of the people

3       involved in the case?

4                PROSPECTIVE JUROR:  The mother of the child.

5                THE COURT:  Oh, was it med-mal case or something?

6                PROSPECTIVE JUROR:  It was a child struck by a

7       bus.

8                THE COURT:  Okay.

9                PROSPECTIVE JUROR:  Okay.  And just that alone,

10      you know, she wasn't threatening but she made sly remarks.

11      I've run into her in my area.  I live over by Yankee Stadium

12      so, you know, this -- that's just a civil case.  When I

13      first seen her I was like, oh my gosh.  I started changing

14      my routes going home.  I became a little paranoid, you know,

15      because it wasn't --

16               THE COURT:  First of all, do you feel she -- did

17      she attend the trial all the time?

18               PROSPECTIVE JUROR:  Well, she had to because it

19      was her child.

20               THE COURT:  So she identified herself or

21      identified you because it was 30 days?  Not identify but she

22      saw you?

23               PROSPECTIVE JUROR:  Well, she recognized me.

24               THE COURT:  She just happened to run into your

25      hospital?

1          PROSPECTIVE JUROR:  Actually, I was coming down

2     going to another unit and she was with the young boy and I

3     guess that was the father, I don't recall, and she says, oh

4     there go the lady that was on the jury.  That was the lady

5     that, you know, I had to stand up, make the decision, the

6     verdict.  And I'm like oh, wow.  But she didn't approach me.

7     She, when I walked by we looked eye to eye, she didn't say

8     something.

9          On another occasion I seen her 161 Street and it's

10     like we walked right into each other.  Like, you know, she

11     gave me this sneer and attitude but, you know, not, she

12     wasn't hostile, she didn't make a scene, but it's the fact

13     that I was standing somewhere and she's just there.  And I

14     feel it's so close, and maybe this young man or family may

15     be close.  That was my paranoia at the time and that was

16     like four, five years ago.

17          THE COURT:  Well, paranoia, but you actually had

18     something that happened so, I mean, I understand.  It wasn't

19     just that you ran into someone but you felt she was

20     threatening you.

21          PROSPECTIVE JUROR:  Well, I think 'cause I didn't

22     see her all the time, it was just on occasion.

23          THE COURT:  Right.

24          PROSPECTIVE JUROR:  I guess I have those features

25     that you will not forget, you know, and we were there 30

1    days.

2                THE COURT:  Fair to say she may not have been

3    happy with the result?

4                PROSPECTIVE JUROR:  Of course not.

5                THE COURT:  That's what's going on?

6                PROSPECTIVE JUROR:  That's what scared me.  I'm

7    like, oh boy.

8                THE COURT:  You know, number one, you have a right

9    if you feel threatened or harassed, not that you have to,

10   but you have a right to call that judge, call the courtroom

11   or call the police if you felt someone was coming after you.

12   Just number one.

13               Number two, you know, we keep all of your

14   information confidential.  When you are on the jury itself

15   you're escorted to and from the courtroom through the back

16   corridors by the court officers.  That's not to say that you

17   don't get on an elevator, but I don't know -- this is not,

18   from where I sit, a situation that happens at all

19   frequently.  I mean, it's very, very rare.

20               But you've been through something that you feel,

21   and I'm not saying it's going to happen here again, but is

22   that going to give you pause that you never want to sit on a

23   jury again, because I feel terrible about that.  I feel

24   terrible because you're such a, you're doing what you should

25   be doing throughout, and you're the kind of person that you

1   want to have on a jury, but again, I want your honest answer

2   on this.

3            PROSPECTIVE JUROR:  Well, I mean, that is one of

4   the thoughts that came to me when I was saying that this is

5   a criminal case.  I'm like oh lord, you know.  And being

6   that we serve in the county where these people --

7            THE COURT:  That's the thought?

8            PROSPECTIVE JUROR:  That's the only problem I have

9   making the right decision.  I believe what's right is right

10  and what's wrong is wrong, and although it was 15, 20 years

11  ago, we did have a family member who did something and he

12  was wrong so he paid his price.  We have no problems with

13  it.

14            I raised my children to be that way.  None of them

15  have, you know, that's just the way you are.  But I was

16  afraid at that time.  Not deathly afraid, I was shocked to

17  see we just running into each other like that.

18            THE COURT:  What has happened to you, is that

19  going to in any way, as you sit here, do you believe that

20  that will affect your ability to render a verdict in any

21  way?  You keep saying what's right is right, and you know,

22  that's the question.

23            PROSPECTIVE JUROR:  Well, no I don't think it

24  would hinder it, you know.  If I'm going to listen to all

25  the evidence that's presented, however I will not base my

1     fear on someone's, you know.

2                 THE COURT:  Base your verdict on fear?

3                 PROSPECTIVE JUROR:  My verdict, right.

4                 THE COURT:  You will not let that affect you?

5                 PROSPECTIVE JUROR:  No, I wouldn't do that, but I

6     will wonder will I ever see this person in the street again,

7     you know.  Those are just things that happen, you know.

8                 THE COURT:  Jurors, even people who haven't had

9     the experience, you have worry about that all the time.

10    They just worry because it is one --

11                PROSPECTIVE JUROR:  Well, normally I don't worry

12    about walking the streets.  I've been walking these

13    streets --

14                THE COURT:  I'm talking about being on a jury?

15                PROSPECTIVE JUROR:  Well, on a jury, yeah, that's

16    it for me.

17                THE COURT:  Are you willing to serve?

18                PROSPECTIVE JUROR:  Well, I mean, if I'm chosen to

19    do so then I'll serve.  If I'm passed by, then that's fine.

20                THE COURT:  Mr. Mendys, any questions?

21                MR. MENDYS:  No.  Thank you.

22                THE COURT:  Mr. Bonanno?

23                MR. BONANNO:  Are you absolutely certain you

24    wouldn't feel uncomfortable listening to some of the

25    testimony in this matter and then in the back of your mind

Jury Selection

1     think, wow, what if I run into these individuals in the

2     street, these are crimes of violence allegedly?

3               PROSPECTIVE JUROR:  Well.

4               THE COURT:  In terms of whether that would affect

5     her ability to be fair?

6               MR. BONANNO:  To be fair in judging the evidence.

7               PROSPECTIVE JUROR:  I'm going to be fair, but yes,

8     I'm almost sure I will sit here and wonder if I see the

9     young person or whomever it is in the street.

10              THE COURT:  Will that wondering cause you to --

11              PROSPECTIVE JUROR:  No, it will not take me off

12    the, it will not take me off course on what we're here for.

13    But of course, I walk out and say, well goodness, hope I

14    don't ever have to see these people again.  I mean, it's

15    especially after going through what I did the first time and

16    I mean, I was really shocked because it was just like so

17    soon.  Then it wasn't a one time thing, I seen her twice,

18    maybe three times, I don't know.

19              But that was five years ago and God's here, I'm

20    still here, and it's just that was one, and now that it's a

21    different kind of case I'm like, okay.  And it's in the

22    Bronx and I live in the Bronx, so these are things that I

23    think about.

24              THE COURT:  Any other questions?

25              MR. BONANNO:  Nothing.

1        THE COURT:  I'll see you tomorrow morning.

2        PROSPECTIVE JUROR:  Okay, thank you.

3        (Whereupon, the prospective jurors exited the

4    courtroom.)

5        THE COURT:  Bring the next person I can see is

6    Galarraga.

7        COURT OFFICER:  Juror entering.

8        (Whereupon, the prospective juror entered the

9    courtroom.)

10        THE COURT:  All right, prospective juror number

11    three, Angelica Galarraga.

12        Miss Galarraga, this has to do with victim of a

13    crime, your sister.

14        PROSPECTIVE JUROR:  It was myself and her.

15        THE COURT:  I'm sorry, yourself.  Can you tell me

16    what happened?

17        PROSPECTIVE JUROR:  It wasn't something that I

18    reported, but the person who committed the crime onto me had

19    done it the same thing that they did to me to someone else,

20    and then that led to them getting --

21        THE COURT:  What kind of crime?

22        PROSPECTIVE JUROR:  Sexual assault.

23        THE COURT:  And how long ago did this happen?

24        PROSPECTIVE JUROR:  It was when I was young.  I

25    was 11 when it happened.

1           THE COURT:  Oh my goodness, I'm so sorry about

2     this.  And you're saying it was never reported?

3           PROSPECTIVE JUROR:  Not on my side but someone

4     else reported it.

5           THE COURT:  With the same person?

6           PROSPECTIVE JUROR:  With the same person.

7           THE COURT:  But not involving you?

8           PROSPECTIVE JUROR:  No.

9           THE COURT:  So is this going to prevent you from

10    feeling that you can be fair as a juror in this case?

11          PROSPECTIVE JUROR:  I really don't know, to be

12    honest.

13          THE COURT:  You don't know?

14          PROSPECTIVE JUROR:  No.

15          THE COURT:  You've never been on a jury before,

16    have you?

17          PROSPECTIVE JUROR:  No.

18          THE COURT:  And you still think about this from

19    time to time?

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  Because you're going to be hearing, I

22    mean, it's not, this is not at all the same type of

23    allegation, but it's a robbery and it's a criminal case.  Do

24    you believe that that might prevent you in any way, what

25    happened to you, from following my instructions and being

1      able to put that aside and just concentrate on the evidence?

2               PROSPECTIVE JUROR:  I'm really not sure.

3               THE COURT:  Any questions?

4               MR. MENDYS:  No, Judge.

5               MR. BONANNO:  Nothing.

6               THE COURT:  Is there a consent to excuse?

7               MR. MENDYS:  Yes.

8               MR. BONANNO:  Yes.

9               THE COURT:  We're going to excuse you from this

10     case.  You come back tomorrow morning.  We'll give you your

11     card, you just go back to the central jury room tomorrow

12     morning and don't come up here.  And please don't discuss

13     anything about this with anyone else, okay.

14               (Whereupon, the prospective juror exited the

15     courtroom.)

16               THE COURT:  We'll bring out Miss Flores Padilla.

17               (Whereupon, the prospective juror entered the

18     courtroom.)

19               THE COURT:  All right.  Prospective juror Enid

20     Flores Padilla.

21               Now, what did you want to talk to me about in

22     terms of your ability to be a juror and be fair?

23               PROSPECTIVE JUROR:  As a Christian I'm not, I

24     can't judge anybody's mistake.

25               THE COURT:  We're not talking about judging

1        anybody's soul or mistake, you're listening to facts.  What
2        do you do a living?
3                    PROSPECTIVE JUROR:  Billing coordinator.
4                    THE COURT:  People make mistakes on their bills,
5        don't you correct them?
6                    PROSPECTIVE JUROR:  I do correct them.
7                    THE COURT:  Right.  And in your life you've never
8        ever said oh, that was wrong what you did, or I don't
9        remember it that way or anything like that?
10                   PROSPECTIVE JUROR:  I'm not going to say I don't,
11       but because of my belief, religious belief, Christian, I'm
12       not supposed to judge anybody else.
13                   THE COURT:  No, no, that's not actually what
14       Christianity actually teaches.  Christianity doesn't say --
15                   PROSPECTIVE JUROR:  One of the commandments is
16       you're not to supposed to judge anyone.
17                   THE COURT:  Then I guess I have to retire and we
18       can't have any system of justice because you're here not to
19       judge a soul.  Christianity teaches there's an ultimate
20       judge at the end.
21                   PROSPECTIVE JUROR:  Exactly.
22                   THE COURT:  But what is bound on Earth is bound on
23       the -- and you're not judging a person, you're judging
24       evidence.  We call and we talk about that.  It's a whole
25       different concept.

Jury Selection

1                   PROSPECTIVE JUROR:  I understand but I wouldn't

2   feel --

3                   THE COURT:  There are Christian people that serve

4   on juries.

5                   PROSPECTIVE JUROR: Not everybody's the same.  We

6   don't have, there's different types of Christians.  Some of

7   them where pants, I don't wear pants.  We all have different

8   rules so we --

9                   THE COURT:  This is your personal view not based

10  on your religion?

11                  PROSPECTIVE JUROR:  According to what the Bible

12  says one commandment is you cannot judge, so I can't be here

13  or anywhere judging anybody that I was not present.  So I

14  cannot talk regarding whether they show evidence or not.

15  You know, I wouldn't be --

16                  THE COURT:  You mean people come up to you, tell

17  you I just saw this happen and you say I wasn't there so?  I

18  mean, people are, your family's telling you things that

19  happen?

20                  PROSPECTIVE JUROR:  A lot things have happened in

21  my family, I'm not going to say no, but I try to live the

22  right life with God.  It's if something happens, I let --

23  you studied to become a judge, I respect that, then it's up

24  to you.  I leave it to you to study.  You went to school for

25  it, I didn't so I can't sit here, sit here with other people

1      trying to judge, because like you said, everybody makes

2      mistakes.  I wouldn't be feeling comfortable being here.

3               THE COURT:  Any questions?

4               MR. MENDYS:  Nope.

5               MR. BONANNO:  Actually one, Judge.  What faith do

6      you practice, ma'am?

7               PROSPECTIVE JUROR:  Pentecostal.

8               MR. BONANNO:  So you don't want to be judged less

9      you be judged?

10               PROSPECTIVE JUROR:  The Bible's telling me not to

11      judge anybody so I can't be judged.

12               THE COURT:  It actually --

13               MR. BONANNO:  Says you're not a judge.  He says

14      also render to Caesar that what is Caesar's, and this is

15      part --

16               PROSPECTIVE JUROR:  I understand, just like it

17      tells me I have to follow the laws from down here.  But like

18      I said, I'm not going to feel comfortable.  I'm not going to

19      be here, whether you give me evidence or not, I was not

20      present.  I want to follow the way I was brought up and --

21               MR. BONANNO:  So you believe that your faith would

22      interfere with your honest and fair rendition of your

23      interpretation?

24               PROSPECTIVE JUROR:  I'm not saying that I am an

25      honest person, but I'm not going to sit here and judge

1    anybody else.  I'm sorry.

2              MR. BONANNO:  No further questions.

3              THE COURT:  You're consenting?

4              MR. MENDYS:  Yes.

5              MR. BONANNO:  Yes.

6              THE COURT:  You're excused.  Go to the central

7    jury room tomorrow morning.  You're not coming back up here.

8              (Whereupon, the prospective juror exited the

9    courtroom.)

10             THE COURT:  Miss Florentino.  You know, I think

11   she was fine.  Bring Miss Florentino out, maybe I mentioned

12   it by mistake.

13             THE WITNESS:  Prospective juror entering.

14             (Whereupon, the prospective juror entered the

15   courtroom.)

16             THE COURT:  Miss Florentino has entered the

17   courtroom.  You know, I asked you to stay but you actually

18   didn't give me any reason that you couldn't be fair, right?

19             PROSPECTIVE JUROR:  I didn't give you a reason.  I

20   never said that I want to talk to you in private.

21             THE COURT:  No, and I'm sorry.  You can go.  I'll

22   see you tomorrow morning.  I'm sorry.

23             (Whereupon, the prospective juror exited the

24   courtroom.)

25             THE COURT:  Miss Duckett.

Jury Selection

1          COURT OFFICER:  Prospective juror entering.

2          (Whereupon, the prospective juror entered the

3     courtroom.)

4          THE COURT:  All right.  Prospective juror number

5     six, Miss Duckett.

6          Now Miss Duckett, I'm sorry again to even have to

7     ask these questions.  You talked about your sister and

8     actually there were three people in your family.

9          PROSPECTIVE JUROR:  My sister, my niece and my

10    youngest son.

11         THE COURT:  What happened to your sister?

12         PROSPECTIVE JUROR:  My sister was sexually

13    assaulted.

14         THE COURT:  And your niece?

15         PROSPECTIVE JUROR:  My niece, after my niece --

16    after my sister was sexually assaulted, my niece when she

17    was a baby was burned on the back of her leg with the barrel

18    of a gun.  My niece, as an adult, was gang raped.  My son

19    was a victim of a robbery.

20         THE COURT:  All right.  Miss Duckett, first of

21    all, I am so sorry for what happened within your family to

22    these individuals.  There's nothing I can say.

23         The question is, are you able to put all of that

24    aside as a juror?  Have you ever been on a jury?

25         PROSPECTIVE JUROR:  No.

Jury Selection

1            THE COURT:  So you know that's a lot for anyone

2       and it's a lot to ask, but some people are able to do things

3       and they are and others aren't.  And you know yourself.

4       This is a criminal trial.  I mean, the most relevant

5       factually is the robbery.  How long ago was your son robbed?

6            PROSPECTIVE JUROR:  Two years.

7            THE COURT:  Did it involve a weapon?

8            PROSPECTIVE JUROR:  I wasn't there.  I wasn't near

9       him.  I found out afterwards.  He said that a weapon was

10      sticking out of the person's pocket.

11           THE COURT:  So the charges in this case involve a

12      forcible stealing of property, a robbery.  You cannot think

13      as you're a juror, and no juror can say all right, what I'm

14      hearing here is this case but I'm thinking about something

15      else, you have to only concentrate on this case and you have

16      to be able to put aside anything and everything that's

17      happened to other people in your lives when they've been

18      victims of a crime in order to be a fair juror.  Are you the

19      type of person who's able to do that?

20           PROSPECTIVE JUROR:  I don't think so.

21           THE COURT:  Okay.  Any questions?

22           MR. MENDYS:  No.

23           MR. BONANNO:  No, Judge.

24           THE COURT:  Consent to excuse?

25           MR. MENDYS:  Yes.

Jury Selection

1           MR. BONANNO:  Yes.

2           THE COURT:  Thank you, Miss Duckett.  And again,

3     I'm sorry for everything.  And you just have to go to the

4     central jury room, not come back here tomorrow.

5           (Whereupon, the prospective juror exited the

6     courtroom.)

7           THE COURT:  Miss Pena.

8           COURT OFFICER:  Prospective juror entering.

9           (Whereupon, the prospective juror entered the

10    courtroom.)

11          THE COURT:  Prospective juror Yojane Pena, number

12    seven.

13          So tell me what you want to discuss in private

14    about victim of a crime?

15          PROSPECTIVE JUROR:  My son when he was 17, four

16    guy come and jump, tried to take the phone from him.

17          THE COURT:  How long ago was that?

18          PROSPECTIVE JUROR:  Like two years ago.

19          THE COURT:  Is your son injured?

20          PROSPECTIVE JUROR:  Huh?

21          THE COURT:  Was your son --

22          PROSPECTIVE JUROR:  He okay.  He okay.

23          THE COURT:  So the question I have for you, the

24    charges in this case involve a theft, a robbery.  Are you

25    able to put aside what happened to your son in order to be a

Jury Selection

1       fair juror in this case and just concentrate on the evidence

2       in this case?

3                PROSPECTIVE JUROR:  That's, that's, the thing is I

4       think if everybody do something wrong have to pay for that,

5       and sometime I don't see the two phases.  Sometimes I only

6       see that happen in my life.

7                THE COURT:  You can only see what happened to your

8       son?

9                PROSPECTIVE JUROR:  Uh, huh.

10               THE COURT:  You really can't put it aside, yes or

11      no?

12               PROSPECTIVE JUROR:  No.

13               THE COURT:  You cannot.  Any questions?

14               MR. MENDYS:  None, Judge.

15               MR. BONANNO:  None, Judge.

16               THE COURT:  Consent?

17               MR. MENDYS:  Yes.

18               MR. BONANNO:  Yes.

19               THE COURT:  You're excused from this case, ma'am.

20      You just go back to the central jury room tomorrow.  And

21      then Mr. Davis will be the last.

22               (Whereupon, the prospective juror exited the

23      courtroom.)

24               COURT OFFICER:  Prospective juror entering.

25               (Whereupon, the prospective juror entered the

Jury Selection

1          courtroom.)

2                  THE COURT:  All right.  Prospective juror number

3          nine, Mr. Davis.  So none the other jurors are currently

4          present.

5                  Mr. Davis, you said you had a contact with the

6          police, so tell me what happened.

7                  PROSPECTIVE JUROR:  Yes.  I was on going to school

8          that day and I didn't pay to get on the train, and that's

9          fare evasion and --

10                 THE COURT:  How long ago was that?

11                 PROSPECTIVE JUROR:  Maybe two-and-a-half to three

12         years.  I got arrested for that.

13                 THE COURT:  It was an arrest where you went before

14         a judge right away within a day or so?

15                 PROSPECTIVE JUROR:  Yes.

16                 THE COURT:  Was it in the Bronx?

17                 PROSPECTIVE JUROR:  Yes.

18                 THE COURT:  Did you have to come back to court

19         again after that?

20                 PROSPECTIVE JUROR:  No, it was, I think said it

21         was a violation.

22                 THE COURT:  You pled to a violation that day?

23                 PROSPECTIVE JUROR:  Yes.

24                 THE COURT:  That was it?

25                 PROSPECTIVE JUROR:  Yes.

Jury Selection

1           THE COURT:  So let me, the reason that these

2      questions are asked -- and is there anyone else in the

3      family that's ever been like arrested or questioned by any

4      police?

5           PROSPECTIVE JUROR:  Not to my knowledge.

6           THE COURT:  Let me ask you questions, because

7      sometimes people who have had an incident where they have

8      been arrested and you were prosecuted for a crime feel that

9      they have some bias against the police or the district

10      attorney that would make them unable to be fair.  Do you

11      believe the police treated you unfairly in the case?

12           PROSPECTIVE JUROR:  No, I don't.

13           THE COURT:  Do you have any bias that you have

14      from that case that would cause you to automatically think

15      police officers are lying?

16           PROSPECTIVE JUROR:  Not at all.

17           THE COURT:  You'll be able to follow my

18      instruction again about police testimony?

19           PROSPECTIVE JUROR:  Yes, sir.

20           THE COURT:  And how about the district attorney's

21      office, you know they're the ones who prosecuted you in the

22      Bronx.  You promise me that you don't have any feelings, bad

23      feelings against them because of what happened that would

24      make you biased against them?

25           PROSPECTIVE JUROR:  Not at all.

Jury Selection

1    THE COURT:  Okay.  Have you ever been on a jury?

2    PROSPECTIVE JUROR:  No.

3    THE COURT:  And just once again, you know

4    yourself, you know what has happened to you in your life and

5    you know what the charges are in this case.  Is there

6    anything at all that you believe would make you unfair if

7    selected as a juror in this case?

8    PROSPECTIVE JUROR:  No.

9    THE COURT:  You promise me you'll be fair to the

10   People?

11   PROSPECTIVE JUROR:  I promise.

12   THE COURT:  Promise you'll be fair to the

13   defendant?

14   PROSPECTIVE JUROR:  I promise.

15   THE COURT:  And you'll follow my instructions?

16   PROSPECTIVE JUROR:  Yes.

17   THE COURT:  You have any questions about the

18   prosecution, the arrest or anything?

19   MR. MENDYS:  I'm sorry, I just didn't understand.

20   What was it that you did that caused you to be arrested?

21   PROSPECTIVE JUROR:  I didn't pay to get on the

22   public transportation.

23   MR. MENDYS:  To get on the train?

24   PROSPECTIVE JUROR:  Yes.

25   MR. MENDYS:  All right, thank you.  That's it.

Jury Selection

1          MR. BONANNO:  Nothing, Judge.

2          THE COURT:  See you tomorrow.

3          (Whereupon, the prospective juror exited the

4     courtroom.)

5          THE COURT:  So I'll ask you guys to come back by

6     10 tomorrow because I think we're not going to have that

7     juror here until at least 10:30.

8          MR. MENDYS:  One thing I noticed on the sheet I

9     provided you there's a typo on one of the names.  It says

10    Jose Rodriguez, it should be Joel Rodriguez.

11         THE COURT:  Thank you.

12         MR. MENDYS:  And it seems from the way you're

13    speaking to the jurors that you're not expecting to start

14    until Friday.

15         THE COURT:  It appears from the way we don't have

16    many jurors that I don't expect that we'll be starting at

17    least until Friday, yes.

18         MR. MENDYS:  Okay.

19         THE COURT:  We'll see what happens tomorrow.  Have

20    a goodnight.

21         (Whereupon, the case was adjourned to July 14,

22    2015.)

23         (Continued on the next page...)

24

25

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     BRONX COUNTY : CRIMINAL TERM : PART 96
 2   -------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK
 3
              -against-
 4                                       Ind. No.
     RICHARD DIAZ,                       3349-2012
 5
                        Defendant.
 6   -------------------------------------x
                                       265 East 161 Street
 7                                     Bronx, New York 10451
                                       JULY 14, 2015
 8
     B E F O R E:
 9
                  THE HONORABLE RALPH FABRIZIO
10                Justice of the Supreme Court

11              (Appearances same as previously noted.)

12                                    LAURA ROSEN
                                      SENIOR COURT REPORTER
13
         *      *      *      *      *      *      *      *
14              (Whereupon, the following took place in open court

15       in the presence of the defense counsel and the assistant

16       district attorney.)

17              THE CLERK:  Case on trial continued.  Richard

18       Diaz.

19              Appearances, please.

20              MR. MENDYS:  Newton Mendys for the office of the

21       district attorney.  Good morning.

22              MR. BONANNO:  Good morning, Your Honor.  Pat

23       Bonanno for Mr. Diaz.

24              THE COURT:  Good morning.  Well, it's 10:35 and at

25       last count, which was just a few minutes ago, we were
```

Proceedings

1      missing about 10 jurors.

2              COURT OFFICER:  Nine.

3              THE COURT:  Nine jurors, right.  One of them was

4      coming late because of a doctor's appointment.  But I

5      suspect it's much more problematic than that and I'd like to

6      get a sense of who's here, so I've asked the jurors be

7      brought into the courtroom.

8              Now, while we're on the record, of course I don't

9      see Mr. Diaz again.  Mr. Bonanno, have you continued to try

10     to reach out to your client?

11             MR. BONANNO:  I have tried, Judge.  I actually

12     spoke with him.

13             THE COURT:  You did?

14             MR. BONANNO:  Yesterday after proceedings I

15     informed him again of the urgency to present himself before

16     the court.  He understands that, in my opinion, and he did

17     not leave me with a definite answer as to what he was --

18             THE COURT:  I'm sorry, you spoke with him after

19     jury selection began and he indicated he wasn't coming?

20             MR. BONANNO:  No, I didn't say that, Judge.  I

21     said I spoke with him.  I told him that there's a warrant

22     for his arrest.  He has an absolute need to present himself

23     to this court and answer that warrant.  That jury selection

24     had begun and I needed his assistance in doing that, and

25     that by presenting himself here he would assist me in that.

Proceedings

1   And he never gave me a definite answer as to if he was going

2   to see me today or come here today, and I just texted him

3   again.

4   THE COURT:  So what you're saying is he did not

5   tell you he was coming.

6   MR. BONANNO:  No, he did not tell me he was

7   coming.

8   THE COURT:  So why would you say, then, he said he

9   was coming?  I asked you if, you know -- he told you he

10  wasn't coming, basically he would not tell you that he --

11  MR. BONANNO:  If I said that, Judge, then I

12  misstated.  I don't think I said that.

13  THE COURT:  No, no.  He said he doesn't, he said

14  he's -- he didn't tell you that he was coming?

15  MR. BONANNO:  He didn't say he was not coming.  He

16  didn't say he was coming.  I told him of the urgency to be

17  here and he never gave me a definite answer either way.

18  THE COURT:  But why isn't an indefinite answer an

19  indication that he is doing anything but voluntarily

20  absenting himself from this proceeding?

21  MR. BONANNO:  Judge, that is your conclusion to

22  make if you wish.  I would think a reasonable mind could

23  make that conclusion.  I am not going to make that

24  conclusion.

25  THE COURT:  Well, you're the one person, and

Proceedings

1    correct me if I'm wrong, Mr. Mendys, I don't believe anyone

2    in your office has any success in learning that Mr. Diaz is

3    hospitalized or in custody anywhere.

4         MR. MENDYS:  Well, my understanding is that he is

5    not hospitalized.  He is not in custody.  He's not in

6    Immigration custody.  Specifically he is not in prison

7    anywhere.  He is not deceased.  I think the last thing that

8    my detectives have to do is make physical checks at

9    locations in an attempt to ascertain his whereabouts and

10   hopefully find him.

11        THE COURT:  Did he tell you where he was?

12        MR. BONANNO:  He did not and I did not inquire.

13   It did not appear he was hospitalized.  It did not appear he

14   was in custody from our conversation.

15        THE COURT:  Well, that's not -- that part of the

16   question I think is kind of answered already, but did he

17   tell you physically -- you didn't ask him where he was?

18        MR. BONANNO:  I didn't ask him where he was,

19   Judge, no, I did not.

20        THE COURT:  We don't even know if he's in the

21   jurisdiction then.

22        MR. MENDYS:  I know he has not boarded any planes

23   within --

24        THE COURT:  That's also part of -- well, yes.

25        MR. MENDYS:  -- the past.

Proceedings

1            THE COURT:  Okay.  So he hasn't tried to leave the

2     country as far as you know, but he also hasn't --

3            MR. MENDYS:  He could have gotten a car.

4            THE COURT:  He could have gone to a different

5     state.  He could have gone anywhere.  We don't even know if

6     he's in New York City, the Bronx, his home.  And you didn't

7     ask any of those questions?

8            MR. BONANNO:  I told him they're going to come to

9     your house for you, you better come in.  There's no reason

10    for you not to come in.

11           THE COURT:  So you would have advised him, of

12    course, which, you know, I don't expect that he wouldn't

13    have, that there's an warrant issued for his arrest?

14           MR. BONANNO:  Yes.

15           THE COURT:  And the police would be looking for

16    him and actually are looking for him?

17           MR. BONANNO:  Absolutely.

18           THE COURT:  And he is not surrendering himself

19    voluntarily to this court because he's just not here.

20           Did you tell him a time to be here this morning?

21           MR. BONANNO:  Yes, I did.

22           THE COURT:  What time did you tell him?

23           MR. BONANNO:  10 a.m.

24           THE COURT:  10 a.m.?

25           MR. BONANNO:  Yes.

Jury Selection

1          THE COURT:  Okay.  Well, it's now 10:40 a.m.  So

2     in addition to nine jurors, we're still missing one

3     defendant.  Let's -- can we bring the jurors in now?

4     They're in the hallway and we'll take attendance and see

5     who's here and who's not here.  You can put the ones in the

6     box, yeah, we'll do that.

7          COURT OFFICER:  Prospective jurors entering.

8          (Whereupon, the prospective jurors entered the

9     courtroom.)

10          THE COURT:  If you remember what seats you were in

11     in the box, if you don't we'll tell you if you're not in the

12     right seats.

13          Good morning everyone.  I know it's about twenty

14     of eleven and we were missing a substantial number of

15     prospective jurors until a few minutes ago.  I just want to

16     take attendance to see who we're missing right now okay.

17          (Whereupon, roll call was taken by the Clerk of

18     the Court.)

19          THE COURT:  So we're missing now three.

20          THE CLERK:  Yes, your Honor.

21          THE COURT:  Can you call down to the central jury

22     room for --

23          THE CLERK:  I'd be happy to.

24          MR. MENDYS:  Judge, can we approach for a moment?

25          THE COURT:  Sure.

Jury Selection

1            (Whereupon, a discussion was held at the bench off

2       the record among the Court and counsel.)

3            THE CLERK:  Seat number nine is on his way up,

4       your Honor, and only Miss Bims(ph) called she's not coming.

5            THE COURT:  Who called?

6            THE CLERK:  Careese(ph) Bims(ph) called the jury

7       room, not coming in today.  So we're missing Mr. Rodriguez.

8       Jose R. Rodriguez.

9            THE COURT:  And from the box we're missing?

10           THE CLERK:  But Mr. Davis from the box is on his

11      way up.

12           THE COURT:  There's another one missing.

13           THE CLERK:  Seat number nine is the one that's

14      coming up.

15           THE COURT:  Oh, okay.  We have everybody in the

16      box whose on his way up.  That seat fooled me.  All right.

17           Before we proceed further, and I just learned

18      something at the bench that I need to have two conversations

19      with two individuals, and I'm sorry for the up and down but

20      I need to do this before I continue with the jury selection

21      process.

22           Mr. Ali, who's in seat number 13, I'm just going

23      to ask you to stay for a minute, I need to speak with you.

24      Then Miss Lee in the audience wants to speak with me.  I'll

25      call you back in after everyone else is, after I've finished

Jury Selection

1    with Mr. Ali.  Just keep my instructions, do not talk about

2    the case.  Do not talk to any of lawyers about anything

3    whatsoever.  And Mr. Ali, if you just remain in your seat

4    and everybody else can leave, I'll call you back in a few

5    minutes.  Just wait in the hall and then we'll continue.

6            (Whereupon, the prospective jurors exited the

7    courtroom.)

8            THE COURT:  All the jurors have now left the

9    courtroom with the exception of juror number 13, Mr. Syed

10   Ali.

11           And I need you to place on the record now what you

12   just said at the bench, Mr. Mendys, okay?

13           MR. MENDYS:  Judge, it's my responsibility.  I

14   told the Court and defense that Mr. Ali approached me

15   outside the courtroom just telling me that he was late and I

16   told him that I would get an officer for him.  That was it.

17           THE COURT:  So Mr. Ali, the last instruction that

18   I gave you yesterday was not to speak with any of the

19   lawyers or anyone in particular about anything connected

20   with this case at all.  Nothing.  You couldn't have even

21   pleasantries with them.  Did you not understand that

22   instruction when I gave it to you?

23           PROSPECTIVE JUROR:  I did understand the

24   instruction.

25           THE COURT:  You didn't understand?

Jury Selection

1              PROSPECTIVE JUROR:  No, I did understand.

2              THE COURT:  So why would you disobey it?  That's

3       the DA, you know you're not supposed to talk to the lawyers

4       or have contact with anybody about anything connected with

5       this case, with any of them.

6              PROSPECTIVE JUROR:  I'm sorry about that.  I

7       didn't, I probably forgot the instruction.

8              THE COURT:  Mr. Bonanno?

9              MR. BONANNO:  I mean, I see it as a harmless

10      error, Judge.

11             THE COURT:  So you're not asking me to strike him.

12      Okay.  Mr. Ali, I have to make sure that I am satisfied

13      because there are times where we have to declare mistrials,

14      which means we have to start all over again, because jurors

15      do not follow instructions, and the instructions are there

16      and they are very important.

17             It's important not to speak to anybody about this

18      case.  It's important not to visit scenes including by cyber

19      methods of any kind.  It's important not to do research.

20      It's important not to start deliberating before you're told

21      to deliberate.

22             I've given you lots of instructions already and I

23      will continue to give the jury instructions.  Do you

24      understand that you have taken an oath already to follow

25      each and every one of my instructions?

Jury Selection

1          PROSPECTIVE JUROR:  I do.

2          THE COURT:  And do you understand that if there

3     is, there is a violation, it could result in a problem with

4     the case that we either have to start all over again or

5     something else could happen that we really don't want to

6     happen?

7          PROSPECTIVE JUROR:  I do.

8          THE COURT:  Do you promise me that you will follow

9     every instruction?

10          PROSPECTIVE JUROR:  Yes, I will.

11          THE COURT:  You will not speak to any of the

12     lawyers?

13          PROSPECTIVE JUROR:  No, your Honor.

14          THE COURT:  And you won't talk to any of the other

15     jurors about what we're discussing now?

16          PROSPECTIVE JUROR:  No, your Honor.

17          THE COURT:  Mr. Bonanno, you still are you

18     satisfied?

19          MR. BONANNO:  Judge, if you're satisfied, I'm

20     satisfied.

21          THE COURT:  Well, I'm asking you.

22          MR. BONANNO:  I have no objection, Judge.

23          MR. MENDYS:  I'm fine.

24          THE COURT:  You could step down, Mr. Ali.

25          We can call prospective juror Miss Lee into the

1    courtroom who's not in the box.

2              (Whereupon, the prospective juror exited the

3    courtroom.)

4              COURT OFFICER:  Prospective juror entering.

5              (Whereupon, the prospective juror entered the

6    courtroom.)

7              THE COURT:  Prospective juror Miss Lee I already

8    spoke with at the bench off the record.

9              So now I understand you want to speak to me about

10   something else.

11             PROSPECTIVE JUROR:  Yes.  I know you said at least

12   by 4:30 to leave, but yesterday that did not work.  I did

13   not get to him on time, so the schedule --

14             THE COURT:  How late were you?

15             PROSPECTIVE JUROR:  15 to 20 minutes.

16             THE COURT:  And you left at 4:30?

17             PROSPECTIVE JUROR:  Yes.

18             THE COURT:  So you're not able to leave at 4:30 to

19   pick up your son.  You had said you had to pick him up at

20   5:30 in Riverdale, basically.

21             PROSPECTIVE JUROR:  Yes, and then I have to go

22   right after and get my second son so.

23             THE COURT:  So in order for you to be on this

24   jury, we would have to break at 4 o'clock every single day.

25             PROSPECTIVE JUROR:  Yes.

1          THE COURT:  That's not something that I believe

2     our schedule can accommodate at all.

3          Do I have any disagreement with the attorneys?

4          MR. MENDYS:  Judge, I think it's a short case for

5     a few days.  I mean, I understand your position.

6          THE COURT:  But I have actually made

7     accommodations for other people already about days off that

8     I hadn't planned on for medical appointments.  I mean, I

9     told them, there's a number of people, so if we have to

10    break at 4 o'clock every single day and there's a witness on

11    the stand, you believe that, that you can finish this case

12    and this can go to the jury in the time that I have

13    announced, especially given the fact that we don't have very

14    many jurors out of 61 people, we have fewer than 30 left

15    right now?

16         MR. MENDYS:  Judge, I think my position is at this

17    point let's see how this plays out.

18         THE COURT:  And your position?

19         MR. BONANNO:  Judge, I can't imagine sitting in

20    that jury box when 3:45 rolls around wondering am I gonna

21    get out of here at 4 o'clock to pick up my two kids.

22         THE COURT:  No, I'd have to commit to leave at 4

23    o'clock.  There is no way that Miss Lee would be on this

24    jury.  I had said I had committed to 4:30 because I thought

25    she could be there within, I thought it would take an hour

Jury Selection

1      to get to Riverdale would be reasonable, but it apparently

2      is at least an hour and 15 minutes.  So you know, and she

3      has a young child and this is a common problem that we do --

4      so are you willing to say we stop at 4 o'clock every

5      afternoon, too?

6                  MR. BONANNO:  I'm more willing to allow Miss Lee

7      to be excused than to stop at 4 o'clock.

8                  THE COURT:  You're excused, I think for the

9      purposes of scheduling and what I need to do.  Thank you,

10     Miss Lee.

11                 PROSPECTIVE JUROR:  I'm sorry.

12                 (Whereupon, the prospective juror exited the

13     courtroom.)

14                 THE COURT:  Before we bring the rest of the jurors

15     back in, I would like to fill the four seats with four

16     people that have not been called yet.  First of all, does

17     either side have an objection to that?

18                 MR. MENDYS:  No, Judge.

19                 MR. BONANNO:  None.

20                 THE COURT:  And can they be seated in the

21     positions that are vacant?

22                 MR. BONANNO:  That's fine.

23                 MR. MENDYS:  That's fine.

24                 THE COURT:  Good.  So we'll put these put people

25     back in the box.  We're going to call four additional names

Jury Selection

1    and I'll seat them, and then we'll finish this panel

2    hopefully shortly.

3              COURT OFFICER:  Panel entering.

4              (Whereupon, the prospective jurors entered the

5    courtroom.)

6              THE COURT:  All right, members of the jury, hello.

7    We're going to actually call -- wait, we're missing

8    somebody.  We're now Missing Miss Smith who is in seat

9    number two.  Here she is.

10             COURT OFFICER:  Juror entering.

11             (Whereupon, the prospective juror entered the

12   courtroom.)

13             THE COURT:  So we have four individuals who are

14   not on the jury panel following questioning after we broke

15   yesterday.  We're going to call four additional names to

16   take those seats.  Do we have the questionnaires for them,

17   too, from yesterday?  Just follow the court officer's

18   instructions.

19             THE CLERK:  Seat number three, Annyelica Diaz,

20   A-N-N-Y-E-L-I-C-A.

21             Seat number four, Luis A. Vargas.

22             Seat number six, Dacesk, D-A-C-E-S-K, last name

23   D-E-D-A.

24             Seat number seven, Rebecca M., last name Torres.

25             THE COURT:  Okay.  So Miss Diaz, I'm going to

1    start with you again right now because you're in seat number

2    three.   You kind of know the drill from yesterday.

3                Tell me what neighborhood in general do you live

4    in?

5                PROSPECTIVE JUROR:  Burnside.

6                THE COURT:  How long have you been in your current

7    neighborhood?

8                PROSPECTIVE JUROR:  A few years.

9                THE COURT:  Anyone living in your household with

10   you?

11               PROSPECTIVE JUROR:  Yes, three siblings, my mom

12   and her husband.

13               THE COURT:  You working outside the home?

14               PROSPECTIVE JUROR:  I'm a full-time student.

15               THE COURT:  What are you studying?

16               PROSPECTIVE JUROR:  Business.

17               THE COURT:  I know you told me about going back,

18   so business?

19               PROSPECTIVE JUROR:  Uh, huh.

20               THE COURT:  Anyone employed in your household?

21               PROSPECTIVE JUROR:  My mom's husband.

22               THE COURT:  What do they do?

23               PROSPECTIVE JUROR:  He works for Icon Parking.

24               THE COURT:  You or anyone close to you ever been

25   the victim of any kind of crime?

Jury Selection

1          PROSPECTIVE JUROR:  Yes, my cousin.

2          THE COURT:  Do you feel comfortable speaking about

3      it with the other jurors present?

4          PROSPECTIVE JUROR:  He was stabbed last March.

5          THE COURT:  Well, I'm very, very sorry to hear

6      that.  Did it happen here in the Bronx?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Do you know whether it was reported to

9      the police?

10          PROSPECTIVE JUROR:  It was not.

11          THE COURT:  It was not.  It was?

12          PROSPECTIVE JUROR:  It was not.

13          THE COURT:  Do you know why it was not?

14          PROSPECTIVE JUROR:  I'd rather not discuss that

15      with the jurors.

16          THE COURT:  We're going to talk about this outside

17      the presence of the jurors, okay.

18          Mr. Vargas, how are you, sir?

19          PROSPECTIVE JUROR:  Good, good.

20          THE COURT:  Neighborhood?

21          PROSPECTIVE JUROR:  I live in Macombs, 170.

22          THE COURT:  How long have you been at your current

23      address?

24          PROSPECTIVE JUROR:  I live there over 20 years.

25          THE COURT:  Anyone living in your household with

1      you?

2                  PROSPECTIVE JUROR:  My wife, my daughter, my

3      grandson.

4                  THE COURT:  Grandson, okay.  You working?

5                  PROSPECTIVE JUROR:  And my son.

6                  THE COURT:  Sorry?

7                  PROSPECTIVE JUROR:  I have a little boy too, son.

8                  THE COURT:  Now, you working?

9                  PROSPECTIVE JUROR:  Yes, I work.

10                 THE COURT:  What do you do?

11                 PROSPECTIVE JUROR:  I work in Long Island in the

12     plumbing industry.

13                 THE COURT:  And anyone else employed in your

14     household?

15                 PROSPECTIVE JUROR:  Just my daughter.

16                 THE COURT:  What does she do?

17                 PROSPECTIVE JUROR:  She works in a sneaker store

18     in Fordham.

19                 THE COURT:  You or anyone close to you ever been

20     the victim of any kind of crime?

21                 PROSPECTIVE JUROR:  I have a list of people, yes.

22     A couple of people, yeah.

23                 THE COURT:  Tell me about it?

24                 PROSPECTIVE JUROR:  Well, my moms, I have my

25     brother.

Jury Selection

```
 1                    THE COURT:  Do you feel comfortable talking about
 2         what happened?
 3                    PROSPECTIVE JUROR:  Not really.  I'll tell you.
 4                    THE COURT:  In private?
 5                    PROSPECTIVE JUROR:  Yeah, I tell you.
 6                    THE COURT:  Okay.
 7                    Mr. Deda, how are you, sir?
 8                    PROSPECTIVE JUROR:  Good.  How are you?
 9                    THE COURT:  Good, thank you.
10                    Now, the neighborhood you live in is what?
11                    PROSPECTIVE JUROR:  Pelham Bay Park.
12                    THE COURT:  How long in your current address?
13                    PROSPECTIVE JUROR:  Nine years.
14                    THE COURT:  Anyone living in the household with
15         you?
16                    PROSPECTIVE JUROR:  My wife, my daughter and my
17         son.
18                    THE COURT:  Now, I know you say you work in a
19         building in Manhattan.
20                    PROSPECTIVE JUROR:  Yes.
21                    THE COURT:  You've had that job for a year you
22         said?
23                    PROSPECTIVE JUROR:  One year.
24                    THE COURT:  Right.  Anyone else in your household
25         employed?
```

1        PROSPECTIVE JUROR:  No.

2        THE COURT:  Have you or anyone close to you ever

3    been the victim of any kind of crime?

4        PROSPECTIVE JUROR:  No.

5        THE COURT:  Charged with, accused of, questioned

6    in connection with any kind of criminal activity, anyone

7    close to you anything like that?

8        PROSPECTIVE JUROR:  No.

9        THE COURT:  Do you have any close friends or

10   relatives who work in any kind of law enforcement job like

11   police officers?

12       PROSPECTIVE JUROR:  No, no.

13       THE COURT:  Nothing like that, court officers?

14       PROSPECTIVE JUROR:  No.

15       THE COURT:  Have you ever been on a jury?

16       PROSPECTIVE JUROR:  No, first time.

17       THE COURT:  You have?

18       PROSPECTIVE JUROR:  No, first time.

19       THE COURT:  This is the first time, okay.

20       Now you were here yesterday, you heard what other

21   people said.  I've told you what the charges are.  You know

22   what's expected of the jurors, to be fair and follow

23   instructions.  Is there any reason based on anything in your

24   life that you believe you could not be a fair juror if

25   selected in this case?

Jury Selection

1           PROSPECTIVE JUROR:  No.

2           THE COURT:  Do you promise me you will be fair?

3           PROSPECTIVE JUROR:  Yes.

4           THE COURT:  Let me ask you something.  You've been

5   sitting here.  Are you able to understand all the questions

6   I'm asking and all of the things that other people are

7   saying?

8           PROSPECTIVE JUROR:  I don't understand everything.

9           THE COURT:  You're having problems understanding

10  everything?

11          PROSPECTIVE JUROR:  Yes.

12          THE COURT:  Okay.  Miss Torres, how are you?

13          PROSPECTIVE JUROR:  Good.  How are you?

14          THE COURT:  Okay.  Tell me your neighborhood?

15          PROSPECTIVE JUROR:  Norwood.

16          THE COURT:  How long?

17          PROSPECTIVE JUROR:  Twenty years, a little bit

18  more.

19          THE COURT:  Anyone in your household with you?

20          PROSPECTIVE JUROR:  Yeah, my mom and my two

21  brothers.

22          THE COURT:  Now you're working, right?  Where are

23  you working?

24          PROSPECTIVE JUROR:  I'm a teacher.

25          THE COURT:  Right.  And in the summer also you

1    coordinate problems.  How long you been a school teacher?

2         PROSPECTIVE JUROR:  In the end of my first year.

3         THE COURT:  Anyone in your household working

4    outside the home?

5         PROSPECTIVE JUROR:  My mother.  She's a parent

6    coordinator.

7         THE COURT:  Okay good.  Have you or anyone close

8    to you ever been the victim of any kind of crime?

9         PROSPECTIVE JUROR:  Yeah.

10        THE COURT:  Who would that be?

11        PROSPECTIVE JUROR:  My aunt.

12        THE COURT:  And do you feel comfortable speaking

13   about this with other people around?

14        PROSPECTIVE JUROR:  Yeah.

15        THE COURT:  Tell me what happened to your aunt?

16        PROSPECTIVE JUROR:  She was raped.

17        THE COURT:  I'm very, very, very sorry to hear

18   that.  Let me, first of all, ask that question I asked other

19   people yesterday.  Are you able to put aside what happened

20   to your aunt and be a juror on this case where the charges

21   have absolutely nothing to do with that?

22        PROSPECTIVE JUROR:  I guess, I don't know.  Maybe

23   we can talk about this.

24        THE COURT:  Let me speak to you about this without

25   the other jurors also, okay.

1               Miss Cabrera, how are you?

2               PROSPECTIVE JUROR:  Hi.

3               THE COURT:  Tell me what neighborhood?

4               PROSPECTIVE JUROR:  University Heights.

5               THE COURT:  How long you've been at your current

6       address?

7               PROSPECTIVE JUROR:  Fifteen years.

8               THE COURT:  Anyone living in your household with

9       you?

10              PROSPECTIVE JUROR:  Yes.

11              THE COURT:  Who?

12              PROSPECTIVE JUROR:  My husband and two children.

13              THE COURT:  Now, I know you told me you work as a

14      counselor with young people on a --

15              PROSPECTIVE JUROR:  Mental health therapist, yes.

16              THE COURT:  Mental health therapist.  Is your

17      husband working?

18              PROSPECTIVE JUROR:  Yes.

19              THE COURT:  What does he do?

20              PROSPECTIVE JUROR:  He's a business owner.

21              THE COURT:  Now, have you or anyone close to you

22      ever been the victim of any kind of criminal activity,

23      victims of a crime?

24              PROSPECTIVE JUROR:  Yes.

25              THE COURT:  Who would that be?

Jury Selection

```
 1              PROSPECTIVE JUROR:  My husband and my father.

 2              THE COURT:  How long ago was -- are they separate

 3         incidents?

 4              PROSPECTIVE JUROR:  Yes.

 5              THE COURT:  How long ago did it happen to your

 6         husband?

 7              PROSPECTIVE JUROR:  My husband owns a grocery

 8         store so -- in Harlem, so he gets robbed like all the time.

 9         It's not --

10              THE COURT:  Okay.  So, well, let's talk about

11         this.  So I mean, these are people that come in with weapons

12         sometimes?

13              PROSPECTIVE JUROR:  Yes.  I've never --

14              THE COURT:  Or from what you've heard, right, or

15         they threaten that they might have weapons or something?

16              PROSPECTIVE JUROR:  Yes.

17              THE COURT:  And they take money.

18              PROSPECTIVE JUROR:  Money, uh, huh.

19              THE COURT:  Are the police call routinely?

20              PROSPECTIVE JUROR:  Sometimes, yeah.

21              THE COURT:  Does he have cameras?

22              PROSPECTIVE JUROR:  He does.

23              THE COURT:  And are arrests ever made?

24              PROSPECTIVE JUROR:  The cops haven't told my

25         husband what happens next.
```

Jury Selection

1          THE COURT:  The cops haven't told you?

2          PROSPECTIVE JUROR:  Because they don't take large

3     amounts of money.  It's whatever's on the register, a couple

4     of hundred and stuff like that.  He doesn't keep money like

5     that, so when the cops do the investigation they take the

6     report.

7          THE COURT:  So you're unaware if anyone's ever

8     arrested or followed up?

9          PROSPECTIVE JUROR:  Yeah, I'm unaware.

10          THE COURT:  Do the police ever ask to see the

11     surveillance video?

12          PROSPECTIVE JUROR:  Yes, they do.

13          THE COURT:  They do.  So, well, first of all,

14     there's a couple of things going on here.  Number one, the

15     charges in this case involve a robbery, a theft by force,

16     and you're telling me your husband's constantly a victim of

17     this type of crime due to the business he runs.  Is that

18     fact going to make you feel uncomfortable being a juror on

19     this type of case because the charges?

20          PROSPECTIVE JUROR:  No.

21          THE COURT:  Are you able to put all that aside?

22          PROSPECTIVE JUROR:  My husband's situation, yes.

23          THE COURT:  How about your, is it your father, are

24     you going to have a different answer?

25          PROSPECTIVE JUROR:  Yeah, because my father was,

1    my father's a driver.  He's been a driver for many years, 30

2    years.  That's how he makes a living.  And about a year ago

3    my father was robbed at gunpoint and beat.  And I went to

4    criminal court downtown Manhattan and I was his translator

5    for the DA while he was recounting his story.  And to me, it

6    was like impacting to see my father, an immigrant for so

7    long making a living, he gave us everything he could, and to

8    get beat the way he did.  Good thing for him he had the

9    dashboard camera so the camera recorded everything.  And he

10   didn't have to go to court because one of the gentleman --

11   he was beat by three people, one of the gentleman who robbed

12   him was on probation, out on probation, so the camera he was

13   like --

14            THE COURT:  So let me just stop you with this.

15   You, as your father, was deeply affected by what happened?

16            PROSPECTIVE JUROR:  Yes.

17            THE COURT:  You had to experience it through him

18   by talking to the DA relaying what happened.  You believe

19   you're not able to put that aside, even though it's a

20   different person, different situation because of what

21   happened to your dad?

22            PROSPECTIVE JUROR:  It's different than my

23   husband.  My husband's young and he's tough, you know.  It's

24   different.  My father is older and --

25            THE COURT:  I'm not, let me just say, and I've

1    said this to everyone, there are no right or wrong answers.

2    And you've actually thought about this overnight, you

3    understand the questions I'm asking you and the reason the

4    questions exist.  And we don't want to have a situation

5    where in any case for any reason where you hear all the

6    evidence and I give you the charge, and then you go back

7    with 11 other people to deliberate and you say, you know

8    what, I can't do this the way the judge told me because I'm

9    having trouble keeping my emotions from that case out of it.

10        You could be emotional but you can't let it

11    interfere with what the job you have to do as a juror.  And

12    that's the potential problem that we all have.  We come here

13    with a lifetime of things that have happened to us, good,

14    bad, great sometimes, horrible sometimes.  And then you're

15    on a jury.  And in order to be on a jury you have to kind

16    of, you're a fact finder, you have to focus on the

17    witnesses, you have to make factual determinations, and that

18    doesn't mean that what happened in your life didn't happen,

19    but you can't let that interfere with your ability to be a

20    fair and impartial juror for either side.

21        So are you unsure that you could put it aside or

22    do you believe you can't put it aside, but your father --

23        PROSPECTIVE JUROR:  In true honesty about my

24    father, I don't think emotionally like I could put it aside.

25    It's too fresh.

1              THE COURT:  And that's my -- and that's fine.

2     Thank you.

3              Miss Altschuler, how are you?

4              PROSPECTIVE JUROR:  I'm good, and yourself?

5              THE COURT:  Good, thank you.  So, neighborhood?

6              PROSPECTIVE JUROR:  Throgs Neck.

7              THE COURT:  How long?

8              PROSPECTIVE JUROR:  Thirty years.

9              THE COURT:  A while, okay.  Who do you live with,

10    if anyone?

11             PROSPECTIVE JUROR:  Husband and two daughters.

12             THE COURT:  Are you working outside the home?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  Did you tell me this already?  I

15    probably forgot.  What do you do?

16             PROSPECTIVE JUROR:  I'm a teacher.

17             THE COURT:  What grade do you teach?

18             PROSPECTIVE JUROR:  Third.

19             THE COURT:  Anyone else in your household

20    employed?

21             PROSPECTIVE JUROR:  Everybody, yes.

22             THE COURT:  Everybody.  Okay, what do they do?

23             PROSPECTIVE JUROR:  My husband is self-employed.

24    My daughter is the senior development officer for LIJ, and

25    my other daughter's a teacher.

Jury Selection

1           THE COURT:  Have you or anyone close to you ever
2      been the victim of any kind of crime?
3           PROSPECTIVE JUROR:  No.
4           THE COURT:  Charged with, accused of, questioned
5      in connection with?
6           PROSPECTIVE JUROR:  No.
7           THE COURT:  Any close friends or relatives work in
8      any kind of law enforcement capacity?
9           PROSPECTIVE JUROR:  No.
10          THE COURT:  Have you ever been or a jury?
11          PROSPECTIVE JUROR:  No.
12          THE COURT:  Now, after hearing everything that's
13     happened, after what other people have said, my questions,
14     knowing the type of crime that's charged in this case, do
15     you have any reason at all that you believe you could not be
16     fair if you were selected to be a juror in this case?
17          PROSPECTIVE JUROR:  I'd like to believe I can be
18     fair.
19          THE COURT:  Do you promise you'll be fair to the
20     DA?
21          PROSPECTIVE JUROR:  Sure, why not.
22          THE COURT:  And the defendant?
23          PROSPECTIVE JUROR:  Sure.
24          THE COURT:  And you'll follow all my instructions?
25          PROSPECTIVE JUROR:  Sure.

Jury Selection

```
 1              THE COURT:  Okay, thank you.
 2              Mr. Pena, how are you?
 3              PROSPECTIVE JUROR:  Okay.
 4              THE COURT:  Neighborhood?
 5              PROSPECTIVE JUROR:  Webster.
 6              THE COURT:  How long?
 7              PROSPECTIVE JUROR:  Eight years.
 8              THE COURT:  Anyone living in your household with
 9      you?
10              PROSPECTIVE JUROR:  Yeah, my parents and my
11      siblings.
12              THE COURT:  You working outside the home?
13              PROSPECTIVE JUROR:  I'm a full-time student.
14              THE COURT:  What are you studying?
15              PROSPECTIVE JUROR:  Criminal justice.
16              THE COURT:  Ah ha.  What do you hope to do with
17      your criminal justice degree besides getting job?  What kind
18      of work -- are you working?
19              PROSPECTIVE JUROR:  I'm planning to go to law
20      school.
21              THE COURT:  Great.  Let me just ask you how far
22      along are you in your studies?
23              PROSPECTIVE JUROR:  This is my senior year.
24              THE COURT:  In your course of studies do you
25      discuss the criminal justice system?
```

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  You discuss policing?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  Policies?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  Activities, all sorts of things?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  So you have some training in school on

9     certain issues?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  That gives you maybe a leg-up over

12    other people, in an academic sense anyway, about

13    understanding what's happening.

14          Now a juror, as I said, you come here with your

15    life experience, but when you're a juror your job is to be a

16    juror.  And one of the things no juror could ever do is

17    become an expert on any topic in the jury room.

18          If someone says oh, you're in your last year of

19    criminal justice, listen, when the judge says this, tell me

20    what it means, I don't really get what the judge is saying,

21    what would your answer be to that juror if they asked you to

22    become an expert or give advice outside the scope of my

23    instructions?

24          PROSPECTIVE JUROR:  We have to follow your

25    instruction to the word.

1          THE COURT:  And but also the second part is you

2     cannot, you cannot supplement anything.  I mean, the advice

3     would be, listen, if you don't understand, you should ask

4     the judge, don't ask me because of my background.  Right?

5     You understand that?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  And you promise me you wouldn't do

8     that?

9          PROSPECTIVE JUROR:  Yes.

10          THE COURT:  In your household who else is

11     employed?

12          PROSPECTIVE JUROR:  My father and my mother.

13          THE COURT:  What do they do?

14          PROSPECTIVE JUROR:  My father's a tailor, my

15     mother's a home attendant.

16          THE COURT:  Have you or anyone close to you ever

17     been the victim of a crime?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Who would that be?

20          PROSPECTIVE JUROR:  Myself and my younger brother.

21          THE COURT:  You feel comfortable talking about

22     yourself?

23          PROSPECTIVE JUROR:  Myself, yes.

24          THE COURT:  So tell me what happened to you?

25          PROSPECTIVE JUROR:  I was mugged a few years ago

Jury Selection

1    and an object of huge sentimental value was stolen from me.

2              THE COURT:  Was this the Bronx?

3              PROSPECTIVE JUROR:  Yes.

4              THE COURT:  Was there a weapon that you saw or was

5    threaten?

6              PROSPECTIVE JUROR:  It was a knife and a gun.

7              THE COURT:  More than one person?

8              PROSPECTIVE JUROR:  Yes, three people actually.

9              THE COURT:  Did you report it to the police?

10             PROSPECTIVE JUROR:  When I went to report it they

11   said it was too late because I went through a phase of being

12   in hysterics so I didn't know what to do.  And I almost got

13   into a huge trouble because of it, though when I went to it

14   was like a reported over a month after it happened, they

15   said it was too late.

16             THE COURT:  The charges in this case involve a

17   robbery, a stealing by force of property which is the

18   elements of the crime.  But, I mean, I'll give you full

19   instructions of it, but that's basically what a robbery is.

20   Because you've been a victim of a robbery will that prevent

21   you in any way from being a fair juror in this case?

22             PROSPECTIVE JUROR:  To myself it won't.  I don't

23   know.

24             THE COURT:  But now your --

25             PROSPECTIVE JUROR:  My little brother.

Jury Selection

1              THE COURT:  You don't want to discuss what

2       happened.  How long ago did it happen?

3              PROSPECTIVE JUROR:  To my brother or myself?

4              THE COURT:  No, your brother?

5              PROSPECTIVE JUROR:  Over two years ago.

6              THE COURT:  And was that in the Bronx too?

7              PROSPECTIVE JUROR:  Yes.

8              THE COURT:  Was anyone arrested in connection with

9       that case?

10             PROSPECTIVE JUROR:  No.

11             THE COURT:  Was he injured?

12             PROSPECTIVE JUROR:  Yes.

13             THE COURT:  How old was he at the time?

14             PROSPECTIVE JUROR:  Sixteen.

15             THE COURT:  Do you believe that -- so you said

16      about you, you've been, your personal experiences as a crime

17      victim that you would be able to put aside?

18             PROSPECTIVE JUROR:  Yes, and also leaning towards

19      the law.

20             THE COURT:  Well, that's a whole -- I haven't even

21      gotten to that question yet because that is an important

22      question.  That's the, I guess that goes back to your

23      training and your experience as choosing the major criminal

24      justice.  You believe that you have some sort of bias in

25      favor of law enforcement or against law enforcement?

Jury Selection

1           PROSPECTIVE JUROR:  I like to believe that I would

2      be fair.

3           THE COURT:  Okay.  Well then, do you promise me

4      you'll be fair?

5           PROSPECTIVE JUROR:  The thing is, your Honor.

6           THE COURT:  You know what?  Let's talk about this

7      without the other jurors, okay.

8           Mr. Ali?

9           PROSPECTIVE JUROR:  Yes.

10          THE COURT:  How are you, sir?

11          PROSPECTIVE JUROR:  Good.  How are you?

12          THE COURT:  Neighborhood?

13          PROSPECTIVE JUROR:  Norwood.

14          THE COURT:  How long?

15          PROSPECTIVE JUROR:  Seven years.

16          THE COURT:  Anyone living in your household with

17      you?

18          PROSPECTIVE JUROR:  Parents and older brother.

19          THE COURT:  Are you working?

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  What do you do?

22          PROSPECTIVE JUROR:  I work in a hotel.

23          THE COURT:  And anyone else in your household

24      working?

25          PROSPECTIVE JUROR:  My brother.

1          THE COURT:  What does your brother do?

2          PROSPECTIVE JUROR:  He's a pharmacy technician.

3          THE COURT:  Have you or anyone close to you ever

4    been the victim of a crime?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  Charged with, accused of, questioned

7    in connection with any criminal activity?

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  Do you have any close friends or

10   relatives who work at any kind of law enforcement capacity?

11         PROSPECTIVE JUROR:  A cousin.

12         THE COURT:  What does your cousin do?

13         PROSPECTIVE JUROR:  He's a police officer.

14         THE COURT:  Ever talk to your cousin about things

15   that happen in the job as a police officer?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  Question is asked basically for this

18   reason.  I've given you all an instructions you must judge a

19   police officer's testimony in what we call an objective

20   manner just like you must judge every other witness's

21   testimony in terms of their credibility.  You can't say a

22   police officer is entitled to more credibility or less

23   credibility simply because of what they do for a living.

24   You understand that?

25         PROSPECTIVE JUROR:  Yes, sir.

Jury Selection

1              THE COURT:  Promise me you'll follow that

2      instruction?

3              PROSPECTIVE JUROR:  Yes, sir.

4              THE COURT:  You've been on a jury?

5              PROSPECTIVE JUROR:  No, first time.

6              THE COURT:  If selected in this case, you promise

7      me you'll be fair to the DA?

8              PROSPECTIVE JUROR:  Yes.

9              THE COURT:  Fair to the defense?

10             PROSPECTIVE JUROR:  Yes.

11             THE COURT:  And you'll follow my instructions?

12             PROSPECTIVE JUROR:  Yes, sir.

13             THE COURT:  Okay, thank you.

14             Miss Baljit, how are you?

15             PROSPECTIVE JUROR:  Good.  How are you?

16             THE COURT:  Good, thank you.  Neighborhood?

17             PROSPECTIVE JUROR:  St. Lawrence.

18             THE COURT:  How long?

19             PROSPECTIVE JUROR:  Like 20 years.

20             THE COURT:  Anyone living in your household with

21     you?

22             PROSPECTIVE JUROR:  Yeah, my parents, my two

23     sisters and my niece.

24             THE COURT:  You working?

25             PROSPECTIVE JUROR:  Yeah, I work and I go to

1      school.
2                THE COURT:  So what kind of job do you do?
3                PROSPECTIVE JUROR:  I work at T-Mobile.
4                THE COURT:  And what are you studying in school?
5                PROSPECTIVE JUROR:  Radiology.
6                THE COURT:  Okay.  Anyone else in your household
7      employed?
8                PROSPECTIVE JUROR:  Yeah, my parents and my older
9      sister.
10               THE COURT:  What do they do?
11               PROSPECTIVE JUROR:  My sister's a receptionist.
12     My dad works for the Channel 7 ABC news, and my mom, I
13     honestly don't know what she does.  Like, she does work.
14               THE COURT:  She keeps it a secret?
15               PROSPECTIVE JUROR:  No, she works in an office.
16               THE COURT:  Works in an office, okay.  You know
17     everything is being taken done here, but I promise we won't
18     show your mother this, okay?  Go ahead.
19               PROSPECTIVE JUROR:  Yeah, that's it.
20               THE COURT:  So have you or anyone close to you
21     ever been the victim of any kind of crime?
22               PROSPECTIVE JUROR:  Yes, me and my sister.
23               THE COURT:  You feel comfortable talking about
24     what happened?
25               PROSPECTIVE JUROR:  Yeah, sure.

1        THE COURT:  Was it together or separate?

2        PROSPECTIVE JUROR:  No, it was separate.  My

3    sister, she, some guy like followed her off the train and

4    punched her in the face for her phone, so he robbed her.

5    And it was the same incident with me.  I was coming off the

6    train, like on my way home from work, they just pushed me

7    against the train station and stole my phone.

8        THE COURT:  Did you report this to the police?

9        PROSPECTIVE JUROR:  Yes.

10       THE COURT:  What happened to you?

11       PROSPECTIVE JUROR:  Yes.

12       THE COURT:  Did your sister report what happened

13   to her?

14       PROSPECTIVE JUROR:  Yeah.

15       THE COURT:  Do you know if anyone was arrested in

16   either instance?

17       PROSPECTIVE JUROR:  No.

18       THE COURT:  Were you satisfied with the way the

19   police handled the complaint that he took from you?

20       PROSPECTIVE JUROR:  No.

21       THE COURT:  No?

22       PROSPECTIVE JUROR:  No.

23       THE COURT:  Why not?

24       PROSPECTIVE JUROR:  Well, with my situation I felt

25   like they didn't care 'cause when I went to the police

Jury Selection

1    station he literally told me like a phone is in less of his

2    needs, that they have more important things to do, so I just

3    didn't go back.  He was just like put your name down but I'm

4    not gonna --

5              THE COURT:  Was this in the Bronx?

6              PROSPECTIVE JUROR:  Yeah.

7              THE COURT:  Well, let me, you know -- now this, of

8    course, has two separate parts, but let me get to the second

9    thing first, which is about the way you were not satisfied

10   with the way the police handled your sister's complaint and

11   probably yours as well.  But is that going to give you any

12   bias against law enforcement in this case?

13             PROSPECTIVE JUROR:  No.

14             THE COURT:  You promise me that?

15             PROSPECTIVE JUROR:  Yeah.

16             THE COURT:  What about the fact that you're the

17   victim and your sister were the victims of a crime that

18   involved a theft, robbery, is that going to make you feel

19   that you could not be fair in this case to the defense?

20             PROSPECTIVE JUROR:  No, I don't think so.

21             THE COURT:  Are you able to put that aside?

22             PROSPECTIVE JUROR:  Yeah.

23             THE COURT:  Just judge this case on what the

24   allegations are in this case?

25             PROSPECTIVE JUROR:  Yeah.

Jury Selection

 1          THE COURT:  Okay.  Anyone close ever been charged

 2     with, accused of, questioned in connection with any crime?

 3          PROSPECTIVE JUROR:  Yes.

 4          THE COURT:  Who would that be?

 5          PROSPECTIVE JUROR:  My cousin.

 6          THE COURT:  How long was that?

 7          PROSPECTIVE JUROR:  Probably two years ago.

 8          THE COURT:  Was that in the Bronx?

 9          PROSPECTIVE JUROR:  Yeah.

10          THE COURT:  Your cousin was arrested?

11          PROSPECTIVE JUROR:  Yeah.

12          THE COURT:  Did you ever come to court for

13     anything involving that case?

14          PROSPECTIVE JUROR:  No, I didn't.

15          THE COURT:  Do you know if your cousin had to

16     attend court?

17          PROSPECTIVE JUROR:  Yeah, he did.

18          THE COURT:  Is the case still pending if you know?

19          PROSPECTIVE JUROR:  No, he's on probation.

20          THE COURT:  So he -- number one, do you believe

21     your cousin was treated unfairly based on what you know?

22     You know what he was charged with and what happened, do you

23     believe he was treated unfairly by the police?

24          PROSPECTIVE JUROR:  Um, I don't know.  I think so,

25     but then I don't.  I don't know how to --

1          THE COURT:  Well, you know, when you're arrested

2     in the Bronx the people who are the prosecutors are the

3     Bronx DA's Office.  Mr. Mendys is a member of the Bronx

4     District Attorney's Office, so his office would have been

5     the prosecutor on the case involving your cousin.  Will that

6     make you believe in any way that you couldn't be fair to the

7     police or the DA because the fact that your cousin was

8     arrested and prosecuted in Bronx County?

9          PROSPECTIVE JUROR:  No, I have no problem.

10          THE COURT:  You promise me that you will not hold

11    that against the police or the DA's office?

12          PROSPECTIVE JUROR:  Yeah.

13          THE COURT:  Okay.  Do you have any close friends

14    or relatives who work in law enforcement?

15          PROSPECTIVE JUROR:  Yeah.  My uncle who was

16    working I think at Rikers Island, something like that.

17          THE COURT:  So the instruction that I give you,

18    are you able to judge a police witness testimony objectively

19    in a way that I've told you?

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  You ever been on a jury?

22          PROSPECTIVE JUROR:  No.

23          THE COURT:  Knowing everything that you know about

24    yourself, knowing what happened to you, your sister, your

25    cousin, anything else in your life, and knowing what it

1    takes to be a fair and impartial juror, do you promise me

2    that if you're selected you will be fair to the DA?

3                PROSPECTIVE JUROR:  Yeah.

4                THE COURT:  You promise me you will be fair to the

5    defense?

6                PROSPECTIVE JUROR:  Yeah.

7                THE COURT:  And you promise you'll follow each of

8    my instructions?

9                PROSPECTIVE JUROR:  Yeah.

10               THE COURT:  Okay, thank you.

11               Mr. Betances, how are you, sir?

12               PROSPECTIVE JUROR:  I'm good, well.  Thank you.

13               THE COURT:  Neighborhood?

14               PROSPECTIVE JUROR:  Kingsbridge.

15               THE COURT:  How long?

16               PROSPECTIVE JUROR:  Twenty-two years.

17               THE COURT:  You live with anyone in your

18   household?

19               PROSPECTIVE JUROR:  Yes.  My parents, my sister

20   and two younger brothers.

21               THE COURT:  You working?

22               PROSPECTIVE JUROR:  Yes, I'm a teacher.

23               THE COURT:  What do you teach?

24               PROSPECTIVE JUROR:  Seventh and eighth English.

25               THE COURT:  Okay.  And anyone else in your

Jury Selection

1      household employed?

2                  PROSPECTIVE JUROR:  Yes, my parents and my sister.

3                  THE COURT:  What do they do?

4                  PROSPECTIVE JUROR:  My father works for a company

5      called Remco, and my mother is a teacher's aide, and my

6      sister is an accountant for PWC.

7                  THE COURT:  Okay.  Now have you or anyone close to

8      you ever been the victim of any kind of crime?

9                  PROSPECTIVE JUROR:  Yes, my brother.

10                  THE COURT:  You feel comfortable speaking about

11      this?

12                  PROSPECTIVE JUROR:  Yes.

13                  THE COURT:  How long ago was it?

14                  PROSPECTIVE JUROR:  It was in February.

15                  THE COURT:  February of this year?

16                  PROSPECTIVE JUROR:  Yes.

17                  THE COURT:  What happened?

18                  PROSPECTIVE JUROR:  He was held at gunpoint and

19      robbed.

20                  THE COURT:  Was this in the Bronx?

21                  PROSPECTIVE JUROR:  Yes.

22                  THE COURT:  Was it reported to the police?

23                  PROSPECTIVE JUROR:  Yes.

24                  THE COURT:  Do you know if anyone was arrested?

25                  PROSPECTIVE JUROR:  There were no arrests.

Jury Selection

1           THE COURT:  Based on what you know -- did you go

2      to the police with your brother or --

3           PROSPECTIVE JUROR:  They came to our house.

4           THE COURT:  Were you present when they spoke?

5           PROSPECTIVE JUROR:  Yes.

6           THE COURT:  Were you satisfied with the way they

7      treated your brother in taking the complaint?

8           PROSPECTIVE JUROR:  Yes.

9           THE COURT:  I know you said there have been no

10     arrests.  Do you have any dissatisfaction with the police in

11     the manner in which the case was investigated?

12          PROSPECTIVE JUROR:  No.

13          THE COURT:  It is a robbery and the charges here

14     are robbery.  Do you promise me that you are able to put

15     that aside and be fair as a juror in this case?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Anyone close to you ever been charged

18     with, accused of, questioned in connection with any crime?

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  Who would that be?

21          PROSPECTIVE JUROR:  My uncle.

22          THE COURT:  Feel comfortable talking about this?

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  Well, let me just ask you, how long

25     ago -- we're going to talk about it without the other

Jury Selection

1    jurors.  How long was it?

2              PROSPECTIVE JUROR:  Two years.

3              THE COURT:  And was it in the Bronx?

4              PROSPECTIVE JUROR:  Yes.

5              THE COURT:  Okay.  We'll talk in private, okay?

6              Miss Adames, how are you?

7              PROSPECTIVE JUROR:  Good.  How are you?

8              THE COURT:  Neighborhood?

9              PROSPECTIVE JUROR:  Bailey Avenue.

10             THE COURT:  How long?

11             PROSPECTIVE JUROR:  Twenty years.

12             THE COURT:  Anyone living in your household with

13   you?

14             PROSPECTIVE JUROR:  Yeah, my parents.

15             THE COURT:  You working?

16             PROSPECTIVE JUROR:  No, I just graduated from

17   college.

18             THE COURT:  What did you get a degree in?

19             PROSPECTIVE JUROR:  Biology.

20             THE COURT:  Congratulations.

21             PROSPECTIVE JUROR:  Thank you.

22             THE COURT:  Anyone in your household employed?

23             PROSPECTIVE JUROR:  Yeah, my parents.  My father's

24   a superintendent in a building in Harlem and my mother's a

25   home health aide.

Jury Selection

1          THE COURT:  Have you or anyone close to you ever

2      been the victim of any kind of crime?

3          PROSPECTIVE JUROR:  Yes, I have been.

4          THE COURT:  Are you comfortable talking?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  Okay, private.

7          Miss Gonzalez, how are you?

8          PROSPECTIVE JUROR:  Good.  How about you?

9          THE COURT:  Good, thank you.  Neighborhood?

10         PROSPECTIVE JUROR:  Pelham Bay.

11         THE COURT:  How long?

12         PROSPECTIVE JUROR:  Four years.

13         THE COURT:  Anyone living in your household with

14     you?

15         PROSPECTIVE JUROR:  Yes, my son and my daughter.

16         THE COURT:  You working?

17         PROSPECTIVE JUROR:  Yes.

18         THE COURT:  What do you do?

19         PROSPECTIVE JUROR:  I'm a director of an

20     outpatient mental health program.

21         THE COURT:  Anyone else in your household

22     employed?

23         PROSPECTIVE JUROR:  No.

24         THE COURT:  Let me ask you, does your program have

25     dealings with the court system?

Jury Selection

1          PROSPECTIVE JUROR:  We sometimes get forensic
2     referrals.
3          THE COURT:  Do you have to come to court at any
4     time?
5          PROSPECTIVE JUROR:  No.
6          THE COURT:  With any cases?
7          PROSPECTIVE JUROR:  Not so far.
8          THE COURT:  Have you or anyone close to you ever
9     been the victim of any kind of crime?
10          PROSPECTIVE JUROR:  No.
11          THE COURT:  Charged with, accused of, questioned
12     in connection with any kind of crime?
13          PROSPECTIVE JUROR:  No.
14          THE COURT:  Any close friends or relatives who
15     work in any kind of law enforcement capacity?
16          PROSPECTIVE JUROR:  My ex-husband is a police
17     officer.
18          THE COURT:  Now, he's your ex-husband.  Do you
19     hold that against the whole police department?
20          PROSPECTIVE JUROR:  Not at all.
21          THE COURT:  You're going to see police witnesses
22     testify.  You promise me you're going to follow my
23     instructions about judging police witness testimony
24     objectively?
25          PROSPECTIVE JUROR:  Yes.

Jury Selection

1          THE COURT:  Ever been on a jury?

2          PROSPECTIVE JUROR:  No.

3          THE COURT:  If you are selected, knowing

4   everything you know about yourself, what the case is about

5   what we're looking for, which is basically to be fair,

6   impartial, unbiased; listen, follow the law, and legal

7   instructions, you promise me that you'll be able to do that?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Promise me you'll be fair to the DA?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  Fair to the defense?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  Follow everything I tell you?

14          PROSPECTIVE JUROR:  Yes.

15          THE COURT:  Thank you.

16          Mr. Abad, how are you?

17          PROSPECTIVE JUROR:  I'm good, and yourself?

18          THE COURT:  Good, thank you.  Neighborhood?

19          PROSPECTIVE JUROR:  171 and Grand Concourse.

20          THE COURT:  How long?

21          PROSPECTIVE JUROR:  Three years.

22          THE COURT:  Is anyone living in your household

23   with you?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  Who would that be?

Jury Selection

1          PROSPECTIVE JUROR:  My mother, little brother, two
2     nieces and two nephews.
3          THE COURT:  You working?
4          PROSPECTIVE JUROR:  No, just graduated.
5          THE COURT:  What did you study?
6          PROSPECTIVE JUROR:  Psychology.
7          THE COURT:  Congratulations to you as well.
8          Anyone in your household employed?
9          PROSPECTIVE JUROR:  Not right now.
10          THE COURT:  You or anyone close to you ever been
11     the victim of any kind of crime?
12          PROSPECTIVE JUROR:  Yeah.
13          THE COURT:  Who would that be?
14          PROSPECTIVE JUROR:  Myself.
15          THE COURT:  You feel comfortable speaking about
16     it?
17          PROSPECTIVE JUROR:  Yeah.  It was, I got jumped
18     for my phone years back.
19          THE COURT:  How long was that?
20          PROSPECTIVE JUROR:  Maybe seven years ago or
21     something.
22          THE COURT:  Was it in the Bronx?
23          PROSPECTIVE JUROR:  Yeah.
24          THE COURT:  You reported to the police?
25          PROSPECTIVE JUROR:  Yeah.

1          THE COURT:  Police take a complaint?

2          PROSPECTIVE JUROR:  Yeah.  I just needed to report

3     it to them, my phone for my company.

4          THE COURT:  You didn't -- were you satisfied with

5     the way the police spoke with you in that case?

6          PROSPECTIVE JUROR:  I didn't think anything of it.

7     I was just, I just needed the report.  I needed to get my

8     phone back from the company.

9          THE COURT:  Okay.  Now based on what happened, I

10    mean, you were jumped, so someone actually threatened or hit

11    you or something?

12         PROSPECTIVE JUROR:  Yeah.

13         THE COURT:  So based on the charges in this case

14    being a robbery, are you able to put aside what happened to

15    you and be fair in this case?

16         PROSPECTIVE JUROR:  I would say from myself yeah,

17    but there has been another incident with my sister.

18         THE COURT:  Oh, we should probably talk about that

19    in private, too.  All right.

20         So we have, I have a number of people I need to

21    speak with one-on-one here, and the first will be Miss Diaz.

22    We're going to take a recess now while I do this.  When I

23    have finished with these questions, the next order of

24    business will be questioning by the attorneys of the people

25    who are going to remain in the box, and then we'll continue

1    with the jury selection process.

2         So Miss Diaz, if you could just remain behind,

3    I'll call the other people who wish to speak to me

4    one-on-one back into the courtroom.  And while we have this

5    recess, the recess instructions apply.  Do not discuss the

6    case, keep an open mind, and I'll see you, the rest of you

7    all, the rest of you who remain afterwards, okay.  Miss

8    Diaz, you can just sit down, okay.

9         (Whereupon, the prospective jurors exited the

10   courtroom.)

11        THE COURT:  All the prospective jurors have left

12   and we have juror seated in seat three, Miss Diaz.

13        So what did you want -- I know you didn't feel

14   comfortable talking about it in front of other jurors.  Tell

15   me now what's on your mind.

16        PROSPECTIVE JUROR:  Well, my family didn't report

17   what happened to my cousin because --

18        THE COURT:  You didn't report the stabbing, right,

19   that's what -- so what happened was you knew the person and?

20        PROSPECTIVE JUROR:  Well, this happened in this

21   building after a party my family was having to celebrate my

22   aunt's birthday.  He went downstairs to take someone in a

23   cab and they jumped him and they stabbed him.  He chose not

24   to report it.

25        THE COURT:  Was he afraid?

Jury Selection

1              PROSPECTIVE JUROR:  I don't think he was afraid.

2       We just don't really trust the police.

3              THE COURT:  Now, let me see how I could formulate

4       the question.  Is the failing to report something and the

5       crime itself, I mean the whole incident, is that something

6       that would leave you to believe in any way you could not be

7       fair as a juror in this case?

8              PROSPECTIVE JUROR:  That's a specific incident,

9       but another encounter my family has had.

10             THE COURT:  Tell me about that?

11             PROSPECTIVE JUROR:  Well, my dad is currently in

12      prison.

13             THE COURT:  I missed it.

14             PROSPECTIVE JUROR:  My dad is currently in prison.

15             THE COURT:  Okay.  And did you come to court for

16      any proceedings involving him?

17             PROSPECTIVE JUROR:  When I was younger, yes.

18             THE COURT:  And was that in the Bronx?

19             PROSPECTIVE JUROR:  No, it was in Brooklyn.

20             THE COURT:  And do you believe what you, based on

21      everything that you know, that your father was treated

22      unfairly in any way?

23             PROSPECTIVE JUROR:  During the proceedings, no.

24             THE COURT:  So why, what is it about that that you

25      believe would not make you be fair in this case?

Jury Selection

1          PROSPECTIVE JUROR:  Treatment of his, the way he's

2     being treated or was treated at some point where he was

3     held.

4          THE COURT:  And you believe that that would

5     prevent you from following my instructions, that you just

6     have to judge the case on the facts and not let things that

7     have happened in your life affect --

8          PROSPECTIVE JUROR:  If I'm answering truthfully,

9     yes, especially when you specified that NYPD was part of the

10    witness list and detectives and etc.

11         THE COURT:  Any questions, Mr. Mendys?

12         MR. MENDYS:  No, Judge.

13         THE COURT:  Mr. Bonanno?

14         MR. BONANNO:  None.

15         MR. MENDYS:  Consent.

16         THE COURT:  Is there consent?

17         MR. BONANNO:  Yes.

18         THE COURT:  We're going to excuse you, Miss Diaz.

19    You are excused from further service on this case, and thank

20    you.  You can go back to the central jury room.

21         (Whereupon, the prospective juror exited the

22    courtroom.)

23         THE COURT:  The next one is Mr. Vargas.

24         COURT OFFICER:  Prospective juror entering.

25         (Whereupon, the prospective juror entered the

Jury Selection

1    courtroom.)

2          THE COURT:  You can just sit anywhere in the jury

3    box.  Mr. Luis Vargas who's prospective juror number four

4    currently.

5          So you said your mother and your brother?

6          PROSPECTIVE JUROR:  Yeah, in 1993 my moms in

7    Pennsylvania, she was murdered by her, by her boyfriend.  He

8    choked her and then he tried to burn the apartment.  But it

9    never, you know.  And then in the 90's I think my brother

10    got shot in Townsend Avenue and 176.

11          THE COURT:  You know, first of all, I'm so sorry.

12          PROSPECTIVE JUROR:  No, no, it's --

13          THE COURT:  Well, you know, it's a terrible

14    terrible thing and I'm sorry to even have to ask questions

15    of people who come in for jury service because I know it

16    brings back a lot just to be in a courtroom sometimes.

17          PROSPECTIVE JUROR:  I also have a cousin, he's a

18    police officer.  I don't have to tell you the truth, you see

19    me with tattoos and everything.

20          THE COURT:  I do.

21          PROSPECTIVE JUROR:  I've never been to jail.  I

22    have a grandkid.  I have a 26-year-old boy because I was a

23    father from young.  I have a 26, 21 and I have a daughter

24    with Down syndrome.  I just had a newborn, too.

25          THE COURT:  You told us --

Jury Selection

1          PROSPECTIVE JUROR:  I had a grandson from my

2     daughter.

3          THE COURT:  And you know, I heard all of that and

4     you told me something about, what's the day that you have --

5          PROSPECTIVE JUROR:  No, I have an appointment

6     tomorrow.

7          THE COURT:  The appointment tomorrow?

8          PROSPECTIVE JUROR:  Tomorrow.

9          THE COURT:  Right, but I'm just saying --

10         PROSPECTIVE JUROR:  I could be fair with the

11    lawyers.

12         THE COURT:  First of all, I can understand how

13    people don't want to speak about personal things with the

14    other jurors around.  There's no problem, I have no problem

15    with that.  The question, and I'm not sure if you're

16    answering it ahead of time, are you able to be fair?

17         PROSPECTIVE JUROR:  I could be fair.  Of course I

18    could be fair.

19         THE COURT:  You promise me you will?

20         PROSPECTIVE JUROR:  Yes, because I'm more against

21    crime.  And I have cousin like in the law enforcement.

22         THE COURT:  Well --

23         PROSPECTIVE JUROR:  I could be fair.

24         THE COURT:  See, but that's, that's all against

25    crime?

Jury Selection

1          PROSPECTIVE JUROR:  No, no.

2          THE COURT:  Well, you know when you say something

3     like that, and I understand nobody supports crime.

4          PROSPECTIVE JUROR:  No, no, exactly.

5          THE COURT:  But you cannot -- I told everyone that

6     this is not like a referendum on anything, that includes

7     crime, you know.  You don't become a juror and say I'm going

8     to vote to convict someone because I'm against crime.

9          PROSPECTIVE JUROR:  No, no.

10          THE COURT:  If you vote to convict it's because

11     the People have --

12          PROSPECTIVE JUROR:  I have another problem too.

13          THE COURT:  You have tell me.

14          PROSPECTIVE JUROR:  No, no, I'll explain to you.

15     I was born and raised in the Bronx, right.  I live in

16     Macombs, and I heard that the crime happens is Walton.  So

17     you said the names yesterday.  I don't recognize the names,

18     the only problem I have is if I get selected and I recognize

19     one of these people.

20          THE COURT:  Well, you see, and this is the best

21     that we can do at this point because witnesses --

22          PROSPECTIVE JUROR:  That's one more problem I

23     have.

24          THE COURT:  No, no, and the reason the question is

25     asked because sometimes people say well, I live there, I've

1    heard about this.  Or they may say --

2           PROSPECTIVE JUROR:  I never heard about nothing.

3           THE COURT:  No, what I'm saying is sometimes

4    hearing a name you might think you know somebody.

5           PROSPECTIVE JUROR:  Yes.

6           THE COURT:  But you don't right now.  But if you

7    were selected and you realized that you knew someone, you

8    would have a duty to inform me.

9           PROSPECTIVE JUROR:  Of course I'll tell you.

10          THE COURT:  Through a court officer.

11          PROSPECTIVE JUROR:  That's one of my problems.

12   That's the only problem I have, that I'm afraid that I

13   probably know one of these.

14          THE COURT:  You're what?

15          PROSPECTIVE JUROR:  I'll probably know one of

16   these or seen one of these guys.

17          THE COURT:  You may or may not, but if that

18   happens --

19          PROSPECTIVE JUROR:  I'll let you know.  I'll tell

20   you right away.

21          THE COURT:  So you've never been on a jury;

22   correct?

23          PROSPECTIVE JUROR:  No.  I've been called but

24   never been selected.

25          THE COURT:  If you are selected in this case, and

1    knowing everything that you know about the charges, it's a

2    robbery, it's in that neighborhood that you know, those are

3    the allegations, you've had terrible things happen in your

4    life to family members, you have relatives who were on the

5    police force, are you promising me that if you are selected

6    you will be fair?

7              PROSPECTIVE JUROR:  I will be fair.

8              THE COURT:  You'll be fair to the DA?

9              PROSPECTIVE JUROR:  I'll be fair.

10             THE COURT:  And the defense?

11             PROSPECTIVE JUROR:  Of course.

12             THE COURT:  And you'll follow my instructions?

13             PROSPECTIVE JUROR:  Of course.

14             THE COURT:  Mr. Mendys, do you have any questions

15   on any of the things right now?

16             MR. MENDYS:  I do not.

17             THE COURT:  Mr. Bonanno, anything about -- you can

18   question Mr. Vargas again about things that don't apply to

19   what he's raising now, but obviously he doesn't want to talk

20   about what happened in his family with the other jurors.  So

21   I'll give you an opportunity to address anything like that

22   now.

23             MR. BONANNO:  I understand, Judge.  Just on the

24   questioning here, if I can have one or two?

25             THE COURT:  Go ahead.

Jury Selection

1           MR. BONANNO:  I notice, Mr. Vargas, when the judge

2     was speaking with you, and I know you said you could be

3     fair, but your answers were directed directly to the DA.

4     And just now when the judge asked you if you could be fair

5     to the DA, you acknowledged the DA eye-to-eye, and when the

6     judge asked you if you can be fair to the defense?

7           PROSPECTIVE JUROR:  No, no, I'm sorry.  I'm sorry

8     if I didn't acknowledge.

9           MR. BONANNO:  I'm not taking it personal.  I'm not

10    taking it personal.  I just want you to give an

11    explanation --

12          PROSPECTIVE JUROR:  Of course.

13          MR. BONANNO:  -- for your reasons, because when

14    the judge asked you to be fair to the defense you kind of

15    put your head down.

16          PROSPECTIVE JUROR:  No, no, I'm just a little --

17          MR. BONANNO:  I'm asking you to really search your

18    soul.

19          PROSPECTIVE JUROR:  Yes.  Yeah, I could be fair to

20    you too.

21          MR. BONANNO:  You could be fair to both sides?

22          PROSPECTIVE JUROR:  Yeah, to both sides.

23          MR. BONANNO:  I have no further questions, Judge.

24          THE COURT:  Okay.  See you in a few minutes, Mr.

25    Vargas.  Thank you.

Jury Selection

1          PROSPECTIVE JUROR:  Thank you.

2          (Whereupon, the prospective juror exited the

3     courtroom.)

4          THE COURT:  Mr. Deda.

5          COURT OFFICER:  Prospective juror entering.

6          (Whereupon, the prospective juror entered the

7     courtroom.)

8          THE COURT:  Mr. Deda, prospective juror number

9     six, has entered the courtroom.

10          Now Mr. Deda, you had approached prior to jury

11     selection and we had a conversation about your belief that

12     you could not really understand enough English.  I believed

13     at our bench conference that you did, and I actually you

14     were answering all the questions perfectly well until I got

15     to the last one about whether you could be fair and you

16     didn't respond to that.

17          And so tell me, number one, about the English

18     part.  What haven't you understood?

19          PROSPECTIVE JUROR:  Sorry again.  I'm sorry?

20          THE COURT:  You haven't understood a lot of what I

21     said?

22          PROSPECTIVE JUROR:  You need to tell me, I don't

23     understand.

24          THE COURT:  Any questions, Mr. Mendys?

25          MR. MENDYS:  No, Judge.  Consent.

1          THE COURT:  Is there consent?

2          MR. BONANNO:  Consent, Judge.

3          MR. MENDYS:  Consent.

4          THE COURT:  You're excused, sir.

5          (Whereupon, the prospective juror exited the

6     courtroom.)

7          THE COURT:  Okay, Miss Rebecca Torres.

8          COURT OFFICER:  Prospective juror entering.

9          (Whereupon, the prospective juror entered the

10    courtroom.)

11         THE COURT:  Prospective juror seat number seven,

12    Rebecca Torres.  Miss Torres, sit in any seat.  Don't worry.

13    That's just the record I'm making of who you are in your

14    position in the jury box.

15         So tell me you want to speak in private about

16    things that have happened.  So tell me what happened.

17         PROSPECTIVE JUROR:  Well, the thing is, like it

18    happened a very long time ago, like about 10 to 11 years

19    ago.  I was really young when it happened and we never

20    pressed charges.  I was never given the whole story because

21    I was so young when it happened but I do know that it

22    happened.  Like, my aunt was going to see a friend who's

23    supposed to be her friend and she was raped and, like, they

24    never pressed charges.

25         THE COURT:  And you said there was no one ever

Jury Selection

1      arrested?

2              PROSPECTIVE JUROR:  No.

3              THE COURT:  Are you able to put that aside and be

4      a juror?

5              PROSPECTIVE JUROR:  The rape, probably, yes.

6              THE COURT:  But then there's something else?

7              PROSPECTIVE JUROR:  Yeah.

8              THE COURT:  What's the other thing?

9              PROSPECTIVE JUROR:  Oh well, no, I know somebody

10     recently convicted of something, of burglary actually.

11             THE COURT:  You believe that would make you

12     unfair?

13             PROSPECTIVE JUROR:  Well so, I mean, it's a long

14     story.  It was my boyfriend's twin sister and it happened

15     about four years ago, and she was just a lookout.  And I've

16     taken criminal law classes so I totally understand why she's

17     convicted because she was included in the crime.  But just

18     from, like, what she's told from me, like, the way it went

19     down, like, it just shouldn't, I don't know if it's

20     unprofessional, I guess, for me to say, it shouldn't have

21     went down like that.  I don't know.

22             Like, she was, like, treated very rudely and she

23     was promised certain things and, like, she wasn't given it.

24     And then, like, apparently, like, they were just extremely

25     rough with her and they let the people that she was with,

Jury Selection

1       like, run away, but like, they -- and she's a female and

2       then they grabbed her and they were just, like, really rough

3       with a female.  So just thinking about that, like, kind of

4       makes it hard.

5              THE COURT:  And is that, it's that you believe it

6       would affect your ability to be fair in this case?

7              PROSPECTIVE JUROR:  If I'm honest, yes.

8              THE COURT:  Okay.  Any questions, Mr. Mendys?

9              MR. MENDYS:  No, Judge.  Consent.

10             THE COURT:  Mr. Bonanno?

11             MR. BONANNO:  None.

12             THE COURT:  Is there consent?

13             MR. MENDYS:  Yes.

14             MR. BONANNO:  Yes.

15             THE COURT:  All right, you're excused, Miss

16      Torres.  Thank you.

17             (Whereupon, the prospective juror exited the

18      courtroom.)

19             THE COURT:  The next one I have to speak with, I'm

20      not going to call Miss Cabrera back in unless you want me to

21      call her back in.

22             MR. MENDYS:  No.

23             MR. BONANNO:  Who was that?

24             THE COURT:  Then --

25             MR. MENDYS:  I'm okay, unless -- I'm fine, unless

1          Mr. Bonanno --

2                    THE COURT:  Mr. Bonanno?

3                    MR. BONANNO:  What was the issue?

4                    THE COURT:  You can talk to her in the jury box.

5          I have nothing else I want to say to her.

6                    MR. BONANNO:  That's the husband and the father.

7                    MR. MENDYS:  Right.

8                    THE COURT:  The next one is, therefore, Mr. Pena.

9          Julio Pena.

10                   MR. MENDYS:  Yes.  Julio Pena who's number 12.

11                   COURT OFFICER:  Prospective juror entering.

12                   (Whereupon, the prospective juror entered the

13         courtroom.)

14                   THE COURT:  Prospective juror number 12, Mr. Julio

15         Pena, has entered the courtroom, outside the presence of the

16         other jurors.

17                   So Mr. Pena, at the very end we were getting into

18         this dialogue about fairness and things that you thought

19         might have prevented you from being fair.  Have you thought

20         about, you know, that question and answer again?  Just tell

21         me what you want to share with me.

22                   PROSPECTIVE JUROR:  Well, my younger brother when

23         he was robbed, he was at knifepoint.  He was punched in the

24         face very hard to the point he almost lost his right eye,

25         and it's probably gonna cost him his entrance into the

1    Marine Corp.  We went through a lot because it was a lot of

2    going back and forth to doctors and he almost lost the eye.

3    So through that time I saw it and I couldn't believe it

4    myself.  So every time I even think about seeing him with

5    that eye patch on his face, I can't describe the feeling,

6    your Honor.

7                THE COURT:  And I understand all of that.  And let

8    me say, as I say to many people, I'm even sorry that I have

9    to ask these types of questions because it brings back

10   things that you may not think about unless -- well, you

11   certainly will think about more when you're prompted, let's

12   put it that way.  But that is horrible what happened to your

13   brother.  It's not that case.  You understand that?

14               PROSPECTIVE JUROR:  Yes, I do understand.

15               THE COURT:  And I need an assurance from you, if

16   you can give me the assurance, and I don't want to put words

17   in your mouth, I need an assurance that you will be able to

18   put that aside, that you will focus only on this case, and

19   that you will be fair to both sides and follow my

20   instructions despite what happens.  And that's the real

21   question.

22               PROSPECTIVE JUROR:  Your Honor, since I'm under

23   oath I can't promise you that I can be fair, and I honestly

24   don't want any bias to affect the outcome of the case.

25               THE COURT:  Nobody does, and I appreciate your

Jury Selection

1      honesty.  Any questions?

2              MR. MENDYS:  No.

3              MR. BONANNO:  None, Judge.

4              THE COURT:  Do we have consent?

5              MR. MENDYS:  Yes.

6              THE COURT:  And I do, I appreciate your honesty

7      tremendously, Mr. Pena.  Thank you for sharing that with us

8      in an honest way.  I'm sorry for what happened to your

9      brother, and you just have to go back to the central jury

10     clerk, and thank you.

11             (Whereupon, the prospective juror exited the

12     courtroom.)

13             THE COURT:  The next one I have is Mr. Betances.

14             MR. BONANNO:  Judge?

15             MR. MENDYS:  Judge before --

16             THE COURT:  Go ahead.

17             MR. MENDYS:  In terms of Miss Cabrera, I think Mr.

18     Bonanno and I would consent to her release.

19             MR. BONANNO:  Yes.

20             THE COURT:  Consent to her being excused from the

21     jury?

22             MR. BONANNO:  Yes.

23             THE COURT:  All right, we'll do that at the very

24     end.  Actually, you know what?  You can give her her card.

25     You find Miss Cabrera in the hallway, that's prospective

Jury Selection

1     juror number 10.   Then Mr. Betances.

2             COURT OFFICER:   Prospective juror entering.

3             (Whereupon, the prospective juror entered the

4     courtroom.)

5             THE COURT:   Prospective juror number 15, Mr.

6     Andrew Betances.

7             So Mr. Betances, again, share with us what

8     happened and then tell me how you think it might, if at all,

9     affect your ability to be fair.

10            PROSPECTIVE JUROR:   I don't think it would.   My

11    uncle was arrested for distributing heroin.   He was

12    arrested.   He did his time I think in two years, then went

13    to a rehab facility, so.

14            THE COURT:   And it was in the Bronx you said?

15            PROSPECTIVE JUROR:   It was in the Bronx.

16            THE COURT:   Did you ever come to court?

17            PROSPECTIVE JUROR:   No.

18            THE COURT:   But he went through courtroom

19    proceedings?

20            PROSPECTIVE JUROR:   Uh, huh.

21            THE COURT:   Yes?   And he's in jail?

22            PROSPECTIVE JUROR:   No.

23            THE COURT:   But he was prosecuted by the Bronx

24    District Attorney's Office who's the prosecutor for all

25    cases where arrests occur in Bronx County.   You said you

Jury Selection

1      don't believe you would be unfair but I need to have an

2      assurance from you.  Is there any reason that you believe he

3      was treated unfairly by the police?

4                  PROSPECTIVE JUROR:  No.

5                  THE COURT:  By the DA's office?

6                  PROSPECTIVE JUROR:  No.

7                  THE COURT:  Do you have any bias against law

8      enforcement whatsoever based on what happened?

9                  PROSPECTIVE JUROR:  No.

10                 THE COURT:  Do you have any close friend or

11     relative who works in law enforcement?

12                 PROSPECTIVE JUROR:  No.

13                 THE COURT:  I didn't ask you that question, right,

14     and you've never been on a jury either?

15                 PROSPECTIVE JUROR:  No.

16                 THE COURT:  So based on everything that you know

17     about yourself, what you understand a juror has to be, you

18     know, the type of person who has to come in here without any

19     preconceived biases or prejudices for or against anything,

20     do you promise me that you will be that type of juror?

21                 PROSPECTIVE JUROR:  Yes, I do.

22                 THE COURT:  That you will be fair to the DA?

23                 PROSPECTIVE JUROR:  Yes.

24                 THE COURT:  That you will be fair to the defense?

25                 PROSPECTIVE JUROR:  Yes.

1              THE COURT:  And you'll follow my instructions,

2       each and every one of them?

3              PROSPECTIVE JUROR:  Yes.

4              THE COURT:  Okay, any questions?

5              MR. MENDYS:  Just a couple, Judge.

6              THE COURT:  Sure.

7              MR. MENDYS:  Mr. Betances, you brought this up for

8       a reason.  Were you close to your uncle or are you close to

9       your uncle?

10             PROSPECTIVE JUROR:  I am.

11             MR. MENDYS:  And through conversations with him

12      have you, you haven't gotten any sense of that he was

13      treated poorly or treated in an unfair manner?

14             PROSPECTIVE JUROR:  He was, he was treated very

15      fairly.

16             MR. MENDYS:  And in your heart of hearts, as you

17      sit here now you think you can be fair?

18             PROSPECTIVE JUROR:  Yes.

19             MR. MENDYS:  Okay, that's it.  Thank you.

20             THE COURT:  Any questions, Mr. Bonanno?

21             MR. BONANNO:  Do you still have a relationship

22      with your uncle now?

23             PROSPECTIVE JUROR:  Yes.

24             MR. BONANNO:  In your opinion, was his

25      incarceration probably one of the best things that happened

Jury Selection

1          to him?

2                    PROSPECTIVE JUROR:  I believe so.

3                    MR. BONANNO:  No further questions.

4                    THE COURT:  Step out.  Thank you.

5                    (Whereupon, the prospective juror exited the

6          courtroom.)

7                    THE COURT:  Miss Adames.

8                    COURT OFFICER:  Prospective juror entering.

9                    (Whereupon, the prospective juror entered the

10         courtroom.)

11                   THE COURT:  Miss Adames, you can just take a seat

12         anywhere.

13                   So you want to speak to us privately about

14         something that happened.  Why don't you tell me.

15                   PROSPECTIVE JUROR:  I was molested by my godfather

16         when I was 11 years old.

17                   THE COURT:  I'm so so sorry to hear that.  And I'm

18         so sorry that you, I have to ask these types of questions.

19                   PROSPECTIVE JUROR:  It's okay.

20                   THE COURT:  Was he arrested and prosecuted?

21                   PROSPECTIVE JUROR:  No.

22                   THE COURT:  It wasn't reported --

23                   PROSPECTIVE JUROR:  No.

24                   THE COURT:  -- to the police?  Are you able to put

25         that aside and be a juror on a criminal case?

Jury Selection

1            PROSPECTIVE JUROR:  I don't think so.

2            THE COURT:  Any questions?

3            MR. MENDYS:  No.

4            MR. BONANNO:  Consent, Judge.

5            THE COURT:  You're excused, ma'am, and I'm so

6      sorry.

7            PROSPECTIVE JUROR:  Thank you.

8            (Whereupon, the prospective juror exited the

9      courtroom.)

10            THE COURT:  And Mr. Abad.

11            COURT OFFICER:  Prospective juror entering.

12            (Whereupon, the prospective juror entered the

13      courtroom.)

14            THE COURT:  All right, Mr. Eddie Abad has entered.

15            So we were talking about, you mentioned something

16      about your sister.

17            PROSPECTIVE JUROR:  Yeah.  She was involved in a

18      robbery in 167 gas station about four years ago, and that is

19      still pending.  She's still going back and forth to the DA.

20      The DA -- she hasn't been arrested.  She made some sort of

21      deal, I guess, with the DA where the DA has her tell him

22      pretty much like snitch whenever there's any drug-related

23      activity because she's been involved with that as well.  She

24      will go and tell them, and they already made, I believe,

25      like two arrests because of what my sister has told them,

Jury Selection

1    which is why I have, I live with my nieces and nephews with

2    my mom because my sister can't take care of them.  My mother

3    has custody of the kids and I made the agreement to help my

4    mom to raise the kids.

5         So my sister's not allowed to go around my

6    neighborhood because she knows some people know spreading

7    rumors about things like that.

8              THE COURT:  Understood.

9              PROSPECTIVE JUROR:  So I --

10              THE COURT:  All right, so let me just stop you

11    about all of this because you appear to know a lot.  And

12    have spoken to your sister about this? .

13              PROSPECTIVE JUROR:  Yeah.

14              THE COURT:  Have you spoken with her lawyer at

15    all?

16              PROSPECTIVE JUROR:  I have because I --

17              THE COURT:  Let me just say what your sister is

18    doing something in connection with a case?

19              PROSPECTIVE JUROR:  Yeah.

20              THE COURT:  And for quite a long time, but she

21    still has contact with the Bronx DA's office?

22              PROSPECTIVE JUROR:  Yeah.

23              THE COURT:  Are you, do you think she's being

24    treated unfairly by the DA's office?

25              PROSPECTIVE JUROR:  I honestly I wouldn't, I don't

1     think so because she still hasn't been arrested knowing what

2     she's done so.

3          THE COURT:  Have you ever spoken with the DA

4     yourself about your sister?

5          PROSPECTIVE JUROR:  No because she has had other

6     lawyers before, and I think this is her third one.

7          THE COURT:  In terms of the DA?

8          PROSPECTIVE JUROR:  Yeah.

9          THE COURT:  You don't know the name of the DA?

10         PROSPECTIVE JUROR:  I don't.

11         THE COURT:  Is your sister's involvement, all of

12    the involvement with the criminal justice system in terms of

13    her case, is that going to make you believe you could not be

14    fair as a juror in this case?

15         PROSPECTIVE JUROR:  I would think not.

16         THE COURT:  Well, okay.  I just want you to -- the

17    reason I'm asking, and I know that the questions are hard

18    because what's happening is something pretty extraordinary,

19    but do you promise me that you will not let that affect you,

20    because I need to know and the parties need to know that if

21    a person is going to be on the jury, they can't let any of

22    that affect their ability to judge the facts and the

23    evidence in the case and render a verdict.

24         PROSPECTIVE JUROR:  Yeah, I'll try my best.

25         THE COURT:  Sorry?

Jury Selection

1          PROSPECTIVE JUROR:  I will try my best.

2          THE COURT:  You can't promise me?

3          PROSPECTIVE JUROR:  I promise.

4          THE COURT:  You do?

5          PROSPECTIVE JUROR:  Yeah, I promise.

6          THE COURT:  I don't want you to say, I'm not

7    asking you to say because you think you want -- you think I

8    want to hear you say it.  I mean, if this is the truth,

9    that's fine, but there have been a lot of people that have

10   been excused.

11         PROSPECTIVE JUROR:  Right.

12         THE COURT:  And that's, you know, their reasons

13   are whatever they are, but honest answers are very much

14   appreciated.  So are you promising me because you yourself

15   believe you will be fair and you promise me you will be

16   fair?

17         PROSPECTIVE JUROR:  Yeah, I'll be fair.

18         THE COURT:  And you will be fair to the DA?

19         PROSPECTIVE JUROR:  Yeah.

20         THE COURT:  You'll be fair to the defense?

21         PROSPECTIVE JUROR:  Yeah.

22         THE COURT:  Follow all of my instructions?

23         PROSPECTIVE JUROR:  Yeah.

24         THE COURT:  You've never been on a jury, right?

25         PROSPECTIVE JUROR:  No.

Jury Selection


 1              THE COURT:  And you've had no close friends or

 2      relatives in law enforcement?

 3              PROSPECTIVE JUROR:  No.

 4              THE COURT:  Mr. Mendys?

 5              MR. MENDYS:  Nothing.

 6              MR. BONANNO:  No, Judge.

 7              THE COURT:  Step out, sir.  Thank you.

 8              (Whereupon, the prospective juror exited the

 9      courtroom.)

10              THE COURT:  Let's just do with this group.  We'll

11      call them all back in, you have guys can do your 15 minutes

12      each.

13              COURT OFFICER:  Prospective jurors entering.

14              (Whereupon, the prospective jurors entered the

15      courtroom.)

16              THE COURT:  Okay.  Almost good afternoon everyone.

17      We're ready to proceed with the next part of the jury

18      selection process, and that's questions by the attorneys.

19              Mr. Mendys, you may inquire of the prospective

20      jurors.

21              MR. MENDYS:  Thank you, Judge.

22              Good almost afternoon everyone.  My name Newton

23      Mendys.  I'm the assistant district attorney who's assigned

24      to this case by your District Attorney, Robert Johnson.

25      This is probably one of the most important, if not the most

Jury Selection

1   important parts of a case.  You've never seen it on TV, it's

2   never talked about in the news, but this is the part where

3   we try and get fair jurors, people who can sit and do two

4   things.  Okay.  One will be here in court where you listen

5   to witnesses, evaluate evidence.  You need to be able to do

6   that with an open mind, okay.  Fair, impartial and with an

7   open mind.

8            Mr. Vargas, can do you that?

9            PROSPECTIVE JUROR:  I can do that.

10           MR. MENDYS:  Okay.  The second thing you need to

11   do is when you, after you've heard all of that you're gonna

12   go back into that jury room and you're gonna take the law

13   that the judge provided to you, and you're gonna decide,

14   you're gonna take the facts and see if it matches with the

15   law.  Okay.  That's what you're gonna, that is your job as a

16   juror.

17           In a nutshell, Miss Smith, is that something you

18   think you can do?

19           PROSPECTIVE JUROR:  I think I can do it.

20           MR. MENDYS:  Okay.  So all the questions I'm going

21   to ask kind of fall into one of those two categories.  And

22   the first question I want to ask, and I'm not trying to pick

23   on you, Miss Florentino, you mentioned some issues yesterday

24   in terms of language.  Have you understood everything today?

25           PROSPECTIVE JUROR:  Not everything.  I told you

Jury Selection

1     yesterday I did not understand a hundred percent, so I have

2     some difficulty.

3               MR. MENDYS:  That's still the case?

4               PROSPECTIVE JUROR:  Uh, huh.

5               MR. MENDYS:  Okay.  Thank you for answering.

6               So let me ask this question to the group.  By a

7     show of hands, who is excited when they got their jury

8     summons in the mail?  There's always one.  Come on.  All

9     right.  No one was excited.  All right.

10              Mr. Betances, how did you feel when you got your

11    summons in the mail?

12              PROSPECTIVE JUROR:  I just felt like it was

13    something that I had to do.

14              MR. MENDYS:  Okay.  Something you had --

15              PROSPECTIVE JUROR:  Not excited, not dreading it.

16              MR. MENDYS:  Does everyone agree with Mr.

17    Betances?  Same kind of --

18              PROSPECTIVE JUROR:  Yeah.

19              MR. MENDYS:  Mr. Vargas?

20              PROSPECTIVE JUROR:  Yeah.

21              MR. MENDYS:  Okay.  Miss Gil, how about you?

22              PROSPECTIVE JUROR:  I said oh shit, so I'm here.

23              MR. MENDYS:  All right, appreciate that.

24              Mr. Davis?

25              PROSPECTIVE JUROR:  I look it as a new experience.

Jury Selection

1    This is my first time being a juror so I'm open to it.

2            MR. MENDYS:  There we go.  That's what I'm talking

3    about.  This is part of the American experience, right?  The

4    judge mentioned it yesterday, there are lots of people who

5    want to come to this country and this is one of the

6    responsibilities we have.  Right?  It's like taxes and

7    voting, you know, all that stuff.

8            But Mr. Betances, you said, you know, something

9    you have to do, right?  So that's the first instruction you

10   got from the court, all of you got.  You've got to come to

11   court on this day and show up for jury duty.

12           Now, you might not have liked it, right?  Maybe

13   you're not crazy about having to answer all of these

14   questions and going into all of this information, but you

15   all did it.  Right, Mr. Abad?

16           PROSPECTIVE JUROR:  Right.

17           MR. MENDYS:  So the point I'm trying to make is

18   that that's the first instruction you're going to get.  And

19   as we go through this case the judge is going to continue to

20   give you instructions, whether it's not to talk to us or to

21   show up at a certain time, or to what the actual

22   instructions are for this case at the end of it.  And

23   whether you agree or disagree, you're gonna have to follow

24   those instructions.  All right?

25           So Mr. Vargas, is that something you can do?

Jury Selection

1    PROSPECTIVE JUROR:  Yes, I could.

2    MR. MENDYS:  And Miss Gadson, how about you?

3    PROSPECTIVE JUROR:  Yeah.

4    MR. MENDYS:  You can do that?

5    Miss Altschuler, am I pronouncing that correctly?

6    PROSPECTIVE JUROR:  Yes.

7    MR. MENDYS:  Is that something you can do?

8    PROSPECTIVE JUROR:  I believe so.

9    MR. MENDYS:  Okay.  So let's move on a little bit.

10   Let me give you an example, okay.  You guys were all here

11   yesterday, right?  Mr. Vargas, where did you go for lunch?

12   PROSPECTIVE JUROR:  I went --

13   THE COURT:  Well, you don't have to disclose the

14   lunch location, but what did you have for lunch maybe?  Did

15   you have lunch?  I'll rephrase.  Did you eat somewhere

16   around here for lunch?

17   PROSPECTIVE JUROR:  Yes, I did.

18   THE COURT:  My apologies, by the way, for that.

19   MR. MENDYS:  One of the local dining

20   establishments?

21   PROSPECTIVE JUROR:  No, I ate two hot dogs.

22   MR. MENDYS:  From one of the guys over here?

23   PROSPECTIVE JUROR:  From across the street.

24   MR. MENDYS:  Your lunch does not really fit with

25   my example, so let's go with somebody else.

1              Did anyone go to one of the local restaurants

2       around here yesterday for lunch?

3              PROSPECTIVE JUROR:  Deli on the corner.

4              MR. MENDYS:  That will work.  So you went to the

5       deli?

6              PROSPECTIVE JUROR:  Yes.

7              MR. MENDYS:  And you ordered a sandwich or

8       whatever you had?

9              PROSPECTIVE JUROR:  Yeah.

10             MR. MENDYS:  You ordered what you, and you,

11      someone took your order; right?

12             PROSPECTIVE JUROR:  Yes.

13             MR. MENDYS:  Did that same person put together

14      your meal?

15             PROSPECTIVE JUROR:  Yes.

16             MR. MENDYS:  And did that same person, did you pay

17      that same person?

18             PROSPECTIVE JUROR:  No, then I had to pay at a

19      different cashier.

20             MR. MENDYS:  So there are two people?

21             PROSPECTIVE JUROR:  Yes.

22             MR. MENDYS:  Would you agree that you wouldn't

23      have gotten your lunch if you hadn't seen each of those

24      people?

25             PROSPECTIVE JUROR:  No, I wouldn't have.

Jury Selection

1          MR. MENDYS:  Right.  And it took both of those

2     people to get you your lunch; right?

3          PROSPECTIVE JUROR:  Absolutely.

4          MR. MENDYS:  They were working together?

5          PROSPECTIVE JUROR:  Yes.

6          MR. MENDYS:  Acting together?

7          PROSPECTIVE JUROR:  Yes.

8          MR. MENDYS:  And the judge mentioned a concept

9     called accessorial liability, acting in concert; something

10    the law accounts for where people, if they act together to

11    commit a crime, they can, the law accounts for that.  That's

12    something that it's your job to decide whether the acts of

13    somebody else can be attributed to, in this case, Richard

14    Diaz, okay.

15          Is that an instruction that you think you can

16    follow?  An idea that you understand?

17          PROSPECTIVE JUROR:  Absolutely.

18          THE COURT:  Well, I did give you the instruction

19    already, number one, on accessorial liability that a person

20    can be liable criminally for the acts, one person can be

21    liable for the acts of another person in acting with the

22    same mental state or the mental state required for the

23    commission of the crime.  They do what the law says or that

24    has occurred, there's a specific instruction.

25          Are you able -- you understand that you have to

Jury Selection

1      follow each of the instructions?

2                PROSPECTIVE JUROR:  Yes.

3                THE COURT:  Okay.  Go ahead.

4                MR. MENDYS:  Thank you.  And with that, now you

5      understand that we're only dealing with one of those people,

6      Mr. Diaz, okay.  You're not, do you agree you're not going

7      to worry about anyone else who would be --

8                THE COURT:  Well, I don't want to say, you know,

9      that's actually not -- the only person who is on trial in

10     this case is Mr. Diaz.  Now, the fact that the other people

11     will not be -- you won't be deliberating on anything

12     involving them in terms of voting whether they are guilty.

13     You understand that that's what, that's what you're doing

14     here, just voting on Mr. Diaz?

15               PROSPECTIVE JUROR:  Yes.

16               THE COURT:  And you can't speculate about why

17     those other persons are not part of what you will be

18     deliberating on?

19               PROSPECTIVE JUROR:  So you're saying the other

20     people involved are not on trial here?

21               THE COURT:  Correct, they're not.

22               PROSPECTIVE JUROR:  Okay.  So that's okay.

23               MR. MENDYS:  Thank you, Judge.  And thank you for

24     being my guinea pig, so to speak.

25               Can everyone agree to do that?  Let me ask you

Jury Selection

1       Miss Smith.  How are you?

2                   PROSPECTIVE JUROR:  I'm good, thanks.

3                   MR. MENDYS:  This is the way I get people to talk,

4       I pick on people, I'm sorry.

5                   How do you determine if someone is being honest

6       with you, telling you the truth?

7                   PROSPECTIVE JUROR:  How do I determine?

8                   MR. MENDYS:  Uh, huh.

9                   PROSPECTIVE JUROR:  Well, that depends on the

10      person.  I mean, do I know them or do I not know them?

11                  MR. MENDYS:  Let's say no, you don't know them.

12                  PROSPECTIVE JUROR:  I don't know them?  Well, I

13      can't determine if it's honest if they say they did

14      something, then I'll just, because I don't know them I

15      didn't see them do anything so I can't assume and I'll just

16      have to take their word.

17                  THE COURT:  You have been on a jury already in a

18      civil case?

19                  PROSPECTIVE JUROR:  Yes.

20                  THE COURT:  You had to make --

21                  PROSPECTIVE JUROR:  Those decisions.

22                  THE COURT:  A determination about what was

23      credible and not credible from witnesses?

24                  PROSPECTIVE JUROR:  Right.

25                  THE COURT:  Right?

1       PROSPECTIVE JUROR:  Right.

2       THE COURT:  So did you use factors from your own

3   life in making both of the determinations in that case,

4   things that you do every day?

5       PROSPECTIVE JUROR:  You talking about five, six

6   years ago.

7       THE COURT:  Well, you know, that's, we're asking

8   you to come in here and do what you usually do.

9       PROSPECTIVE JUROR:  Well, see, the question that

10  he's posing to me I guess I have to, you have to give me a

11  scenario.  You're just saying I have to determine if it's

12  the truth.

13      THE COURT:  Are there any things that you would

14  take into consideration or determine --

15      PROSPECTIVE JUROR:  All right, if I understood the

16  topic of whatever our conversation is about and I ask a

17  question, and I'm familiar with it and I understand what the

18  concept of it is, then yes, I can make a determination

19  whether he's telling the truth.  Oh, yes, okay, the train is

20  not working because he heard the news, and I know according

21  to the news or whatever that there's some delays in the

22  train, so yes, he could be telling the truth.

23      MR. MENDYS:  What about like physical, do people

24  behave, in your experience, physically in one way or another

25  if they're telling the truth or not?

Jury Selection

1           PROSPECTIVE JUROR:  Well, sometimes you could tell

2     during a conversation, like if, say if it was physical,

3     well, did I hit the young man, yes I hit him because I hit

4     him back, I can believe that because sometimes people are

5     just not going to let them hit you.

6           MR. MENDYS:  Okay Miss Gadson, how are you?

7           PROSPECTIVE JUROR:  I'm fine.

8           MR. MENDYS:  How do you feel if someone was

9     telling you the truth in your experience?

10          PROSPECTIVE JUROR:  I don't know, I just give the

11    benefit of the doubt.

12          MR. MENDYS:  You give people the benefit of the

13    doubt?

14          PROSPECTIVE JUROR:  Yeah.

15          MR. MENDYS:  All right.  How about you, Miss Gil?

16    How about you?

17          PROSPECTIVE JUROR:  Mannerisms, body language.

18          MR. MENDYS:  What kind of mannerisms?

19          PROSPECTIVE JUROR:  Just how their hands, I'll

20    just watch, you know, their whole, like, eye contact and

21    tone.

22          MR. MENDYS:  Okay.  Mr. Davis, do you agree with

23    that?

24          PROSPECTIVE JUROR:  Yes, I do.  Different ways to

25    answer the question.  If their eye contact, if they keep

Jury Selection

1       looking to the side, if they seem nervous, you know, a
2       little flustered.
3               MR. MENDYS:  Where did you learn that stuff?
4               PROSPECTIVE JUROR:  Honestly, um, I'm kind of not
5       very trusting and, you know, when I'm in a relationship I
6       look for things like that.
7               MR. MENDYS:  You learn that through your life?
8               PROSPECTIVE JUROR:  Yes.
9               MR. MENDYS:  Going through, you know, the world?
10              PROSPECTIVE JUROR:  Yes.
11              MR. MENDYS:  Right.  Sometimes you get burned by
12      people, sometimes you don't?
13              PROSPECTIVE JUROR:  That's true.
14              MR. MENDYS:  Right.  Anyone have anything else
15      they'd like to add about that?  Mr. Ali, what about you?
16              PROSPECTIVE JUROR:  If the whole story's clear and
17      makes sense.
18              MR. MENDYS:  Mr. Betances?
19              PROSPECTIVE JUROR:  Just towards that scenario, I
20      don't think that's a fair analysis of someone if someone's
21      telling the truth or not.  I feel some people are very shy
22      or nervous.
23              MR. MENDYS:  Right.
24              PROSPECTIVE JUROR:  I think that also takes into
25      account whether a person is telling the truth or not.

1          MR. MENDYS:  And depending on the situation,

2     right?

3          PROSPECTIVE JUROR:  Uh, huh.

4          MR. MENDYS:  If Mr. Davis knows someone and you

5     expect that person to look you in the eye, then if they

6     don't that means something to you, right?

7          PROSPECTIVE JUROR:  Yes.

8          MR. MENDYS:  But if you're in a different

9     situation where maybe someone's nervous, well, maybe that's

10    why they're not looking you in the eye, right, possibly?

11         PROSPECTIVE JUROR:  True.

12         MR. MENDYS:  That's for you to decide?

13         PROSPECTIVE JUROR:  Yes.

14         MR. MENDYS:  Well, all these things we're talking

15    about, you know, are things you learned in your lives that

16    we want you to bring in here, okay.  We don't want you to

17    leave them at the door, all right.  We recognize that this

18    is a unique experience.

19         You mentioned that, Mr. Davis, this is a new

20    experience for a lot of people, and you know, it can be

21    nerve-racking and challenging, but it's really important

22    that you bring all that experience, your common sense that

23    you've learned during the course of your lives and bring it

24    here.  And when you look at the witnesses, those are the

25    things you use, right, because sitting in here in a

Jury Selection

1    courtroom, it's a lot different than being out in your

2    houses or your jobs, but it's the same common sense that

3    applies.  Do you understand, Mr. Abad?

4           PROSPECTIVE JUROR:  I understand.

5           MR. MENDYS:  Is this something you can do?

6           PROSPECTIVE JUROR:  Sure.

7           MR. MENDYS:  Miss Gonzalez, how about you?

8           PROSPECTIVE JUROR:  Yes.

9           MR. MENDYS:  You can do that?

10          PROSPECTIVE JUROR:  Uh, huh.

11          MR. MENDYS:  And Miss Baljit, can you do that?

12          PROSPECTIVE JUROR:  Yeah, I guess.

13          MR. MENDYS:  Are you sure?

14          PROSPECTIVE JUROR:  I feel like anybody could lie.

15    I don't think you could tell when somebody's lying,

16    honestly.  I don't, like anybody can lie to you and you

17    would never know.

18          MR. MENDYS:  Right, every witness is going to come

19    up here and affirm or --

20          PROSPECTIVE JUROR:  Like, even if under oath

21    anybody can lie.

22          THE COURT:  But I don't want you talking over each

23    other.  I didn't hear your whole last answer, you said what?

24          PROSPECTIVE JUROR:  I said even if somebody is

25    like under oath, I feel like they can still lie.  They can

Jury Selection

1    sit there and still lie.

2                THE COURT:   Okay.

3                MR. MENDYS:   Right.   And that's why we're here,

4    right, because if it were as simple as swearing to tell the

5    truth on the Bible, well, then, you know, what real role is

6    there for a juror, right?   But you have to decide whether

7    someone is telling the truth or not.   Do you feel that you

8    can, that's something you can do?

9                PROSPECTIVE JUROR:   I don't know.

10               MR. MENDYS:   I mean, you do it every day.

11               PROSPECTIVE JUROR:   Yeah.   All right, I guess yes.

12   Sorry.

13               MR. MENDYS:   Listen, we're trying to find people

14   who can be fair.

15               PROSPECTIVE JUROR:   Yes.

16               MR. MENDYS:   You have to look within yourself to

17   know.

18               PROSPECTIVE JUROR:   Yeah.

19               MR. MENDYS:   To know whether that's something you

20   can do, because if we pick you and we get down the road, you

21   can't change your mind.

22               PROSPECTIVE JUROR:   Yeah.

23               MR. MENDYS:   And we're not trying to corner you

24   into a decision, but, and you know, we recognize that things

25   play out in a couple of weeks, we're asking you to make

Jury Selection

1     commitments for that, but we're trying to find a fair juror.

2          PROSPECTIVE JUROR:  I mean, I'll listen to the

3     situation.  If I feel like they're lying, then I will just

4     say they're lying, you know.

5          MR. MENDYS:  Good, that's your job.

6          I'm gonna wrap up here in a moment.  Everybody

7     anybody watch CSI?  All right.  You watch CSI?

8          PROSPECTIVE JUROR:  Yes.

9          MR. MENDYS:  I'm going to continue to pick on you.

10    What show do you want?  CSI, any one, pick it.

11         PROSPECTIVE JUROR:  I watch all of them, Miami

12    with my mom.

13         MR. MENDYS:  Why do you like it?

14         PROSPECTIVE JUROR:  I don't know, it's like,

15    bonding with her so it's like interesting seeing, like, why

16    people do certain things, like finding out what's going on

17    in their mind, what triggers them to do things.

18         MR. MENDYS:  Mr. Vargas, what about you?

19         PROSPECTIVE JUROR:  No, I don't want those shows.

20         MR. MENDYS:  You don't watch those shows?

21         PROSPECTIVE JUROR:  Not at all.

22         MR. MENDYS:  Okay.  Miss Gil, do you watch those

23    shows?

24         PROSPECTIVE JUROR:  Law and Order.

25         MR. MENDYS:  The original?

1 PROSPECTIVE JUROR:  The Special Victims.

2 MR. MENDYS:  The Special victims.

3 Miss Gonzalez, how about you?

4 PROSPECTIVE JUROR:  Not anymore.

5 MR. MENDYS:  Miss Gil, why do you like them?

6 PROSPECTIVE JUROR:  I'm a forensic psych major,

7 bachelor's, so it's interesting to me.

8 MR. MENDYS:  You recognize it's entertainment,

9 right?

10 PROSPECTIVE JUROR:  Yes, yes, of course.

11 MR. MENDYS:  Everyone recognizes it's

12 entertainment?  Like, you get, within an hour you get a

13 horrific crime, sometimes an arrest, you get a trial and

14 investigation, and you get, you know, this great decision at

15 the end they put it altogether.  Right?  And at the end you

16 have no doubt that's what happened, right?

17 PROSPECTIVE JUROR:  Yeah.

18 MR. MENDYS:  For the most part.  And it's good TV,

19 and you've all recognized, obviously, that that is not what

20 this is here.  All right.

21 And the question I want to ask you is, you know in

22 a case like this you may not hear about DNA, you may not

23 hear about fingerprints, you may not hear about any of

24 those, any of that stuff they create for television for

25 entertainment, all right.  Is that something -- you

1        obviously recognize that fact?

2                PROSPECTIVE JUROR:  Yes.

3                MR. MENDYS:  Okay.  Now the judge mentioned

4        there's no particular way I have to prove my case.  Is that

5        something you would require in a case like this?

6                PROSPECTIVE JUROR:  No.

7                MR. MENDYS:  Okay.  And I just want to make sure

8        that you all will hold me to the burden of proof, it's

9        beyond a reasonable doubt, not to some TV --

10               PROSPECTIVE JUROR:  Yes.

11               MR. MENDYS:  You can do that, Miss Baljit?  Can do

12       you that?

13               PROSPECTIVE JUROR:  Uh, huh.

14               MR. MENDYS:  Yes?  Are you sure?

15               PROSPECTIVE JUROR:  I'm like can't somebody do a

16       like a lie detector test?  I don't know.  Like, am I being

17       extra?  I'm just asking.

18               MR. MENDYS:  Well, you know television is

19       television, okay.  You know, you're gonna have to come to

20       your decision based on what the evidence is here.

21               PROSPECTIVE JUROR:  Okay.

22               MR. MENDYS:  All right?

23               PROSPECTIVE JUROR:  Okay.

24               MR. MENDYS:  Is that something you can do?

25               PROSPECTIVE JUROR:  Yeah, yeah.

1          MR. MENDYS:  And you can hold me to the burden of

2     proof here beyond a reasonable doubt?  Mr. Betances, you can

3     do that?

4          PROSPECTIVE JUROR:  Yes.

5          MR. MENDYS:  Mr. Ali, you can do that?

6          PROSPECTIVE JUROR:  Yes.

7          MR. MENDYS:  Mr. Vargas?

8          PROSPECTIVE JUROR:  Yes.

9          MR. MENDYS:  Thank you very much for your time.

10          THE COURT:  Thank you.

11          Mr. Bonanno?

12          MR. BONANNO:  If I may inquire?

13          THE COURT:  You may.

14          MR. BONANNO:  Mr. Mendys has the tactical

15     advantage of being close to you.  I'm going to utilize his

16     desk, though, if you don't mind.  There's a reason he's

17     close to you too.  Procedurally, in the law, he has the

18     burden of proof, and it's that he has to be closer to the

19     jury.  That's just the way the courtrooms are set up.

20          I want to thank you all, number one, for coming

21     today.  This is one of the greatest honors we can do as

22     Americans to honor our forefathers, the people that serve us

23     today in the military and people that serve us every day in

24     government so faithfully.

25          I'm gonna ask you a few questions directly and I

Jury Selection

1        want to just elicit some responses, especially Mr. Davis.

2        Your first name El Shaddai?

3                  PROSPECTIVE JUROR:  Yes.

4                  MR. BONANNO:  That's a pretty powerful name.  Do

5        you know the origin of that name?

6                  PROSPECTIVE JUROR:  Yes.

7                  MR. BONANNO:  So I've got to assume that there are

8        people in your family that care about you that gave you that

9        great name?

10                 PROSPECTIVE JUROR:  Yes.

11                 MR. BONANNO:  Some people would say that's the

12       name above all names.

13                 PROSPECTIVE JUROR:  Yes.

14                 MR. BONANNO:  Is that correct?

15                 PROSPECTIVE JUROR:  Yes.

16                 MR. BONANNO:  So it leads me to believe you have

17       very a serious Christian background.

18                 PROSPECTIVE JUROR:  Yes.

19                 MR. BONANNO:  Also leads me to believe that you

20       may be a student of the Bible.

21                 PROSPECTIVE JUROR:  Yes.

22                 MR. BONANNO:  Matthew 7, judge not less you be

23       judged.

24                 PROSPECTIVE JUROR:  Yes.

25                 MR. BONANNO:  How do you feel about that?

Jury Selection

PROSPECTIVE JUROR:  Um, it's a very good question.
I don't feel like --

THE COURT:  Actually, are you comfortable
answering this type of question with the other jurors
present, because it's not something that I allow people to
necessarily go into if they, if they don't want.  I don't
want to put anyone on the spot to discuss anything like that
with the other jurors.

And if this is important, I would actually, if
it's going to continue I'm going to ask that this take place
as a question that would be posed to everyone without -- we
don't really ask people about their religious beliefs,
except to the extent that whether they have any kind of
religious or philosophical beliefs that would interfere with
their ability to be a fair juror.  But I don't really allow
this type of questioning to occur because I do think it
makes people somewhat uncomfortable.

MR. BONANNO:  If I can inquire?

THE COURT:  I would just ask the question myself
and it went a little further than I would allow anyway.  Not
only to you, but is there anybody -- because I asked if
there's any reason anybody has that they could not be fair,
let me amplify that question.  Are there any religious or
philosophical or that type of reason that could prevent you
from sitting as jurors and evaluate evidence in the manner

Jury Selection

1        that a juror is required to do?  Does anyone, is the answer

2        to that question yes for any of you?  Okay, no one has

3        raised their hands.

4                Mr. Bonanno, you may continue.

5                MR. BONANNO:  Thank you, Judge.

6                So I'm just gonna ask Mr. Vargas, based on all

7        your experiences in life, do you feel you could be impartial

8        as to analyzing all the facts in this case?

9                PROSPECTIVE JUROR:  I could be fair.  I could be

10       fair.

11               MR. BONANNO:  Do you promise me that?

12               PROSPECTIVE JUROR:  I promise.

13               MR. BONANNO:  You promise the Court that?

14               PROSPECTIVE JUROR:  I promise.

15               MR. BONANNO:  That's the real promise, to the

16       Court.

17               Miss Gonzalez, if you were a defendant in this

18       case, is there any reason why we wouldn't pick you as a

19       juror?

20               PROSPECTIVE JUROR:  No.

21               MR. BONANNO:  Your ex-husband is a police officer.

22               PROSPECTIVE JUROR:  Yes.

23               MR. BONANNO:  And that's not gonna form a bias as

24       to the credibility of police officers?

25               PROSPECTIVE JUROR:  No.

Jury Selection

1        MR. BONANNO:  It's not gonna form a bias as to the
2    credibility of the defendant?
3        PROSPECTIVE JUROR:  No.
4        MR. BONANNO:  Mr. Betances right, have you or any
5    member of your family ever worked with anyone who's been in
6    a rehabilitative program?
7        PROSPECTIVE JUROR:  Yes.
8        MR. BONANNO:  Tell us a little bit about that.
9        PROSPECTIVE JUROR:  Just my uncle.
10       MR. BONANNO:  Your uncle?
11       PROSPECTIVE JUROR:  Yeah.
12       MR. BONANNO:  And did that work out well for him?
13       PROSPECTIVE JUROR:  That worked out well for him.
14       MR. BONANNO:  So if, are you of the belief that
15   someone who maybe had some bad experiences, did some bad
16   things in the past can turn over a new leaf in life?
17       PROSPECTIVE JUROR:  Yes.
18       MR. BONANNO:  Can go on to live a productive life?
19       PROSPECTIVE JUROR:  Yes.
20       MR. BONANNO:  And the fact that someone had a
21   prior conviction of some sort wouldn't bias you in any way
22   as to that person's current activities?
23       PROSPECTIVE JUROR:  No.
24       MR. BONANNO:  Miss Smith, you know I'd pick you,
25   right?  You know I want to talk to you, right?

Jury Selection

1              PROSPECTIVE JUROR:  Sure.

2              MR. BONANNO:  You do investigations for insurance

3      companies.

4              PROSPECTIVE JUROR:  Yes.

5              MR. BONANNO:  And you've got to look at facts all

6      the times.

7              PROSPECTIVE JUROR:  Yes.

8              MR. BONANNO:  I'm sure that people don't tell you

9      the truth all the time.

10             PROSPECTIVE JUROR:  No.

11             MR. BONANNO:  I'm sure that, do you investigate

12     insurance fraud cases?

13             PROSPECTIVE JUROR:  No.

14             MR. BONANNO:  So but you have to analyze whether

15     people are telling you the truth on their claims?

16             PROSPECTIVE JUROR:  Yes, most of the time.

17             MR. BONANNO:  And sometimes people don't tell you

18     the truth.  Can you tell me what's the worst encounter that

19     you've ever had with someone who didn't tell you the truth?

20             PROSPECTIVE JUROR:  Well, the worst that can

21     happen is that the case will come back, because normally

22     when I do an investigation I read off the questions that we

23     have to ask them, and I tell them to tell me the truth

24     because it just doesn't stop at my desk, it goes further

25     with the investigations more in depth.  So I let them know

1    that as well, you know, that it will be investigated

2    further.  And if they find out you do have these bank

3    accounts with thousands and thousands of dollars in it, the

4    city is going to find out about it, so let's talk about it.

5    And sometimes it works.  They'll come out, I do have an

6    account here and I have an account there.

7            And that way I know how I could work with them if

8    I could be of an assistance because I do do Medicaid

9    applications and I am certified in it, therefore when I send

10   my applications to the state I don't want them to come back

11   knowing, you know, wanting them to come back rejected

12   because something was overlooked such as a bank account or

13   extra child somewhere that wasn't reported.  So I do have to

14   go in depth with a lot of patients that do come in.

15           MR. BONANNO:  So there's a process to get to the

16   truth?

17           PROSPECTIVE JUROR:  Yes, and sometimes they don't

18   tell the truth.

19           MR. BONANNO:  Sometimes it's not always what it

20   appears to be.

21           PROSPECTIVE JUROR:  No.

22           MR. BONANNO:  And you gotta cut through and go

23   through the procedures to get there?

24           PROSPECTIVE JUROR:  Yeah.

25           MR. BONANNO:  And you're comfortable doing that in

1      this case?

2              PROSPECTIVE JUROR:  Well, I look at the facts,

3      listen to whatever I have to listen to and sit down and make

4      your determination from there.  I mean, because somewhere in

5      there the truth is going to come out.  The truth is hidden

6      in there, you just have to look up it.

7              MR. BONANNO:  Miss Gadson, if you were

8      deliberating and everybody was against you, and you held out

9      one way and the other jurors were the other way, tell me

10     what you would do to either hold to your beliefs or try and

11     persuade the other jurors?

12             PROSPECTIVE JUROR:  Um.

13             THE COURT:  Well, you remember the instructions I

14     gave you on deliberations that what you're required to do

15     is, you know, deliberate and listen and exchange with each

16     other?  Okay, so that's -- so go ahead, you can answer Mr.

17     Bonanno's question.

18             PROSPECTIVE JUROR:  I would have to stay true to

19     what I believe, I mean, because I'm going by the facts.

20             MR. BONANNO:  Even if it was Friday at 4:45?

21             PROSPECTIVE JUROR:  Everybody else wants to go

22     home.

23             MR. BONANNO:  Yeah, and you want to go home too.

24             PROSPECTIVE JUROR:  Yeah.

25             MR. BONANNO:  I mean, I would want to go home.

Jury Selection

1           THE COURT:  Well, you know something, there is no

2      rush to any verdict, nor should there be.  It's a very, you

3      know, I want you all to understand that, and I don't want

4      you to think that there should be any suggestion that you

5      have to reach a verdict by a certain time of day or

6      anything.  You deliberate as long as you need to deliberate.

7           PROSPECTIVE JUROR:  But if we going by the facts,

8      then it shouldn't really be a problem.

9           MR. BONANNO:  So you would stay with your beliefs?

10          PROSPECTIVE JUROR:  Yes.

11          MR. BONANNO:  Even though everyone was against

12     you?

13          PROSPECTIVE JUROR:  Yes.

14          MR. BONANNO:  And no matter what time it was?

15          PROSPECTIVE JUROR:  Yes.

16          MR. BONANNO:  I certainly wasn't meaning to imply

17     you had to do it by a certain time.  If it takes weeks to

18     get to the truth, that's what we're gonna stay because this

19     is a most important case to Mr. Diaz.

20          This is one of the most important rights we have

21     as free American citizens, and I can't tell you how much I

22     really really appreciate each one of your attention, because

23     we've been watching you, everybody's been watching you, and

24     we can see that you're affixed to this and you're giving it

25     the attention it deserves.  And that's what we need and

1      that's what the system needs.

2              So I'm gonna ask Mr. Vargas, the People have a

3      burden of proof.  It's a heavy burden, it's a burden beyond

4      a reasonable doubt.  The judge will explain that to you as

5      we go along and if you're chosen.  And I want to ask you, if

6      the People do not prove their case beyond a reasonable

7      doubt, how would you vote, guilty or not guilty?

8              PROSPECTIVE JUROR:  Wow.

9              THE COURT:  If they didn't prove their case?

10             MR. BONANNO:  If they didn't.

11             THE COURT:  If the People did not meet their

12     burden of proof, what would your vote be?

13             PROSPECTIVE JUROR:  If they didn't prove?

14             THE COURT:  If they did not prove?

15             PROSPECTIVE JUROR:  If they did not prove?

16             MR. BONANNO:  Yes.

17             THE COURT:  Yes.

18             PROSPECTIVE JUROR:  I'll say guilty.

19             MR. BONANNO:  You would say guilty?

20             THE COURT:  If they didn't prove?

21             MR. BONANNO:  If they did not prove.

22             THE COURT:  Did you understand my instructions

23     about the burden of proof, that the People have to prove the

24     defendant guilty beyond a reasonable doubt?  That's their

25     burden, it never shifts.  And that if the People fail to

1    prove the defendant guilty beyond a reasonable doubt, well

2    then, you must vote not guilty.  And if they do prove him

3    guilty, you must vote guilty.  That's what the instruction

4    says.

5          Why would you say he's guilty if they didn't prove

6    him guilty beyond a reasonable doubt?

7          MR. BONANNO:  Did you not understand the question?

8          PROSPECTIVE JUROR:  I didn't.

9          MR. BONANNO:  Okay.

10         THE COURT:  Well, no, would you vote him -- you

11   answered that you would say he was guilty.  Why would you do

12   that if they didn't prove him guilty beyond a reasonable

13   doubt?

14         PROSPECTIVE JUROR:  I don't know.

15         THE COURT:  What would your vote be -- do you

16   understand the instruction?  Yes?

17         PROSPECTIVE JUROR:  Yes.

18         THE COURT:  You understand that the People have to

19   prove him guilty beyond a reasonable doubt?  In fact, Mr.

20   Mendys said that at the close of his voir dire to you that

21   you would hold him to his burden of proof.  He has to prove

22   the defendant guilty.  If he fails to meet that burden, the

23   verdict is not guilty.  If he meets that burden, then the

24   verdict is guilty.  You understand that?

25         PROSPECTIVE JUROR:  Uh, huh; yes.

1              THE COURT:  So if he doesn't meet his burden, what

2      would your verdict be?

3              PROSPECTIVE JUROR:  Not guilty.

4              THE COURT:  Continue.

5              MR. BONANNO:  Miss Florentino, now do you

6      understand that question too?  If the People do not meet

7      their burden of proof, how would you vote, guilty or not

8      guilty?

9              PROSPECTIVE JUROR:  I don't understand.

10             MR. BONANNO:  You don't understand?

11             PROSPECTIVE JUROR:  No, I don't understand.

12             MR. BONANNO:  Mr. Ali, how would you vote that

13     same question, People don't meet their burden of proof?

14             PROSPECTIVE JUROR:  Not guilty.

15             MR. BONANNO:  Not guilty.  Miss Gil?

16             PROSPECTIVE JUROR:  Not guilty.

17             MR. BONANNO:  Mr. Davis?

18             PROSPECTIVE JUROR:  Not guilty.

19             MR. BONANNO:  Mr. Abad?

20             PROSPECTIVE JUROR:  Not guilty.

21             PROSPECTIVE JUROR:  Not guilty.

22             PROSPECTIVE JUROR:  Not guilty.

23             PROSPECTIVE JUROR:  Not guilty.

24             MR. BONANNO:  Miss Gadson?

25             PROSPECTIVE JUROR:  Not guilty.

Jury Selection

1        MR. BONANNO:  I have no further questions.  Thank

2   you.

3        THE COURT:  We're going to take a recess now while

4   the attorneys discuss which of you will be acceptable to

5   serve on this jury.  If you are not selected, it is nothing

6   personal, it's just a decision that's been made, and these

7   questions are made in every trial.  I thank you for you

8   service if you're not selected.  If you are selected, I'd

9   give you further instruction.

10        The people in the audience, you'll be coming back

11   in for the next phase when we have these jurors come in and

12   I'll give you instructions at that time, okay.  So just

13   follow my recess rules.  Don't discuss the case, keep an

14   open mind and I'll see you in a few minutes, okay.

15        (Whereupon, the prospective jurors exited the

16   courtroom.)

17        THE COURT:  Are you ready for cause challenges

18   now?

19        MR. MENDYS:  Yes.

20        THE COURT:  Veronica?

21        MR. MENDYS:  I think we have a consent.

22        THE COURT:  Well, tell me what your challenges

23   are.

24        MR. MENDYS:  Okay.  My consent, my consent

25   challenge would be number --

Jury Selection

1           MR. BONANNO:  Five.

2           MR. MENDYS:  Five, Miss Florentino, on language

3   issues.  She indicated yesterday at the bench, and today, I

4   think both when I questioned her and when Mr. Bonanno

5   questioned her that she was not, did not understand a

6   hundred percent of what was being said.

7           THE COURT:  Mr. Bonanno?

8           MR. BONANNO:  Yes, it's on consent, Judge.

9           THE COURT:  Juror number five struck for cause on

10  consent.  Anyone else?

11          MR. MENDYS:  No others for cause.

12          THE COURT:  You have no other challenge for cause;

13  right?

14          MR. MENDYS:  That's correct.

15          THE COURT:  We didn't even go through with the, I

16  don't -- Veronica, I apologize because this is not what we

17  normally do, we go through you.  And so let's call into the

18  record the way we need to with the numbers and everything.

19          THE CLERK:  Thank you.

20          As to the remaining seats one through 18, People?

21          THE COURT:  Challenge for cause?

22          THE CLERK:  Any challenge for cause?

23          MR. MENDYS:  Nothing else.

24          THE CLERK:  Defense, do you have any challenge for

25  cause as to remaining seats one through 18?

Jury Selection

1          MR. BONANNO:  I believe Mr. Vargas, seat four.

2     Clearly, Judge, he had issues comprehending, you know,

3     whether how to vote.  Not understanding the standard I

4     believe.

5          THE COURT:  Mr. Mendys?

6          MR. MENDYS:  Judge, I think he, at least on that

7     one issue he was rehabilitated.  He was also the first

8     prospective --

9          THE COURT:  That's the only issue being raised for

10    the challenge for cause now is that he did not understand

11    that if the People didn't meet their burden he had to vote

12    not guilty.  That's the only, is that the only challenge for

13    cause that's being raised?

14         MR. BONANNO:  That is at this point.

15         THE COURT:  That's the cause challenge that's

16    being raised.

17         MR. MENDYS:  In terms of that issue, Judge, he was

18    the first prospective juror who was asked that specific

19    question.  He's never been through this before.  I think

20    it's reasonable that he didn't fully grasp the question.

21    When asked by your Honor he gave an appropriate response.

22    He had spoken to us at length, I think, about this and other

23    issues.  I don't think that there's --

24         THE COURT:  This is the only issue.

25         MR. MENDYS:  I understand, but taken as a whole, I

1          don't think that there's a basis for a cause challenge.

2                    THE COURT:  All right.  He did, actually after the

3          law was re-explained to him, and he said he understood it

4          and that he would vote not guilty and understood the burden

5          of proof, and there was an expurgatory oath at that point,

6          and so the cause challenge is denied for Mr. Vargas.

7                    THE CLERK:  Would this be all for challenges, Mr.

8          Bonanno?

9                    MR. BONANNO:  Yes.

10                    THE CLERK:  People, as to peremptory challenges as

11          to the remaining seats one through 18?

12                    THE COURT:  Are there only 12 left now?

13                    THE CLERK:  Eleven.

14                    THE COURT:  That's what -- I'm sorry, one through

15          18.  Thank you.

16                    MR. MENDYS:  People challenge Juror No. 2, Miss

17          Smith; Juror No. 11, Miss Altschuler; Juror No. 14, Miss

18          Baljit; and Juror No. 18, Mr. Abad.  That's all.

19                    THE CLERK:  Thank you.

20                    Mr. Bonanno, do you have any peremptory challenges

21          as to remain seats one through 17?

22                    MR. BONANNO:  Number 17, Miss Gonzalez.

23                    THE CLERK:  Do you have any other peremptory

24          challenges?

25                    MR. BONANNO:  Number four, Mr. Vargas.

Jury Selection

1          THE CLERK:  Will that be all?

2          MR. BONANNO:  That will be all.

3          THE COURT:  That's it?  Okay, so.

4          THE CLERK:  So Antoinette Gadson will be Juror No.

5     1.  Lorraine Gil will be Juror No. 2.  El Shaddai Davis will

6     be Juror No. 3.  Juror No. 4 will be Syed Ali.  And Andrew

7     A. Betances will be Juror No. 5.

8          THE COURT:  We can bring them in.

9          COURT OFFICER:  Prospective jurors entering.

10         (Whereupon, the prospective jurors entered the

11    courtroom.)

12         THE CLERK:  Thank you all for being here.  If I

13    call out your name, please step outside and wait for further

14    instructions from our court officers:  Luis Vargas, Milagros

15    Gonzalez, Eddie Abad, Julia Baljit, Christine Altschuler,

16    Yvette Smith and Dora Florentino, you may step outside.

17         (Whereupon, the excused prospective jurors exited

18    the courtroom.)

19         THE CLERK:  Now can you please stand.

20         Are the jurors satisfactory to the People?

21         MR. MENDYS:  They are.

22         THE CLERK:  Are the jurors satisfactory to the

23    defense?

24         MR. BONANNO:  They are.

25         THE CLERK:  Will you please raise your hand one

1    more time.

2              (Whereupon, the jurors were duly sworn by the

3    Clerk of the Court.)

4              THE CLERK:  Thank you.  You may be seated.

5              THE COURT:  Well, good afternoon and welcome to

6    the jury.  So Miss Gadson, you're going to be our foreperson

7    and I'll give you some instructions about what that means,

8    which is it's not very difficult.  It's like recordkeeping

9    and note writing during deliberations, but that's pretty

10   much it.

11             So you are on the jury.  You've now been sworn on

12   the jury.  I have given you those instructions and it's

13   imperative now that you follow them to the letter the recess

14   instructions that I referred to not to discuss anything of

15   any substance about this case with anyone else.

16             Not to visit any kind of scenes or locations.

17             Not to discuss receiving or agree to receive or

18   discuss giving information about this case to anyone else.

19   If someone trying to influence you or anyone else, let me

20   know immediately if something like that happens.

21             You're not to do any kind of research of any kind

22   of factual or legal issue by means of anything.  You're not

23   to do any kind of Facebooking or any kind of checking up on

24   witnesses or anything like that, or any parties involved in

25   the case.

Jury Selection

1          And you also cannot read any accounts that may

2      have been or may ever be reported in the media.

3          We're going to keep you for a few minutes while we

4      exchange information.  Court officer is going to give you

5      contact information for us so you can call the courtroom

6      directly if you're going to be delayed on any day that

7      you're required to be here.

8          We're also going to get information about how we

9      can contact you from the courtroom, which is information

10     that is only in the court's possession and not shared with

11     anyone else incase we're not going to need you on a date

12     that I've told you in advance.

13         Now, I am hopeful at this moment that we can begin

14     this case Friday morning in terms of evidence, so I'm going

15     to ask you to be here at 10 o'clock on Friday.

16         MR. MENDYS:  Judge, can we approach on that?  Very

17     briefly.

18         THE COURT:  Well, you can approach on it, yes.

19         (Whereupon, a discussion was held at the bench off

20     the record among the Court and counsel.)

21         THE COURT:  You have an appointment on the 17th

22     but at nine.  What time can you be here?

23         SWORN JUROR:  I can change it.

24         THE COURT:  Are you positive, because will you be

25     able to be here by like noon or 11:30?

1    PROSPECTIVE JUROR:  Yes.

2    THE COURT:  What time?

3    PROSPECTIVE JUROR:  My appointment was at nine.

4    THE COURT:  How long will it take you to?

5    PROSPECTIVE JUROR:  I'm honestly not sure because

6    I had to take a test.

7    THE COURT:  Well, you know something, I don't want

8    you to have to reschedule that appointment.  And thank you

9    for -- step back just a minute.  And there were other people

10   who told me about appointments as well.  Would you be able

11   to be here you think by noon or you're not sure?

12   PROSPECTIVE JUROR:  Definitely by noon I should.

13   THE COURT:  So then, yes?

14   PROSPECTIVE JUROR:  I have, it might be a holiday

15   a Muslim holiday on Friday.

16   THE COURT:  The 17th?

17   PROSPECTIVE JUROR:  Yeah.

18   THE COURT:  Not this Friday, I'm sorry the 24th?

19   PROSPECTIVE JUROR:  Yeah, this Friday.

20   THE COURT:  We're not meeting on the 24th, that's

21   the day --

22   MR. MENDYS:  He said this Friday.

23   THE COURT:  This Friday you cannot be here?

24   PROSPECTIVE JUROR:  Yeah.

25   THE COURT:  Did you tell me about this beforehand?

Jury Selection

1      PROSPECTIVE JUROR:  No, I haven't.

2      THE COURT:  You can't be here at all on Friday?

3      PROSPECTIVE JUROR:  I don't know, it might be on

4  Friday or Saturday.  I don't know yet.

5      THE COURT:  Well, let's do this.  We'll begin

6  Monday, okay, and I think we'll be fine.  I will ask you to

7  all be here, and then it will be no doubt that we will begin

8  on Monday, July 20.

9      And I will ask you to all be here by 9:45 in the

10  morning at the room where you gathered this morning before

11  continuing jury selection process, okay.  So you'll exchange

12  information now and I'll see you Monday okay.

13      COURT OFFICER:  Step this way.

14      (Whereupon, the sworn jurors exited the

15  courtroom.)

16      THE COURT:  Now in the few minutes that we have

17  remaining I'm just going to ask that the names of the

18  individuals be called to sit in the jury box, and I'm not

19  going to engage in any questions at this time but I want you

20  to have these positions when we return this afternoon so we

21  can fill the box with however many people we have left.

22      THE CLERK:  Seat number one, Maria Cordero.

23      Seat number two, Loevy Afanadore, L-O-E-V-Y, last

24  name is A-F-A-N-A-D-O-R.

25      Seat number three, Blessing Brown.

1          Seat number four, Yocasta Alvarez, first name
2     Y-O-C-A-S-T-A.
3          Seat number five, James Munoz.
4          Seat number six, Galina, last name Kalmatskaya,
5     K-A-L-M-A-T-S-K-A-Y-A.
6          Seat number seven, Eunis Apau, last name A-P-A-U.
7          Seat number eight, Silvia Williams.
8          Seat number nine, Jose L. Burgos.
9          Seat number 10, Namory Toure, first name
10    N-A-M-O-R-Y, last name T-O-U-R-E.
11          Seat number 11, Jocelyn Germany.
12          Seat number 12, Trevor Johnson.
13          THE COURT:  So I'm going to pose one question to
14    all of you that I want a show of hands because, as I said,
15    the second round will work faster than the first round, and
16    I'm going to handle this part of it first.
17          You've listened to all the questions, you've
18    listened to what we're looking for, you heard other people's
19    answers.  Any of you feel that you would be wanting to speak
20    with me outside the presence of the other prospective jurors
21    about anything whatsoever?  Raise your hands and keep them
22    up.
23          So Miss Cordero, Miss Brown, Miss Alvarez, Miss
24    Williams, Miss Apau, Mr. Burgos.  Anyone else?  Okay.  Oh,
25    I'm sorry, yes, Miss Williams, right.  Yes, I have Miss

1    Williams and Miss Apau.

2             So you six when we return from the lunch break I'm

3    going to have you each come in individually.  I'm not going

4    to call everybody in and have them leave.  I'll bring you

5    back, and then after we have finished our private

6    discussions, then I will be asking whoever is left the other

7    questions that I have.

8             So enjoy your lunch.  Don't discuss the case.

9    Keep those recess instructions that I've given you.  Please

10   be back by about 2:15 in that room down the hall, and

11   especially the people that I want to see in private first.

12   And then once we're done, we should be finished with this

13   process 3:15 or so this afternoon, okay.  I'll see you

14   later.

15             (Whereupon, the prospective jurors exited the

16   courtroom.)

17             THE COURT:  I just want to note the jurors have

18   left.  I do want to do that Parker hearing after the round

19   that we finish this afternoon.  Will your witness be

20   available to testify about what they already know and

21   whatever else they've learned this morning?

22             MR. MENDYS:  I will, I will check.  I'm not sure

23   if they're gonna -- I was told he was gonna go out after I

24   spoke to him this morning.  I assume that would be done by

25   the time I come back from lunch.

Jury Selection

1          THE COURT:  Other than his home address, did you
2      have any other place he might --
3          MR. MENDYS:  He mentioned addresses so I don't
4      know if that relates, if this relates to the bail, the bond
5      or checking --
6          THE COURT:  You're talking about the people on the
7      bond?
8          MR. MENDYS:  I don't know, I didn't ask him,
9      inquire where he was going.
10          THE COURT:  They don't have to act as a bail
11      bondsman and bring him in, they just need to find out that
12      he's not in extreme amiss or not in custody.  And basically,
13      we also have a record from his lawyer now that he is alive
14      and well and communicating, and understands that we are
15      proceeding even with jury selection.
16          MR. MENDYS:  What time would you like him here?
17          THE COURT:  3:30.
18          MR. MENDYS:  I will make a phone call and tell him
19      that you are ordering him here.
20          THE COURT:  Thank you.  And if we need more, if we
21      need to have more, we'll put it over.
22          MR. MENDYS:  Okay.
23          THE COURT:  Okay.
24          (Whereupon, there was a luncheon recess taken.)
25      A  F  T  E  R  N  O  O  N      S  E  S  S  I  O  N

Jury Selection

1              (Whereupon, the following took place in open court

2       in the presence of defense counsel and the assistant

3       district attorney.)

4              THE CLERK:  Part 98 is back in session.  Case on

5       trial continued, Richard Diaz.  The defendant is still not

6       before the court.  Appearances once more.

7              THE COURT:  Mr. Mendys?

8              MR. MENDYS:  Hi, Judge.

9              THE COURT:  Hi.

10             MR. MENDYS:  I spoke to Detective Clark-El, Clark

11      hyphenated E-L.  He was in the lobby of my building right

12      before lunch.  At that point he had a team and they were

13      going out to the three locations to attempt to locate Mr.

14      Diaz.  I told him that the Court wanted him here at 3:30.

15      He said that shouldn't be a problem.

16             THE COURT:  Terrific.

17             MR. MENDYS:  All three locations, my understanding

18      is all three locations are very close to one another in

19      upper Manhattan so.

20             THE COURT:  Terrific.

21             MR. MENDYS:  I will, once we break I'll make a

22      call to him.

23             THE COURT:  Any other contact?

24             MR. BONANNO:  No, Judge.

25             THE COURT:  He hasn't called?

1      MR. BONANNO:  He has not called.

2      THE COURT:  Or texted?

3      MR. BONANNO:  No.

4      THE COURT:  All right.  Well then, do we have the

5   jurors that I want to see privately?

6      COURT OFFICER:  I haven't separated them yet.

7   They're all in the room down the hall.

8      THE COURT:  Pull these cards, then you can just

9   bring them down.  One, three, four, seven, eight, nine.

10   Then you can just, you know, bring them and you don't have

11   to go running back and forth.

12      MR. MENDYS:  Judge, how many alternates do you,

13   are you going to be seeking?

14      THE COURT:  I don't even know if I want 12 jurors.

15   Two?  Three?  We'll see how far we get.

16      MR. MENDYS:  Okay.

17      THE COURT:  No less than two.  We can start with

18   Miss Cordero.

19      COURT OFFICER:  Prospective juror entering.

20      (Whereupon, the prospective juror entered the

21   courtroom.)

22      THE COURT:  Miss Cordero, sit anywhere in the

23   front row you want.  This is prospective Juror No. One for

24   that panel, Maria Cordero.

25      So Miss Cordero, what did you want to speak with

Jury Selection

1    me without the other, with the lawyers and without the other

2    jurors present?

3           PROSPECTIVE JUROR:  Yes.  Right now I work as a

4    director in a daycare center where the daycare center has

5    been accused of sexually abusing an infant, and we are going

6    through a trial ourselves.

7           THE COURT:  Who is we, you are --

8           PROSPECTIVE JUROR:  One of my staff members and

9    myself.

10          THE COURT:  You're a defendant?

11          PROSPECTIVE JUROR:  Well, I'm part of the, being

12   that I'm director of the program so they're saying that

13   because the kid was under my care that I'm responsible as

14   well as with the case.

15          THE COURT:  Is this a criminal case?

16          PROSPECTIVE JUROR:  Well, they accusing my staff

17   member of sexually molesting one of the girls.

18          THE COURT:  They're accusing a staff member.  So

19   where is the case pending?

20          PROSPECTIVE JUROR:  I really don't know if it's

21   gonna be in this court.  We had the first case was settled

22   for June 19th, but because we had graduations they cancelled

23   the case and they told us, they cancelled that day at the

24   court and they told us they were going to reschedule and let

25   us know.

Jury Selection

1      THE COURT:  But when you say settled, it was a

2   civil case?  Money had to be paid?

3      PROSPECTIVE JUROR:  Well, they're suing the

4   school, yes, but it hasn't been paid yet.  The case hasn't

5   been seen yet.

6      THE COURT:  So okay.  So are you a witness in that

7   case?

8      PROSPECTIVE JUROR:  Yes.

9      THE COURT:  In that civil case?

10      PROSPECTIVE JUROR:  Yes.

11      THE COURT:  You're a witness in a civil case.  And

12   it doesn't have anything to do with this case, obviously;

13   right?

14      PROSPECTIVE JUROR:  No, doesn't have nothing to do

15   with this case, but also I personally don't feel that I

16   would be a good juror here because I myself had certain

17   conflicts with certain policemans(sic).  And I also go to

18   college and I have policemans that are friends and we

19   discuss the way that they sometimes fabricate cases.  So I

20   don't think that I would be fair in a decision knowing

21   what's going on.

22      THE COURT:  You cannot follow my instructions

23   about judging police testimony in this case as you would

24   judge anyone else's testimony?

25      PROSPECTIVE JUROR:  I would say that I could

1   follow instructions up to a certain point, but because my

2   brother was killed and was never done nothing about it, and

3   hearing my friends the way they talk and the way they joke

4   about certain things that happens within the system, it

5   doesn't give me that trust I would go ahead say, okay, I'm

6   going to be fair with this because I'm going to be moved my

7   personal experience with my brother and through all the

8   problems we had had with the policeman.

9          THE COURT:  I'm so sorry to hear that your brother

10  was killed, but the police, no one was ever arrested?

11         PROSPECTIVE JUROR:  No.  And then when we try to

12  find out, they said that we know a Puerto Rican did it.

13  That's what we were told by who's in charge of the case.

14         THE COURT:  Because of this you can't promise me

15  you can be fair, is that what you're saying?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  Any questions?  Consent?

18         MR. MENDYS:  Yes.

19         MR. BONANNO:  Yes.

20         THE COURT:  You're excused, ma'am.  Thank you for

21  you candor.  Good luck to you.  You have to go back

22  downstairs.

23         (Whereupon, the prospective juror exited the

24  courtroom.)

25         THE COURT:  Next is Miss Brown.

Jury Selection

1          COURT OFFICER:  Prospective juror entering.

2          THE COURT:  Prospective juror number three,

3     Blessing Brown.  Miss Brown, you can just sit in the front

4     row in any seat, that's fine.

5          Now, you raised your hand.  Tell me what's on your

6     mind.

7          PROSPECTIVE JUROR:  I was once held up in a C-B's

8     office with my cousin and my cousin's car was stolen.  It

9     was reported to the police officers and the car was found,

10    but the people that dropped us were not found.  That kind of

11    left a very bad taste, you know, in my mouth.

12         THE COURT:  A bad taste because they weren't found

13    or bad taste about being the victim or both?

14         PROSPECTIVE JUROR:  Being a victim and they

15    weren't found.

16         THE COURT:  Is that going to make you unable to be

17    fair in this case?

18         PROSPECTIVE JUROR:  I would say, yes.

19         THE COURT:  Any questions?

20         MR. MENDYS:  No.

21         MR. BONANNO:  None, Judge.

22         THE COURT:  Consent?

23         MR. MENDYS:  Yes.

24         MR. BONANNO:  Yes.

25         THE COURT:  Okay Miss Brown, thank you for your

Jury Selection

1   candor and you're excused.  Good luck to you.

2              (Whereupon, the prospective juror exited the

3   courtroom.)

4              THE COURT:  Number four, Yocasta Alvarez.

5              COURT OFFICER:  Prospective juror entering.

6              (Whereupon, the prospective juror entered the

7   courtroom.)

8              THE COURT:  All right, prospective juror number

9   four, Miss Yocasta Alvarez.

10             Miss Alvarez, can you tell me what you want to

11  speak to me about?

12             PROSPECTIVE JUROR:  Yes.  I know yesterday was a

13  hard day for you and stuff like that, and I just wanted to

14  say as much as I want to be here, I personally can't be here

15  due to my job.

16             THE COURT:  It wasn't a hard day for me, but this

17  is about your work?

18             PROSPECTIVE JUROR:  My work, yes.

19             THE COURT:  You're a school teacher?

20             PROSPECTIVE JUROR:  I'm not a school teacher, I'm

21  an administrative assistant.  I work in the office where

22  there's only two assistants, and our last day of school was

23  July 10 because I work for a charter school and we --

24             THE COURT:  But they pay your full --

25             PROSPECTIVE JUROR:  Yes.

Jury Selection

1          THE COURT:  -- salary here?  There is no hardship
2     to you personally.
3          PROSPECTIVE JUROR:  Technically because --
4          THE COURT:  No, to you, absolutely you don't lose
5     any money and you come in to sit on a jury, and you can't be
6     excused from jury service because it's something that
7     happens at your work.  I don't think that the charter
8     schools would like to hear that their employees are coming
9     in and asking to get off jury duty.
10          PROSPECTIVE JUROR:  I haven't signed my new
11     contract for the new year.  We do it --
12          THE COURT:  They can't fire you.
13          PROSPECTIVE JUROR:  We haven't signed the contract
14     and the new secretary that's there, she's completely new.
15     I've been there two years.
16          THE COURT:  But they can't fire you.
17          PROSPECTIVE JUROR:  I don't know.  I honestly
18     don't know that.
19          THE COURT:  No, the law it says they can't fire
20     you unless they have, they can't fire you for being on a
21     jury.
22          PROSPECTIVE JUROR:  No they can't, but at the same
23     time, it would make me behind for the new school year
24     because the new person she's new, she doesn't know the
25     students.  She doesn't know anything.  And I'm usually

1     there, my last date of work is technically Friday, July

2     31st, then I'm off completely the summer so.

3              THE COURT:  So then why didn't you just delay this

4     until August 1st?

5              PROSPECTIVE JUROR:  I tried to and it didn't allow

6     me.

7              THE COURT:  Because you --

8              PROSPECTIVE JUROR:  This is --

9              THE COURT:  You put this off so many times?

10             PROSPECTIVE JUROR:  No, this is the only, I

11    postponed it once.  This is my first time.  And I tried

12    doing it until August.  The latest he gave me was July.

13             THE COURT:  So, but you had had it deferred

14    already once?

15             PROSPECTIVE JUROR:  Yes, once.

16             THE COURT:  So yes, you have.  Right.  And you

17    were entitled to that.

18             PROSPECTIVE JUROR:  Exactly.  And I tried to

19    postpone it until August but I wasn't allowed to do so.

20             THE COURT:  Well, you know, I don't know what to

21    tell you, but we have a lot of people in this country that

22    go out and fight wars, they come back wounded.  We have a

23    lot of people that do all sorts of things for the United

24    States.  This is something that every citizen is required to

25    do in their life, give up a week, two weeks.  I'm not asking

Jury Selection

1    you to give up six months or a year.  You also have off in

2    August.

3              So this is, you don't want fulfill your obligation

4    as a citizen?

5              PROSPECTIVE JUROR:  I do.

6              THE COURT:  Be on a jury because you feel you need

7    to be in an office where you're getting paid full-time and

8    everybody else, and -- I understand everybody has jobs to

9    do, everybody has things in their lives, and then we have

10   our system of government.  And if we don't, and if we don't

11   get people that can serve, well maybe we should just

12   abandoned the whole system and have nobody sit as jurors

13   because I do hear these excuses from lots and lots of people

14   who believe that they have something to do that will prevent

15   them from being fair.

16             This is all about your schedule, this isn't about

17   fairness.  This isn't --

18             PROSPECTIVE JUROR:  It's not.

19             THE COURT:  This is you just don't want to be

20   here.

21             PROSPECTIVE JUROR:  No, it's not.

22             THE COURT:  Because you feel that it's more

23   important to be at the charter school.

24             PROSPECTIVE JUROR:  It's not that it's more

25   important.  I am a single mother, and again, I have not

1    signed my new contract.  I know that there's been other

2    employees have gone to jury duty during the school year, and

3    because this is my first time and I am, my last day of work

4    is July 31st, I'm not sure exactly how that works on that

5    end.

6           THE COURT:  Have you spoken to anyone at the

7    school that you could be on a jury for two to three weeks

8    and not?

9           PROSPECTIVE JUROR:  I haven't.  I haven't.  And

10   honestly, I'm leery.

11          THE COURT:  You're off the rest of this week.  You

12   go to work Wednesday, Thursday, Friday.  You have off the

13   24th of July.  You go in that day, and whatever other days

14   we may have off.

15          PROSPECTIVE JUROR:  But your Honor, it's not

16   just --

17          THE COURT:  You would not be there so it's not

18   that we're holding you here for this entire period of time,

19   but you, this is going to -- this concern you have is not

20   going to allow you to be a juror on this case, that's what,

21   that's why you came forward?

22          PROSPECTIVE JUROR:  Yes.  And I'm being honest.  I

23   mean, aside from the fact that I've been a victim, and I'm

24   not gonna say here that I'm gonna use my personal experience

25   against towards the case, but personally my job, you know,

Jury Selection

1    I'm not sure if it's in jeopardy because I haven't signed a

2    new contract or anything like that.  And sir, I came because

3    it's my duty as a citizen, as a United States citizen to

4    come and sit here and be honest, but it's not that I will

5    not like to be here.  Now, if you call me in August, I have

6    no problems being here.

7              THE COURT:  Mr. Mendys?

8              MR. MENDYS:  Nothing else.

9              THE COURT:  Mr. Bonanno?

10             MR. BONANNO:  Nothing.

11             THE COURT:  Are you consenting?

12             MR. BONANNO:  I'll consent.

13             MR. MENDYS:  Yes.

14             (Whereupon, the prospective juror exited the

15   courtroom.)

16             THE COURT:  Number seven, Miss Eunice Apau,

17   A-P-A-U, Asare, A-S-A-R-E.

18             COURT OFFICER:  Prospective juror entering.

19             THE COURT:  This is prospective juror Eunis Apau

20   Asare, A-S-A-R-E.  And those were two separate names, right?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  Thank you.  I just want to make sure

23   we have the right spelling.

24             Okay ma'am, tell me what did you want to speak to

25   me about?

Jury Selection

1             PROSPECTIVE JUROR:  Yeah, about the incident like

2       being a victim.

3             THE COURT:  You've been a victim of what kind of a

4       crime?

5             PROSPECTIVE JUROR:  Robbery.

6             THE COURT:  How long ago was it?

7             PROSPECTIVE JUROR:  About 10 years when I was 11.

8             THE COURT:  Did it involve any kind of weapon?

9             PROSPECTIVE JUROR:  Yeah, a gun.

10            THE COURT:  And what was taken from you?

11            PROSPECTIVE JUROR:  It was around my birthday so

12      they attacked my family and took away my birthday money and

13      Christmas money, and even ate my food from my birthday

14      party.

15            THE COURT:  I'm so sorry to hear this.  Was this

16      reported to the police?

17            PROSPECTIVE JUROR:  Yeah, but it was back home

18      when I was back in my country.

19            THE COURT:  Where is that?

20            PROSPECTIVE JUROR:  In Ghana.

21            THE COURT:  So the police in Ghana were not able

22      to arrest anyone?

23            PROSPECTIVE JUROR:  No.

24            THE COURT:  So now that happened obviously in a

25      different place.  I know it's the same charges as in this

Jury Selection

1       case.  Are you able to keep what happened to you separate

2       and be a juror who can just view this case in terms of its

3       own facts?

4                PROSPECTIVE JUROR:  I've been trying like the

5       whole day, but it's just it keeps coming back and --

6                THE COURT:  Okay.  So you feel you could not

7       assure me that you would be fair to both sides?

8                PROSPECTIVE JUROR:  No.

9                THE COURT:  Any questions from the DA?

10               MR. MENDYS:  No.

11               THE COURT:  Mr. Bonanno?

12               MR. BONANNO:  None.

13               THE COURT:  Okay ma'am, you're excused.  Good luck

14      to you.

15               (Whereupon, the prospective juror exited the

16      courtroom.)

17               THE COURT:  Silvia Williams.

18               COURT OFFICER:  Prospective juror entering.

19               (Whereupon, the prospective juror entered the

20      courtroom.)

21               THE COURT:  Okay, this is prospective juror number

22      eight, Silvia Williams.

23               PROSPECTIVE JUROR:  Yes.

24               THE COURT:  Good afternoon, Miss Williams.

25               PROSPECTIVE JUROR:  Good afternoon.

Jury Selection

1          THE COURT:  What did you want to speak about?

2          PROSPECTIVE JUROR:  Okay.  The one, my godson was

3     murdered.

4          THE COURT:  I'm so sorry, ma'am.  Are you able to

5     sit on a criminal case?

6          PROSPECTIVE JUROR:  Oh yes.

7          THE COURT:  You are okay.  So when was this?  How

8     long?

9          PROSPECTIVE JUROR:  This was 2011.

10         THE COURT:  Was it here in the Bronx?

11         PROSPECTIVE JUROR:  The two of them were killed.

12    He saw one guy get murdered, both of them, two guys got him

13    and another friend, another guy, either he saw the murder or

14    other guy saw the murder, but they killed both of them

15    and --

16         THE COURT:  Did that happen here in Bronx County?

17         PROSPECTIVE JUROR:  Right in my neighborhood.

18         THE COURT:  Was anyone arrested?

19         PROSPECTIVE JUROR:  It's an open case, that's why

20    I wanted to talk to you.  It's still open case.

21         THE COURT:  Right.  And you still keep in touch

22    with the detectives on the case?

23         PROSPECTIVE JUROR:  Well, his mother keeps me

24    aware of what's going on and they gonna take it to another

25    precinct, so the case is still open.  That's why I just want

Jury Selection

1       to talk about it out in the open.

2                   THE COURT:  Now, I know the charges in this case

3       are robbery and, you know, a crime where it's alleged force

4       was used to take property.  You're able to put aside what

5       happened --

6                   PROSPECTIVE JUROR:  Oh yes.

7                   THE COURT:  In that case and be fair here?

8                   PROSPECTIVE JUROR:  I am.

9                   THE COURT:  Well, thank you for bringing this to

10      our attention.  I understand, you know.  What else, go

11      ahead?

12                  PROSPECTIVE JUROR:  One more thing.  My grandson

13      had a little problem and he was arrested.

14                  THE COURT:  Okay.

15                  PROSPECTIVE JUROR:  But he was proven innocent.

16      He spent sometime in jail, okay, with the feds, and now he's

17      in a halfway house doing good and he was exonerated from all

18      charges.

19                  THE COURT:  Where was this?

20                  PROSPECTIVE JUROR:  This was, it was, they got, he

21      got arrested because there was a tail end --

22                  THE COURT:  Was it here in the Bronx too?

23                  PROSPECTIVE JUROR:  It was in the Bronx.

24                  THE COURT:  In?

25                  PROSPECTIVE JUROR:  The Bronx.

Jury Selection

1              THE COURT:  So he was, he was arrested and

2      prosecuted, and you say he was found, he went to trial?

3              PROSPECTIVE JUROR:  He went to trial.

4              THE COURT:  Did you go to the trial?

5              PROSPECTIVE JUROR:  Yes, I did.

6              THE COURT:  And was it in this courthouse?

7              PROSPECTIVE JUROR:  It was in down at the feds

8      downtown, the federal building downtown.  I can't --

9              THE COURT:  How old was he at the time?

10             PROSPECTIVE JUROR:  At the time he was 21, 22.

11             THE COURT:  So it was in a different courthouse

12     downtown?

13             PROSPECTIVE JUROR:  Yes, yes.  He spent time and

14     the time he was found innocent of whatever the deal was.

15             THE COURT:  Can I ask you what the charges were?

16             PROSPECTIVE JUROR:  The charges was drug dealing,

17     but at the time like he was like the tail end of it, and

18     like he's in a halfway house in Odessey Houses there now.

19     He's doing well and no problem.

20             THE COURT:  Now do you believe that he was treated

21     unfairly by the police and law enforcement?

22             PROSPECTIVE JUROR:  No, no.  My thing is I felt

23     that he got into a situation without thinking, okay.  You

24     know, he just, kids are, they think they now.  His thing

25     he's not listening to his mother, he's not listening to me,

Jury Selection

1    and that was it.  Now he learned his lesson.  He's going to

2    be a father soon so he's a different person.  He's 24 now.

3    He's a different person.  That's, I just want to bring that

4    up because I hope it doesn't cause harm me in any kind of

5    way.

6                  THE COURT:  While I have you here I'm going to go

7    through the rest of questions with you, then let the

8    attorneys ask you if they need to ask you any questions.

9                  Tell me you live in what neighborhood?

10                 PROSPECTIVE JUROR:  I live in Soundview.

11                 THE COURT:  And how long have you been there?

12                 PROSPECTIVE JUROR:  35, 34 years.

13                 THE COURT:  Do you live with anyone right now?

14                 PROSPECTIVE JUROR:  Yes, I do.

15                 THE COURT:  Who?

16                 PROSPECTIVE JUROR:  My grandchildren.

17                 THE COURT:  Does that include the grandson who had

18   the problem?

19                 PROSPECTIVE JUROR:  No, no, he's at the Odessey

20   House in Harlem.

21                 THE COURT:  Have you been employed?

22                 PROSPECTIVE JUROR:  I was, I'm retired now.  I

23   used to be a home health aide for 30 years.

24                 THE COURT:  Now you told me about the victim as

25   well as the someone who's been, had been arrested.  Do you

1    have any close friends or relatives who've been working in

2    law enforcement as police?

3            PROSPECTIVE JUROR:  Well, again, I have another

4    friend in the building, her daughter works as a guard in

5    Rikers Island, and she's a very nice girl, you know.

6            THE COURT:  Are you able to follow my instructions

7    about --

8            PROSPECTIVE JUROR:  Yes, I am, no problem.

9            THE COURT:  -- evaluating fairness?  Okay.  Have

10   you ever been on a jury?

11           PROSPECTIVE JUROR:  No, this is my first time.

12           THE COURT:  So Miss Williams, when all is said and

13   done and you heard everything from my questions, the

14   lawyers' questions, and you know your life, you promise me

15   if you're on the jury, if you're selected, you'll be fair to

16   the DA?

17           PROSPECTIVE JUROR:  I will be fair.

18           THE COURT:  You'll be fair to the defense?

19           PROSPECTIVE JUROR:  I sure will.

20           THE COURT:  And you will promise to follow all my

21   instructions?

22           PROSPECTIVE JUROR:  I will do that.

23           THE COURT:  Mr. Mendys, if you want to make any

24   inquiry of Miss Williams, you may do so right now.

25           MR. MENDYS:  Thank you, Judge.

Jury Selection

1          Miss Williams, how are you?

2          PROSPECTIVE JUROR:  Fine.

3          MR. MENDYS:  Just a couple of questions.  You know

4    you've been on both extremes of the system, unfortunately.

5    In terms of, it sounds like the case involving your grandson

6    which was unfortunately killed.

7          PROSPECTIVE JUROR:  My godson.

8          MR. MENDYS:  Your godson, I'm sorry.  Is it fair

9    to say that in your opinion the police have treated the case

10   fairly and you have no issue with their handling?

11         PROSPECTIVE JUROR:  They have.  They've been very

12   fair and they keep in touch with the mother, you know.  So

13   it's not that she doesn't know anything.  She very aware of

14   what's going on, and she relates the information to me as

15   she gets it.

16         MR. MENDYS:  And then I guess it's gonna be the

17   same question in terms of your grandson's case.  When he

18   went to trial, do you have any feelings how he was treated?

19   Was he treated fairly by the prosecutor, by his attorney, by

20   the police who were involved?

21         PROSPECTIVE JUROR:  Yes, he was very fair and

22   lucky, very lucky.

23         MR. MENDYS:  Thank you.

24         THE COURT:  Mr. Bonanno, any questions?

25         MR. BONANNO:  I have no questions.

Jury Selection

1          THE COURT:  None?

2          MR. BONANNO:  None.

3          THE COURT:  Miss Williams, thank you.  We'll call

4     you back in a few minutes.

5          PROSPECTIVE JUROR:  Okay.

6          THE COURT:  Then we have Mr. Jose Burgos will be

7     the last person.

8          COURT OFFICER:  Prospective juror entering.

9          . (Whereupon, the prospective juror entered the

10    courtroom.)

11         THE COURT:  This is prospective juror number nine

12    in this group, Mr. Jose Burgos.  Mr. Burgos, just make

13    yourself comfortable.

14         Tell me what you want to talk to me about.

15         PROSPECTIVE JUROR:  Some of the crimes in my

16    family, you know, history of myself or whatever.  I was

17    raised in Puerto Rico and unfortunately the area that I

18    lived in was a very violent one.  There was a lot of crimes.

19    A lot of them had to do with drugs and what not.

20         But the one case that impacted me the most was the

21    murder of my cousin Albert.  He was a very big role model,

22    ex-military, and he was mugged.  He was mugged and killed

23    over a gold chain and whatnot.  And you know, it's, just

24    being here it makes me very uncomfortable knowing that the

25    case is about robbery.  You know, it's very uncomfortable

1      situation.

2              On top of that, years later I came here to United

3      States not long ago, about two years and ten months a family

4      friend also was mugged down over a gold chain as well.  This

5      happened in by the area of the Cross Bronx.  It was a very

6      big case, it was all over the news.  And you know, it just

7      brings back a lot of bad memories and stuff.

8              THE COURT:  First of all, let me tell you how

9      sorry I am to even have to ask these questions, and I'm

10     sorry to hear because of what, it brings it stuff back.  And

11     I know what you're saying, so you could not promise me you'd

12     be fair if selected as a juror; is that correct?

13             PROSPECTIVE JUROR:  Yeah, basically, you know,

14     another a case, it was my cousin.  He was indicted over you

15     know --

16             THE COURT:  I understand, sir.  Any questions from

17     the DA?

18             MR. MENDYS:  No, Judge.

19             THE COURT:  Mr. Bonnano?

20             MR. BONNANO:  No, Judge.

21             THE COURT:  Consent?

22             MR. MENDYS:  Yes.

23             MR. BONANNO:  Consent.

24             THE COURT:  You're excused, sir.  Good luck to

25     you.

Jury Selection

1                 (Whereupon, the prospective juror exited the

2         courtroom.)

3                 MR. MENDYS:  Judge, while we're waiting, Mr.

4         Johnson who was currently, I guess will be seat number

5         seven.

6                 THE COURT:  Yes.

7                 MR. MENDYS:  Trevor Johnson indicated he had a

8         scheduling issue on July 30.

9                 THE COURT:  Right.

10                MR. MENDYS:  I don't know.

11                THE COURT:  Well, that's towards the end of the

12        case.

13                COURT OFFICER:  Prospective jurors entering.

14                (Whereupon, the prospective jurors entered the

15        courtroom.)

16                THE COURT:  Mr. Johnson, first row, please.  I'm

17        sorry, Miss Afanadore, you can be seat number one.  I'm

18        sorry I have them.  They're all mixed up.  There's no

19        problem.

20                (Pause in proceedings.)

21                THE COURT:  Okay.  So you've heard me ask these

22        questions so many times you think can do it by yourself,

23        Miss Afanadore, or you want me to ask?

24                PROSPECTIVE JUROR:  I think it's better if you ask

25        them.

Jury Selection

1          THE COURT:  Neighborhood?

2          PROSPECTIVE JUROR:  Pelham.

3          THE COURT:  How long?

4          PROSPECTIVE JUROR:  Two years.

5          THE COURT:  Anyone living in your household with

6     you?

7          PROSPECTIVE JUROR:  My husband.

8          THE COURT:  You working outside the home?

9          PROSPECTIVE JUROR:  I'm a paraprofessional for the

10    Department of Education.

11         THE COURT:  Right.  And your husband working?

12         PROSPECTIVE JUROR:  Yes, he's a porter.

13         THE COURT:  You or anyone close ever been the

14    victim of any kind of crime?

15         PROSPECTIVE JUROR:  No.

16         THE COURT:  Charged with, accused of, questioned

17    in connection with any crime?

18         PROSPECTIVE JUROR:  No.

19         THE COURT:  Any close friends or relatives who

20    work in law enforcement?

21         PROSPECTIVE JUROR:  No.

22         THE COURT:  Have you ever been on a jury?

23         PROSPECTIVE JUROR:  No.

24         THE COURT:  You didn't raise your hand.  You

25    thought about everything that everyone else said, the

Jury Selection

1    questions I've asked, and are you promising me that if

2    selected you'll be fair to the DA?

3              PROSPECTIVE JUROR:   Yes.

4              MR. MENDYS:   You'll be fair to the defense?

5              PROSPECTIVE JUROR:   Yes.

6              THE COURT:   And you'll follow all my instructions?

7              PROSPECTIVE JUROR:   Yes.

8              THE COURT:   Thank you so much.

9              Mr. Munoz, how are you, sir?

10             PROSPECTIVE JUROR:   Yeah, fine.

11             THE COURT:   Neighborhood?

12             PROSPECTIVE JUROR:   Villa Avenue.

13             THE COURT:   How long?

14             PROSPECTIVE JUROR:   Seven years.

15             THE COURT:   You living with anyone in your

16   household?

17             PROSPECTIVE JUROR:   My wife.

18             THE COURT:   You working?

19             PROSPECTIVE JUROR:   Yes.

20             THE COURT:   What do you do?

21             PROSPECTIVE JUROR:   New Jersey maintenance.

22             THE COURT:   How long have you had that job, been

23   working in New Jersey?

24             PROSPECTIVE JUROR:   10 years.

25             THE COURT:   Is your wife working?

Jury Selection

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Have you or anyone close to you ever

3    been the victim of a crime?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  Charged with, accused of?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  Questioned in connection with any kind

8    of crime?

9          PROSPECTIVE JUROR:  No.

10          THE COURT:  Did you have any close friends or

11    relatives who work for the police department or any kind of

12    law enforcement agency?

13          PROSPECTIVE JUROR:  No.

14          THE COURT:  Have you ever been on a jury?

15          PROSPECTIVE JUROR:  The fifth time.

16          THE COURT:  So Mr. Munoz, have you understood

17    everything that's been said in the courtroom?  Have you

18    understood everything I've said and the answers given?

19    Everything the attorneys have said?

20          PROSPECTIVE JUROR:  My English is little okay.

21          THE COURT:  What have you had trouble

22    understanding?  Do you think that you would be able to sit

23    as a juror in this case and be fair to both sides?

24          PROSPECTIVE JUROR:  I don't understand.

25          THE COURT:  Is it because of the English?

Jury Selection

1          PROSPECTIVE JUROR:  Spanish.

2          THE COURT:  Okay.  Miss Kalmatskaya?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  How are you, ma'am?

5          PROSPECTIVE JUROR:  Fine.

6          THE COURT:  So tell me what neighborhood do you

7     live in?

8          PROSPECTIVE JUROR:  Van Cortlandt Park.

9          THE COURT:  How long have you lived in your

10    current address?

11         PROSPECTIVE JUROR:  Two years.

12         THE COURT:  Who are you living with right now?

13         PROSPECTIVE JUROR:  My friend lives with me.

14         THE COURT:  You working?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  What do you do, tell me again?

17         PROSPECTIVE JUROR:  Medical billing company.

18         THE COURT:  Have you or anyone close to you ever

19    been the victim of a crime?

20         PROSPECTIVE JUROR:  My friend.

21         THE COURT:  How long ago was it?  How much -- when

22    did it happen?

23         PROSPECTIVE JUROR:  He got this year.

24         THE COURT:  Sorry?

25         PROSPECTIVE JUROR:  He got trial the end of April

1     this year.  But not friend who lives with me, he another

2     friend.

3              THE COURT:  Tell me everything that happened in

4     that case.

5              PROSPECTIVE JUROR:  It's Medicaid fraud.

6              THE COURT:  You know, we should -- I actually

7     would like to speak with you about this without the other

8     jurors.  I'm sorry.

9              Miss Williams, I've already gone through questions

10    with you.

11             Mr. Toure?

12             PROSPECTIVE JUROR:  Yes.

13             THE COURT:  How are you, sir?

14             PROSPECTIVE JUROR:  I'm okay.

15             THE COURT:  Neighborhood?

16             PROSPECTIVE JUROR:  Yes, yes.

17             THE COURT:  Where do you live?

18             PROSPECTIVE JUROR:  Oh, Bronx.

19             THE COURT:  What part of the Bronx?

20             PROSPECTIVE JUROR:  168 and Washington Avenue.

21             THE COURT:  Do you live with anyone in your

22    household?

23             PROSPECTIVE JUROR:  I have a little problem for

24    English, I speak French.

25             THE COURT:  Have you had trouble understanding?

Jury Selection

1          PROSPECTIVE JUROR:  Yeah.

2          THE COURT:  Did you come up to the bench yesterday

3    to speak to me?

4          PROSPECTIVE JUROR:  Yeah -- no, I'm not.

5          THE COURT:  You didn't.  Okay.

6          Did you understand the questions I was asking

7    everyone today?

8          PROSPECTIVE JUROR:  Yeah, I have a little problem

9    for English.

10         THE COURT:  You have a problem with that, okay.

11   Do you think that will prevent you from being able to sit

12   and listen to testimony, the fact, you know, your English

13   language --

14         PROSPECTIVE JUROR:  I speak French.

15         THE COURT:  No, I understand, but you don't

16   understand everything that's being said?

17         PROSPECTIVE JUROR:  No, I'm not understanding

18   everything.

19         THE COURT:  Okay.

20         PROSPECTIVE JUROR:  Little by little.

21         THE COURT:  Miss Germany, how are you?

22         PROSPECTIVE JUROR:  I'm fine.

23         THE COURT:  Neighborhood?

24         PROSPECTIVE JUROR:  174 Street.

25         THE COURT:  How long have you been at your current

Jury Selection

1          address?

2                    PROSPECTIVE JUROR:  22 years.

3                    THE COURT:  You living with anyone?

4                    PROSPECTIVE JUROR:  My mother and my sister.

5                    THE COURT:  You working?

6                    PROSPECTIVE JUROR:  No, I'm a full-time student.

7                    THE COURT:  What are you studying?

8                    PROSPECTIVE JUROR:  Anthropology and sociology.

9                    THE COURT:  Okay.  And anyone else in your

10         household employed?

11                   PROSPECTIVE JUROR:  Yes, my sister is a mechanic

12         and my mother is a home health aide.

13                   THE COURT:  Have you or anyone close to you ever

14         been the victim of a crime?

15                   PROSPECTIVE JUROR:  Yes.

16                   THE COURT:  Who would that be?

17                   PROSPECTIVE JUROR:  Multiple family members.

18                   THE COURT:  So tell me what types of crimes were

19         involved?

20                   PROSPECTIVE JUROR:  My brother, older brother and

21         my older cousins were stabbed.

22                   THE COURT:  I'm sorry.  When did that happened?

23                   PROSPECTIVE JUROR:  That had to be, my older

24         cousin was probably the, probably early 90's, and my brother

25         it was probably 2001 or 2002.

Jury Selection

1          THE COURT:  Now were those incidents reported to
2     the police?
3          PROSPECTIVE JUROR:  Yes.
4          THE COURT:  Do you know if anyone was ever
5     arrested?
6          PROSPECTIVE JUROR:  No, I was really young when it
7     happened so my mom didn't really tell me much.
8          THE COURT:  Who else?  You said multiple family
9     members, what else?
10          PROSPECTIVE JUROR:  I've had other family members
11     robbed by other family members and those crimes weren't
12     reported.
13          THE COURT:  People in the family robbed other
14     family members?
15          PROSPECTIVE JUROR:  Yes, and those crimes weren't
16     reported because they had already had crime histories and.
17          THE COURT:  I know you didn't raise your hand and
18     so, but I'm asking you anyway.  Although you have relatives
19     who have been the victims of crimes, and some of them have
20     included robbery which is the charge in this case, you're
21     able to put all that aside and be fair, just focus on the
22     evidence in this case?
23          PROSPECTIVE JUROR:  Absolutely.
24          THE COURT:  Anyone in your family ever been
25     charged?  Not your family only but any close friends or

Jury Selection

1    relatives ever been charged, accused of?  I mean, you know,

2    you talked about the robbery of family members, but anyone

3    other than that?

4         PROSPECTIVE JUROR:  Yes, I've had family members

5    accused and charged with criminal activity.

6         THE COURT:  And where did these things happen that

7    they were charged with crimes?

8         PROSPECTIVE JUROR:  My aunt is a convicted felon,

9    and I've had like relatives who were like busted because

10   they were dealing with drugs or just got caught up in the

11   wrong things at the wrong time.

12        THE COURT:  Okay.  So once again, you didn't raise

13   your hand.  You believe any of them were treated unfairly by

14   the police or law enforcement?

15        PROSPECTIVE JUROR:  No.

16        THE COURT:  Or the DA's office?

17        PROSPECTIVE JUROR:  No.

18        THE COURT:  Were any of them prosecuted by the

19   Bronx District Attorney's Office to your knowledge?

20        PROSPECTIVE JUROR:  Not that I know.

21        THE COURT:  Do you promise me that you are able to

22   put all that aside and be fair when judging the testimony of

23   police witnesses?

24        PROSPECTIVE JUROR:  Yes.

25        THE COURT:  And be fair to the DA in this case?

Jury Selection

1           PROSPECTIVE JUROR:  Absolutely.

2           THE COURT:  Okay.  Any close friends or relatives

3      in law enforcement?

4           PROSPECTIVE JUROR:  No.

5           THE COURT:  Have you ever been on a jury?

6           PROSPECTIVE JUROR:  No.

7           THE COURT:  So final question is, I know you

8      didn't raise hand, but you are promising to be fair to the

9      DA and to the defense; correct?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  And to follow all my instructions?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  Okay.  And Mr. Johnson, how are you?

14          PROSPECTIVE JUROR:  Good, thank you.

15          THE COURT:  Tell me what neighborhood?

16          PROSPECTIVE JUROR:  Near Bronx Lebanon Hospital.

17          THE COURT:  How long?

18          PROSPECTIVE JUROR:  Two years.

19          THE COURT:  Living with anyone?

20          PROSPECTIVE JUROR:  Yeah, my fiancée and her

21      daughter.

22          THE COURT:  You have the appointment, right?  You

23      working?

24          PROSPECTIVE JUROR:  Yeah.

25          THE COURT:  What do you do?

Jury Selection

1         PROSPECTIVE JUROR:  I'm an executive at a local

2    tech startup in Manhattan.

3         THE COURT:  What kind of work are they doing?

4         PROSPECTIVE JUROR:  Well, it's a mobile app.

5         THE COURT:  Fiancée working outside the home?

6         PROSPECTIVE JUROR:  She's a registered nurse.

7         THE COURT:  You or anyone close ever been the

8    victim of any kind crime?

9         PROSPECTIVE JUROR:  No.

10        THE COURT:  Charged with, accused of, convicted,

11   questioned in connection, anything that?

12        PROSPECTIVE JUROR:  No.

13        THE COURT:  No?

14        PROSPECTIVE JUROR:  Nothing, no.

15        THE COURT:  Okay.  Any close friends or relatives

16   in law enforcement?

17        PROSPECTIVE JUROR:  Yes, several.

18        THE COURT:  What do they do?

19        PROSPECTIVE JUROR:  I have multiple friends who

20   work in Santa Clara County in California, and for the

21   California high school and state police and San Francisco

22   police.

23        THE COURT:  Are you going to be able to judge

24   police testimony in the manner that I instructed everyone

25   about being --

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Objective?  Okay.  Ever been on a jury

3     anywhere?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  Mr. Johnson, you didn't raise your

6     hand and I am asking you, you promise me that you will be

7     fair to both the DA and the defense?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  And you will follow my instructions?

10         PROSPECTIVE JUROR:  Yes.

11         THE COURT:  Okay.  All right, so my apologies for

12    doing this one last time, but we do need to speak to Miss

13    Kalmatskaya.  I do want to get this just with her and the

14    rest of you not in the courtroom, but this shouldn't take

15    long.  You can put them in the back.  You'll go to a

16    different spot, it's a little closer, and just don't discuss

17    the case keep and open mind.

18         COURT OFFICER:  Come this way.

19         (Whereupon, the prospective jurors exited the

20    courtroom.)

21         THE COURT:  Okay.  Miss Kalmatskaya is in the

22    courtroom.

23         Ma'am, I'm sorry, I do want to discuss this fully

24    and I didn't want to get into things that you may not want

25    to talk about.  So tell me the whole story again from the

1    beginning.

2        PROSPECTIVE JUROR:  I will try to get words.  Long

3    story short, I met his mother and he's my friend and other

4    few family when I get in America, and they help me a lot and

5    I considered him real good friend.  A few years ago he get

6    married and his wife work in Medicaid office.  And I truly

7    believe he was in love, he did not use his mind, and he was,

8    with a little help he was involved in this scheme.

9        THE COURT:  You mentioned something about this

10   went to court?

11       PROSPECTIVE JUROR:  Yeah.  The trial was about end

12   of April of this year in New Jersey.

13       THE COURT:  In?

14       PROSPECTIVE JUROR:  New Jersey.

15       THE COURT:  Were you, did you go to the courthouse

16   for any of that?

17       PROSPECTIVE JUROR:  No, he asked not to come to

18   the courthouse.

19       THE COURT:  So are you able, based on everything

20   that happened to you and other people that are in your life

21   in that case, are you able to be fair as a juror?

22       PROSPECTIVE JUROR:  Yes, I able, but I don't fully

23   understand all questions, and sometimes --

24       THE COURT:  You did approach yesterday about

25   language and we had a conversation and I thought at the

Jury Selection

1    time, as I do with many people, and sometimes I'm right and

2    sometime it's not correct, but I thought you had enough of a

3    grasp of the English language to be a juror on this case.

4         Have you been following everything that everyone's

5    been saying here?

6         PROSPECTIVE JUROR:  Yes, not every following when

7    lawyers start to asking people some questions.

8         THE COURT:  You got --

9         PROSPECTIVE JUROR:  Confused.  I couldn't.

10        THE COURT:  Did you get confused by what they were

11   saying?

12        PROSPECTIVE JUROR:  Yeah.

13        THE COURT:  And do you think that would prevent

14   you from being fair if you have to sit and listen to them

15   asking questions?

16        PROSPECTIVE JUROR:  Yeah.

17        THE COURT:  Of witnesses and things?

18        PROSPECTIVE JUROR:  Yeah.

19        THE COURT:  Any questions?

20        MR. MENDYS:  No, Judge.

21        MR. BONANNO:  No, Judge.

22        THE COURT:  Is it consent?

23        MR. BONANNO:  Yes.

24        MR. MENDYS:  Yes.

25        THE COURT:  All right.  We have the card.  We can

1    excuse Miss Kalmatskaya, and then we'll just bring everybody

2    else in and just finish.

3            (Whereupon, the prospective juror exited the

4    courtroom.)

5            COURT OFFICER:  Prospective jurors entering.

6            (Whereupon, the prospective jurors entered the

7    courtroom.)

8            THE COURT:  We'll now continue the next order of

9    business is questioning by the ADA.  All the jurors are

10   present and properly seated.  Go ahead.

11           MR. MENDYS:  Thank you, Judge.

12           Good afternoon everyone.  You've had a long day,

13   right?  Long couple days.  My name is Newton Mendys, the

14   assistant district attorney which is assigned to this case.

15   You all, I know, were listening attentively when I spoke to

16   you as a group, so I'm going to try not to repeat myself too

17   much, but there are couple of things I do want to talk

18   about.

19           Everyone, does everyone understand the concept

20   that we mentioned before about accessorial liability?  Mr.

21   Johnson, you understand that Mr. Diaz is the only one on

22   trial here?

23           PROSPECTIVE JUROR:  Yes.

24           MR. MENDYS:  You wouldn't speculate about anyone

25   else involved?

Jury Selection

1          PROSPECTIVE JUROR:  Yes.

2          MR. MENDYS:  And Miss Germany, you understand that

3     as well?

4          PROSPECTIVE JUROR:  Yes.

5          MR. MENDYS:  And Miss Williams?

6          PROSPECTIVE JUROR:  Yes.

7          MR. MENDYS:  And Miss Afanadore, you understand

8     that?

9          PROSPECTIVE JUROR:  Yes.

10          MR. MENDYS:  Miss Afanadore, you heard me ask the

11     other question to the other group about what do you look for

12     to determine whether people are telling the truth.  I'm

13     gonna ask that question to you now.  What do you look to to

14     see if someone's being honest with you?

15          PROSPECTIVE JUROR:  I guess hearing for the facts

16     to match up.

17          MR. MENDYS:  Okay, with whatever?

18          PROSPECTIVE JUROR:  Whatever is being --

19          MR. MENDYS:  What you know, Miss Williams, you

20     agree?

21          PROSPECTIVE JUROR:  I agree, the testimony.

22          MR. MENDYS:  What else?

23          PROSPECTIVE JUROR:  I look at the testimony, what

24     the witness is saying and the facts as they go along, you

25     know, as if does it compare to what he's saying, what's

1   actually being said, you know, does it match up.

2           MR. MENDYS: Okay, okay. Mr. Johnson, what about

3   you? What do you look to see if someone's being honest with

4   you?

5           PROSPECTIVE JUROR: If it's precise facts and

6   evidentiary, look harder based on my experience with in the

7   past with maybe people who I know not telling the truth

8   based on what their body language says, but if I don't know

9   that person it's pretty hard to make a determination just

10  based solely by looking at them.

11          MR. MENDYS: Sure, sure.

12          Miss Germany, anything else you've got?

13          PROSPECTIVE JUROR: Usually if someone is saying

14  one thing but the body is saying something else. Like if

15  they're saying yes but they're going like this, that's

16  usually.

17          MR. MENDYS: Indicating shaking her head. Okay,

18  okay.

19          So now, you can appreciate obviously the

20  circumstances kind of dictates sometimes how people act,

21  right?

22          PROSPECTIVE JUROR: Yes.

23          MR. MENDYS: And you heard me talk about this is

24  all about common sense, right? This is a unique situation.

25  No one here has served on a jury before, right? This is a

1    unique situation.

2          Anyone nervous when they came through the door

3    yesterday?  Sure, Miss Williams, right?  You don't know what

4    you're walking into.  You don't know what kind of case it's

5    going to be.  You don't know what we're gonna be like, what

6    questions you're going to be asked.  So I'm sure you can

7    appreciate other people would be nervous coming into a

8    courtroom as well, right?

9          But we want you to bring that common sense with

10   you, okay.  Just because it's a courtroom doesn't mean that

11   the situation changes, that your judgment changes.  We're

12   picking you for that common sense.

13         So Miss Afanadore, is that something you can do?

14         PROSPECTIVE JUROR:  Yes.

15         MR. MENDYS:  Use your common sense?

16         PROSPECTIVE JUROR:  We.

17         MR. MENDYS:  You know, whether someone's telling

18   truth or not.  Just because they're swearing on the Bible

19   doesn't mean they're being honest, right?

20         PROSPECTIVE JUROR:  Right.

21         MR. MENDYS:  Otherwise, you can do that, Miss

22   Williams?

23         PROSPECTIVE JUROR:  Yes.

24         MR. MENDYS:  Mr. Johnson?

25         PROSPECTIVE JUROR:  Yes.

1            MR. MENDYS:  And Miss Germany?

2            PROSPECTIVE JUROR:  Yes.

3            MR. MENDYS:  Let me ask you this.  What if you

4    heard me talk about the law and now you have to follow every

5    instruction, what if I grabbed this machine right here the

6    court reporter is using, what if I just grab it, ran out the

7    door, okay, you would agree that's not mine?

8            PROSPECTIVE JUROR:  Right.

9            MR. MENDYS:  Right?  Just for purposes of this

10   example, you would agree that I stole it?

11           PROSPECTIVE JUROR:  Yes.

12           MR. MENDYS:  Right?  So what if as I'm running out

13   the court officers follow me, and then a minute later they

14   come back with the machine and give it back to the reporter?

15   Okay.  Does that mean I didn't take it?

16           PROSPECTIVE JUROR:  You still stole it.

17           MR. MENDYS:  You agree with that, Mr. Johnson?

18           PROSPECTIVE JUROR:  Yes.

19           MR. MENDYS:  You agree with that, Miss Williams?

20           PROSPECTIVE JUROR:  Yes.

21           MR. MENDYS:  Miss Afanadore, you agree with that?

22           PROSPECTIVE JUROR:  Yes.

23           MR. MENDYS:  The point I'm trying to make is that

24   I would still have to be held responsible, right?

25           PROSPECTIVE JUROR:  Yes.

Jury Selection

1           MR. MENDYS:  And that would be up to you to
2    decide.  But based on this example, does it still mean that
3    I took the whatever machine, whatever that machine is
4    called?
5           PROSPECTIVE JUROR:  Uh, huh.
6           MR. MENDYS:  Right?  Let me, one more topic I want
7    to cover with you guys.
8           You know, you've heard a lot about evidence.  You
9    mentioned before, Mr. Johnson, what do you, when you think
10   of evidence what does that word mean to you?  What do you
11   think of as evidence?
12          PROSPECTIVE JUROR:  Anything that would help
13   determine if the person was guilty or not guilty, physical
14   or testimony.
15          MR. MENDYS:  Okay, physical or testimony?
16          PROSPECTIVE JUROR:  Uh, huh.
17          MR. MENDYS:  So something you can hold or look at?
18          PROSPECTIVE JUROR:  Uh, huh.
19          MR. MENDYS:  And the words from witnesses, right?
20          PROSPECTIVE JUROR:  Right.
21          MR. MENDYS:  You agree with that?
22          PROSPECTIVE JUROR:  Yes.
23          MR. MENDYS:  You agree with that, Miss Williams?
24          PROSPECTIVE JUROR:  Yes.
25          MR. MENDYS:  Miss Afanadore?

1              PROSPECTIVE JUROR:  Yes.

2              MR. MENDYS:  That's an important point because

3      most of the evidence you're going to hear and see is from

4      witnesses who are going to tell you what happened.  And at

5      the end of the day we're asking you to come to a decision

6      based on facts, whatever you determine the facts to be and

7      the law.

8              Now, we recognize that you're emotional or not,

9      but people are emotional beings, right?  You feel bad for

10     some people.  You feel empathy.  You feel happy for other

11     people.  And some of those emotions might come into play.

12             This is a criminal trial and that might be part of

13     it, but we want to make sure that you can separate that, all

14     right.  Not that you don't feel it, not that you don't

15     understand it, but that you can separate the emotion, any

16     kind of sympathy, for empathy, for anybody, and come to a

17     decision based on facts and the law.

18             Now Miss Williams, as you sit here you can do

19     that?

20             PROSPECTIVE JUROR:  Yes, I can.

21             MR. MENDYS:  Now part of it is this trial is gonna

22     go on, it's gonna go into next week and maybe the week

23     after.  Are you comfortable, as you sit here now can you

24     promise us that you'll be able to keep that promise?

25             PROSPECTIVE JUROR:  Yes.

Jury Selection

1          MR. MENDYS:  To separate as we go forward?

2          PROSPECTIVE JUROR:  I can.

3          MR. MENDYS:  Miss Afanadore, can you do that?

4          PROSPECTIVE JUROR:  Yes.

5          MR. MENDYS:  Miss Germany?

6          PROSPECTIVE JUROR:  Yes.

7          MR. MENDYS:  Mr. Johnson?

8          PROSPECTIVE JUROR:  Yes.

9          MR. MENDYS:  Thank you very much for your time.

10          THE COURT:  Thank you.

11          Mr. Bonanno?

12          MR. BONANNO:  Thank you.

13          Thank you, prospective jurors.  It has been a long

14     day, hasn't it?  Am I only the one that's freezing in here?

15     No, right?  It's cold.  I thought it was me.

16          Anyway, I'm gonna ask you also, and I really

17     appreciate Mr. Mendys because he gives me also a sense of

18     everybody and how they're feel and how they're thinking too.

19     It makes my job a little easier.  I like that because I know

20     everybody wants to get this day over with.

21          I'm gonna ask you -- number one, thank you all

22     again, as I thanked everyone else for, this is one of the

23     most honored things that a citizen of this country can do,

24     and it is a pain in the neck.  It is.  I've served on it and

25     it's a pain in the neck.  But to do it, and I know when

Jury Selection

1    everybody finally sits in that seat, they take the burden

2    seriously.  I can see it on each of your faces that you

3    taking responsibility the way it should be, because there's

4    someone's liberty interests here at stake, and that, in our

5    country, is what we hold most sacred.

6            So I'm gonna ask you, Mr. Johnson, is there

7    anything, if you were the defendant in this case, that would

8    cause you to be concerned about having a person like

9    yourself sit on a jury?

10           PROSPECTIVE JUROR:  No.

11           MR. BONANNO:  You can look at someone from a

12   different ethnic background, racial background, social

13   background, and fairly evaluate evidence presented against

14   them?

15           PROSPECTIVE JUROR:  Yes.

16           MR. BONANNO:  Without any prejudice?

17           PROSPECTIVE JUROR:  Yes.

18           MR. BONANNO:  And how about you, Miss Williams?

19           PROSPECTIVE JUROR:  Yes.

20           MR. BONANNO:  Now you've had some experiences in

21   life.

22           PROSPECTIVE JUROR:  I have.

23           MR. BONANNO:  On both the good and bad side?

24           PROSPECTIVE JUROR:  Yes, I have.

25           MR. BONANNO:  Sound likes your godson is really

1      moving on in a positive direction.

2                PROSPECTIVE JUROR:  Uh, huh.

3                MR. BONANNO:  So you believe that people who make

4      bad choices sometimes in life can turn themselves around?

5                PROSPECTIVE JUROR:  I do.

6                MR. BONANNO:  How did you feel about that, Mr.

7      Muniz?

8                PROSPECTIVE JUROR:  Munoz.

9                MR. BONANNO:  Excuse me, I'm sorry.  How do you

10     feel about that, about people that have made some mistakes

11     in life but have proven that they can move on from that, do

12     you think they should be colored by mistakes they've made in

13     the past?

14               PROSPECTIVE JUROR:  I don't understand.

15               MR. BONANNO:  You don't understand?

16               PROSPECTIVE JUROR:  No.

17               MR. BONANNO:  Okay Miss Afanadore, how do you feel

18     about that?

19               PROSPECTIVE JUROR:  I agree people can move on

20     from --

21               MR. BONANNO:  They can move on?

22               PROSPECTIVE JUROR:  Yes.

23               MR. BONANNO:  So let me ask you, Miss Germany, if

24     you were deliberating and would you change your beliefs if

25     you felt a way certain way at the end of this case, either

1      guilty or not guilty, and the other jurors were all against

2      you, how would you feel about change, would change your

3      verdict just to go along with someone else?

4                PROSPECTIVE JUROR:  No.

5                MR. BONANNO:  You would hold true?

6                PROSPECTIVE JUROR:  Yes.

7                MR. BONANNO:  To whether it was guilty or not

8      guilty?

9                PROSPECTIVE JUROR:  Yeah.

10               MR. BONANNO:  And each and every one of you have

11     heard the standard of proof that the People have to prove,

12     and it's beyond a reasonable doubt.  And I'm not going to

13     explain to you what that standard is, that's up to the

14     judge, the judge is the ruler of the law here, you have to

15     listen to his instructions.  He'll give you the standard by

16     what the People need to prove every element of the crimes

17     charged against them Mr. Diaz.

18               And if they don't prove each and every element of

19     the crime beyond that standard beyond a reasonable doubt, up

20     to that standard, how would you hold for Mr. Diaz at the end

21     of the day, guilty or not guilty?

22               PROSPECTIVE JUROR:  Well, it's not up to the

23     standard that the judge says, so it's not guilty.

24               MR. BONANNO:  Miss Gil?

25               PROSPECTIVE JUROR:  Not guilty.

1           MR. BONNANO:  Sir, what do you say to that?

2           PROSPECTIVE JUROR:  I do not.

3           MR. BONANNO:  French, that's would you would say,

4      right?

5           PROSPECTIVE JUROR:  I don't understand.

6           MR. BONANNO:  I don't speak French.

7           Miss Williams?

8           PROSPECTIVE JUROR:  Not guilty.

9           MR. BONANNO:  And Mr. Munoz?  No?

10          Miss Afanadore?

11          PROSPECTIVE JUROR:  Not guilty.

12          MR. BONANNO:  Thank you very much.

13          THE COURT:  Thank you.  All right.  So we're going

14     to take a short recess and we'll call you back with the

15     decisions.  Just don't discuss the case.  Keep an open mind.

16     Keep the recess instructions.  We'll get back to you very

17     shortly, okay.

18          COURT OFFICER:  Right this way jurors.

19          (Whereupon, the prospective jurors exited the

20     courtroom.)

21          MR. MENDYS:  I'm ready, Judge.

22          THE COURT:  Okay.

23          THE CLERK:  Mr. Mendys, as to seats two through

24     12, do you have any challenge for cause?

25          MR. MENDYS:  Mr. Munoz and Mr. Toure.

1          THE COURT:  Those are both because of language?

2          MR. MENDYS:  Yes.

3          THE COURT:  Any objection?

4          MR. BONANNO:  That's my application.

5          THE COURT:  So they are struck for cause.  Mr.

6    Munoz who is seated in two now and Mr. Toure.

7          THE CLERK:  Any other challenge for cause?

8          MR. MENDYS:  No.

9          THE CLERK:  Defense, any challenge for cause as to

10   seats remaining seats two through 12.

11         MR. BONANNO:  No.

12         THE CLERK:  As to peremptory challenges, People?

13         MR. MENDYS:  I think it's number 11, Miss Germany.

14         THE COURT:  Okay.

15         MR. MENDYS:  That's the only one.

16         THE CLERK:  Mr. Bonanno, peremptory challenges?

17         MR. BONANNO:  Yes, prospective juror number two.

18         THE COURT:  Miss Afanadore.

19         MR. BONANNO:  And Mr. Johnson.

20         THE CLERK:  So Miss Silvia Williams will be Juror

21   No. 6.

22         For the record, I have that People have used five

23   challenges and defense four.  Yes?

24         MR. BONANNO:  That's what I have.

25         MR. MENDYS:  I agree.

Jury Selection

1          THE COURT:  You can bring them in.

2          COURT OFFICER:  Prospective jurors entering.

3          (Whereupon, the prospective jurors entered the

4     courtroom.)

5          THE CLERK:  Once again, thank you all for coming.

6     Everyone except Miss Silvia Williams step outside and wait

7     for further instructions from our court officers.

8          THE COURT:  Miss Williams, you can just remain.

9     Thank you and everyone else, and thank you, the rest of you

10    thank you for your participation, okay.  Good luck to all of

11    you.

12         (Whereupon, the prospective jurors exited the

13    courtroom.)

14         THE CLERK:  Miss Williams, can you please stand up

15    one more time.

16         Is the juror satisfactory to the People?

17         MR. MENDYS:  Yes, she is.

18         THE CLERK:  Is the juror satisfactory to the

19    defense?

20         MR. BONANNO:  Yes, she is.

21         THE CLERK:  Raise your right hand one more time.

22    Do you solemnly swear or affirm to try this case of the

23    People of the State of New York against Richard Diaz the

24    defendant, in a just and impartial manner to the best of

25    your judgment, and to render a verdict according to the law

Jury Selection

1     and evidence?

2               SWORN JUROR:  I will.

3               THE COURT:  You may be seated.

4               Miss Williams, just have a seat.  You were here

5     this morning when I spoke to the other jurors who were

6     selected, so you are actually on the jury now.

7               PROSPECTIVE JUROR:  Okay.

8               THE COURT:  Welcome.  We will be starting Monday

9     morning, so I'm going to ask you to be here by like 9:45 so

10    we can get started.  You'll go down the hall to room 601

11    where were you this afternoon.

12              PROSPECTIVE JUROR:  Okay.

13              THE COURT:  You're done for the week so enjoy the

14    next three days.  Start working hard next Monday.

15              SWORN JUROR:  I didn't sleep at all last night.  I

16    stood all last night.  I couldn't sleep.  I was wind up,

17    okay, so.

18              THE COURT:  Well, you know, it's, people who sit

19    on juries like was said during voir dire, you don't always

20    know what to, expect you're nervous, but you're going to be

21    with other people, and when you get in the back and

22    deliberate you're going to find, I believe, that you're

23    going to have honest discussions about things, and you'll

24    listen and it's, and it's an experience that we need people

25    like you who are willing to do.  So thank you for doing

Jury Selection

1    that.

2              PROSPECTIVE JUROR:  Thank you for having me.

3              THE COURT:  You have a Brooklyn shirt, by the way.

4    You like Brooklyn?

5              SWORN JUROR:  Oh, yeah.

6              THE COURT:  In the time now you have to follow all

7    those instructions you could tell everybody, your friends

8    I'm on a jury, nothing about the case.

9              SWORN JUROR:  Nothing.  Can't talk about anything.

10             THE COURT:  But you know, I have to be there

11   Monday.  The judge will tell me when to come back other

12   days.  Don't do any research on any topic, visit any scenes

13   or locations in any manner as I told you.

14             PROSPECTIVE JUROR:  I promise I won't.

15             THE COURT:  All of those recess instructions will

16   apply.  We'll just exchange information with you briefly and

17   then you can be gone for the day and I'll see you Monday

18   okay.

19             SWORN JUROR:  See you Monday.  Have a pleasant

20   week.

21             THE COURT:  You too.  And bring a sweater again.

22   It's going to be cold.

23             SWORN JUROR:  I sure will.

24             (Whereupon, the sworn juror exited the courtroom.)

25             THE COURT:  Okay so.

DI Daniel Clark-El - People - Direct

1         MR. MENDYS:  Let me make a phone call.

2         THE COURT:  Make a phone call, then tell me what

3    to expect and then we'll be ready for our Parker hearing.

4         (Pause in proceedings.)

5         THE COURT:  We're back on the record and we're

6    proceeding to a hearing pursuant to People v Parker.

7         And Mr. Mendys, you may call your witness.

8         MR. MENDYS:  The People call to the stand

9    Detective Investigator Daniel Clark-El of the Bronx DA's

10   office.

11        THE COURT:  Can you put on the mic?

12        THE CLERK:  Yes.

13        COURT OFFICER:  Witness entering.

14        (Whereupon, the witness entered the courtroom and

15   took the witness stand.)

16   D A N I E L    C L A R K - E L,   Shield No. 298, New York

17     City Police Department, Bronx District Attorney

18     Detective Investigator Squad, called as a witness on

19     behalf of the People, having been first duly affirmed,

20     was examined and testified as follows:

21        THE COURT:  Please have a seat.

22        THE CLERK:  For the record, state your name,

23   shield number and your command, please.

24        THE WITNESS:  My name is Daniel Clark-El, last

25   name is spelled C-L-A-R-K hyphen E-L.  Bronx District

DI Daniel Clark-El - People - Direct

1      Attorney's Office Detective Investigators, shield number 298

2      I'm a Senior Detective investigator.

3                  THE COURT:  Shield is what?

4                  THE WITNESS:  298.  I'm a Senior Detective

5          Investigator.

6                  THE COURT:  Thank you.

7                  ADA Mendys, you may inquire.

8                  MR. MENDYS:  Thank you, Judge.

9      DIRECT EXAMINATION

10     BY MR. MENDYS:

11         Q      Good afternoon, Detective.

12         A      Good afternoon.

13         Q      How long have you worked for the Bronx District

14     Attorney's Office as a Detective Investigator?

15         A      A happy 19 and a half years.

16         Q      And generally speaking, what are your responsibilities

17     there?

18         A      I investigate all types of crimes.  We execute

19     warrants; search warrants, arrest warrants, bench warrants.

20     Locate witnesses.  We do the whole gamut of things.  We're the

21     investigative and police for the district attorney.

22         Q      Now I want to direct you to this past Monday, which was

23     July 13th of 2015.  Were you assigned an investigation into the

24     location or whereabouts of an individual known as Richard Diaz?

25         A      Yes, I was.

DI Daniel Clark-El - People - Direct

1    Q    And he is the subject who is on trial in this part
2    currently; correct?

3    A    That's correct.

4    Q    From your understanding?

5    A    Yes.

6    Q    Now what steps, if any, did you take in an effort to
7    determine his whereabouts or whether he is here, he is not here
8    of his own free will?

9    A    We, first thing we did was I checked the city's police
10   system to find out if he was arrested.  He was not arrested in
11   any of the four counties of New York City.  I checked with the
12   Department of Corrections.  He's not in jail in the city.  He's
13   not in jail in the state system.  I checked the feds.  I checked
14   with the US Marshals.  He has not been entered as a new arrest in
15   their system.  He is not in their system in the Federal Bureau of
16   Prisons.

17           And I also spoke to ICE to find out if he was a federal
18   detainee, because my understanding is he's born in the Dominican
19   Republic.  They had a case on him in 2013, but that case was no
20   longer active and he's not in their custody.  I had them check
21   for me to find out whether or not based upon his alien number he
22   has left the country, and they do not see any indication that he
23   has left the country.

24           In fact, what I did to ensure that, within 24 hours,
25   that's, their system can check for 24 hours, and to ensure that I

1    had them place the information that should he attempt to leave

2    that I be contacted, also ICE would be in contact.  I've heard

3    nothing from them in regards to him leaving.

4        Q    Did you do any check to determine if he were injured or

5    in fact passed away over the past number of days?

6        A    Correct.  We called all the local hospitals.  He's not

7    in patient information, he is not entered into the hospitals, nor

8    was he entered into the emergency rooms, because some of the

9    hospitals have two separate systems.

10                  THE COURT:  Which hospitals did you check?

11                  THE WITNESS:  If you don't mind?

12                  THE COURT:  No, please refresh your recollection.

13                  THE WITNESS:  Thank you.  Jacobi, Bronx Lebanon,

14        Montefiore, Columbia Presbyterian because his address is up

15        there in Inwood, Washington Heights.  We checked, let me

16        see, Elmhurst, Einstein, Lincoln, North Central, St.

17        Barnabas.  We even checked Yonkers and also the Veteran's

18        Administration, even though we don't think he's a veteran.

19        Q    And did you learn anything in terms of whether he had

20    been, he had passed away or anything like that?

21        A    Yeah, we checked with New York City Chief Medical

22    Examiner.  You used to do every borough, now it's a centralized

23    system.  He has not, there's no recording of him being a person

24    that has passed away in the City of New York.

25        Q    What about -- oh, did you check any addresses where he

DI Daniel Clark-El - People - Direct

1    has had or any recent addresses on file with him?

2        A    Yes.   The last address that we have for him is also the

3    same address that the court has, which is 552 West 185 Street,

4    apartment 11.   Actually, this morning we went to that address.

5    He resides with his, supposed to have resided with his

6    grandmother.   Her name is Andrea Santana.   We spoke to her.   She

7    generally speaks Spanish.   But also is there was another daughter

8    who is the defendant's aunt, her name was Malaina(ph) Santana.

9    She was there.   She spoke more English.   And he, they had not

10   seen him in three months.

11       Supposedly, that he might have been staying with a

12   sister in the Bronx in an Ogden Avenue address, but they did not

13   know that address.   They did speak to that sister Saturday.   She

14   said that the last time she saw him was, they spoke to her

15   recently, said the last time they saw him, she spoke to him was

16   Saturday, but he had not been around for like three days.   No,

17   since, pardon me, he had not been around since Saturday.   He

18   disappeared, they don't know where he is.   That was the aunt.

19              THE COURT:   In the Ogden Avenue address?

20              THE WITNESS:   At the Ogden Avenue address, but I

21          did not go to that address.   They did not know the

22          numeric --

23              THE COURT:   Right.   Whatever the address was,

24          someone spoke to the woman who lives there.   Is that Mr.

25          Diaz' sister you're saying?

DI Daniel Clark-El - People - Direct

1          THE WITNESS:  That is his own sister's address.

2          THE COURT:  Someone you spoke with when you went

3     to the Manhattan apartment, the grandmother Santana's

4     apartment, they reached out to the sister and that was the

5     information they gave you?

6          THE WITNESS:  They had recently spoken to her and

7     that was Mr. Diaz' aunt.  Her name is also Miss Santana.

8     Her first name is like Malaina(ph).

9     Q     Just to be clear, did you not speak to the sister

10    yourself?

11    A     No, I did not speak to the sister myself.  Also, I

12    found out that he had a girlfriend by the name of Yanel(ph)

13    Pimental(ph).  Incidentally, I found out about this and then when

14    I looked and I saw the arrest report, this is the same individual

15    that he called when he was arrested in this arrest.

16          I found out her address, which was 511 West 181 Street

17    also in Manhattan.  I went to that address.  Her mother was

18    there.  She only spoke Spanish but she spoke, called her daughter

19    of hers on the telephone, and they say that the girlfriend lives

20    in the Bronx.  I even showed the grandmother a picture of the

21    defendant in this case, and they didn't know who he was, and they

22    said that they would try to get the daughter to contact me.  I

23    left a business card with her on my way here, that's why I was a

24    little late, I apologize, your Honor.

25          THE COURT:  That's okay.

DI Daniel Clark-El - People - Direct

1    A      The girlfriend actually called me so I got off the
2    telephone with her just momentarily from coming in here.  She
3    said she hasn't dealt with him, spoken to him in a while.  I'm
4    assuming about at least a year.  She said it's been a long time
5    since she's dealt with him.  She does not know where he resides.

6           I asked her specifically if she knew where his sister
7    who's known as Julissa in the Bronx somewhere on Ogden Avenue.
8    She said I know her but I don't talk to her, and I don't know her
9    that well but I don't really know where she lives in the Bronx,
10   and that was it.  Oh, one other address --

11   Q      Sure.

12   A      -- I did check which was the location of his arrest
13   which was 601 West 182 Street.  He was arrested outside.  Now
14   these three addresses are all in the same vicinity, so we went by
15   there just kind of looking around see if we saw him in the
16   location and he was no where to be found.

17   Q      Now you have obviously had a picture of him while
18   you've been doing your searches and speaking to people?

19   A      Yes, that's correct.

20   Q      Have you been working this case with anyone?

21   A      Yes.

22   Q      Who is that?

23   A      My partner is Detective Theresa Cariskill(ph).

24   Q      Is she here in court as well?

25   A      Yes.

1    Q    Are there any additional steps that you planned or your
2    partner planned to take within the next day or so?
3         A    I mean, the only thing that I can think of is try to
4    narrow down maybe the other address on Ogden Avenue, but we don't
5    have enough information at this point.
6                   THE COURT:   You have no telephone number for him
7         or cell phone or anything?
8                   THE WITNESS:   No.
9                   THE COURT:   Did any of the people you spoke with
10        offer to give you any phone number for him?
11                   THE WITNESS:   No.
12                   THE COURT:   Okay.
13                   MR. MENDYS:   I have no further questions.
14                   THE COURT:   Okay, Mr. Bonanno?
15   CROSS-EXAMINATION
16   BY MR. BONANNO:
17        Q    Just briefly, Detective.
18             You said you checked all the hospitals and he's not
19   entered into the systems; is that correct?
20        A    Correct.
21        Q    Could it have been that he was in the emergency room
22   and not entered into a system?
23                   MR. MENDYS:   Objection.
24                   THE COURT:   Well, I mean, it's speculative.
25        Sustained.   You can answer that.

DI Daniel Clark-El - People - Cross

1          THE WITNESS:  Yes.

2          THE COURT:  Go ahead.

3          THE WITNESS:  And I did.  I explained that when

4     you call the hospitals they have separate systems, so for

5     every single hospital you ask if a person is registered in

6     the hospital.  And also because I've been doing this 19

7     years, you have to specifically ask for them to check their

8     emergency room system because for most hospitals it's a

9     separate system.  He's only, they only -- they're not in the

10    hospital system until emergency.  If they come in the

11    emergency they're entered and they're registered.  You have

12    to check both systems, and we did that for all the hospitals

13    that we called is.

14    Q     That was for the name of Richard Diaz; is that correct?

15    A     Richard Diaz, also Richard Santana.  We also checked

16    under Santana.

17          THE COURT:  Because that's an alias that he has on

18    his federal --

19          THE WITNESS:  I&S.

20          THE COURT:  ICE, right.

21          THE WITNESS:  ICE has him under both names as

22    well.

23          THE COURT:  Right, because he's known as Santana

24    and Diaz, Santana and just Diaz to ICE.

25          THE WITNESS:  Right.

1          THE COURT:  He has the name Santana.

2          THE WITNESS:  He has both.  So the way I checked,

3     I'm sorry --

4     Q     Do you know if during your check it revealed any John

5     Does that were entered into the hospital system?

6     A     No, but we did give them a date of birth, so the date

7     of birth is also included when they check to see if there's

8     anyone under that name.  For instance, one time, one place that

9     we called they had a Charles Diaz, but not that date of birth and

10    not our Richard Diaz.

11    Q     When you checked the New York State prison system that

12    was for people that are already incarcerated in state's prison?

13    A     That's correct.

14    Q     State prison?

15    A     That's correct.

16    Q     But it's not anybody that's in custody immediately?

17    A     Well.

18    Q     Waiting to be tried?

19    A     Well, see, correct, but my reason --

20    Q     That's the answer?

21    A     Correct.

22    Q     When you checked the US Marshals, you checked to see if

23    they had anybody in custody that had already been a sentenced

24    prisoner?

25    A     No, that's a different agency.  Federal Bureau of

DI Daniel Clark-El - People - Cross

1    Prison holds incarcerated, convicted prisoners.  The US Marshals

2    handles all new arrests from arrest to arraignment.

3         Q    I'm aware of the jurisdictions.

4         A    All right.

5         Q    When the US Marshals takes someone into custody, do

6    they hold a log of who they have in custody?

7         A    Absolutely.

8         Q    Who did you call with the US Marshals?

9         A    I called Southern District out of the US Marshals and I

10   spoke to --

11        Q    Did you call the Eastern District?

12        A    No.

13        Q    There is an Eastern District.

14        A    There is an Eastern District but when they run --

15        Q    Yes or no?

16        A    There is an Eastern District.

17        Q    And it handles a different jurisdiction than the

18   southern?

19        A    That's correct.  However, if I will --

20             THE COURT:  Well, I'm going to ask you anyway so

21        you can might as well explain to me now.

22             MR. BONANNO:  Sure.

23             THE COURT:  Go ahead.

24        A    The way they run them is through, if he doesn't have a

25   federal registry number they'll run him by the number that I gave

DI Daniel Clark-E1 - People - Redirect

1    them, which is his FBI number.  And when the Southern District

2    puts in an FBI number, if he is anywhere in the United States or

3    its territories, that FBI number would tell them where he is, and

4    he was not in their system.

5              MR. BONANNO:  I have no further questions, Judge.

6              THE COURT:  Do you have anything else?

7    REDIRECT EXAMINATION

8    BY MR. MENDYS:

9        Q    Detective, you indicated you've been doing this for 19

10   years?

11             THE COURT:  Nineteen and a half.

12       A    Nineteen and a half happy years.

13       Q    Is it, would it be accurate to say you have conducted

14   these investigations in the past?

15       A    Yes.

16       Q    Can you approximate how many over the years?

17       A    50 maybe.  Maybe about 50.

18             MR. MENDYS:  Nothing else.

19             THE COURT:  Any recross?

20             MR. BONANNO:  No, Judge.

21             THE COURT:  Thank you, Detective.  You can step

22        out.

23             (Whereupon, the witness was excused.)

24             THE COURT:  Anything further?

25             MR. MENDYS:  No, Judge.

Proceedings

1         THE COURT:  Okay Mr. Bonanno, is there any record

2    you want to make at this time about anything?  I mean,

3    you're not calling any further witnesses?

4         MR. MENDYS:  No further witnesses.

5         THE COURT:  Okay, fine.

6         So Mr. Bonanno, what do you want to say?

7         MR. BONANNO:  Judge, I heard testimony that Mr.

8    Diaz was tried to be located, but I didn't really hear any

9    testimony as to, you know, he's not here.  There's a warrant

10   issued for his arrest.

11        THE COURT:  What did you mean he's not here,

12   there's a warrant?  What testimony?  We do have a warrant

13   issued for his arrest.

14        MR. BONANNO:  I'm stating the fact he's not here

15   there's a warrant issued for his arrest.  This is, as I

16   understand, a Parker hearing.  I haven't heard any testimony

17   that he was given Parker Warnings or that Parker was --

18        THE COURT:  You want me to call myself?  You were

19   here when I gave the Parker Warnings.

20        MR. BONANNO:  Judge.

21        THE COURT:  It's a matter of public record in the

22   case on July 1st that all defendants were what we say

23   Parkerized.

24        MR. BONANNO:  Judge, I would just ask that

25   perhaps --

Proceedings

1        THE COURT:  What is your concept of what a Parker

2   hearing has to encompass?  You mean they have to tell the

3   judge what the judge already knows through testimony or

4   evidence that exists on the record, that we have to prove

5   the Parker Warnings?

6        MR. BONANNO:  I would think at least the DA would

7   lay the foundation and ask for judicial notice.

8        THE COURT:  Okay.  What else?

9        MR. BONANNO:  That's my only objection.

10        THE COURT:  That we don't have any evidence that I

11   gave the Parker Warnings in this case?

12        MR. BONANNO:  There's been no foundation laid in

13   that respect.

14        THE COURT:  Foundation?  What foundation?

15        MR. BONANNO:  That Parker Warnings were given in

16   this instance, there's no --

17        THE COURT:  Your client was arraigned and we have

18   jurisdiction over him.  Why do I proceed to pick a jury?

19        MR. BONANNO:  That's my application.

20        THE COURT:  Okay.

21        MR. MENDYS:  Judge, I think Parker, this Court's

22   responsible to make a finding based on the record that the

23   defendant is voluntarily absented himself, not appear before

24   the court.  That can be done through testimony as we've had,

25   it can be inferred through actions of the defendant.

Proceedings

1            Here we have testimony from a -- it's the district

2       attorney's obligation to present evidence of due diligence,

3       reasonable steps that have been taken to attempt to locate

4       Mr. Diaz, and to attempt to determine whether he is not here

5       of his own free will.

6            Detective Clark-El testified credibly that he has

7       done this for a number of years and that this is part, these

8       are part of his responsibilities.  And he testified that the

9       fact that the defendant is not hospitalized, he is not

10      incarcerated, he checked, I would submit went above and

11      beyond what is required of him in going to locations and

12      speaking with family members to attempt to ascertain his

13      whereabouts.

14            THE COURT:  What is your belief of what I'm

15      allowed to take into account in this hearing to determine

16      whether the defendant is voluntarily absenting himself?  You

17      think you have to prove extrinsically that I gave Parker

18      Warnings here?

19            MR. MENDYS:  No, Judge.  I think you have a

20      responsibility and obligation to go, to rely on the record

21      that has been made today and in days past that has been made

22      in public court, in open court by the court and by the

23      parties.  And the court issued Parker Warnings on July 1st

24      and I think and on a second occasion when the all the

25      defendants were late after lunch one day I think they were

Proceedings

1    all re-Parkerized.

2         THE COURT:  I referred to the fact that we can

3    proceed without them and that they would forfeit their right

4    to be present if it happened again.  I did tell them all

5    that after we waited 45 minutes for Mr. Melenciano and Mr.

6    Santana, and you had witnesses here and we went quite that

7    late that day, yes.

8         Do I even have to give Parker Warnings when we're

9    on trial?

10        MR. MENDYS:  Well, I think, you know, Parker notes

11   that, in fact it quotes on page 141, in order to effect a

12   voluntary, knowing and intelligent waiver, the defendant

13   must, at a minimum, be informed in some manner of the nature

14   of the right to be present at trial and the consequences of

15   failing to appear at trial.

16        THE COURT:  But Parker is a case where the

17   defendant was not actually on trial.  Sanchez which is the

18   other case I gave you the other day, which I think is 63

19   NY2d, if you're already on trial, you know, you're on trial

20   so you don't actually need to give the Parker Warnings for

21   someone who's on trial, but that did happen in this case.

22        MR. MENDYS:  Yes.  And I guess, well, in any

23   event.

24        THE COURT:  Do you know anything about this fact

25   that he's also known as Santana, and does that have any

Proceedings

1    relationship to the fact that the co-defendant, Mr. Santana,

2    also absconded at the same time as he did and is out on a

3    warrant now?

4              MR. MENDYS:  Judge, it's a common name.

5              THE COURT:  I know.

6              MR. MENDYS:  I don't know anything whether --

7              THE COURT:  I'm just wondering if there's any kind

8    of interesting --

9              MR. MENDYS:  I find it hard to believe that it's a

10   coincidence but.

11             THE COURT:  There are many coincidences, but you

12   have nothing in your investigation?

13             MR. MENDYS:  Nothing that -- I have nothing.

14             The final point I'd like to make is that, you

15   know, when Mr. Diaz first did not appear before this court

16   yesterday, Monday, inquiry was made of his attorney as well

17   as the co-defendants' attorneys in terms of their

18   whereabouts.  And I believe Mr. Bonanno indicated that he

19   had spoken to him and that I think at least told me off the

20   record, and I believe on the record that Mr. Diaz indicated

21   he would be here or he was on his way, would be here in a

22   number of minutes.  And obviously, we are you know 28, 29

23   hours past that now and he is still has not appeared.

24             Mr. Bonanno also indicated he spoke to his client

25   yesterday evening and reiterated to him the fact that there

1       is a warrant for his arrest, that people will be looking for

2       him, and that there was no commitment from him one way other

3       another about whether he would be coming in or not.

4            So these are all matters that are on the record,

5       they have been made by all of us as officers of the court,

6       and I think there is ample record at this point for the

7       court to determine he is voluntarily not appearing to face

8       charges.

9            THE COURT:   Let me just trace a little bit of

10      history of the, beyond even what you're speaking about here.

11           I mean, the defendant himself was arrested

12      November 22, 2012.  He was arraigned, bail was set in the

13      amount of $25,000.  A bond was posted November 26, 2012 for

14      and he was released, I assume that day or the next day, and

15      the defendant, as part of the agreement, is supposed to

16      report once a week in person to the office of the bail

17      bondsman here on Sheridan Avenue in Bronx County.

18           The individuals who are listed as sureties

19      actually live in different places, but one of them notably

20      was unemployed, and yet, she was acceptable to the bail

21      insurance company as someone who could be liable for

22      $25,000.

23           In any event, the defendant is not here and no

24      bondsman has appeared to surrender him despite the fact that

25      a warrant was issued yesterday, and I think you did -- did

Proceedings

1    you notify them or -- I know that they, that the warrant

2    exists.  So anyway, it is, in fact, correct that I did read

3    not only Mr. Diaz, but Mr. Melenciano and Mr. Santana who

4    are co-defendants in this matter, on July 1st what we call

5    Parker warnings.

6            I advised them they had a right to be here.  I

7    advised them pretty much of every right to be present at

8    every material stage, including the pretrial hearings, jury

9    selection, trial, witnesses, verdict, sentencing,

10   everything.  And I understood they indicated they understood

11   them, and they indicated that they understood that if they

12   did not voluntarily appear, we would proceed without them.

13           We did conduct a pretrial hearing, and on the very

14   first day of testimony Mr. Melenciano and Mr. Santana did

15   not appear as required in the afternoon after being here in

16   the morning, and they showed up around 3 o'clock instead of

17   2:15 and we proceeded late.

18           And you're correct, Mr. Mendys, that I did at that

19   time advise them, and if I didn't advise Mr. Diaz, he

20   himself was here, and they understood that they had to be

21   here and we were going to proceed without them at every

22   stage if they were not here.

23           We completed those hearings.  All defendants were

24   here.  We had arguments on some motions.  We adjourned on

25   Friday.  I advised everyone to be here at 10 a.m. and said

Proceedings

1    we would call for the jury.  But I needed a decision on

2    which case was going to proceed and I wanted everyone here

3    at 10 o'clock.

4         All attorneys were here actually before 10 and I

5    had another matter on the calendar and I actually called the

6    case sometime after 10:30, about 10:30, 10:35.  None of the

7    defendants were here at that time.

8         Mr. Melenciano's attorney did not know where he

9    his client was because he said he had no way of contacting

10   him.  Mr. Santana's attorney, Mr. Weinstein, said he had

11   actually heard from his client who was on his way and was

12   going to be here at 11 o'clock.  And at that point Mr.

13   Bonanno told me he had tried to contact his client and left

14   messages but had not heard from him at all, and warrants

15   were issued for the arrests of all defendants at that time.

16        Mr. Melenciano did appear subsequent to that.

17   Now, Mr. Melenciano had about, I don't know, five, six

18   warrants in this case.  He had a cell phone that was ringing

19   in the courtroom after he told me his cell phone didn't

20   work, and he told me that he believed he had to be here at

21   10:30.  And I granted the People's application to raise his

22   bail to $10,000 from $5,000 bond, and to raise the cash also

23   to $10,000, and so bail was set on him.

24        And I was told again by Mr. Santana's attorney

25   that he was on his way, would be here shortly, and I left

Proceedings

1     the bench.  I said call me when they arrive and I received

2     no calls.

3           At 12:30 I asked for Mr. Mendys and Mr. Bonanno to

4     appear.  At that time Mr. Bonanno said he actually had

5     spoken with Mr. Santana, that Mr. Santana -- I'm sorry, Mr.

6     Diaz, Mr. Diaz.  Actually, my recollection is that Mr. Diaz

7     had spoke with Mr. Santana.  Mr. Santana said to be here at

8     11 o'clock and he had indicated when Mr. Bonnano spoke with

9     him, which was sometime around 10:45, that he, that Mr. Diaz

10    said he would be here at 11 a.m.  Well, he did not appear at

11    11, was not here 12:30.  I directed the People to conduct a

12    search for via Parker.  We proceeded to select -- well, we

13    didn't select any jurors but we called for jurors and then

14    this morning continued jury selection.

15          Mr. Bonanno informed me that actually he had

16    spoken with his client after we broke yesterday at 4:30.

17    That he had informed his client, Mr. Diaz, that we were on

18    trial, that we were picking a jury.  He said he needed his

19    client to be here to help him.  That Mr. Santana -- Mr.

20    Diaz, rather, understood apparently that we are on trial but

21    was equivocal about whether he was going to appear.

22          Jury selection continued.  We've had six jurors

23    selected and at this point we have had our Parker hearing,

24    and I fully credit the testimony of the detective

25    investigator who's been doing this for 19 and a half years,

Proceedings

1    and did a very thorough search.

2                He searched the city arrest system, defendant's

3    not in custody.  He searched pretty much every hospital in

4    the Bronx, upper Manhattan and lower Westchester to

5    determine whether the defendant was ill, admitted in an

6    emergency room.  Not there.  There's no record that he has

7    been, no cause to believe that he is dead and his body is in

8    the medical examiner's office because that was checked.

9                The detective investigator, in my experience, went

10   actually so far as to check multiple addresses, not only the

11   address the defendant represented he lived at to both his

12   bail bondsman and to CJA, which is 582 West 185 Street where

13   he hasn't been living for a while according to the people

14   who live there, and they haven't even seen him for about

15   three months, but that he, there was information that he

16   lived with perhaps a sister in the Bronx, but she hadn't

17   even seen him since last Saturday.  And a girlfriend who the

18   defendant called at the time of his arrest was contacted.

19   She doesn't know where he is.

20               The detective went to other addresses up in the

21   Washington Heights area that the defendant was affiliated,

22   including that girlfriend's address and the building where

23   he was arrested, and the defendant was no where to be seen.

24               We have no record ourselves, the police don't, and

25   the DA does not have any record of his cell phone number so

Proceedings

1    they can't do any kind of pinging or cell site search, but

2    they have made efforts to ensure that Mr. Diaz, who is not a

3    United States citizen, was already the subject of an active

4    investigation with ICE in 2013 but is no longer active, who

5    has an alien number.  They've been taking steps to make sure

6    he does not leave the country, although we don't know

7    whether that would work or not.

8            Based on everything that has been done in this

9    case, based on all of the records made, I find that this

10   defendant was acutely aware, not only of the rights he would

11   be forfeiting because he was advised of them directly by me,

12   but he understood that we were actually on trial, that we

13   were proceeding on this case, and he has not been here for

14   two days.

15           I find that based on all of the evidence and all

16   of the colloquies that that defendant understands that his

17   presence is required, and that he is voluntarily choosing

18   not to be here, which is his right under the constitution.

19   The right to be present at trial also includes the right not

20   to be present at trial, and if he's exercising that right

21   not to be here, that's free and informed, and he's not here.

22   And so, we are not going to stop with our jury selection

23   process now.

24           I also, of course, have an independent

25   responsibility given the fact that he is charged with a very

Proceedings

1     serious crime and he is now a fugitive.  I have issued a

2     bench warrant that has nothing to really do with his

3     decision not to appear, and if he does show up with the

4     warrant squad or any other way during while this trial is

5     proceeding, I will hear arguments at that time and any

6     record that anyone wants to make, but at this time the

7     burden has been satisfied to this Court's satisfaction that

8     this defendant's choice not to be here is his and his alone,

9     and voluntary.

10            See you tomorrow, let's say about 11:30.  We have

11     to get a new panel.

12            (Whereupon, the case was adjourned to July 15,

13     2015.)

14            (Continued on the next page...)

15

16

17

18

19

20

21

22

23

24

25

1   SUPREME COURT OF THE STATE OF NEW YORK
    BRONX COUNTY : CRIMINAL TERM : PART 96

2   --------------------------------------x
    THE PEOPLE OF THE STATE OF NEW YORK

3

4        -against-
                               Ind. No.
    RICHARD DIAZ,                  3349-2012

5

6                   Defendant.
    --------------------------------------x

7                         265 East 161 Street
                         Bronx, New York 10451

8                         JULY 15, 2015

9    B E F O R E:

10         THE HONORABLE RALPH FABRIZIO
          Justice of the Supreme Court

11         (Appearances same as previously noted.)

12                         LAURA ROSEN
                         SENIOR COURT REPORTER

13       *     *     *     *     *     *    *    *

14         (Whereupon, the following took place in open court

15    in the presence of defense counsel and the assistant

16    district attorney.)

17         THE CLERK:  Case on trial continued.  Richard Diaz

18    still is not present before the court.

19         Appearances, please.

20         MR. MENDYS:  Newton Mendys for the Office of

21    district attorney.  Good morning.

22         THE COURT:  Good morning.

23         MR. BONANNO:  Good morning, Your Honor.  Pat

24    Bonnano for Mr. Diaz.

25         THE COURT:  Although we've completed the Parker

Proceedings

1    hearing, you have any information whether he's been taken

2    into custody?

3              MR. MENDYS:  No.

4              THE COURT:  And I do not have, certainly, the

5    warrant squad before me, and Mr. Diaz is still not here at

6    twenty of noon on the 15th of July.

7              We do have another panel who is ready, and are

8    they going to pick them up now?

9              THE CLERK:  If you want, yes.

10             THE COURT:  They're on their way up.  We're going

11   to have however many jurors they send us and we'll see if

12   they're --

13             MR. MENDYS:  This is a new group.

14             THE COURT:  Let's just see who they are.  Right.

15             MR. BONANNO:  Judge, was it your intention if we

16   pick by Thursday to have anything on Friday?

17             THE COURT:  No, because the juror, one of the

18   selected jurors couldn't be here at all Friday or wasn't

19   sure he could be here, and I told everybody show up on

20   Monday.  If there's some legal argument or anything I need

21   to hear, I'm here, but I'm assuming that there's no other

22   issues that I have to address, and you're free to address

23   anything at any place, any time with me before we begin.

24   No, I mean we're going to have testimony Monday, Tuesday,

25   Wednesday, Thursday and not Friday.  Is it possible that we

Proceedings

1    could finish by Thursday?

2              MR. MENDYS:  Of next week, yes.

3              THE COURT:  That's what I was thinking.

4              MR. MENDYS:  I'm speaking with Mr. Bonanno off the

5    record.  It seems that assuming the schedule plays out as I

6    want it to, that that's what will happen.

7              THE COURT:  I mean, the worst case scenario is we

8    would finish testimony on the 27th, probably then, which is

9    the following Monday.

10             MR. MENDYS:  I think that's fair.

11             THE COURT:  I'm just saying it's possible we could

12   wrap, this could be a four-day trial in terms of evidence

13   which would be fine.  Of course, we do have the wild card of

14   who's going to walk through the door, but to be voir dired

15   for the jury but --

16             MR. MENDYS:  But I'm not anticipating a heavy

17   amount of physical evidence so I anticipate the testimony

18   should be rather direct.

19             (Pause in proceedings.)

20             THE COURT:  You can bring the panel in.

21             COURT OFFICER:  Prospective jurors entering.

22             (Whereupon, the prospective jurors entered the

23   courtroom.)

24             THE COURT:  Good afternoon everyone.  Welcome to

25   Supreme Court, Bronx County, Part 98.  My name is Judge

Jury Selection

1    Ralph Fabrizio.  I preside over this case and I will be the

2    judge who will presiding over the, trial which I can tell

3    you now is the case of the People of the State of New York

4    against Richard Diaz.  We've already selected some jurors

5    and we're continuing with the jury selection process, and

6    I'm hopeful that I can complete the jury with the people who

7    have been sent to me today.

8            I know that you all have a number of questions and

9    I will likely give you the answer to each and every one of

10   those very shortly.  Before we proceed further, I'm going to

11   ask our clerk to take attendance to make sure that

12   everyone's here who's supposed to be here so we have no one

13   who's not supposed to be here.  Then you'll be sworn in,

14   I'll start speaking with you again.

15           THE CLERK:  The court officer took attendance

16   outside.

17           THE COURT:  Attendance was taken.  Never mind.

18   Everyone rise.  Thank you.

19           THE CLERK:  Please all rise.  Raise your right

20   hand, please.

21           (Whereupon, the prospective jurors were duly sworn

22   by the Clerk of the Court.)

23           THE CLERK:  You may be seated.

24           THE COURT:  All right.  Before I proceed any

25   further, first of all, I want to introduce you to the

1    attorneys in the well who are involved in the case.  The

2    People of the State of New York are represented by Robert

3    Johnson, the District Attorney of Bronx County, and the case

4    is going to be tried for the People by Assistant District

5    Attorney Newton Mendys.

6              Mr. Mendys, can you just introduce yourself.

7              MR. MENDYS:  Good afternoon everyone.

8              THE COURT:  The defendant's attorney is Mr.

9    Patrick Bonnano.  Mr. Bonnano?

10             MR. BONANNO:  Good afternoon everyone.

11             THE COURT:  Mr. Diaz is not present and you're not

12   to draw any inference one way or another about that.

13             Now, does anyone believe that they know either of

14   the two attorneys involved?  You know me?  Is this a

15   potential juror?  Okay.

16             Now you're here, you got a summons that said to

17   come to court.  It's jury duty, but I refer to it as jury

18   service.  We as Americans at different times provide lots of

19   services to our country.  Some people enlist, join the armed

20   services, protect our borders, protect our interests

21   overseas.  They perform a service to the country.  People

22   work in public service.  They dedicate their lives to

23   helping other people.

24             Jury service is something that all Americans have

25   to do.  Every few years we're all, myself included, get a

Jury Selection

1    summons in the mail saying come to court.  We need you to

2    perform a service for your country.  We need you to serve on

3    a jury.  The jury system is a cornerstone of our democracy

4    for more than 200 years.  It is part of our American society

5    and our legal system, and it exists here and other countries

6    can only envy what we have.

7              The jury, to be on a jury doesn't require any type

8    of special education, any type of special training.  For the

9    entire existence of this country people from the community

10   have been called to court to act as jurors, to act as fact

11   finders.  The only requirements that you have before you

12   come here, that are not of a legal basis of any kind, are

13   that you have to be fair.  You come in with an open mind.

14   You have no preconceived biases or notions about anything.

15             A jury trial is not a referendum of any social or

16   political issues.  Jurors are called upon to act as fact

17   finders in a particular case and to determine based on the

18   facts that they find whether the People have proven a

19   particular defendant guilty beyond a reasonable doubt.

20             I'm going to be asking you a series of questions,

21   the same types of questions that judges ask in every jury

22   selection process in every courtroom in this country, and

23   they're to determine to find out whether you will be able to

24   be fair and impartial and follow instructions.  The

25   attorneys will have an opportunity to ask you questions as

1    well.  There are no right or wrong answers to any of these

2    questions.  We ask you to be honest, and in fact you just

3    took an oath to answer all questions honestly, so it would

4    only be wrong to give an answer that's less than completely

5    honest.

6         Jurors are required also to follow court's

7    instructions about the law.  You have to accept each

8    instruction I give you and follow each instruction that I

9    give you to the letter.

10        Now I'm going to give you an instruction that will

11   apply during the jury selection process and if you are

12   selected during the entire trial.  I'm going to refer to

13   these as recess instructions because these are requirements

14   for you to observe as jurors during the course of the trial.

15        Now, you are forbidden and you may not under any

16   circumstances discuss anything of a substantive, a factual

17   nature about this case with anyone else, friends, relatives,

18   co-workers, even other jurors until there's deliberations.

19   You could tell people if you're selected I'm on a jury, I'm

20   due court on this date this date, but you can't talk about

21   the case.

22        You may not under any circumstances accept, agree

23   to accept, discuss accepting any kind of gratuity or

24   benefit, money of any kind in return for giving anyone

25   information of any kind about this case, and you have to

Jury Selection

1   report directly to me if someone does try to influence you

2   or you're aware that they're trying to influence any other

3   members of the jury.

4           You're not allowed to visit any type of scenes or

5   locations that are connected with the charges in this case,

6   and you'll be learning about different scenes and locations

7   that are relevant.  And that includes not just visiting

8   scenes in person, but also not using any of your smart

9   phones or tablets or laptop or any electronic devices to do

10  any kinds of searches via, for example, Google maps or

11  Mapquest or any kind of GPS device, nothing like that.

12          You may not do any research on any factual or

13  legal issue that arises during the case, whether by

14  internet, library, talking to other people.

15          And you cannot read any accounts that may or may

16  not may have been reported or may in the future be reported

17  about this case in any media or internet or any site

18  whatsoever.

19          You can't do any kind of research on any

20  individuals involved.  You can't friend people, attempt to

21  friend people.  No social media contacts.  Nothing.

22          You can't have contact with the lawyers or me,

23  except through in the courtroom.  If there's a problem

24  you'll alert a court officer to speak to me, but you can't

25  talk to the attorneys under any circumstances, not even to

Jury Selection

1    say hello or ask for directions or anything like in the

2    hallway.  They're forbidden to talk to you and they have to

3    advise me if anyone who's a juror comes up to them.

4        So you have to follow all of these instructions,

5    and they will apply each and every time we take a recess in

6    this case for whatever reason and you're not in the

7    courtroom.

8        Now, there are a couple of legal requirements that

9    do apply to jury service, and I have two questions to the

10   group as a whole.

11       First of all, is anyone in the courtroom not a

12   United States citizen?  No one's raised their hands.

13       Is there anyone who does not live in Bronx County?

14   No one's raised their hands.

15       I'm going to talk to you a little bit about the

16   scheduling in the case and, you know, what you can expect in

17   terms of when you're required to be here.  Now in general,

18   in this courthouse trials are conducted Monday through

19   Friday between 9:30 in the morning and 4:30 to 5 in the

20   afternoon.

21       We break for lunch every day at 1 o'clock.  Jurors

22   are expected to return from lunch at about 2:15 for the

23   afternoon's business.

24       Jurors go home each and every night during the

25   trial and even during deliberations.  There's no such thing

Jury Selection

1      as jury sequestration.  You don't go to a hotel, you go home

2      each and every time.

3              Now, we will have the following days off where we

4      will not be hearing any evidence in this case whatsoever and

5      that's next Friday the 24th of July.

6              Now I've spoken with the parties about scheduling

7      and the anticipated length of the trial, we need to complete

8      our jury selection in this case and that takes time, and you

9      can never predict how long that's going to be, but we will

10     begin testimony in this case Monday the 20th of July.

11             I expect that the evidence will be fully present

12     to you over the course of no more than five court days,

13     which means that as I understand it, I can't predict if

14     there's something terribly unforeseen that's going to

15     happen, but the case will be finished as far as evidence on

16     the 27th and in your hands on the 28th.  So less than two

17     weeks from today the case will be finished.

18             That's our schedule.  It's not a particularly long

19     case in terms of the evidentiary portion.  In fact, that's

20     usually considered a pretty short one.  So I have two

21     questions to all the people in the courtroom.  And the first

22     one relates to the schedule.

23             The way we're going to do this is I'm going to ask

24     you to raise your hand if you want to speak to me.  If the

25     answer is yes to either of these two questions, you'll come

1    up to the bench and you'll talk to me with the attorneys

2    present.

3              The first question, again, it relates to

4    scheduling, and the question is based on that schedule, is

5    there anyone present for a personal or a business-related

6    reason who cannot be present for this trial and deliberate

7    on this case after receiving the case during the period I

8    outlined?  If the answer to that question is yes, you raise

9    your hand and you'll come and see me.

10             The second question -- hold on because there's a

11   second question, the second question is if there is anyone

12   here who does not speak or understand the English language?

13             So if the answers to those questions are yes, I'm

14   going to let the court officers arrange for this, keep your

15   hands up, and they're going to pull a card and then you'll

16   just follow their instructions and I'll see you at the

17   bench.  And we'll do this in an orderly way and then I'll

18   speak to the rest of you afterwards, okay?

19             (Whereupon, the Court spoke to prospective jurors

20   at the bench, off the record, in the presence of the

21   assistant district attorney and defense counsel.)

22             (Whereupon, the following took place in open court

23   in the presence of defense counsel and the assistant

24   district attorney.)

25             THE COURT:  Let me tell you some more information

Jury Selection

1    about the case.  Now, this case comes to us by way of a

2    document called an indictment.  An indictment contains

3    accusations of crimes.  Neither the indictment itself nor

4    the fact that one has been filed constitutes any evidence

5    whatsoever.  The defendant has answered not guilty and the

6    trial is conducted for you to decide whether the defendant

7    is guilty or not guilty.

8           Now the defendant is charged with crimes including

9    robbery in the second degree, grand larceny, and crime

10    impersonation and other crimes.  Now he is charged under a

11    legal theory called acting in concert, he, acting with two

12    accomplices, and their names are Jose Melenciano and Amauri

13    Santana.

14           Now they are not present in the courtroom and

15    you're not to speculate in any way why they are not here or

16    why they are not on trial and only Mr. Diaz is on trial in

17    this case.  No, you shouldn't speculate about that at all.

18           It's alleged that the crimes occurred on October

19    17, 2012, at about 12:15 or so in the morning, in the

20    vicinity of and specifically near an address at 2315 Walton

21    Avenue here in Bronx County.  The victim's name is Mr. Yohn

22    Contreras.

23           Now, I've told you something but not a lot.  I've

24    told you what the charges are.  I've told you where it's

25    alleged to have occurred, when it's alleged to have

Jury Selection

1    occurred, who is charged and being accomplices in this case

2    with Mr. Diaz, and the name of the victim.  Based on that

3    information does anyone think they know anything at all

4    about this case?  No one's raised their hand.

5         I'm going to be reading you a list of names of

6    individuals who will either be called and will testify at

7    trial or who you will hear referred to during the course of

8    the trial.  And I'm going to ask you to pay close attention

9    to the list because I'm going to ask you afterwards if

10   anyone believes they know any of these individuals.  And

11   they are as follows.

12        I already told you about Yohn Contreras, it's

13   Y-O-H-N Contreras.  There's also Joel Rodriguez.  Esmeraldi

14   Rodriguez.  Argelia Rosario.  Eric Figueroa.

15        And number of police officers, Police Officer

16   Edgar Mangual.  Detective Wilson Colon.  Police Officer Jose

17   Pachot, P-A-C-H-O-T.  Detective Ana Bell.  Detective Chris

18   Rodriguez.  And Police Officer John Walters.

19        Does anyone here believe they know any of those

20   individuals whose names I just mentioned?  And no one's

21   raised their hands.

22        So as I told you, we've begun jury selection in

23   this case and we've already selected some jurors.  A jury is

24   comprised of 12 people, and in addition to those 12 jurors

25   we will also be selecting alternate jurors.  The first

Jury Selection

1    person called who's sworn, and that person's already been

2    sworn, this is the jury's foreperson.

3              Now, a jury's responsibility is to evaluate fairly

4    the evidence, the testimony presented at the trial, to apply

5    the law as I tell you the law is to the facts as you find

6    them to be, and to decide whether the People have proven the

7    defendant guilty beyond a reasonable doubt.

8              When you deliberate on the charges you cannot

9    consider or speculate about matters relating, for example,

10   to sentence or punishment.  If there's a verdict of guilty,

11   it's my responsibility to impose an appropriate sentence.

12             Moreover, your verdict cannot be based on any bias

13   for or against any party or any sympathy for anyone.  My

14   role at the trial and the role of a trial judge in any case

15   is to assure that the trial is conducted in a fair and

16   orderly manner in accordance with the law.  And I do that by

17   presiding over the trial.  I decide questions of law that

18   arise between the parties and I explain to you, the members

19   of the jury, as I am right now, what the law is that the

20   jury must accept and must follow.

21             Therefore, we are both judges in this case.  It's

22   important to recognize that we judge different things.  You,

23   the jury, judge the facts of the case in order to reach a

24   verdict of guilty or not guilty.  I judge the law.  That

25   means I decide questions of law and I instruct you, members

1     of the jury, on that law.  It's not my responsibility to

2     judge the facts, that's yours.

3          You and you alone are the judges of the facts, and

4     you and you alone are responsible for deciding whether the

5     defendant is guilty or not guilty.  So nothing I say to you

6     or say to the lawyers, or no matter how I say anything, and

7     no ruling I make on the law is intended to be nor should it

8     be considered by you as an expression that I may have an

9     opinion about the facts of the case or of whether the

10    defendant is guilty or not guilty.

11         Now when you are jurors and judge the facts, you

12    will be considering only the evidence.  And the evidence in

13    this case and in every case typically include the following.

14    First is testimony.  Testimony of witnesses.  This is our

15    witness box, that's our jury box.  So witnesses will come in

16    and testify.

17         Another type of evidence are exhibits.  These are

18    physical items things like photographs, documents, maps, all

19    sorts of kind of tangible thing and that's a second type of

20    evidence.

21         A third type that happens in some cases is called

22    a stipulation, and that's an agreement by the parties that

23    you can consider something to be evidence without having to

24    have a witness testify about it.

25         I'm now going to turn to fundamental principles of

1    our law that apply in this and every criminal trial, and

2    there are three of them.  They are the presumption of

3    innocence, the burden of proof and the requirement of proof

4    beyond a reasonable doubt.

5            Now throughout these proceedings the defendant is

6    presumed to be innocent, and as a result, you must find the

7    defendant not guilty unless on the evidence presented at the

8    trial you conclude that the People have proven the defendant

9    guilty beyond a reasonable doubt.

10           That a defendant does not testify as a witness is

11   not a factor from which any inference unfavorable to the

12   defendant may be drawn.  The defendant is not required to

13   prove he's not guilty.  In fact, the defendant is not

14   required to prove or disprove anything.  To the contrary,

15   the People have the burden of proving the defendant guilty

16   beyond a reasonable doubt.

17           That means that before you can find the defendant

18   guilty of a particular crime, the People must prove beyond a

19   reasonable doubt every element of that crime, including the

20   fact that the defendant is the person who committed the

21   crime.  That burden of proof never shifts from the People to

22   the defendant.

23           Now, if the People fail to satisfy their burden of

24   proof, you must find the defendant not guilty.  If the

25   People satisfy their burden of proof, then you must find the

1        defendant guilty.

2                What does our law mean when it requires proof of

3        guilt beyond a reasonable doubt?  Well, the law uses that

4        term proof beyond a reasonable doubt to simply tell you how

5        convincing the evidence of guilt must be to permit a verdict

6        of guilty.

7                Now, the law recognizes that in dealing with human

8        affairs there are very few things in this world that we know

9        with absolute certainty, and therefore the law does not

10       require that the People prove a defendant guilty beyond all

11       possible doubt.  On the other hand, it's not sufficient to

12       prove that the defendant is probably guilty.  In a criminal

13       case the proof of guilt must be stronger than that, it must

14       be beyond a reasonable doubt.

15               And a reasonable doubt is an honest doubt of the

16       defendant's guilt for which a reason exists based upon the

17       nature and the quality of the evidence.  A reasonable doubt

18       is an actual doubt, it's not an imaginary doubt.  It's a

19       doubt that a reasonable person acting in a matter of this

20       importance would be likely to entertain because of the,

21       because of the evidence that was presented or because of the

22       lack of convincing evidence.

23               Proof of guilt beyond a reasonable doubt is proof

24       that leaves you so firmly convinced of the defendant's

25       guilt, that you have no reasonable doubt of the existence of

Jury Selection

1    any elements of the crime or of the defendant's identity as

2    the person who committed that crime.  Now I will be giving

3    you further instructions on this subject throughout the

4    trial and at the end of the trial.

5         Now, as judges of the facts, you alone will

6    determine the truthfulness as well as the accuracy of the

7    testimony of each witness you hear from.  You must decide

8    whether a witness told the truth and was accurate, or

9    instead, testified falsely or was simply mistaken.  You must

10   also decide what importance that you give to the testimony

11   which you accept to be truthful and accurate.

12        And it is the quality of the testimony that's

13   controlling, not the number of witnesses who testify.  And

14   I'll instruct you again further on this subject at the end

15   of trial and give you some factors you might consider to

16   make a determination about credibility.

17        Now, in this case you will be hearing the

18   testimony of police officers.  The testimony of a witness

19   should not be believed solely and simply because that

20   witness is a police officer.  At the same time, a witness's

21   testimony should not be disbelieved solely and simply

22   because the witness ask a police officer.  You must evaluate

23   a police officer's testimony in the same way that you would

24   evaluate the testimony of any other witness.

25        Now I told you about the theory about accessorial

Jury Selection

1    liability and acting in concert.  I'm going to give you some

2    legal instructions now and I will he repeat these again in

3    my closing instructions.  Now, our law recognizes that two

4    or more individuals can act jointly to commit a crime, and

5    that in certain circumstances each can be held criminally

6    liable for the acts of the other person.  In that situation

7    those persons can be said to be acting in concert with each

8    other.  And our law defines the circumstances under which

9    one person may be criminally liable for the conduct of

10   another person, and here's that definition:

11          When one person engages in conduct which

12   constitutes an offense, another person is criminally liable

13   for such conduct when, acting with the state of mind

14   required for the commission of that offense, that individual

15   solicits, requests, commands importunes or intentionally

16   aids such person to engage in such conduct.

17          Again, as I told you, I will give you further

18   legal instructions on this subject at the conclusion of the

19   trial.

20          Now, after all the evidence is presented, after

21   the attorneys sum up, and after I give you those final legal

22   instructions, at that time a jury is required to deliberate.

23   And when you deliberate, your verdict, whether it's guilty

24   or not guilty, must be unanimous.  That is, each and every

25   juror must agree to it.  And you have to render a verdict

Jury Selection

1    separately and specifically upon each count or legal charge

2    that I submit to you.

3              Now, since 12 people will seldom agree immediately

4    on anything, in order to reach that unanimous verdict you

5    must deliberate with the other jurors.  That means you

6    should discuss the evidence, consult with each other, listen

7    to each other, give each others views careful consideration

8    and reason together when considering the evidence.  And when

9    you deliberate, you should do so with a view toward reaching

10   an agreement if that can be done without surrendering any

11   individual judgment.

12             Now each of you must decide the case for yourself,

13   but only after a fair and impartial consideration of the

14   evidence with the other jurors.  You should not surrender an

15   honest view of the evidence simply because you want the

16   trial to end or you happened to be outvoted.  And at the

17   same time, you should not hesitate to reexamine your views

18   and change your mind if you become convinced that your

19   position was not correct.

20             Now those are my legal instructions to you prior

21   to my questioning.  The next step for all of you will be

22   questioning about information by me.  I'm going to tell you

23   now, and I'll tell you when the questioning begins which is

24   going to be after lunch, I'm not trying to pry into anything

25   personal.  These are the types of questions that people ask

1    all the time.  They're questions about your background, what

2    you do for a living, things like that, whether you've ever

3    been on a jury.  There are questions about whether you have

4    ever yourself been the victim of a crime or anyone close to

5    you or whether anyone close to you has been charged with or

6    convicted of a crime, and whether you know police officers.

7            That's just the basic tenure of my questions, and

8    as I said to you, there's no right or wrong answer, but

9    every answer has to be honest.  We're going to do that

10   questioning after the lunch break.  I'm going to excuse you

11   all now and ask you to return at 2:15.  The court officers

12   will tell you when you go in the hallway where to go, but

13   it's room 601.  It is down the hall.

14           So you're going to come back in the building, come

15   right up to the sixth floor.  Don't go to the central jury

16   room.  When you're all gathered together, we will bring you

17   in and we'll continue.

18           Now I cannot begin until you're all here so that

19   time is very important and it's very important when you're

20   on a jury to be respectful to the other jurors, be

21   respectful to the Court, the parties, because other people

22   are here, they're giving up time, you all are, you're giving

23   up time out of your lives, and we do want to make sure

24   things run as smoothly as possible, so please do not -- be

25   courteous to the other jurors and be here by 2:15.  So

1    you've already been through our security system that means

2    you can't just show up at the front door at 2:15 and you'll

3    magically appear on the sixth floor.  You've got to be at

4    the building by about 2 o'clock.

5           So I'm going to excuse you now.  My recess

6    instructions that I gave you apply.  Don't discuss the case.

7    Keep an open mind.  There are two individuals that I'm going

8    to be speaking with that are going to ask to remain.  One is

9    Miss Spencer Hill, and then Mr. Acuria -- is that the

10   gentleman with the headphones?  Yes, just remain here and

11   everyone else is excused for now and I'll see you at 2:15

12   okay.

13          (Whereupon, the prospective jurors exited the

14   courtroom.)

15          THE COURT:  Mr. Acuria, if you could just step up

16   and sit in the jury box.  Your first name, can you spell

17   your last name for the record?

18          PROSPECTIVE JUROR:  My first name Kevin, last name

19   A-C-U-R-I-A.

20          THE COURT:  Mr. Acuria, you approached the bench

21   when I was speaking about scheduling but you said to me that

22   you don't really live in the Bronx.  So tell me why you're

23   here and where do you really live and where should you be

24   summoned to appear on a jury?

25          PROSPECTIVE JUROR:  Okay.  Well, I moved back to

Jury Selection

1    my mother's house.  I was living with my father, right.

2           THE COURT:  Where is this?

3           PROSPECTIVE JUROR:  He lives in Holland Avenue,

4    2221 Holland Avenue.

5           THE COURT:  In?

6           PROSPECTIVE JUROR:  I was living with him.

7           THE COURT:  Yeah.

8           PROSPECTIVE JUROR:  Then I moved back to my mom's

9    house recently, like two months ago.

10          THE COURT:  Where does she live?

11          PROSPECTIVE JUROR:  In 122 East 104 Street,

12   apartment 60.

13          THE COURT:  But not in the Bronx.

14          PROSPECTIVE JUROR:  No, not in the Bronx, this is

15   Manhattan.  So I moved back to my mom.

16          THE COURT:  You live Manhattan and that's your

17   legal address?

18          PROSPECTIVE JUROR:  No, no, my legal address on my

19   ID as of today is still to this day says the Bronx.

20          THE COURT:  Your legal address is Bronx County?

21          PROSPECTIVE JUROR:  Yes, sir.

22          THE COURT:  You have a state ID card?

23          PROSPECTIVE JUROR:  Yes, sir.

24          THE COURT:  That says you live in Bronx County?

25          PROSPECTIVE JUROR:  Yes, sir.

Jury Selection

1           THE COURT:  Where you work?

2           PROSPECTIVE JUROR:  Yes, sir.

3           THE COURT:  And you get a W-2.

4           PROSPECTIVE JUROR:  Yes.

5           THE COURT:  Where's your work address?

6           PROSPECTIVE JUROR:  In the Bronx Holland Avenue.

7           THE COURT:  You vote you registered to vote.

8           PROSPECTIVE JUROR:  Yes.

9           THE COURT:  Where are you registered to vote?

10          PROSPECTIVE JUROR:  In the motor vehicles in 125

11     Street.

12          THE COURT:  No, no, where are you supposed to

13     vote, in the Bronx or Manhattan?

14          PROSPECTIVE JUROR:  Well, when I voted it was when

15     I was younger, I voted right across street in my school.  I

16     mean from my house.

17          THE COURT:  In the Bronx?

18          PROSPECTIVE JUROR:  No, in Manhattan.

19          THE COURT:  So you're a registered voter that's

20     where your registered to vote in Manhattan, I'm not asking

21     if you vote or not.

22          PROSPECTIVE JUROR:  I understand.  Years ago I

23     used to live with my mother.  Years ago I used to live with

24     my mother and I moved with my father.  You know, things are

25     not working out with me and me father so I moved back in my

Jury Selection

1    mother's house recently, but I was receiving mail for more

2    than a year over there in the Bronx.  Still to this day I

3    do.

4           THE COURT:  So is your Bronx address your legal

5    address?

6           PROSPECTIVE JUROR:  Well, basically I receive

7    mail, yeah, so it is my legal address.

8           THE COURT:  It's not a mail drop, it's the address

9    that you maintain on all your records, your DMV records,

10   your IRS records, this is where you purport to have a legal

11   residence?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  And people can have several places

14   where they stay, but you've never changed your address.

15          PROSPECTIVE JUROR:  I'm trying to now.  I'm

16   actually going I'm going to a --

17          THE COURT:  Did you tell -- see, one of the

18   questions they ask you downstairs when you come in, and they

19   ask you a lot of screening questions is did you tell them

20   downstairs anything about this, in the central jury room?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  So what you're saying is you should be

23   called to be a juror in Manhattan and not in the Bronx?

24          PROSPECTIVE JUROR:  Basically, yes.  Yes, sir.

25          THE COURT:  Where do you work?

Jury Selection

1          PROSPECTIVE JUROR:  I work in Dykeman Street.

2          THE COURT:  What kind of job do you have?

3          PROSPECTIVE JUROR:  I'm a salesman.  I'm a

4     salesman.  I sell sneakers and clothing brands.

5          THE COURT:  I'm going to be looking into this and

6     I'll see you this afternoon, okay.

7          PROSPECTIVE JUROR:  No problem, sir.

8          COURT OFFICER:  Step out, please.

9          (Whereupon, the prospective juror exited the

10    courtroom.)

11         (Whereupon, the prospective juror entered the

12    courtroom.)

13         THE COURT:  Okay.  And we also now have Miss

14    Spencer Hill.  You can sit where you are.

15         PROSPECTIVE JUROR:  Spicer.

16         THE COURT:  Tell me first your name, spell

17    everything for record.

18         PROSPECTIVE JUROR:  Kristal, K-R-I-S-T-A-L, last

19    name is S-P-I-C-E-R hyphen H-I-L-L.

20         THE COURT:  So what did you want to tell me?  I

21    mean, you have to state it on record with the attorneys here

22    so they have a right to also question you about this.  It

23    does relate to your qualifications but it does not relate to

24    your schedule, so go ahead.

25         PROSPECTIVE JUROR:  It's to number one, my oldest

1    daughter is due any day now.  This is my first grandchild

2    that's coming.  And also, the second thing is that I have a

3    ten-month old which I'm breast feeding.  When I called

4    earlier they said you have no lactation facilities, so I

5    cannot breast feed -- well, pump.

6              THE COURT:  Do you believe because of your

7    daughter's incarceration --

8              PROSPECTIVE JUROR:  No, not incarceration, she's

9    due, my first grand baby.

10             THE COURT:  Who's is in jail?

11             PROSPECTIVE JUROR:  No, no.

12             THE COURT:  No, I missed this whole thing, I'm

13   sorry.  I heard something that I -- come up.  Come up.

14             (Whereupon, a discussion was held at the bench off

15   the record among the Court and counsel.)

16             THE COURT:  2:15.

17             (Whereupon, there was a luncheon recess taken.)

18        A  F  T  E  R  N  O  O  N      S  E  S  S  I  O  N

19             (Whereupon, the following took place in open court

20   in the presence of defense counsel and the assistant

21   district attorney.)

22             THE CLERK:  Part 98 is back in session.  Case on

23   trial continued.  The defendant is still not before the

24   court.  Counsel remain the same.  Prospective jurors are not

25   before the court.

Jury Selection

1          THE COURT:   In terms of Mr. Acuria who was here

2     before lunch, I have actually looked at the rules and the

3     judiciary law talks about residence, but the rules of the

4     Chief Administrative Judge Section 128.4 says that a

5     resident is someone who maintains a fixed permanent and

6     principle home within that county to which such person,

7     wherever temporarily located, always intends to return.

8          And then I did find this case called People v

9     Mikell, M-I-K-E-L-L, that's at volume 183 AD2d 411 from the

10    First Department, where a juror stated that he lived with

11    his sister in Manhattan, and despite ongoing contacts with

12    the Bronx, the court found that the juror was properly

13    dismissed because that juror was not a resident of the

14    Bronx.

15         Would either side wish to comment?

16         MR. BONANNO:   I say consent.

17         MR. MENDYS:   Yes, I agree.

18         MR. BONANNO:   It's a consent.

19         THE COURT:   Well, I mean, this goes to the juror's

20    qualifications.   And quite frankly, residence is where you

21    live and not where you legally get your mail.   So I have

22    actually put a little note to Mr. Acuria's card, I don't

23    know what he put in his juror questionnaire in terms of

24    where he lives, but they should put him on the Manhattan

25    list.

1    So whoever is going to get the jurors, Mr. Acuria

2    does not come back into the courtroom.  He takes this note

3    to the jury clerk.

4    MR. BONANNO:  Did you want to address that issue

5    about the young lady?

6    THE COURT:  Tell me.

7    MR. BONANNO:  It, I was just sitting outside.  I

8    asked the court officer to identify her for me.

9    THE COURT:  Tell me what happened.

10    MR. BONANNO:  I'm sitting there texting and she

11    came up to me in my face, asked me is the courtroom still

12    open and I totally ignored her, didn't say anything to her,

13    picked up my bag and I walked away.

14    THE COURT:  And you've identified who she is?

15    COURT OFFICER:  I'll go ask her her name.  I know

16    what she looks like.

17    THE COURT:  You should bring her in.  Thank you.

18    MR. BONANNO:  I just don't want her to think I was

19    rude.

20    THE COURT:  I even added that you're required to

21    tell me, which you just did.

22    (Pause in proceedings.)

23    COURT OFFICER:  Prospective juror entering.

24    (Whereupon, the prospective juror entered the

25    courtroom.)

1          THE CLERK:  This is Shatice, S-H-A-T-I-C-E,

2     Bennett.

3          THE COURT:  All right.  And just to confirm, this

4     is the juror?

5          MR. BONANNO:  Yes.

6          THE COURT:  Mr. Bonnano?

7          MR. BONANNO:  Yes, thank you.

8          THE COURT:  Miss Bennett, I had instructed the

9     jurors this morning that they weren't allowed to speak with

10    anybody, and especially the lawyers about anything at all,

11    and that the lawyers are required to speak to me if a juror

12    speaks to them about anything, no matter what it is.  And I

13    was informed that you did speak to Mr. Bonnano, although I

14    know he didn't say anything back to you, but it put him in a

15    very, very awkward position.  Did you not understand my

16    instructions?

17         PROSPECTIVE JUROR:  No, I apologize.  I didn't

18    realize that he was one of the attorneys for the case.  I

19    was just asking if the doors were open.

20         THE COURT:  So the people that you can speak to

21    are the court officers, and they're all in uniform --

22         PROSPECTIVE JUROR:  Okay.

23         THE COURT:  If you have any questions about that.

24    But you didn't realize when Mr. Bonnano stood up?  You

25    didn't?  Okay.  Any questions?

Jury Selection

1              MR. BONANNO:  Not at all, Judge.

2              MR. MENDYS:  No.

3              THE COURT:  You understand and will follow the

4      instruction?

5              PROSPECTIVE JUROR:  Yes.

6              THE COURT:  No requests to excuse her or anything?

7              MR. BONANNO:  No.

8              MR. MENDYS:  No.

9              THE COURT:  Okay, I'll see you in a few minutes.

10             (Whereupon, the prospective juror exited the

11     courtroom.)

12             COURT OFFICER:  Ready for the panel, Judge?

13             THE COURT:  I am.

14             COURT OFFICER:  Panel entering.

15             (Whereupon, the prospective jurors entered the

16     courtroom.)

17             THE COURT:  All right.  Good afternoon, again

18     everyone.  Hope you had a good lunch.

19             Now, the next part of the jury selection process

20     is we're going to be calling the names of 18 people who will

21     be seated in the jury box.  There's a questionnaire on each

22     of the seats there.  You're not gonna fill it out, but it

23     gives you an idea of the questions I'm asking you.

24             If there are any questions that you believe you

25     would like or that you feel that you would like to answer

Jury Selection

1   without the other jurors present but with myself and the

2   attorneys present, just let me know and we'll take care, I

3   will defer that question to a later time and you'll be in

4   the courtroom without the other jurors for that type of

5   questioning.  Again, these are the normal types of questions

6   that all judges ask, and just be honest in your answers.

7           So listen for your name, follow the instructions

8   of the court officers and take the seat that they're

9   directing you to and we'll get started.

10          THE CLERK:  Seat number one, Damilola Rinnaye.

11  First name D-A-M-I-L-O-L-A, last name R-I-N-N-A-Y-E.

12          Seat number two, Evelyn Caceres, C-A-C-E-R-E-S.

13          Seat number three, Irene Fernandez.

14          Seat number four, Robert Ferguson.

15          THE COURT:  Keep that open.  Mr. Ferguson hasn't

16  returned from lunch.  We'll see what happens.

17          THE CLERK:  Seat number four --

18          THE COURT:  No, seat number four for now because

19  his name has been called.

20          THE CLERK:  Thank you.

21          Seat number five, Newlyn Torres, first name

22  N-E-W-L-Y-N.

23          Seat number six, Raymond or Ramon Medina, Jr.

24          Seat number seven, Jonathan Rivera.

25          Seat number eight, Allen Abraham, A-L-L-E-N.

1            Seat number nine, Wilfredo Solis.

2            Seat number 10, Yarenys Camillo, Y-A-R-E-N-Y-S.

3            Seat number 11, Bernadette Begley, B-E-G-L-E-Y.

4            Seat number 12, Sheila Hines, H-I-N-E-S.

5            Seat number 13, Angelina Caceres, C-A-C-E-R-E-S.

6            Seat number 14 Jennifer Konadu, last name

7       K-O-N-A-D-U.

8            Seat number 15, Madelyne Miranda, M-A-D-E-L-Y-N-E.

9            Seat number 16, Jennifer Rodriguez.

10            Seat number 17, Jose Lopez.

11            Seat number 18, Kesia Giron, K-E-S-I-A, last name

12       G-I-R-O-N.

13            THE COURT:  Can you call down to the central jury

14       room, see if Mr. Ferguson is down there by any chance?  It's

15       a quarter to three.

16            THE CLERK:  Of course.

17            (Pause in proceedings.)

18            THE COURT:  May I ask the attorneys, it's now a

19       quarter of three, Mr. Ferguson, whose name was called,

20       wasn't here, is not in the central jury room, and apparently

21       is not down the hall either in the room where the jurors

22       were told to gather.  Can we call another person for seat

23       four?

24            MR. BONANNO:  Yes.

25            MR. MENDYS:  Yes.

Jury Selection

1          THE COURT:  No objection?

2          MR. MENDYS:  No.

3          THE COURT:  Call another individual for seat four.

4          THE CLERK:  Seat number four, Anthony Smith, Jr.

5          THE COURT:  All right.  Good afternoon, again

6     everyone.

7          Now Miss Rinnaye, so you were the first name

8     called, your name came out of a wheel.  Not as exciting as

9     Yolanda Vega picking your Power Ball number, I know, but

10    you're the first person that we're going to be questioning

11    today, and you're going to show everyone else how easy this

12    is because they're basically very simple questions.

13          So first of all, tell me in general what

14    neighorhood do you live in?  I don't want your street

15    address.  You know, north, south, east, west; Wakefield

16    Fordham, Edenwall.  Where do you live in the Bronx?

17          PROSPECTIVE JUROR:  Wakefield.

18          THE COURT:  How long have you been at your current

19    address?  How many years you've been living at your current

20    residence?

21          PROSPECTIVE JUROR:  In the Wakefield?

22          THE COURT:  Yeah, at your current house?

23          PROSPECTIVE JUROR:  Three years.

24          THE COURT:  Does anyone live in your household

25    with you?

Jury Selection

1              PROSPECTIVE JUROR:  My family.

2              THE COURT:  Do you live with other people?

3              PROSPECTIVE JUROR:  My family.

4              THE COURT:  Who?

5              PROSPECTIVE JUROR:  My husband and my children.

6              THE COURT:  Are you working outside the home?  Do

7      you have a job?

8              PROSPECTIVE JUROR:  Yeah, I have a job.

9              THE COURT:  What is it?

10             PROSPECTIVE JUROR:  Home health aide at a Jewish

11     home.

12             THE COURT:  Is your husband working?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  What does he do?

15             PROSPECTIVE JUROR:  He works with, he works with

16     kids.

17             THE COURT:  He works, okay.  We'll just say he

18     does a job.

19             PROSPECTIVE JUROR:  Yeah.

20             THE COURT:  Okay.  Any of the children working

21     age?

22             PROSPECTIVE JUROR:  No, students.

23             THE COURT:  Now, Miss Rinnaye, have you or anyone

24     close to you, a close friend, a family member, ever been the

25     victim of any kind of crime where something happened to you

Jury Selection

1    or them?

2              PROSPECTIVE JUROR:  No.

3              THE COURT:  Have you or anyone close to you ever

4    been charged with, accused of, questioned in connection with

5    in kind of criminal activity?

6              PROSPECTIVE JUROR:  No.

7              THE COURT:  Do you have any close friends or

8    relatives who work in law enforcement of any kind; police,

9    court officers, corrections officers, anything like that?

10             PROSPECTIVE JUROR:  No.

11             THE COURT:  And your husband doesn't do anything

12   like that either, right?

13             PROSPECTIVE JUROR:  No, he's a teacher.

14             THE COURT:  Now have you ever been on a jury?

15             PROSPECTIVE JUROR:  No, this my first time for me.

16             THE COURT:  Never?

17             PROSPECTIVE JUROR:  No, this is my first time for

18   me.

19             THE COURT:  Let me ask you, I've told you what it

20   takes to be a juror.  You have to have no preconceived

21   biases, no result that you want to happen in this case in

22   favor or against any party.  You have to follow my

23   directions.  I've told you generally what the case is about.

24   Nothing what you know about yourself, and you know yourself

25   better than anyone else, do you promise me that if you are

Jury Selection

1    selected, you will be a fair juror?  You'll be fair?

2              PROSPECTIVE JUROR:  Yeah, I'll be fair.

3              THE COURT:  Do you promise me you'll be fair to

4    the DA?

5              PROSPECTIVE JUROR:  Uh, huh.

6              THE COURT:  Yes?

7              PROSPECTIVE JUROR:  Yes.

8              THE COURT:  You have to answer yes or no for the

9    record because they need words.  She needs to take it down.

10             PROSPECTIVE JUROR:  I'll be fair.

11             THE COURT:  Do you promise me you'll be fair to

12   the defense?

13             PROSPECTIVE JUROR:  I'll be fair.

14             THE COURT:  Will you promise to follow all of my

15   instructions?

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  Okay, thank you.

18             That's the questions you're all going to get.  The

19   answers may be very different.

20             Miss Caceres, how are you?

21             PROSPECTIVE JUROR:  Hi.  Nervous.

22             THE COURT:  Nervous?  Well, you know, I

23   understand, and I'm not trying to put you on the spot.

24             So just tell me generally what neighorhood do you

25   live in?

Jury Selection

1           PROSPECTIVE JUROR:  Norwood.

2           THE COURT:  How long roughly at your current

3     address?

4           PROSPECTIVE JUROR:  12 years.

5           THE COURT:  Who, if anybody, else resides in your

6     household with you?

7           PROSPECTIVE JUROR:  My two daughters.

8           THE COURT:  Do you work outside the home?

9           PROSPECTIVE JUROR:  Yes.

10          THE COURT:  What do you do?

11          PROSPECTIVE JUROR:  I'm temp employee at a

12    hospital.

13          THE COURT:  Okay.  Have you or anyone close to you

14    at any time been the victim of any kind of crime?

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  Who would that be?

17          PROSPECTIVE JUROR:  My daughter's father.

18          THE COURT:  Your daughter's father.  Now how long

19    ago was this?

20          PROSPECTIVE JUROR:  12 years ago.

21          THE COURT:  Did it happen here in the Bronx?

22          PROSPECTIVE JUROR:  No.

23          THE COURT:  Where was it?

24          PROSPECTIVE JUROR:  Brooklyn.

25          THE COURT:  Do you know if anyone was arrested in

Jury Selection

1          connection with that crime?

2                    PROSPECTIVE JUROR:  Yes.

3                    THE COURT:  Who was?  I mean, that person was

4          arrested?  Did that person go to trial?

5                    PROSPECTIVE JUROR:  Yes.

6                    THE COURT:  And did you ever go to trial to watch

7          proceedings?

8                    PROSPECTIVE JUROR:  No.

9                    THE COURT:  Now, do you feel comfortable about

10         telling me what happened to your daughter's father that he

11         was a victim?

12                   PROSPECTIVE JUROR:  He was murdered.

13                   THE COURT:  And first of all, let me tell you I'm

14         very sorry about this, and these questions are asked and I'm

15         sorry that I have to ask them.

16                   Now first of all, this is a criminal case, and the

17         charges are not that charge, but you're going to have to be

18         sitting and hearing evidence from police officers and other

19         individuals in this case.  Have you ever been on a jury?

20                   PROSPECTIVE JUROR:  No.

21                   THE COURT:  Are you able to put aside what

22         happened and concentrate on the evidence in this case and

23         not let that affect you in any way in your deliberations in

24         your assessment of the case?

25                   PROSPECTIVE JUROR:  Yes.

Jury Selection

1          THE COURT:  And you could be a fair juror to this
2     defendant?
3          PROSPECTIVE JUROR:  Yes.
4          THE COURT:  Okay.  Let me ask you a couple other
5     questions.  Based on what you know, were you satisfied with
6     the way the police and the DA handled that case?
7          PROSPECTIVE JUROR:  I wasn't too much involved so.
8          THE COURT:  Based on what you know?
9          PROSPECTIVE JUROR:  I guess.
10          THE COURT:  And the reason I'm asking the question
11     is, whether you were satisfied or not satisfied, would that
12     affect your ability to be fair to the prosecution?  Would
13     you be able to put aside whatever feelings you might have
14     about the way that case was handled and still follow my
15     instructions about evaluating police testimony and not
16     holding it against this DA or actually favoring the DA if
17     you were happy about it?
18          PROSPECTIVE JUROR:  Yes.
19          THE COURT:  Has anyone close to you ever been
20     charged with or accused of or questioned in connection with
21     any kind of crime?
22          PROSPECTIVE JUROR:  Yes.
23          THE COURT:  Close relative or friend?
24          PROSPECTIVE JUROR:  Close relative.
25          THE COURT:  How long ago was that?

Jury Selection

1             PROSPECTIVE JUROR:  A long time ago.  A long time

2       ago.

3             THE COURT:  Where was it?

4             PROSPECTIVE JUROR:  I think it was in Manhattan.

5             THE COURT:  Do you know what type of crime was

6       involved?

7             PROSPECTIVE JUROR:  No.

8             THE COURT:  Based on what you know, and I don't

9       know what you know, do you believe that your friend was

10      treated unfairly by the police or the prosecutor in that

11      case?

12            PROSPECTIVE JUROR:  I'm not sure.

13            THE COURT:  So even if you're not sure, if even

14      you believe that they were treated improperly, are you able

15      to put that aside and be fair in this case?

16            PROSPECTIVE JUROR:  Yes.

17            THE COURT:  You are.  You promise me that you will

18      not let that affect your ability to be fair to the DA or the

19      defendant in this case?

20            PROSPECTIVE JUROR:  Yes, I promise.

21            THE COURT:  Okay.  Has anyone close to you been

22      involved in any kind of law enforcement activity, police

23      corrections, court officers?

24            PROSPECTIVE JUROR:  Yes.

25            THE COURT:  How many people, because you still

1   look like, the way you gave the answer it looked like it was

2   more than one.  Is it more than one?

3                    PROSPECTIVE JUROR:  Yes.

4                    THE COURT:  So were they police officers?

5                    PROSPECTIVE JUROR:  Yes.

6                    THE COURT:  Corrections maybe?

7                    PROSPECTIVE JUROR:  Yes.

8                    THE COURT:  Ever talk to any of them about what

9   they do?  What happens on their job?

10                    PROSPECTIVE JUROR:  No.

11                    THE COURT:  The reason this question is asked, if

12   you have close friend or relative who work in the police

13   department, I gave you that instruction about how to

14   evaluate police testimony.  And do you promise me that you

15   will follow that instruction and when a police officer

16   testifies and you evaluate their testimony, you'll do it in

17   the objective manner that the law requires?

18            In other words, you can't say I believe them

19   because they're police officers, and you can't say they're

20   lying just because they're a police officer.  You promise me

21   you'll follow that instruction?

22                    PROSPECTIVE JUROR:  Yes, sir.

23                    THE COURT:  Have you ever been on a jury?

24                    PROSPECTIVE JUROR:  No.

25                    THE COURT:  Now, if you are selected to be on this

Jury Selection

1          jury, based on what you know about yourself and anything and

2          everything that I've told you about this case so far, do you

3          promise me that you will be fair to the DA?

4                    PROSPECTIVE JUROR:  Yes.

5                    THE COURT:  You'll be fair to the defense?

6                    PROSPECTIVE JUROR:  Yes.

7                    THE COURT:  And yes?

8                    PROSPECTIVE JUROR:  Yes.

9                    THE COURT:  And you'll follow each and every one

10         of my instructions?

11                   PROSPECTIVE JUROR:  Yes.

12                   THE COURT:  Okay, great.  Thank you.

13                   Miss Fernandez, how are you?

14                   PROSPECTIVE JUROR:  Good.

15                   THE COURT:  Neighorhood?

16                   PROSPECTIVE JUROR:  Sedgwick.

17                   THE COURT:  How long?

18                   PROSPECTIVE JUROR:  Three years.

19                   THE COURT:  And who lives in your household?

20                   PROSPECTIVE JUROR:  With my cousins.

21                   THE COURT:  You working outside the home?

22                   PROSPECTIVE JUROR:  Yes.

23                   THE COURT:  What did you do?

24                   PROSPECTIVE JUROR:  I'm a nurse.

25                   THE COURT:  How long you've been doing that?

Jury Selection

1          PROSPECTIVE JUROR:  For a long time.

2          THE COURT:  That's fine.  Have you or anyone close

3    to you ever been the victim of any kind of crime?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  Charged with, accused of, questioned

6    in connection with any criminal activity?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  Do you have any close friend or

9    relative who work in any kind of law enforcement capacity?

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  Have you ever been on a jury?

12          PROSPECTIVE JUROR:  No, this my first time.

13          THE COURT:  If you are selected to be a juror in

14    this case, do you promise me that you will follow all of my

15    instructions?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Do you promise me you'll be fair to

18    the DA?

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  Promise you'll be fair to the

21    defendant?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  Thank you very much.

24          Mr. Smith, how are you?

25          PROSPECTIVE JUROR:  Good.

1              THE COURT:  Neighorhood?

2              PROSPECTIVE JUROR:  Baychester.

3              THE COURT:  How long?

4              PROSPECTIVE JUROR:  Seven years.

5              THE COURT:  Anyone living in your household with

6      you?

7              PROSPECTIVE JUROR:  Mother and two sisters.

8              THE COURT:  You working?

9              PROSPECTIVE JUROR:  Yes, sir.

10             THE COURT:  What do you do?

11             PROSPECTIVE JUROR:  Security.

12             THE COURT:  Private?

13             PROSPECTIVE JUROR:  No.

14             THE COURT:  You work for a particular?

15             PROSPECTIVE JUROR:  Yeah, security Yankee Stadium.

16             THE COURT:  Oh, that's your job at Yankee Stadium?

17             PROSPECTIVE JUROR:  Yes, sir.

18             THE COURT:  Security.  How long you had that?

19             PROSPECTIVE JUROR:  Four years now.

20             THE COURT:  Now let me ask you, is this a licensed

21     security job that you have?

22             PROSPECTIVE JUROR:  Yes, sir.

23             THE COURT:  So you know, we've been to ball games

24     and sometimes people act in ways that they shouldn't and the

25     police are called.  Do you have contact with the police at

Jury Selection

1          Yankee Stadium?

2                    PROSPECTIVE JUROR:  Yes, sir.

3                    THE COURT:  And you work with them, people are

4          kind of removed sometimes from the stadium?

5                    PROSPECTIVE JUROR:  Yes, sir.

6                    THE COURT:  So you actually interact through your

7          job with the police.  And the reason I'm asking this

8          question, and it's, you know, related to whether you know

9          people or related, but is any relationship you have with any

10         police officers going to make you favor the police or the DA

11         in this case?

12                   PROSPECTIVE JUROR:  No, sir.

13                   THE COURT:  Do you promise me that you will follow

14         my instructions about evaluating police testimony?

15                   PROSPECTIVE JUROR:  Yes, sir.

16                   THE COURT:  Are you or anyone else in your

17         household employed?

18                   PROSPECTIVE JUROR:  Yes, my older sister.

19                   THE COURT:  What does she do?

20                   PROSPECTIVE JUROR:  She does school counseling.

21                   THE COURT:  Now, you or anyone close to you ever

22         been the victim of any kind of crime?

23                   PROSPECTIVE JUROR:  No, sir.

24                   THE COURT:  Charged with, accused of, questioned

25         in connection with any kind of criminal activity, anything

1     like that?

2            PROSPECTIVE JUROR:  No, sir.

3            THE COURT:  Have you any cases that you've dealt

4     with at Yankee Stadium had to come to court in connection

5     with anything that happened through your job there?

6            PROSPECTIVE JUROR:  I didn't make it to court,

7     sir.

8            THE COURT:  Ever have to talk to the DA about

9     anything, the Bronx DA, through your job?  Did you ever talk

10    to the Bronx DA?

11           PROSPECTIVE JUROR:  Yes.

12           THE COURT:  So you've interacted with the DA's

13    office, too.  And I just want to ask again, is that going to

14    affect your ability to be fair in this case?

15           PROSPECTIVE JUROR:  No, sir.

16           THE COURT:  You promise me you're not going to

17    favor the DA just because you've had contact with the DA's

18    office?

19           PROSPECTIVE JUROR:  Yes, sir.

20           THE COURT:  Or not favor the DA?

21           PROSPECTIVE JUROR:  Yes, sir.

22           THE COURT:  Okay.  Have you ever been on a jury?

23           PROSPECTIVE JUROR:  No, sir.

24           THE COURT:  So when all is said and done, do you

25    promise me that based on what you know about yourself, the

1    case, what we're looking for, that you have what it takes to

2    be a fair and impartial juror?

3                    PROSPECTIVE JUROR:  Yes, sir.

4                    THE COURT:  You'll follow all my instructions?

5                    PROSPECTIVE JUROR:  Yes, sir.

6                    THE COURT:  You'll be fair to the defense and the

7    DA?

8                    PROSPECTIVE JUROR:  Yes.

9                    THE COURT:  Thanks a lot.

10                    Mr. Torres, how are you, sir?

11                    PROSPECTIVE JUROR:  Pretty good, thank you.

12                    THE COURT:  Neighorhood?

13                    PROSPECTIVE JUROR:  Morris Heights.

14                    THE COURT:  How long?

15                    PROSPECTIVE JUROR:  My whole life.

16                    THE COURT:  Anyone living in your household with

17    you?

18                    PROSPECTIVE JUROR:  Just my mom.

19                    THE COURT:  You working?

20                    PROSPECTIVE JUROR:  Yes.

21                    THE COURT:  What did you do?

22                    PROSPECTIVE JUROR:  I'm an EMT.

23                    THE COURT:  Oh, okay.  How long you had that job?

24                    PROSPECTIVE JUROR:  A little over a year.

25                    THE COURT:  So as an EMT when you're called, you

Jury Selection

1          also sometimes have police involved at the scene, right?

2                    PROSPECTIVE JUROR:  Yes.

3                    THE COURT:  Interact with police officers?

4                    PROSPECTIVE JUROR:  Yes.

5                    THE COURT:  You cooperate with them, they're

6          trying to help you sometimes.

7                    PROSPECTIVE JUROR:  Yes.

8                    THE COURT:  Is that going to make you in any way

9          believe that you could not be fair in this case?

10                   PROSPECTIVE JUROR:  No.

11                   THE COURT:  You promise me you will not favor the

12         police or the DA's office?

13                   PROSPECTIVE JUROR:  I promise.

14                   THE COURT:  Based on your job?  Okay.

15                   You mom working outside the home?

16                   PROSPECTIVE JUROR:  Yes, she's a teacher.

17                   THE COURT:  And have you or anyone close to you

18         ever been the victim of a crime?

19                   PROSPECTIVE JUROR:  No.

20                   THE COURT:  Charged with, accused of, questioned

21         in connection with any type of criminal activity?

22                   PROSPECTIVE JUROR:  No.

23                   THE COURT:  I know you've been an EMT you said

24         about a year.  Have you ever had to come to court to testify

25         before a grand jury or in a courtroom for anything?

Jury Selection


1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Have you ever been on a jury?

3          PROSPECTIVE JUROR:  No, I've been summoned but

4     I've never.

5          THE COURT:  Summoned but you didn't get to that

6     point, right?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  Now you're at this point.  So the

9     question is, do you have what it takes to get to the next

10    point if you're selected here?  Do you promise me you will

11    be fair to both sides?

12         PROSPECTIVE JUROR:  I promise.

13         THE COURT:  And you'll follow my instructions?

14         PROSPECTIVE JUROR:  Absolutely.

15         THE COURT:  Terrific.  Thank you.

16         Mr. Medina?

17         PROSPECTIVE JUROR:  How ya doing?

18         THE COURT:  Neighorhood?

19         PROSPECTIVE JUROR:  Boston Road.

20         THE COURT:  How long?

21         PROSPECTIVE JUROR:  About three years now.

22         THE COURT:  And does anyone reside in your

23    household with you?

24         PROSPECTIVE JUROR:  Yes.

25         THE COURT:  Who would that be?

Jury Selection

1              PROSPECTIVE JUROR:  My parents and my sister.

2              THE COURT:  You working?

3              PROSPECTIVE JUROR:  Not right now.

4              THE COURT:  Have you worked?

5              PROSPECTIVE JUROR:  Yeah.

6              THE COURT:  What did you do?

7              PROSPECTIVE JUROR:  I was a sales associates in

8        Modells.

9              THE COURT:  And either of your parents or both

10       employed outside the home?

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  What do they do?

13             PROSPECTIVE JUROR:  My mom is a home attendant and

14       my dad is, works in a body shop.

15             THE COURT:  Have you or anyone close to you ever

16       been the victim of any kind of crime whatsoever?

17             PROSPECTIVE JUROR:  Nope.

18             THE COURT:  Anyone in your life ever been charged

19       with, questioned in connection with any kind of criminal

20       activity, accused of any crime?

21             PROSPECTIVE JUROR:  Nope.

22             THE COURT:  Do you have any close friends or

23       relatives who work in any kind of law enforcement capacity?

24             PROSPECTIVE JUROR:  Yes.

25             THE COURT:  Who would that be?

Jury Selection

1        PROSPECTIVE JUROR:  My uncle and my friends.

2        THE COURT:  What do they do?

3        PROSPECTIVE JUROR:  My friends, they're all police

4    officers.

5        THE COURT:  NYPD?

6        PROSPECTIVE JUROR:  Yeah.

7        THE COURT:  And your uncle?

8        PROSPECTIVE JUROR:  He's back in my home country.

9    He was with the police.

10        THE COURT:  Now, you are going to be seeing, again

11    as I told you, you see police witnesses testify.  You have

12    to judge their credibility the way I instructed you,

13    objectively without giving any more or less credibility

14    simply because of what they do for a living.  Do you

15    understand, promise me you'll follow that instruction?

16        PROSPECTIVE JUROR:  Yes.

17        THE COURT:  Ever been on a jury?

18        PROSPECTIVE JUROR:  First time.

19        THE COURT:  If you are selected on this to be a

20    member of this jury, Mr. Medina, do you promise me you'll be

21    fair to both sides?

22        PROSPECTIVE JUROR:  I promise.

23        THE COURT:  Do you promise me you'll follow all my

24    instructions?

25        PROSPECTIVE JUROR:  Yes.

Jury Selection

1          THE COURT:  Okay, thank you.

2          Mr. Rivera, how are you?

3          PROSPECTIVE JUROR:  I'm good.  You?

4          THE COURT:  Good, thank you.

5          Neighorhood?

6          PROSPECTIVE JUROR:  Simpson.

7          THE COURT:  How long?

8          PROSPECTIVE JUROR:  Four years.

9          THE COURT:  Anyone living in your household with

10    you?

11         PROSPECTIVE JUROR:  I live with my parents, two

12    brothers and sister.

13         THE COURT:  A lot of people.

14         PROSPECTIVE JUROR:  Uh, huh.

15         THE COURT:  You working outside the home?

16         PROSPECTIVE JUROR:  Yeah.

17         THE COURT:  What do you do?

18         PROSPECTIVE JUROR:  I work at Starbucks.  I'm a

19    barista.

20         THE COURT:  Okay.  Anyone else employed in your

21    household?

22         PROSPECTIVE JUROR:  My brother and my father.

23         THE COURT:  What do they do?

24         PROSPECTIVE JUROR:  Well, my dad does maintenance

25    and my brother, he works in a retirement home, I don't know.

Jury Selection

1           THE COURT:  Okay.  Anyone close to you or yourself
2    ever been the victim of a crime?
3           PROSPECTIVE JUROR:  No.
4           THE COURT:  Charged with, accused of, questioned
5    in connection with any kind of criminal activity?
6           PROSPECTIVE JUROR:  No.
7           THE COURT:  Do you have any close friends or
8    relatives who work in any kind of law enforcement capacity?
9           PROSPECTIVE JUROR:  No.
10          THE COURT:  Have you ever been on a jury?
11          PROSPECTIVE JUROR:  No, this is my first time.
12          THE COURT:  Mr. Rivera, if you are selected to be
13   a juror in this case, do you promise me that you will be
14   fair and impartial?
15          PROSPECTIVE JUROR:  Yes.
16          THE COURT:  Promise me you'll be fair to the DA?
17          PROSPECTIVE JUROR:  Yes.
18          THE COURT:  Fair to the defendant?
19          PROSPECTIVE JUROR:  Yes.
20          THE COURT:  And that you'll follow all my
21   instructions?
22          PROSPECTIVE JUROR:  Yes.
23          THE COURT:  Okay, thank you.
24          Mr. Abraham?
25          PROSPECTIVE JUROR:  Good afternoon.

Jury Selection

1           THE COURT:  Good afternoon to you, sir.

2           Tell me, what neighorhood?

3           PROSPECTIVE JUROR:  Baychester area.

4           THE COURT:  How long?

5           PROSPECTIVE JUROR:  Twenty some odd years.

6           THE COURT:  Anyone living in your household with

7     you?

8           PROSPECTIVE JUROR:  No.

9           THE COURT:  You're working?

10          PROSPECTIVE JUROR:  No, I am not.

11          THE COURT:  You're retired?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  What did you used to do?

14          PROSPECTIVE JUROR:  Repairman, fix copy machines.

15          THE COURT:  Copy machines, okay.  And have you or

16    anyone close to you ever been the victim of any kind of

17    crime?

18          PROSPECTIVE JUROR:  No.

19          THE COURT:  Charged with, accused of, questioned

20    in connection with any kind of criminal activity?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  Do you have any close friend or

23    relative who work in law enforcement?

24          PROSPECTIVE JUROR:  My brother used to be a

25    corrections officer, something like 10 years ago.  I believe

Jury Selection

1    he stopped that, but he used to be a correction officer.

2              THE COURT:  But will you follow, you'll promise me

3    you'll follow my instructions about judging police testimony

4    in an objective manner?

5              PROSPECTIVE JUROR:  Yes, sir.

6              THE COURT:  You've been on a jury?

7              PROSPECTIVE JUROR:  This is as far as I got.

8              THE COURT:  This is as far as you got.  Let's try

9    and get you to the next level.

10             So Mr. Abraham, you know everything there is to

11   know about yourself, and you know, basically I've outlined

12   to the jurors the things that make you don't need special

13   training or anything.  You need to keep an open mind, be

14   able to listen, you're going to have to make a ruling, judge

15   credibility, you're going to have to render a verdict.  You

16   promise me you'll have what it takes to be a juror?

17             PROSPECTIVE JUROR:  Yes, sir.

18             THE COURT:  You'll promise you'll be fair to the

19   DA?

20             PROSPECTIVE JUROR:  Yes, sir.

21             THE COURT:  Fair to defense?

22             PROSPECTIVE JUROR:  Yes, sir.

23             THE COURT:  And you'll follow all my instructions?

24             PROSPECTIVE JUROR:  Yes, sir.

25             THE COURT:  And if our copy machines breaks down?

1              PROSPECTIVE JUROR:  I'll take care of it.

2              THE COURT:  Thank you.  Good.

3              Mr. Solis, how are you?

4              PROSPECTIVE JUROR:  Good.

5              THE COURT:  Neighorhood?

6              PROSPECTIVE JUROR:  Zerega.

7              THE COURT:  How long?

8              PROSPECTIVE JUROR:  Twenty years.

9              THE COURT:  Anyone living in your household with

10      you?

11              PROSPECTIVE JUROR:  Yeah, my mother.

12              THE COURT:  You working?

13              PROSPECTIVE JUROR:  Yes.  Physical therapist

14      assistant.

15              THE COURT:  Okay.  And anyone else in your

16      household working?

17              PROSPECTIVE JUROR:  Yeah, my mother.  She works

18      for a hotel.

19              THE COURT:  Now have you or anyone close to you,

20      anyone in your life ever been the victim of any kind of

21      crime?

22              PROSPECTIVE JUROR:  No.

23              THE COURT:  Charged with, accused of, questioned

24      in connection with any kind of criminal activity?

25              PROSPECTIVE JUROR:  Yes.

1           THE COURT:  Who would that be?

2           PROSPECTIVE JUROR:  One of my close friends.

3           THE COURT:  You feel comfortable discussing this

4    with the other jurors present?

5           PROSPECTIVE JUROR:  Yeah, it's fine.

6           THE COURT:  Okay.  How long ago was it?

7           PROSPECTIVE JUROR:  I would have to say probably

8    last year.

9           THE COURT:  Was this an arrest?

10          PROSPECTIVE JUROR:  Yeah.

11          THE COURT:  Where did it happen, in the Bronx?

12          PROSPECTIVE JUROR:  Yeah, in the Bronx.

13          THE COURT:  And did you ever go to court to watch

14   stuff?

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  Are you aware what the charges were?

17          PROSPECTIVE JUROR:  Robbery.

18          THE COURT:  And do you know if the case is still

19   pending?

20          PROSPECTIVE JUROR:  Yes, it is.

21          THE COURT:  All right.  So number one, if it's a

22   robbery and it happened in the Bronx, the Bronx DA's office

23   is the prosecutor.  That office that Mr. Mendys works for

24   prosecutes all criminal activity in Bronx County and he's

25   the prosecutor in this case.  Do you believe and will you

1     promise me that you will not let this, what happened in that

2     case, affect your ability to be fair in this case?

3               PROSPECTIVE JUROR:  I promise.

4               THE COURT:  Do you promise me you will still be

5     fair to the DA?  Do you feel this person was treated

6     unfairly in any way by the police based on what you know?

7               PROSPECTIVE JUROR:  No, not that I know of.

8               THE COURT:  You don't know.  Do you know very much

9     about it?

10              PROSPECTIVE JUROR:  Not too much.

11              THE COURT:  Well, are you going -- you're going to

12    have any bias against police witnesses that would cause you

13    to be unfair based on this?

14              PROSPECTIVE JUROR:  No.

15              THE COURT:  Okay.  Do you have any close friends

16    or relatives who work in law enforcement?

17              PROSPECTIVE JUROR:  No.

18              THE COURT:  Ever been on a jury?

19              PROSPECTIVE JUROR:  Nope.

20              THE COURT:  So we've covered, you know, things

21    that have happened in your life, but you know yourself

22    better than anyone else.  First time here.  You know what I

23    want, what we're looking for, what the attorneys are looking

24    for.  Do you promise me that if you are selected you will be

25    that fair juror?

Jury Selection

1             PROSPECTIVE JUROR:  I promise.

2             THE COURT:  That you'll be fair to both sides?

3             PROSPECTIVE JUROR:  Yes.

4             THE COURT:  And you'll follow each and every one

5       of my instructions?

6             PROSPECTIVE JUROR:  Yes.

7             THE COURT:  Great, thank you.

8             Miss Camillo, neighborhood?

9             PROSPECTIVE JUROR:  Bedford Park.

10            THE COURT:  How long?

11            PROSPECTIVE JUROR:  Six years.

12            THE COURT:  Before that, did you live in a

13      different place in the Bronx or just got here?  Just yes a

14      different place in the Bronx?

15            PROSPECTIVE JUROR:  Yeah.

16            THE COURT:  Good.  Who lives currently in your

17      household?

18            PROSPECTIVE JUROR:  My mother and my sister.

19            THE COURT:  You working?

20            PROSPECTIVE JUROR:  Yes.

21            THE COURT:  What do you do?

22            PROSPECTIVE JUROR:  I am a sales assistant at

23      Michael Kors.

24            THE COURT:  Anyone else in your household working?

25            PROSPECTIVE JUROR:  My sister.  She works at a

Jury Selection

1          doctor's office.

2                    THE COURT:  Have you or anyone close to you ever

3          been the victim of any kind of crime?

4                    PROSPECTIVE JUROR:  Yes.

5                    THE COURT:  Who would that be?

6                    PROSPECTIVE JUROR:  My sister.

7                    THE COURT:  How long ago was it?

8                    PROSPECTIVE JUROR:  Less than a year.

9                    THE COURT:  Did it happen here in the Bronx?

10                   PROSPECTIVE JUROR:  Yes.

11                   THE COURT:  Do you feel comfortable speaking about

12         what happened to her?

13                   PROSPECTIVE JUROR:  Yes.  She was robbed at

14         knifepoint.

15                   THE COURT:  Robbed at knifepoint.  What was taken,

16         if you know?

17                   PROSPECTIVE JUROR:  Nothing.

18                   THE COURT:  Nothing.  Oh nothing?  Was anyone

19         apprehended?  Anyone arrested?

20                   PROSPECTIVE JUROR:  Yes.

21                   THE COURT:  And your sister reported it to the

22         police?

23                   PROSPECTIVE JUROR:  Yes.

24                   THE COURT:  And did she have to come to speak to

25         the DA's office to your knowledge about the case?

1           PROSPECTIVE JUROR:  Yes.

2           THE COURT:  Is the case still pending?

3           PROSPECTIVE JUROR:  No.

4           THE COURT:  So first of all, the charges in this

5   case are robbery.  Robbery is forcibly taking property from

6   another person.  That's the general definition of a robbery.

7   You have a close relative who's a victim of the same kind of

8   crime.  Are you able to put aside what you know happened to

9   your sister and be fair to the defense in this case?

10          PROSPECTIVE JUROR:  Of course.

11          THE COURT:  And just view the facts of this case

12  as they are here without referring to anything in your mind

13  about what happened to your sister?

14          PROSPECTIVE JUROR:  Yup.

15          THE COURT:  Were you satisfied based on what you

16  know with the way the DA's office and the police department

17  handled the case?

18          PROSPECTIVE JUROR:  Yeah.

19          THE COURT:  Do you have any bias in favor of the

20  police or the DA's office that would make you believe you

21  could not be fair?

22          PROSPECTIVE JUROR:  Would I be biased?

23          THE COURT:  Will you be, yes, you could say it

24  that way.

25          PROSPECTIVE JUROR:  No, I won't be biased.

Jury Selection

1            THE COURT:  In favor of the DA or the police?

2            PROSPECTIVE JUROR:  No.

3            THE COURT:  Okay.  And so that case you can keep

4    aside and when you're, if you're on the jury and you're

5    deliberating, it's just about this case?

6            PROSPECTIVE JUROR:  Of course.

7            THE COURT:  Okay.  Anyone close to you ever been

8    charged with, accused of, questioned, anything like that?

9            PROSPECTIVE JUROR:  No.

10           THE COURT:  You have any close friend or relative

11   who works in law enforcement?

12           PROSPECTIVE JUROR:  No.

13           THE COURT:  Have you ever been on a jury?

14           PROSPECTIVE JUROR:  No.

15           THE COURT:  If you are selected in this case, Miss

16   Camillo, do you promise me that you will be a fair juror?

17           PROSPECTIVE JUROR:  I promise.

18           THE COURT:  That you'll be fair to both the DA and

19   the defendant?

20           PROSPECTIVE JUROR:  Yes.

21           THE COURT:  And that you'll follow each and every

22   one of my instructions?

23           PROSPECTIVE JUROR:  Yes, sir.

24           THE COURT:  Thank you.

25           Miss Begley, tell me neighorhood?

Jury Selection

1        PROSPECTIVE JUROR:  Woodlawn.

2        THE COURT:  How long?

3        PROSPECTIVE JUROR:  17 years.

4        THE COURT:  Anyone living in the neighorhood with

5   you?

6        PROSPECTIVE JUROR:  What?

7        THE COURT:  In your household, I'm sorry.

8   Neighorhood, yes, there's a lot of people in Woodlawn.

9   Anyone in your household?

10       PROSPECTIVE JUROR:  My husband and two children.

11       THE COURT:  Are you working outside the home?

12       PROSPECTIVE JUROR:  Not at the moment.

13       THE COURT:  Your husband working?

14       PROSPECTIVE JUROR:  Yes.

15       THE COURT:  What does he do?

16       PROSPECTIVE JUROR:  He's a mechanical engineer.

17       THE COURT:  Okay.  And you said "not at the

18   moment".  Did you have like a job?

19       PROSPECTIVE JUROR:  Yeah, I used, I was working as

20   a private duty nurse and my patient went into a nursing home

21   so that ended the case.

22       THE COURT:  Have you or anyone close to you ever

23   been the victim of any type of crime?

24       PROSPECTIVE JUROR:  Yes.  Well, one of the people

25   is my brother.  Somebody took a baseball bat to his car.

Jury Selection

```
  1              THE COURT:  He, was he in the car at the time?
  2              PROSPECTIVE JUROR:  No.
  3              THE COURT:  So was this in the Bronx?
  4              PROSPECTIVE JUROR:  Yes.
  5              THE COURT:  And how long ago was this?
  6              PROSPECTIVE JUROR:  It was about 20 years ago.
  7              THE COURT:  Do you know whether the police were
  8       called?
  9              PROSPECTIVE JUROR:  Yes.
 10              THE COURT:  Were they able to make an arrest?
 11              PROSPECTIVE JUROR:  Yes.
 12              THE COURT:  Someone was arrested?
 13              PROSPECTIVE JUROR:  Yes.
 14              THE COURT:  So were you, based on what you know
 15       was your brother satisfied with the way the police handled
 16       the case?
 17              PROSPECTIVE JUROR:  He was.
 18              THE COURT:  The DA's office?
 19              PROSPECTIVE JUROR:  He was, yeah.
 20              THE COURT:  Is that going to make, give you any
 21       kind of bias in favor of law enforcement in this case?
 22              PROSPECTIVE JUROR:  I don't think so.
 23              THE COURT:  So that's a crime that involved damage
 24       to property.  Although it's different than the crime in this
 25       case, nonetheless, having a relative who was a victim of a
```

1     crime, is that going to make you in any way be unfair to the

2     defendant in this case?

3               PROSPECTIVE JUROR:  I don't believe so.

4               THE COURT:  Well, you think it might, though?

5               PROSPECTIVE JUROR:  I don't think so.

6               THE COURT:  Okay.  Is there a reason you think

7     it --

8               PROSPECTIVE JUROR:  No.

9               THE COURT:  So you promise me that it will not

10    affect your ability to be fair to him?

11              PROSPECTIVE JUROR:  I promise you.

12              THE COURT:  Okay.  Was there someone else you

13    talked about?

14              PROSPECTIVE JUROR:  Well, I had a cousin who was

15    murdered.

16              THE COURT:  I'm so sorry about that.  I just have

17    a few questions about that if you feel comfortable talking

18    about that with the other jurors.  Just how long ago was

19    that?

20              PROSPECTIVE JUROR:  It was a long time ago.

21              THE COURT:  Was it in the Bronx?

22              PROSPECTIVE JUROR:  It was in the Bronx.

23              THE COURT:  And someone arrested?

24              PROSPECTIVE JUROR:  No.

25              THE COURT:  Based on what you know, is there any

Jury Selection

1     dissatisfaction with the police or the investigation?

2            PROSPECTIVE JUROR:  Yes, there is.  They just

3     never, I don't know, they just, I guess, never found the

4     murderers.

5            THE COURT:  Does that make you feel that you may

6     have some bias against law enforcement?

7            PROSPECTIVE JUROR:  No.

8            THE COURT:  That would affect your ability to be

9     fair here?

10           PROSPECTIVE JUROR:  No.

11           THE COURT:  And would that fact also because of,

12    again, very serious crime and a family member, would that

13    make you feel you would have any kind of bias that might

14    affect your ability to be fair to the defendant?

15           PROSPECTIVE JUROR:  I don't think so.

16           THE COURT:  Okay.  Do you have any close friends

17    or relatives who work in law enforcement?

18           PROSPECTIVE JUROR:  Yes.

19           THE COURT:  Who would that be?

20           PROSPECTIVE JUROR:  Well, my brother used to work

21    in law enforcement, and I have two nephews who are police

22    officers as well.

23           THE COURT:  NYPD?

24           PROSPECTIVE JUROR:  Yes.

25           THE COURT:  And you understand my instructions

1    about judging police testimony in an objective way, are you

2    able to follow that instruction?

3              PROSPECTIVE JUROR:  I believe so.

4              THE COURT:  You ever been on a jury?

5              PROSPECTIVE JUROR:  No.

6              THE COURT:  If you are selected as a juror in this

7    case, based on everything that you know about yourself, what

8    happened in your life, do you promise me you'll be fair to

9    the DA?

10             PROSPECTIVE JUROR:  Yes.

11             THE COURT:  You promise me you'll be fair to the

12   defense?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  You promise me you'll follow all my

15   instructions?

16             PROSPECTIVE JUROR:  Yes.

17             THE COURT:  All right, thank you.

18             Miss Hines, how are you?

19             PROSPECTIVE JUROR:  I'm fine.  Yourself?

20             THE COURT:  Good, thank you.

21             Neighorhood?

22             PROSPECTIVE JUROR:  Morris Heights.

23             THE COURT:  How long?

24             PROSPECTIVE JUROR:  24 years.

25             THE COURT:  Anyone living in your household with

Jury Selection

1    you?

2               PROSPECTIVE JUROR:  Yes.

3               THE COURT:  Who would that be?

4               PROSPECTIVE JUROR:  My daughter and her daughter.

5               THE COURT:  You working?

6               PROSPECTIVE JUROR:  Not at the moment.

7               THE COURT:  Had you worked recently?

8               PROSPECTIVE JUROR:  Yes, receptionist.

9               THE COURT:  What kind of company?

10              PROSPECTIVE JUROR:  It was called Claremont Center

11   working with youths.

12              THE COURT:  Your daughter working outside the

13   home?

14              PROSPECTIVE JUROR:  Yeah, she's a teacher.

15              THE COURT:  You or anyone close to you ever been

16   the victim of any kind of crime?

17              PROSPECTIVE JUROR:  No.

18              THE COURT:  Charged with, accused of, questioned

19   in connection with any kind of crime?

20              PROSPECTIVE JUROR:  No.

21              THE COURT:  Any close friend or relative who work

22   in any kind law enforcement?

23              PROSPECTIVE JUROR:  No.

24              THE COURT:  You ever been on a jury?

25              PROSPECTIVE JUROR:  Yes.

Jury Selection

1           THE COURT:  Tell me how many times?

2           PROSPECTIVE JUROR:  Twice.

3           THE COURT:  Civil, criminal, one of each?

4           PROSPECTIVE JUROR:  Supreme Court.

5           THE COURT:  Well, was it a criminal case or a

6      civil case, because this is Supreme court, criminal Supreme

7      Court.  Civil hears different kind of cases like

8      malpractice.

9           PROSPECTIVE JUROR:  It was criminal.

10          THE COURT:  Okay.  Now you were a juror on each of

11     those cases.  Did you get to deliberate on both of those

12     cases with the other jurors?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  And without telling me the result, did

15     both juries reach a verdict in those cases?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  So I have to let you know, but I don't

18     know what, if anything, you remember about the instructions

19     you received from the judges in those cases, but you've got

20     to forget about everything that those judges told you and

21     you have to follow my instructions.

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  If you remember anything at all,

24     follow my instructions.  You promise me you'll do that?

25          PROSPECTIVE JUROR:  Yes.

1          THE COURT:  Okay.  So if you are selected for the

2     third time to be a juror, do you promise me that you will be

3     a fair juror?

4          PROSPECTIVE JUROR:  I promise.

5          THE COURT:  Because you know what it is?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  You know the whole process in terms of

8     showing up, deliberating, discussions, all sorts of things

9     that happen.

10         PROSPECTIVE JUROR:  Yes.

11         THE COURT:  Do you promise me that you will be a

12    fair juror?

13         PROSPECTIVE JUROR:  Yes, I do.

14         THE COURT:  You'll be fair to both sides?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  You will follow my instructions?

17         PROSPECTIVE JUROR:  Yes, I will.

18         THE COURT:  Great.  Thank you.

19         Miss Caceres number two, neighorhood?

20         PROSPECTIVE JUROR:  Fordham.

21         THE COURT:  How long?

22         PROSPECTIVE JUROR:  Five years.

23         THE COURT:  Anyone living in your household with

24    you?

25         PROSPECTIVE JUROR:  My four-year-old son.

Jury Selection

1          THE COURT:  You working?

2          PROSPECTIVE JUROR:  Right now I'm laid off for the

3     summertime.

4          THE COURT:  Where had you --

5          PROSPECTIVE JUROR:  Au Bon Pain in Bronx Community

6     College.

7          THE COURT:  And they laid you off for when

8     they're --

9          PROSPECTIVE JUROR:  Only for the summertime.  It's

10    a college.

11         THE COURT:  All right.  Have you or anyone close

12    to you ever been the victim of any kind of crime?

13         PROSPECTIVE JUROR:  Yes, myself.

14         THE COURT:  Feel comfortable discussing it?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  First of all how long ago?

17         PROSPECTIVE JUROR:  I was four months pregnant

18    with my son so it was four years ago.

19         THE COURT:  Was it in the Bronx?

20         PROSPECTIVE JUROR:  Yes.

21         THE COURT:  Did you report it to the police?

22         PROSPECTIVE JUROR:  Yes.

23         THE COURT:  Was anyone arrested?

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  Can you tell me generally what type

Jury Selection

1          of --

2                      PROSPECTIVE JUROR:  I was a victim of a home

3          invasion.

4                      THE COURT:  Did the police did take your

5          complaint?  Yes?

6                      PROSPECTIVE JUROR:  Yes, I went down to One Police

7          Plaza and did picture sketches, went through the whole nine.

8                      THE COURT:  They were unable to apprehend, they

9          did not apprehend anyone?

10                     PROSPECTIVE JUROR:  No.

11                     THE COURT:  Were you satisfied with the way the

12         police handled what they did?

13                     PROSPECTIVE JUROR:  Yes, I was because I had

14         constant contact and showed that they were trying.

15                     THE COURT:  And is that going to give you any,

16         will that make you tend to favor law enforcement if you're a

17         juror in this case?

18                     PROSPECTIVE JUROR:  No.

19                     THE COURT:  Now that particular crime that you

20         were involved in, and I'm sure you remember everything about

21         it, are you going to be able to sit as a juror in a criminal

22         case and put that aside?

23                     PROSPECTIVE JUROR:  Yes, I will.

24                     THE COURT:  You promise me you will do that?

25                     PROSPECTIVE JUROR:  I promise you.

Jury Selection

1           THE COURT:  And you will not hold that against
2      either side, not hold it against the defendant?
3           PROSPECTIVE JUROR:  No, I won't.
4           THE COURT:  Any close friends or relatives who
5      work in law enforcement?
6           PROSPECTIVE JUROR:  I have a half brother who's a
7      NYPD police officer.
8           THE COURT:  Well, you have to follow all my
9      instructions, so you promise me you'll follow my instruction
10     about judging police testimony?
11          PROSPECTIVE JUROR:  Yes.
12          THE COURT:  Okay.  Have you ever been on a jury?
13          PROSPECTIVE JUROR:  No.
14          THE COURT:  You promise me if you're selected for
15     this one that you will be fair to both sides?
16          PROSPECTIVE JUROR:  Yes.
17          THE COURT:  And follow all my instructions?
18          PROSPECTIVE JUROR:  Yes.
19          THE COURT:  Great.  Thank you.
20          Miss Konadu, how are you?
21          PROSPECTIVE JUROR:  I'm fine.
22          THE COURT:  Tell me neighorhood?
23          PROSPECTIVE JUROR:  Washington.
24          THE COURT:  How many years?
25          PROSPECTIVE JUROR:  Nine years.

Jury Selection


1              THE COURT:  Anyone living in your household with

2         you?

3              PROSPECTIVE JUROR:  Husband and two kids.

4              THE COURT:  Are you working outside the home?

5              PROSPECTIVE JUROR:  Yes.

6              THE COURT:  What do you do?

7              PROSPECTIVE JUROR:  Patient care associate at a

8         hospital.

9              THE COURT:  You or anyone close to you ever been

10        the victim of any kind of crime?

11             PROSPECTIVE JUROR:  No.

12             THE COURT:  Charged with, accused of, questioned

13        in connection with any kind of criminal activity?

14             PROSPECTIVE JUROR:  No.

15             THE COURT:  Any close friends or relatives who

16        work in any kind of law enforcement capacity?

17             PROSPECTIVE JUROR:  No.

18             THE COURT:  You ever been on a jury?

19             PROSPECTIVE JUROR:  No.

20             THE COURT:  If you're selected for this one, do

21        you promise me that you will be fair to both sides?

22             PROSPECTIVE JUROR:  Yes.

23             THE COURT:  You'll be listening objectively to all

24        evidence?

25             PROSPECTIVE JUROR:  Yes.

Jury Selection

1        THE COURT:  And you'll follow all my instructions?

2        PROSPECTIVE JUROR:  Yes.

3        THE COURT:  Thank you.

4        Miss Miranda?

5        PROSPECTIVE JUROR:  Hello.

6        THE COURT:  So you think you can answer the

7   questions without my asking them?

8        PROSPECTIVE JUROR:  Yes.

9        THE COURT:  You can.  I think everyone probably

10  can right now.  Give it a shot.  I won't say anything.  Go

11  ahead.

12       PROSPECTIVE JUROR:  I live in the hub area.  I

13  have lived with my three children.  I'm working as a

14  pharmacy technician.  Prior to that I was a head teller at a

15  bank.  I have been a victim of a crime myself.

16       THE COURT:  Now I have to interrupt.

17       PROSPECTIVE JUROR:  Okay.

18       THE COURT:  You were doing great.

19       PROSPECTIVE JUROR:  Okay.

20       THE COURT:  So you've been the victim of a crime

21  yourself.  How long ago was it?

22       PROSPECTIVE JUROR:  I was 15.

23       THE COURT:  Like, last year then?

24       PROSPECTIVE JUROR:  I was at a Ricky Martin

25  concert.

Jury Selection

1        THE COURT:  A Ricky Martin concert?

2        PROSPECTIVE JUROR:  Yes.

3        THE COURT:  You were the victim of a crime?

4        PROSPECTIVE JUROR:  Yes, I got --

5        THE COURT:  Was Ricky involved?

6        PROSPECTIVE JUROR:  No.  I wish.

7        THE COURT:  And what happened?

8        PROSPECTIVE JUROR:  I was robbed at knifepoint.

9        THE COURT:  Where was the concert?

10       PROSPECTIVE JUROR:  In Puerto Rico.

11       THE COURT:  Oh my God.

12       PROSPECTIVE JUROR:  Yes.

13       THE COURT:  Talk about la vida loca.  Somebody

14  came up with a knife at the concert and what did he take?

15       PROSPECTIVE JUROR:  All my jewelry and my purse.

16       THE COURT:  Was it reported to local authorities?

17       PROSPECTIVE JUROR:  No, the consulate was stupid.

18  I'm sorry.  I was 15.

19       THE COURT:  I know, I know that, you know, it's,

20  what we're discussing and describing is very serious of

21  course and the charges in this case.

22       PROSPECTIVE JUROR:  I got scared, yes.

23       THE COURT:  And the charges in this case do

24  involve a robbery.

25       PROSPECTIVE JUROR:  Uh, huh.

1          THE COURT:  Having been yourself the victim of a

2     robbery, are you able to sit and be objective on a case

3     where a defendant is charged with a crime of robbery?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  You can put aside what happened at

6     that case?

7          PROSPECTIVE JUROR:  Yes.

8          THE COURT:  And just focus on this evidence?

9          PROSPECTIVE JUROR:  Yes.

10          THE COURT:  Okay.

11          PROSPECTIVE JUROR:  I also had to testify in the

12     grand jury.

13          THE COURT:  Where?

14          PROSPECTIVE JUROR:  One Plaza.  I was, as I was

15     working as head teller I got robbed like five times.

16          THE COURT:  This was in the Bronx or?

17          PROSPECTIVE JUROR:  I was working in the bank in

18     Manhattan.

19          THE COURT:  So you went to 100 Centre Street?

20          PROSPECTIVE JUROR:  One plaza downtown.

21          THE COURT:  Oh, it's a federal grand jury?

22          PROSPECTIVE JUROR:  Yes, One Police Plaza.

23          THE COURT:  Wait, wait.  Police plaza?  If you

24     were in a grand jury it was in a courthouse.

25          PROSPECTIVE JUROR:  It was in a courthouse, yes.

Jury Selection

1           THE COURT:  That's okay.  It's all in the same
2      area.
3           PROSPECTIVE JUROR:  Yes.
4           THE COURT:  But you testified in the grand jury.
5      You were a teller, you were robbed as a teller?
6           PROSPECTIVE JUROR:  Yes.
7           THE COURT:  Was it was the, did you see a weapon
8      or was it --
9           PROSPECTIVE JUROR:  At gunpoint, yes.
10          THE COURT:  There was actually a gun displayed?
11          PROSPECTIVE JUROR:  Yes.
12          THE COURT:  And so you had contact with a
13     prosecutor in that case?
14          PROSPECTIVE JUROR:  Yes.  First I was called to ID
15     the person, you know, a line-up.  And then I had to go to
16     the grand jury and testify.
17          THE COURT:  So you in terms of what you went
18     through as a witness/victim witness in that case, you
19     testified so?
20          PROSPECTIVE JUROR:  Yes.
21          THE COURT:  In the grand jury there was no one but
22     the DA questioning, no defense attorney.
23          PROSPECTIVE JUROR:  That's it.
24          THE COURT:  So trial is different.  The defense
25     attorneys gets --

Jury Selection

1          PROSPECTIVE JUROR:  I did not go to trial.

2          THE COURT:  It did go to trial?

3          PROSPECTIVE JUROR:  Yes, it did.

4          THE COURT:  Did you testify at the trial?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  Were you -- first of all, again, this

7    is a robbery case.

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  An it's more recent and it's also in

10   New York.  Are you able to put that aside and be fair in

11   this case?

12         PROSPECTIVE JUROR:  Yes, sir.

13         THE COURT:  And just listen to evaluate testimony

14   in this case?

15         PROSPECTIVE JUROR:  Yes, sir.

16         THE COURT:  Do you have any bias in favor of law

17   enforcement based on all that they went through in that case

18   with you and the line-up and the grand jury?

19         PROSPECTIVE JUROR:  No.

20         THE COURT:  You promise me that you will be

21   unbiased and not favor them in this case either?

22         PROSPECTIVE JUROR:  Yes, sir.

23         THE COURT:  Okay.  Anyone close to you ever been

24   charged with, accused of?

25         PROSPECTIVE JUROR:  A crime?

Jury Selection

1           THE COURT:  Yes.

2           PROSPECTIVE JUROR:  No.

3           THE COURT:  Close friend or relative in law

4     enforcement?

5           PROSPECTIVE JUROR:  Yes.

6           THE COURT:  Who would that be?

7           PROSPECTIVE JUROR:  My brother-in-law, my uncle.

8     My son is gonna join NYPD.  Another uncle.

9           THE COURT:  You're going to be able to follow my

10    instruction?

11          PROSPECTIVE JUROR:  Yes, sir.

12          THE COURT:  Promise me that?

13          PROSPECTIVE JUROR:  Yes, sir.

14          THE COURT:  Been on a jury?

15          PROSPECTIVE JUROR:  No, up to here, that's it.

16          THE COURT:  If you are selected for this jury, do

17    you promise me that you will be fair to both sides?

18          PROSPECTIVE JUROR:  Yes, sir.

19          THE COURT:  And you'll follow all my instructions?

20          PROSPECTIVE JUROR:  Yes, sir.

21          THE COURT:  All right, thank you, ma'am.

22          Miss Rodriguez?

23          PROSPECTIVE JUROR:  Hi.

24          THE COURT:  You think you could start off the same

25    way?

Jury Selection

1          PROSPECTIVE JUROR:  Not really.  She has a good

2    memory.

3          THE COURT:  I don't mean the same answers, no.

4    Tell me what neighorhood?

5          PROSPECTIVE JUROR:  Hunts Point area.

6          THE COURT:  How long?

7          PROSPECTIVE JUROR:  A little over 15 years.

8          THE COURT:  Anyone living in your household with

9    you?

10          PROSPECTIVE JUROR:  Just myself and my two

11   children.

12          THE COURT:  You working?

13          PROSPECTIVE JUROR:  Yes.  I'm a medical assistant.

14          THE COURT:  Have you or anyone close to you ever

15   been the victim of any kind of crime?

16          PROSPECTIVE JUROR:  No.

17          THE COURT:  Charged with, accused of, questioned

18   in connection with any kind of criminal activity?

19          PROSPECTIVE JUROR:  No.

20          THE COURT:  Do you have close relatives or friends

21   who work in law enforcement?

22          PROSPECTIVE JUROR:  I just have a friend who just

23   started the academy.  I don't know if that counts.

24          THE COURT:  But the reason the question is asked,

25   do you understand when you see police witnesses you have to

1      follow my instructions about judging their testimony in an

2      objective manner?

3              PROSPECTIVE JUROR:  Yes.

4              THE COURT:  You promise you're going to do that?

5              PROSPECTIVE JUROR:  Yes.

6              THE COURT:  Ever been on a jury?

7              PROSPECTIVE JUROR:  No.

8              THE COURT:  If you are selected for this jury, do

9      you promise me that you will be fair to both sides?

10              PROSPECTIVE JUROR:  Yes.

11              THE COURT:  And you will follow all my

12      instructions?

13              PROSPECTIVE JUROR:  Yes.

14              THE COURT:  Mr. Lopez?

15              PROSPECTIVE JUROR:  Yes, sir.

16              THE COURT:  How are you?

17              PROSPECTIVE JUROR:  Fine.  You?

18              THE COURT:  Good.  Neighorhood?

19              PROSPECTIVE JUROR:  You ask the questions.  I

20      don't want to give out too much information.

21              THE COURT:  All right.  Who lives in your

22      household with you?

23              PROSPECTIVE JUROR:  I live by myself.

24              THE COURT:  You working?

25              PROSPECTIVE JUROR:  Yes, I work for New York City

Jury Selection

1      Transit.

2              THE COURT:  Anyone close to you ever been the

3      victim of any kind of crime?

4              PROSPECTIVE JUROR:  No, sir.

5              THE COURT:  Charged with, accused of any kind of

6      crime?

7              PROSPECTIVE JUROR:  No, sir.

8              THE COURT:  Any close friend or relative work in

9      any law enforcement?

10             PROSPECTIVE JUROR:  No, sir.

11             THE COURT:  Ever been on a jury?

12             PROSPECTIVE JUROR:  Yes, sir, three times before.

13             THE COURT:  Three times on a jury, okay.  Bronx?

14             PROSPECTIVE JUROR:  Right over here.

15             THE COURT:  Were they all criminal or some civil?

16             PROSPECTIVE JUROR:  Both of them criminal,

17     criminal.  Two, and they're both criminal -- one criminal,

18     two civil.

19             THE COURT:  First of all, in the civil case?

20             PROSPECTIVE JUROR:  Two civil, one criminal.

21             THE COURT:  In the civil cases, did you get to

22     deliberate on each of those cases?

23             PROSPECTIVE JUROR:  No.

24             THE COURT:  They both settled?

25             PROSPECTIVE JUROR:  Yeah, they settled.  They got

1      --

2          THE COURT:  In the criminal case did you get to

3      deliberate with the other jurors?

4          PROSPECTIVE JUROR:  Yes, sir.

5          THE COURT:  Without telling me the result, did

6      that jury reach a verdict in the criminal case?

7          PROSPECTIVE JUROR:  Oh.

8          THE COURT:  Did you reach a verdict?

9          PROSPECTIVE JUROR:  Yes, sir.

10         THE COURT:  Now, couple of things.  Civil cases

11    are completely different.  The instructions are different,

12    the burdens are different, has nothing to do with criminal

13    jury instructions whatsoever.  So whatever you may remember

14    from the civil cases, rather, you have to forget, put it

15    aside.  Do you understand that?

16         PROSPECTIVE JUROR:  Yes, sir.

17         THE COURT:  And even though you were on a criminal

18    jury, you still have to put those aside and follow my

19    instructions.  You promise you'll be that?

20         PROSPECTIVE JUROR:  Yes, sir.

21         THE COURT:  So first of all, thank you for being

22    on all those juries.

23         PROSPECTIVE JUROR:  I didn't have no choice.

24         THE COURT:  It's very much appreciated.  If you

25    are selected again to be on a jury in this case, do you

Jury Selection

1       promise me you'll be fair to both sides?

2               PROSPECTIVE JUROR:  Yes, sir.

3               THE COURT:  You'll follow all my instructions?

4               PROSPECTIVE JUROR:  Yes, sir.

5               THE COURT:  All right, thank you.

6               Miss Giron, how are you, ma'am?

7               PROSPECTIVE JUROR:  I'm fine.

8               THE COURT:  I'm a little tired right now.  Tell me

9       the neighborhood you live in?

10              PROSPECTIVE JUROR:  Pelham Parkway.

11              THE COURT:  How long?

12              PROSPECTIVE JUROR:  Two years.

13              THE COURT:  Anyone living in your household with

14      you?

15              PROSPECTIVE JUROR:  My boyfriend.

16              THE COURT:  You working?

17              PROSPECTIVE JUROR:  Yes.

18              THE COURT:  What do you do?

19              PROSPECTIVE JUROR:  I'm a school bus driver.

20              THE COURT:  Okay, right.  And boyfriend?

21              PROSPECTIVE JUROR:  He works with the MTA.  He's a

22      mechanic.

23              THE COURT:  You or anyone close to you ever been

24      the victim of any kind of crime?

25              PROSPECTIVE JUROR:  Myself.

Jury Selection

1        THE COURT:  You feel comfortable speaking about

2    it?

3        PROSPECTIVE JUROR:  No.

4        THE COURT:  You know what, this is actually a

5    perfect time to break and I was going to give everyone a

6    short recess before we went to the next part, so we're going

7    to take about five 10 minutes.  If you have anything

8    personal you need to take care of, you can take care of it.

9    You'll leave the courtroom, except for you Miss Giron, I'm

10   going to talk about this without the other jurors present.

11   Then when we're finished with this, I'll call you back.

12       The next order of business will be -- well, you're

13   eager to go, but I've got to tell you to make sure you don't

14   discuss the case.  Keep my recess instructions.  I'll see

15   you in a few minutes, okay.

16       (Whereupon, the prospective jurors exited the

17   courtroom.)

18       THE COURT:  All right.  All the prospective jurors

19   have left with the exception of Miss Giron who's still

20   present.

21       So tell me, ma'am, and I'm sorry to have to ask

22   these questions, but you say you were the victim of a crime.

23   How long was it?

24       PROSPECTIVE JUROR:  Two years ago.

25       THE COURT:  Where was it?

Jury Selection

1          PROSPECTIVE JUROR:  In Manhattan.

2          THE COURT:  And can you tell us what happened?

3          PROSPECTIVE JUROR:  I got arrested 'cause it's a

4     long story.  I got arrested for --

5          THE COURT:  You were arrested?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  And you were taken to court?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Prosecuted?

10          PROSPECTIVE JUROR:  Uh, huh.

11          THE COURT:  And what happened to the case?

12          PROSPECTIVE JUROR:  They dismissed the case.

13     Dismissed the case.

14          THE COURT:  Dismissed.  Okay.  Do you believe you

15     were treated unfairly by the police in that case?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Do you believe you were treated

18     unfairly by the prosecutor in that case that was involved?

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  Does that give you bias that would

21     make you unfair in this case to the police or the

22     prosecutors?

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  Do you promise me you're able to put

25     that aside?

1       PROSPECTIVE JUROR:  Yes.

2       THE COURT:  What in particular were you

3   dissatisfied with or upset about with the police?

4       PROSPECTIVE JUROR:  What was that question?

5       THE COURT:  I mean, why did you feel you were not

6   treated fairly?

7       PROSPECTIVE JUROR:  Why?

8       THE COURT:  Yeah, why?

9       PROSPECTIVE JUROR:  Because that case doesn't have

10  to do with my case.

11      THE COURT:  Okay.  Do you have any friend or

12  relatives who work in law enforcement?

13      PROSPECTIVE JUROR:  NYPD friends.

14      THE COURT:  And are you able to, again you promise

15  me you'll follow my instructions about having, about how to

16  evaluate police testimony?

17      PROSPECTIVE JUROR:  Yes.

18      THE COURT:  You've been on a jury?

19      PROSPECTIVE JUROR:  No.

20      THE COURT:  If you are selected to be on this

21  jury, do you promise me based on everything that's happened

22  to you, what you know about yourself, that you will be fair

23  to both sides?

24      PROSPECTIVE JUROR:  Yes.

25      THE COURT:  And you're going to follow my

1     instructions?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  All right.  I'm going to allow the

4     attorneys to ask you some questions now about what you

5     raised outside the presence other jurors.

6              Mr. Mendys, go ahead.

7              MR. MENDYS:  Thank you, Judge.

8              Good afternoon, ma'am.  I'm sorry about your

9     experience.  Just a couple of question, though.  You said

10    you were, you weren't happy with how you were treated by the

11    police and the DA, right?  Is there anything specific that

12    makes you feel that way about your experience?

13             PROSPECTIVE JUROR:  'Cause they went in, arrested

14    to my house at six in the morning and they never told me

15    that I supposed to get arrested.

16             MR. MENDYS:  Okay.  Once again, I'm sorry for what

17    you had to go through, but we've got to make sure this is a

18    fit.  Now that was in Manhattan you said?

19             PROSPECTIVE JUROR:  Yes.

20             MR. MENDYS:  So you recognize that that's totally

21    separate from what's going on here?

22             PROSPECTIVE JUROR:  Uh, huh; yes.

23             MR. MENDYS:  Right.  Okay, that's it.  Thank you.

24             THE COURT:  Any questions?

25             MR. BONANNO:  Just briefly.  I'm not sure if you

Jury Selection

1    ever said what the charge was that you did.  I didn't catch

2    it, I'm sorry.  Do you know what they charged you with?

3                PROSPECTIVE JUROR:  How you say that in English?

4                MR. BONANNO:  You're having difficulty

5    understanding what --

6                PROSPECTIVE JUROR:  No, I understand, but I don't

7    know how to say that word in English.

8                THE COURT:  What the charge is?

9                MR. BONANNO:  What language --

10               THE COURT:  What was the crime?

11               MR. BONANNO:  What language will you feel

12   comfortable talking?

13               PROSPECTIVE JUROR:  Spanish.

14               MR. BONANNO:  You can say it in Spanish?

15               PROSPECTIVE JUROR:  Frauday(ph), frauday(ph).

16               THE COURT:  You want to come up for a minute.

17               (Whereupon, a discussion was held at the bench off

18   the record among the Court and counsel.)

19               THE COURT:  Miss Giron, I just want to ask you

20   some questions just about, I know you said you knew what the

21   word for the crime was in Spanish but not in English, but

22   have you understood what I've said throughout this case, all

23   the words that I've used?

24               PROSPECTIVE JUROR:  Yes.

25               THE COURT:  And do you believe you have any

Jury Selection

1     trouble whatsoever with the English language?

2          PROSPECTIVE JUROR:  No.

3          THE COURT:  And it's just that one word that you

4     say you can't translate?

5          PROSPECTIVE JUROR:  Yes, sometimes when I get

6     nervous I can't really speak well.

7          THE COURT:  But you do understand my legal

8     instructions and everything else?

9          PROSPECTIVE JUROR:  Yes.

10          THE COURT:  You're excused.  Thank you.  We'll see

11     you in a few minutes, okay.

12          (Whereupon, the prospective juror exited the

13     courtroom and there was a brief recess taken.)

14          COURT OFFICER:  Prospective jurors entering.

15          (Whereupon, the prospective jurors entered the

16     courtroom.)

17          THE COURT:  All right.  Good afternoon everyone.

18     And the next order of business is questioning by the

19     attorneys, and we're going to begin with Mr. Mendys.  You

20     may inquire of the prospective jurors.

21          MR. MENDYS:  Thank you, Judge.

22          Good afternoon everybody.  My name is Newton

23     Mendys.  I'm the assistant district attorney assigned to

24     this case by your district attorney, Robert Johnson.  And I

25     think we all learned in the course of this process today

1          that if you have to come back tomorrow, bring a sweater.

2          Bring a sweater.  All right.  We have been here for a number

3          of days and that is, this has to be the coldest room in the

4          building.

5               So we are all trying to find fair and impartial

6          jurors, right?  You've heard that.  Miss Hines, I know

7          you've heard that many many times, that's what we're trying

8          to do.  Everyone likes to believe that they're fair, right?

9          We all, it's a nice word that everyone wants to think in

10         their heart of hearts that they are, and the reality is that

11         everyone's different, and everyone, through their own

12         experiences, you know, tend to lean one way or another

13         depending on the issues, depending on whatever the topic is.

14              So all these questions are designed for us to be

15         able to figure out whether you're right for this case.  And

16         just based on what you, you've heard, does anyone think for

17         any reason why when talking about this or not, as you sit

18         here now does anyone have any questions about whether they

19         can be fair?  Anyone think this might not be the right case

20         for them for any reason whatsoever?  Okay, no hands.  Thank

21         you very much.

22              What I'm gonna do is I'll follow-up with some

23         questions that are based on what you were already asked.

24              Miss Caceres, how are you?

25              PROSPECTIVE JUROR:  I'm all right.

Jury Selection

1            MR. MENDYS:  You're just first because you're

2      second in the seat, okay.  I heard you work for a hospital

3      but I didn't hear what you did exactly?

4            PROSPECTIVE JUROR:  Call center associate.  I just

5      started this week.

6            MR. MENDYS:  Congratulations.

7            PROSPECTIVE JUROR:  Thank you.

8            MR. MENDYS:  So what are you responsibilities

9      there?

10           PROSPECTIVE JUROR:  It's supposed to be scheduling

11     patients, but I haven't had the training yet so I'm actually

12     in training right now.

13           MR. MENDYS:  Okay.  Now you talked a lot about

14     experiences involving your daughter's father, and a

15     situation with a relative who was accused of a crime.  You

16     know you're gonna hear from officers, from police officers

17     detectives in this case.  Do you think you're gonna have any

18     issue listening to them with an open mind, treating them

19     like anybody else based on your experience?

20           PROSPECTIVE JUROR:  No.

21           MR. MENDYS:  Thank you very much.

22           Mr. Solis, how are you?

23           PROSPECTIVE JUROR:  Good.

24           MR. MENDYS:  Good.  I'm gonna ask this question.

25     You mentioned a friend who was accused of a situation here

Jury Selection

1        in the Bronx.

2                    PROSPECTIVE JUROR:  Right.

3                    MR. MENDYS:  Do you mind sharing his name?

4                    PROSPECTIVE JUROR:  I'll share his first name.

5        I'll share.  His full name Peter Drysdale.

6                    MR. MENDYS:  Peter Drysdale?

7                    PROSPECTIVE JUROR:  Yes.

8                    MR. MENDYS:  Just to make sure there's no

9        connection whatsoever.

10                   PROSPECTIVE JUROR:  Yeah, yeah.

11                   MR. MENDYS:  And have you spoken to him about what

12       he's been going through?

13                   PROSPECTIVE JUROR:  Yeah.

14                   MR. MENDYS:  And based on what your conversation

15       you have not appeared in court, right?

16                   PROSPECTIVE JUROR:  No, no.

17                   MR. MENDYS:  Based on everything that he's going

18       through and everything that you've learned, you said before

19       that you think you feel that he's been treated fairly?

20                   PROSPECTIVE JUROR:  Yeah.

21                   MR. MENDYS:  And you recognize, obviously the same

22       question, there's gonna be officers, detectives who testify

23       here.

24                   PROSPECTIVE JUROR:  Right.

25                   MR. MENDYS:  Are you gonna be able to keep an open

Jury Selection

1    mind?

2                    PROSPECTIVE JUROR:  Yes.

3                    MR. MENDYS:  Thank you very much.

4                    Miss Camillo, how are you?

5                    PROSPECTIVE JUROR:  I'm good.  You?

6                    MR. MENDYS:  Good.  The situation involving your

7    sister, you mentioned that case is closed; right?

8                    PROSPECTIVE JUROR:  Yes.

9                    MR. MENDYS:  Do you know if there was a trial or

10   was it something that resolved without a trial?

11                   PROSPECTIVE JUROR:  I have no clue, honestly.

12                   MR. MENDYS:  But you're certain that it's over?

13                   PROSPECTIVE JUROR:  Yeah.

14                   MR. MENDYS:  Thank you very much.

15                   Miss Hines, how are you?

16                   PROSPECTIVE JUROR:  I'm good.

17                   MR. MENDYS:  Twice a juror.  Mr. Lopez, we're

18   gonna get to you, too, don't worry.  My question for you,

19   Miss Hines, is now you mentioned that you deliberated in the

20   two cases that you were a juror.

21                   PROSPECTIVE JUROR:  Yes.

22                   MR. MENDYS:  I don't want to know about your

23   verdict, okay, but I am curious about what the charge was,

24   the accusations were, what kind of case it was.  This case

25   is a robbery.  What kind of cases were those that you sat on

Jury Selection

1        before?

2                PROSPECTIVE JUROR:  Robbery.

3                MR. MENDYS:  They were both robberies?

4                PROSPECTIVE JUROR:  Yes.

5                MR. MENDYS:  Third time's a charm I guess, right?

6        So my question is, I guess is there anything about those

7        experiences that would impact your ability to be a fair

8        juror here?

9                PROSPECTIVE JUROR:  No.

10               MR. MENDYS:  Anything about the deliberations

11       process, anything like that?

12               PROSPECTIVE JUROR:  Not at all.

13               MR. MENDYS:  Great.  Thank you very much.

14               Miss Caceres, how are you?

15               PROSPECTIVE JUROR:  How are you doing?

16               MR. MENDYS:  I'm good.  My question for you is,

17       I'm sorry to hear about the situation you were involved in,

18       do you know why your home was broken into?

19               PROSPECTIVE JUROR:  No.

20               MR. MENDYS:  Were you home when that took place?

21               PROSPECTIVE JUROR:  I was actually walking out of

22       my door to go to the supermarket for my grandfather.

23               MR. MENDYS:  But so you don't know why --

24               PROSPECTIVE JUROR:  No.

25               MR. MENDYS:  -- your home was chosen?  So you can

Jury Selection

1    appreciate the fact that sometimes we don't know why certain

2    crimes happen?

3              PROSPECTIVE JUROR:  Wrong place at the wrong time,

4    I guess.

5              MR. MENDYS:  Now in this case one thing that you

6    will be, you'll be instructed on later is that I don't have

7    to prove any particular type of motive.  Okay.  Parts of a

8    crime called elements, those are things that I have to

9    prove, parts of a robbery.  The judge mentioned force.

10   That's something that I have to prove.  You may, you may not

11   hear about a motive in this case.  If you don't hear about a

12   motive, is that something that you're gonna hold against me?

13             PROSPECTIVE JUROR:  No.

14             MR. MENDYS:  You can follow the judge's

15   instructions?

16             PROSPECTIVE JUROR:  Yes.

17             MR. MENDYS:  And if I prove my case you'll vote

18   guilty?

19             PROSPECTIVE JUROR:  If it's the right choice, yes.

20             MR. MENDYS:  If it's beyond a reasonable doubt,

21   right?

22             PROSPECTIVE JUROR:  Yes.

23             MR. MENDYS:  Does everyone understand that that's

24   something that I don't have to prove, a motive?  You may

25   hear something about that, you may not.

Jury Selection

1          Mr. Torres, can you follow that instruction?

2          PROSPECTIVE JUROR:  Absolutely.

3          MR. MENDYS:  You understand that?

4          PROSPECTIVE JUROR:  Yes.

5          MR. MENDYS:  You have any issue if you don't hear

6     about why something happen?

7          PROSPECTIVE JUROR:  A motive?  No, no issues.

8          MR. MENDYS:  Okay.  Mr. Medina, how about you?

9          PROSPECTIVE JUROR:  I have no issue.

10         MR. MENDYS:  You might be curious about it and

11    that's human nature, but in terms of what you have to

12    deliberate on and what in terms of proving the actual

13    charge, that's something, that's an instruction you can

14    follow?

15         PROSPECTIVE JUROR:  Yes.

16         MR. MENDYS:  Mr. Rivera, how about you?

17         PROSPECTIVE JUROR:  Yes.

18         MR. MENDYS:  Great.  Thank you very much.

19         Mr. Lopez?

20         PROSPECTIVE JUROR:  Yes, sir.

21         MR. MENDYS:  Our other experienced juror.

22    Professional juror, perhaps.  The two types of, or you were

23    a criminal juror once?

24         PROSPECTIVE JUROR:  Once, the last one.

25         MR. MENDYS:  So the one same question I'm gonna

1    ask that I asked Miss Hines, when you were a criminal juror,

2    without -- I don't want hear about what your verdict was,

3    but what kind of case?

4              PROSPECTIVE JUROR:  Robbery.

5              MR. MENDYS:  A robbery?

6              PROSPECTIVE JUROR:  Yes.

7              MR. MENDYS:  So anything about your experience in

8    that jury, either with fellow jurors or with the case

9    itself, that would impact you here?

10             PROSPECTIVE JUROR:  No, sir.

11             MR. MENDYS:  Now you also mentioned that you

12   worked for --

13             PROSPECTIVE JUROR:  New York City Transit.

14             MR. MENDYS:  What do you do?

15             PROSPECTIVE JUROR:  Train operator.

16             MR. MENDYS:  Subway?

17             PROSPECTIVE JUROR:  Yeah.

18             MR. MENDYS:  What line?

19             PROSPECTIVE JUROR:  Four line.

20             MR. MENDYS:  Four line.  When the four train's

21   late we can blame you?

22             PROSPECTIVE JUROR:  Yes.

23             MR. MENDYS:  So couple of other things I want to

24   talk about.  You've heard the judge mention about acting in

25   concert, right?  This is a case against Richard Diaz.  Now,

Jury Selection

1       you're gonna hear about other people that he was involved

2       with and you're gonna hear about who they are, but your job

3       is to deliberate and decide whether Richard Diaz is guilty

4       or not guilty.

5               Mr. Torres, is that something you can do?

6               PROSPECTIVE JUROR:  Absolutely.

7               MR. MENDYS:  You can agree not to speculate about

8       what's going on with those other guys or what's happening

9       with them?

10              PROSPECTIVE JUROR:  No problem.

11              MR. MENDYS:  And just deliberate?

12              PROSPECTIVE JUROR:  Solely on him, yes.

13              MR. MENDYS:  Mr. Rivera, you can do that, too?

14              PROSPECTIVE JUROR:  Yes.

15              MR. MENDYS:  Mr. Medina?

16              PROSPECTIVE JUROR:  Yes.

17              MR. MENDYS:  Miss Fernandez, how about you?

18              PROSPECTIVE JUROR:  Yes.

19              MR. MENDYS:  You can do that?

20              PROSPECTIVE JUROR:  Yes.

21              MR. MENDYS:  Mr. Smith?

22              PROSPECTIVE JUROR:  Yes, sir.

23              MR. MENDYS:  All right.  So let me ask you a

24      question, Mr. Smith.  When -- how do you determine if

25      someone's being honest with you, someone's telling you

Jury Selection

1      truth?

2                  THE COURT:  I'm sorry?

3                  MR. MENDYS:  If someone's being honest.

4                  THE COURT:  Oh, okay.

5                  MR. MENDYS:  Telling you the truth?

6                  PROSPECTIVE JUROR:  They're actions, body actions.

7                  MR. MENDYS:  Body actions, like anything in

8      particular?

9                  PROSPECTIVE JUROR:  Fidgeting, twitching, stuff

10     like that.

11                 MR. MENDYS:  Okay.  Miss Fernandez, what about

12     you?

13                 PROSPECTIVE JUROR:  Being uneasy, restless.  You

14     can look, see in the eyes, through the eyes.

15                 MR. MENDYS:  Okay.  Okay, let's see.  Miss

16     Rinnaye, what about you, anything you would add to that?

17                 PROSPECTIVE JUROR:  Actions speak louder than

18     voice.  Depends on the way the person reacts.

19                 MR. MENDYS:  Actions mean a lot to you.  Okay.

20     Miss Caceres, how about you?

21                 PROSPECTIVE JUROR:  Yes, the actions sometimes.

22                 MR. MENDYS:  Anything in particular?

23                 PROSPECTIVE JUROR:  Sometimes facial expressions

24     or looks, I don't know.

25                 MR. MENDYS:  Miss Camillo, would you add anything

1       to that?

2                   PROSPECTIVE JUROR:  The way they speak and carry

3       them, testifies.

4                   MR. MENDYS:  Where did you learn that stuff?

5                   PROSPECTIVE JUROR:  Myself, observing,

6       observations.

7                   MR. MENDYS:  Life experience, right?

8                   PROSPECTIVE JUROR:  Yeah.

9                   MR. MENDYS:  Talking to people and sometimes you

10      get burned by people.  Maybe they tell you something that's

11      not true and sometimes --

12                  PROSPECTIVE JUROR:  I deal with people every

13      single day.

14                  MR. MENDYS:  Right.  It's part of this experience

15      we call life, and we also call it common sense.

16                  PROSPECTIVE JUROR:  Right.

17                  MR. MENDYS:  So all the things you talked about,

18      body language, eye contact, fidgeting, we all determine

19      what, based on whatever experiences we've all had.

20                  And Miss Caceres, you said at the outset you were

21      nervous, right, coming in here?

22                  PROSPECTIVE JUROR:  Yeah.

23                  MR. MENDYS:  Anyone else nervous when they walked

24      in?  Right?  I mean, come on, this is jury duty, this is

25      not, you know, no one's itching to come here and be like

Jury Selection

1     really excited about it.  And for a lot --

2                THE COURT:  Some might be, I don't know about

3     that.

4                MR. MENDYS:  Well, I shouldn't assume.  But we're

5     all, you're all, a lot of you are -- this is the first time,

6     and with anything new there's gonna be some anxiety because

7     you don't know what you're gonna be asked.  You don't know

8     who you're going to be dealing with.  You don't know any of

9     those things.  So nerves, that something to be expected.

10               And I guess my question for you, Mr. Smith, is the

11    situation also plays a factor, right?

12               PROSPECTIVE JUROR:  Yes.

13               MR. MENDYS:  Because as nervous as you guys were,

14    I'm sure you can appreciate the fact that it's possible, all

15    right, that someone who has to come testify might be nervous

16    as well.

17               Miss Miranda, you had to testify in the grand jury

18    before?

19               PROSPECTIVE JUROR:  Yes, sir.

20               MR. MENDYS:  Were you nervous when you did?

21               PROSPECTIVE JUROR:  Yes.

22               MR. MENDYS:  Sure, right?  And in those situations

23    maybe you are a little fidgety.  Maybe your eye contact,

24    you're not being direct with your eye contact.  So the

25    bottom line that I'm trying to get to, and probably a very

1    long winded way, is that it's your decision, all right, to

2    determine whether someone is telling the truth or not.  And

3    just because you have walked into a courthouse, and just

4    because you might have been nervous, we want you to bring

5    that common sense with you, okay.  It doesn't get checked

6    with your bags and, you know, your pockets when you go

7    through the metal detectors, right?  You bring it with you

8    and you use it when a witness comes up here, okay, because

9    they're all gonna swear or affirm on the Bible, all right.

10            But Mr. Rivera, does that mean that they're

11   telling the truth necessarily just because they swear on the

12   Bible?

13            PROSPECTIVE JUROR:  No.

14            MR. MENDYS:  Otherwise we wouldn't be here, okay.

15   It's not that simple, right?  So can you do that?  Is that

16   something you can do?  Can you bring your common sense and

17   look at people and decide whether they're telling the truth

18   or not?

19            PROSPECTIVE JUROR:  Yeah.

20            MR. MENDYS:  Can you decide what parts are

21   important and what parts aren't?

22            PROSPECTIVE JUROR:  Yeah.

23            MR. MENDYS:  Right?  I'm good.  Thank you very

24   much everyone.

25            THE COURT:  Thank you, Mr. Mendys.

1           Mr. Bonnano, you may inquire.

2           MR. BONANNO:   Thank you, Judge.

3           Great thing about going last is I'm gonna be the

4       shortest one because I've already gotten an opportunity to

5       look at everybody and listen to the judge's questions and

6       listen to Mr. Mendys' questions.   And we've already taken a

7       look at your answers and we're here, our part here is to

8       evaluate whether you can be a fair and impartial juror.

9           And you know, you guys are part of this process of

10      helping us get through what we are as Americans, and each

11      and every one of you, I want to thank you for being here and

12      for going through this process.

13          Whether you're selected or not, just being part of

14      the process is incredible because, listen, when you get a

15      jury summons you're like, oh my gosh, I gotta go,

16      everybody's busy, everybody's got a life, you know.   But

17      when you ultimately get picked, and the reason you get

18      picked is because the judge has asked you questions, the

19      DA's asked you questions, I get an opportunity to ask you

20      questions, and we make an assessment based upon our

21      knowledge of everybody, everything, and what we know, too,

22      using our common sense to see if you will be fair and

23      impartial, because what we're talking about here is one of

24      the most precious gifts that we have in this country is

25      liberty and a person's liberty interests, and that will be

1      in your hands to decide.  So we have to do --

2                    MR. MENDYS:  I'm going to object to that, Judge.

3                    THE COURT:  Well, I mean, you can't use bias or

4      sympathy or anything like that in your deliberations,

5      although, you know, we have great, we all are guaranteed the

6      right to a fair trial is what we're here about today.  And

7      you can continue, okay.

8                    MR. BONANNO:  Thank you, Judge.

9                    In any event, we have to make that decision as to

10     whether you guys fit that bill.  And I thank the judge for

11     all his questions and Mr. Mendys for all his questions.  And

12     as a matter of fact, Mr. Mendys mentioned one of the key

13     things that he needs to prove in his case beyond a

14     reasonable doubt, and that's the elements of the crimes

15     charged.  He has to prove not only that someone was there at

16     the crime being committed, but that that person committed

17     the elements necessary to commit that crime.

18                    Mr. Rivera, I'm gonna ask you to bring a mocha

19     latte tomorrow, too, in addition to a sweater, because it is

20     cold in here, right?

21                    PROSPECTIVE JUROR:  Yeah.

22                    MR. BONANNO:  I know you're more than just

23     nervous, you've got to be cold, too.

24                    Miss Rinnaye, I went through that little speech

25     before about, you know, being able to be fair and impartial

Jury Selection

1    because when the judge asked you those questions

2    particularly you were kind of hesitant, at least in my

3    opinion.  So I've got to be sure that you can be fair and

4    impartial as to judging all the evidence that comes in

5    before you.  Can you do that?

6               PROSPECTIVE JUROR:  Yes.

7               MR. BONANNO:  Are you sure?

8               PROSPECTIVE JUROR:  Uh, huh.

9               MR. BONANNO:  Are you just being nervous or are

10   you not sure that you can be fair and impartial to a

11   defendant?

12              PROSPECTIVE JUROR:  I'll be fair.

13              MR. BONANNO:  Okay.  Mr. Abraham, we're all

14   jealous because you're retired.

15              PROSPECTIVE JUROR:  Oh, not so much fun.

16              MR. BONANNO:  Not so much fun?

17              PROSPECTIVE JUROR:  Not so much money.

18              MR. BONANNO:  Can you be fair and impartial, I

19   mean, looking at the crimes that are gonna be charged

20   against my client?

21              PROSPECTIVE JUROR:  Sure.

22              MR. BONANNO:  And you wouldn't be prejudiced by

23   the fact that the DA is, you know, accusing my client of

24   doing something wrong?

25              PROSPECTIVE JUROR:  No.

1            MR. BONANNO:  Mr. Smith?

2            PROSPECTIVE JUROR:  How are you doing, sir?

3            MR. BONANNO:  How are you?

4            PROSPECTIVE JUROR:  Fine.

5            MR. BONANNO:  You work at Yankee Stadium?

6            PROSPECTIVE JUROR:  Yes, sir.

7            MR. BONANNO:  You get any free balls or anything

8     like that?

9            PROSPECTIVE JUROR:  Here and there.

10           MR. BONANNO:  You work with the police kind of

11    intimately in that situation, don't you?

12           PROSPECTIVE JUROR:  Yes, sir.

13           MR. BONANNO:  Do you know any of the police

14    officers on the Yankee Stadium detail?

15           PROSPECTIVE JUROR:  A few, yes.

16           MR. BONANNO:  Do you know an Officer Mangual?

17           PROSPECTIVE JUROR:  No, sir.

18           MR. BONANNO:  Would you, I mean, is it fair to say

19    that there would be some police officers that you know by

20    sight but not by name?

21           PROSPECTIVE JUROR:  Yes, sir.

22           MR. BONANNO:  Do you ever have to bring people in

23    custody to bring them to the police?

24           PROSPECTIVE JUROR:  No, sir.

25           MR. BONANNO:  But you did say you worked with the

Jury Selection

1      DA's office on a few times?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  I'm sorry, I forgot.  How long have

4      you worked at Yankee Stadium?

5              PROSPECTIVE JUROR:  This is my fourth year now.

6              THE COURT:  Four years.  I forgot the answer.

7      Thank you.

8              MR. BONANNO:  So that wouldn't affect the way you

9      would treat my client?

10             PROSPECTIVE JUROR:  No, sir.

11             MR. BONANNO:  Knowing that you might have to deal

12     with the DA's office next week in the course of your job?

13             PROSPECTIVE JUROR:  No, sir.

14             MR. BONANNO:  Okay.  Miss Miranda?

15             PROSPECTIVE JUROR:  Yes, sir.

16             MR. BONANNO:  Still a Ricky Martin fan?

17             PROSPECTIVE JUROR:  Sure.

18             MR. BONANNO:  Okay.  You've been robbed a lot.

19             PROSPECTIVE JUROR:  Yes, I have.

20             MR. BONANNO:  Remind me never to hang out with

21     you, okay?

22             PROSPECTIVE JUROR:  Well, that hurt.

23             MR. BONANNO:  And but you still appear to have a

24     positive attitude.

25             PROSPECTIVE JUROR:  Yes.

Jury Selection

1              MR. BONANNO:  Mr. Smith?

2              PROSPECTIVE JUROR:  How are you doing, sir?

3              MR. BONANNO:  How are you?

4              PROSPECTIVE JUROR:  Fine.

5              MR. BONANNO:  You work at Yankee Stadium?

6              PROSPECTIVE JUROR:  Yes, sir.

7              MR. BONANNO:  You get any free balls or anything

8      like that?

9              PROSPECTIVE JUROR:  Here and there.

10             MR. BONANNO:  You work with the police kind of

11     intimately in that situation, don't you?

12             PROSPECTIVE JUROR:  Yes, sir.

13             MR. BONANNO:  Do you know any of the police

14     officers on the Yankee Stadium detail?

15             PROSPECTIVE JUROR:  A few, yes.

16             MR. BONANNO:  Do you know an Officer Mangual?

17             PROSPECTIVE JUROR:  No, sir.

18             MR. BONANNO:  Would you, I mean, is it fair to say

19     that there would be some police officers that you know by

20     sight but not by name?

21             PROSPECTIVE JUROR:  Yes, sir.

22             MR. BONANNO:  Do you ever have to bring people in

23     custody to bring them to the police?

24             PROSPECTIVE JUROR:  No, sir.

25             MR. BONANNO:  But you did say you worked with the

Jury Selection

1        DA's office on a few times?

2              PROSPECTIVE JUROR:  Yes.

3              THE COURT:  I'm sorry, I forgot.  How long have

4        you worked at Yankee Stadium?

5              PROSPECTIVE JUROR:  This is my fourth year now.

6              THE COURT:  Four years.  I forgot the answer.

7        Thank you.

8              MR. BONANNO:  So that wouldn't affect the way you

9        would treat my client?

10             PROSPECTIVE JUROR:  No, sir.

11             MR. BONANNO:  Knowing that you might have to deal

12       with the DA's office next week in the course of your job?

13             PROSPECTIVE JUROR:  No, sir.

14             MR. BONANNO:  Okay.  Miss Miranda?

15             PROSPECTIVE JUROR:  Yes, sir.

16             MR. BONANNO:  Still a Ricky Martin fan?

17             PROSPECTIVE JUROR:  Sure.

18             MR. BONANNO:  Okay.  You've been robbed a lot.

19             PROSPECTIVE JUROR:  Yes, I have.

20             MR. BONANNO:  Remind me never to hang out with

21       you, okay?

22             PROSPECTIVE JUROR:  Well, that hurt.

23             MR. BONANNO:  And but you still appear to have a

24       positive attitude.

25             PROSPECTIVE JUROR:  Yes.

Jury Selection

```
 1                MR. BONANNO:  As far as being able to judge the
 2      evidence.
 3                PROSPECTIVE JUROR:  Correct.
 4                MR. BONANNO:  And all your experiences, as bad as
 5      they may have been, wouldn't affect you either way?
 6                PROSPECTIVE JUROR:  No.
 7                MR. BONANNO:  It won't prejudice my client?
 8                PROSPECTIVE JUROR:  No sir.
 9                MR. BONANNO:  And it won't prejudice you to favor
10      the DA?
11                PROSPECTIVE JUROR:  No.
12                MR. BONANNO:  And Mr. Lopez?
13                PROSPECTIVE JUROR:  Yes, sir.
14                MR. BONANNO:  You want to be number four?
15                PROSPECTIVE JUROR:  Got no choice.
16                MR. BONANNO:  That's the kind of answer I love to
17      hear because, you see, everybody here, maybe they're saying
18      I don't want to get picked, but the kind of, the
19      transformation, and you know because you're a veteran juror,
20      and I believe Miss Hines, right, is a veteran juror also,
21      when you sit in that jury box you get transformed, don't
22      you?  You become a person attuned to what your job has to
23      be.  And your job has to be, once you get here, to weigh the
24      evidence fairly impartially and to decide the guilt or
25      innocence of the defendant.
```

Jury Selection

1          MR. MENDYS:  Objection.

2          THE COURT:  Well, you know, guilty or not guilty

3     isn't actually the standard, but go ahead.

4          MR. BONANNO:  The guilty or not guilty?

5          THE COURT:  The standard is whether the People

6     have proven guilt beyond a reasonable doubt.

7          MR. BONANNO:  Beyond a reasonable doubt.  You have

8     to weigh that.

9          And Mr. Abraham, the People haven't proved their

10    case beyond a reasonable doubt how would you vote, guilty or

11    not guilty?

12         PROSPECTIVE JUROR:  Not guilty beyond a reasonable

13    doubt.

14         MR. BONANNO:  How would you vote, Mr. Solis?

15         PROSPECTIVE JUROR:  Not guilty.

16         MR. BONANNO:  How would you vote?

17         PROSPECTIVE JUROR:  Not guilty.

18         MR. BONANNO:  How would you vote?

19         PROSPECTIVE JUROR:  Not guilty.

20         MR. BONANNO:  How would you vote, Mr. Torres?

21         PROSPECTIVE JUROR:  Not guilty.

22         MR. BONANNO:  Mr. Smith?

23         PROSPECTIVE JUROR:  Not guilty.

24         MR. BONANNO:  Miss Fernandez?

25         PROSPECTIVE JUROR:  Not guilty.

Jury Selection

1          MR. BONNANO:  Miss Caceres?

2          PROSPECTIVE JUROR:  Not guilty.

3          MR. BONNANO:  And Miss Rinnaye?

4          PROSPECTIVE JUROR:  Not guilty.

5          MR. BONANNO:  Miss Camillo?

6          PROSPECTIVE JUROR:  Yes, not guilty.

7          MR. BONANNO:  Not guilty.  Miss Begley?

8          PROSPECTIVE JUROR:  Not guilty.

9          MR. BONNANO:  Miss Hines?

10         PROSPECTIVE JUROR:  Not guilty.

11         MR. BONNANO:  Miss Caceres?

12         PROSPECTIVE JUROR:  Not guilty.

13         MR. BONNANO:  Miss Konadu?

14         PROSPECTIVE JUROR:  Not guilty.

15         MR. BONNANO:  Miss Miranda?

16         PROSPECTIVE JUROR:  Not guilty.

17         MR. BONNANO:  Miss Rodriguez?

18         PROSPECTIVE JUROR:  Not guilty.

19         MR. BONNANO:  Mr. Lopez?

20         PROSPECTIVE JUROR:  Not guilty.

21         MR. BONNANO:  And Miss Giron?

22         PROSPECTIVE JUROR:  Not guilty.

23         MR. BONANNO:  I have no further questions.  Thank

24    you.

25         THE COURT:  All right.  Thank you, Mr. Bonnano.

Jury Selection

1      So what's going to happen now is the attorneys

2   will discuss who they believe is appropriate for the jury.

3   Some of you will be selected, some of you will not.  That's

4   just from experience.  And actually, there's too many of you

5   to even select because we don't have juries of 18 anyway.

6      I do want to say if you're not selected it is not

7   a personal decision whatsoever and you shouldn't take it as

8   a negative.  It's just that perhaps the attorneys have, for

9   whatever reason don't believe you may be appropriate for

10   this particular case, and I will thank you in advance if

11   you're not selected for your participation in the process,

12   it is very important.  And I'm so glad to see that you've

13   shown up and you're willing and ready and able to be so

14   engaged in jury selection process.  It's terrific.

15      So we'll take about recess 10 or 15 minutes.

16   We'll have you all back in, people in the audience I'll give

17   you instructions depending on what happened.  Keep an open

18   mind, don't discuss the case and we'll see you as soon as

19   the attorneys have finished.

20      COURT OFFICER:  Right this way jurors.

21      (Whereupon, the prospective jurors exited the

22   courtroom.)

23      THE COURT:  Are you ready?

24      MR. MENDYS:  Yes.

25      MR. BONANNO:  Yes.

Jury Selection

1          THE CLERK:  Beginning with the People have used

2     five peremptory challenges and defense four.  As to

3     challenge for cause, People, seats one through six do you

4     have any?

5          MR. MENDYS:  Number one, Miss Rinnaye.

6          THE COURT:  Challenge for cause?

7          MR. MENDYS:  Yes.  I found her to be nonresponsive

8     to a lot of questions about fairness, specifically at the

9     end when Mr. Bonnano was asking her.  It might have been

10    just my positions, but I did not hear an audible answer.

11    There seemed to be a lot of kind of awkward laughter.

12         THE COURT:  The laughter certainly was there.  I

13    believe she ultimately said yes, I'll be fair, and it was

14    very low in terms of audibility, but she did as far as the

15    record will reflect, which doesn't reflect laughter and body

16    language.  And thing the record itself will show is that she

17    said yes, I'll be fair.  As Mr. Bonnano did observe, there

18    was a, like a reluctance to answer questions.  There was

19    some head shaking that then you had to get the answer on the

20    record from her.

21         But I'm just, I am fairly confident that this

22    record itself, her words will say I can be fair, but let me

23    hear from Mr. Bonnano.

24         MR. BONNANO:  I'll join in that application.

25         THE COURT:  You are also moving for a challenge

Jury Selection

1      for cause?

2                  MR. BONANNO:  Yes.

3                  THE COURT:  So both sides for challenge for cause.

4      I'll grant it because both sides want it, but on consent.

5                  MR. BONANNO:  That's right.

6                  THE CLERK:  Any other challenge for cause, People?

7                  MR. MENDYS:  No.

8                  THE CLERK:  Defense, do you have any challenge for

9      cause as to seats two through six?

10                 MR. BONANNO:  I do not.

11                 THE COURT:  People, do you have any peremptory

12     challenges as to seats two through six?

13                 MR. MENDYS:  Mr. Medina.  That is all.

14                 THE CLERK:  Medina is seat number six.

15                 Defense, do you have any peremptory challenges as

16     to seats two through five?

17                 MR. BONNANO:  Seats four and five, Mr. Smith and

18     Mr. Torres.

19                 THE CLERK:  Seat number two, Evelyn Caceres will

20     be Juror No. 7.  Seat number three, Irene Fernandez, will be

21     Juror No. 8.

22                 We shall continue?  People, do you have any

23     challenge for cause as to seats seven through 10?

24                 MR. MENDYS:  No.

25                 THE CLERK:  Defense?

Jury Selection

1          MR. BONANNO:  No.

2          THE CLERK:  People, do you have any peremptory

3    challenges as to seats seven through 10?

4          MR. MENDYS:  Number nine, Mr. Solis, and number

5    seven, Mr. Rivera.  That's it.

6          THE CLERK:  Defense, do you have any peremptory

7    challenges as to seats eight or 10?

8          MR. BONANNO:  No.

9          THE CLERK:  Seat number eight, Allen Abraham, will

10   be Juror No. 9.  And seat number 10, Yarenys Camillo, will

11   be Juror No. 10.

12          People, do you have any challenge for cause as to

13   seats 11 and 12?

14          MR. MENDYS:  No.

15          THE CLERK:  Defense?

16          MR. BONANNO:  No.

17          THE CLERK:  People, do you have any peremptory

18   challenges as to seats 11 and 12?

19          MR. MENDYS:  Miss Begley, number 11.  That's it.

20          THE CLERK:  Defense?

21          MR. BONANNO:  Miss Hines.

22          THE CLERK:  As to seats 13 and 14, do you have any

23   challenge for cause, People?

24          MR. MENDYS:  No.

25          THE CLERK:  Defense?

Jury Selection

1          MR. BONANNO:  No.

2          THE CLERK:  People, do you have any peremptory

3    challenges as to seats 13 and 14?

4          MR. MENDYS:  Number 12, Miss Konadu.

5          THE COURT:  13 and 14.  Miss Konadu is 14.

6          MR. MENDYS:  Number 14, Miss Konadu.

7          THE CLERK:  Defense, as to seat 13?

8          MR. BONANNO:  13.

9          THE COURT:  You're challenging 13?

10         MR. BONANNO:  Yes, perempt.

11         THE CLERK:  As to seats 15 and 16, People, do you

12   have any challenge for cause?

13         MR. MENDYS:  No.

14         THE CLERK:  Defense?

15         MR. BONANNO:  No.

16         THE CLERK:  As to 15 and 16 do you have peremptory

17   challenges, People?

18         MR. MENDYS:  No.

19         THE CLERK:  Defense?

20         MR. BONANNO:  Miss Miranda.

21         THE CLERK:  So seat number 16, Jennifer Rodriguez,

22   will be Juror No. 11.

23         As to seat number 17, do you have any challenge

24   for cause, People?

25         MR. MENDYS:  No.

Jury Selection

1              THE CLERK:  Defense?

2              MR. BONANNO:  No.

3              THE CLERK:  Any peremptory challenges as to seat

4        number 17, People?

5              MR. MENDYS:  No.

6              THE CLERK:  Defense?

7              MR. BONANNO:  No.

8              THE CLERK:  This is Juror No. 12.

9              THE COURT:  We have a jury.

10             THE CLERK:  We'll proceed to alternate jurors.

11             THE COURT:  Alternate No. 1, number 18.

12             THE CLERK:  Number 18, People, do you have any

13       challenge for cause?

14             MR. MENDYS:  No.

15             THE CLERK:  Defense?

16             MR. BONANNO:  No.

17             THE CLERK:  Peremptory challenges as to seat

18       number 18, People?

19             MR. MENDYS:  Yes.

20             THE COURT:  So we have our 12 jurors.  We need to

21       pick alternates tomorrow and we'll do that we have plenty of

22       time to do -- I don't know whether I'm going to call 18 in

23       the box to do it, but I also, one of the jurors who's here,

24       I believe her name is Miss Stone.

25             THE CLERK:  Yes, that's correct.

Jury Selection

1        THE COURT:  Miss Stone is the juror who came up
2   and said she has to be at an appointment in Westchester at
3   10 o'clock and isn't even sure she could be here in the
4   afternoon.  She came up to the bench.  I did say we'd see
5   how the jury selection process went.  She wasn't picked for
6   this panel.  I don't want to hold up the selection process
7   and I do want to excuse her because she cannot be here
8   tomorrow.  Any objection to that?
9        MR. BONANNO:  None at all.
10        MR. MENDYS:  No.
11        THE COURT:  We can bring them all in and we'll
12   just, I'll hold Miss Stone until the end, okay.
13        COURT OFFICER:  Prospective jurors entering.
14        (Whereupon, the prospective jurors entered the
15   courtroom.)
16        THE COURT:  All right.  Before we proceed, I just
17   want to let everyone in the room know the parties have
18   selected additional jurors.  If you are in the jury box and
19   you haven't been selected, tomorrow morning you go back to
20   the central jury room.  You still could be put on another
21   jury panel tomorrow because there are other judges picking
22   jurors.  And again, thank you for participating if you're
23   not selected.  You'll find that out.
24        For the people in the audience, I'm excusing you
25   for the night but you're going to come back tomorrow

1    morning.  What you need to do is check in in the central

2    jury room, and then I'm going to ask you to be here by 10

3    o'clock tomorrow morning in room 601 down the hall, and then

4    we're going to continue questioning you in the jury box, and

5    that's tomorrow morning.

6         And in fact, if the people in the audience do want

7    to leave now, you're welcome to leave.  Miss Stone, come up

8    though, I need to talk to you for a minute at the bench with

9    the lawyers.

10        (Whereupon, the excused prospective jurors exited

11   the courtroom.)

12        (Whereupon, prospective juror Stone was seen at

13   the bench, off the record, in the presence of the court and

14   counsel.)

15        THE CLERK:  Please listen for your name.  If I

16   call your name, please remain seated.  Everyone else will be

17   able to step out and wait for further instructions from our

18   court officers.

19        Evelyn Caceres, Irene Hernandez, Allen Abraham,

20   Yarenys Camillo, Jennifer Rodriguez and Jose Lopez.  Please

21   remain seated.  Everyone else step outside, please.

22        (Whereupon, the excused prospective jurors exited

23   the courtroom.)

24        THE CLERK:  Can you please rise one more time.

25        Are the jurors satisfactory to the People?

Jury Selection

1          We're going to ask you right now just with the one

2     of the court officers to exchange some information.  We're

3     going to give you our courtroom direct telephone number so

4     if you're delayed in any way, give us a call, let us know,

5     you know, I'll be a half hour late.  Look we, understand

6     things happen.

7          We're also going to ask you to give us contact

8     information the best way we can reach you.  Now, this

9     information is only in my, it's the court's information,

10    it's not shared with anyone else.  But if, for example, I

11    know that something is going to, something comes up that

12    you're not required to be here on a particular date or time,

13    I want to let you know that in advance so you don't just

14    come to court and nothing happens.  Okay?

15         So with that, have a great night, enjoy the rest

16    of the week and I'll see you Monday okay.

17              COURT OFFICER:  Jurors, this way.

18              (Whereupon, the sworn jurors entered the

19    courtroom.)

20              THE COURT:  I'll see you tomorrow ten-ish.

21              (Whereupon, the case was adjourned to July 16,

22    2015.)

23              (Continued on the next page...)

24

25

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     BRONX COUNTY : CRIMINAL TERM : PART 96
 2   -------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK
 3
             -against-
 4                                        Ind. No.
     RICHARD DIAZ,                        3349-2012
 5
                     Defendant.           TRIAL - VOLUME 11
 6   -------------------------------------x
                                          265 East 161 Street
 7                                        Bronx, New York 10451
                                          July16, 2015
 8
     B E F O R E:                            FILED
 9
                 THE HONORABLE RALPH FABRIZIO    OCT -5 2016
10              Justice of the Supreme Court
                                             SUP COURT, APP. DIV.
11              (Appearances same as previously noted.) FIRST DEPT.

12                                        LAURA ROSEN
                                          SENIOR COURT REPORTER
13
           *       *       *       *       *       *       *       *
14              (Whereupon, the following took place in open court

15      in the presence of defense counsel and the assistant

16      district attorney.)

17              THE CLERK:  Case on trial continued.  Richard

18      Diaz, the defendant, is still not before the court.

19              Appearances, please.

20              MR. BONANNO:  Good morning, Your Honor.  Pat

21      Bonnano for Mr. Diaz.

22              MR. MENDYS:  Newton Mendys for the office of the

23      district attorney.  Good morning.

24              THE COURT:  Good morning.

25              COURT OFFICER:  Jury panel entering.
```

Jury Selection

1        (Whereupon, the prospective jurors entered the

2    courtroom.)

3        THE COURT:  All right, good morning everyone.

4    We're going to continue with the selection process.  We're

5    just going to call 12 names now from the people in the

6    audience and we can start, and follow the court officers

7    instructions about where to sit.

8        THE CLERK:  Before I do, I just want to make sure

9    Dezorey Njoku is here?

10            Seat number one, Marlin A. Maxwell.

11            Seat number two, Stephanie Lopez.

12            Seat number three, Almira Session.

13            Seat number four, Jacob Torres.

14            Seat number five, Miles Surland, S-U-R-L-A-N-D.

15            Seat number six, Franklyn J. Beco, B-E-C-O.

16            Seat number seven, Xavier Scott.

17            Seat number eight, Merlene Pearson, M-E-R-L-E-N-E.

18            Seat number nine, Dezorey, D E Z O R E Y, last

19    name N-J-O-K-U.

20            Seat number 10, Jose Guzman Morel.

21            Seat number 11, Maurice Randall.

22            Seat number 12, Maria, Loor, L-O-O-R.

23        THE COURT:  All right.  So good morning everybody

24    again.  Now, you were all here yesterday.  You heard the

25    questions you heard answers.  Before I start my own

Jury Selection

1     questioning, I want to know just by a show of hands if based

2     on any of the questions, you know, that I'm going to be

3     asking, will anyone want to speak outside the presence of

4     the other jurors about any topic?  Great.  So you're all

5     ready to go.

6                 Mr. Maxwell -- wait, I'm sorry.  Mr. Morel.

7                 PROSPECTIVE JUROR:  Yes.

8                 THE COURT:  So I will note that and that will

9     happen at the end.  So Mr. Maxwell?

10                 PROSPECTIVE JUROR:  Good morning.

11                 THE COURT:  How are you?

12                 PROSPECTIVE JUROR:  I'm fine.  Thank you, sir.

13                 THE COURT:  You thought about all this all night.

14     You focused on all my questioning?

15                 PROSPECTIVE JUROR:  Pretty much.  Yeah.

16                 THE COURT:  Neighorhood?

17                 PROSPECTIVE JUROR:  Mace Avenue.

18                 THE COURT:  How long have you been at your current

19     address?

20                 PROSPECTIVE JUROR:  I believe three and a half

21     years.

22                 THE COURT:  Anyone living in the household with

23     you?

24                 PROSPECTIVE JUROR:  Yeah.  Me, my wife and my

25     stepdaughter and my son.

Jury Selection


 1                    THE COURT:  Now, are you currently working?
 2                    PROSPECTIVE JUROR:  Yes, sir.
 3                    THE COURT:  What do you do?
 4                    PROSPECTIVE JUROR:  I'm a New York City bus
 5          operator.
 6                    THE COURT:  Wife working outside the home?
 7                    PROSPECTIVE JUROR:  Unfortunately not right now.
 8                    THE COURT:  She works in the home, though?
 9                    PROSPECTIVE JUROR:  Yeah right.
10                    THE COURT:  Oh yes.  No, no, no.  Now, have you or
11          anyone close to you ever been the victim of any kind of
12          crime?
13                    PROSPECTIVE JUROR:  Yes, sir.
14                    THE COURT:  Who would that be?
15                    PROSPECTIVE JUROR:  Me.
16                    THE COURT:  Was it in connection with your job as
17          bus operator?
18                    PROSPECTIVE JUROR:  No, sir.
19                    THE COURT:  Tell me what happened?
20                    PROSPECTIVE JUROR:  It was my bike got stolen.  I
21          leant it to a friend.  We ended up fighting over my own
22          bike.
23                    THE COURT:  You had a fight with your friend over
24          your own bike?
25                    PROSPECTIVE JUROR:  Right.

Jury Selection

1          THE COURT:  You leant the friend your bike, he

2     wouldn't give it back to you?

3          PROSPECTIVE JUROR:  Right.  He claimed that

4     somebody stole it.

5          THE COURT:  So someone stole it from your friend.

6     How long ago was this?

7          PROSPECTIVE JUROR:  Back in '93.

8          THE COURT:  Was it reported to the police?

9          PROSPECTIVE JUROR:  Yes, sir.

10          THE COURT:  Did you ever get the bike back?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  Did the police take a complaint from

13     you?

14          PROSPECTIVE JUROR:  Yes, sir.

15          THE COURT:  Were you satisfied with the way the

16     police took the complaint and spoke to you at the time?

17          PROSPECTIVE JUROR:  Yes, sir.

18          THE COURT:  So you were the victim of a crime

19     involving theft.  Are you able to put that aside, just focus

20     facts in this case?

21          PROSPECTIVE JUROR:  Yes, sir.

22          THE COURT:  Promise me that?

23          PROSPECTIVE JUROR:  Yes, sir.

24          THE COURT:  Anyone close to you ever been charged

25     with, accused of, arrested in connection with any kind of

Jury Selection

1          crime?

2                    PROSPECTIVE JUROR:  My cousin.

3                    THE COURT:  How long ago was that?

4                    PROSPECTIVE JUROR:  This is 2009 I believe.

5                    THE COURT:  Was it here in the Bronx?

6                    PROSPECTIVE JUROR:  No, it was in the State of

7          Florida.

8                    THE COURT:  Florida, okay.  Are you aware of what

9          the charges were?

10                    PROSPECTIVE JUROR:  Yeah.

11                    THE COURT:  What were they?

12                    PROSPECTIVE JUROR:  It was theft.

13                    THE COURT:  Theft, okay.  Based on -- you were not

14          a witness or living in Florida at the time?

15                    PROSPECTIVE JUROR:  No.

16                    THE COURT:  Based on what you know about that

17          case, do you believe that your cousin was treated unfairly

18          in any way by law enforcement?

19                    PROSPECTIVE JUROR:  No.

20                    THE COURT:  Will the fact that your cousin was

21          arrested, had police contact, will that affect your ability

22          to be fair to the police and the DA in this case?

23                    PROSPECTIVE JUROR:  No, sir.

24                    THE COURT:  You're able to put that aside as well?

25                    PROSPECTIVE JUROR:  Yes, sir.

Jury Selection

1          THE COURT:  Any close friends or relatives who
2     work in law enforcement?
3          PROSPECTIVE JUROR:  My uncle used to but I believe
4     he retired.  He used to back in Jamaica, but when he came up
5     here he decided not to pursue that kind of career.
6          THE COURT:  You understand the reason I'm asking
7     the question?
8          PROSPECTIVE JUROR:  Yes, sir.
9          THE COURT:  Is because when police witnesses
10    testify, you have to judge their testimony objectively the
11    way I said, not give them any more or any less credibility.
12         PROSPECTIVE JUROR:  Yes, sir.
13         THE COURT:  By the way, your job as a bus driver,
14    do you work with police?  Are they involved with Transit
15    police coming?
16         PROSPECTIVE JUROR:  Very rarely.  Very rarely.
17         THE COURT:  Have you ever been on a jury?
18         PROSPECTIVE JUROR:  I was never selected.
19         THE COURT:  Well, if you are selected here, do you
20    promise me you'll be fair to both sides and follow my
21    instructions?
22         PROSPECTIVE JUROR:  Yes, sir.
23         THE COURT:  Thank you.
24         Miss Lopez?
25         PROSPECTIVE JUROR:  Hello.

Jury Selection

1          THE COURT:  How are you?

2          PROSPECTIVE JUROR:  I'm fine.

3          THE COURT:  Neighorhood?

4          PROSPECTIVE JUROR:  Parkchester.

5          THE COURT:  How long?

6          PROSPECTIVE JUROR:  Five years.

7          THE COURT:  Anyone living in the household with

8     you?

9          PROSPECTIVE JUROR:  And my mom.

10          THE COURT:  Are you working?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  In school?

13          PROSPECTIVE JUROR:  No.

14          THE COURT:  Had you been employed or gone to

15     school recently?

16          PROSPECTIVE JUROR:  No.

17          THE COURT:  Anyone in your household employed?

18          PROSPECTIVE JUROR:  No.

19          THE COURT:  Any have you or anyone close to you

20     ever been the victim of any kind of crime?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  Charged with, accused of?

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  Questioned, nothing like that?  Any

25     close friends or relatives who work in law enforcement?

1          PROSPECTIVE JUROR:  No, sir.

2          THE COURT:  You ever been on a jury?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  So you heard everything that other

5     people said yesterday.  I told you what the case is about.

6     I told you what we need, what jurors need to do if they're

7     selected.  Do you promise me you will be a fair and

8     impartial juror?

9          PROSPECTIVE JUROR:  Yes, sir.

10         THE COURT:  And you'll be fair to both sides?

11         PROSPECTIVE JUROR:  Yes, your Honor.

12         THE COURT:  And you'll follow my instruction?

13         PROSPECTIVE JUROR:  Uh, huh; yes.

14         THE COURT:  Thank you.

15         Miss Session, how are you?

16         PROSPECTIVE JUROR:  Good.

17         THE COURT:  Neighorhood?

18         PROSPECTIVE JUROR:  Morris.

19         THE COURT:  How long?

20         PROSPECTIVE JUROR:  All my life.

21         THE COURT:  Could you speak a little louder?

22         PROSPECTIVE JUROR:  Sorry.  All my life.

23         MR. MENDYS:  I didn't --

24         THE COURT:  All my life.  I didn't hear the

25     neighorhood.

1          PROSPECTIVE JUROR:  Morris.

2          MR. MENDYS:  Thank you.

3          THE COURT:  And is anyone living in your household

4     with you?

5          PROSPECTIVE JUROR:  My mother and two children.

6          THE COURT:  Are you working?

7          PROSPECTIVE JUROR:  Currently I'm a stay-at-home

8     mom.

9          THE COURT:  What had you done?

10          PROSPECTIVE JUROR:  I was a chef at Fordham

11    University.

12          THE COURT:  Oh, very nice.  Anyone else in your

13    household employed?

14          PROSPECTIVE JUROR:  No.

15          THE COURT:  You or anyone close to you ever been

16    the victim of a crime?

17          PROSPECTIVE JUROR:  My sister and I.

18          THE COURT:  How long ago was it?

19          PROSPECTIVE JUROR:  A long time ago.  I was about

20    seven years old.

21          THE COURT:  What happened?

22          PROSPECTIVE JUROR:  She was robbed.  My sister was

23    robbed while I was with her.

24          THE COURT:  Was there a weapon involved in it if

25    you know?

Jury Selection

1          PROSPECTIVE JUROR:  We didn't see one.  He said he

2     had a gun, yeah.

3          THE COURT:  What was taken?

4          PROSPECTIVE JUROR:  Her beeper.  That's when

5     beepers first came out.

6          THE COURT:  You understand what the charges are in

7     this case?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Involving a robbery and other things.

10    Do you promise me, are you able to, that you're able to put

11    aside, what happened, and just judge this case based on the

12    evidence in this case?

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  You have no bias that could ever be

15    against the defendant just because of the charges?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  Your sister report that to the police?

18         PROSPECTIVE JUROR:  I don't remember.  I was like

19    seven years old.

20         THE COURT:  You don't?

21         PROSPECTIVE JUROR:  I don't remember.

22         THE COURT:  Okay.  All right.  Anyone close to you

23    ever been charged with or accused of any kind of criminal

24    activity?

25         PROSPECTIVE JUROR:  No.

Jury Selection

1          THE COURT:  Any close friends or relatives who
2    work in law enforcement?
3          PROSPECTIVE JUROR:  Yes.
4          THE COURT:  Who would this be?
5          PROSPECTIVE JUROR:  I have about four cousins that
6    are corrections officer.
7          THE COURT:  Okay.  So you're going to see
8    uniformed police officers testify here.  You promise me
9    you'll follow my instructions about judging their testimony
10   in an objective manner?
11         PROSPECTIVE JUROR:  Yes.
12         THE COURT:  You ever been on a jury?
13         PROSPECTIVE JUROR:  No.
14         THE COURT:  So as you sit here, do you promise me
15   that you will be fair to both sides and follow my
16   instructions?
17         PROSPECTIVE JUROR:  Yes.
18         THE COURT:  Thank you.
19         Mr. Torres?
20         PROSPECTIVE JUROR:  Hello.
21         THE COURT:  How are you?
22         PROSPECTIVE JUROR:  I'm good.  How are you?
23         THE COURT:  Good, thank you.
24         Neighorhood?
25         PROSPECTIVE JUROR:  Soundview.

Jury Selection

1        THE COURT:  How long?

2        PROSPECTIVE JUROR:  Seven years.

3        THE COURT:  Anyone living in your household with

4    you?

5        PROSPECTIVE JUROR:  Yes, my mother, my two

6    brothers and a dog.

7        THE COURT:  Okay.  You working?

8        PROSPECTIVE JUROR:  Yeah.

9        THE COURT:  What do you do?

10       PROSPECTIVE JUROR:  I'm a bank teller.

11       THE COURT:  Okay.  How long you had that job?

12       PROSPECTIVE JUROR:  Just about a year in August.

13       THE COURT:  Anyone else in your household

14   employed?

15       PROSPECTIVE JUROR:  Yes, my two brothers.

16       THE COURT:  What do they do?

17       PROSPECTIVE JUROR:  One is a waiter and the other

18   manages a laundromat.

19       THE COURT:  Have you or anyone close to you ever

20   been the victim of a crime?

21       PROSPECTIVE JUROR:  Yes.

22       THE COURT:  Who would that be?

23       PROSPECTIVE JUROR:  My mother.

24       THE COURT:  How long ago was it?

25       PROSPECTIVE JUROR:  10 years, 10 years.

Jury Selection

1              THE COURT:  Where did it happen, if you know, in

2        the Bronx County?

3              PROSPECTIVE JUROR:  In the Bronx.

4              THE COURT:  What happened?

5              PROSPECTIVE JUROR:  She was a victim of a home

6        invasion.

7              THE COURT:  Was she home at the time?

8              PROSPECTIVE JUROR:  Yes.

9              THE COURT:  Were you home?

10             PROSPECTIVE JUROR:  No.

11             THE COURT:  Was anyone else other than your mother

12       home?

13             PROSPECTIVE JUROR:  No.

14             THE COURT:  Day or night?

15             PROSPECTIVE JUROR:  Daytime.

16             THE COURT:  Was your mother injured in any way?

17             PROSPECTIVE JUROR:  No, not physically.

18             THE COURT:  Any weapons?

19             PROSPECTIVE JUROR:  Yeah, a gun.

20             THE COURT:  Were the police contacted about this?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  And they took a complaint?

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  To your knowledge, was anyone

25       arrested?

Jury Selection

1           PROSPECTIVE JUROR:  No.

2           THE COURT:  Based on what you know, was there

3      dissatisfaction on your part or the part of any members of

4      your family about the way the police handled their

5      investigation?

6           PROSPECTIVE JUROR:  No.

7           THE COURT:  Now the crime of burglary, what was it

8      did they take from the house?

9           PROSPECTIVE JUROR:  My memory it was a safe that

10     my father had in the closet he kept in the bedroom.

11          THE COURT:  Property was stolen?

12          PROSPECTIVE JUROR:  Yeah.

13          THE COURT:  So this is a case that involves a

14     robbery stealing property?

15          PROSPECTIVE JUROR:  Yeah.

16          THE COURT:  Are you able to put aside what

17     happened to your mother and your home, the people, everyone

18     who lives in your household, and be a fair juror if selected

19     in this case?

20          PROSPECTIVE JUROR:  Yes.

21          THE COURT:  Anyone close to you been charged with

22     any kind of crime, arrested, questioned in connection with

23     any criminal activity?

24          PROSPECTIVE JUROR:  No.

25          THE COURT:  Close friends or relatives who work in

1    law enforcement?

2             PROSPECTIVE JUROR:  No.

3             THE COURT:  You ever been on a jury?

4             PROSPECTIVE JUROR:  No.

5             THE COURT:  If you're selected for this case will

6    you, do you promise me you'll follow my instructions and be

7    fair to both sides?

8             PROSPECTIVE JUROR:  Yes.

9             THE COURT:  Thank you.

10            Mr. Surland?

11            PROSPECTIVE JUROR:  Yes, sir.

12            THE COURT:  How are you?

13            PROSPECTIVE JUROR:  All right.

14            THE COURT:  Half marathon.  That's your shirt.

15            PROSPECTIVE JUROR:  Yeah, yeah, half is still 13

16   miles.

17            THE COURT:  Tell me what neighorhood you live in.

18            PROSPECTIVE JUROR:  Morrisania.

19            THE COURT:  How long have you been in that

20   neighorhood?

21            PROSPECTIVE JUROR:  Back and forth for about

22   twenty years, but the last three.

23            THE COURT:  Three years, the last three you've

24   been there?

25            PROSPECTIVE JUROR:  Yeah.

Jury Selection

1            THE COURT:  Anyone living in the household with

2      you?

3            PROSPECTIVE JUROR:  With my mother.

4            THE COURT:  You working?

5            PROSPECTIVE JUROR:  Yes, I work with the

6      developmentally disabled population.

7            THE COURT:  Your mom work outside the home?

8            PROSPECTIVE JUROR:  No.

9            THE COURT:  Have you or anyone close to you ever

10     been a victim of any kind of crime?

11           PROSPECTIVE JUROR:  No.

12           THE COURT:  Charged with, accused of, questioned

13     in connection with any criminal activity?

14           PROSPECTIVE JUROR:  Who, me charged?

15           THE COURT:  You or anyone close to you?

16           PROSPECTIVE JUROR:  No, not a victim but I have

17     been arrested before.

18           THE COURT:  Wait.  So we're talking about victim

19     again?

20           PROSPECTIVE JUROR:  No, you asking me if --

21           THE COURT:  I said has anyone close to you or

22     yourself ever been a victim where something happening?

23           PROSPECTIVE JUROR:  No, there's been nothing that

24     happened.

25           THE COURT:  But arrests or contact with the police

Jury Selection

1        as a suspect, questioned in connection with any kind of

2        crime?

3                    PROSPECTIVE JUROR:  Yes, that's happened.

4                    THE COURT:  To who?

5                    PROSPECTIVE JUROR:  To myself a couple years back.

6                    THE COURT:  Okay.  Now, when and where was this?

7                    PROSPECTIVE JUROR:  Kingsbridge.

8                    THE COURT:  Were you stopped and questioned by the

9        police?

10                   PROSPECTIVE JUROR:  Yeah, I was taken in and

11       arrested.

12                   THE COURT:  You were arrested?

13                   PROSPECTIVE JUROR:  Yeah, yeah.  I wasn't

14       convicted.

15                   THE COURT:  Okay.  You had a case pending in Bronx

16       court?

17                   PROSPECTIVE JUROR:  Yeah.

18                   THE COURT:  Did you have to come back on more than

19       one occasion?

20                   PROSPECTIVE JUROR:  Yeah, I did.

21                   THE COURT:  Can you tell me -- do you feel

22       comfortable talking about this?

23                   PROSPECTIVE JUROR:  Yeah.

24                   THE COURT:  Can you tell me what the accusations

25       were in that case, the charges?

Jury Selection

1        PROSPECTIVE JUROR:  Well, it was an assault and

2   destruction of property.

3        THE COURT:  Okay.  Now, do you believe that the

4   police treated you fairly or unfairly in arresting you in

5   that case?

6        PROSPECTIVE JUROR:  No I thought they did a good

7   job in defusing the situation.  I was treated fairly.

8        THE COURT:  Was anyone else arrested?

9        PROSPECTIVE JUROR:  No, I was the only one.

10        THE COURT:  Now the Bronx DA's office, of course,

11   was the prosecutor in that case.

12        PROSPECTIVE JUROR:  Yeah.

13        THE COURT:  And they're the prosecutors in this

14   case as well.  Do you have any negative feelings about the

15   way that office handled your case or treated you in that

16   case?

17        PROSPECTIVE JUROR:  No, they were just carrying

18   out justice.  No hard feelings.

19        THE COURT:  Would you say that you believe that

20   you are, would be affected in any way that would make you

21   unfair to the police or the DA in this case if selected as a

22   jury here?

23        PROSPECTIVE JUROR:  No.

24        THE COURT:  You promise me that?

25        PROSPECTIVE JUROR:  I promise you that.

Jury Selection

1            THE COURT:  Okay.  You have any close friends or

2       relatives who work in law enforcement?

3            PROSPECTIVE JUROR:  One friend that's a police

4       officer.

5            THE COURT:  And do you promise me that you'll

6       judge police testimony in the manner that I instructed all

7       the jurors in that objective way?

8            PROSPECTIVE JUROR:  I do promise.

9            THE COURT:  You ever been on a jury?

10           PROSPECTIVE JUROR:  I haven't been selected.  I

11      was called for jury duty but not selected.

12           THE COURT:  Mr. Surland, if you are selected on

13      this case, do you promise me that you will be fair to the

14      DA?

15           PROSPECTIVE JUROR:  Yes.

16           THE COURT:  You promise me fair to the defense?

17           PROSPECTIVE JUROR:  Yes.

18           THE COURT:  And you promise me you'll follow all

19      my instructions?

20           PROSPECTIVE JUROR:  I will.

21           THE COURT:  Okay.  Thank you.

22           Mr. Beco?

23           PROSPECTIVE JUROR:  Yeah.

24           THE COURT:  How are you?

25           PROSPECTIVE JUROR:  Good, and you?

Jury Selection

1            THE COURT:  Good, thank you.

2            Neighorhood?

3            PROSPECTIVE JUROR:  Bedford Park.

4            THE COURT:  How long?

5            PROSPECTIVE JUROR:  12 years now.

6            THE COURT:  Anyone living in the household with

7    you?

8            PROSPECTIVE JUROR:  My father, my mother, my

9    little sister and my little brother.

10           THE COURT:  You working now?

11           PROSPECTIVE JUROR:  No.

12           THE COURT:  You in school?

13           PROSPECTIVE JUROR:  Yeah, full-time.

14           THE COURT:  Would it be Syracuse?

15           PROSPECTIVE JUROR:  No.

16           THE COURT:  You're wearing the sweatshirt.  What

17   are you studying?

18           PROSPECTIVE JUROR:  Computer science.

19           THE COURT:  Okay.  And anyone in your household

20   employed right now?

21           PROSPECTIVE JUROR:  My father, he's a car dealer.

22           THE COURT:  You or anyone close to you ever been

23   the victim of a crime?

24           PROSPECTIVE JUROR:  No, sir.

25           THE COURT:  Charged with, accused of, questioned

Jury Selection

1        in connection with any kind of criminal activity?

2                    PROSPECTIVE JUROR:  No.

3                    THE COURT:  Close friends or relatives in any law

4        enforcement job?

5                    PROSPECTIVE JUROR:  No.

6                    THE COURT:  Ever been on a jury?

7                    PROSPECTIVE JUROR:  No.

8                    THE COURT:  So knowing everything you know about

9        yourself, what you know about the case, the charges, what

10       you know the job of a juror is, if selected do you promise

11       me that if you are selected as a juror you will be fair to

12       both sides?

13                   PROSPECTIVE JUROR:  Promise you.

14                   THE COURT:  And you'll follow all my instructions?

15                   PROSPECTIVE JUROR:  Yeah.

16                   THE COURT:  Okay.  Mr. Scott, how are you?

17                   PROSPECTIVE JUROR:  Good, and yourself?

18                   THE COURT:  Good, thank you.  So neighorhood?

19                   PROSPECTIVE JUROR:  Soundview.

20                   THE COURT:  How long?

21                   PROSPECTIVE JUROR:  12 years.

22                   THE COURT:  Anyone living in the household with

23       you?

24                   PROSPECTIVE JUROR:  My mother, my stepfather and

25       my sister.

Jury Selection

1           THE COURT:  You working outside the home?

2           PROSPECTIVE JUROR:  Not at the moment.

3           THE COURT:  Had you worked recently?

4           PROSPECTIVE JUROR:  Yes.

5           THE COURT:  What did you do?

6           PROSPECTIVE JUROR:  I was a measure

7    specialist/tailor for Ralph Lauren.

8           THE COURT:  And anyone else in your household

9    employed?

10          PROSPECTIVE JUROR:  Yes, my mother and my

11   stepfather.

12          THE COURT:  What do they do?

13          PROSPECTIVE JUROR:  My stepfather's a postal

14   worker and my mother's a social worker.

15          THE COURT:  Have you or anyone close to you ever

16   been the victim of any kind of crime?

17          PROSPECTIVE JUROR:  No.

18          THE COURT:  Charged with, accused of, questioned

19   in connection with any criminal activity?

20          PROSPECTIVE JUROR:  No.

21          THE COURT:  Close friends or relatives of any kind

22   who work in law enforcement of any kind?

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  You ever been on a jury?

25          PROSPECTIVE JUROR:  No.

Jury Selection

1          THE COURT:  So Mr. Scott, you sat here.  You have

2     what it takes to be a jury?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  You promise me that if you are

5     selected you'll be fair to both sides?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  And you'll follow all my instructions?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Okay, thank you.

10          Miss Pearson, how are you?

11          PROSPECTIVE JUROR:  I'm fine, thank you.  And you?

12          THE COURT:  Thank you so much for asking.  I'm

13     okay.

14          Tell me what neighorhood you live in?

15          PROSPECTIVE JUROR:  Parkchester.

16          THE COURT:  How long?

17          PROSPECTIVE JUROR:  Five years.

18          THE COURT:  Anyone living in your household with

19     you?

20          PROSPECTIVE JUROR:  No.

21          THE COURT:  Do you currently work?

22          PROSPECTIVE JUROR:  Not at this moment.

23          THE COURT:  Had you worked, you know, recently or

24     done --

25          PROSPECTIVE JUROR:  I'm out on disability.

Jury Selection

1              THE COURT:  And what had you worked?  What kind of

2       work had you worked at before?

3              PROSPECTIVE JUROR:  Home health aide/CNA.

4              THE COURT:  Have you or anyone close to you ever

5       been the victim of any kind of crime?

6              PROSPECTIVE JUROR:  No.

7              THE COURT:  Charged with, accused of, questioned

8       in connection with any kind of criminal activity?

9              PROSPECTIVE JUROR:  Yes.

10             THE COURT:  Who would that be?

11             PROSPECTIVE JUROR:  My youngest son.

12             THE COURT:  Now, how long ago was this?

13             PROSPECTIVE JUROR:  About nine years.

14             THE COURT:  Was he arrested?

15             PROSPECTIVE JUROR:  Yes.

16             THE COURT:  And was it in the Bronx?

17             PROSPECTIVE JUROR:  Yes.

18             THE COURT:  Are you aware of what the charges, the

19      accusations were?

20             PROSPECTIVE JUROR:  Well, it's a misdemeanor.  He

21      was in a fight.

22             THE COURT:  Okay.  Do you believe that he was

23      treated unfairly by the police in that case in being

24      arrested for what the charges were?

25             PROSPECTIVE JUROR:  No.

Jury Selection

1          THE COURT:  Did he have to come to court on
2      several occasions at that time, if you remember?
3          PROSPECTIVE JUROR:  Not that I can remember.
4          THE COURT:  Do you know how old he was at the
5      time?
6          PROSPECTIVE JUROR:  Yes, 19.
7          THE COURT:  Did you ever come to any court
8      proceedings that involved your son in connection with that
9      case?
10         PROSPECTIVE JUROR:  Yes.
11         THE COURT:  And did it go to trial do you know?
12     Was there a trial where people testified and --
13         PROSPECTIVE JUROR:  No.
14         THE COURT:  Your son was prosecuted by the Bronx
15     DA's office for that charge.  And again, they're the DA's
16     office prosecuting, that is prosecuting this case, as they
17     do all crimes that are for arrests that happen in the Bronx.
18         Do you have any feelings against law enforcement,
19     the DA's office, the police based on what happened in that
20     case that would make you believe you could not be fair in
21     this case?
22         PROSPECTIVE JUROR:  No.
23         THE COURT:  You promise me you will still be fair?
24         PROSPECTIVE JUROR:  Sure.
25         THE COURT:  Do you have any close friends or

Jury Selection

1        relatives who work in any kind of law enforcement?

2                    PROSPECTIVE JUROR:  No.

3                    THE COURT:  You ever been on a jury?

4                    PROSPECTIVE JUROR:  About the same as here.  I've

5        been about the same as here.

6                    THE COURT:  This point?

7                    PROSPECTIVE JUROR:  This point, yeah.

8                    THE COURT:  If you are selected in this case, do

9        you promise me that you will be fair to the DA?

10                   PROSPECTIVE JUROR:  Yes.

11                   THE COURT:  Do you promise me you will be fair to

12       the defendant?

13                   PROSPECTIVE JUROR:  Yes.

14                   THE COURT:  And do you promise me you'll follow

15       all of my instructions?

16                   PROSPECTIVE JUROR:  Yes.

17                   THE COURT:  Okay, thank you.

18                   Miss Njoku, tell me what neighorhood?

19                   PROSPECTIVE JUROR:  I live on Freeman Street.

20                   THE COURT:  How long?

21                   PROSPECTIVE JUROR:  14 years.

22                   THE COURT:  Anyone living in your household with

23       you?

24                   PROSPECTIVE JUROR:  Yes, both my parents and two

25       brothers.

Jury Selection

1          THE COURT:  Are you working?

2          PROSPECTIVE JUROR:  Not at the moment.

3          THE COURT:  You in school?

4          PROSPECTIVE JUROR:  I got accepted, yes, into

5    Empire State.

6          THE COURT:  To study what?

7          PROSPECTIVE JUROR:  Finance.

8          THE COURT:  Congratulations.  When do you start?

9          PROSPECTIVE JUROR:  This Fall.

10         THE COURT:  Now you said you're not working.  Have

11   you worked before you applied?

12         PROSPECTIVE JUROR:  Yes, I had an administrative

13   assistant job at a cash advance agency.

14         THE COURT:  Anyone else in your household

15   employed?

16         PROSPECTIVE JUROR:  Yes, both my parents and my

17   older brother.

18         THE COURT:  What do they do?

19         PROSPECTIVE JUROR:  My mom is a nurse, my dad is a

20   cab driver, and my brother is also a nurse.

21         THE COURT:  Now have you or anyone close to you

22   ever been the victim of a crime?

23         PROSPECTIVE JUROR:  Yes, myself.

24         THE COURT:  When did that happen?

25         PROSPECTIVE JUROR:  This happened about two, three

Jury Selection

1     years ago.

2                    THE COURT:  And where did it happen?

3                    PROSPECTIVE JUROR:  In the Bronx.

4                    THE COURT:  And what happened?

5                    PROSPECTIVE JUROR:  Some boy tried to steal my

6     phone.

7                    THE COURT:  Tried to?

8                    PROSPECTIVE JUROR:  Yes.

9                    THE COURT:  But was not successful?

10                   PROSPECTIVE JUROR:  No.

11                   THE COURT:  Just some boy?

12                   PROSPECTIVE JUROR:  Yes, random.

13                   THE COURT:  Why was he unsuccessful?

14                   PROSPECTIVE JUROR:  Because he was weak, I guess.

15                   THE COURT:  So you did to, you prevented the crime

16    from happening?

17                   PROSPECTIVE JUROR:  Yes, you could say that, yes.

18                   THE COURT:  Okay, I gotcha.  Did you report what

19    happened to the police?

20                   PROSPECTIVE JUROR:  I didn't want to but I ended

21    up reporting it.

22                   THE COURT:  And did the police take a complaint

23    from you?

24                   PROSPECTIVE JUROR:  Yes.

25                   THE COURT:  Did they follow-up in any way to your

Jury Selection

1       knowledge?

2               PROSPECTIVE JUROR:  Yes.

3               THE COURT:  Was there, was some boy arrested?

4               PROSPECTIVE JUROR:  As far as I know, no, but he

5       was just like chased down street by like three men who saw

6       what happened.

7               THE COURT:  This is at the time of the, he tried

8       to take your phone?

9               PROSPECTIVE JUROR:  Yes.

10              THE COURT:  So other people chased him down the

11      street?

12              PROSPECTIVE JUROR:  Yes.

13              THE COURT:  So he may not have felt comfortable

14      coming back there.

15              PROSPECTIVE JUROR:  Yes.

16              THE COURT:  Okay.  Now this is a case where the

17      charges include a completed robbery where it's alleged that

18      property actually was taken.  Based on what happened to you,

19      are you able to put that aside and be a fair juror in this

20      case?

21              PROSPECTIVE JUROR:  Yes.

22              THE COURT:  For the defense?

23              PROSPECTIVE JUROR:  Yes.

24              THE COURT:  Were you satisfied with the way the

25      police, you did report it, treated you who took your

Jury Selection

1      complaint?

2                PROSPECTIVE JUROR:  Yes.

3                THE COURT:  Anyone close to you ever been charged

4      with or accused any kind of criminal activity?

5                PROSPECTIVE JUROR:  Yes, a close friend.

6                THE COURT:  So how long ago was this?

7                PROSPECTIVE JUROR:  This was about two years ago I

8      think.

9                THE COURT:  Where was this?

10               PROSPECTIVE JUROR:  In the Bronx.

11               THE COURT:  And was your friend arrested?

12               PROSPECTIVE JUROR:  Yes.

13               THE COURT:  Are you aware of what the charges

14     were?

15               PROSPECTIVE JUROR:  Attempted murder.

16               THE COURT:  Is there still a pending case to your

17     knowledge?

18               PROSPECTIVE JUROR:  No.

19               THE COURT:  Did you ever come to court for any of

20     the proceedings connected with that case?

21               PROSPECTIVE JUROR:  I came but I didn't, I was too

22     late, like the court case had already finished by the time I

23     came.

24               THE COURT:  It had been called but you did come

25     by --

Jury Selection

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Now, based on what you know about the

3    case, number one, do you believe your friend was treated

4    unfairly in any way by the police in being arrested and

5    charged with the crime?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  This is in the Bronx so the Bronx DA's

8    office were the prosecutors.  Did you come to this building?

9          PROSPECTIVE JUROR:  I did.

10         THE COURT:  So again, they're the prosecutors in

11   this case.  Do you believe that that office treated your

12   friend unfairly?

13         PROSPECTIVE JUROR:  No.

14         THE COURT:  Do you have any bias against law

15   enforcement based on what happened to your friend?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  You promise me you will be fair to the

18   DA and police witnesses in this case?

19         PROSPECTIVE JUROR:  I promise.

20         THE COURT:  Okay.  Do you have any close friends

21   or relatives who work in law enforcement?

22         PROSPECTIVE JUROR:  No.

23         THE COURT:  You've never been on a jury?

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  If you're on this case, do you promise

Jury Selection

1       me that you will be fair to the DA?

2                   PROSPECTIVE JUROR:  I promise.

3                   THE COURT:  Promise me you'll be fair to the

4       defendant?

5                   PROSPECTIVE JUROR:  I promise.

6                   THE COURT:  And you'll follow my instructions?

7                   PROSPECTIVE JUROR:  Yes.

8                   THE COURT:  Okay.  I'm going to skip over Mr.

9       Morel for now.

10                  Mr. Derlandish?

11                  PROSPECTIVE JUROR:  No, my last name is Randall.

12                  THE COURT:  I'm sorry.  Neighorhood?

13                  PROSPECTIVE JUROR:  Co-op City.

14                  THE COURT:  How long?

15                  PROSPECTIVE JUROR:  Twenty years.

16                  THE COURT:  Anyone living in your household with

17      you?

18                  PROSPECTIVE JUROR:  My mother.

19                  THE COURT:  Working?

20                  PROSPECTIVE JUROR:  She's retired.

21                  THE COURT:  What do you do?

22                  PROSPECTIVE JUROR:  Me?

23                  THE COURT:  Yeah.

24                  PROSPECTIVE JUROR:  I'm a dispatcher for Executive

25      Transportation Group.

Jury Selection

1          THE COURT:  And mom?

2          PROSPECTIVE JUROR:  She's retired.

3          THE COURT:  From what?

4          PROSPECTIVE JUROR:  She retired from, actually

5     retired twice, from Federal Reserve Bank and then NYPD

6     crossing guard.

7          THE COURT:  What?

8          PROSPECTIVE JUROR:  Crossing guard.

9          THE COURT:  So she was a crossing guard.  Is that,

10    you're a police department employee for that I guess.

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  Okay.  So I'm going to jump ahead a

13    little bit.  You have a close friend, actually your mother,

14    worked for the police department.

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  Based on that, are you able to tell me

17    that you will follow my instructions and judge police

18    testimony in a fair and objective way without giving any

19    more or less credibility to those witnesses because of what

20    they do for a living?

21         PROSPECTIVE JUROR:  Yes.

22         THE COURT:  Any other, do you have any other

23    friends or relatives who work in NYPD?

24         PROSPECTIVE JUROR:  I have.

25         THE COURT:  Or anyone else?

Jury Selection

1          PROSPECTIVE JUROR:  I have a cousin who's a

2     corrections officer.

3          THE COURT:  Okay.  So have you ever been the

4     victim of any kind of crime?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  What happened to you?

7          PROSPECTIVE JUROR:  I was stabbed.

8          THE COURT:  Oh, my goodness.  I'm so sorry to hear

9     that.  When was that?

10          PROSPECTIVE JUROR:  About 11 years ago.

11          THE COURT:  Where did that happen?

12          PROSPECTIVE JUROR:  Where I live, Co-op City.

13          THE COURT:  Police were involved, obviously?

14          PROSPECTIVE JUROR:  Well, they questioned me in

15     the hospital.

16          THE COURT:  Right, because they're required to

17     show up when there's that kind of an injury.

18          Did you -- so it was reported, whether you did or

19     not, they showed up to talk to you at the hospital?

20          PROSPECTIVE JUROR:  Yeah.

21          THE COURT:  Were you satisfied with the way the

22     police --

23          PROSPECTIVE JUROR:  Yes.

24          THE COURT:  -- treated you?  Was anyone ever

25     arrested in connection with that?

Jury Selection

1      PROSPECTIVE JUROR:  No.

2      THE COURT:  Do you have any kind of bias that

3      would result from what happened to you, either bias in favor

4      of or against the police or that could affect the defendant

5      in any way in this case if you were selected?

6      PROSPECTIVE JUROR:  No.

7      THE COURT:  You will be fair despite being a

8      victim of that type of crime?

9      PROSPECTIVE JUROR:  Yes.

10     THE COURT:  Anyone else close to you before a

11     crime victim?

12     PROSPECTIVE JUROR:  No.

13     THE COURT:  Anyone close to you or yourself been

14     charged with or accused, questioned in connection with any

15     crime?

16     PROSPECTIVE JUROR:  Yes, myself.

17     THE COURT:  How long ago was that?

18     PROSPECTIVE JUROR:  Well, it was two instances.

19     THE COURT:  Two?

20     PROSPECTIVE JUROR:  Yes.

21     THE COURT:  Okay.  So what's the most recent one?

22     PROSPECTIVE JUROR:  Most recent was about six

23     years ago.

24     THE COURT:  Was this also in the Bronx?

25     PROSPECTIVE JUROR:  No.

Jury Selection

```
 1              THE COURT:  Where was this?
 2              PROSPECTIVE JUROR:  This was in Manhattan.
 3              THE COURT:  Were you arrested at the time?
 4              PROSPECTIVE JUROR:  Yes, sir.
 5              THE COURT:  And can I ask what the allegations,
 6      accusations were?
 7              PROSPECTIVE JUROR:  Criminal possession of a
 8      firearm.
 9              THE COURT:  That case is over?
10              PROSPECTIVE JUROR:  Yes.
11              THE COURT:  Did you, were you dissatisfied with
12      the way the police handled the case?
13              PROSPECTIVE JUROR:  No.
14              THE COURT:  Were you the only one arrested in
15      connection with that particular event?
16              PROSPECTIVE JUROR:  No.
17              THE COURT:  There were other people arrested?
18              PROSPECTIVE JUROR:  Yes.
19              THE COURT:  Okay.  Was your case disposed of
20      without any kind of felony conviction?
21              PROSPECTIVE JUROR:  Yes.
22              THE COURT:  And what was the other time?
23              PROSPECTIVE JUROR:  About 2005 I was subpoenaed to
24      be questioned by the U.S. DA.
25              THE COURT:  And what was that in connection with?
```

Jury Selection

1          PROSPECTIVE JUROR:  It was a raid that happened in

2     Co-op City.

3          THE COURT:  And you were subpoenaed to be

4     questioned by them?

5          PROSPECTIVE JUROR:  Yes, they --

6          THE COURT:  Do you feel that you were an unfair

7     subject of the subpoena or unfairly questioned?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Do you have any bias from the

10    treatment you received in that case?

11         PROSPECTIVE JUROR:  No, no.

12         THE COURT:  You promise me you'll still be fair to

13    the DA and the police officers testifying in this case?

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  Do you have any close friends or

16    relatives who work in law enforcement?

17         PROSPECTIVE JUROR:  My cousin that's a correction

18    officer.

19         THE COURT:  Yes, you told me.  I'm sorry, you went

20    through this.  Yes.

21         Ever been on a jury?

22         PROSPECTIVE JUROR:  No.

23         THE COURT:  And if you are selected on this case

24    do you promise me that you will be fair to the DA?

25         PROSPECTIVE JUROR:  Yes.

Jury Selection

1            THE COURT:  You'll be fair to the defense?

2            PROSPECTIVE JUROR:  Yes.

3            THE COURT:  And you'll follow all my instructions?

4            PROSPECTIVE JUROR:  Indeed, yes.

5            THE COURT:  Miss Loor?

6            PROSPECTIVE JUROR:  Yes.

7            THE COURT:  How are you?

8            PROSPECTIVE JUROR:  Good, your Honor.  How are

9      you?

10           THE COURT:  Good, thanks.

11           Neighorhood?

12           PROSPECTIVE JUROR:  Van Nest.

13           THE COURT:  How long?

14           PROSPECTIVE JUROR:  11 years.

15           THE COURT:  Anyone living in your household with

16     you?

17           PROSPECTIVE JUROR:  Yes, my mother, stepfather and

18     my two young siblings.

19           THE COURT:  You working?

20           PROSPECTIVE JUROR:  Yes, sir.  I work for Con

21     Edison, customer service representative.

22           THE COURT:  Anyone else in your household

23     employed?

24           PROSPECTIVE JUROR:  Yes, my mother and my

25     stepfather.

Jury Selection

1        THE COURT:  What do they do?

2        PROSPECTIVE JUROR:  My mother's a cashier and my

3    stepfather's working in maintenance.

4        THE COURT:  Okay.  Anyone close to you where

5    yourself ever been the victim of any kind of crime?

6        PROSPECTIVE JUROR:  Yes, my stepfather.

7        THE COURT:  How long ago was it?

8        PROSPECTIVE JUROR:  Probably nine, 10 years ago.

9        THE COURT:  Was it in the Bronx?

10        PROSPECTIVE JUROR:  Yes, sir.

11        THE COURT:  What happened?

12        PROSPECTIVE JUROR:  He was mugged and beaten up.

13        THE COURT:  Property taken?

14        PROSPECTIVE JUROR:  I don't recall.  I was really

15    young.

16        THE COURT:  Okay, but because a mugging usually

17    implies like something someone being beaten up or assaulted

18    for stealing something.

19        PROSPECTIVE JUROR:  Yeah.

20        THE COURT:  Is that what your understanding was,

21    it was an assault that happened?

22        PROSPECTIVE JUROR:  Yeah, he went to the hospital.

23        THE COURT:  He went to the hospital.  You were

24    very young, I understand.  People still talk about it from

25    time to time in the house?

Jury Selection

1           PROSPECTIVE JUROR:  No.

2           THE COURT:  Do you know whether anyone was ever

3    arrested in connection with that?

4           PROSPECTIVE JUROR:  I don't think so.

5           THE COURT:  Based on the fact that your father was

6    the victim of a crime, and particularly that crime, would

7    that in any way make you unfair if selected as a juror in

8    this case?

9           PROSPECTIVE JUROR:  No, your Honor.

10          THE COURT:  You promise me you could put that

11   aside and be fair?

12          PROSPECTIVE JUROR:  Yeah.

13          THE COURT:  Anyone close to you ever been or

14   yourself been charged, accused, questioned in connection

15   with any kind of criminal activity?

16          PROSPECTIVE JUROR:  No, your Honor.

17          THE COURT:  Any close friends or relatives who

18   work in any law enforcement capacity?

19          PROSPECTIVE JUROR:  No.

20          THE COURT:  You ever been on a jury?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  If selected to be on this jury, do you

23   promise me you will be fair to both sides?

24          PROSPECTIVE JUROR:  Yes, sir.

25          THE COURT:  You'll follow my instructions?

Jury Selection

1              PROSPECTIVE JUROR:  Of course.

2              THE COURT:  I'm going to take a very, very brief

3       recess now while I speak to Mr. Morel outside the presence

4       of all the other jurors.  So just don't discuss the case,

5       keep an open mind.  Follow my recess instructions.  And once

6       I finish with this, we'll call you all back and we'll have

7       questions from the lawyers, okay.  Mr. Morel, you can just

8       remain.

9              (Whereupon, the prospective jurors exited the

10      courtroom.)

11             THE COURT:  All the prospective jurors have left

12      with the exception of juror in seat number 10.

13             So tell me, sir, what was your, what did you want

14      to talk without the other jurors around about?

15             PROSPECTIVE JUROR:  I've been arrested a couple of

16      times that's why.

17             THE COURT:  Tell me, couple of times, twice or

18      more than twice?

19             PROSPECTIVE JUROR:  Five times actually.

20             THE COURT:  Five times.  All in the Bronx?

21             PROSPECTIVE JUROR:  All in the Bronx, yeah.

22             THE COURT:  Did they involve the same type of

23      charge?

24             PROSPECTIVE JUROR:  More or less.

25             THE COURT:  What was it?

Jury Selection

1          PROSPECTIVE JUROR:  In '89 it was gun charge.

2          THE COURT:  Gun possession?

3          PROSPECTIVE JUROR:  Yeah, that was dismissed.

4          THE COURT:  Was dismissed, okay.  What else?

5          PROSPECTIVE JUROR:  In '93 it was I was accused of

6    shooting somebody.  That was dismissed also.  In '95 my

7    sister had a business and I had a gun charge also.

8          THE COURT:  A gun charge in the business?

9          PROSPECTIVE JUROR:  Yeah, correct, yeah.

10         THE COURT:  What happened to that case?

11         PROSPECTIVE JUROR:  That case was attempted

12   possession of a weapon.  They charged me with a misdemeanor.

13         THE COURT:  You have a misdemeanor conviction from

14   that?

15         PROSPECTIVE JUROR:  Yeah, from that, yeah.

16         THE COURT:  In the Bronx?

17         PROSPECTIVE JUROR:  In the Bronx.

18         THE COURT:  What else?

19         PROSPECTIVE JUROR:  And in 2000 it was for

20   numbers.

21         THE COURT:  You were charged with --

22         PROSPECTIVE JUROR:  Slips and numbers.

23         THE COURT:  Gambling, numbered slips?

24         PROSPECTIVE JUROR:  Yeah.

25         THE COURT:  Was this in connection with your

1     business?

2              PROSPECTIVE JUROR:  That was another business.

3              THE COURT:  Well, a business, right?

4              PROSPECTIVE JUROR:  Yeah.

5              THE COURT:  What happened to that case?

6              PROSPECTIVE JUROR:  A fine, $200 fine.

7              THE COURT:  And the last one?

8              PROSPECTIVE JUROR:  Three years ago.  It was three

9     or two years ago right in the neighorhood there was a police

10    officer, you know, usually frisks.  They arrested me, they

11    put like possession.  It was dismissed.

12             THE COURT:  Possession of drugs?

13             PROSPECTIVE JUROR:  Drugs, yeah.  They find a bag,

14    empty bag of marijuana and they, you know, and that was

15    dismissed also.

16             THE COURT:  Okay.  So having been arrested,

17    prosecuted by the Bronx DA's office for a number of cases,

18    are you able to be fair to this DA's office in this case?

19             PROSPECTIVE JUROR:  Yes.

20             THE COURT:  You're able to put that all aside?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  You promise, do you feel in any way

23    that you were treated unfairly by the DA's office in

24    connection with any of those cases?

25             PROSPECTIVE JUROR:  Well, last time, actually to

Jury Selection

1       be honest.

2                   THE COURT:  The last case, was it, did the case

3       that case end at the arraignment?

4                   PROSPECTIVE JUROR:  At the arraignment right

5       there.

6                   THE COURT:  It was over at the arraignment.  Okay.

7                   PROSPECTIVE JUROR:  Right, yeah.

8                   THE COURT:  So you believe the police treated you

9       unfairly in arresting you in that case?

10                  PROSPECTIVE JUROR:  In that case, yes, I have to

11      believe.

12                  THE COURT:  And do you have any bias against the

13      police?

14                  PROSPECTIVE JUROR:  No, no.

15                  THE COURT:  Police department because of that

16      arrest?

17                  PROSPECTIVE JUROR:  No, I figured they was doing

18      what they had to do.

19                  THE COURT:  And you promise me that that will not

20      affect your ability to be fair in this case?

21                  PROSPECTIVE JUROR:  No, no.

22                  THE COURT:  All right.  So let me go through the

23      rest of the questions.  What neighborhood do you live in?

24                  PROSPECTIVE JUROR:  I live around this neighorhood

25      actually.

Jury Selection

1          THE COURT:  How long you've been at your current
2     address.
3          PROSPECTIVE JUROR:  Right now it's my mother's
4     address.  I always use it.  I'm staying with her right now.
5          THE COURT:  Who lives in your household?
6          PROSPECTIVE JUROR:  My mother, my son and my wife.
7          THE COURT:  Now do you still own your own
8     business?
9          PROSPECTIVE JUROR:  No, no.
10         THE COURT:  What kind of store?
11         PROSPECTIVE JUROR:  No, no, that was --
12         THE COURT:  What were the businesses?
13         PROSPECTIVE JUROR:  It was a grocery store, a
14    liquor store.  Then I had a parking lot also.
15         THE COURT:  And do you work now?
16         PROSPECTIVE JUROR:  Yes.
17         THE COURT:  What do you do?
18         PROSPECTIVE JUROR:  I'm a security officer.
19         THE COURT:  Anyone else in your household
20    employed?
21         PROSPECTIVE JUROR:  My son actually, but he goes
22    to college also.
23         THE COURT:  You ever been the victim of any kind
24    of crime?
25         PROSPECTIVE JUROR:  Twice.

Jury Selection

1           THE COURT:  What happened?

2           PROSPECTIVE JUROR:  Back in the eighties, '82 when

3    I was in high school I actually was robbed, me and my,

4    girlfriend at gunpoint.

5           THE COURT:  Was a weapon involved?

6           PROSPECTIVE JUROR:  Yes.

7           THE COURT:  And what was the other time?

8           PROSPECTIVE JUROR:  In 2004 in one of the

9    businesses that I have.

10          THE COURT:  Okay.  And that's --

11          PROSPECTIVE JUROR:  Parking lot.

12          THE COURT:  It was a robbery or theft or --

13          PROSPECTIVE JUROR:  It was more or less we had a,

14   you know, like an argument, stuff like that.  So he

15   assaulted me and broke one of the cars window.

16          THE COURT:  Was anyone arrested in either case?

17          PROSPECTIVE JUROR:  Both of them.

18          THE COURT:  Did you have to testify?

19          PROSPECTIVE JUROR:  First one, yeah, grand jury

20   and testify.

21          THE COURT:  Will that make you believe that you

22   couldn't be fair in any way in this case because you've been

23   a victim of those types of crimes?

24          PROSPECTIVE JUROR:  No, no.

25          THE COURT:  You promise me will you still be

Jury Selection

1      fair --

2              PROSPECTIVE JUROR:  Yeah sure.

3              THE COURT:  To both sides?  Okay.  Any close

4      friends or relatives who work in law enforcement?

5              PROSPECTIVE JUROR:  Yes, my son.

6              THE COURT:  Is what?

7              PROSPECTIVE JUROR:  He's working doing intern in

8      data right now.

9              THE COURT:  Going to be able to follow my

10     instructions?  Promise me you'll follow my instructions?

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  About police testimony specifically.

13     Ever been on a jury?

14             PROSPECTIVE JUROR:  No.

15             THE COURT:  So if you're selected to be on this

16     jury you promise me you will be fair to the DA?

17             PROSPECTIVE JUROR:  Sure.

18             THE COURT:  You'll be fair to the defendant?

19             PROSPECTIVE JUROR:  Yeah.

20             THE COURT:  And you'll follow all my instructions?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  All right.  I will allow both sides to

23     have any questions you want about Mr. Morel's arrest record

24     because that's what he wanted to speak about privately, but

25     that questioning cannot take place after this time.  So Mr.

Jury Selection

1          Mendys?

2                    MR. MENDYS:  Nothing.

3                    THE COURT:  Mr. Bonnano?

4                    MR. BONANNO:  I just discuss --

5                    THE COURT:  Questioning about anything else too,

6          but if it's the arrests, I don't want that raised with the

7          other jurors.

8                    MR. BONANNO:  That's fine.  I just didn't hear

9          what your son did.  He did something in the law enforcement.

10                   PROSPECTIVE JUROR:  He's gonna be, he wants to be

11         a law enforcement actually.

12                   MR. BONANNO:  He wants to be law enforcement but

13         he's not in it now?

14                   PROSPECTIVE JUROR:  He's working in data right now

15         doing their intern actually.

16                   MR. BONANNO:  And he's doing internship?

17                   PROSPECTIVE JUROR:  Yeah, data in one of those,

18         you know, data 42nd Street with the police department.

19                   MR. BONANNO:  He's working for like a contractor

20         for the police department?

21                   PROSPECTIVE JUROR:  It's data.  It's free so it's

22         an intern.

23                   MR. BONANNO:  Okay.  On these arrests that you

24         have you had a great lawyer, you lived the charmed life

25         here.  I mean --

Jury Selection

1          PROSPECTIVE JUROR:   That's --

2          THE COURT:   Is that a question or a comment?

3          PROSPECTIVE JUROR:   No, no, that's the beauty of

4  the American system.   That's the way it is, the benefit of

5  the doubt.

6          MR. BONANNO:   And what I'm trying to get to is, at

7  the end of the day did you realize that the police had a job

8  to do?

9          PROSPECTIVE JUROR:   That I understand.   We all

10  have right to defend ourselves and you have the right to

11  accuse whatever.   That's the way it goes.

12          MR. BONANNO:   And you realize that a defendant has

13  a right to put on his defense?

14          PROSPECTIVE JUROR:   Correct, that's the system,

15  American system.

16          MR. BONANNO:   And so it wouldn't bias you in any

17  way that a person here is charged with a crime?

18          PROSPECTIVE JUROR:   No.

19          MR. BONANNO:   You'll look at the facts

20  independently and fairly even though you've had some pretty

21  colorful experiences in your past?

22          PROSPECTIVE JUROR:   Yeah, that's the beauty of the

23  life.

24          MR. BONANNO:   I agree with you.   I have no further

25  questions.

Jury Selection

1          THE COURT:  Okay.  See you in a few minutes.

2      Thank you.

3              (Whereupon, the prospective juror exited the

4      courtroom.)

5          THE COURT:  Just before I call them back, Mr.

6      Randall with the gun charge, possession of a firearm, I

7      myself am satisfied with his answer that he doesn't have a

8      felony conviction.  I mean, I asked him that.  Is there any

9      further questioning that you wanted of that?  I mean, he

10     didn't ask to speak privately but.

11         MR. MENDYS:  No.

12         THE COURT:  Okay.  Well, we can call them back if

13     they're ready.

14         COURT OFFICER:  Prospective jurors entering.

15             (Whereupon, the prospective jurors entered the

16     courtroom.)

17         THE COURT:  All right.  Good morning still

18     everyone, and the next order of business is the questioning

19     by Mr. Mendys.  You may inquire of the prospective jurors.

20         MR. MENDYS:  Thank you, Judge.

21         Good morning everyone.  My name's Newton Mendys.

22     As you heard yesterday, I'm the prosecutor who's been

23     assigned this it case.  Thank you very much for your time,

24     coming back today.

25             You're dressing a little more warmly.  It's still

Jury Selection

1    cold in here, but not as bad as yesterday.

2         So as you heard yesterday, I'm going to try not to

3    repeat myself too much.  Has anyone heard anything so far or

4    thought of anything that makes you maybe feel like this

5    isn't the case for you?  For whatever reason, anyone feel

6    that way as you sit here right now?  No hands.  I know you

7    haven't heard too much about the case.  You know it's a

8    robbery, but as we go on you'll learn more.

9         What we're trying to do we're gonna try and find

10   people who can be fair, who can be impartial, who can listen

11   with an open mind to witnesses, to testimony and to all the

12   evidence.

13        Mr. Scott, is that something you think you can do?

14        PROSPECTIVE JUROR:  Yes.

15        MR. MENDYS:  Mr. Beco?

16        PROSPECTIVE JUROR:  Yes.

17        MR. MENDYS:  Mr. Surland, how about you?

18        PROSPECTIVE JUROR:  Yes.

19        MR. MENDYS:  Before we get going into like the

20   real substance of what I want to ask, I want to follow-up a

21   few things you guys mentioned already.

22        Mr. Beco, how are you?

23        PROSPECTIVE JUROR:  How are you doing, sir?

24        MR. MENDYS:  I didn't catch what your dad did?

25        PROSPECTIVE JUROR:  Sells cars to Toyota.

1              MR. MENDYS:  He's a car salesman?

2              PROSPECTIVE JUROR:  Yeah.

3              MR. MENDYS:  How long as he been doing that, a

4       long time?

5              PROSPECTIVE JUROR:  Very long time.  16 years I

6       think now.

7              MR. MENDYS:  And you're a student?

8              PROSPECTIVE JUROR:  Yes.

9              MR. MENDYS:  Computer science, it's a good field.

10      Where did you going to school?

11             PROSPECTIVE JUROR:  BCC for now, trying to

12      transfer out in two years.

13             MR. MENDYS:  When did you start?

14             PROSPECTIVE JUROR:  I'm gonna start now, August

15      27.

16             MR. MENDYS:  You're just starting now?

17             PROSPECTIVE JUROR:  Yeah.

18             MR. MENDYS:  Okay.  Have you worked in the past?

19             PROSPECTIVE JUROR:  Yeah, I was working at Aldo

20      the shoe store on 42nd.  I also used to work in Best Buy.

21      My other job was an internship, paid internship in an office

22      on 59th Street and Columbus Circle, it's called Manhattan

23      Management Service dealing with computer programming, stuff

24      like that, you know.

25             MR. MENDYS:  Computer science, that's, you know,

Jury Selection

1    very specific, very numbers oriented, you know.  You have to

2    have the right formula otherwise your program doesn't work,

3    right?

4              PROSPECTIVE JUROR:  Yeah.

5              MR. MENDYS:  Serving on a jury isn't quite like

6    that.  You know, it's based on what you think.  It can be

7    very nebulous almost in determining whether you think

8    someone's telling the truth or not.  You think you can do

9    that?

10             PROSPECTIVE JUROR:  Yes.

11             MR. MENDYS:  Mr. Surland, how are you?

12             PROSPECTIVE JUROR:  I'm fine.

13             MR. MENDYS:  Just a question about the case that

14   you unfortunately had to deal with.  What ended up happening

15   with it?

16             PROSPECTIVE JUROR:  Well, came to a deal with the

17   DA that I, that I had to do community service and it would

18   be eventually wiped off my record.  It was not a

19   misdemeanor.

20             MR. MENDYS:  So it was a violation?

21             PROSPECTIVE JUROR:  A violation, yeah, that's the

22   word I was looking for.

23             MR. MENDYS:  Okay.  And you felt, you indicated

24   before you felt you were treated fairly by the police?

25             PROSPECTIVE JUROR:  Yeah.

1        MR. MENDYS:  That they worked hard to kind of
2    defuse the situation as you described it.
3        PROSPECTIVE JUROR:  Yeah, the whole situation was
4    out of control and they did what was right --
5        MR. MENDYS:  Okay.
6        PROSPECTIVE JUROR:  To alleviate the situation.
7        MR. MENDYS:  And you had a lawyer yourself?
8        PROSPECTIVE JUROR:  I had a court-appointed
9    lawyer.
10       MR. MENDYS:  And you felt he represented you well?
11       PROSPECTIVE JUROR:  She did a good job.
12       MR. MENDYS:  Okay.  And through that experience,
13   you know, we're just trying to make sure that is something
14   that you recognize, obviously sounds like you do, something
15   that's totally separate from what's going on here.
16       PROSPECTIVE JUROR:  Of course, yeah.
17       MR. MENDYS:  That's something you can put aside
18   and listen to with an open mind?
19       PROSPECTIVE JUROR:  Yeah.
20       MR. MENDYS:  Police officers included?
21       PROSPECTIVE JUROR:  Yup.
22       MR. MENDYS:  Thank you very much.
23       Mr. Torres, how are you?
24       PROSPECTIVE JUROR:  I'm good.
25       MR. MENDYS:  You mentioned that your mom is victim

Jury Selection

1          of a home invasion, unfortunately.

2                    PROSPECTIVE JUROR:  Yes.

3                    MR. MENDYS:  Do you have any idea why your mom's

4          home was chosen?

5                    PROSPECTIVE JUROR:  No, not really.

6                    MR. MENDYS:  What the motive was?

7                    PROSPECTIVE JUROR:  I guess just for robbery.

8                    MR. MENDYS:  Money?

9                    PROSPECTIVE JUROR:  Yeah, money.

10                    MR. MENDYS:  But beyond that, why your mom's home

11          was chosen in particular?

12                    PROSPECTIVE JUROR:  No.

13                    MR. MENDYS:  Okay.  So can you recognize that

14          sometimes you know that and sometimes you don't?

15                    PROSPECTIVE JUROR:  Yeah.

16                    MR. MENDYS:  In a case?

17                    PROSPECTIVE JUROR:  Yeah.

18                    MR. MENDYS:  Right?  In this case you may know

19          that, you may not find that out, but that's --

20                    THE COURT:  Motive you're talking about?

21                    MR. MENDYS:  I'm talking about motive.  And it's

22          totally reasonable and understandable for you to maybe

23          wonder about that, but you're gonna hear at the end of the

24          case that's not something I have to prove.  I don't have to

25          prove anything about motive.  And like I said, you might

Jury Selection

1    hear about it, you might not.

2              Considering all that, will you be able to come to

3    a verdict?  Specifically will you be able to find somebody

4    guilty if I prove my case beyond a reasonable doubt if you

5    don't hear about a motive?

6              PROSPECTIVE JUROR:  Yes.

7              MR. MENDYS:  You can do that?

8              PROSPECTIVE JUROR:  Yes.

9              MR. MENDYS:  Mr. Surland, can you do that?

10             PROSPECTIVE JUROR:  Yes.

11             MR. MENDYS:  Mr. Beco?

12             PROSPECTIVE JUROR:  Yes.

13             MR. MENDYS:  Miss Session, how about you?

14             PROSPECTIVE JUROR:  Yes.

15             MR. MENDYS:  Miss Lopez?

16             PROSPECTIVE JUROR:  Yes.

17             MR. MENDYS:  And Mr. Maxwell?

18             PROSPECTIVE JUROR:  Yes, sir.

19             MR. MENDYS:  How long have you been a bus driver?

20             PROSPECTIVE JUROR:  Eleven and a half years.

21             MR. MENDYS:  Okay.  All right.  So you heard

22   yesterday that this involves, this is the case against the

23   People of the State of New York against Richard Diaz.  All

24   right.  Your job is to decide ultimately whether Richard

25   Diaz is guilty or not guilty.

Jury Selection

1           Now, you are gonna hear about a couple of people

2      that he acted with, he's accused of acting in concert with.

3      Now you're gonna hear about those people, you're gonna hear

4      about what they did, but it's your job only to deal with Mr.

5      Diaz and not worry about, not speculate about what's going

6      on with them.

7           Mr. Maxwell, is that something you can do?

8           PROSPECTIVE JUROR:  Yes, sir, I can.

9           MR. MENDYS:  Miss Lopez?

10          PROSPECTIVE JUROR:  Yes.

11          MR. MENDYS:  Miss Session?

12          PROSPECTIVE JUROR:  Yes.

13          MR. MENDYS:  Okay.  Let me ask you a question,

14     Miss Njoku.  How are you?

15          PROSPECTIVE JUROR:  I'm fine.  How are you?

16          MR. MENDYS:  I'm good, I'm good.

17          If you heard, I ask this question of everybody,

18     I'm going to ask you guys too, how do you determine if

19     someone's being honest with you?

20          PROSPECTIVE JUROR:  More importantly with me eye

21     contact.

22          MR. MENDYS:  Eye contact, okay.  Why is that

23     important to you?

24          PROSPECTIVE JUROR:  Because I know a lot of people

25     who lie and sometimes I can catch them mainly off of what

1    they do with their eyes.

2              MR. MENDYS:  And you know a lot of liars, huh?

3              PROSPECTIVE JUROR:  Unfortunately, yes.

4              MR. MENDYS:  Okay.  Miss Lopez, would you add

5    anything to that, the eye contact?

6              PROSPECTIVE JUROR:  Just their body language, if

7    they're, like if they're telling you something and they're

8    like moving around nervously or, you know, avoiding eye

9    contact, you can tell they're not be truly honest with

10   whatever they're telling you.

11             MR. MENDYS:  Sure.  Miss Session, anything you

12   would add?

13             PROSPECTIVE JUROR:  I agree.  Yeah, I agree with

14   what the both of them said.

15             MR. MENDYS:  You guys, I'm sure, learned that

16   through dealing with people and going through life, right?

17   We all take those experiences and we use them as we go

18   forward.  And I said it yesterday, you know, I'm sure some

19   of you were nervous yesterday, maybe less so today coming in

20   for jury duty, but we want you to bring those experiences

21   with you.  All right.  That's part of who you are and it's

22   part of what ultimately, hopefully will make you a good

23   juror.  So we want you to bring that common sense with you.

24   All right.  Use it when you're looking at the witnesses and

25   you're looking at the evidence and determining whether what

Jury Selection

1    you're gonna hear makes sense.  Ultimately, at the end of

2    the day that's what this is about.

3              Mr. Scott, is that something you can do?

4              PROSPECTIVE JUROR:  Yes.

5              MR. MENDYS:  Miss Pearson, how about you?

6              PROSPECTIVE JUROR:  Yes.

7              MR. MENDYS:  Mr. Beco?

8              PROSPECTIVE JUROR:  Yes.

9              MR. MENDYS:  Miss Loor?

10             PROSPECTIVE JUROR:  Yes.

11             MR. MENDYS:  Mr. Randall?

12             PROSPECTIVE JUROR:  Yes.

13             MR. MENDYS:  Mr. Morel, how about you?

14             PROSPECTIVE JUROR:  Yes.

15             MR. MENDYS:  Who likes Law and Order, CSI?

16   Everybody.  Everybody.

17             Miss Njoku, which one is your favorite one?

18             PROSPECTIVE JUROR:  SVU.

19             MR. MENDYS:  Those who like CSI, the science ones.

20   Okay, Mr. Scott, why do you like those shows or that show in

21   particular?

22             PROSPECTIVE JUROR:  I like the details and the

23   forensics, the actual how they discover mystery and

24   investigation.

25             MR. MENDYS:  Yeah, it's cool, right?

Jury Selection

1          PROSPECTIVE JUROR:  Yeah.

2          MR. MENDYS:  It's some of the things they can use

3     are unbelievable.  In fact, are actually unbelievable,

4     right?  And you recognize that?

5          PROSPECTIVE JUROR:  Yes.

6          MR. MENDYS:  It's fiction, obviously, although

7     ripped from the headlines all the time.

8          PROSPECTIVE JUROR:  Yes.

9          MR. MENDYS:  So the question I have for you is

10    whether you obviously can recognize fact versus fiction?

11         PROSPECTIVE JUROR:  Yes.

12         MR. MENDYS:  Right.  And you know, sometimes in

13    real cases you have some of that stuff and sometimes you

14    don't right.  And at the end of the day it's about the

15    quality of the evidence that you heard the judge mentioned

16    that yesterday.

17         PROSPECTIVE JUROR:  True.

18         MR. MENDYS:  And that has to deal with the people

19    you hear from and what you look at.  You can recognize all

20    that?

21         PROSPECTIVE JUROR:  Yes.

22         MR. MENDYS:  And you can hold me to the standard

23    of proof beyond a reasonable doubt, not some television

24    standard?

25         PROSPECTIVE JUROR:  No.

Jury Selection

1           MR. MENDYS:  That maybe you see in CSI?

2           PROSPECTIVE JUROR:  Of course not.

3           MR. MENDYS:  Miss Njoku, can you do that?

4           PROSPECTIVE JUROR:  Yes.

5           MR. MENDYS:  Miss Lopez?

6           PROSPECTIVE JUROR:  Yes.

7           MR. MENDYS:  Mr. Maxwell?

8           PROSPECTIVE JUROR:  Yes, I can.

9           MR. MENDYS:  Mr. Torres?

10          PROSPECTIVE JUROR:  Yes.

11          MR. MENDYS:  You're a bank teller?

12          PROSPECTIVE JUROR:  Yes.

13          MR. MENDYS:  You a good one?

14          PROSPECTIVE JUROR:  Yes.

15          MR. MENDYS:  You are?

16          PROSPECTIVE JUROR:  Yeah.

17          MR. MENDYS:  Do you know any bad ones?

18          PROSPECTIVE JUROR:  Not in my branch.

19          MR. MENDYS:  Okay.  I'm sure some exist, right?

20          PROSPECTIVE JUROR:  Yes, I guess so.

21          MR. MENDYS:  You can recognize that with any job

22     you see that, right?  Good, bad teller; good bus drivers and

23     bad ones unfortunately; good lawyers and bad.  Hopefully you

24     had a good one.  And the same goes for police officers,

25     right?  So it's gonna be your job, you know, we've all

1    talked about police testimony, you're gonna hear it's your

2    job to keep an open mind, and at the end of the day that's

3    all we really looking for, all right.  Treat them as you

4    would any other witness.

5                Can do you that, Mr. Surland?

6                PROSPECTIVE JUROR:  Sure can.

7                MR. MENDYS:  Mr. Beco?

8                PROSPECTIVE JUROR:  Yes.

9                MR. MENDYS:  Mr. Scott?

10               PROSPECTIVE JUROR:  Yes.

11               MR. MENDYS:  Thank you very much for your time.

12               THE COURT:  Mr. Mendys, thank you.

13               Mr. Bonnano?

14               MR. BONANNO:  Thank you, Judge.

15               Again, I'll say, well, good morning, number one,

16   to everyone again, and I say to everyone that I've said

17   before, thank you so much for coming here.  It's been a long

18   week.  You've guys have been here since Monday, right?

19               PROSPECTIVE JUROR:  No, since yesterday.

20               MR. BONANNO:  Just yesterday so it's not that bad.

21   But in any event, I've said it to every panel that we've

22   spoken to before and I'll say it again, what you're doing

23   here right now is really our minimum service as Americans

24   citizens, and there are so many people in this country that

25   put themselves on the line, women and men in the service,

1    local service, armed services, and this is really our

2    minimum amount that we can do to support that whole concept

3    of democracy that we have, so I thank you for that.

4         Whether you're selected or not, you know, just

5    coming here and being forthright and having to subject

6    yourselves to these questioning and answers, it's part of

7    the process, and the process is we try and select the most

8    fair and impartial people that can try by a jury of their

9    peers, and that's the cornerstone of our American

10   principles.

11        So I want to just ask a few more questions for

12   each of you.  The judge has made my job easiest as well as

13   Mr. Mendys, he's speaking to most of you, and we've got an

14   understanding of what we're looking for as far as that

15   choice selection is.

16        Mr. Maxwell, where is your route as far as a bus

17   driver?

18        PROSPECTIVE JUROR:  I'm currently I'm on the big

19   BX6.

20        MR. BONANNO:  Does that --

21        PROSPECTIVE JUROR:  Outside.

22        MR. BONANNO:  Right in front of the courthouse?

23        PROSPECTIVE JUROR:  Yes.

24        MR. BONANNO:  You see a lot of cops cars and a lot

25   of corrections vans going back and forth all day long?

1          PROSPECTIVE JUROR:  Right.

2          MR. BONANNO:  Has that influenced you in any way,

3     shape or form?

4          PROSPECTIVE JUROR:  No.

5          MR. BONANNO:  When you see people being brought in

6     daisy chains and cuffed up?

7          PROSPECTIVE JUROR:  No.

8          MR. BONANNO:  No, sir?  Okay, so that wouldn't

9     influence you if you have to sit and see, you know, a

10    defendant charged with a crime, you won't form a bias

11    against that person?

12         PROSPECTIVE JUROR:  No, sir.

13         MR. BONANNO:  And Miss Pearson?

14         PROSPECTIVE JUROR:  Yes, sir.

15         MR. BONANNO:  You said you're disabled?

16         PROSPECTIVE JUROR:  Yes, I'm on disability.

17         MR. BONANNO:  Will that affect you in any way,

18    shape or form from getting back and forth to the courthouse

19    or, you know, hinder you if you should have to deliberate on

20    this matter?

21         PROSPECTIVE JUROR:  No.

22         MR. BONANNO:  So you don't think your physical

23    condition would in any way, shape or form be an impact --

24         THE COURT:  Let me just interrupt, and I don't

25    mean to, I just want to let you know, if you are selected

1    and you need any kind of accommodations for anything, please

2    let the court officers know, but I not aware of what the

3    nature of the disability is nor do I want to ask you about

4    it, but if there is something that you need, just let me

5    know, okay?

6              PROSPECTIVE JUROR:  Okay.

7              THE COURT:  Thank you.

8              MR. BONANNO:  And Mr. Scott, one of the unwritten

9    rules that I have is that no juror can look better than me,

10   okay.  You can't dress better than me.  Sorry.

11             THE COURT:  It's a rule that's actually often

12   broken.

13             MR. BONANNO:  Oh, my gosh.  I'm only teasing.  But

14   I see you're a person that has attention to detail.  Quite

15   honestly, that's kind of what we're looking for here,

16   someone who would look at a situation, look at a set of

17   circumstances and determine, you know, what's appropriate,

18   what's not appropriate.

19             And do you think you could do that fairly and

20   honestly in this case?

21             PROSPECTIVE JUROR:  Yes.

22             MR. BONANNO:  Mr. Surland, you think you can do

23   that?  You've had little encounters with law enforcement,

24   maybe good, maybe bad.  Maybe you had a good defense

25   attorney, maybe you had a bad defense attorney, only you

Jury Selection

1    know that.  But do you think that will affect your judgment

2    here in any way, shape or form?

3              PROSPECTIVE JUROR:  Not in any way.

4              MR. BONANNO:  Not in any way?

5              PROSPECTIVE JUROR:  No.

6              MR. BONANNO:  You can just be fair, impartial,

7    look at the client, look at my client and say you know what,

8    I'm gonna give him what he deserves, which is a fair shot at

9    this case?

10             PROSPECTIVE JUROR:  I can do that.

11             MR. BONANNO:  Okay.  Miss Njoku, I wrote it down

12   phonetically so I can say it properly, you're studying

13   finance in the Fall?

14             PROSPECTIVE JUROR:  Yes.

15             MR. BONANNO:  Attention to detail also.

16             PROSPECTIVE JUROR:  Yes.

17             MR. BONANNO:  Right?  Numbers, that's a great

18   field.

19             PROSPECTIVE JUROR:  Yes.

20             MR. BONANNO:  Good for you.  So do you think you

21   can look at the evidence and parse through that evidence and

22   determine what's really appropriate, what's not appropriate?

23             PROSPECTIVE JUROR:  Right, yes.

24             MR. BONANNO:  Mr. Mendys mentioned yesterday about

25   the elements that he has to prove, the elements of acting in

Jury Selection

1    concert and as they apply to Mr. Diaz.  Each and every one

2    of you have to be able to apply that.  There are other

3    people involved in this incident, but you're going to have

4    to apply the elements of acting in a conspiracy.

5              THE COURT:  Well, not conspiracy.

6              MR. BONANNO:  Acting in concert, excuse me, I

7    apologize.  Acting in concert.  And the crimes of robbery

8    and other crimes that are charged to Mr. Diaz, you're gonna

9    have to look at those elements and see if they apply to Mr.

10   Diaz only.  Are you able to do that, Miss Session?

11             MR. BONANNO:  Yes.

12             THE COURT:  Miss Lopez?

13             MR. BONANNO:  Yes.

14             THE COURT:  And if the People are not able to

15   prove beyond a reasonable doubt that those elements are

16   satisfied, how would you vote, Miss Pearson, guilty or not

17   guilty?

18             PROSPECTIVE JUROR:  Not guilty.

19             THE COURT:  If they're not able to prove?

20             MR. BONANNO:  If they're not able to.

21             THE COURT:  Who are you speaking to?

22             MR. BONANNO:  Miss Pearson.

23             THE COURT:  You were blocking Miss Pearson.

24   Right, okay.

25             MR. BONANNO:  Yes.

Jury Selection

1    THE COURT:  Mr. Scott, how would you vote?

2    PROSPECTIVE JUROR:  Not guilty.

3    MR. BONANNO:  Mr. Beco?

4    PROSPECTIVE JUROR:  Not guilty.

5    MR. BONNANO:  Mr. Surland?

6    PROSPECTIVE JUROR:  Not guilty.

7    MR. BONNANO:  Mr. Torres?

8    PROSPECTIVE JUROR:  Not guilty.

9    MR. BONNANO:  Miss Session?

10   PROSPECTIVE JUROR:  Not guilty.

11   MR. BONNANO:  Miss Lopez?

12   PROSPECTIVE JUROR:  Not guilty.

13   MR. BONNANO:  Mr. Maxwell?

14   PROSPECTIVE JUROR:  Not guilty.

15   MR. BONNANO:  Miss Njoku?

16   PROSPECTIVE JUROR:  Not guilty.

17   MR. BONNANO:  Mr. Guzman Morel?

18   PROSPECTIVE JUROR:  Not guilty.

19   MR. BONNANO:  Mr. Randall?

20   PROSPECTIVE JUROR:  Not guilty.

21   MR. BONNANO:  And Miss Loor?

22   PROSPECTIVE JUROR:  Not guilty.

23   MR. BONANNO:  Thank you all.

24   THE COURT:  Okay.  Thank you Mr. Bonnano.

25   All right.  So we're going to take a few minutes.

Jury Selection

1       The attorneys will discuss their choices.  Some of you will

2       be selected, some of you will not.  I told the jurors

3       yesterday if you're not selected it's nothing personal.  We

4       need your cooperation, we need your honest answers and you

5       have given that and more, and I thank you in advance if

6       you're not selected for your jury service.  It has been very

7       much appreciated.

8               So we'll take a short recess.  Don't discuss the

9       case.  Keep my recess instructions and we'll call you back

10      with the final decisions.  Okay.

11              (Whereupon, the prospective jurors exited the

12      courtroom.)

13              MR. MENDYS:  Judge, I'm ready.

14              THE COURT:  Okay.

15              MR. MENDYS:  One thing I wanted to just note and

16      remind everyone, Miss Session yesterday I think at the bench

17      indicated that on July 22nd, which is Wednesday, she has a

18      morning appointment.

19              THE COURT:  Thank you for the reminder.

20              MR. MENDYS:  I don't know what time or what it is.

21              THE COURT:  She can't be here all day on the 22nd.

22              MR. MENDYS:  I wrote a.m.

23              THE COURT:  Oh, right.  No, no, that's right.  Let

24      me just check.

25              MR. BONANNO:  8 a.m. was her --

Jury Selection

1              THE COURT:  All right.  So Alternate No. 1.

2              THE CLERK:  People have used a peremptory

3    challenge for Alternate No. 1.  So as to seat number one, do

4    you have any challenge for cause?

5              MR. MENDYS:  No.

6              THE CLERK:  Defense?

7              MR. BONANNO:  No.

8              THE CLERK:  As to seat number one any peremptory

9    challenge?

10             MR. MENDYS:  No.

11             THE DEFENDANT:  Defense?

12             MR. BONANNO:  No.

13             THE CLERK:  We have Alternate No. 1.  That's

14   Marlon A. Maxwell.

15             Seat number two, any challenge for cause?

16             MR. MENDYS:  No.

17             THE CLERK:  Defense?

18             MR. BONANNO:  No.

19             THE CLERK:  Any peremptory challenge, People?

20             MR. MENDYS:  Yes.

21             THE CLERK:  Seat number three, any challenge for

22   cause?

23             MR. MENDYS:  No.

24             THE CLERK:  Defense?

25             MR. BONANNO:  No.

Jury Selection

1            THE CLERK:  Do you have any peremptory challenge

2       as to seat number three, defense?

3            MR. MENDYS:  No.

4            THE CLERK:  You already used two -- two per seat.

5       I'm sorry, you said no?

6            MR. MENDYS:  I said no.

7            THE CLERK:  Defense?

8            MR. BONANNO:  Yes.

9            THE COURT:  Challenge perempt for Miss Session.

10      Okay.

11           THE CLERK:  As to seat number four, any challenge

12      for cause, People?

13           MR. MENDYS:  No.

14           THE CLERK:  Defense?

15           MR. BONANNO:  No.

16           THE CLERK:  Any peremptory challenge?

17           MR. MENDYS:  No.

18           THE CLERK:  Defense?

19           MR. BONANNO:  Yes.

20           THE COURT:  So you challenged Mr. Torres, okay.

21      Continue.

22           THE CLERK:  As to seat number five, any challenge

23      for cause?

24           MR. MENDYS:  No.

25           THE CLERK:  Defense?

Jury Selection

1        MR. BONANNO:  No.

2        THE CLERK:  Any peremptory challenge?

3        MR. MENDYS:  Yes.

4        THE CLERK:  As to seat number six any challenge

5    for cause?

6        MR. MENDYS:  No.

7        THE CLERK:  Defense?

8        MR. BONANNO:  Nope.

9        THE CLERK:  Peremptory challenge?

10        MR. MENDYS:  No, we didn't have any.

11        THE CLERK:  They're gone.

12        THE COURT:  Right, you're out.

13        MR. MENDYS:  We're both out.

14        THE CLERK:  So number six is Alternate No. 2.

15    That's Franklyn J. Beco.

16        THE COURT:  All right.  Let's try for a third

17    alternate if we can get one, all right?

18        THE CLERK:  As to seat number seven challenge for

19    cause?

20        MR. MENDYS:  No.

21        THE CLERK:  Defense?

22        MR. BONANNO:  No.

23        THE CLERK:  Xavier Scott, any peremptory

24    challenge, People?

25        MR. MENDYS:  No.

Jury Selection

1          THE CLERK:  Defense?

2          MR. BONANNO:  No.

3          THE COURT:  Mr. Scott is --

4          THE CLERK:  Alternate No. 3.

5          THE COURT:  You want to try for a fourth alternate

6    or what do you want to do?

7          MR. MENDYS:  I'm fine with it.  If you want to do

8    that I'm okay with it.  We have the people.

9          THE COURT:  I mean, you know, sometimes it's

10   better to be safe than sorry.

11         MR. BONANNO:  That's fine.

12         THE COURT:  If we have the people.  Every seat you

13   have two peremptory challenges.

14         MR. BONANNO:  Oh, okay.

15         THE COURT:  Do you understand that?

16         MR. BONANNO:  Yeah.

17         THE COURT:  So yes, each side has two challenges

18   for each alternate seat.  Okay.

19         THE CLERK:  Seat number eight any challenge for

20   cause?

21         MR. MENDYS:  No.

22         THE CLERK:  Defense?

23         MR. BONANNO:  No.

24         THE CLERK:  Any peremptory challenge, People?

25         MR. MENDYS:  No -- yes, I'm challenging Miss

Jury Selection

1    Pearson.  I'm sorry.

2              THE CLERK:  As to seat number nine any challenge

3    for cause?

4              MR. MENDYS:  No.

5              THE CLERK:  Defense?

6              MR. BONANNO:  No.

7              THE CLERK:  Any peremptory challenge, People?

8              MR. MENDYS:  No.

9              THE CLERK:  Defense?

10             MR. BONANNO:  No.

11             THE CLERK:  Alternate No. 4 is seat number nine,

12   Dezorey Njoku.

13             THE COURT:  You can bring them in.

14             COURT OFFICER:  Jury entering.

15             (Whereupon, the prospective jurors entered the

16   courtroom.)

17             THE COURT:  We have selected our jury.  So what

18   that means for the people in the audience, I thank you.  I

19   didn't question you but you will return down to the central

20   jury room after we dismiss the other people in the box.

21   You'll just follow the court officers instructions about

22   doing that, but I thank you for being here even though you

23   were not questioned, but we do have our entire jury.

24             All right, Veronica, you can go ahead.

25             THE CLERK:  Thank you all for being here.  If I

1    call your name, please remain seated.  Everyone else will

2    step outside and wait for further instructions:  Marlon

3    Maxwell, Franklyn Beco, Dezorey Njoku and Xavier Scott,

4    please remain seated.  Everyone else step outside.

5          (Whereupon, the excused prospective jurors exited

6    the courtroom.)

7          THE COURT:  Please rise one more time.  Are the

8    jurors satisfactory to the People?

9          MR. MENDYS:  They are.

10          THE CLERK:  Are the jurors satisfactory to the

11    defense?

12          MR. BONANNO:  They are.

13          THE CLERK:  Can you please rise, raise your right

14    hand one more time.

15          (Whereupon, the jurors were duly sworn by the

16    Clerk of the Court.)

17          THE CLERK:  Thank you.  You may be seated.

18          THE COURT:  All right.  Well, welcome to the jury.

19    You complete our jury panel for the trial in this case.  You

20    are all actually alternate jurors, but what that means is

21    you will be here during the entire trial.  Substitutions

22    occur when other jurors are not able to finish the case for

23    unforeseen reasons at this time, and we always select

24    alternate jurors, but you are here for the entire trial.

25    You'll be required to be here with all the other jurors.

Jury Selection

1          You've just taken an oath to be fair, impartial

2     jurors, to follow the law which you all promised me you do

3     anyway.  And there's no difference during the trial and I'll

4     advise you as we go along what's gonna happen when that

5     would occur, but I'm just giving you a heads up on that.

6          Now, we are adjourned until Monday so you're off

7     tomorrow, you're off for the rest of day today.  I'm going

8     to ask you all to be here 9:45 Monday.  You no longer have

9     to check in down in the central jury room, you'll come

10    directly to room 601 down the hall.

11         We can't start until everyone is here from the

12    jury, the actual jurors, so please be mindful that everyone

13    is giving up, you know, time from their homes, families,

14    businesses to be here, so please be respectful of other

15    jurors as well as the court and the parties to be here so

16    we're not delayed waiting for you.

17         But I understand things can happen.  Before you

18    leave we're just going to exchange some information with the

19    court through the court officers.  We're going to give you

20    our courtroom direct number that if you know you're running

21    late or something has happened, you call us and so we will

22    have that information.

23         We're also going to ask you for a contact number

24    that we can call you which is just in the possession of the

25    court.  It doesn't go to any of the parties.  But if I know

Jury Selection

1     in advance, for example, that I've told you to be here at a

2     certain day but you don't have to be here, I don't want you

3     having to come to the courthouse unnecessarily and learn

4     that information.  I want to get that information as soon as

5     I have it, okay.

6          So it's extremely important now that you are on

7     the jury that you follow those recess instructions to the

8     letter.  You can all go home, tell your family your friends,

9     your co-workers I'm on a jury but you can't tell them what

10    kind of case it is, you can't tell them anything about the

11    case, nothing of any substance.  Don't discuss it even with

12    the other jurors.

13         You remain under an obligation not to accept,

14    agree to accept, discuss accepting any kind of gratuity,

15    money in exchange for giving information to anyone about

16    this case, and you have to let me know if anyone tries to

17    contact you or influence you in anyway.

18         You can't visit any scenes or locations, and

19    you've already learned some.  But again, don't go to any

20    scenes that you know about in person or by the internet,

21    Google Earth, Mapquest, MTA.  Just don't visit any scenes.

22         Don't do any research on any legal or factual

23    issue by any means whatsoever, including the internet or

24    going to a library.  And do not read any accounts that may

25    have been or may still be reported in any kind of media in

Jury Selection

1      this case.

2              Again, no Facebooking of any of the witnesses.  No

3      contact with the, you know, with any of the attorneys in any

4      way.  And have a pleasant afternoon, it's a beautiful day.

5      Now you can go home and enjoy the day because your jury

6      service for the day is over, and I'll see you all Monday,

7      okay.

8              COURT OFFICER:  Step this way.

9              THE COURT:  You have a question?  Hold on.

10             PROSPECTIVE JUROR:  Today I received a call from

11     it a recruiter and they wanted to know if I could start a

12     job on Monday.

13             THE COURT:  This happened, why didn't you -- you

14     should have told me this before.

15             PROSPECTIVE JUROR:  It happened today while I was

16     downstairs.

17             THE COURT:  You could have told me before we

18     started today.

19             PROSPECTIVE JUROR:  It's not for definite yet.

20     She sent me like some test that I have to take, and if I

21     pass that then she wants me to start.

22             THE COURT:  But they want you there on Monday for

23     a job?

24             PROSPECTIVE JUROR:  If I pass, only if I pass.

25     I'm just telling you just because it's going on.

Jury Selection

1          THE COURT:  You are going to be taking some kind
2    of online test?
3          PROSPECTIVE JUROR:  Yes.
4          THE COURT:  Today or tomorrow?
5          PROSPECTIVE JUROR:  Today.  If I pass it, then
6    they want me to start on Monday.
7          THE COURT:  Well, go in the back for a minute.
8    Let me talk to the parties.  I'll call you back in, okay.
9          COURT OFFICER:  Everybody.
10         (Whereupon, the sworn jurors exited the
11   courtroom.)
12         THE COURT:  The juror who was speaking was
13   Alternate No. 4, Miss Njoku.  So yes, this is Alternate No.
14   4.  So, I can't tell her not to take her test.
15         MR. BONANNO:  I think it's still tentative and
16   speculative.  Those online exams don't --
17         THE COURT:  You want to just wait and see what she
18   tells us via phone on Monday?
19         MR. BONANNO:  We can relieve her, then if that
20   what your intentions are I would consent to that, or you
21   want to pick another one.
22         THE COURT:  I mean, you know, of course it would
23   have been nice if she thought about this before.
24         MR. MENDYS:  I'm content to, I think, just let her
25   go.  If the Court wants to wait to hear the results to see

Jury Selection

1      if maybe we can get her, then I'm okay with that.

2              THE COURT:  What is your position?

3              MR. BONANNO:  I would think we can wait until

4      Monday morning to do that.

5              THE COURT:  Well, she's actually probably going to

6      know before Monday whether she has to show up.

7              MR. BONANNO:  Whenever she knows that's fine.

8              THE COURT:  So you're consenting that if she gets

9      this job, she passes this test and she has this job, Monday

10     both sides are consenting that I can advise her by telephone

11     that she will not have to serve on this case anymore?

12             MR. BONANNO:  Absolutely.

13             MR. MENDYS:  Yes.

14             THE COURT:  And then, you know, I'll make the

15     record on Monday when we're back if she's not going to be

16     here.  And if she's here, she's here.

17             MR. BONANNO:  Fine.

18             THE COURT:  Anything else you want to talk about

19     relating to the case?  If you want, let me have her come out

20     and then we'll.

21             MR. MENDYS:  That's fine.

22             THE COURT:  As soon as you could get Miss Njoku,

23     if you could just bring her out.  Thanks.

24             COURT OFFICER:  Juror entering.

25             (Whereupon, the sworn juror entered the

Proceedings

1        courtroom.)

2              THE COURT:  So Alternate Juror No. 4 is back in

3        the courtroom.  So this is what we agreed that will happen.

4        If you take the test and if you are offered this position

5        and you have to start Monday, I want you to call us and

6        tell, call the courtroom as soon as you know that.  You

7        expect you'll know that sometime tomorrow?

8              PROSPECTIVE JUROR:  Yes.

9              THE COURT:  If that happens we will excuse you

10       from the case.  If you don't for some reason get the job,

11       then you'll come in Monday anyway.  You wouldn't have to

12       call us.  If you want to call us, I didn't get the job,

13       fine.  I'm assuming if I don't hear from you that you'll be

14       here, but I do need to hear from you.  But I'm telling you

15       in advance incase it takes time, you know, you can accept

16       the position and you we will excuse from you the case.

17             PROSPECTIVE JUROR:  Okay.  Thank you, your Honor.

18             THE COURT:  You're welcome.

19             COURT OFFICER:  Juror exiting.

20             (Whereupon, the sworn juror exited the courtroom.)

21             THE COURT:  So Mr. Mendys, what do you want to

22       talk about?

23             MR. MENDYS:  Judge, I don't know, I've never tried

24       a case in front of you, and I know history tells me that

25       that the court is not going to speculatively rule on matters

Proceedings

1    of evidentiary admissibility in terms of whether something

2    could come into evidence because it depends on what is said.

3              THE COURT:   I hear in limine applications all the

4    time, so tell me.

5              MR. MENDYS:   What I'm going to seek to do, and I

6    wanted put defense on notice, is that during the hearing we

7    heard testimony about Mr. Diaz' statement that he made and

8    Detective Bell testified that she documented it in a DD5 the

9    following day.   Now, my application -- well, during the

10   trial I am going to seek to admit the portion of the DD5

11   that includes this statement.

12             THE COURT:   The recorded what she wrote in the

13   DD5?

14             MR. MENDYS:   Correct.

15             THE COURT:   I mean, is there anything else on the

16   DD5 that could not, that you would be redacting, first of

17   all?

18             MR. MENDYS:   There are.   The DD5 is two pages

19   long.   It includes, it includes the date and the time.   It

20   includes that he was asked his pedigree information.   That

21   he was not made any promises.   That he was offered a

22   bathroom break and something to eat, and that he was

23   Mirandized.   And then on the second page is the body of the

24   statement that she took.

25             So on the first page, I would seek I think to

Proceedings

1        admit them both, but --

2                THE COURT:  Under what theory?

3                MR. MENDYS:  Under the theory that it's an

4        admission.

5                THE COURT:  Well, no, the rest of it is, is an

6        admission, I understand the statement itself, but the

7        written document you want to have admitted as evidence of

8        his admission in of what he said?

9                MR. MENDYS:  Correct.

10               THE COURT:  And the document itself comes in --

11               MR. MENDYS:  Well.

12               THE COURT:  -- under what, I'm just wondering?

13               MR. MENDYS:  No, I think --

14               THE COURT:  I understand what you're saying.

15       First of all, let me just say that I actually like to have a

16       heads up on anything that might be of some controversy in

17       terms of an evidentiary application, so I appreciate that

18       you're bringing this to my attention, but just so I

19       understand it, your main focus is that you want the typed

20       DD5, but it includes things in it, if I recall, like names

21       of the co-defendants in parentheses.  It refers to them by

22       nicknames and then, or street names, but then as testified

23       to government names.

24               MR. MENDYS:  Right.

25               THE COURT:  He didn't know their government names.

Proceedings

1          MR. MENDYS:  Let me slightly amend my application.

2    I will only be asking to admit the document, the portion of

3    the DD5 that includes --

4          THE COURT:  Let me see what you have.

5          MR. MENDYS:  That includes this statement.

6          THE COURT:  Right.

7          MR. MENDYS:  In terms of redactions, I would

8    redact the --

9          THE COURT:  Right, because she has in parentheses

10   Homeboy, Jose Melenciano, in this document which was not in

11   evidence at the hearing but was referred to.  And does she

12   talk about -- yes, and Santana is Lappy, L-A-P-P-Y, right.

13   So she has those names in here.

14         MR. MENDYS:  So I would, especially based on her

15   testimony from the hearing in which she indicated she did

16   not specifically recall how she came to the conclusion that

17   Homeboy was Melenciano and Lappy was Santana, I would redact

18   the government names.

19         THE COURT:  Okay.  And certainly if it were

20   admitted, you could not have that part because the defendant

21   never admitted that this was Mr. Santana and that this was

22   Mr. Melenciano, he just gave names.  And it was through

23   further police investigation --

24         MR. MENDYS:  Correct.

25         THE COURT:  So Mr. Bonnano, you're aware of the

Proceedings

1    DD5, obviously.  The People are going to seek to introduce

2    the actual memorialized statement which is alleged to have

3    been made by your client to the detective with those

4    redactions.  What would your objection, if any, be to this?

5              MR. BONANNO:  Well, I mean, it would be subject to

6    cross, Judge, so I don't know what objection I would have

7    other than the document that he presented to you.  I see

8    it's already pre-marked.

9              MR. MENDYS:  Well, this is from the hearing.

10             THE COURT:  It's from the hearing but we don't

11   have to have, I mean, that's not the original, that's a --

12             MR. MENDYS:  It's a photocopy.

13             MR. BONANNO:  Photocopy of the original.

14             THE COURT:  I wouldn't put things before this jury

15   that had evidence stickers on them if that's your concern.

16             MR. BONANNO:  Well, my also concern is just it

17   says case active thereafter, so I don't know if that's

18   something that could be prejudicial in any way, shape of

19   form.

20             MR. MENDYS:  I have no problem redacting that.

21             THE COURT:  You just want the paragraph --

22             MR. MENDYS:  Yes.

23             THE COURT:  -- of what the defendant's statement

24   is?

25             MR. MENDYS:  I would -- in fact, it notes at the

Proceedings

1    top continued from page one.  I would redact that just to

2    prevent any kind of speculation about it.

3            THE COURT:  All right.  So what it sounds to me

4    that the defense is not objecting to the admission of a

5    redacted document that only purports to show what Mr. Diaz

6    said to the detective.  Is that correct?

7            MR. BONANNO:  He allegedly said, and it's subject

8    to cross so I don't have objection to it.

9            THE COURT:  So then you can just agree on the

10   redactions --

11           MR. MENDYS:  That's fine.

12           THE COURT:  -- together, and then that will be

13   fine.  So there won't be an objection to it coming with the

14   redactions that the defense is agreeing on.

15           This does raise, though, an issue that I have been

16   thinking about, and it wasn't really fleshed out at the

17   hearing nor did it need to be, but the actual source of the

18   information that Lappy is Mr. Santana and Homeboy is Mr.

19   Melenciano, the conclusion that that, the basis for that

20   conclusion being made I never really heard.  Is that going

21   to be something that you're going to seek to?

22           MR. MENDYS:  I'm gonna have an extensive

23   conversation with the detectives tomorrow.

24           THE COURT:  So you don't actually know, I mean it

25   is something you do have to prove -- well, the theory is

Proceedings

1    acting in concert and that the statement, of course, the

2    full statement from Mr. Diaz does implicate and name two

3    others, actually three individuals who were involved,

4    another person named Hombre who I don't believe anybody

5    identified, but I could understand you're wanting to admit a

6    link between the name Lappy and Amauri Santana and Homeboy

7    and Mr. Melenciano.  I just don't know how you're planning

8    to do that and through what means.

9              MR. MENDYS:  Well, I would, I may seek to do that,

10   but I'm not gonna know the answer to this until I have

11   further discussions with my detectives.

12             THE COURT:  If you're going to seek to do that I

13   think we should have a head up on that.

14             MR. MENDYS:  I would ask Mr. Bonnano if he's going

15   to be in the county tomorrow and if the Court has any

16   availability tomorrow.

17             THE COURT:  I'm here.

18             MR. MENDYS:  If that's something that we could.

19             THE COURT:  I mean, I'm not going to put the case

20   on the calendar.

21             MR. MENDYS:  Sure.

22             THE COURT:  But if you want to come back, we can

23   can always call it in.  The defendant's not here so it's not

24   really an issue.

25             MR. BONANNO:  I didn't cross out my calendar for

Proceedings

1      tomorrow so I do have matters in Westchester.

2              THE COURT:  But it's not something that, it would

3      only be something that if you feel I need to rule on it

4      before opening statements.

5              MR. MENDYS:  I don't think that's gonna be

6      necessary, Judge.  I think, even without that I think

7      there's ample evidence or there will be ample evidence.

8              THE COURT:  I wouldn't want you opening on the

9      fact that, incorporate in your opening that the defendant

10     made a statement and he named --

11             MR. MENDYS:  No, no.

12             THE COURT:  Santana and Melenciano by name.

13             MR. MENDYS:  No, I wouldn't do that.  I would not

14     be doing that.

15             THE COURT:  Okay.  Is there any other kind of

16     evidentiary -- I think I have a grasp on what your physical

17     evidence is.  You have the videos.

18             MR. MENDYS:  It's the, and frankly, it may just be

19     the one video that I seek to use given the quality.

20             THE COURT:  One particular angle.

21             MR. MENDYS:  It's from, well, I should say the

22     video from one particular location, the 2315 video that is,

23     I guess, more direct, the one that was across the street

24     where it's just in the corner.  But I think it's just gonna

25     be the one video.  I've asked Mr. Bonnano, I've shown him

Proceedings

1     the, some of the documents that I, that I'm going to seek to

2     move in, including the line-up photos, the Miranda card, the

3     video and arrest photos of each of the defendants.

4            THE COURT:  Oh, okay.  So you're actually, that's

5     the other question.  So you want to prove identity of this

6     defendant?

7            MR. MENDYS:  Yes.

8            THE COURT:  Which you're not going to really have

9     an in-court ID, it seems we have now, but you want to prove

10    it through the arrest photo.

11           MR. MENDYS:  Yes.

12           THE COURT:  Can I just, and is there -- may I just

13    see the arrest photo itself?  I mean, he's not arrested at

14    the same time so.

15           (Whereupon, the referred to item was handed to the

16    Court.)

17           THE COURT:  So yes, I just want, I mean, the

18    People do have to prove it's him, and his decision not to be

19    here allows them to prove it through photographs shown in

20    the courtroom.

21           MR. BONANNO:  I understand.  I believe he asked me

22    to stipulate to them.  I don't know if I'm --

23           MR. MENDYS:  I didn't ask him to stipulate, I

24    asked whether he would consent to them going into evidence.

25           THE COURT:  Right.  I assume what you're going to

Proceedings

1    do -- well, I don't know.  Let's see.  I mean, certainly the

2    arresting officer, one of the two detectives was there when

3    he was in custody.  Certainly they can say this is how he

4    appeared when I arrested him, but you need to have, I guess

5    you want to have your eyewitness, complaining witness,

6    whoever you would be asking for an in-court ID of the

7    defendant.

8         MR. MENDYS:  I think I want to have that option.

9         THE COURT:  No, I understand that.  This is the

10   witness who already made -- is this the one that made the

11   line-up ID?

12        MR. MENDYS:  Yes, and I may seek to have other

13   witnesses.

14        THE COURT:  I understand.  You will have the

15   option.  And you know, it's just the question of who, how it

16   gets, the timing of it getting into evidence.

17        MR. MENDYS:  Well, I think my plan is for Monday

18   to have, I think, all the police witnesses here, and I would

19   move through Detective Rodriguez the photo in through him.

20   And then depending on, you know, witness prep and things

21   like that, if I made the choice to do an ID, then it's

22   already in evidence.

23        THE COURT:  Right.  And then you would also have

24   like the line-up photograph.

25        MR. MENDYS:  Correct.

Proceedings

1          THE COURT:  But no testimony about the line-up ID

2      itself.

3          MR. MENDYS:  Correct.

4          THE COURT:  But just the photograph coming in.

5          MR. MENDYS:  Just the photographs would be in

6      evidence.

7          THE COURT:  Right.

8          MR. MENDYS:  I may not even seek to do the ID

9      based on the photo alone.  I may just rely on the line-up

10     ID.

11         THE COURT:  And so, I mean, basically that's your

12     physical evidence with everything outlined.

13         MR. MENDYS:  The only other thing is something

14     that came in during the hearing is the wanted card.

15         THE COURT:  Which was based on a prior mugshot,

16     right?

17         MR. MENDYS:  Correct.

18         THE COURT:  This is not the arrest photo from this

19     case.

20         MR. MENDYS:  It is not the arrest photo.  I mean,

21     I think it's important only from the standpoint that he was

22     not, when he was apprehended it was not based on a separate

23     arrest, it was based on the fact that there was a wanted

24     card and the wanted poster and that, and you know, I'm not

25     intending to call the apprehension officer, but I would call

Proceedings

1    Detective Rodriguez to say that he submitted an I-card and

2    that he submitted a photograph.  I mean, I recognize this

3    kind of falls into the same, well, potentially the same

4    areas of photo array in terms of some of the prejudice that

5    might be attached to it but.

6              MR. BONANNO:  I think more prejudice is where did

7    he get the photo from.  It assumes he has a criminal record,

8    a felony record or whatever it is, and I think that's really

9    where the prejudice lies.

10             THE COURT:  So your objection would be that the

11   fact that the police had a photograph of this, of Mr. Diaz

12   in custody would lead them to speculate that he has a prior

13   arrest because he left the scene?

14             MR. BONNANO:  Well, I don't know if leaving the

15   scene has anything to do --

16             THE COURT:  No, a photograph of him from the

17   scene.

18             MR. BONANNO:  Yes.

19             THE COURT:  Right?

20             MR. MENDYS:  Well.

21             MR. BONANNO:  There's clearly not a, from what I

22   see and from I'm assuming the jury will see, not a clear

23   facial of anyone in that video.

24             MR. MENDYS:  Okay.  Then, all right, so.

25             THE COURT:  How would you be -- I know, yes, based

Proceedings

1    on an investigation, the investigation is all based on Mr.

2    Melenciano identifying him.

3         MR. MENDYS:  Correct.

4         THE COURT:  He said this is his name and then it

5    turns out to be a nickname, and they find the picture and

6    they show it to him, and then there's a photo array from a

7    different individual.  Now, if you're calling that other

8    individual who obviously can't testify about the photo

9    array.

10        MR. MENDYS:  Unless the door is opened, of course.

11        THE COURT:  Well, I mean, it seems that you're

12   going to have to explain something to a jury about how --

13        MR. MENDYS:  I think my intent, Judge, and what

14   I've done in past cases, would be to have Detective

15   Rodriguez indicate that on October 17th of 2012, after he

16   was assigned the case, through his investigation he was able

17   to develop a suspect named Richard Diaz, without referring

18   to the identification by Melenciano, without referring to

19   the photo array by Miss Rodriguez.  And once he developed

20   that suspect, the name, he submitted what is known as an

21   investigation card or a wanted card to the rest of NYPD

22   indicating that if he, if anyone from NYPD came across him,

23   they would be taken into custody and Detective Rodriguez

24   would be notified, and that ultimately on November 22nd that

25   is what happened.

Proceedings

1              So I think my, what I would seek would be his

2       testimony to be limited in that way so that there's no

3       reference.  And in fact, based on that, you know, I'll, I

4       will not move the wanted posters into evidence, but, or seek

5       to move it into evidence, but I will, I would, I think, seek

6       to have that testimony.  I think it's fair testimony without

7       prejudicing, causing any prejudice based on his record or

8       any kind of inappropriate or inadmissible ID's.

9              THE COURT:  And --

10             MR. BONANNO:  If it actually is put forth as Mr.

11      Mendys articulated, I don't know if I would be able to

12      object to it but for the fact that co-defendant here was the

13      one who gave up Mr. Diaz, but that kind of opens the door I

14      would think.

15             THE COURT:  Opens the door for who?

16             MR. BONANNO:  For the photo.

17             THE COURT:  No, no, you're saying, number one, of

18      course I assume the witnesses are prepped to say nothing

19      about Mr. Melenciano and the identification.  That's not,

20      it's basically a sanitized version that there was a third

21      person who was a suspect involved in the case.

22             MR. MENDYS:  Correct.

23             THE COURT:  And based on information developed in

24      the course of the case being investigated, because two

25      people are already in custody, they're arrested at the

Proceedings

1    scene.

2              MR. MENDYS:  Right.

3              THE COURT:  They were able to come up with the

4    name of Mr. Diaz and a wanted card was prepared.  And then

5    on this date Mr. Diaz himself was taken into custody and

6    here's Mr. Diaz.

7              MR. MENDYS:  Right, and that would be --

8              THE COURT:  They're not going --

9              MR. BONANNO:  That's fine.

10             MR. MENDYS:  Listen, if Mr. Bonnano seeks to go

11   into the, you know, fact that Mr. Melenciano gave up Mr.

12   Diaz, that's his choice, you know.  And if that, whatever

13   ramifications come from that we'll see at the time but.

14             THE COURT:  I don't think he was wanting to open

15   the door, I think he was worried that some door opened.

16             MR. BONANNO:  Somehow.

17             THE COURT:  I don't think you want to question --

18             MR. BONANNO:  No.

19             THE COURT:  Right.  I mean, it's, you know, yes

20   you can explain just as the background how the police came

21   to -- that the police did focus on someone who's considered

22   a suspect, and then it's confirmed actually by the person

23   through the line-up, and that's your evidence.

24             MR. MENDYS:  Sure.

25             THE COURT:  Yes, that happened.  That's fine.

Proceedings

1           MR. MENDYS:  Ultimately through his own words.

2           THE COURT:  I'm glad you don't want to put the

3    photograph in.  It raises, like the wanted card photo it

4    raises a number of issues that I think would require

5    certainly instruction by me to the jury not to speculate

6    about this or that, or you know, and even with the picture

7    itself it's, I know what it is, and because it was the same

8    picture as in the photo array, right?

9           MR. MENDYS:  Right.

10          THE COURT:  Two earrings and, you know.

11          MR. MENDYS:  Right.  So I think based on, I think

12   largely your Honor's correct, the evidence will be limited

13   to the video, to the line-up photos, the arrest photo of

14   Diaz as well as the co-defendants and the Miranda card and

15   the statement.

16          THE COURT:  Okay.  And you said you're going to

17   have four police witnesses here Monday?

18          MR. MENDYS:  I will have three police witnesses

19   here Monday.

20          THE COURT:  Bell?

21          MR. MENDYS:  Bell, Detective Rodriguez and Officer

22   Mangual.

23          THE COURT:  And is there another police witness

24   that you're calling?

25          MR. MENDYS:  As of right now, no.

Proceedings

1          THE COURT:  Okay.  So then, my understanding

2     basically is you may have no more than three additional

3     witnesses after that?

4          MR. MENDYS:  That is correct.

5          THE COURT:  But two of them are going to come in

6     one day at a time?

7          MR. MENDYS:  Also correct.

8          THE COURT:  Okay.

9          MR. MENDYS:  And given, I think given, this is

10    something that maybe we can discuss Monday when I know more,

11    I have not -- I'll be frank, they're coming from

12    out-of-state, I have not met with them personally at all

13    during the course of this.  I would ask the Court for a

14    little leeway briefly in the morning to meet with them to,

15    even if it's meeting instead of 10, 10:30, assuming I can

16    get them here at an early hour.

17         THE COURT:  Okay.

18         MR. MENDYS:  You know, or to 11 if your Honor's

19    feeling generous.

20         THE COURT:  Have you turned over any criminal

21    records that you're aware of?

22         MR. MENDYS:  I am not aware of any criminal

23    records.

24         THE COURT:  Okay.

25         MR. MENDYS:  I will email the grand jury minutes

Proceedings

1      to Mr. Bonnano for all the witnesses this afternoon.

2              THE COURT:  But you know their dates of birth and

3      you checked?

4              MR. MENDYS:  I know their dates of birth.  I

5      checked recently, yes.

6              THE COURT:  Because you've never spoken to them.

7              MR. MENDYS:  I've spoken to them on the phone.

8              THE COURT:  But I mean, but it's more accurate

9      that you actually have run based on dates of birth.

10             MR. MENDYS:  Yes.

11             THE COURT:  And names.  And you have, and none of

12     the witnesses that will be testifying that you're calling

13     have any kind of criminal records?

14             MR. MENDYS:  That is correct.

15             THE COURT:  Okay.  All right, anything, Mr.

16     Bonnano, that you want to raise?

17             MR. BONANNO:  The only thing I can see

18     potentially, Judge, is there's that radio transmission tape

19     that I may want to question Officer Mangual on.

20             THE COURT:  Well, what is the substance of the

21     tape that's so --

22             MR. BONANNO:  It's trying to apprehend the fleeing

23     suspect.

24             THE COURT:  Okay.

25             MR. BONANNO:  And the directions of flight and the

Proceedings

1      confusion there at.  And there was actually a person

2      apprehended a few blocks away, ID'd and not, you know,

3      brought.

4                    THE COURT:  ID'd?

5                    MR. BONANNO:  Well, you know, not ID'd but held.

6                    MR. MENDYS:  Negative show up.

7                    THE COURT:  So you want to bring up that they

8      apprehended someone and the witnesses were brought to the

9      scene and they said that's not him?

10                    MR. BONANNO:  I might just to show the, there was

11      a lot of confusion in Officer Mangual's arresting officers

12      transmissions.

13                    THE COURT:  But you want to bring in a negative

14      identification that the police, acting on whatever

15      information they had, held someone and that -- did all four

16      people view this?

17                    MR. MENDYS:  I'm not sure.

18                    THE COURT:  Did all four people?

19                    MR. BONANNO:  I'm not sure either.

20                    MR. MENDYS:  You can't tell from this.

21                    MR. BONANNO:  All I know is it was a negative ID.

22                    THE COURT:  Is there no paperwork?

23                    MR. MENDYS:  There's no paperwork.

24                    THE COURT:  There's no 2-50 or anything?

25                    MR. MENDYS:  It's just a, there's no 2-50 that I'm

Proceedings

1      aware of.  There is the Sprint report and the transmission

2      itself.

3              THE COURT:  So, but there was a viewing by, by at

4      least one of the victims?

5              MR. BONANNO:  And not even sure who that was.

6              MR. MENDYS:  It appears so.  As the Court I'm sure

7      is aware, there are, when the radio transmissions come

8      through there are often multiple cases and multiple

9      transmissions relating to unrelated incidents going on at

10     the same time.  It is not entirely clear to me that you hear

11     negative come over the radio, but it's not entirely clear to

12     me at least that that negative is in relation to the, the

13     any possible showup.

14              There is a question at some point about they ask

15     for a description and they say something to the effect that

16     there might be somebody here who matches the description.

17     They asked for the description and then at some point later

18     there is a negative.  It's not negative showup.  It's not

19     negative anything to that effect, it's just, I think it's

20     just negative.

21              So I'm not entirely -- I don't think I'm a hundred

22     percent certain that the negative relates to a possible

23     showup and, you know, I'm gonna inquire more of that about

24     that tomorrow.

25              THE COURT:  And the only witness that you're

Proceedings

1    calling from that night is Officer Mangual?

2            MR. MENDYS:  Correct.

3            THE COURT:  So do you have any information that

4    Officer Mangual was involved in any kind of a showup

5    afterward?

6            MR. MENDYS:  From what he has told me he went

7    directly back to the precinct.

8            THE COURT:  Because he had someone in custody

9    which would actually make sense.

10           MR. MENDYS:  And he had -- he was driving the van.

11           THE COURT:  He had to transport these guys back to

12   the precinct.

13           MR. BONANNO:  I don't really want to show it so

14   much for the negative showup, but to show the confusion and

15   the circumstances at the scene; wrong directions of flight,

16   wrong, you know, ID, the color of the perpetrator's clothes.

17   No one ever knew it was a male black, male Spanish, male

18   white, no one.  That is maybe one of the reasons I want to

19   bring it in, if I do decide.

20           THE COURT:  Who would you be seeking to impeach

21   with that type of --

22           MR. BONANNO:  I think Officer Mangual has

23   testified kind of conflicting between his grand jury

24   testimony, his hearing testimony, and to compound that with

25   confusion at the scene would tend to show his inexperience

Proceedings

1       in these types of matters, and his observation skills in

2       these types of matters.

3               THE COURT:  So did Officer Mangual receive a

4       description from the individuals of the third perpetrator or

5       is it his own description of what he observed for the moment

6       that he saw the third person there?

7               MR. BONANNO:  I don't think I've never done any

8       inquiry on this.

9               MR. MENDYS:  There is a description that comes

10      over the radio that is consistent of blue sweatshirt, male

11      Hispanic, approximately 30 years old, five-foot-nine, with a

12      white belt.

13              THE COURT:  Right.  And do you know the source of

14      that description?  Who, the person who gave that person is?

15              MR. MENDYS:  I believe it's one of the females.

16              THE COURT:  So if it's a consistent description,

17      I'm not sure that you could just put the police tape in to

18      show that there's communications just in a generic sense,

19      which sounds like you're trying to do without knowing who's

20      giving this information and what it's about.

21              Is there any, I mean, and you would be seeking to

22      admit this through Officer Mangual?

23              MR. BONANNO:  Mangual, just as to the actual

24      confusion that was going on at the time, he gave a wrong

25      direction of flight.  Then he gave a connected direction of

Proceedings

 1    flight, you know.

 2              THE COURT:  He himself?

 3              MR. BONANNO:  Someone on the tape did, I'm not

 4    sure if it was Mangual or --

 5              THE COURT:  Well, I don't know what your position

 6    is on this.

 7              MR. MENDYS:  Well, I don't think there's any

 8    grounds for the recording itself to come into evidence or at

 9    least I haven't heard any.  If he seeks to attempt to

10    impeach Officer Mangual with something to that effect, you

11    know, I guess we'll deal with that at the time, but I'm not,

12    I don't hear any grounds for admissibility and, I mean, I

13    would object to it coming into evidence.

14              THE COURT:  Well, I mean, I don't know if a

15    foundation is going to be laid.  I don't know what Officer

16    Mangual is going to say.  But your sponsoring witness for

17    this tape is this one police officer, and I'm not sure what

18    foundation would allow it to come in.  I'll, you know, you

19    can attempt to lay a foundation, but you can't just play a

20    tape and say --

21              MR. BONANNO:  I understand that.  I just want to

22    give, again, a heads up that should, you know, during the

23    cross or direct that opportunity arises, I may chose to do

24    that.

25              THE COURT:  Okay.  Anything else?

Proceedings

1          MR. MENDYS:  I think that's it, Judge.

2          THE COURT:  All right.  So if you need to talk or

3    even if you want to call chambers if something comes up,

4    it's 3623 is the extension.  Just call chambers, otherwise

5    I'll see you 9:30 Monday if there's something we need to

6    discuss.

7          Now also, I'm sorry, one last thing, and it

8    concerns Mr. Diaz and his nonappearance but his potential

9    reappearance.  I'm not sure, you know, if he's going to come

10   in on his own, but if he does contact you and he wants to

11   come to court, I would like a heads up to myself.

12         MR. BONANNO:  Sure.

13         THE COURT:  The staff and Mr. Mendys.  I don't

14   know, though, how we can prevent what I am kind of thinking

15   about because warrant officers just walk into this courtroom

16   all hours of the day and night no matter what's going on,

17   and I'm going to have a jury here.  And the thought that Mr.

18   Diaz would be brought in in handcuffs by an officer while

19   you have witnesses on the stand and a jury in the box kind

20   of haunts me in a way that it troubles me.

21         And I'm not sure how we can prevent -- obviously,

22   he has to be returned to where the warrant is ordered, but

23   he can't be returned in a way that's going to be

24   prejudicial, although he's the cause of warrant being

25   offered.

1          So is there anything that anyone can think of?

2          MR. MENDYS:  Only thing, and I'm not -- listen,

3    I'm not here to tell the officers how, court officers how to

4    do their jobs or where they can be or where they can't be,

5    but, you know, I know that at least on occasion I've seen

6    officers either at the door.

7          THE COURT:  You mean court officers?

8          MR. MENDYS:  Court officers to essentially

9    monitor.

10         THE COURT:  Yes, perhaps the court officers who

11   are here could be given Mr. Diaz' picture, but we need

12   probably an extra officer in the hallway, which is not

13   something that we usually have.  It's going to be a whole

14   new crew, I know, but it would really be -- and you know, I

15   can make a call, but if you can give whoever's coming like a

16   heads up we might need to station someone out in the hallway

17   just incase Mr. Diaz comes in when we're on trial, that's

18   probably the most efficient way.

19         Other thing may be I'm not sure they all come in

20   through the front door.  The police officers like, you know,

21   on 161 Street.

22         COURT OFFICER:  They have to go through the

23   magnetometers.

24         THE COURT:  That's the only entrance they come in

25   when they don't bring returns on warrants through any other

Proceedings

1    entrance?

2            COURT OFFICER:  No, but they check in and find out

3    where they're going downstairs.  Generally, they have the

4    warrant, it says what part it came out of.  That's where

5    they generally take the warrants.

6            THE COURT:  Would they be able to like know

7    downstairs to advise the court that, the courtroom that Mr.

8    Diaz is coming into the building and that we can take steps

9    to prevent any kind of, I mean.

10           COURT OFFICER:  It's a lot of different, I think

11   it's more feasible to have somebody in the front.  I think

12   that's more feasible than to just monitor everybody that's

13   walking throughout the magnetometers.

14           THE COURT:  Just having somebody outside the

15   court.  All right.  I'll see, talk to the captain or whoever

16   see what we can come up with.  All right.

17           MR. MENDYS:  I think that's probably the best way.

18           THE COURT:  It probably is the only way we can or

19   the best way to prevent something like that from happening

20   during the trial.  And then, you know, if he does return,

21   we'll deal with that when it happens, but we just don't want

22   that to happen with the jury sitting in the box.

23           If I don't hear from you, I'll see you Monday.

24   Have a good weekend.  Thank you.

25           MR. BONANNO:  Thank you.

Proceedings

1                    (Whereupon, the case was adjourned to July 20,

2          2016.)

3                    (Continued on the next page...)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    SUPREME COURT OF THE STATE OF NEW YORK
      BRONX COUNTY : CRIMINAL TERM : PART 98
 2    ------------------------------------x
      THE PEOPLE OF THE STATE OF NEW YORK
 3
            -against-
 4                                        Ind. No.
      RICHARD DIAZ,                       3349-2012
 5
                      Defendant.
 6    ------------------------------------x
                                      265 East 161 Street
 7                                    Bronx, New York 10451
                                      JULY 20, 2016
 8
      B E F O R E:
 9
                  THE HONORABLE RALPH FABRIZIO
10                Justice of the Supreme Court

11                (Appearances same as previously noted.)

12                                      LAURA ROSEN
                                        SENIOR COURT REPORTER
13
            *      *      *      *      *      *      *      *
14                      (Whereupon, the following took place in open court

15      in the presence of the defendant and the assistant district

16      attorney.)

17                  THE CLERK:  Part 98 is now in session, the

18      Honorable Ralph Fabrizio presiding.  Case on trial

19      continued, Richard Diaz.  The defendant continues not to be

20      present.

21                  MR. MENDYS:  Newton Mendys for the office of the

22      district attorney.  Good morning.

23                  THE COURT:  Good morning.

24                  MR. BONANNO:  Good morning, Your Honor.  Pat

25      Bonanno for Mr. Diaz.
```

Proceedings

1        THE COURT:  Good morning to you.  All right, I

2   understand we just about have all of our jurors.  Any legal

3   issues or anything you want to discuss?

4        MR. MENDYS:  One thing I wanted to, a couple of

5   things I wanted to follow-up on from our conversation on the

6   Thursday.  In terms of the nicknames, Lappy and Homeboy that

7   we discussed a little bit on Thursday, I spoke with

8   Detective Rodriguez.  He informed me that he learned those

9   nicknames through his interview with Jose Melenciano.

10        THE COURT:  He learned the nicknames through the

11   interview with Jose Melenciano.

12        MR. MENDYS:  Melenciano, the co-defendant.

13        THE COURT:  And Melenciano's statement --

14   Melenciano is the one who implicated Diaz?

15        MR. MENDYS:  Correct.

16        THE COURT:  But Melenciano is Lappy or Homeboy?

17        MR. MENDYS:  Homeboy.

18        THE COURT:  He said my nickname is Homeboy?

19        MR. MENDYS:  And he referenced Santana as Lappy.

20        THE COURT:  And he referenced Mr. Santana as

21   Lappy, so go ahead.

22        MR. MENDYS:  So I would be seeking to move to

23   introduce evidence of those nicknames, obviously cognizant

24   of the fact that co-defendant's statement who is not on

25   trial can present issues.  My suggestion would be just to

Proceedings

1        sanitize it to the extent that Detective Rodriguez learned,

2        during the course of his investigation, that Jose Melenciano

3        had a nickname of Homeboy and Amauri Santana had a nickname

4        of Lappy.

5                THE COURT:  Mr. Bonanno?

6                MR. BONANNO:  Judge, the way I see it gives me

7        reason to question Detective Bell, then, that she did not

8        learn those names.

9                THE COURT:  No, no, she said she learned them but

10       she didn't remember how she learned them you thought?

11               MR. MENDYS:  I think she testified that Chris

12       Rodriguez learned them but --

13               THE COURT:  Right.

14               MR. MENDYS:  -- she was not clear who was, who

15       from her own --

16               THE COURT:  As I recall, her testimony was when

17       she interviewed your client and he mentioned the nicknames,

18       and then she put together what the real name was and then

19       put the real names in parenthesis in the statement when she

20       typed it up, but she learned it may have been through

21       Rodriguez, I don't remember.  But she at least she testified

22       she learned it through the police investigation.

23               MR. BONANNO:  And it's actually page 110, I don't

24       remember how I got the name.  Sergeant DeCandido and

25       Rodriguez provided them.

Proceedings

 1        THE COURT:  Right.  I thought she said she didn't
 2    remember how, but it was through the investigation.  It
 3    doesn't impeach her that --
 4        MR. MENDYS:  Well, I want to be clear, Detective
 5    Rodriguez is the one who will, he would be the one who would
 6    testify to this because he's the one who learned them.
 7        THE COURT:  But you want Detective Rodriguez to
 8    testify that he just learned these through the
 9    investigation?
10        MR. MENDYS:  Yes.
11        THE COURT:  And your --
12        MR. BONANNO:  That's fine, Judge.  That's fine.
13        THE COURT:  Okay.  If that's the way you want to
14    bring it out, but he actually learns it in a face-to-face,
15    he learns from Melenciano, Melenciano tells him.
16        MR. MENDYS:  Correct.
17        THE COURT:  My nickname is Homeboy, right?
18        MR. MENDYS:  Correct.
19        THE COURT:  So why isn't that admissible just as a
20    statement from him that he took directly, but then you don't
21    want him to talk about Melenciano saying Santana's nickname,
22    but that was a different part of a --
23        MR. MENDYS:  I know there are Crawford
24    insinuations with co-defendants' statements.
25        THE COURT:  About a -- well.

1      MR. MENDYS:  With a hearsay --

2      THE COURT:  It's procedural to ask what your

3  nickname is.

4      MR. MENDYS:  Is it pedigree information?

5      THE COURT:  Pedigree, right.

6      MR. MENDYS:  So I mean, I'm erring on the side of

7  caution.

8      THE COURT:  All right.  No, so that's fine.  So

9  there's no objection to you're having it raised as during

10  the course of my investigation I learned this, and it's

11  going to be admitted for the truth?

12      MR. MENDYS:  Yes.

13      THE COURT:  Okay.  Anything else?  Mr. Bonanno?

14      MR. BONANNO:  I guess that raises the question did

15  he independently verify that.  Did he?

16      THE COURT:  Independently verify from who?

17      MR. BONANNO:  His police sources just as he went,

18  you know, to his -- I forgot what it is that they used, that

19  system.

20      THE COURT:  I understand the Crawford problem as

21  the declarant.  I mean, I understood that this had to come

22  up somewhere someplace, otherwise Detective Bell would not

23  have had to include that information or have the information

24  to include in her DD5s.  But the source is Mr. Melenciano

25  who is severed, number one, because of your application, and

Proceedings

1    he's not here as a witness either to testify about it.  So

2    are you objecting to it coming in at all?

3              MR. BONANNO:  Not at this time, Judge.

4              THE COURT:  You're not objecting?

5              MR. BONANNO:  Not at this time, no.  I'll see how

6    it comes out.

7              THE COURT:  Anything else?

8              MR. MENDYS:  Second thing I wanted to follow-up on

9    from Thursday was that Mr. Bonanno raised the issue of the

10   radio runs.  I spoke to Officer Mangual and Detective Colon.

11   Detective Colon is the voice that you hear that we have

12   heard on the radio runs making the radio transmissions.

13   There are other sectors unidentified at this point that are

14   communicating, but Officer Mangual does not appear on the

15   radio runs.  His voice is no where on the radio run.

16             THE COURT:  So are you making an in limine --

17             MR. MENDYS:  This is just for educational purposes

18   only.

19             THE COURT:  Okay.

20             MR. MENDYS:  So that Mr. Bonanno, should he seek

21   to go through that, does not go through the wrong witness.

22   The new piece of information I have is I learned Friday

23   afternoon, I want to say around 4 o'clock, that Mr.

24   Contreras, I spoke to his wife, Mr. Contreras I've been told

25   he's currently in the Dominican Republic.  That his wife

Proceedings

1    informed me Friday that she does not know when he is

2    returning.

3              I spoke to her again yesterday.  Detective

4    Rodriguez spoke to her on Friday as well.  I spoke to her

5    again yesterday and she provided me a number of someone he

6    is with in the Dominican and we are attempting to reach out

7    and see, see what's going on.  So whether he testifies or

8    not at this point, I think, is a question.

9              THE COURT:  Can you meet your burden without him?

10             MR. MENDYS:  My, as to a robbery in the second

11   degree we've had conversations internally in my office and I

12   don't believe so.  As to an attempted robbery in the second

13   degree, yes.

14             THE COURT:  So.

15             MR. MENDYS:  At the minimum.

16             THE COURT:  So it would not be because you believe

17   you don't have to prove that it was the ownership of the

18   money, is that it?

19             MR. MENDYS:  It's based on my interviews right now

20   and based on who I've spoken to up to this point, I do not

21   -- aside from Mr. Contreras, no one else can say that money

22   was taken from him.

23             THE COURT:  Right.  So how can you get from that

24   there was, if you're saying the attempt is because of the

25   video showing people frisking?

Proceedings

1        MR. MENDYS:  I think it's a number of things.  It

2    would be the video showing the frisking.  It would be

3    recovery of $6,000 from one of the co-defendants, which

4    there will be no evidence of where it came from if Mr.

5    Contreras doesn't testify.  Plus, the statement of Mr. Diaz

6    in which he says we went there not knowing that guy had

7    $3,000 on him to buy drugs.  Put those things together and I

8    think we have a pretty good attempted robbery in the second

9    degree.

10        THE COURT:  Well, I also want to go further on

11    this because you're calling Officer Mangual; right?

12        MR. MENDYS:  Correct.

13        THE COURT:  And Officer Mangual at the hearing

14    testified that Mr. Contreras said to him they took our

15    money, they took our money.  Something like that.

16        MR. MENDYS:  Correct.

17        THE COURT:  And maybe another person said it as

18    well.  Mr. Rodriguez said it also; correct?

19        MR. MENDYS:  Correct.

20        THE COURT:  So are you planning on eliciting those

21    statements from those witnesses, from that police officer

22    who arrives on the scene and that's spoken to at that

23    moment?

24        MR. MENDYS:  I am.  I hope that it will meet an

25    excited utterance.

Proceedings

1        THE COURT:  Well, this is your first witness?

2        MR. MENDYS:  Yes.

3        THE COURT:  So we really do need to discuss this.

4   And I don't want to have to have a sidebar and, you know,

5   you have a video that corroborates, although there's no

6   sound on it, people pointing and yelling at the moment the

7   officers arrive, and grab these people without any, you

8   know, there's no time passage there.  It's basically

9   unfolding in a matter of seconds.

10        So you would be, you're implying that to have

11   hearsay statements of people who may not testify, well,

12   you've never had Mr. Rodriguez anyway as far as I know who

13   is on --

14        MR. MENDYS:  Contreras?  Oh, Mr. Rodriguez.

15        THE COURT:  Mr. Rodriguez is not someone we

16   expected to come or at least I didn't expect him to come in,

17   so you would want to elicit what the officer described at

18   the hearing for the truth of the matter that they took our

19   money, they took our money, not just to explain why the

20   officers did what they did; handcuffed, searched, those

21   things.

22        MR. MENDYS:  Correct.

23        THE COURT:  Under an excited utterance theory.

24        MR. MENDYS:  Correct.

25        THE COURT:  And Mr. Bonanno?

Proceedings

1          MR. BONANNO:  Well Judge, I don't know if it fits

2     the excited utterance exception.  And I mean, there was a

3     claim that, you know, they took my money, but then you have

4     to bring in Melenciano's statement which says it's mine.

5          THE COURT:  No, Mr. Melenciano's statement is not

6     admissible.  How does that come?  You actually, you actually

7     don't get to put Mr. Melenciano's statement in, I believe.

8     How could you put it in?

9          MR. BONANNO:  Well, I can't see a way how you can,

10    this is what I'm saying.  So for the excited utterance or

11    what purports to be an excited utterance to come in when the

12    complaining witness is not here to verify that's exactly

13    what was said, I mean, there was a lot of contradiction in

14    Mangual's, Officer Mangual's hearing testimony as opposed to

15    his grand jury testimony, so I don't know.  And it's

16    certainly gonna be subject to cross, you know, if that's

17    really reliable and coming in as an excited utterance.

18         THE COURT:  Well, what is the objection, that it's

19    not reliable under the excited utterance foundational

20    requirements?

21         MR. BONANNO:  Judge, is it a statement made

22    contemporaneous with an alleged event?  I mean, it's a

23    statement made simultaneous or directly thereafter what he

24    believed he saw as a robbery.  But you know, again, I don't

25    believe it should come in.  I think it's just too highly

Proceedings

1    prejudicial to Mr. Diaz, who is not here, the defendant's

2    statement, and to Mr. Melenciano who is not here, to

3    contradict that statement that it was his money.

4          THE COURT:  Well, okay, there's two issues here.

5    The first is whether the officer will be allowed to testify

6    and as evidence in chief under a hearsay exception to what

7    the victims of the crime said to him when they arrived.

8          Now, we have this video, which I have reviewed for

9    a whole separate purpose in this case.  It was in connection

10   with the motion to sever.  And you said during the video,

11   during the motion to sever, although I understand you're not

12   bound by your position here for this argument, that the

13   reason you wanted the severance is because your client

14   realized when he was watching this happening that they were

15   robbing these people and he wanted no part of it because he

16   didn't know ahead of time that they were going to be robbing

17   them.  So when he's looking at this, according to your

18   proffer, he's determined that this is a robbery, this is not

19   what I signed up for.  I'm out of here, basically.

20         The video -- you already corroborated that which

21   is your defense at that time, but the video also shows that

22   when the police arrive and your client walks off before they

23   even get out of the car, that the police run in, apprehend

24   individuals who are also trying to walk away or run away or

25   move away in different directions, Mr. Melenciano and Mr.

Proceedings

1    Santana.  And at that particular time the victims are

2    screaming at the police in the video without, as I said you

3    can't hear, there's no audio on the videotape, but you see

4    them excited, jumping up and down, pointing, running.

5         And the foundational requirements for excited

6    utterance is that it's at or near the commission of a

7    startling event with really no time for detached reflection.

8    These men have just been, under this videotape been pushed

9    up against the wall and they're being frisked on the street.

10        Now what is really happening, you know, that's

11   what it appears to be, but when the officer arrives and

12   these people are screaming and he's actually arriving while

13   they're frisking, it's all unfolding in a matter of seconds,

14   that videotape is actually the best evidence of why this is

15   an excited utterance, and because it corroborates in a

16   visual way that there is no time for any kind ever detached

17   reflection.

18        Do you think that this doesn't satisfy the

19   foundational requirements?

20        MR. BONNANO:  If you observe the video and the

21   simultaneous actions, yes, but it still doesn't in my mind.

22   And my position would be that as Mr. Goldstein had put forth

23   in his defense at the hearing this was a pre-arranged

24   meeting between individuals for the purchase of drugs and,

25   you know, a claim that it's my money, it's my money is

Proceedings

1      something that's already predisposed in Mr. Contreras' head

2      and, hence, it's not excited utterance but it's an utterance

3      made to get his money back or get back the money that Mr.

4      Melenciano brought to the deal to buy drugs.  So you know --

5              THE COURT:  So I understand that's the second

6      part, which you were wondering whether you would be -- would

7      you be seeking to get into evidence a statement by Mr.

8      Melenciano, well, I don't remember now which one said it.

9      Did they both say -- Mr. Melenciano said it's our money.

10     Santana says it's my money, right?

11             MR. MENDYS:  Right.

12             THE COURT:  And the money is found on Santana.

13             MR. MENDYS:  Correct.

14             THE COURT:  So Santana says it's my money, then it

15     goes beyond that.  It's my money and 16,000 versus 6,000

16     which is the actual amount.  So do you want-- you believe if

17     the excited utterance comes in you should be able to bring

18     out Mr. Santana's statement?

19             MR. BONANNO:  Well, I certainly wasn't prepared

20     for that, but if the excited utterance comes in, yes, I

21     believe that I should be able to at least rebut that

22     statement with the statement of the person it was taken from

23     to say it is my money and not your money, Mr. Contreras.

24             THE COURT:  Mr. Mendys?

25             MR. MENDYS:  One moment, Judge.

Proceedings

1          (Pause in proceedings.)

2          MR. MENDYS:  Judge, I just -- my recollection of

3     the case law on this issue is that there needs to be some

4     kind of basis.  It's obviously hearsay so I think there

5     needs to be some kind of basis for it to come in, an

6     exception to hearsay that would allow for that statement to

7     come in, and I'm just not sure what that is.

8          THE COURT:  If it's being admitted for the truth.

9          MR. MENDYS:  Right, which it seems that it would

10    be.

11         THE COURT:  Well, and you'd be seeking if you were

12    making that application, Mr. Bonanno, to have Mr. Santana's

13    statement admitted for the truth?

14         MR. BONANNO:  Yes, sir.

15         THE COURT:  But then what about the rest of the

16    statement where he gives, according to the officer --

17         MR. BONANNO:  The incorrect amount?

18         THE COURT:  Yeah.

19         MR. BONANNO:  Then that would be Mr. Mendys's

20    move, I would think, at that point to bring the rest of the

21    statement in.

22         THE COURT:  See, it really is, is that point -- I

23    don't think Mr. Mendys wants to have a statement made by Mr.

24    Santana that I have $16,000 in for the truth of the

25    statement because the position is the statement is untrue.

Proceedings

1           MR. MENDYS:  Right.

2           THE COURT:  But it explains why the police did not

3     arrest anyone but the three people under arrest in that

4     there was a misrepresentation of the amount of money that

5     was stolen, and that when the victim says I had $6,000 and

6     it turns out to be $6,000, that that explains why there was

7     an arrest.

8           Well, first of all, I am ruling that the

9     statements that are made by Mr. Rodriguez and --

10          MR. MENDYS:  Mr. Contreras.

11          THE COURT:  Mr. Contreras to the officers who

12    arrived and grabbed them are excited utterances based on

13    already hearing the testimony of the officer and viewing the

14    video.  It would be much more apparent to the jury that this

15    is an excited utterance if they saw the video as the

16    statement was being elicited from the officer, but you know,

17    if he explains when this is when he were talking, see them

18    talking, the jury can see it all.  So that ruling is pretty

19    basic.

20          The rest of it, I don't know what you want to go

21    into because that would be your cross-examination.  It could

22    be admissible not as, not for the truth of the matter

23    certainly, but to explain the actions of the police

24    officers.  But that really falls into the lap of the DA

25    because the DA is, I would think would love to have those

1    statements in not for the truth, that Mr. Santana said it's

2    my money but it's $16,000 and it turned out to be $6,000.

3            So I'm not sure what you, strategically you would

4    want to do.  You know, this would not have been so much of a

5    problem with Mr. Contreras on the stand.  We don't know if

6    that's happening yet because you would be able to confront

7    Mr. Contreras, isn't it a fact that you, you were there for

8    a drug transaction?  Isn't it a fact --

9            MR. BONNANO:  Absolutely, I agree.

10           THE COURT:  Blah, blah, blah.

11           MR. BONNANO:  I agree.  My issue that I see

12   actually as I'm reviewing the file even a little more, if I

13   do want to elicit that statement from Mr. Melenciano, then I

14   would want to also follow it up with this letter that I see

15   in the file from an attorney from Mr. Santana about the sum

16   of money he received in a lawsuit and why it was lawfully

17   his money and really his money that night.  So you know,

18   that raises a back and forth.

19           THE COURT:  You're asking if you would be able to,

20   you're making an application to admit a letter?

21           MR. BONANNO:  You know, I can see that I would

22   have to go in this direction if I were to elicit that

23   statement from Mr. Melenciano.

24           THE COURT:  Well, that was never your trial

25   strategy and that's why we were having a joint trial to

Proceedings

1    begin with.  You, you moved to sever and you said your

2    client's defense was "X".  And I understand things can

3    change, I understand your client isn't here, but under what

4    theory would that letter ever be admissible as under the

5    rules of evidence?

6           MR. BONANNO:  I'd be hard-pressed to find it

7    myself, Judge.

8           THE COURT:  Yes, I think that's the answer.  It's

9    inadmissible.

10          Well, in terms of the direct examination of this

11   witness how far -- are you also seeking to elicit that he

12   said it was $6,000 or you just want to leave it as?

13          MR. MENDYS:  I think the witness was prepared to

14   testify that he recovered $6,000.

15          THE COURT:  Right.  I'm talking about the

16   statement from but not about what he was told?

17          MR. MENDYS:  Correct.

18          THE COURT:  Right, okay.  So as long as you're not

19   going to go beyond those first statements that they took our

20   money, they took our money, that's fine.  You know, it could

21   be a little difference in a legal analysis of it's $6,000

22   because there was some back and forth at that time, but this

23   is, this isn't the subject of any questions they took our

24   money.  The officers don't say what happened.

25          MR. MENDYS:  Right.

Proceedings

1          THE COURT:  It's just it's being screamed that

2     this is what happened.

3          MR. MENDYS:  Before we begin play I'd advise the

4     witness of your ruling so he doesn't just --

5          THE COURT:  I would hope you would do that.  Go

6     right ahead.

7          MR. MENDYS:  Before I do that, Judge, I want, I

8     spoke to Mr. Bonanno about pre-marking evidence, well, for

9     identification only, and I didn't know the Court's policy,

10    if you would like it marked.

11         THE COURT:  Which ever way you chose.  Have you

12    done it already?

13         MR. MENDYS:  No, we just talked about it.

14         THE COURT:  Don't worry about it, we'll do it in

15    the courtroom if it's not because I'd like to bring the jury

16    out.  It's about 10:30.

17         MR. MENDYS:  Just so everyone's on the same page,

18    in terms of Officer Mangual, the evidence that I would be

19    seeking to admit through him are the arrest photos of the

20    co-defendants, the voucher for the money and the video from

21    2315 Walton Avenue.

22         And then Detective Rodriguez will be the arrest

23    photo of Richard Diaz and the two line-up photos.

24         THE COURT:  Right.  So that's the next witness?

25         MR. MENDYS:  Yes.

Proceedings

1          THE COURT:  But you want, but those are the pieces

2    of evidence?

3          MR. MENDYS:  I've talked to him about all of them.

4          THE COURT:  Right.  Okay.

5          MR. MENDYS:  And then the, Detective Bell would be

6    the final witness today would be the Miranda card of Diaz

7    and the redacted statement that Mr. Bonanno and I agreed

8    upon.

9          THE COURT:  Okay.

10          MR. BONANNO:  And just I'm wondering how does

11    Mangual bring the video in?

12          MR. MENDYS:  He is on the video, ninety percent of

13    it.  I think if there's an objection he's not there from the

14    beginning, I will start playing it from the time that he

15    arrives, and it would be coming in in total subject to

16    connection through a later witness.

17          THE COURT:  And?

18          MR. BONANNO:  I think that's for this witness,

19    then I would agree if we could stipulate to start when he

20    arrives.

21          THE COURT:  Okay.  That's the other part subject

22    to connection.  You just want the part this witness will be

23    marking this exhibit, whatever it is, and it will be played

24    from the moment that you see the van coming into the picture

25    because that's when he's describing what happens, and then

Proceedings

1    everything after that he's present for.  And this is, he

2    presumably will say this is a fair and accurate

3    representation of everything that happened that day.

4            MR. MENDYS:  Correct.

5            THE COURT:  And you don't have any objection to

6    that part?

7            MR. BONANNO:  Not to that portion.

8            THE COURT:  And then you have another witness who

9    could put the rest of it in.

10           MR. MENDYS:  Yes.

11           THE COURT:  All right.  So we'll, what we'll do is

12   we'll call it whatever number and then the other will be

13   "A".  We'll make it 5 and 5-A, whatever it is.

14           MR. MENDYS:  It's gonna be on the same disk.

15           THE COURT:  It's going to be on the same disk, but

16   it's going to be altogether on the disk?

17           MR. MENDYS:  Yes.

18           THE COURT:  But the other part we'll just have an

19   "A" designation.

20           MR. MENDYS:  Okay.  Will you please just to speak

21   to the witness?

22           MR. BONANNO:  Judge, procedurally, do we want to

23   dismiss the alternate?

24           THE COURT:  You know, thank you, Mr. Bonanno.

25   Yes, we just actually, thank you, we got a call from

Preliminary Instructions

1      Alternate No. 4 and we did have a discussion about this

2      before we broke on Thursday.  She has gotten a job and she's

3      been told, she just called this morning actually not Friday

4      so we were a little in suspense.  So you're consenting that

5      Alternate No. 4 is dismissed?

6                  MR. BONANNO:  Yes.

7                  THE COURT:  Okay.

8                  (Pause in proceedings.)

9                  THE COURT:  Are we ready for the jury?

10                 MR. MENDYS:  Just one moment, Judge.

11                 THE COURT:  You can bring the jury out.

12                 COURT OFFICER:  Jury entering.

13                 (Whereupon, the jury entered the courtroom.)

14                 THE CLERK:  The sworn jury is present and properly

15     seated, your Honor.

16                 THE COURT:  Okay.  Good morning, everyone.  We are

17     now about to proceed with the trial, the People of the State

18     of New York against Richard Diaz.  Now I'm going to explain

19     in opening instructions the various stages of the trial so

20     you can know what you can expect to see and hear, and you

21     may better understand what's happening as you see it.

22                 I'm also going to remind you of some basic

23     principles of law that apply to this and all criminal

24     trials.  When the case is over, I will again remind you of

25     those principles and I'll define the crimes charged, explain

1    the law that applies to those charges, and list for you the

2    elements of each crime that the People have to prove beyond

3    a reasonable doubt.

4         Now, the trial formally begins with what the law

5    calls an opening statement by the prosecutor.  The law

6    requires the prosecutor to make an opening statement.  The

7    law, however, does not require the defense attorney to make

8    an opening statement.  If the defendant does not make an

9    opening statement, that's not a factor from which you may

10   draw any inference unfavorable to the defense.

11        Now, I want you to remember what the lawyers say

12   in an opening statement, and actually in any time

13   thereafter, is not evidence.  The lawyers are not witnesses.

14   When I say something to you, what I say isn't evidence, I'm

15   not a witness.  In other words, you have to decide the case

16   on the evidence, and what the lawyers say at any time is not

17   evidence.

18        Now after completion of the opening statement or

19   statements, the prosecutor will proceed with the

20   presentation of the People's case.  I remind you that

21   there's an indictment, and the indictment is not evidence.

22   It's simply a document that contains an accusation.  The

23   defendant has pled not guilty to the accusations and the

24   trial is for you to hear the evidence and decide whether the

25   defendant is guilty or not guilty.

1        I'm reminding you that evidence really basically

2    consists of three things.  Testimony, which is the most

3    common form of evidence that comes from the questioning of

4    the witnesses by the lawyers, and perhaps even by me.  When

5    a witness is questioned, the question itself is not

6    evidence.  Evidence is the question combined with the answer

7    to the question.

8        So for example, sometimes a question will assume

9    that something is true.  You're not, however, to conclude

10   that the assumption in the question is true unless the

11   answer to that question, in your judgment, confirms that

12   it's true.  So in other words, you consider the question and

13   the witness's answer, decide whether you find the answer to

14   be believable and accurate, and then that's it because,

15   again, the question and the answer is really the evidence,

16   is the evidence, the testimony.

17       Evidence will also come in the form of physical

18   objects.  There could be documents, photographs, videotapes,

19   charts, graphs, anything physical nature that's received in

20   evidence.

21       And finally, it can be a stipulation which I

22   explained to you and I'll tell you again, it's information

23   that both parties agree you can hear as evidence without

24   actually having a witness testify to it.

25       Now, it's common and it's permissible for a lawyer

1       or an investigator for a lawyer to speak to a witness about

2       their testimony before that witness testifies on the stand.

3       Witnesses can review documents and other material pertaining

4       to the case before they testify at trial.

5               Now, after the People have completed the

6       presentation of their evidence, the defendant may, but is

7       not required, to present evidence.

8               Now members of the jury, during jury selection and

9       right now you have noticed that there is no one present at

10      the defense table other than the attorney.  The defendant is

11      not present in the courtroom.

12              Now, a defendant has a right to be present in the

13      courtroom for any part of the trial or for the entire trial.

14      A defendant also has a right not to be present.  Thus,

15      you're not to speculate about the reason for the defendant's

16      absence, nor are you to draw any inference for or against

17      the defendant or for or against the People because of the

18      defendant's absence.

19               I do remind you that throughout these proceedings

20      the defendant is presumed to be innocent.  As a result, you

21      must find the defendant not guilty, unless on the evidence

22      presented at the trial you conclude that the People have

23      proven the defendant guilty beyond a reasonable doubt.

24              Now, that a defendant does not testify as a

25      witness is not a factor from which any inference unfavorable

1      to the defendant may be drawn.  The defendant is not

2      required to prove that he is not guilty.  In fact, the

3      defendant is not required to prove or disprove anything.  To

4      the contrary, the People have the burden of proving the

5      defendant guilty beyond a reasonable doubt.

6             That means that before you can find the defendant

7      guilty of a crime, the People most prove beyond a reasonable

8      doubt each and every element of that crime, including the

9      fact that the defendant is the person who committed the

10     crime.  That burden of proof never shifts from the People to

11     the defendant.  If the People fail to satisfy their burden

12     of proof, you must find the defendant not guilty.  If the

13     People satisfy their burden of proof, you must find the

14     defendant guilty.

15            Now, what does our law mean when it requires proof

16     of guilt beyond a reasonable doubt?  The law uses the term

17     proof beyond a reasonable doubt to tell you how convincing

18     the evidence of guilt must be to permit a verdict of guilty.

19            The law recognizes that in dealing with human

20     affairs there are very few things in this world that we know

21     with absolute certainty, therefore the law does not require

22     the People to prove a defendant guilty beyond all possible

23     doubt.

24            On the other hand, it's not sufficient to prove

25     that the defendant is probably guilty.  In a criminal case

1     the proof of guilt must be stronger that that, it must be

2     beyond a reasonable doubt.

3              And a reasonable doubt is an honest doubt of the

4     defendant's guilt for which a reason exists based upon the

5     nature and the quality of the evidence.  A reasonable doubt

6     is an actual doubt, it's not an imaginary doubt.  It's a

7     doubt that a reasonable person acting in a matter of this

8     importance would be likely to entertain because of the

9     evidence that was presented or because of the lack of

10    convincing evidence.

11             Proof of guilt beyond a reasonable doubt is proof

12    that leaves you so firmly convinced of the defendant's guilt

13    that you have no reasonable doubt of the existence of any

14    element of the crime or of the defendant's identity as the

15    person who committed that crime.

16             In determining whether or not the People have

17    proven the defendant's guilt beyond a reasonable doubt, you

18    should be guided solely by a full and a fair evaluation of

19    the evidence.  After carefully evaluating the evidence, each

20    of you must decide whether or not that evidence convinces

21    you beyond a reasonable doubt of the defendant's guilt.

22             Now whatever your verdict may be, it must not rest

23    upon any baseless speculations, nor may it be influenced in

24    any way by any bias, any prejudice, any sympathy or by a

25    desire to bring an end to your deliberations or to avoid an

1    unpleasant duty.

2          If you are not convinced beyond a reasonable doubt

3    that the defendant is guilty of a charged crime, you must

4    find the defendant not guilty of that crime.  If you are

5    convinced beyond a reasonable doubt that the defendant is

6    guilty of a charged crime, you must find the defendant

7    guilty of that crime.

8          Now each witness who will testify by whom that

9    witness is called is first examined, that is asked

10   questions, by the lawyer who calls that witness to testify,

11   and that's what we call direct examination.  When the direct

12   examination is completed, the other lawyer is permitted to

13   ask the same witness questions.  That's called

14   cross-examination.

15         You may then have redirect examination and

16   recross-examination, but under our, law the scope of any

17   such additional examination is limited and can be limited by

18   me on the theory that the lawyers had sufficient opportunity

19   on their original direct or cross to ask whatever they

20   wanted.

21         Now the lawyers are responsible for questioning

22   the witnesses.  As I said, I, at times, may ask the witness

23   a question.  Jurors may not ask questions of witnesses.

24         Now, as judges of the facts you alone are here to

25   determine the truthfulness and the accuracy of the testimony

1  of these witnesses.  You must decide whether a witness told

2  the truth and was accurate or, instead, testified falsely or

3  was simply mistaken.  You must also decide what importance

4  to give to the testimony that you accept as truthful and

5  accurate.  It is the quality of the testimony that's

6  controlling and not the number of witnesses who testify.

7          There is no particular formula for evaluating the

8  truthfulness and the accuracy of another persons statement

9  or their testimony.  You all bring to this process your

10  varied life experiences, and in your lives you frequently

11  decide the truthfulness and the accuracy of statements that

12  other people make to you.  Those same factors that you use

13  to make those decisions you should use them in this case

14  when evaluating the testimony.  And at the end of the trial

15  I'll give you some examples of factors you may consider.

16          There are, as I'm sure you appreciate, legal rules

17  for all stages of trial including rules that govern whether

18  certain types of evidence may be introduced, and if so, how

19  they may be introduced and when they may be introduced.

20  Part of my job as the judge of the law is to enforce those

21  rules.  Some of the rules you might understand when you hear

22  the ruling, some of them you may not understand unless

23  you've studied the law.  But I assure you these rules are

24  have been carefully developed over hundreds of years and

25  they are exist for the sole purpose of guaranteeing a fair

1   and an orderly trial.

2           The rules are not designed to determine whether

3   the evidence you hear and see is true or false, accurate or

4   inaccurate.   That's for you to decide, not me.   That's

5   evaluating the evidence and you make that decision.   The

6   rules are designed to ensure that the evidence you hear and

7   see is relevant and in a form that permits you to evaluate

8   it fairly.

9           Now, a witness usually can testify only about

10   matters that the witness has personal knowledge of.   That is

11   something that the witness has personally seen, heard, felt,

12   touched, or tasted.   A witness is not permitted to guess or

13   speculate or say what he or she thinks another person saw,

14   heard, felt, touched or tasted.

15           A witness is not permitted to give an opinion

16   about matters for which a special expertise is necessary,

17   unless, of course, the witness purports to be an expert on

18   the matter they're being questioned about.   With some

19   exceptions, what a witness may have been thinking when

20   something was taking place is also not relevant evidence.

21           Often a lawyer will ask the court to receive in

22   evidence items such as an a photograph.   Under our law, to

23   have a photograph or a document or a map or something like

24   that admitted into evidence, it must be shown that the

25   photograph is a fair and accurate depiction of the area in

Preliminary Instructions

1      question at the time in question.  If that is done, it

2      doesn't matter on the question of receiving the photograph

3      into evidence who took the photograph or when it was done.

4              Now, during the presentation of evidence the

5      lawyers for the parties will be asking questions of

6      witnesses as I told you in turn.  Now, during that

7      questioning, a lawyer is not permitted to make comments on

8      the witness's answers or the case.  That always happens on

9      television.  It always happens in the movies.  They have a

10     short period of time to convey the story, they're looking

11     for the drama.  In real trials that's not allowed, and it's

12     certainly not allowed in my courtroom.

13             In a real trial, at the end of the case the

14     lawyers are permitted to address the jurors in what is

15     called a summation, and it is then and only then that the

16     lawyers may comment on the witnesses, on the testimony and

17     other evidence.

18             Now, during the questioning of a witness if a

19     lawyer believes a question or some other presentation of

20     evidence is not in accord with the law, the lawyer will

21     object.  When an objection is made, I will decide whether

22     the rules permit the question to be asked or the evidence to

23     be introduced.

24             Now making objections is part of a lawyer's job.

25     They do it all the time.  You're not to draw any inference,

Preliminary Instructions

1    unfavorable inference because objections are made.  They

2    take place at every trial.

3            Now, a lawyer may object before a witness answers

4    a question.  A lawyer may also object after the answer has

5    been given by the witness.  When an objection is made to a

6    question before the witness answers, if I overrule the

7    objection, if you hear me say objection overruled or just

8    the word overruled, that witness will be permitted to

9    answer.  If I sustain the objection, say sustained or

10   objection sustained, then there will be no answer to the

11   question.  And remember, there's no evidence then because

12   it's the question plus the answer that is evidence.

13           If the lawyer objects after the witness answers

14   the question and I overrule the objection, well, then, the

15   answer stands and the question and the answer are the

16   evidence.  However, if I sustain the objection even after

17   the answer is given, that answer is not evidence.  The

18   question and the answer are stricken from the record and

19   then that means that they're stricken from your mind and you

20   are to completely disregard them.

21           I have to inform you that I have an obligation

22   under the laws of New York to make sure that certain very

23   fundamental and basic rules of law are followed even if one

24   of the lawyers does not object, so on occasion you may hear

25   me say sustained or something like that even though there's

Preliminary Instructions

1     no objection.

2          In any event, any ruling that I make on an

3     objection of counsel or otherwise is based on our law.  It

4     expresses absolutely no opinion about the facts of the case

5     or whether the defendant is guilty or not guilty.  That's

6     your responsibility to do.

7          Now, upon completion of the evidence the lawyers

8     will address you in their closing statements and that's what

9     the law calls a summation.  Just as the opening statements,

10    what a lawyers says in summation is not evidence.  They

11    provide each lawyer with an opportunity to review the

12    evidence presented and submit for your consideration the

13    facts and the inferences they submit can be drawn from the

14    facts, and the conclusions they contend may be properly

15    drawn from the evidence presented.  When the summations are

16    over I'll instruct you on the rules of law.

17         Now, you must accept and follow each of my

18    instructions.  You will then begin your deliberations, and

19    during your deliberations your function as jurors will be to

20    decide what the facts are and to apply the rules of law that

21    I set out.  You will determine what the facts are from the

22    testimony, any exhibits that are submitted, any stipulations

23    the parties have agreed to.  In other words, you decide the

24    case on the evidence.  The conclusion you reach from the

25    facts and applying the law will be your verdict, guilty or

1     not guilty.

2              So the stages of a criminal trial, just to sum up,

3     are the opening statement or statements, the presentation of

4     evidence, the summations, my final instructions on the law,

5     your deliberations and verdict.

6              Now, during the trial if any of you need to speak

7     to me about something related to your jury service or to the

8     trial, please let one of the court officers know that you

9     need to speak with me.  I will then arrange an appropriate

10    meeting with the lawyers in the courtroom.  Do not discuss

11    with your fellow jurors whatever you feel necessary to bring

12    to my attention.  After we've had our conversation, do not

13    discuss with the fellow jurors what it was that we did

14    discuss.

15             Now, during a trial we all do our best to avoid

16    delay, but from experience, just like everything else in

17    life, delays are inevitable and they happen for a multitude

18    of reasons through no one's deliberate fault.  When any

19    delay occurs and you're sitting around waiting to be called

20    out, I ask for your understanding and patience.

21             I also request that you all be here at the time

22    times I set so absence or lateness of a particular juror is

23    not the occasion for such a delay.  So if an emergency

24    arises that will make you late or prevent you from

25    attending, please call the court, leave a number where you

1       can be reached if you don't speak to anybody directly who

2       could answer your question, explain the problem so we can

3       minimize everyone's inconvenience.  Okay?

4               Now, we have now three alternate jurors.  An

5       alternate juror is expected to pay the same close attention

6       to the case as anyone of the 12 jurors who were first

7       selected.  The only difference between an alternate juror

8       and one of the 12 jurors is that the alternate juror does

9       not know at this time whether they will be called upon at

10      some point during the trial to substitute for one of the

11      other 12 jurors.

12              Now for everyone's information, that substitution

13      can take place only if some presently unforeseen

14      extraordinary emergency arises that makes it totally

15      impossible for one of the first jurors to complete the

16      trial.  Our law expects that the first 12 jurors who begin

17      the trial will be the 12 jurors at the end of the trial, so

18      it does take an extraordinary emergency before there's a

19      substitution of an alternate.

20              Finally, I'm going to repeat to you the

21      admonitions I gave you the instructions that apply to

22      recesses.  And our law requires you to follow these

23      instructions in order to help assure a just and fair trial.

24      They apply whenever we take a recess of any length from the

25      courtroom, for lunch, overnight, all the time.  And I'll

Preliminary Instructions

1     remind you of them by calling them the recess instruction.

2             First of all, do not converse among yourselves or

3     with anyone else about anything related to the case.

4             Do not at any time during this trial request,

5     accept, agree to accept or discuss with any person the

6     receipt or acceptance of any kind of payment for any kind of

7     benefit in return for supplying any information concerning

8     this trial.  You must promptly report directly to me any

9     incident within your knowledge involving an attempt by any

10    person improperly to influence you or any other members of

11    the jury.

12            Do not visit or view any premises or place where

13    the charged crime was allegedly committed or any other

14    premises or places involved in this case.  And you must not

15    use any kind of internet maps, Google Earth, any kind of GPS

16    tracking, any program or any device to search for and view

17    any location discussed in testimony.

18            Do not read, view or listen to any accounts or

19    discussions of the case reported by newspapers, television,

20    the radio, internet or any news media, whether in the past,

21    present or future.

22            Do not accept -- I'm sorry, do not attempt to

23    research any fact, any issue or law related to this case

24    whether by discussion with others, by research in a library

25    or by the internet or other source.

1        Now, when I say not to discuss the cases with

2   anyone, I want to emphasize not only can you not converse

3   face to face, but no social media communications, no text

4   messages, no email, no internet, chat rooms, nothing.  Okay?

5        So those will apply every time you take a recess.

6   Those are my opening instructions.  We will now commence the

7   trial with the opening statement of the DA.

8        Mr. Mendys, you may address the jury.

9        MR. MENDYS:  Thank you, Judge.

10        People are taught from a young age to listen to

11   authority.  Kids are taught to listen to their parents,

12   listen to their teachers, and as adults, we listen to our

13   bosses, listen to the police.  We do that because there can

14   be repercussions if we don't.

15        If kids don't listen to their parents or their

16   teachers, they could be disciplined, they could be grounded,

17   suspended.  If we don't listen to our bosses as adults, we

18   could get fired.  If we don't listen to the police, well,

19   maybe we would get arrested.  Okay.

20        So what happens, jurors, when someone pretends to

21   have that authority?  When someone pretends to have

22   authority but uses it for their own purposes?  What happens

23   when someone pretends to be a police officer?  What happens

24   when Richard Diaz gets a badge and he and his accomplices,

25   Jose Melenciano and Amauri Santana, take four people and put

1    them up against the wall at 2315 Walton Avenue on October

2    17, 2012, shortly right around midnight?  What happens when

3    they frisk them, when they search them like common criminals

4    who are about to be arrested?

5         Well, Yohn Contreras and the people he was with

6    that night, Joel Rodriguez, Esmeraldi Rodriguez and Argelia

7    Rosario, they listened.  They didn't ask for any further

8    identification.  All it took was Richard Diaz saying police,

9    up against the wall, and he pushed each of them, each of the

10   four of them up against the wall, and he watched the two

11   women while Santana and Melenciano frisked and searched the

12   men.

13        The irony of this is while this was happening, the

14   real police happened to be driving down the block.  Officer

15   Edgar Mangual who will come before you, you'll hear from him

16   in just a minute, was driving a marked van right down Walton

17   Avenue, and as he was doing that Richard Diaz noticed it and

18   walks away.  Walks away, leaving Santana and Melenciano to

19   deal with the consequences.

20        Mangual gets out of the van with his partners, and

21   as soon as he does, Yohn Contreras points at Melenciano and

22   Santana, says they took my money.  Mangual stopped Santana.

23   What's he find?  $6,000 cash.  Santana's arrested,

24   Melenciano is arrested and they're taken from the scene to

25   the precinct.  They're processed.

Opening Statements - People

1        But there's still one outstanding individual.  The

2    case is assigned to a unique specialty unit within the

3    police department that handles just these types of cases,

4    cases where people pretend to be police officers and commit

5    crimes.

6        Detective Chris Rodriguez specifically was

7    assigned the case.  He got the case and that same day,

8    October 17, 2012.  Richard Diaz was his suspect.  So he put

9    out what's called a wanted card.  He tells, essentially

10   telling every officer within NYPD that Richard Diaz is

11   wanted for this crime that occurred on October 17, 2012.

12       About a month later in November 22nd, Detective

13   Rodriguez finds out that Richard Diaz was apprehended.

14   Rodriguez takes him into custody and gets in touch with

15   Argelia Rosario.  She goes to the precinct and she views a

16   line-up and she identifies Richard Diaz as the third man

17   from the incident on October 17, 2012, where she and her

18   friend were pushed up against the wall by fake police

19   officers.

20       Rodriguez' partner Detective Ana Bell, she reads

21   Diaz his rights.  She read him his Miranda Rights.  He

22   agrees to make a statement.  And in that statement you'll

23   hear he said, he says that he is, he was with his friends

24   that night and that his friend Homeboy knew that the victim

25   had money on him.  The defendant stated he thought the

1     victim had $3,000 and was going to be used to buy narcotics.

2          The defendant stated he had a security shield

3     around his neck affixed to a beaded chain on the date and

4     time of the incident.  He stated that when he saw the police

5     drive up, he turned walked quickly away from the location

6     and threw the shield under a vehicle on Walton Avenue.  When

7     asked if he or any of the aforementioned defendants have

8     impersonated police officers in the past to commit other

9     crimes, the defendant responded no.

10          So jurors, you got this incident with the police

11     rolling up on you, got $6,000 cash recovered, you've got a

12     witness identifying Richard Diaz as one of the perpetrators,

13     you've got a statement where he admits to having a shield,

14     admits to being on the scene, gives you the reason why they

15     were even there to begin with.  What more could you ask for?

16     How about a video?

17          2315 Walton Avenue the scene of the crime two

18     cameras, one on either side of what happened that night.

19     You're gonna see it.  You're gonna see for yourself the

20     minute that these four individuals got out of the cab and

21     went to the sidewalk.  You're gonna see Richard Diaz

22     approach them, put each of them up against the wall.  You're

23     gonna see his two accomplices come and search the men while

24     he stands with the women.  And you're gonna see him walk off

25     as soon as the police get there, and you will see the police

Opening Statements - Defendant

1    apprehend Melenciano and Santana.  You will see all of it.

2            Jurors, that's what this case is.  That's what

3    this is case.  Three, almost three years it's taken to get

4    to this point Richard Diaz was arrested, he was charged, and

5    now there's a trial before 12 jurors of the Bronx for you to

6    decide what happened.

7            And after you hear the evidence, after you hear

8    the witness, after you see the video I'm gonna get a chance

9    to speak to you again.  And when I do, I'm gonna remind you

10   of the oath you have taken to come to a verdict based on

11   facts, based on evidence and based on law, without regard

12   for speculation, without record for bias, or sympathy.

13           Jurors, if you do those things, if you do those

14   things, there won't be but one conclusion for you to come to

15   at the end of this case, and that is that Richard Diaz is

16   guilty.  Thank you.

17           THE COURT:  Thank you, Mr. Mendys.

18           Mr. Bonanno, does the defense wish to make an

19   opening statement?

20           MR. BONANNO:  We do, Judge, just briefly.  Thank

21   you.

22           THE COURT:  Okay.

23           MR. BONANNO:  If it please the Court, good morning

24   everyone.  And I know with all this heat outside everybody

25   is kind of happy to be here today, right?  No?  I didn't

1    think so.  But you know what we're happy about, we're happy

2    that you're sitting here doing the job that you swore you

3    would do.  And if you recall, when we spoke to you as

4    prospective jurors I told you about the shift that happens

5    once you become a sworn juror, and I've observed each and

6    every one of you and I see that quantum move, that quantum

7    shift to the duty that you've sworn to do.

8           And if you recall also when we were speaking with

9    you, Mr. Mendys, who I have a great deal of respect for, he

10   is doing the job he is supposed to do representing the State

11   of New York zealously as I am supposed to do for Mr. Diaz,

12   because you heard the judge speak about the presumption of

13   innocence, well, Mr. Diaz right now is cloaked with that

14   presumption of innocence until such time as you deliberate

15   and determine that the People have proven every element of

16   the crimes that he is charged with beyond a reasonable

17   doubt.  And that will be your decision.

18           You're gonna see the video that Mr. Mendys spoke

19   about.  You're gonna see that facial recognition from that

20   video is pretty difficult.  You're gonna also hear testimony

21   we submit that the ladies that were allegedly involved in

22   this incident couldn't recognize at the scene the face of

23   Mr. Diaz, but they described him in prior testimony as a

24   kind of a big guy, big build.  That's all they can describe.

25   Couldn't describe his facial hair, couldn't describe his

1    facial features.  In fact, you'll see in the video there was

2    a hood up on the individual that is purported be Mr. Diaz.

3                You're gonna hear that money was taken from

4    someone.  You're gonna also hear that Mr. Diaz was not the

5    person that took that money.  You're gonna hear that there

6    was a pre-arranged meeting from a girlfriend and a

7    complaining witness, and there was other people that knew

8    that Mr. Contreras, who allegedly had money taken from him,

9    was there supposedly to buy a car with this cash who one of

10   the witnesses told him was available, and that was the

11   reason he brought the money.

12               Well, I'm gonna ask you, ladies and gentlemen,

13   after you've heard everything, view everything, listened to

14   the police officer's testimony of what they did and did not

15   see, that you will be able to determine that Mr. Diaz is

16   innocent of this, not only because of the presentation of

17   the evidence, but also by the lack of that evidence.   Thank

18   you.

19               (Whereupon, further trial proceedings were

20   provided daily copy and are not transcribed herein.)

21                                Certified to be a true and
                                  accurate transcript of the
22                                foregoing proceedings

23

24                                *Laura Rosen*
                                  Laura Rosen

25

1   SUPREME COURT OF THE STATE OF NEW YORK

2   BRONX COUNTY : CRIMINAL TERM : PART 98

3   ----------------------------------

4   THE PEOPLE OF THE STATE OF NEW YORK

5               -against-                Indictment No.
                                         3349-2012
6   RICHARD DIAZ,

7                       Defendant.       Trial Excerpt:
                                         Testimony
8
    ------------------------------------
9                                   JULY 20, 2015

10                                  Bronx Supreme Court
                                    265 East 161 Street
11                                  Bronx, New York

12

13  B E F O R E:    HONORABLE RALPH FABRIZIO
                    Justice of the Supreme Court
14                                          **FILED**

15  A P P E A R A N C E S:              **OCT -5 2016**

16          ROBERT JOHNSON, ESQ.        **SUP COURT, APP. DIV.**
            District Attorney, Bronx County **FIRST DEPT.**
17          BY:  NEWTON MENDYS, ESQ.
                 Assistant District Attorney
18
            PAT BONANNO, ESQ.
19          Attorney for the Defendant

20

21

22                      Laura Rosen
                        Senior Court Reporter
23

24

25

lr-a                          PO Mangual - People - Direct

1                    (Whereupon, following the initial trial

2          proceedings stenographically recorded but not transcribed

3          herein, the following proceedings took place.)

4                    (Whereupon, the following took place in open court

5          in the presence of the Court, defense counsel, and the

6          assistant district attorney.)

7                    THE COURT:  Mr. Bonanno, thank you very much.

8                    Mr. Mendys, do you wish to call your first

9          witness?

10                   MR. MENDYS:  Yes, Judge.  The People call Police

11         Officer Edgar Mangual.

12                   COURT OFFICER:  Witness entering.

13                   (Whereupon, the witness entered the courtroom and

14         took the witness stand.)

15    POLICE OFFICER   E D G A R   M A N G U A E L,   Shield No.

16         23880, New York City Police Department, Transit District

17         12, called as a witness on behalf of the People, having

18         been first duly sworn, was examined and testified as

19         follows:

20                   COURT OFFICER:  Take a seat.  In a loud, clear

21         voice state your full name, shield number and command for

22         the record.

23                   THE WITNESS:  Edgar Mangual, shield number 23880,

24         Transit District 12.

25                   THE COURT:  All right.  Good morning, Officer

1r-a                              PO Mangual - People - Direct

1        Mangual.  Now, I'm going to ask you to please speak slowly.

2        Wait for the lawyers to finish asking the question before

3        you give their, you give your answer to those questions.

4                    And Mr. Mendys, you may inquire.

5                    MR. MENDYS:  Thank you, Judge.

6    DIRECT EXAMINATION

7    BY MR. MENDYS:

8        Q     Good morning, Officer.

9        A     Good morning.

10       Q     How long have you been with the police department?

11       A     A bit over 15 years.

12       Q     Can you take us through your various assignments over

13   your 15 years with the department?

14       A     Yes.  I started out in the 42 Precinct.  From there, I

15   started doing the Yankee Stadium details.  Eventually I was

16   transferred to Bronx Task Force, and now I'm presently in Transit

17   District 12.

18       Q     And how long were you at the 42, approximately?

19       A     Approximately 11 years.

20       Q     And the Yankee Stadium detail?

21       A     I did that seasonally for nine years.

22       Q     What does that consist of, the stadium detail?

23       A     Pretty much securing the outer perimeter of the stadium

24   and the neighborhood around it.

25       Q     What did you do when there isn't a game or it's off

1    season?

2       A    I get sent to the precincts that are in need of

3    manpower.

4       Q    Where were you assigned after the stadium detail?

5       A    Bronx Task Force.

6       Q    And how long were you there?

7       A    Approximately four years.

8       Q    And you're currently at Transit District 12?

9       A    Yes.

10      Q    What does that mean?  What are your responsibilities

11   with them?

12      A    Pretty much securing the train system.

13      Q    And any particular lines or areas that you are

14   responsible for?

15      A    Yes, the 2 and the 5.

16      Q    In the Bronx?

17      A    Yes, in the Bronx.

18      Q    Now Officer, where are you originally from?  Where did

19   you grow up?

20      A    Brooklyn.  I grew up in Brooklyn.

21      Q    And how far did you go in school?

22      A    I got some college.  Unfortunately, I haven't finished

23   my degree yet.

24      Q    Are you married?

25      A    Yes.

lr-a                          PO Mangual - People - Direct


1       Q     Do you have any kids?

2       A     Yes.

3       Q     Did you work at all prior to joining the police

4  department?

5       A     Yes, I did.

6       Q     What did you do?

7       A     I worked for FedEx and I was also in the military.

8       Q     What branch of the military did you serve in?

9       A     Navy.

10      Q     And did you serve on a ship?

11      A     Yes, I did.

12      Q     What kind?

13      A     Submarine.

14      Q     Submarine?

15      A     Yes, sir.

16      Q     And what rank did you have when you -- well, are you

17  currently still in the military?

18      A     No, I'm not.

19      Q     How long did you serve?

20      A     I did four years active and six reserve.

21      Q     And what rank did you leave with?

22      A     Third-class petty officer.

23      Q     So you said you are about 15 years with the department?

24      A     A bit over, yes.

25      Q     You have plans after you leave the department?

 1      A     Yes, I do.

 2      Q     What do you want to do?

 3                  MR. BONANNO:  Objection.

 4                  THE COURT:  Sustained to that, yes.

 5                  MR. MENDYS:  Okay.

 6      Q     So I want -- you're here to talk about an incident that

 7   occurred on October 17, 2012.

 8      A     Yes.

 9      Q     Where were you assigned or what was your command that

10   you were working out of back then?

11      A     I was assigned to the Yankee Stadium, but I was

12   covering the 46 Precinct.

13      Q     So that was either off season, there wasn't a game that

14   night?

15      A     No game.

16      Q     Were you in uniform that night?

17      A     Yes.

18      Q     Do you remember what tour you had or what hours you

19   were working?

20      A     A six to two.

21      Q     6 p.m. or 6 a.m.?

22      A     No, 6 p.m.

23      Q     Till?

24      A     It's actually six to two is from, yeah, 1600 to 0205.

25      Q     So 4 p.m.?

1        A     Yes.

2        Q     To 2 a.m.?

3        A     Something like that, yes.

4        Q     So you were working the evening?

5        A     I was working the evening.

6        Q     So your shift would have started the 16th and into the

7    17th?

8        A     Yes.

9        Q     And did you -- I'm sorry, were you in uniform that

10   night?

11       A     Yes, I was.

12       Q     And did you have any partners?

13       A     Yes, I did.

14       Q     Who were they?

15       A     Officer Colon and Officer Pachot.

16       Q     Were they your steady partners who you would normally

17   work with?

18       A     Occasionally I would work them.

19       Q     How were the three of you traveling that night?

20       A     In a marked van.

21       Q     Now around midnight, were you in the area of 2315

22   Walton Avenue here in the Bronx?

23       A     Yes, I was.

24       Q     And why did you happen to be in that area?

25       A     We were covering the 46 and we were on our way back,

1    almost the end of tour.

2      Q    So you were on your way back to where?

3      A    To Yankee Stadium.

4      Q    And you just happened to be on Walton Avenue?

5      A    Yes.

6      Q    Now when you got to specifically -- well, let me ask

7    you this.  2315 Walton Avenue, that block of Walton Avenue, how

8    many lanes is it?

9      A    Driving, one.

10     Q    Is there parking on either side or?

11     A    Yes, there's also two lanes where vehicles are parked.

12     Q    And what -- so it's one way going?

13     A    One-way street, yes.

14     Q    Do you recall which direction traffic travels?

15     A    Yes, south.

16     Q    And what kind of neighborhood is it?  Is it apartment

17   buildings, houses, is it --

18     A    It's a high-rise apartment building.

19     Q    Pardon?

20     A    High-rise apartment buildings.

21     Q    Now, are there streetlights on the sidewalk?

22     A    Yes.

23     Q    And on the buildings?

24     A    Yes, some of them.

25     Q    Now, when you reached the area of 2315 Walton Avenue

1    did you notice anything unusual?

2        A    Yes, I did.

3        Q    What did you see?

4        A    I saw four people lined up against a wall and what

5    appeared to be three officers behind them.

6        Q    Okay.  How did they -- what made you think they were

7    officers?

8        A    Just because it appeared they were, the other people

9    were being frisked.

10       Q    The four people against the wall?

11       A    Yes.

12       Q    Now, if you're driving south on Walton, what side of

13   the street was this?  Would this be on your right, on your

14   left-hand side?

15       A    On my right.

16       Q    And the van, who was driving the van?

17       A    I was.

18       Q    Do you recall where your partners were seated?

19       A    To my recollection, Colon was the front passenger and

20   Pachot was behind us.

21       Q    Now when you saw this, you indicated -- I'm sorry, four

22   people were up against the wall?

23       A    Yes.

24       Q    Do you recall, if you could tell the jury what, what's

25   the breakdown in terms of gender if it was all men, all women?

lr-a                              PO Mangual - People - Direct

1      A    Two males and two females.

2      Q    And what about the people who you believed to be

3   officers, were those men or women or both?

4      A    Men.

5      Q    Now, what did you do when you saw this was going on?

6      A    I initially slowed down.  That's usually what we do

7   just to make sure the officers were all right, and as I got

8   closer it seemed odd so I stopped.

9      Q    It seemed odd?

10     A    Yes.

11     Q    What about it seemed odd to you?

12     A    The initial people that I thought were officers, their

13  clothing attire was, didn't fit the clothing attire that an

14  off-duty officer -- not off-duty, correction, a plainclothes

15  officer would be wearing.

16     Q    So these men were not in uniform?

17     A    No, they weren't.

18     Q    Now, so can you be a little specific, tell the jury

19  what specifically indicated to you that these might not be

20  plainclothes officers?

21     A    Yes.  Their pants were hanging way below their

22  waistline, which clothing like that there's no way you would be

23  able to hold a gun belt or a gun, or any of the equipment that we

24  wear.

25     Q    Even as plainclothes officers?

lr-a                          PO Mangual - People - Direct


1        A      Even as plainclothes officers.

2        Q      Okay, anything else?

3        A      I couldn't see any color of the day, and that's about

4   it.

5        Q      What is color of the day?

6        A      The color that's given to us on a daily basis so that

7   we can identify plainclothes officers.

8        Q      So, well, how do you -- how is it used?  How does it

9   help you identify --

10              THE COURT:  Describe what the whole thing of what

11          color of the day means?

12              THE WITNESS:  Color of the day is pretty much like

13          I said, a color that's given to us from the borough every

14          day.  It's usually a wristband that the officer will usually

15          wear on his forearm or on his wrist.

16       Q      Okay, if the officer's in plainclothes?

17       A      Yes.

18       Q      And when you -- so when do you learn of this color?

19       A      As I get closer to them I don't see it.

20              THE COURT:  No, I think the question was, when are

21          you advised of what the color of the day is?

22              THE WITNESS:  Sorry, upon turnout.

23       Q      What's turnout?

24       A      Beginning of the tour when we first start our day.

25       Q      So every day you're told the different color?

1r-a                       PO Mangual - People - Direct


1    A    Yes.

2    Q    And in this particular situation, do you recall what

3    the color of the day was?

4    A    No.

5    Q    Would anything refresh your recollection?

6    A    Yes, my memo book.  I have it on me.

7              THE COURT:  You have your memo book?

8              THE WITNESS:  Yes.

9              THE COURT:  You may refresh your recollection.

10   You can read it to yourself and let us know when your

11   recollection is refreshed, okay?

12             THE WITNESS:  Okay.  It was yellow.

13   Q    The color of the day was yellow?

14   A    Yes, it was.

15   Q    So any plainclothes officer would be wearing some kind

16   of band, yellow band that day?

17   A    Yes.

18   Q    Now the color of the day, is that changed every day?

19   A    Yes, it does.

20   Q    Is there any order to it?

21   A    No.

22   Q    So it's totally a random color every day?

23   A    Yes.

24   Q    So now, on these three individuals -- well, did there

25   come a point when you got out of the van?

lr-a                          PO Mangual - People - Direct

1      A     Yes, I did.

2      Q     When you got out of the van what was your, were you

3   still thinking that these were actually police officers or at

4   this point had you realized that something was wrong?

5      A     At that point I really realized something was wrong.

6      Q     Now when you got out of the van, what happened?

7      A     Upon walking in the direction of the building, the

8   males doing the frisking separated into different directions,

9   started walking away.

10     Q     Did any of them manage to leave the scene totally?

11     A     Yes.

12     Q     And if you're looking, if you're approaching the scene

13  as it was going on, where was that person?  Would that person be

14  on the left-hand side, the right-hand side or the middle?

15     A     He was on the far right.

16     Q     The far right?

17     A     Yes.

18     Q     In what direction did he go?

19     A     Northbound.

20     Q     Which is to your right or your left?

21     A     To my right.

22     Q     Now, the other two individuals?

23     A     Yes.

24     Q     Where did they go?

25     A     One went to the left and the other started going to his

lr-a                             PO Mangual - People - Direct

1    right, I believe.

2        Q    To his right?

3        A    Well, to the right.  North.

4        Q    Now had you ever seen, at this point had you ever seen

5    any of these people before?

6        A    No, I hadn't.

7        Q    Had, at any point once you proceeded with this

8    investigation did you -- had you ever come into contact with any

9    of these people, either the two people who were doing the

10   frisking or the four people who were up against the wall?

11       A    No, I hadn't.

12       Q    Now as you, as you got out, as you were approaching,

13   did anyone, any one of the people up against the wall say

14   anything?

15       A    Yes.  One of them pointed at Mr. San -- I'm sorry,

16   yeah, Mr. Santana and yelled out, he took my money.

17       Q    He yelled it out?

18       A    Yes.

19       Q    Do you recall -- I'm sorry, do you speak Spanish?

20       A    Yes.

21       Q    Do you recall if this person yelled it in Spanish or

22   English?

23       A    I don't remember.  I don't recall.

24       Q    Did you, prior to him saying that did you ask him

25   anything?

lr-a                           PO Mangual - People - Direct

1      A    No.

2      Q    Did you say anything to him?

3      A    No.

4      Q    And how far or how soon after you got out of the van

5    would you say he said that?

6      A    In the time that it would have taken me to just walk to

7    the front of the van.

8      Q    A matter of seconds?

9      A    A matter of seconds, yes.

10     Q    Now once he said that, what did you do?

11     A    I continued walking towards Mr. Santana.

12     Q    Now was this, where was this person in relation to you

13   at that point?

14     A    Santana was maybe a car length away.

15     Q    In what direction?

16     A    He was walking southbound.

17     Q    So to your left?

18     A    Yes.

19     Q    And what about the second individual?

20     A    He was somewhere to the right.

21     Q    Now, did your partners also get out of the van?

22     A    Yes, they did.

23     Q    So what did you do?  What did you do as you approached

24   Santana?

25     A    I continued approaching, I stopped him and I motioned

lr-a                          PO Mangual - People - Direct

1    him over to the vehicle, and I cuffed him and frisked him.

2         Q    Did you find anything upon frisking him?

3         A    Yes, I did.

4         Q    What did you find?

5         A    I found a wad of money in his left jacket pocket.

6         Q    How was it bound up, if it was?

7         A    In rubber bands.

8         Q    Was it like folded in half?  Was it rolled up?

9         A    It was folded in half.

10        Q    If you could estimate just how big this wad was, was it

11   substantial or can you estimate inches or --

12              THE COURT:  Can you like estimate by showing the

13        jury?

14              THE WITNESS:  Yeah.  I would say maybe about, it

15        was like that, three inches, two inches.

16              THE COURT:  The record should reflect the witness

17        is holding up his left hand, and between your thumb and your

18        forefinger you're saying it's about an inch, between one and

19        two inches, that's how big the, what you've described the

20        wad is?

21              THE WITNESS:  More or less, yeah.

22              THE COURT:  I just want to explain to the jury

23        what I'm doing.  Sometimes during deliberations jurors will

24        ask for readback of what's taken by the court reporter.  So

25        if the record just says, it looked like this, the word this

lr-a                              PO Mangual - People - Direct

1     may not mean much to you.  But if the description is on the

2     record, then you have that recollection yourself, plus the

3     words characterizing it.  I'm just characterizing it to

4     preserve the record, that's all.

5                Okay, you can continue, Mr. Mendys.

6                MR. MENDYS:  Thank you, Judge.

7     Q     So Officer, once you came, once you found this wad of

8     cash in Mr. Santana's pocket, what did you do with it?

9     A     I put it back in his pocket.

10    Q     Why did you do that?

11    A     I was still in the investigation phase finding out what

12    was going on.

13    Q     What did you do with Mr. Santana?

14    A     I, shortly after that, put him in the police van.

15    Q     What did you -- was he handcuffed?

16    A     Yes, he was handcuffed at that time.

17    Q     When was that?

18    A     When was he handcuffed?

19    Q     When in relation to you finding the money was he

20    handcuffed?

21    A     I don't recall if it was immediately, I think it was

22    immediately after.

23    Q     Immediately after you found the money?

24    A     Yes.

25    Q     So now what was going on?  You mentioned a second

lr-a                        PO Mangual - People - Direct

 1    individual --

 2        A     Yes.

 3        Q     -- who was there.  Do you recall his name?

 4        A     Yes.

 5        Q     What was that?

 6        A     Mr. Melenciano.

 7        Q     Jose Melenciano?

 8        A     Yes.

 9        Q     Do you recall Santana's?

10              THE COURT:  I'm sorry, Jose Melenciano?

11              MR. MENDYS:  Yes.

12              THE COURT:  Sorry, go ahead.

13        Q     Do you recall Santana's first name?

14        A     I don't recall his first name.

15        Q     Would anything refresh your --

16              THE COURT:  You need to refresh your recollection?

17              THE WITNESS:  Yes.

18              THE COURT:  Go ahead.

19        A     Amauri.

20        Q     Amauri?

21        A     Yes.

22        Q     And Santana is the person that you were dealing with;

23    correct?

24        A     Yes.

25        Q     Now, what was going on with Mr. Melenciano?

1r-a                         PO Mangual - People - Direct


1       A      Mr. Melenciano, my partners were dealing with him at

2   that point.

3       Q      So after the money was found, where was Mr. Santana

4   ultimately taken?

5       A      To the police van.

6       Q      And what about Melenciano?

7       A      He was also in the police van.

8       Q      Now did you, without telling us what was said, did you

9   have conversations with any of the people who were, who you had

10  seen up against the wall?

11      A      Yes.

12      Q      Anyone in particular?  Do you remember names?

13      A      Yes.

14      Q      Who?

15      A      Contreras, Mr. Contreras.

16      Q      And was that the person who had yelled out to you upon

17  your arrival?

18      A      Yes.

19      Q      And who was the second person, who was the other --

20  anybody else you spoke to?

21      A      Yes, Mr. Rodriguez.

22      Q      What about the women, did you speak to the women?

23      A      Briefly.

24      Q      Briefly?

25      A      Yes.

lr-a                        PO Mangual - People - Direct

1              MR. MENDYS: All right. So okay, I'm going to

2       show you two items which I would ask be marked, showing them

3       to counsel, I ask they be marked for identification.

4              THE COURT: People's 1 and 2?

5              MR. MENDYS: Correct.

6              THE COURT: People's 1 and 2 being marked for

7       identification.

8              (Whereupon, People's Exhibits 1 & 2 were marked

9       for identification.)

10             COURT OFFICER: People's 1 and 2 for ID so marked.

11             THE COURT: You want to show them to the witness?

12             MR. MENDYS: Please, Judge.

13             THE COURT: Okay.

14             (Whereupon, the referred to items were handed to

15       the witness.)

16      Q     Officer, do you recognize those two documents?

17      A     Yes.

18      Q     What are they?

19      A     They're photos of Santana and Melenciano, Mr. Santana

20      and Mr. Melenciano.

21      Q     Just for the record, which one is marked No. 1 for

22      identification?

23      A     Mr. Santana.

24      Q     So No. 2 would be Melenciano?

25      A     Yes.

1r-a                          PO Mangual - People - Voir Dire

1      Q      And are those photographs in color?

2      A      Yes, they are.

3      Q      And do those photographs accurately reflect how Mr.

4   Santana and Mr. Melenciano appeared on that night October 17,

5   2012?

6      A      Yes.

7                 MR. MENDYS:  At this point I would ask that they

8           be moved into evidence as People's 1 and 2 respectively.

9                 THE COURT:  Any objection or voir dire?

10                 MR. BONANNO:  Just a brief voir dire.

11   VOIR DIRE EXAMINATION

12   BY MR. BONANNO:

13      Q      Officer, did you take those photos?

14      A      These here?

15      Q      Yes.

16      A      No.

17      Q      Do you know where those photos come from?

18      A      Probably from central booking.

19      Q      But you're not certain?

20      A      Not a hundred percent sure.

21      Q      Do you know when those photos were taken?

22      A      No.

23                 MR. BONANNO:  Judge, my objection would be that

24           they may not accurately reflect the witness --

25                 THE COURT:  You haven't asked that question of the

lr-a                          PO Mangual - People - Voir Dire

1        witness at all.

2                     MR. BONANNO:  I will.

3                     THE COURT:  If you have further --

4                     MR. BONANNO:  I do.

5                     THE COURT:  -- voir dire.

6    Further VOIR DIRE EXAMINATION

7    BY MR. BONANNO:

8        Q    Do you know if that accurately reflects the way Mr.

9    Santana and Mr. Melenciano looked on the night of October 17,

10   2012?

11       A    Yes, it does.

12       Q    And how can you make that statement, Officer?

13       A    How can I make it?  That's how they looked the day of

14   the incident.

15       Q    Do you independently recall that?

16       A    Yes.

17                     MR. BONANNO:  Again, Judge, I object.  It doesn't

18        appear the witness --

19                     THE COURT:  First of all, I don't need to have

20        speaking objections made.  You're objecting to their

21        admissibility?

22                     MR. BONANNO:  I am.

23                     THE COURT:  The objection is overruled.  Members

24        of the jury, these are both marked into evidence as People's

25        1 and 2.  These are what I talked about being exhibits.

lr-a                        PO Mangual - People - Direct


 1      This is physical evidence that will be available for you to

 2      look at, okay.

 3                (Whereupon, People's Exhibit 1 & 2 were received

 4      in evidence.)

 5                COURT OFFICER:  People's 1 and 2 so marked.

 6                MR. MENDYS:  Judge, if I may put them on the

 7      monitor?

 8                THE COURT:  Absolutely.

 9   Cont'd DIRECT EXAMINATION

10   BY MR. MENDYS:

11      Q    Officer, I'm going to show you People's 1 on the

12   monitor behind you.  Do you -- who is this?

13      A    Mr. Santana.

14      Q    And Mr. Santana is the person you were dealing with?

15      A    Yes.

16      Q    And you found -- what did you find on him, if anything?

17      A    The money.

18      Q    And this is People's 2.  Who is this?

19      A    Mr. Melenciano.

20      Q    And who exactly was dealing with him?

21      A    My partners.

22      Q    Now both of these men, were they ultimately arrested?

23      A    Yes, they were.

24      Q    Now, when you arrived at the scene were you able to

25   tell the positioning of these two individuals, Melenciano and

1r-a                          PO Mangual - People - Direct

1   Santana?

2       A    Yes.

3       Q    And who would have been on the left?

4       A    To my recollection, it was Santana.

5       Q    Well, who would have been in the middle then?

6       A    Melenciano.

7       Q    Are you certain about that?

8       A    Not a hundred percent sure, but they were definitely

9   the two on the left-hand side.

10      Q    They were the two on the left-hand side?

11      A    Yes.

12      Q    And the third individual you said walked away going

13  northbound?

14      A    Yes.

15      Q    Now, Santana and Melenciano were arrested.  Where did

16  you take them?

17      A    To the 46 Precinct.

18      Q    And you indicated earlier that you put the $6,000 back

19  into Santana's pocket?

20      A    Yes.

21      Q    What, ultimately, did you do with that money?

22      A    I took it out of his pocket.

23      Q    For what purpose?

24      A    So that I can voucher it at a later time.

25      Q    Voucher it as what?

1     A     Arrest evidence.

2     Q     What does it mean to voucher something?

3     A     Pretty much to secure it in police custody.

4     Q     Now at what point did you remove it from his person?

5     A     Shortly after I put him in the van.

6     Q     Now at that point had you spoken to Mr. Contreras and

7  Mr. Rodriguez?

8     A     Yes.

9     Q     So you took the money, you mentioned it was vouchered,

10 it goes into police custody.  How do you keep track of it?

11    A     Through voucher numbers.

12    Q     Are those numbers unique to whatever items are being

13 vouchered?

14    A     Yes.

15    Q     And approximately -- well, did you get an opportunity

16 to count the money at some point?

17    A     Yes.

18    Q     When was that?

19    A     Upon prior to vouchering it.

20    Q     Where would that have taken place?

21    A     At the 46 Precinct.

22    Q     And about -- not about, how much money was recovered

23 from Mr. Santana?

24    A     $6,000.

25    Q     And that was all within that rubber band?

lr-a                          PO Mangual - People - Direct

1      A    Yes.

2      Q    Do you recall the denominations, as you it here?

3      A    It varied.

4      Q    When you do a voucher or when you voucher property, do

5    you have to fill out paperwork in relation to that?

6      A    Yes.

7      Q    Can you describe that for the jury, please?

8      A    Pretty much the voucher will have all the information

9    of the property being taken, and then everything's placed into an

10   envelope and sealed.

11     Q    And within the, on the voucher is the contents of

12   whatever it is you're vouchering?

13     A    Yes.

14     Q    Does your name go on that?

15     A    Yes.

16     Q    And the person that you have taken it from?

17     A    Yes.

18     Q    And there is a number that is assigned to it?

19     A    Yes.

20              MR. MENDYS:  I'm showing a two-page document to

21          Mr. Bonanno, asking it be marked People's 3 for

22          identification.

23              THE COURT:  People's 3 for ID.

24              (Whereupon, People's Exhibit 3 was marked for

25          identification.)

1r-a                          PO Mangual - People - Direct

1            COURT OFFICER:   People's 3 for ID so marked.

2                 (Whereupon, the referred to item was handed to the

3      witness.)

4      Q    Officer, do you recognize that two-page document?

5      A    Yes.

6      Q    What is it?

7      A    It's the voucher invoice.

8      Q    For what?

9      A    For the money that was removed from Mr. Santana.

10     Q    Is that something you fill out yourself?

11     A    Yes.

12     Q    And are you -- is it the duty of the New York City

13     Police Department to complete those whenever property is

14     recovered and kept for arrest purposes?

15     A    Yes, it is.

16     Q    You have an obligation to fill that out as accurately

17     as possible?

18     A    Yes.

19     Q    And it is your business duty to do so; correct?

20     A    Yes, it is.

21     Q    And you have to do it within a short period of time or

22     at the same time that the property is actually being vouchered?

23     A    Yes.

24            MR. MENDYS:   At this point I would offer it as

25     People's 3 into evidence.

lr-a                          PO Mangual - People - Direct

1          MR. BONANNO:  No objection.

2          THE COURT:  No objection?  All right, it is

3      admitted into evidence without objection.

4              (Whereupon, People's Exhibit 3 was received in

5       evidence.)

6          COURT OFFICER:  People's 3 so marked.

7          MR. MENDYS:  I'm gonna put the top page on the

8       monitor behind you.  This is People's 3.

9      Q    Officer, on the top right, that number 2000147849, what

10    is that number?

11    A    That's the invoice number.

12    Q    That's the number that is unique to this particular

13    evidence?

14    A    Yes, it is.

15    Q    And as we move down, your name appears; correct?

16    A    Yes.

17    Q    Now these denominations, are they -- can you just point

18    out to the jury what we're looking at here?

19    A    On the far left it tells you the total quantity of each

20    item.  For example, there it says 20.  Can you shrink it a

21    little?

22    Q    Shrink it?  Sorry.

23    A    All right, it shows you the item, which is a

24    twenty-dollar bill.

25          THE COURT:  A twenty-dollar bill?

1r-a                            PO Mangual - People - Direct

1    A     I'm sorry, hundred-dollar bills.  It shows you hundred
2    dollar bills and there's 20 of them, the quantity.  And so you
3    see the number two which is the second item, it's a different
4    bill, it's a fifty-dollar bill, and it displays 16 fifty-dollar
5    bills.  Same thing as you go down, item number three will be
6    twenty-dollar bills.  There was 155 twenty-dollar bills.  And as
7    you go to number four, it goes ten-dollar bills.  There was only
8    10 ten-dollar bills.

9    Q     On the right-hand side you had to calculate the --

10   A     On the right is the total.

11   Q     -- total of each denomination?

12   A     Yes.

13   Q     So there was $2,000 worth of hundred-dollar bills, $800
14   worth of fifty-dollars bills, etc., and then the grand total?

15   A     Yes.

16   Q     And then the second page we just see your signature?

17   A     Yes.

18   Q     And the signature of your supervisor?

19   A     Yes.

20   Q     And on here -- I'm sorry, just one more thing.  This is
21   page two.  It indicates command PBBX?

22   A     Yes.

23   Q     What is that?

24   A     Patrol Borough Bronx.

25   Q     You said you were working for the Yankee Stadium detail

1      back then.

2          A     Yes.   When you're assigned to the Yankee Stadium, it's

3      a Patrol Borough assignment so we're actually, our command is the

4      Patrol Borough Bronx.

5                    MR. MENDYS:   I'm sorry, one more thing on the

6            first page.

7                    (Whereupon, the referred to exhibit was displayed

8            on the ELMO.)

9          Q     We see the names of Santana and Melenciano, correct, on

10     the bottom left portion?

11         A     Yes.

12         Q     Was anything else, any other property recovered during

13     the course of your or during the course of this arrest, anything

14     from the scene?

15         A     Yes.

16         Q     What was that?

17         A     A black Acura.

18         Q     A black Acura?

19         A     Yes.

20         Q     And do you know who that -- it's a car?

21         A     Yes.

22         Q     What kind of car was it?   Was it a sedan?

23         A     It's a sedan.

24         Q     And who was the owner of that car, if you know?

25         A     After running the vehicle, the vehicle came back to

lr-a                          PO Mangual - People - Direct

1    Jose Melenciano.

2        Q    That would be the person depicted in People's 2;

3    correct?  I'm sorry, People's 2?

4        A    Yes.

5        Q    And what was done -- it was vouchered for the same

6    purpose?

7        A    Yes.

8        Q    How did the car -- what did you do with the car

9    physically?  Where did it go?

10       A    I brought it to the 46 Precinct.

11       Q    You took it to the precinct?

12       A    Yes.

13       Q    You drove it yourself?

14       A    To my recollection, yes.

15       Q    Okay.  And you had to do the same type of voucher for

16   the car?

17       A    Yes, I had to voucher the vehicle.

18       Q    All right.  Now, did you later learn of video

19   surveillance that was recovered from this incident?

20       A    Yes.

21       Q    And have you had an opportunity to view that

22   surveillance?

23       A    Yes, I did.

24       Q    Are you depicted on that surveillance?

25       A    Yes.

lr-a                        PO Mangual - People - Direct


1              MR. MENDYS:   I'm gonna show you or have this

2      marked People's 4 for identification, and I will show it to

3      you.

4              THE COURT:   This is People's?

5              MR. MENDYS:   Four.

6              THE COURT:   Four for identification.

7              (Whereupon, People's Exhibit 4 was marked for

8       identification.)

9              COURT OFFICER:   People's 4 so marked for

10      identification.   Showing it to the witness.

11     Q     Officer, do you recognize that?

12     A     Yes.

13     Q     What is that?

14     A     It's a DVD.

15     Q     Of what?

16     A     Of the incident.

17     Q     And do you know where that DVD was taken from or what

18     location it came from?

19     A     From the address of the location.

20     Q     2315 Walton?

21     A     Yes.

22     Q     And you have occasion to view the contents of that

23     video?

24     A     Yes.

25     Q     And how many angles are on it?   How many different

lr-a                          PO Mangual - People - Direct

1    camera angles?

2        A     Two or three.

3        Q     Were you responsible for finding this video?

4        A     No.

5        Q     This came to your attention later?

6        A     Yes.

7        Q     And you have had an opportunity to view it.  Does it

8    fairly and accurately reflect what transpired the night of

9    October 22 -- October 17, 2012?

10                MR. BONANNO:  Judge, maybe we'd like to see the

11        video first before those questions are asked?

12                THE COURT:  Are you agreeing to put it in

13        evidence?  This is the foundation.  Are you, are you --

14                MR. BONANNO:  I think we can, I think we've

15        already somewhat stipulated to that.  Fine.

16                THE COURT:  Well, stipulate to what, that this

17        is --

18                MR. BONANNO:  That the video --

19                THE COURT:  -- a fair and accurate representation

20        of what was depicted, according to what this officer

21        observed, that night and his part, his arrival?

22                MR. BONANNO:  If it's what the People presented in

23        discovery, then yes, I will say that.

24                THE COURT:  So we can mark it without objection.

25                MR. BONANNO:  Sure.

lr-a                        PO Mangual - People - Direct

1             THE COURT:  People's 4 in evidence.

2             (Whereupon, People's Exhibit 4 was received in

3        evidence.)

4             COURT OFFICER:  People's 4 so marked in evidence.

5             THE COURT:  So you're going to play it?

6             MR. MENDYS:  At this point I'm going to play the

7        first camera angle.

8             THE COURT:  I just have a question.  Logistically,

9        are you going to be asking the officer to describe what he's

10       seeing and point to certain things?

11            MR. MENDYS:  I will be asking him -- what I would

12       like to do is to pause it at certain places and ask him

13       questions.

14            THE COURT:  That's fine.  My question is are you

15       going to need him to get down from where he's --

16            MR. MENDYS:  At a certain point I may.

17            THE COURT:  Okay.  We'll handle that when that

18       happens, all right.  Thank you.

19            So is this what you're depicting?

20            MR. MENDYS:  Yes.  Let the record reflect that

21       time reflected is 23:57 hours on 10/16 of 2012.

22            THE COURT:  So members of the jury, the video --

23       what did you say the time is?

24            MR. MENDYS:  The timestamp specifically is

25       23:57:37.

1r-a                              PO Mangual - People - Direct

1          THE COURT:  23:57:37, but this is the timestamp

2     that's on the video camera in the middle of the video.

3               MR. MENDYS:  Right top.

4          THE COURT:  You're beginning with this particular

5     part.

6               MR. MENDYS:  And I have paused it here.

7     Q     Officer, do you see your van in this photograph or this

8     as it's paused?

9     A     Yes, it looks like the van on the right-hand side.

10    Q     In the top right?

11    A     Top right, yes.

12    Q     That would be coming what direction?

13    A     Moving south.

14    Q     So this camera looks north?

15    A     Yes.

16    Q     And on the left against the wall what is depicted

17    there?

18    A     Four people up against the wall and three others pretty

19    much holding them against the wall frisking, what appeared to be

20    frisking.

21              MR. MENDYS:  I'm going to be playing the video at

22         this point and I'll pause it as we need.  I'm going to pause

23         it again at 23:58:23.

24    Q     If you could just approach the screen and point

25    yourself out for the jury?

lr-a                          PO Mangual - People - Direct

1              THE COURT:  Officer Mangual, I'm sorry, when you

2       approach the screen, you can go but I want you to stand on

3       the side next to the court officer so the jury can have an

4       unobstructed view of the screen.  That's perfect.

5       A     Right over here.

6              THE COURT:  That's you?

7              THE WITNESS:  That's me.

8       Q     Indicating the right center of the screen?

9       A     Yes.

10             THE COURT:  In the middle of the street.

11             THE WITNESS:  Right here in the street.

12      Q     And where -- could you see on that screen who it is

13      you're approaching?

14      A     Right here, Santana.

15      Q     And that person is slightly, as you're looking at the

16      screen slightly to the left of you as you're on the screen?

17      A     Yes.

18      Q     Near in between kind of a white and a black car?

19      A     Yes.

20             MR. MENDYS:  Continuing.  Let the record reflect

21       that I'm pausing again 23:58:32.

22      Q     We just had an individual walk away from the wall in

23      your direction.

24      A     Yes.

25      Q     Do you recall who that was?

1     A     That was Mr. Contreras.

2     Q     And is that when he was telling you they took my money?

3     A     Yes.

4           MR. MENDYS:  Continuing.  Pausing at 23:58:46.

5     Q     Where is, can you see Melenciano in this image?

6     A     Not really.  He's probably over here somewhere.

7     Q     You're indicating behind the tree?

8     A     Yes.

9     Q     That's in front of a parked car and part of the police

10    van?

11    A     Yes.

12          (Whereupon, the referred to video was played in

13    open court.)

14    Q     You saw what appeared to be a light on the bottom

15    right, did you notice that?

16          THE COURT:  Bottom right in the corner?

17          MR. MENDYS:  Yes.

18    Q     Did you see that officer?

19    A     I didn't notice it.

20          (Whereupon, the referred to video was played in

21    open court.)

22    Q     Right there, you see that?

23          THE COURT:  At what point?

24          MR. MENDYS:  I paused it at 23:59:31.

25    Q     Do you see that, Officer?

lr-a                        PO Mangual - People - Direct

1       A    Yes.

2       Q    Do you know what that is?

3       A    Looks like a flashlight.

4       Q    That would have been your flashlight?

5       A    Possibly, yes.

6       Q    Do you know what it was you were doing at that point?

7       A    Not exactly.

8       Q    Do you recall using your flashlight at all for any

9   purpose that night?

10      A    Yes.

11      Q    And what purpose was that?

12      A    To search for more evidence.

13      Q    Pardon?

14      A    To search for more evidence.

15      Q    And did you use them for any purpose in relation to

16   that car that's parked there?

17      A    Yes, at some point to search the lungeable areas to see

18   if they dropped a shield or any weapons.

19              (Whereupon, the referred to video was played in

20       open court.)

21              MR. MENDYS:  Let the record reflect I've paused it

22       at 00:00:27.  The date is now October 17, 2012.

23      Q    In the bottom of the screen there are three

24   individuals.  Are you one of those individuals?

25      A    I think that might be me over here.

1r-a                          PO Mangual - People - Direct

1       Q     If you could --

2             THE COURT:  Which individual?

3       Q     Indicating the person on the far right?

4       A     Yes.

5             (Whereupon, the referred to video was played in

6       open court.)

7             THE WITNESS:  Actually, I might still be over

8       here.

9       Q     I'm sorry, what's that?

10      A     I'm not a hundred percent sure that's me just yet.

11            (Whereupon, the referred to video was played in

12      open court.)

13      Q     On this angle it's 00:00:50, 10/17/2012.  What's going

14      on right now?

15      A     That's definitely me there.  I'm bringing Mr. Santana

16      to the van.

17            THE COURT:  So indicating in the middle of the

18      street, you've just come from the south part of the video

19      into view and are actually walking in the direction of your

20      police van, what you identified as your van earlier; right?

21            THE WITNESS:  Yes, sir.

22      Q     So the other individual is one of your partners?

23      A     Yes.

24      Q     As you look at it, can you tell who it was, whether it

25      was Pachot or Colon?

1      A      No, I can't.

2                     (Whereupon, the referred to video was played in

3      open court.)

4                     (Continued on the next page...)

B mc

40

P.O. Mangual - People - Direct

1    Q.    Officer, I'm going to pause it for a second at

2    00:03:58.  Officer, we just saw flashlights walking northbound on

3    the sidewalk, do you see that?

4    A.    Yes.

5    Q.    What was -- what were you guys doing at that point?

6    A.    I was continuing to search for evidence.

7    Q.    Is there a reason you were looking in that vicinity,

8    that direction?

9    A.    Yes, cause the third guy actually went northbound.

10   Q.    Did you have information that he had any evidence?

11   A.    Yes.

12   Q.    What information did you have?

13   A.    We were told that he had a police shield.

14          (Video playing.)

15          THE COURT:  I'm sorry, what's the marker on this?

16          MR. MENDYS:  00:08:12.

17          THE COURT:  Your van backed up and went forward

18    again?

19          THE WITNESS:  No, what we did, we pushed the

20    van -- because it was blocking the traffic, we pushed the

21    van further in so the traffic could flow.

22          THE COURT:  Okay, thank you.

23          (Video playing.)

24   Q.    Looking at 00:08:36, I just saw a fire truck pass by.

25   That's unrelated, right?

B mc

41

P.O. Mangual - People - Direct

1    A.    Unrelated.

2              (Video playing.)

3              MR. MENDYS:  Pausing at 00:10:33.

4    Q.    Officer, what's going on now as you seem to be -- well,

5    I'm not going to characterize it, but what's going on at this

6    point?

7    A.    Pretty much a canvass was being done for the third guy.

8              THE COURT:  I'm sorry?

9              THE WITNESS: A canvass looking for the third guy.

10             THE COURT:  A canvass.

11             THE WITNESS:  And it looks like supervisors came

12   on the scene.

13             THE COURT:  Okay.

14             (Video playing.)

15             THE COURT: The time is now what?

16             MR. MENDYS:  Time 00:14:27.

17   Q.    And, Officer, what just happened here?

18   A.    The police van just left.

19   Q.    And it appears the flashlight is going on the bottom,

20   right?

21   A.    Yes.

22   Q.    That would be preparations to take the car back to the

23   precinct?

24   A.    Yes.

25             MR. BONANNO:  Objection.

42

B mc

P.O. Mangual - People - Direct

1    THE COURT: Sustained for the leading, yes.

2    Q.   What were you doing at that point?

3    A.   Just checking the vehicle prior to taking it back to

4    the command.

5    Q.   Now at some point -- at some point did Santana and

6    Melenciano, were they transferred from the van to another police

7    car?

8    A.   Yes, they were.

9    Q.   And they were taken back to the 46?

10   A.   Yes.

11   Q.   And what about the people who were against the wall,

12   Contreras, Rodriguez, and the women?

13   A.   The women was also taken to the 46 Precinct.

14   Q.   How were they transported?

15   A.   In police vehicles as well.

16   Q.   Do you know if they -- what car they went in?

17   A.   To my recollection they went in the van.

18   Q.   I'm going to show you at this point parts of a second

19   angle.

20   THE COURT:  Can I just ask for the record was the

21   first camera angle identified by some sort of number, J-peg

22   or something other?

23   MR. MENDYS:  I think in the top right, bear with

24   me one second, the top, the first angle indicates in the

25   top, left corner CH dash 02.

43

P.O. Mangual - People - Direct

1   THE COURT:  Okay, if you can characterize what the

2   next camera is since it's different?

3   MR. MENDYS:  The second camera angle is reflected

4   in the top, left corner as CH dash 01.

5   THE COURT:  Okay.

6   (Video playing.)

7   MR. MENDYS:  Now this is paused at 10/16/12,

8   23:57:38.

9   Q.   Officer, what direction are we viewing here?

10  A.   We're viewing -- the camera is facing southbound.

11  Q.   And do you see your van in this clip?

12  A.   Yes, on the left.

13  THE COURT:  Indicating with the NYPD written on

14  the side of it.  Go ahead.

15  Q.   And, Officer, where were you in the van again?

16  A.   I was the driver.

17  Q.   Now there appears to be a person kind of approaching

18  the camera walking down the block, you see that?

19  A.   Yes.

20  Q.   Did you see that as it was happening?

21  A.   At that point no, I initially saw him as I was driving

22  up, I didn't see the part where he walked away.

23  Q.   So you saw him at the wall and then you didn't see him?

24  A.   Yes.

25  (Video playing.)

44

B mc              P.O. Mangual - People - Direct

1      Q.    Okay, I paused it at 23:58:24.  Can you point to

2   yourself on the video as we see it?

3      A.    Yes, on the top center over there.

4      Q.    Indicating the top center in the middle of the street?

5      A.    Yes, behind the black vehicle, the black Acura.

6      Q.    Now you indicated before when you testified that --

7   Well, I'm going to ask you again.  Do you recall --

8              MR. MENDYS:  Strike that.

9      Q.    Based on the video can you tell what position Santana

10  and Melenciano, what positions they were in as they were against

11  the wall?

12             THE COURT:  I'm sorry at?  Prior to this moment or

13      from --

14     Q.    Prior to this moment on the video what position were

15  Santana and Melenciano?

16             THE COURT:  You need a drink of water?

17             Can we give that juror a drink of water?  I'm

18      sorry, just one minute.

19             (Short pause in the proceedings.)

20             THE COURT:  Okay.  I'm sorry, go ahead.

21     Q.    What positions -- as you looked at the wall what

22  position were Santana and Melenciano in?

23     A.    It looks like Santana was in the center and Melenciano

24  was on the left.

25             (Video playing.)

45

B mc

P.O. Mangual - People - Direct

1    Q.    There appears -- well, did you see a person just

2    approaching you on the video there?

3    A.    Yes.

4    Q.    Who is that?

5    A.    That looks like it was Contreras.

6             THE COURT:  What's the time stamp?

7             MR. MENDYS: I'm sorry, that's 23:58:49.

8    Q.    And at this point were you with anybody else?

9    A.    I was with Santana.

10            (Video playing.)

11   Q.    Officer -- I'm sorry, 23:59:07.  On the right-hand side

12   here we see a glare, in the top right, do you know what that is?

13   A.    That looks like a light, a building light.

14   Q.    Pardon?

15   A.    Building light.

16            (Video playing.)

17   Q.    Pause at 23:59:01.  There's -- 51.  There's a car

18   pretty much right in the center on the curb, do you see that?

19   A.    Right here?

20   Q.    Yes.  Do you see those two individuals or those people

21   by that car?

22   A.    Yes.

23   Q.    Do you know what that is?  Do you know what's going on

24   there?

25   A.    Yes, that's Melenciano, and I don't recall if that's

B mc

46

P.O. Mangual - People - Direct

1  Pachot or Colon, one of the two.

2           (Video playing.)

3     Q.   Now who's approaching?  This is 00:00:29.  Who's

4  approaching the van?

5     A.   That's Melenciano, he's being put into the police van.

6           (Video playing.)

7     Q.   Pause at 00:00:55.  What's going on now?

8     A.   I was just walking Santana to the van.

9           MR. MENDYS:  Okay, I'm stopping it at 00:01:39.

10  Officer, you can have a seat.

11    Q.   Officer, did you make -- did you have to make any --

12  notify any other units regarding this arrest, these arrests that

13  you made that night?

14    A.   Yes, I did.

15    Q.   Who did you have to notify?

16    A.   IAB.

17    Q.   What is IAB?

18    A.   Internal Affairs Bureau.

19    Q.   Why did you have to notify them?

20    A.   Just a procedure we have to do.  We're required to do

21  so when we have anything concerning police corruption or

22  allegations.

23    Q.   And in this situation what concerns did you have about

24  that?

25    A.   Well, they had identified themselves as police officers

47

B mc

P.O. Mangual - People - Direct

1  to the complainants.

2      Q.   That's what you were told?

3      A.   Yes.

4      Q.   Did you have to notify -- there are other units within

5  your -- that appeared on the scene, correct?

6      A.   Yes.

7      Q.   Did you have to make any notifications internally

8  within your command?

9      A.   I had to let my supervisor know.

10     Q.   Why is that?

11     A.   For any arrest we're supposed to call out to the

12  supervisors.

13     Q.   Now did you also -- did you or someone --

14          MR. MENDYS:  Well, strike that.

15     Q.   Did you have to fill out any paperwork when you make an

16  arrest?  Were these your arrests, Santana and Melenciano?

17     A.   Yes.

18     Q.   You were the arresting officer?

19     A.   Yes.

20     Q.   Do you have to fill out any paperwork when you make an

21  arrest like this?

22     A.   Yes.

23     Q.   Can you just give the jury a sense of what happens,

24  what papers you have to fill out?

25     A.   Yes, I have to fill out a complaint report and an

B mc

P.O. Mangual - People - Direct

1 arrest report.

2     Q.   A complainant report is what?

3     A.   It's pretty much the statements made by the

4 complainants of the incident.

5     Q.   And the arrest reports, what are those?

6     A.   Pretty much the arrest report is the paperwork that

7 concerns the person being arrested and the narrative, the story

8 as well.

9     Q.   Did you at any point get a description of the third

10 individual?

11    A.   Yes, I did.

12    Q.   What description did you receive?

13    A.   I received it was a male, dark skin, with a hoodie and

14 blue jeans.

15    Q.   And do you recall who specifically, if anyone, provided

16 you that description?

17              MR. BONANNO:  Objection.

18              THE COURT:  Overruled.

19    A.   I don't recall exactly which one, but it was one of the

20 complainants.

21              THE COURT:  One of them?

22              THE WITNESS: One of the complainants, I don't

23      recall which one.

24    Q.   Was it one of the men or one of the women, if you

25 remember?

49

B mc

P.O. Mangual - People - Direct

1   A.   One of the men.

2   Q.   Did you ever have to testify regarding this case?

3   A.   Yes.

4   Q.   In the Grand Jury?

5   A.   Yes.

6   Q.   Then a pre-trial hearing?

7   A.   Yes.

8           MR. MENDYS:  Just one moment.

9           (Short pause in the proceedings.)

10   Q.   After you made these two arrests did you have anything

11  to do with any further investigation in the case?

12   A.   No.

13          MR. MENDYS:  Nothing else, thank you.

14          THE COURT:  Okay, members of the jury, we've been

15  here about two hours now and I'm going to give you a break,

16  which would -- normally, I would normally give a short break

17  and begin cross-examination, but I do not think we're going

18  to finish cross-examination in the next half hour, so I'm

19  going to give you an extra long break for lunch.  I'm asking

20  you to return at 2:15, okay, to Room 601.  As soon as you're

21  all there, we'll come back and we'll have cross-examination

22  of Officer Mangual.

23          Have a good lunch, drink a lot of fluids because

24  we have a heat alert out there, and keep my instructions.

25  Do not discuss anything about the case, keep an open mind,

B mc

49A

P.O. Mangual - People - Direct

1    all my recess rules.  And I'll see you this afternoon, okay.

2                    (Whereupon, the jurors exit the courtroom.)

3                    THE COURT:  Officer Mangual, you can step down.

4    I'll see you this afternoon.  Okay, thank you.

5                    MR. MENDYS:  What time, Judge?

6                    THE COURT: 2:15.

7                    (Luncheon recess taken.)

8                        CONTINUED NEXT PAGE.............

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       A  F  T  E  R  N  O  O  N      S  E  S  S  I  O  N

2               (Whereupon, the following took place in open court

3       in the presence of the Court, defense counsel and the

4       assistant district attorney.)

5               THE CLERK:  Part 98 is back in session.  Case on

6       trial continued.  The defendant is not before the court, and

7       we are in, the sworn jury is not present at this time.

8               MR. MENDYS:  Judge, I want to keep you informed as

9       to any developments with Mr. Contreras.  Detective Rodriguez

10      spoke to him while we were taking testimony.  The latest

11      word is that he has agreed to come here Monday.  We have

12      told him that the district attorney's office will pay for

13      his travel.

14              THE COURT:  From the Dominican Republic?

15              MR. MENDYS:  From the Dominican Republic.

16              THE COURT:  You want to extradite Mr. Diaz at the

17      same time or not?

18              MR. MENDYS:  If he happens to be there.

19              THE COURT:  I know.  If he happens to be there, I

20      know.

21              MR. MENDYS:  So that is, I want to -- before

22      making arrangements I wanted to advise the Court, and if

23      there was -- I know Monday is the outer range of how far we

24      wanted to conduct testimony.

25              THE COURT:  First of all, there's a couple of

lr-c                              Proceedings

1     things going on.  Number one, I'm not concerned.  If you're

2     going to tell me he's going to be here Monday, I have no

3     problem with him being here Monday.  If you're going to, I

4     imagine you have off Thursday as well as Friday because you

5     don't have any witnesses scheduled for Thursday, as far as I

6     know.

7                 MR. MENDYS:  As of right now, that is correct.

8                 THE COURT:  And Mr. Bonanno, I'll hear from you as

9     well.  You know, the defendant continues not to be here and

10    I did tell the jury that the case would probably be in their

11    hands Tuesday, not Monday, that we would be finishing the

12    evidence about Monday and the case would be in their hands

13    Tuesday, which is exactly what I told them, so it's not that

14    they're expecting it.

15                So if you're asking me now should you bring your

16    witness here for Monday and to make the travel arrangements,

17    yes, that's fine.  I don't have a scheduling issue with it,

18    but I'll hear from Mr. Bonanno.

19                MR. BONANNO:  Judge, that's fine.  I mean, I

20    anticipated that we would have concluded earlier than that

21    and the jury might have gotten it earlier, but --

22                THE COURT:  Well, it's one --

23                MR. BONANNO:  Is it a speculative thing that he

24    promises to be here?  I mean, it's --

25                THE COURT:  What I'm going to say is, of course if

lr-c                              Proceedings

1      he's not here, you know, I'll hear what the DA's application
2      is on Monday in terms of, well, maybe he'll be here Tuesday,
3      but I would assume if you're making travel arrangements and
4      he's going to be getting on a plane and someone's bringing
5      him here?
6                   MR. MENDYS:   I think -- we haven't worked out the
7      details.   The way the conversation has gone has been, you
8      know --
9                   THE COURT:   Just one second.
10                  (Continued on the next page...)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

D mc

52

Proceedings

1    THE COURT:  I had a case earlier this year and I

2    know Mr. Rivera, the chief of that trial bureau, was

3    involved.  I can't remember exactly which A.D.A. it was

4    unfortunately, but we were not starting that case because

5    there was a necessary police officer who's assigned by NYPD

6    to work for NYPD in the Dominican Republic.  I don't know if

7    you're aware of this.

8    MR. MENDYS:  I am not.

9    THE COURT:  And again, I don't know what the

10   job of this police officer is.  And, as I said, I know that

11   Mr. Rivera was very much involved in scheduling and things

12   and we needed date certains.  And I think the case --

13   actually, I think it may have pled, but that's why I can't

14   remember.  I don't remember all the details, but I know that

15   there NYPD maintains police officers who work for the New

16   York City Police Department in the Dominican Republic.  And

17   just as a suggestion it might be helpful, prudent to have

18   someone, if they're available, to say, "Hey, I'm at the

19   airport, bon voyage, here's some tic tacs, have a good

20   flight."

21   MR. MENDYS:  I definitely agree with you.  As we

22   stand now we kind have given him -- not options, but we've

23   given him a range of when we can take his testimony.

24   THE COURT:  But he's agreeable that he would be

25   here to testify on Monday?

D mc

53

Proceedings

1    MR. MENDYS:  That is my understanding.

2    THE COURT:  Okay.

3    MR. MENDYS:  I'm not speaking with him directly at

4    this point.

5    THE COURT:  Thank you for keeping me updated.

6    Continue to keep me updated.  As I said, we'll go from day

7    to day and I'll tell the jury what time to be here.  And if

8    we have a day off -- they already know they have days.  They

9    know we're not working Friday.  And, as I said, I don't see

10   this as a problem, but if he's not here to testify Monday,

11   and it appears that we have no real legal means -- you have

12   no legal means to get him here, then I would ask that you

13   and Mr. Bonanno basically prepare for summations and charge

14   for Monday.  And we'll have a charge conference Thursday in

15   an anticipation of it not happening.  And if it does happen,

16   then we'll have an additional charge conference.

17   I'm still assuming you do not have a witness

18   except for the potential if your client does return?

19   MR. BONANNO:  Not as of yet, Judge.

20   THE COURT:  Right.  Okay, so that's it.  So just

21   I'm going to ask your indulgence for a few more minutes.

22   (Short pause in the proceedings.)

23   (Police Officer Mangual resumes the witness

24   stand.)

25   (Whereupon, the jury enters the courtroom and the

D mc

54

P.O. Mangual - People - Cross

1     following takes place:)

2               THE COURT:  All right, the jury is sworn and

3     properly seated.

4               I remind you, Officer Mangual, that you're still

5     under oath.

6               THE WITNESS:  Yes.

7               THE COURT: Mr. Bonanno, you may conduct your

8     cross-examination.

9               MR. BONANNO:  Thank you, Judge.  May it please the

10    Court.

11    CROSS-EXAMINATION

12    BY MR. BONANNO:

13        Q.    Officer Mangual, I'm going to ask you a few questions.

14        A.    Absolutely.

15        Q.    If you don't know what I'm saying, just ask me to

16    rephrase it and I'll try as best I can.

17              It's true that you testified previously in the grand

18    jury proceeding regarding this matter?

19        A.    Yes.

20        Q.    And also in pre-trial hearings regarding this matter,

21    is that true?

22        A.    Yes.

23        Q.    And I believe the pre-trial hearings were held on

24    July 8th of this year, is that correct?

25        A.    Sounds about right.

D mc

1    Q.   And when you testified in the grand jury, how soon

2  after this alleged incident did you testify?

3    A.   After the grand jury?

4    Q.   After the incident occurred?

5    A.   I don't recall, maybe a week or so.

6    Q.   So is it fair to say that the incident was fresher in

7  your recollection then than it is now three years later?

8    A.   Possibly.

9    Q.   And isn't it true in the hearings that you had on

10  July 8th, you couldn't remember certain things?

11    A.   Certain things, yes.

12    Q.   Because it was three years ago?

13    A.   Yes.

14    Q.   And you said that about six times?

15    A.   Possibly.

16    Q.   Now prior to joining the police department you said you

17  served in the navy?

18    A.   Yes.

19    Q.   What was your role in the navy?

20    A.   I was a machinists mate.

21    Q.   And how many years did you serve in the navy?

22    A.   Four active, six reserve.

23    Q.   Excuse me?

24    A.   Four active, six reserve.

25    Q.   We thank you for that service, Officer, as well as your

D mc

P.O. Mangual - People - Cross

1   service now.

2           On October 17th of 2012, you were assigned to the

3   Yankee Stadium detail, is that correct?

4       A.   Yes.

5       Q.   And how does one get into the Yankee Stadium detail?

6       A.   They fill out an application.

7       Q.   Is it based upon an arrest record?

8       A.   Not really, just you put in an application, they have

9   spots available, they'll pick you up.

10      Q.   Do you know somebody to get in?

11          THE COURT: Sustained.  I don't know that there's

12      any basis for such a question.

13      Q.   Is there a formal process for getting acceptance into

14  the Yankee Stadium detail?

15      A.   Yes, your first time in you fill out the application,

16  they pick you up.  They pick you up after that, every season

17  after if you were a prior.  If you were priorly assigned to that

18  detail, pretty much that they automatically take you in.

19      Q.   So you get a preference?

20      A.   Yes.

21      Q.   If you were to be assigned, let's say -- well assigned

22  to the Yankee Stadium detail, is that considered a privilege?

23      A.   No, people actually get drafted now.

24      Q.   To go into the Yankee Stadium detail?

25      A.   Absolutely.

D mc

P.O. Mangual - People - Cross

1    Q.   So it's not based upon having a voluminous arrest

2  record?

3    A.   No.

4    Q.   Prior to October 17th of 2012, how many robbery arrests

5  had you made?

6    A.   I don't recall, a handful.

7    Q.   And had you ever -- and this robbery arrest allegedly

8  was -- is this classified as a pick-up job?

9    A.   Yes, it is.

10   Q.   And just explain what a pick-up job is?

11   A.   A pick-up job is pretty much a job that you observe

12 prior to it coming over 911.  Pretty much is a job that did not

13 come up over 911, and you just happen to roll up on it.

14   Q.   And prior to this incident how many pick-up robbery

15 jobs did you have?

16   A.   I don't recall, not many.

17   Q.   Not many?

18   A.   Not many.

19   Q.   Do you remember testifying here today that you observed

20 four people on a wall and three people were frisking them, is

21 that correct?

22   A.   Yes.

23   Q.   And, in fact, you also said that in the hearing

24 testimony of July 8th, that you observed four people lined up

25 against the wall and three other people frisking them, is that

D mc

58

P.O. Mangual - People - Cross

1    correct?

2         A.    Yes.

3         Q.    And I believe you also said, when questioned, that

4    there were three people that were frisking the people on the wall

5    in that hearing, do you recall saying that?

6         A.    That there were three people, yes.

7         Q.    Do you recall testifying in the grand jury about a week

8    or so after the incident?

9                   THE COURT:   What date, focus attention on the

10        date?

11                  MR. BONANNO:   Of 10/17 of 2012.   I don't have the

12        exact date of the grand jury.

13                  THE COURT:   I didn't know that you didn't have

14        that.

15        Q.    But you recall testifying in the grand jury?

16        A.    Yes, I testified in the grand jury.

17        Q.    And it was about a week or so after the incident?

18        A.    Something like that, yes.

19        Q.    So -- and the incident was fresh in your mind then?

20        A.    Yes.

21        Q.    You recall testifying that --

22                  THE COURT:   Well are you doing this with question

23        and answer; line, page, the proper way?

24                  MR. BONANNO:   I can do that, Judge.

25        Q.    On Page 3 of the grand jury testimony --

D mc

P.O. Mangual - People - Cross

1      MR. MENDYS:  I'm sorry, what's the full page?

2      MR. BONANNO:  TP3.

3      MR. MENDYS:  Okay.

4   Q.  Question on Line 5, question to you by the D.A.:

5          "Could you please briefly describe the

6   circumstances that brought you to that scene and to their

7   arrests?"

8          And your answer on Line 8:

9          "Yes, while driving down Walton Avenue in a marked

10  department vehicle, and in uniform, I did observe four

11  people being frisked against the wall.  Those that were

12  doing, Mr. Santana and Mr. Melenciano, they were frisking

13  the four people against the wall.

14      MR. MENDYS:  You're misreading it.

15      THE COURT:  It's not -- well, can we have a

16  sidebar, I'm sorry, because I don't have this in front of

17  me.

18          (Whereupon, the following takes place on the

19  record, at sidebar, in the presence of Court and Counsel:)

20      THE COURT:  First of all, "Do you recall being

21  asked this question and giving this answer," the full

22  question has to be read and the full answer has to be read.

23          So what is your objection, he's misreading it?

24      MR. MENDYS:  Mr. Bonanno just said, "Those that

25  were doing, Mr. Santana and Mr. Melenciano, they were

60

D mc

P.O. Mangual - People - Cross

1    continuing frisking the four people."  That's not what it

2    says.  It says, "Mr. Santana and Mr. Melenciano were

3    frisking the four people against the wall."

4             THE COURT:  They were frisking.

5             MR. MENDYS:  Essentially this line, on Line 12, he

6    read it incorrectly.  He read it as, "Mr. Melenciano, they

7    were frisking."

8             THE COURT:  Well it's a typo?

9             MR. MENDYS:  No.

10            MR. BONANNO:  He's saying I misread it.

11            THE COURT:  The word is, "That?"

12            MR. BONANNO:  Did I misread it?

13            THE COURT:  You can go back and read what he

14   said.

15            (Whereupon, the court reporter read back the

16   requested testimony.)

17            THE COURT:  Okay, we'll wait until we go back and

18   I'll sustain the objection and tell you to state it again.

19            (Whereupon, the following takes place on the

20   record, in open court, in the presence of the Court, Mr.

21   Bonanno, Assistant District Attorney Mendys and the sworn

22   jurors:)

23            THE COURT: All right, the objection is sustained.

24   You may ask the question again.

25            MR. BONANNO:  Thank you, Judge, and I'll ask it

D mc

P.O. Mangual - People - Cross

1     all over again.

2   CROSS-EXAMINATION (CONTINUED)

3   BY MR. BONANNO:

4       Q.   Officer, do you remember being asked this question:

5               "Could you please briefly describe the

6       circumstances that brought you to that scene and to their

7       arrests?"

8       A.   I'm sure I was asked that question.

9       Q.   And do you remember eliciting this answer:

10              "Yes, while driving down Walton Avenue in a marked

11      department vehicle, and in uniform, I did observe four

12      people being frisked against the wall.  Those that were

13      doing, Mr. Santana and Mr. Melenciano, that were frisking

14      the four people against the wall, they caught my attention

15      because the way they were dressed."

16              You remember saying that?

17      A.   You're reading it, I guess.

18              THE COURT:  Do you recall saying that?

19              THE WITNESS:  Yes.

20      Q.   And do you also remember saying in the hearing on

21   July 8th of this year, "Yes, I noticed --"

22              THE COURT: Read the question and answer, we do

23      this the right way.

24              MR. BONANNO:  I apologize, your Honor.

25              MR. MENDYS:  What page?

62

D mc

P.O. Mangual - People - Cross

1    MR. BONANNO:  On Page 143.

2    MR. MENDYS:  Okay.

3    THE COURT:  147, Line what?

4    MR. BONANNO:  143, Line 11.

5    Q.   Do you remember being asked this question:

6         "Can you elaborate on that?  What specifically did

7    you see that led you to believe that they weren't actually

8    police officers?"

9         And do you remember answering:

10        "Yes.  I noticed two of the guys, their pants were

11   hanging way below their waist and there's no way that you'd

12   be able to hold a gunbelt or any equipment with the clothes

13   in that manner."

14        Do you remember that?

15   A.   Yes.

16   Q.   Isn't it fair to say that you really only noticed two

17   people frisking people on the wall?

18   A.   I saw three, but I focused on those two, yes.

19   Q.   But I'm talking about the frisking.  Who did you see

20   frisking people?

21   A.   I saw the two.

22   Q.   Talking about Mr. Melenciano and Mr. Santana?

23   A.   Yes.

24   Q.   Now you said that when you took Mr. Santana into

25   custody, you arrested him, you cuffed him and frisked him?

D mc

P.O. Mangual - People - Cross

1    A.    Yes.

2    Q.    So you actually frisked Mr. Santana?

3    A.    Yes.

4    Q.    Are you trained in how to frisk someone in the police

5    academy?

6    A.    Yes.

7    Q.    And isn't it true that the proper way to frisk someone

8    when you put him up on the wall is to separate their hands, set

9    them back a little bit from the wall?

10   A.    Yes, but he was on the car.

11   Q.    I'm talking about frisking somebody on the wall?

12   A.    Okay, yes.

13   Q.    Would you move them back from the wall?

14   A.    Yes.

15   Q.    Would you separate their legs?

16   A.    Yes.

17   Q.    So they have less of -- a better sense of balance?

18   A.    Yes.

19   Q.    And wouldn't it be true that you go down and start at

20   the ankles and move way up the leg to do a proper frisk, is that

21   correct?

22   A.    Yes, that's the way to do it.

23   Q.    Checking in the groin area?

24   A.    Yes.

25   Q.    Checking the small of the back?

64

D mc

P.O. Mangual - People - Cross

1   A.   Yes.

2   Q.   Checking under the armpits?

3   A.   Yes.

4   Q.   Checking the neck area?

5   A.   Yes.

6   Q.   Why is that done?

7   A.   Just procedure, the way they show you in the academy.

8   Q.   But you're trained like that?

9   A.   Yes.

10  Q.   That's a frisk?

11  A.   Well that's actually a search.

12  Q.   Is a frisk when you have your hand on somebody's back?

13  A.   No.

14  Q.   That may be detaining somebody, is that correct?

15  A.   Yes, that would be detaining.

16  Q.   Did you see Mr. Diaz frisking anybody there?

17  A.   I saw him behind them.

18  Q.   It's fair to say you didn't see much of Mr. Diaz, is

19  that correct?

20  A.   My observation was limited.

21  Q.   Did anyone tell you that Mr. Diaz took money from

22  them?

23  A.   No.

24  Q.   When -- you said you recovered some money from

25  Mr. Santana, is that correct?

65

D mc                    P.O. Mangual - People - Cross

1    A.    Yes.

2    Q.    How did you recover that money again?

3    A.    I removed it from his left pocket.

4    Q.    And what did you do with it directly thereafter?

5    A.    I put it back in his pocket.

6    Q.    And why did you do that?

7    A.    I was still in the investigation phase, I was trying to

8    figure out whose money it was and just -- so I kept it in his

9    pocket.

10    Q.    So you weren't sure whose money it was at that point?

11    A.    No.

12    Q.    Did you think it might have been Mr. Santana's?

13          MR. MENDYS:  Objection.

14          THE COURT: Sustained, the answer is stricken.

15    Q.    Why would you have given the money back?

16          MR. MENDYS:  Objection.

17          THE COURT:  I think it's asked and answered, but

18    you can answer the question again.  The reason you gave --

19    you put the money back?

20          MR. MENDYS:  Could we have the question read back,

21    maybe I'm wrong?

22          THE COURT:  No, no, I got the question.  Are you

23    objecting to gave the money back or put the money back in

24    his pocket?

25          MR. MENDYS:  The way I heard the question was why

D mc

P.O. Mangual - People - Cross

1    would you have given the money back?

2              THE COURT:  I thought it was why did you give the

3    money back.  "Why would," the answer is sustained if it was

4    "would," yes.

5    Q.   Why did you give the money back then?

6    A.   I put it back in his pocket while I continued my

7    investigation to determine whose money it was.

8    Q.   So you did not see that money being taken from any of

9    the complaining witnesses?

10   A.   No, I didn't.

11   Q.   And did you see Mr. Diaz take any money?

12   A.   No.

13   Q.   Going back to the Acura, you said you vouchered a black

14   Acura, is that correct?

15   A.   Yes.

16   Q.   I'm going to direct your attention also to the

17   testimony of July 8th, on Page 155, starting at 11 -- 12.  Do you

18   remember being asked this question:

19              "They said that's the vehicle that the

20         defendants --"

21              THE COURT:  That's an answer, that's not a

22         question.  You recall --

23              MR. BONANNO:  Excuse me.  It's on 10.

24              THE COURT:  Do you recall, were you asked this

25         question and gave this answer?

D mc

67

P.O. Mangual - People - Cross

1    Q.   On 10, do you recall being given this question:

2              "And did any of the witnesses indicate to you

3    anything about the car?"

4         And do you remember giving this answer:

5              "They said that's the vehicle that the defendants

6    came out of?"

7    A.   Yes.

8    Q.   And there was a question from the Court:

9              "The three people?"

10        And do you remember answering:

11             "They didn't specify, they just mentioned the

12   two."

13   A.   I don't remember.  If that's what I said, I guess so.

14   Q.   Were those two that were being referred to Mr. Santana

15   and Mr. Melenciano?

16   A.   Yes, the two that were in custody.

17   Q.   So Mr. Diaz was never mentioned as coming out of that

18   Acura, is that correct?

19   A.   I don't recall.

20             MR. BONANNO:  Now I'm going to engage the services

21   of the District Attorney, if I can, to replay a short

22   portion of the videotape.

23             THE COURT:  Which one do you want played?

24             MR. BONANNO:  We can start with the CH 02, right

25   at the 23:57 --

68

D mc                    P.O. Mangual - People - Cross

1                    THE COURT:  CH 02?

2                    MR. BONANNO:  23:57 slash 37 mark.

3                    (Videotape played.)

4                    MR. BONANNO:  Now stop it there, please.

5                    THE COURT:  What's the counter?

6                    MR. MENDYS:  23:57:42.

7                    THE COURT:  42.  You began at what point?

8                    MR. MENDYS:  23:57:37.

9                    THE COURT:  37, okay.

10                    MR. BONANNO:  And it's 52?

11                    MR. MENDYS:  It's 42 right now.

12                    MR. BONANNO:  Can you move it to 23:57.

13                    THE COURT:  So you said to stop it here.  I just

14       want for the record --

15                    MR. MENDYS:  23:57:42.

16       Q.    Can you, Officer, point out where you believe that the

17       third person, other than Mr. Melenciano and Mr. Santana, is in

18       this?

19                    THE COURT:  And if you can get down -- well

20       actually you can do it from there, that's fine.

21       Q.    That's fine.

22                    THE COURT:  That's a good spot.

23       A.    This guy here that just started walking away, he was

24       standing still behind them and then as I came to a stop, he

25       started walking away.

69

D mc

P.O. Mangual - People - Cross

1    Q.   Did you see him walking away?

2         MR. MENDYS:  It's -- I'm sorry, the top left

3    portion, the top of the screen.

4         THE COURT:  Right.

5    Q.   Did you actually see him walking away?

6    A.   I saw the three men standing there and, as I came up, I

7    focused on these two at that point.

8    Q.   So you never really actually saw that third person

9    walking away?

10   A.   No, I didn't.

11        MR. BONANNO:  Can you just back it up a little

12   bit, please.

13        (Video playing.)

14   Q.   Did you ever --

15        MR. BONANNO: Stop it.

16   Q.   Now as to that third person that is walking away in

17   that portion of the video, was he frisking anybody?

18   A.   At that portion of the video it doesn't look like it.

19   Q.   Excuse me?

20   A.   It didn't look like it.

21        THE COURT:  What's the timer on this one?

22        MR. MENDYS:  This is 23:57:45.

23        THE COURT:  45.

24        MR. BONANNO:  If we can do the CH 01 at 10/16?

25        MR. MENDYS:  At where, 10/16?

D mc

P.O. Mangual - People - Cross

1      MR. BONANNO:  The different angle on that.

2      MR. MENDYS:  The same thing?

3      MR. BONANNO:  Yes.

4      (Video played.)

5      MR. BONANNO:  23:58 on this one.

6      MR. MENDYS:  Let the record reflect I turned it on

7  at 23:57:36.

8      THE COURT:  This is CH 01, right?

9      MR. MENDYS:  Yes.

10      THE COURT:  Okay.

11      MR. BONANNO: So can you roll it back again,

12  please?

13      (Video playing.)

14      MR. BONANNO:  Stop it right there.

15      THE COURT:  Prior to that counter you want it

16  rolled back?

17      MR. BONANNO:  Yes.

18      THE COURT:  Okay, tell Mr. Mendys when you want

19  him to stop.

20      (Video playing.)

21      MR. BONANNO:  Right there.  Just a little bit

22  more.  Can we freeze it?

23  Q.   Now where is that third person that walked away, if you

24  know?

25  A.   Right here.

D mc

P.O. Mangual - People - Cross

1   Q.   And is that person frisking anybody?

2   A.   No, right there he just has hands to her back.

3   Q.   In that frame do you see your police vehicle?

4   A.   Yes, I do.

5   Q.   And is it fair to say that that's what you observed

6   when you rolled up on the scene that night?

7   A.   Yes.

8   Q.   So is it fair to say from looking at this that the

9   third person in that video was not observed by you frisking

10   anybody?

11   A.   It appeared he was frisking to me.  At the moment where

12   the other two guys had the two males and he had the two females

13   with their hand to the back, it appeared he was with them and he

14   had the females detained.

15   Q.   But my question is was he frisking them?

16   THE COURT: Was he in the process of frisking them

17   at that moment, is that the question?

18   MR. BONANNO:  Yes.

19   THE COURT:  Okay.

20   THE WITNESS:  I guess not.

21   Q.   The other two people in that photo, were they Mr.

22   Melenciano and Mr. Diaz, I mean Mr. Santana?

23   A.   They're absolutely frisking, yes.

24   Q.   They're absolutely frisking someone, is that correct?

25   A.   Yes.

D mc

72

P.O. Mangual - People - Cross

1    Q.   That's how you would frisk somebody, is that correct?

2    A.   Yes.

3              THE COURT:   Can I ask what the timer is on this

4    that we've been talking about?

5              MR. MENDYS:   23:57:35.

6              THE COURT:   35, okay.

7    Q.   Now, Officer Mangual, after this incident --

8              THE COURT: Are you finished with the video?

9              MR. BONANNO:   Yes.

10             THE COURT:   Thank you.

11   Q.   You notified Internal Affairs Bureau, is that correct?

12   A.   Yes.

13   Q.   And that's because there was an allegation that one or

14   all of the individuals purported themselves to be police

15   officers, is that correct?

16   A.   Yes.

17   Q.   And they're the division that handles those type of

18   incidents in the department?

19   A.   Yes.

20   Q.   Did you ever put in for any kind of an award from this

21   arrest?

22   A.   No.

23   Q.   You didn't write it up?

24   A.   No.

25   Q.   Did you ever write up awards for good arrests?

D mc

P.O. Mangual - People - Cross

1    A.   Yes.

2         THE COURT:  It's sustained and the answer is

3    stricken.

4    Q.   When was the last time you wrote up an award?

5         MR. MENDYS:  Objection.

6         THE COURT: Sustained.

7    Q.   Did you fill out any additional paperwork in connection

8    with this arrest that you haven't already supplied to the

9    District Attorney's office?

10   A.   No.

11   Q.   Including any awards?

12        THE COURT:  It's sustained.  Actually, I don't

13   know what the basis would be, number one; and, number two,

14   it was asked and answered and it's not to continue.

15        MR. BONANNO:  I have no further questions, Judge.

16        THE COURT:  Okay, any redirect?

17        MR. MENDYS:  No.

18        THE COURT:  Officer Mangual, you may step down.

19   Thank you.

20        (Witness excused.)

21        THE COURT:  Okay, you have your next witness?

22        MR. MENDYS:  The People call Detective Chris

23   Rodriguez.

24   C H R I S    R O D R I G U E Z, a witness called by and on behalf

25   of the People, having first been duly sworn, testified as

D mc

Det. Rodriguez - People - Direct

1    follows:

2            COURT OFFICER:  In a loud, clear voice please

3    state and spell your first and last name, give your command,

4    shield number and command, excuse me?

5            THE WITNESS:  Detective Chris Rodriguez.

6    C-h-r-i-s R-o-d-r-i-g-u-e-z.  Shield Number 6522.  Command,

7    Police Impersonation Investigation Unit, Internal Affairs

8    Bureau.

9            THE COURT:  Okay, good afternoon, Detective

10   Rodriguez.

11           THE WITNESS:  Good afternoon, your Honor.

12           THE COURT:  You may inquire, Mr. Mendys.

13           MR. MENDYS:  Thank you, Judge.

14   DIRECT EXAMINATION

15   BY MR. MENDYS:

16   Q.    Good afternoon, Detective.

17   A.    Good afternoon.

18   Q.    How long have you been with the police department?

19   A.    A little over eleven years.

20   Q.    Can you tell the jury about your various assignments?

21   A.    I started in 2004, where I went to the Academy for six

22   months.  I then went over to PSA 5, which is housing, East

23   Harlem, and then from there I was assigned -- I did two years

24   there, and then after that I went to Housing Bureau Special

25   Services which is a citywide anti-crime unit for housing, and I

Det. Rodriguez - People - Direct

D mc

1  went to the Police Impersonation Unit and I'm here currently.

2  Q.   How long have you been in the Police Impersonation

3  Unit?

4  A.   Next month will make four and a half years.

5  Q.   Now your assignment to the Police Impersonation Unit is

6  within the Internal Affairs Bureau?

7  A.   Yes, it is, sir.

8  Q.   Can you describe for the jury what your

9  responsibilities are there?

10  A.   We investigate police impersonation robberies, grand

11  larcenies and major index crime, other violent crime.

12  Q.   What is police impersonation mean?

13  A.   People that pretend to be the police and gain a benefit

14  either doing a robbery, larceny, some type of other criminal

15  act.

16  Q.   And how long have you been a detective?

17  A.   I got promoted August 30th of 2012, so next month it

18  will be three years, a little less than three years.

19  Q.   As an officer how do you go about becoming a

20  detective?

21  A.   While I was assigned to Internal Affairs Bureau I had

22  to wait eighteen months.  Within the eighteen months you're

23  conducting investigations and then you get promoted after

24  eighteen months.

25  Q.   So during those eighteen months, sort of a training?

D mc

Det. Rodriguez - People - Direct

1    A.    Yes, you're learning how to investigate cases.

2    Q.    Prior to joining the police department did you have any

3    other jobs?

4    A.    Yes.

5    Q.    What did you do?

6    A.    I was a medical assistant, I also was an EMT.

7    Q.    Where did you grow up?

8    A.    In Queens.

9    Q.    How far did you go in school?

10   A.    I got some college credits, enough to get on the police

11   department.

12   Q.    And are you married?

13   A.    Yes, I am.

14   Q.    You have kids?

15   A.    Yes, I have a son.

16   Q.    So you're here to testify specifically about an

17   incident that occurred on October 17th of 2012.   Were you working

18   that day, the 17th of October?

19   A.    Yes, I was.

20   Q.    Do you recall what your hours were?

21   A.    I came in at one o'clock and I was working till 9:33.

22   Q.    Now were you --

23        THE COURT:   Is that a.m., one a.m.?

24        THE WITNESS: One p.m.

25        THE COURT:   One p.m.?

D mc

Det. Rodriguez - People - Direct

1          THE WITNESS: 1300 hours.

2     Q.   Now while you're working as a detective, do you have a

3    partner?

4     A.   Yes.

5     Q.   And who was it in relation to this particular case?

6     A.   It was actually my sergeant, Sergeant Michael --

7    Michael Decandido.   D-e-c-a-n-d-i-d-o.

8     Q.   Now that day during your tour did there come a point

9    when you were assigned an investigation into a robbery that

10   occurred at 2315 Walton Avenue shortly around midnight?

11    A.   Yes.

12    Q.   And when you -- how did -- well how did you receive

13   that case, who assigned it to you?

14    A.   My sergeant, Sergeant Michael Decandido.

15    Q.   And when you had been assigned the case, that would

16   have been sometime after one p.m.?

17    A.   Yes.

18    Q.   When you were assigned that case was anyone in custody?

19    A.   Yes.

20    Q.   How many people?

21    A.   There was two people in custody.

22    Q.   And do you remember who they were?

23    A.   Yes.

24    Q.   What are their names?

25    A.   Amauri Santana and Jose Melenciano.

D mc

Det. Rodriguez - People - Direct

1      Q.    So what were your responsibilities in terms of this

2  investigation?

3      A.    From what I was informed there was three subjects

4  involved in this incident that occurred in the confines of the

5  46, which is this robbery.  Two of three subjects were

6  apprehended and I was given the investigation as an enhancement

7  case, meaning to find the third subject.

8      Q.    Now upon receiving the case did you speak to any of the

9  witnesses?

10     A.    Yes.

11     Q.    Did you speak to an individual by the name of Yohn

12 Contreras?

13     A.    Yes.

14     Q.    When did you speak to him?

15     A.    I spoke to him on that day, on October 17th.

16     Q.    Where did you speak to him?

17     A.    I spoke to him at 215 East 161 Street.

18     Q.    Did you speak to an individual by the name of Joel

19 Rodriguez?

20     A.    Yes.

21     Q.    When did you speak to him?

22     A.    Also the same day, at the same location.

23     Q.    He and Mr. Contreras were together?

24     A.    They were separate when I talked to them.

25     Q.    Did you speak to an individual by the name of Esmeraldi

Det. Rodriguez - People - Direct

1  Rodriguez?

2      A.   Yes, I did.

3      Q.   And when did you speak to her?

4      A.   Later on that day.

5      Q.   Do you remember where that conversation took place?

6      A.   That conversation took place at her residence, in front

7  of her residence, actually in front of her apartment door.

8      Q.   Is that in the Bronx?

9      A.   Yes, it is, sir.

10     Q.   Did you speak to an individual by the name of Argelia

11 Rosario?

12     A.   Yes.

13     Q.   And do you recall when you spoke to her?

14     A.   I spoke to her on October 24th of 2012.

15     Q.   And do you remember where you spoke to her?

16     A.   It was in her residence as well.

17     Q.   Now when you were assigned the case -- when you were

18 assigned the case, did you have any information --

19            MR. MENDYS: Well strike that, I'm sorry.

20     Q.   When you were assigned the case, you just knew there

21 was a third outstanding individual?

22     A.   Yes, I did.

23     Q.   You didn't know who it was at that point?

24     A.   No, I did not.

25     Q.   On the 17th of October, did there come a point in time

D mc

80

                    Det. Rodriguez - People - Direct

1   when you developed a lead for the third perpetrator?

2        A.   Yes, I did.

3             THE COURT:  Well to that question the answer

4        is -- the question and answer are overruled.  The answer

5        will stand that you developed a lead, and that's it.  Okay.

6        Q.   And did there come a point in time -- well what was the

7   name of that individual?

8        A.   Richard Diaz.

9        Q.   And what efforts did you make going forward in your

10  investigation in an attempt to locate Mr. Diaz?

11       A.   I issued a wanted card.

12       Q.   What is a wanted card?

13       A.   A wanted card has pedigree information on Mr. Diaz, his

14  last known location where he might reside, his New York State

15  Identification Number, which is called his NYSID number is on

16  that, a brief synopsis of what he's wanted for, a charge, and

17  then some pedigree information in regards to name, rank, command

18  and contact information.

19                    CONTINUED NEXT PAGE.........

20

21

22

23

24

25

lr-e                    Det. C. Rodriguez - People - Direct

1      Q      What is this?  What's it called again?

2      A      A wanted card.  It's called an I-card.

3      Q      Where is this wanted card or I-card, who is it

4  distributed to?

5      A      It actually goes to the wanted desk in HIDTA, High

6  Intensity Drug Traffic Area desk, and it's put into our NYPD

7  database into ADW, which is, will tell you if someone had an

8  active warrant or active I-card.

9      Q      So if anyone within NYPD comes across Mr. Diaz, you

10  will be notified?

11     A      Yes, I will.

12     Q      Now, and when did you submit the wanted card?

13     A      October 18th of 2012.

14     Q      The following day?

15     A      Yes.

16     Q      Now going back to the 17th, did you conduct a variety

17  of computer checks to determine whether either Jose Melenciano or

18  Amauri Santana were ever employed by the New York City Police

19  Department?

20     A      Yes.

21     Q      And what did you find out?

22     A      That they were never employed by the NYPD.

23     Q      Are you familiar with what's called, you mentioned it

24  before, a NYSID number?

25     A      Yes.

1r-e                    Det. C. Rodriguez - People - Direct


1      Q      What is a NYSID number?

2      A      New York State Identification Number is a unique number

3   that's assigned to someone like myself, I have a NYSID number

4   because I am a New York City Detective, or someone that's been

5   arrested will have a unique number called a NYSID number, and

6   that number is specifically assigned to that person.

7      Q      So --

8             THE COURT:  It's not just assigned to people with

9       arrest records, it's assigned for identification purposes.

10            THE WITNESS:  Identification purposes.

11            THE COURT:  People who have licenses, for example,

12      have New York State ID numbers, all sorts of things?

13            THE WITNESS:  Yes.

14            THE COURT:  Go ahead.

15     Q      If you apply for any civil service or government job,

16   you're going to get --

17     A      If you apply for a civil service job and you were

18   fingerprinted, yes.

19     Q      And as the judge mentioned, if you apply to run a

20   daycare or apply for a security license or firearm license?

21     A      Yes, or a liquor license as well.

22     Q      Any of those situations you can get a NYSID number as

23   it's referred to?

24     A      Yes.

25     Q      Now, in this case, Mr. Melenciano and Mr. Santana were

lr-e                   Det. C. Rodriguez - People - Direct

1    arrested and they had a NYSID number; correct?

2        A    Yes.

3        Q    Each of them.  And is that NYSID number one of the ways

4    in which you were able to check to determine whether they were

5    employed by the police department?

6        A    Yes.

7        Q    And had either one even ever applied to become a member

8    of the police department?

9        A    It did not show up on my computer check.

10       Q    During the course of your investigation did you recover

11   any video surveillance from 2315 Walton Avenue?

12       A    Yes, I did.

13       Q    And when did you recover that?

14       A    On October 18, 2012.

15       Q    What was the answer again?

16       A    October 18, 2012.

17       Q    And how were you able to get it?

18       A    I was able to get it through one of the employees of

19   the building, Eric Figueroa.

20       Q    And what did you do with it once it was obtained?

21       A    I secured it and made a copy of it.

22            MR. MENDYS:  I'm just gonna show you this.  This

23        is People's 4 in evidence.

24            (Whereupon, the referred to item was handed to the

25        witness.)

lr-e                    Det. C. Rodriguez - People - Direct


1     Q     Do you recognize that, Detective?

2     A     Yes.

3     Q     What is that?

4     A     That is a copy of the video I copied, 2315 Walton

5  Avenue.

6     Q     Have you viewed the contents of that video?

7     A     Yes.

8     Q     Did you show it to anybody?  Any of the witnesses?

9     A     Any of the witnesses, no.

10              MR. MENDYS:  I can take that back.

11              (Whereupon, the referred to item was handed to the

12        assistant district attorney.)

13    Q     Now I want to direct your attention to November 22,

14  2012.  Were you working at some point that day?

15    A     Yes.

16    Q     Do you remember what tour you were -- well, what hours

17  you were working?

18    A     I actually was working on November 21st that ran into

19  November 22nd.  I was assigned to the Sandy detail in the

20  Rockaways.

21              THE COURT:  The Sandy?

22              THE WITNESS:  The Sandy hurricane.

23              THE COURT:  Hurricane Sandy, right.

24              THE WITNESS:  Hurricane Sandy.

25    Q     What are your responsibilities as a detail for the

lr-e                    Det. C. Rodriguez - People - Direct

1    storm?

2        A     People were looting actually homes that were abandoned,

3    so we were doing just routine patrol marking sure no one was

4    breaking into any homes or no one was being robbed or, you know,

5    there was no crime occurring while we were patrolling.

6        Q     Now, at some point during your shift that day did you

7    come to learn that Richard Diaz had been taken into custody?

8        A     Yes.

9        Q     Do you recall about when it was that you became aware

10   of this?

11       A     Mr. Diaz was arrested on the 22nd of November.  I'm

12   sorry, on October 22.

13       Q     November 22?

14       A     On, I'm sorry, 11/22.  Sorry, 11/22/2012.  And he was

15   arrested at 1:50 a.m., so I believe it was shortly thereafter I

16   received a notification from my sergeant.

17       Q     Sergeant DeCandido?

18       A     Yes.

19       Q     When you say notification, you just got a phone call?

20       A     Yeah, I got a phone call saying that.

21       Q     What did that mean for you given that an arrest had

22   been made?

23             THE COURT:  There is a lot of, the answers are

24        starting before the question has finished.  Just wait so the

25        reporter can --

1        THE WITNESS:  No problem.

2        THE COURT:  So the end of the question is given.

3    Q    What did that mean for you in terms of your

4    responsibility on the detail?

5    A    That I would be getting my post changed to the arrest.

6    Q    So what did you do once your post was changed and once

7    you became aware of the apprehension?

8    A    I went and responded to the location where Mr. Diaz was

9    being held, which is the 34 Precinct.

10   Q    Where is that?

11   A    I don't know the exact location off the top of my head.

12   Q    Where?

13   A    In Manhattan.

14   Q    What part of Manhattan generally?

15        THE COURT:  Again, you're both -- let the witness

16    answer the one question that you're posing.

17        The 34 Precinct is in Manhattan?

18        THE WITNESS:  Yes.

19        THE COURT:  Do you know the neighborhood roughly?

20        THE WITNESS:  I believe it's the Heights.

21        THE COURT:  Washington Heights?

22        THE WITNESS:  Yes.

23        THE COURT:  Next question.

24   Q    Now who did you -- did you go to pick Mr. Diaz up with

25   anyone?

lr-e                    Det. C. Rodriguez - People - Direct

1      A     Yes.

2      Q     Who did you go with?

3      A     I went with my partner, Detective Bell.

4      Q     Did you perform any other assignments or tasks relating

5   to this case with Detective Bell --

6      A     Yes.

7      Q     -- in the past before November 22, 2012?

8               THE COURT:   Let's withdraw the question and

9        rephrase the question.

10              MR. MENDYS:   Thank you, Judge.

11     Q     Prior to November 22, 2012, had you performed any other

12   tasks with Detective Bell?

13     A     Prior to the investigation?  She's my partner so we

14   work cases jointly.

15     Q     Okay.  Did you work this case jointly?

16     A     Yes.

17     Q     All right.  Now, once you arrived at the 34 Precinct,

18   do you recall where Mr. Diaz was?

19     A     Yes.

20     Q     Where was he?

21     A     He was in the cell area.

22     Q     Was he by himself?

23     A     I don't recall if he was by himself.

24     Q     Was he handcuffed?

25     A     Not in the cell he was not handcuffed.

lr-e                    Det. C. Rodriguez - People - Direct

1      Q      What did you do at that point?

2      A      I took custody of him, put him into my RMP and

3    transported him back to the 108 Precinct so he could be

4    processed.

5      Q      Where is the 108 Precinct?

6      A      It's in Queens.

7      Q      Why did you take him there?

8      A      My office is close to the 108 Precinct.

9      Q      Is it routine for any arrest that you make for it to be

10   done out of the 108?

11     A      Normally we go to the 108 Precinct.

12     Q      Where --

13            THE COURT:   I'm sorry, your particular unit goes

14     to the 108 Precinct?

15            THE WITNESS:   Well, we do as far as processing

16     arrests.   Our unit is citywide so we bring, common practice

17     is usually we bring them to the 108.   We have processed

18     before in other places, but we always usually process in the

19     108 Precinct.

20            THE COURT:   Okay, thank you.

21     Q      Now, once you arrived at the 108 where did you take Mr.

22   Diaz?

23     A      We put him in the cell area.

24     Q      And was he handcuffed when you placed him in that cell?

25     A      When he was in the cell, no, handcuffs were taken off.

1r-e                    Det. C. Rodriguez - People - Direct


1      Q      Mr. Diaz was assigned a NYSID number because of that

2    arrest; correct?

3      A      Yes, he was, sir.

4      Q      Did you do the same computer checks for Mr. Diaz to

5    determine if he was ever employed by the police department?

6      A      Yes, I did.

7      Q      Did you learn anything?

8      A      That he was not employed by the New York City Police

9    Department.

10     Q      At any point in time?

11     A      At any point in time.

12     Q      Did you learn whether he had even applied to be a

13   member of the police department?

14     A      Both of the computer checks were conducted, no.

15     Q      So after placing him in the cell -- well, strike that.

16            About what time would you say you got to the 108

17   Precinct with Mr. Diaz, if you know?

18     A      Approximately 0400 hours.

19     Q      So four in the morning?

20     A      Four in the morning, yes.

21     Q      You mentioned before that you took him to the 108 to

22   process him?

23     A      Yes.

24     Q      What does that mean?

25     A      I obtained his pedigree information.  I put his

1r-e                 Det. C. Rodriguez - People - Direct

1   information in the computer and I get him ready to be, to get

2   ready to sit in the line-up.

3       Q    What's pedigree information?

4       A    Pedigree is name, date of birth, address, height,

5   weight, description of what he was wearing.  All that has to be

6   inputted into the computer as well.

7       Q    Now, you mentioned a line-up.

8       A    Yes.

9       Q    You conducted a line-up in this case?

10      A    Yes.

11      Q    What is a line-up?

12      A    A line-up is an identification procedure that's

13  conducted where the complainant, one of the complainants in this

14  case looks through a one-way mirror where there's gonna be six

15  people.  Out of those six people, one of them is our subject and

16  five of them are fillers.  Each person in that room is looking

17  towards the direction where the mirror is.  They cannot see

18  through the mirror, only the complainant can see through the

19  opposite side.  They're given a number; one, two, three, four,

20  five, six.  Each individual holds one number.  The complainant

21  was able to view line-up, see if she identifies or recognizes

22  anybody.

23      Q    Now, does NYPD issue protocols for conducting a

24  line-up?

25      A    Yes.

lr-e              Det. C. Rodriguez - People - Direct


1     Q     Is there paperwork that you have to complete in
2  conjunction with a line-up?
3     A     Yes.
4     Q     And did you do that in this case?
5     A     Yes, I did, sir.
6     Q     Now, who did you want to view this line-up?
7     A     One of the complainants.
8     Q     Do you recall who specifically?
9     A     Argelia Rosario.
10    Q     Now, how did you get in touch with her about viewing
11 the line-up?
12    A     I just went to her residence.
13    Q     And did you speak to her?
14    A     When I went to her residence, yes, I spoke with her.
15    Q     And what did you tell her about what you wanted her to
16 do?
17    A     I needed, I told her she had to come to my precinct to
18 view a line-up.
19    Q     And did she come with you?
20    A     Yes, she did.
21    Q     Was anyone else with you when you went to go pick her
22 up or meet her at her house?
23    A     Not that I recall.
24    Q     Anyone from NYPD?  Was your partner with you?
25    A     Not that I recall.

lr-e                    Det. C. Rodriguez - People - Direct

1    Q     Did you tell her that you had somebody in custody?

2    A     I told her that she's gonna view it, and I explained

3    what the line-up procedure is to her.

4    Q     Was there -- do you speak Spanish?

5    A     Yes.

6    Q     Do you recall if you were speaking to Miss Rosario in

7    English or Spanish?

8    A     I spoke to her in both.

9    Q     In both?

10   A     In English and Spanish, because she does speak English

11   as well.

12   Q     So you brought her back to the 108?

13   A     Yes, I did, sir.

14   Q     And where did you take her specifically within the

15   precinct?

16   A     I took her upstairs to the detective squad room.  In

17   there they have like a cafeteria there with a door.  I placed her

18   in there, closed the door and then went back to set up the

19   line-up room.

20   Q     Was she by herself in that room?

21   A     I guess she was.

22   Q     Did she come with anybody else?  Bring a friend,

23   something like that?

24   A     No one was with her.

25   Q     No?

1r-e                    Det. C. Rodriguez - People - Direct

1      A      No one.

2      Q      Where was Mr. Diaz when you arrived with Miss Rosario?

3      A      He was still in the cell area on the opposite side of

4   where the room she was placed in.

5      Q      When -- and what about you mentioned fillers had, you

6   obtained the fillers at that point?

7      A      Yes.  My sergeant, Sergeant DeCandido, helped me get

8   the fillers.

9      Q      And where were the fillers from?

10     A      They were actually NYPD personnel.

11     Q      So people from the precinct?

12     A      People from, I guess, also Internal Affairs.

13     Q      So while Miss Rosario was in the cafeteria or waiting

14  area in the 108, would she have had an opportunity to see any,

15  either the defendant, Mr. Diaz, or any of the fillers prior to

16  viewing the line-up?

17     A      No.

18     Q      Now, when you are creating a line-up, what is your goal

19  in obtaining the fillers?

20     A      To have similar characteristics; skin tone, maybe same

21  structure in the face or maybe the same hairline, if we can, but,

22  you know, just similarities.  I'm not looking for an identical

23  twin, I'm just looking for someone that's similar.

24     Q      Okay.  Once you observed the fillers, did you take the

25  fillers and Mr. Diaz in the room where the line-up is conducted?

lr-e                    Det. C. Rodriguez - People - Direct

1      A      Yes.

2      Q      And how -- well, what position was Mr. Diaz placed in?

3      A      Mr. Diaz was asked what position would he like to be

4      seated in.  He selected position number three.

5      Q      Now, the fillers, after Mr. Diaz chose his position,

6      were the fillers instructed to fill in in any particular way or

7      were they just told to have a seat?

8      A      From my memory, I just remember telling them to have a

9      seat.

10     Q      Now, is the line-up, when it's actually viewed, are the

11     people in the line-up, the fillers and the subject, are they

12     standing or sitting?

13     A      They're sitting down.

14     Q      Why is that?

15     A      To make them even height.

16     Q      Okay, so because they're sitting, their head levels are

17     roughly the same?

18     A      Approximately the same, yes.

19     Q      What about are they covered in any way?

20     A      I actually grabbed black garbage bags and placed it

21     over them so the witness, when they view the line-up, they're not

22     distracted by, you know, maybe something, a clothing article or

23     something like that that doesn't take their attention away from

24     looking at each individual's face.

25     Q      Okay.  So once the line-up is ready, did you go get

1r-e                    Det. C. Rodriguez - People - Direct

1    Miss Rosario?

2         A    Yes.

3         Q    And did you provide her with any instructions prior to

4    viewing the line-up?

5         A    Yes.

6         Q    What did you instruct her?

7         A    There was instructions that were read to her that she

8    signed explaining how the interview is conducted.  I also asked

9    her I'll be asking her three questions:  I told her that I'm

10   gonna ask her does she recognize anyone; if she does, what number

11   does she recognize; and from where she does she recognize that

12   person.

13        Q    Okay.  Did you provide these instructions to her in

14   English or Spanish?

15        A    They were actually conducted in Spanish.

16        Q    And did she make an identification?

17        A    I'm sorry?  Yes, she did make an identification.

18        Q    Did you have her fill out any paperwork relating to the

19   line-up?

20        A    I actually had her sign what was read to her and I

21   actually, she signed what number she identified and where she

22   identified that person from.

23        Q    And did you sign it as well?

24        A    Yes, I did.

25        Q    After the line-up was done did -- what did you do with

1r-e                 Det. C. Rodriguez - People - Direct

1   Mr. Diaz, if anything?  Well, where was Mr. Diaz taken -- strike

2   that.

3          Where was Mr. Diaz taken after the line-up was done?

4      A   After the line-up he was actually taken back into the

5   cell area.

6      Q   And do you know why he was taken there?

7      A   That's where he was gonna be until he was transported

8   down to central booking.

9      Q   Now did you participate in any interviews of Mr. Diaz?

10     A   No, I did not.

11     Q   Are you aware of when -- was there an interview of Mr.

12  Diaz?

13     A   Yes, there was.

14     Q   When was that conducted?

15     A   It was conducted at approximately 1100 hours by

16  Detective Bell.

17     Q   And what time was the line-up viewed, if you remember?

18     A   9:50 hours.

19     Q   9:50 in the morning?

20     A   In the morning, yes.

21     Q   So that's when Miss Rosario actually viewed the

22  line-up?

23     A   Yes.

24     Q   So about, can you estimate about how long it takes to

25  prepare a line-up between getting Miss Rosario to the precinct

lr-e            Det. C. Rodriguez - People - Direct

1    and getting the fillers?

2        A    It takes a little bit, you know, make sure -- I don't

3    know, takes 15, 10 to 15 minutes.  Maybe 15, 20 minutes depending

4    on, you know.

5            MR. MENDYS:  I'm going to show you three documents

6        which I'm gonna ask be marked 5, 6 and 7 for identification.

7            THE COURT:  5, 6 and 7 for identification.

8            MR. MENDYS:  Yes.

9            (Whereupon, People's Exhibits 5, 6 & 7 were marked

10       for identification.)

11           COURT OFFICER:  People's 5, 6 and 7 for ID so

12       marked.

13           (Whereupon, the referred to items were handed to

14       the witness.)

15       Q    Detective, do you recognize those three items?

16       A    Yes, I do, sir.

17       Q    And what are they?

18           THE COURT:  Well, they each have numbers for

19       identification now on a sticker on the back.

20       A    Exhibit No. 5 is a photo of Richard Diaz.

21       Q    Okay.

22       A    Exhibit No. 6 is a picture of the line-up, and exhibit

23   No. 7 is also a picture of the line-up.

24       Q    Now with regard to No. 5, is that -- that's a color

25   photograph?

lr-e            Det. C. Rodriguez - People - Direct

1       A     Yes.

2       Q     And is that a fair and accurate reflection of how Mr.

3    Diaz appeared when you took him in custody on November 22, 2012?

4       A     Yes.

5       Q     Did you take that photo yourself?

6       A     No, I did not.

7             MR. MENDYS:  At this point I would -- well, hold

8       on.

9             THE COURT:  You're going to move 5 in?

10            MR. MENDYS:  Yes, I'll move 5 in on its --

11            THE COURT:  Any objection or voir dire?

12            MR. BONANNO:  No objection.

13            THE COURT:  People's 5 is in evidence.  We'll mark

14       it in a minute, okay.  Just hold onto it.  Go ahead.

15      Q     Now, 6 and 7, those are, you said, line-up photos?

16      A     Yes, sir.

17      Q     When were they taken in relation to when Miss Rosario

18   were viewed line-up?

19      A     Prior to the line-up.

20      Q     Did you take those photos?

21      A     I don't recall if I took them or not.

22      Q     Is it a fair and accurate -- are they in color?

23      A     Yes, they are.

24      Q     Is it, are they both a fair and accurate reflection of

25   how the line-up appeared when Miss Rosario viewed it back on

lr-e                Det. C. Rodriguez - People - Direct

1    November 22, 2012?

2        A    Yes.

3               MR. MENDYS:  At this point I would move People's 6

4        and 7 into evidence.

5               THE COURT:  Any objection or voir dire?

6               MR. BONANNO:  I ask for an offer of proof as to

7        the two photos.

8               THE COURT:  Well, there are two photographs,

9        right?  You're asking something more?  You want to voir

10       dire?

11              MR. BONANNO:  To the same incident?  I mean, to

12       the same line-up?

13              THE COURT:  Are you rendering an objection or --

14       I'm not looking for a discussion here.  The offer of proof

15       is that I heard the testimony.

16              These are both photographs of the line-up, right?

17              THE WITNESS:  Yes.

18              THE COURT:  Okay, so.

19              MR. BONANNO:  If I can then voir dire?

20              THE COURT:  You may.

21              MR. BONANNO:  Briefly.

22   VOIR DIRE EXAMINATION

23   BY MR. BONANNO:

24       Q    Detective, there's two photos of the same line-up; is

25   that correct?

lr-e               Det. C. Rodriguez - People - Voir Dire

1      A     Yes, sir.

2      Q     And are they just duplicate photos or two separate

3  photos?

4      A     They are two separate photos.

5      Q     And what would be the purpose of taking two separate

6  photos?

7      A     Well, in Exhibit No. 6 it's straight-on, the photo's

8  taken from the front.  Exhibit No. 7, if you look, it's from an

9  angle.

10     Q     Is that normally done?

11     A     Yes.

12     Q     When doing a line-up?

13     A     Yes.

14            MR. BONANNO:  I have no further questions.

15            THE COURT:  Are you objecting?

16            MR. BONANNO:  No.

17            THE COURT:  All right.  So we will mark right now

18     5, 6 and 7 in evidence.

19            (Whereupon, People's Exhibits 5, 6 & 7 were

20     received in evidence.)

21            COURT OFFICER:  People's 5, 6 and 7 so marked.

22  Cont'd DIRECT EXAMINATION

23  BY MR. MENDYS:

24     Q     I'm gonna show you People's 5 on the monitor behind

25  you, Detective.  Who is this?

1r-e                    Det. C. Rodriguez - People - Direct

1    A     Richard Diaz.

2    Q     And this is No. 6.  What position was Mr. Diaz in?

3    A     He was in position number three.

4    Q     And how did he get there again?

5    A     He chose his own position.

6    Q     And No. 7?

7    A     He's still in position number three.

8    Q     And you said these are taken prior to Miss Rosario

9    viewing the line-up?

10   A     Yes, sir.

11   Q     And none of the fillers or nobody changed positions in

12   between the taking of the picture and the time she viewed it?

13   A     Everything stayed the same, sir.

14   Q     In conjunction with your investigation, did you have to

15   fill out any paperwork in relation to this case?

16   A     Yes.

17   Q     Can you give the jury an example of what type of

18   paperwork you have to fill out?

19   A     We fill out DD5s.

20   Q     What are DD5s?

21   A     Detective Document form number five.

22   Q     And what purpose do they serve?

23   A     They memorialize certain steps in the investigation

24   that you've conducted.

25   Q     Do you know why it's form number five?

lr-e                    Det. C. Rodriguez - People - Direct


1       A       I have absolutely no idea.

2       Q       Have you previously testified relating to this case?

3       A       Yes, I have.

4       Q       In the grand jury?

5       A       Yes, sir.

6       Q       And at a pretrial hearing?

7       A       Yes, I have, sir.

8       Q       Now, recently have you made efforts to locate an

9    individual by name of Joel Rodriguez?

10      A       Yes, I have, sir.

11      Q       Who you indicated you spoke to early on?

12      A       Yes, who I interviewed on October 17th of 2012.

13      Q       And were you able to check recent addresses of Mr.

14   Rodriguez?

15      A       Yes, I checked two recent addresses where he might be

16   located at.

17      Q       And generally speaking, within the city what

18   neighborhoods are those addresses?

19      A       Upper Manhattan.

20      Q       And did you speak to anyone about Mr. Rodriguez?

21      A       I spoke to a former roommate of Mr. Rodriguez.

22      Q       And did that person have any information as to his

23   whereabouts?

24      A       He informed me that Mr. Rodriguez resides currently in

25   New Jersey.  He had gave me no address or telephone number that

1r-e                Det. C. Rodriguez - People - Direct

1    he can be reached.  I provided his roommate with my contact

2    information incase that he comes across Mr. Rodriguez or has

3    someone that knows Mr. Rodriguez they can contact me, and I

4    explained the nature of my visit.

5         Q    Now, have you also spoken to people or spoken to the

6    wife of actually Mr. Yohn Contreras?

7         A    Yes, I have.

8         Q    When did you speak to her?

9         A    I spoke to her on July 17.

10        Q    This past Friday?

11        A    2015, yeah.

12        Q    And where was she located when you spoke to her?

13        A    I spoke to her on the phone.

14        Q    Okay.  Do you know where she resides?

15        A    In Massachusetts, I believe.

16        Q    Is that where Mr. Contreras resides?

17        A    Where he resides, yes.

18        Q    From speaking to her, do you know where Mr. Contreras

19   is right now?

20        A    Yes.

21        Q    Where is that?

22        A    He's in the Dominican Republic.

23        Q    And have you spoken to Mr. Contreras recently?

24        A    Yes, I have.

25        Q    When was the last time you spoke with him?

1r-e                    Det. C. Rodriguez - People - Cross

1      A      Maybe like 1:30.

2      Q      And as far as you know, he's going to be coming back?

3      A      Supposedly coming back.

4      Q      To testify?

5      A      Yes.

6             MR. MENDYS:  Nothing else.

7             THE COURT:  All right, cross-examination.

8             MR. BONANNO:  Just briefly, Judge.

9   CROSS-EXAMINATION

10  BY MR. BONANNO:

11     Q      Good afternoon, Detective.

12     A      Good afternoon, sir.

13     Q      I'm just gonna ask a couple of brief questions.

14            You said there came a point when you ran a NYSID number

15  for Mr. Diaz; is that correct?

16     A      Yes, sir.

17     Q      And those NYSID numbers come from when someone's

18  fingerprinted; is that correct?

19     A      Yes, sir.

20     Q      And if you, if someone had a job as a security guard

21  would they, if you know, have been fingerprinted?

22     A      In theory, if you are fingerprinted and you hold a job

23  license as a security guard, it should show that you are a

24  registered security guard.

25     Q      You did a check to see if Mr. Diaz had ever applied for

lr-e                Det. C. Rodriguez - People - Cross

1    or was ever a New York City Police Officer; is that correct?

2        A    Yes, I did, sir.

3        Q    Did you do a check to see if Mr. Diaz was ever a

4    licensed security guard?

5        A    Based on the check I did, which is called an eJustice

6    check, it gives you numerous information.  It will give us his

7    criminal history, but it will also give you job/licensing

8    information.  The job part will show if he was ever a registered

9    security guard, if he was fingerprinted.  Not to say that you

10   couldn't get a job as a security officer and not be

11   fingerprinted, but what you're asking me for that in particular

12   it would have showed that he was a security guard.

13       Q    But did you do a specific check for that?

14       A    There's no specific, I didn't do a specific check.

15       Q    That's my question.  Thank you.

16            And you ultimately put together a line-up with Mr. Diaz

17   in it; is that correct?

18       A    Yes, sir.

19       Q    And the other five fillers were all New York City

20   Police Officers?

21       A    Yes, sir.

22       Q    Now, you referred to People's 5, which is Mr. Diaz'

23   arrest photo.  Do you have that document?  Maybe you could review

24   it.  If I can approach the witness?

25            (Whereupon, the referred to item was handed to the

1          witness.)

2          Q    And that's exactly how Mr. Diaz looked prior to him

3     entering the line-up?

4          A    Could you just repeat the question?

5          Q    Is that the way Mr. Diaz looked prior to him entering

6     the line-up?

7          A    He didn't have a sweatshirt on during the line-up.

8          Q    You notice anything on his earlobes?

9          A    Yes.

10          Q    It appears to be a pretty prominent earring; is that

11     correct?

12          A    Yes.

13          Q    Do you know if he removed that earring when he entered

14     the line-up?

15          A    Typically, when I conduct a line-up I ask everyone to

16     remove their jewelry, rings or earrings, and in this particular

17     case I honestly don't recall, but based on the photos it looks

18     like Mr. Diaz is not wearing an earring.

19          Q    Is that an enhanced photo of the line-up that we have?

20     Can you take a look at People's 7?

21                    THE COURT:  Is it an enhanced photo?

22                    MR. BONANNO:  Six and 7?

23                    THE COURT:  Did you enhance any photos of the

24          line-up?

25                    THE WITNESS:  I did not.

lr-e              Det. C. Rodriguez - People - Cross

 1               THE COURT:  Okay.

 2               MR. BONANNO:  So I want to show the witness again

 3        6 and 7.

 4               (Whereupon, the referred to items were handed to

 5        the witness.)

 6     Q    Now, I think People's 6 is the straight-on one; is that

 7   correct?

 8     A    Yes, sir, it is.

 9     Q    Are the earlobes of the fillers and Mr. Diaz

10   discernable?

11     A    I'm sorry?

12     Q    Are the earlobes of Mr. Diaz and the other fillers

13   clearly discernable in that picture?

14               MR. MENDYS:  Judge, I'm gonna object.  I think the

15        photo speaks for itself.

16               THE COURT:  No, no, the objection is overruled.

17        As you look at it, can you discern their earlobes?

18               THE WITNESS:  If you ask me if I see an earring

19        here, the answer is I don't see an earring here.  Is it a

20        clear, clear picture?  It doesn't, it's not that clear to

21        me, but from me looking at it there's no earring in here.

22     Q    My question was are their earlobes discernable?

23               THE COURT:  Can you see the earlobes on any or all

24        of the individuals in the line-up?

25               THE WITNESS:  No, you can't see the earlobes on

lr-e            Det. C. Rodriguez - People - Cross

1       everyone, but you could see the ear lobes of Mr. Diaz.

2                   MR. BONANNO:  Judge, I just ask that the witness

3            be --

4                   THE COURT:  Well, no, that's the question you

5            asked, okay.  The answer will stand as you said:  Can you

6            discern the earlobes of the people in the line-up.

7        Q      In People's 7 it's angled in the photo; is that

8    correct?

9        A      Yes, sir.

10       Q      And from what angle, from left to right is that shot or

11   from right to left?

12       A      This shot is from left to right.

13       Q      And in People's 5 where is the earring in Mr. Diaz' --

14   People's 5 is the photo arrest photo.  Where is the earring?

15       A      On the left-hand side.

16       Q      So in People's 7 it's shot from the side that he wasn't

17   wearing the earring?

18       A      Yes.

19       Q      Is that correct?

20       A      Yes.

21                  MR. BONANNO:  I have no further questions, sir.

22                  THE COURT:  Is there any redirect?

23                  MR. MENDYS:  Very briefly.

24                  THE COURT:  Go ahead.

25   REDIRECT EXAMINATION

lr-e               Det. C. Rodriguez - People - Redirect

1    BY MR. MENDYS:

2         Q    Detective, defense just asked you about whether you did

3    any specific checks on a security guard application for Mr. Diaz?

4         A    Yes, sir.

5         Q    During your checks, would an application or a licensing

6    application for Mr. Diaz, would that have appeared had it been

7    done?

8         A    On the eJustice check, yes.

9         Q    And did it appear that Mr. Diaz had ever applied to be

10   a licensed security guard?

11        A    Based on that check, no.

12        Q    Are you able, is a person able to become a security

13   guard without obtaining a license?

14        A    Yes.

15             MR. BONANNO:  Objection.

16             THE COURT:  Overruled.

17             THE WITNESS:  Can I answer?

18             THE COURT:  The answer will stand.  I don't know

19        if the jury heard.

20             THE WITNESS:  Yes, someone can be a security guard

21        without being fingerprinted.

22             MR. MENDYS:  Nothing else.

23             THE COURT:  Any re-cross?

24             MR. BONANNO:  Nothing.

25             THE COURT:  Okay.  Thank you.  You can step down.

1          (Whereupon, the witness was excused.)

2          THE COURT:  We can take a five-minute recess, of

3    course.  Members of the jury, we'll take a five-minute

4    recess before the next witness.  Just you'll go back to the

5    back room.  Don't discuss the case.  Keep an open mind.  As

6    soon as you are all ready, we'll call you back.

7          COURT OFFICER:  Jury exiting.

8          (Whereupon, the jury exited the courtroom and

9    there was a brief recess taken.)

10          COURT OFFICER:  Ready, Judge?

11          THE COURT:  Yes.

12          COURT OFFICER:  Jury entering.

13          (Whereupon, the jury entered the courtroom.)

14          THE CLERK:  The sworn jury is present and properly

15    seated.

16          THE COURT:  All right.  Good afternoon, again,

17    members of the jury.

18          Mr. Mendys, you may call your next witness.

19          MR. MENDYS:  People call Detective Ana bell.

20          COURT OFFICER:  Witness entering.

21          (Whereupon, the witness entered the courtroom and

22    took the witness stand.)

23    DETECTIVE   A N A   B E L L,  Shield No. 1504, New York City

24       Police Department, Internal Affair Bureau, called as a

25       witness on behalf of the People, having been first duly

lr-e          Det. A. Bell - People - Direct

1           sworn, was examined and testified as follows:

2                    COURT OFFICER:   Take a seat, please.   In a loud,

3           clear voice state your full name, shield and command for the

4           record.

5                    THE WITNESS:   My first name is Ana, last name is

6           Bell.   My shield number is 1504, and I work for the New York

7           City Police Department Internal Affairs Bureau.

8                    THE COURT:   Mr. Mendys, may inquire.

9                    MR. MENDYS:   Thank you, Judge.

10   DIRECT EXAMINATION:

11   BY MR. MENDYS:

12        Q     Good afternoon, Detective.

13        A     Good afternoon.

14        Q     How long have you been with the police department?

15        A     Approximately 14 years.

16        Q     And can you tell the jury about your various

17   assignments?

18        A     I was in the police academy, and after the police

19   academy I was assigned to the 9th Precinct, which is the East

20   Village in Manhattan.   And I got transferred to the Internal

21   Affairs Bureau where I worked in the command center where people

22   call to make complaints against officers, civilian complaint

23   reports, misconduct.   And then from the command center I then

24   worked for the Police Impersonation Unit, which is also a unit

25   within the Internal Affairs Bureau.

lr-e          Det. A. Bell - People - Direct


1     Q     Now, how long have you been a detective?

2     A     Four years now.  Approximately four years.

3     Q     And what were, where do you currently work?  What is

4     your current assignment?

5     A     I actually work in the Internal Affairs Bureau still

6     but I'm in an administrative position now, and what I do is we

7     read complaints that are called in and we figure out where

8     exactly it needs to go and what group investigates it.

9     Q     Now, where are you from originally?  Where did you grow

10    up?

11    A     I grew up in Brooklyn.

12    Q     You married?

13    A     No.

14    Q     Do you have any kids?

15    A     I have two boys.

16    Q     And how far did you go in school?

17    A     I was close to a bachelor's degree.

18    Q     Did you have any other jobs prior to joining the police

19    department?

20    A     I did.  I worked in early childhood education and

21    that's where I had my associate's degree.  And I then started the

22    New York City Police Department as a school safety agent.

23    Q     So I want to direct you specifically to November 22nd

24    of 2012.  Were you working out of the Police Impersonation Unit

25    back then?

lr-e          Det. A. Bell - People - Direct

1        A     Yes, I was.

2        Q     And around that time, as of that time how long had you

3    been in the impersonation unit?

4        A     I would say approximately maybe six to maybe a year.

5        Q     Six months to a year?

6        A     Yeah.  I'm sorry, maybe about, maybe six months.

7        Q     Did you -- that day were you working?

8        A     I was, yes.

9        Q     Do you recall what your hours were?

10       A     I remember that year, I don't know if you guys

11   remember, it was Sandy, the storm.  I was actually assigned to a

12   detail the night prior which took me into the 22nd, which was

13   when the defendant was arrested.

14       Q     Were you working that detail with Detective Chris

15   Rodriguez?

16       A     Yes, sir.

17       Q     Now, on that day in the early morning hours of the

18   22nd, were the two of you notified about the arrest of an

19   individual named Richard Diaz?

20       A     Yes.

21       Q     And was that related to a case that you were assisting

22   Detective Rodriguez in investigating?

23       A     That is correct.

24             MR. MENDYS:  Now, this is People's 5.

25             (Whereupon, the referred to exhibit was displayed

lr-e          Det. A. Bell - People - Direct

1        on the ELMO.)

2        Q     Do you recognize that person?

3        A     Yes.

4        Q     Who is that?

5        A     That's Richard Diaz.

6        Q     Once you and Detective Rodriguez were notified of his,

7    of his arrest, what did you do?

8        A     We reported to the 34 Precinct.

9        Q     And why did you go there?

10       A     To transport Richard Diaz to the 108.

11       Q     Now once he was transported to the 108, what were your

12   responsibilities in relation to this case?

13       A     I was going to debrief Richard Diaz.

14       Q     You were going to try to talk to him?

15       A     Yes, at the 108.

16       Q     So around 11 a.m. at the 108 Precinct in the morning of

17   November 22nd, did you, in fact, attempt to speak to Mr. Diaz?

18       A     Yes, sir.

19       Q     Now, prior to attempting to speak to him, where was he

20   within the 108?

21       A     He was, I believe he was on the first floor.  The squad

22   hadn't opened up yet because it was so early in the morning that

23   when we took him, we had to lodge him in one of the cells on the

24   first floor in the 108 Precinct.

25       Q     When he's in the cells is he handcuffed?

lr-e          Det. A. Bell - People - Direct

1    A     No.

2    Q     Was there anyone else in the cell with him, if you

3    remember?

4    A     I don't remember.  I can't remember.

5    Q     Was he in that cell up until approximately 11 a.m. when

6    you went to speak to him?

7    A     That's correct, we then took him upstairs to the squad.

8    Q     Where within the squad did you take him?

9    A     We took him to a debriefing room.

10   Q     When you say the squad, what is that?

11   A     It's the -- I'm sorry, it's the 108 Precinct detective

12   unit.

13   Q     It's just a separate floor?

14   A     Yes, it's actually on the second floor.

15   Q     And what does -- the room where you placed him, what,

16   can you describe what it looks like?

17   A     It's a small room.  It has a small table, smaller than

18   that table.  There is a bench against the wall.

19   Q     You're referring to?

20   A     I'm sorry, I'm referring to this table here.  Actually

21   a table the size that this young woman is sitting at.

22   Q     The court reporter?

23   A     Yes.

24              THE COURT:  And you could readback "young woman".

25         Approximately five?

lr-e        Det. A. Bell - People - Direct

1                THE WITNESS:  About three feet.

2                THE COURT:  Thank you.

3                THE WITNESS:  Yeah, about three feet.  And then

4      against the wall is a bench and then there's two chairs.

5      Q     How big is the room in total?

6      A     It's tiny.  It's a small room, maybe 10 by 10.  It's a

7      pretty small room.

8      Q     So prior to taking Mr. Diaz there, did you ever inquire

9      about whether he wanted anything to eat?

10     A     Yes, we did.

11     Q     Did he have anything to eat during this stay?

12     A     He did.  I remember he wanted a sandwich.  I don't

13     remember exactly what type of sandwich he wanted because it was

14     such a long time ago, but I do recall he had a sandwich and a

15     beverage.

16                THE COURT:  Hold on, I just want to wait until the

17         question has finished completely because the court

18         reporter's not able to get everything down, okay?

19                THE WITNESS:  Okay.

20                THE COURT:  Go ahead.

21     Q     Did you allow him to use the facilities?

22     A     Yes.

23     Q     Did you -- I'm sorry, one moment.

24                So once he was brought to the room within the detective

25     squad with the small table and two chairs and the bench, how does

lr-e          Det. A. Bell - People - Direct

1    -- can you explain to the jury how you go about speaking to him

2    or trying to speak to him?

3         A     When we bring someone to the debriefing room we don't

4    have our firearm.  It's a safety thing for us as well as the

5    defendant.  We had asked him if he needed to use the restroom

6    again prior to speaking to him, and before we can speak to him we

7    read Miranda warnings.

8         Q     Now when you were speaking to Mr. Diaz, were you

9    speaking to him in English or in Spanish?

10        A     In Spanish.

11        Q     Do you speak Spanish?

12        A     Yes.

13        Q     How long have you spoken Spanish?

14        A     A long time.  My mom taught me how to speak Spanish.

15        Q     Did you speak Spanish in the home growing up?

16        A     That was my first language, actually.  I went into

17   kindergarten not speaking English.

18        Q     And do you continue to speak Spanish now?

19        A     I do.

20        Q     So now you indicated that you read him his rights, his

21   Miranda Rights?

22        A     Yes, sir.

23        Q     And what do you read those from, a form or do you read

24   them from memory?

25        A     I read them from a form.

lr-e        Det. A. Bell - People - Direct

1    Q    And is that, was that form read to him in Spanish?

2    A    In Spanish, yes.

3    Q    So is it fair to say that every word you said to him

4    was in Spanish?

5    A    Yes.

6    Q    Prior to actually reading his rights, did you tell him

7    what he wanted to talk to him about or what he was there for?

8    What you --

9    A    No.  We told him that we needed to read him his Miranda

10   Warnings before we can speak and discuss the case.

11   Q    So you read him his rights, and can you explain to the

12   jury how it is that you get a response from him about whether he

13   understands his rights?

14   A    Okay.  Once I, I read the questions in Spanish and I

15   asked for the defendant to verbally say yes or no.  It's not

16   enough to nod or to nod yes or shake your head no.  I needed to

17   understand verbally that he says yes, I understand.  And if he

18   had any questions, to please stop me so I can further explain the

19   question.

20   Q    Now is that something you did after each question?

21   A    After each.

22   Q    After each right you advised him?

23   A    Right.  After I would read each question individually,

24   I would wait for a verbal response of yes or no.  I would

25   document his response, which was yes.  At the end of the last

lr-e            Det. A. Bell - People - Direct

1   question I asked him if he understood the prior questions and he

2   signs the document, I sign and print my name as well.

3        Q      And what as well?

4        A      I sign and print my name as well.

5        Q      Do you write down the fact, in any way the fact that he

6   understands the rights?

7        A      Yes.

8        Q      How so?

9        A      I would print yes after each question.

10       Q      Now did he, at any point while you were advising him of

11  his rights, indicate that he didn't understand anything?

12       A      No.

13       Q      Did he ask you any questions about his rights?

14       A      No, he didn't.

15       Q      And at any point up until this point did he ever ask

16  for a lawyer?

17       A      No.

18              MR. MENDYS:  I'm going to ask this be marked No. 8

19        for identification.

20              THE COURT:  People's 8 shown to defense counsel,

21        and we will mark this for identification.

22              (Whereupon, People's Exhibit 8 was marked for

23        identification.)

24              COURT OFFICER:  People's 8 for ID so marked.

25              (Continued on the next page...)

F mc

Det. Bell - People - Direct

1    Q.    Detective, do you recognize that document that's been

2  handed to you?

3    A.    I do.

4    Q.    What is that?

5    A.    The Miranda warnings that I read defendant Richard

6  Diaz.

7    Q.    Does your signature appear on that?

8    A.    Yes, sir.

9    Q.    Does Richard Diaz's signature appear on that?

10    A.    Yes.

11    Q.    And those rights are in Spanish?

12    A.    Yes.

13    Q.    Is that the original?

14    A.    Yes.

15    Q.    Is there anything different about it now than when

16  you -- than after the two of you signed it?

17    A.    No.

18          MR. MENDYS:  At this point I would ask that it

19      be -- I would offer it into evidence as People's 8.

20          THE COURT:  Any objection?

21          MR. BONANNO:  If I can just briefly voir dire?

22          THE COURT: Voir dire?

23          MR. BONANNO: Yes.

24          THE COURT:  Of course.

25          THE WITNESS: I apologize, I need my glasses.

F mc

Det. Bell - People - Voir Dire

1          MR. BONANNO:  I know the feeling.

2          THE WITNESS: Okay, yes, sir.

3    VOIR DIRE EXAMINATION

4    BY MR. BONANNO:

5          Q.   So now you have your glasses?

6          A.   I have my glasses, I'm sorry.

7          Q.   You can better review that document in front of you, is

8    that correct?

9          A.   Yes.

10         Q.   The signature, Mr. Diaz's, that appears on that

11   document, did he sign that in your presence?

12         A.   Yes, sir.

13         Q.   And was there anyone else there when he signed that

14   document?

15         A.   Sergeant Dicandido was.

16         MR. BONANNO:  I have no objection, Judge.

17         THE COURT: It's in evidence without objection.

18   We'll mark it into evidence as People's 8.

19             (Whereupon, the item previously marked for

20        identification is received and marked People's Exhibit

21        Number 8 in evidence.)

22   DIRECT EXAMINATION (CONTINUED)

23   BY MR. MENDYS:

24         Q.   Now those rights are in Spanish as they appear on

25   People's 8, correct?

F mc

Det. Bell - People - Direct

1    A.   Yes, sir.

2    Q.   If you can, I would like for you to read the rights

3  into the record, and for the jury, in English?

4    A.   Okay.

5    Q.   From what you read based on People's 8?

6    A.   Okay.  You have the right to remain silent.  You have

7  the right to remain silent and not answer questions, do you

8  understand?

9          Question Number Two, anything you say can be used

10  against you in a court of law.  Do you understand?

11          You have the right to consult with an attorney before

12  speaking to the police and to have a lawyer present during any

13  question or interrogation now or in the future.  Do you

14  understand?

15          Question Number Four, if you do not have the money to

16  pay for a lawyer, one will be appointed to you without cost.  Do

17  you understand?

18          Question Number Five, if you have a lawyer at your

19  disposition, you have the right to remain silent until one can be

20  obtained for you.  Do you understand?

21          Question Number Six, now that I have explained your

22  rights, do you want to answer questions?

23          MR. MENDYS: Okay, can I have that document,

24    please.  This is People's 8.

25          (Exhibit displayed.)

123

F mc

Det. Bell - People - Direct

1   Q.   Now to the -- after each question there's a "Yes"

2   written.   There's a "Yes" written, correct?

3   A.   Correct.

4   Q.   Did you write that yes or did he?

5   A.   I wrote it.

6   Q.   And that was written after you read each right to him?

7   A.   Yes.

8   Q.   And then we see on the bottom his signature, Richard

9   Diaz?

10   A.   Correct.

11   Q.   And then your signature and your printed name, correct?

12   A.   Yes.

13   Q.   Now the date and time that is written up here at the

14   top, right corner, is that your handwriting?

15   A.   That's me.

16   Q.   Was anyone else sitting in with you during the course

17   of this interview?

18   A.   Sergeant Decandido was.

19   Q.   He was there for the administration of rights?

20   A.   Yes.

21   Q.   As well as the statement itself?

22   A.   Yes.

23   Q.   And does -- to your knowledge, does Sergeant Decandido

24   speak Spanish?

25   A.   No.

124

Det. Bell - People - Direct

1    Q.    So did Mr. Diaz agree to make a statement?

2    A.    Yes, he did.

3    Q.    And at any point did he ever ask for an attorney?

4    A.    No.

5    Q.    At any point did he refuse to answer questions?

6    A.    No, he didn't.

7    Q.    At any point did he even say, "I want to think about

8    this?"

9    A.    No.

10   Q.    Did you ever have to take a break?

11   A.    No.

12   Q.    Now you indicated before that you gave him a sandwich,

13   let him use the bathroom.  Did you document any of that anywhere?

14   A.    Yes.

15   Q.    Where would you do that?

16   A.    It's a complaint follow-up report that I prepared.

17   Q.    Also known as a DD5?

18   A.    Yes.

19   Q.    Now at any point during your questioning of Mr. Diaz

20   did you ever threaten him?

21   A.    No.

22   Q.    Did you ever lay hands on him?

23   A.    No.

24   Q.    Did you ever promise him anything in exchange for a

25   statement?

F mc

Det. Bell - People - Direct

F mc

1      A.    No.

2      Q.    Okay, and when Mr. Diaz made his statement, can you

3  describe for the jury, was it -- did you just let him talk, was

4  it a question and answer like an interview?

5      A.    There was an interview, we asked him to explain what

6  happened that day, which he did.

7      Q.    And the interview was conducted in Spanish?

8      A.    Yes, it was.

9      Q.    Now did you -- during the course of your interview did

10  you ever offer him the opportunity to write a statement for

11  himself?

12      A.    Yes.

13      Q.    And did he agree to do that?

14      A.    No, he didn't want to write a written statement.

15      Q.    Did you ever document the statement that he made to

16  you?

17      A.    I did.

18      Q.    And when did you do that?

19      A.    The next day, on the 23rd.

20      Q.    And how did you document it?

21      A.    I prepared the DD5.

22      Q.    Did you take any notes during the course of this

23  statement?

24      A.    No, I didn't.

25      Q.    So when you created -- when you prepared the DD5 the

F mc

Det. Bell - People - Direct

1  following day, that was from memory?

2      A.   Yes, sir.

3      Q.   And since it was the next day Mr. Diaz never had an

4  opportunity to review it?

5      A.   No.

6      Q.   Now the statement that you typed --

7      A.   Yes.

8      Q.   -- was it something -- was it word for word what he

9  said or was it a summary?

10     A.   It's a summary.

11          MR. MENDYS: Okay, at this point I'm going to ask

12     that this be marked People's 9 for identification.

13          THE COURT:  It's been shown to defense counsel.

14     We'll mark it for ID, and then show it to the witness.

15          (Whereupon, the item referred to is marked

16     People's Exhibit Number 9 for identification.)

17          (Exhibit handed to the witness.)

18     Q.   Detective, do you recognize that document?

19     A.   Yes.

20     Q.   What is it?

21     A.   It's the complaint follow-up informational report, also

22  known as a DD5.

23     Q.   And what specifically does that DD5 relate to or what

24  are its contents?

25     A.   It's the interview that I conducted with the defendant

127

F mc

1  Richard Diaz.

2  Q.   And is it the same one that you typed out back on
3  November 23rd of 2012?

4  A.   Yes.

5  Q.   Aside from the redactions that are included, is there
6  anything different about it?

7  A.   No.

8  MR. MENDYS: At this point I would move it into
9  evidence as People's 9, subject to the redactions that were
10  agreed upon by the Court and the People and defense.

11  THE COURT: It's already redacted, correct?

12  MR. MENDYS:  Yes.

13  THE COURT: Is there any objection to it coming
14  into evidence?

15  MR. BONANNO:  No, Judge.

16  THE COURT: All right, before it's marked, I just
17  want to explain to the jury a redaction is basically -- I
18  have made legal rulings outside your presence in this case
19  and part of those rulings in terms of this document involve
20  taking words and covering them over, which is a redaction.
21  There's a legal reason for it.  You're not to speculate as
22  to why that happened and you're not to speculate about what
23  has been redacted.  In other words, that is not available
24  for you to look at.  You're only to consider what's not
25  redacted.

F mc

128

Det. Bell - People - Direct

1        Let's mark it as People's 9.

2              (Whereupon, the item previously marked for

3        identification is received and marked People's Exhibit

4        Number 9 in evidence.)

5              MR. MENDYS:  If you can provide it back to the

6        witness, please.

7              (Exhibit handed to the witness.)

8        Q.    Detective, I would ask for you to read the statement

9   that Richard Diaz made to the jury, please?

10       A.    The defendant Richard Diaz stated that he has been

11  friends with Lappy for a year and a half and has been friends

12  with Homeboy for over five years.  He stated that on the date of

13  incident he was in Homeboy's vehicle and that Homeboy was talking

14  to another unidentified male nicknamed Hombre.  The defendant

15  stated that Homeboy and Hombre --

16             THE COURT:  Slow down.

17       A.    Homeboy and Hombre knew that the victim had money on

18  him.  The defendant stated he thought the victim had three

19  thousand dollars and it was going to be used by the victim to

20  purchase narcotics.  The defendant stated he believed that Hombre

21  knew the victim.  He stated that he did not know any of the

22  victims and that it was Homeboy's idea to go to the incident

23  location.  The defendant stated that he had a security shield

24  around his neck affixed to a beaded chain on the date and time of

25  the incident.  The defendant stated that he was employed as a

F mc

Det. Bell - People - Direct

1  security guard for a few months and had kept the shield in

2  Homeboy's car.  The defendant stated that when he saw the police

3  drive up, he turned, walked quickly away from the location and

4  threw the shield under a vehicle on Walton Avenue.  When he was

5  asked if he or any of the aforementioned defendants have

6  impersonated police officers in the past to commit other crimes,

7  the defendant responded no.  The defendant declined to make a

8  written statement.

9       Q.   Now the date and time -- you referred in the statement

10 to the date of incident?

11      A.   Yes, which is November 22, 2012.

12      Q.   Well the date of the incident was before then?

13      A.   Yes.

14      Q.   Do you recall the specific date of the incident for

15 this case?

16      A.   I don't.  I don't recall, I'm sorry.

17      Q.   Would anything refresh your recollection?

18      A.   I guess if I see the original log that came in.

19      Q.   How about a 61?

20      A.   That's -- that's enough.

21           (Document handed to the witness.)

22      A.   Thank you.

23      Q.   Does that refresh your recollection, Detective?

24      A.   Yes.

25      Q.   And what was the date of incident?

F mc

Det. Bell - People - Cross

1      A.    It was October 17th of 2012, on a Wednesday, at 12, I

2  apologize, 12:14 a.m.

3      Q.    Okay.  Aside from this statement, did you complete any

4  other paperwork relating to this case?

5      A.    No.

6      Q.    Did you ever testify in the grand jury related to this

7  case?

8      A.    No.

9      Q.    But you did testify in a pre-trial hearing, correct?

10     A.    Yes, sir.

11            MR. MENDYS:  Nothing else.

12            THE COURT:  Cross-examination?

13            MR. BONANNO:  Yes, Judge, briefly.

14  CROSS-EXAMINATION

15  BY MR. BONANNO:

16     Q.    Detective, I'm going to ask you a few questions and if

17  you don't understand, let me know.

18     A.    Yes.

19     Q.    I'll try and rephrase them.

20            Detective, you said you spoke to Mr. Diaz in Spanish,

21  is that correct?

22     A.    That's correct.

23     Q.    Now help me with a little understanding of the Spanish

24  language.  Is it correct that in Spanish certain words can have

25  different meanings?

F mc

131

Det. Bell - People - Cross

1   A.   That is correct.

2   Q.   So -- and certain articulations of the Spanish language

3   has certain dialects, is that correct?

4   A.   That's correct.

5   Q.   So is there something specific to people who are born

6   in the Dominican Republic as opposed to people who are born in

7   Puerto Rico?

8            MR. MENDYS:  Objection.

9            THE COURT:  Well to the form of the question,

10   yes.  I'm not sure what the question is.

11           MR. BONANNO: I'll rephrase the question.  I'll

12   withdraw that and rephrase the question.

13   Q.   Would there be different meanings comprehended from the

14   same words spoken by someone of a Dominican ancestry as opposed

15   to someone from a Puerto Rican ancestry?

16   A.   There's a possibility.

17   Q.   That there might be some conflicting meanings?

18   A.   Sometimes.

19   Q.   And the type of Spanish that you know, is it Dominican

20   based, Puerto Rican based, what type of Spanish is that?

21   A.   My parents were from Puerto Rico.

22   Q.   So do you know the nationality of Mr. Diaz?

23   A.   I know he's Dominican.

24   Q.   So he was speaking a Dominican Spanish?

25   A.   He was --

F mc

Det. Bell - People - Cross

1          MR. MENDYS:  Objection.

2    A.   -- he was speaking a Spanish --

3          THE COURT:  No, overruled.  And let the

4    answer -- she's giving an answer.  Go ahead.

5    A.   I understood him.  If I could just explain a little

6    bit?  I understand what you're saying.  If that's okay?

7          THE COURT:  Yes, go ahead.

8    A.   I am Puerto Rican, but being in a citywide unit as the

9    Police Impersonation, we're exposed to Dominican, Mexican,

10   everything, everything you could possibly imagine.  And the

11   defense attorney is correct, the dialogue is different, but you

12   grow up in New York, you really do adapt to the different

13   meanings that certain words might have.  So that's the

14   explanation.  I did understand what he was saying.  I believe, to

15   my knowledge, that we both understood each other.

16   Q.   You understood what he was saying?

17   A.   I did.  And I also did explain to him if there was at

18   any point, any time that he didn't understand what I was saying,

19   to please interrupt me and tell me and I would explain it

20   further.

21   Q.   Did you ask Mr. Diaz what level of education he had

22   attained?

23   A.   No, sir, I didn't.

24   Q.   Did he appear to you to be a well educated --

25         MR. MENDYS:  Objection.

F mc

Det. Bell - People - Cross

1      THE COURT: Sustained.

2    Q.   Did he appear to you that he had an advanced degree?

3      MR. MENDYS:  Objection.

4      THE COURT: Sustained.

5    Q.   When you -- you're not a certified Spanish instructor?

6    A.   No, sir, I'm not.

7    Q.   And you memorialized this statement that is in as

8  People's 9 the day after this interview?

9    A.   Yes, sir.

10   Q.   And you took no notes?

11   A.   No, sir, I didn't.

12   Q.   And you did this all from memory?

13   A.   Yes, sir.

14   Q.   Now he signed the Miranda card, is that correct?

15   A.   Yes, sir.

16   Q.   But he wouldn't sign a statement?

17   A.   No, he did not want to write a statement.

18   Q.   And had he wanted to sign a statement, would you have

19  done it that night?

20      MR. MENDYS:  Objection.

21      THE COURT:  Had he wanted to, would he have had an

22   opportunity to when she gave the Miranda warnings that day?

23      MR. BONANNO:  Yes.

24      THE COURT:  No, the objection is overruled.

25   A.   I'm sorry, ask the question again?

F mc

Det. Bell - People - Cross

1   Q.   Had he wanted to sign a statement, he said, "Yeah, I'll

2   sign a statement," when would you have done that?

3   A.   We would have done it that day if in fact he wanted to

4   write a statement.   When we ask a defendant if they want to write

5   a statement, it's just to give them the opportunity to write

6   their story and make sure that there's no confusion or

7   misunderstandings.   He chose not to write a statement.

8   Q.   Would it have been in his handwriting?

9   A.   Yes, it would have been in his handwriting.

10  Q.   Or would it have been something you typed and that he

11  signed?

12  A.   No, it would have to be something that he writes in his

13  handwriting and at the end of the paper we would put a line

14  across to make sure that no one adds anything and that's

15  something he would sign with his signature, date it, time, and I

16  would sign underneath his signature.

17  Q.   So he did sign the Miranda card, but he didn't want to

18  sign a statement?

19  A.   He did not write a statement.

20  Q.   Did you at any point show him this statement that you

21  wrote?

22  A.   No, sir.

23  Q.   So it's fair to say that Mr. Diaz never got an

24  opportunity to review this statement?

25  A.   No, sir, he never saw it.   I typed that the next day.

F mc

Det. Bell - People - Cross

1    Q.    Now it says in this statement that defendant thought --

2  stated he thought the victim had three thousand dollars.  Do you

3  know how he learned that information?

4    A.    If I recall correctly, I believe that one of the other

5  defendants had stated to him or he had heard a conversation

6  stating that this person had three thousand dollars.

7    Q.    Did he ever tell you that he was going into this

8  location to assist these -- Lappy and Homeboy to rob somebody?

9    A.    No, he didn't, he said that he was present.

10    Q.    But he never said he specifically went there to assist

11  Lappy and Homeboy to rob somebody?

12    A.    No, he never said that.

13    Q.    Do you know -- did you ever get an opportunity to speak

14  with a woman by the name of Esmeraldi Rodriguez?

15    A.    No, I don't recall.

16    Q.    Do you know if she was one of the witnesses to this

17  incident?

18    A.    I guess, yeah.

19    Q.    Either you know or don't?

20    A.    I don't remember.  Such a long time.  I remember

21  Richard Diaz, I don't remember the victims, I apologize.

22                    MR. BONANNO:  I have no further questions, Judge.

23                    THE COURT: Any redirect?

24  REDIRECT EXAMINATION

25  BY MR. MENDYS:

F mc                      Det. Bell - People - Redirect

1      Q.   Did Mr. Diaz provide you a reason why he didn't want to

2   write a statement?

3      A.   He didn't, no.  He just didn't want to make a written

4   statement.

5      Q.   There could be any number of reasons why he didn't want

6   to make a written statement?

7                MR. BONANNO:  Objection.

8                THE COURT:  Objection sustained.

9                He just said he didn't want to, right?

10                THE WITNESS:  He didn't want to write a statement.

11                MR. MENDYS:  Nothing else.

12                THE COURT:  Any recross?

13                MR. BONANNO:  Nothing, Judge.

14                THE COURT: Thank you, Detective, you can step

15       down.

16                THE WITNESS: Thank you, everyone.

17                (Witness excused.)

18                THE COURT: Could I ask the lawyers to approach

19       briefly?

20                (Whereupon, there was a discussion held off the

21       record, at the bench, among Court and Counsel.)

22                (Whereupon, the following takes place on the

23       record, in open court:)

24                THE COURT:  All right, so that concludes the

25       presentation of evidence for today.

F mc

Proceedings

1    I'm going to ask you to return tomorrow morning at

2    eleven a.m. to Room 601.  Somebody there will bring you down

3    as soon as -- I hope that we are ready at eleven as well,

4    and I expect to be, but go there first, like you have been

5    doing all along.

6    Have a nice night.  Try and keep cool.  Follow my

7    recess instructions.  Keep an open mind.  Do not discuss the

8    case or anything about it with each other or anyone else.

9    And I'll see you tomorrow morning.  Okay.

10   (Whereupon, the jurors exit the courtroom.)

11   THE COURT:  So the jury has left.  As I understand

12   it, it's Miss Rosario tomorrow, and that will be it?

13   MR. MENDYS:  That is my plan.

14   THE COURT:  Okay.

15   MR. MENDYS:  Crime Victims has been in touch about

16   getting her.  The last I spoke to her, she told me she

17   believed the earliest she could be here is around eleven.

18   The first bus is at eight a.m.

19   THE COURT:  She's coming by bus?

20   MR. MENDYS:  Yes.

21   THE COURT:  But bus to the Bronx?

22   MR. MENDYS:  My guess is that it will go to Port

23   Authority.

24   THE COURT:  My question is you expect her to be

25   getting off a bus at eleven or in your office by eleven?

F mc

137a

Proceedings

1    MR. MENDYS: I think she will be in my office at

2    eleven.

3    THE COURT: And there's no other arrangements your

4    office can make to get the witness here?

5    MR. MENDYS: The witness has done this on her own

6    many times.

7    THE COURT: Okay.

8    MR. MENDYS: Crime Victims has made arrangements

9    with her.

10    THE COURT: All right, I'll see you tomorrow.

11    (Trial adjourned to Tuesday, July 21, 2015.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    SUPREME COURT OF THE STATE OF NEW YORK.
      BRONX COUNTY : CRIMINAL TERM : PART 98
 2    --------------------------------------x
      THE PEOPLE OF THE STATE OF NEW YORK
 3
            -against-
 4                                        Ind. No.
      RICHARD DIAZ,                       3349-2012
 5
                        Defendant.
 6    --------------------------------------x
                                          265 East 161 Street
 7                                        Bronx, New York 10451
                                          JULY 21, 2015
 8
      B E F O R E:
 9
                  THE HONORABLE RALPH FABRIZIO
10                Justice of the Supreme Court

11                (Appearances same as previously noted.)

12                                        LAURA ROSEN
                                          SENIOR COURT REPORTER
13
            *       *       *       *       *       *       *       *
14                (Whereupon, the following took place in open court

15          in the presence of the Court, defense counsel, and the

16          assistant district attorney.)

17                THE CLERK:  Come to order.  At this time Part 98

18          is in session.  The Honorable Ralph Fabrizio is presiding.

19                Calling the case on trial, number two on the

20          calendar, the People of the State of New York versus Richard

21          Diaz.  This is under indictment 3349 of 2012.  This case is

22          being called outside the presence of all sworn jurors, and

23          the defendant is not present.

24                Appearances.

25                MR. MENDYS:  Newton Mendys for the office of the
```

1           district attorney.  Good morning.

2                   MR. BONANNO:  Good afternoon, your Honor.  Pat

3           Bonanno for Mr. Diaz.

4                   THE COURT:  Good afternoon.  It is now five after

5           12 and we're getting started at this time because Juror No.

6           3, Mr. Davis, just arrived, although other jurors were

7           certainly late and they were told to be here 11 o'clock.  He

8           is more than an hour late.

9                   I will speak with him, not at this moment because

10          I'd like to get the witness on the stand, but I do want to

11          speak to him before the end of the day to understand how we

12          can better contact him, and vice-versa, because this can't

13          really happen.

14                  Is there any record anyone wants to make at this

15          time?

16                  MR. MENDYS:  No, Judge.

17                  MR. BONANNO:  Not at this time.

18                  THE COURT:  And Mr. Diaz continues not to be

19          present, and my understanding is no one knows where he is.

20                  MR. MENDYS:  That is correct.

21                  MR. BONANNO:  That is correct.

22                  THE COURT:  Okay.  And this next witness is going

23          to be testifying through a Spanish interpreter.  I'm going

24          to explain that to the jury before the witness actually

25          comes in the room, but we can bring the jurors in as soon as

1r-a                         Proceedings

1         they're ready to come out.

2                      COURT OFFICER:  Jury entering.

3                      (Whereupon, the jury entered the courtroom.)

4                      THE CLERK:  Let the record reflect that all sworn

5         jurors are present and properly seated.

6                      THE COURT:  And please turn off all of your cell

7         phones and electronic devices, and good afternoon, members

8         of the jury.  We are going to continue proceeding with the

9         DA's case.  The next witness I want to advise you will be

10        testifying through an official court interpreter.  Can I ask

11        you to put your name on the record, please?

12                     THE INTERPRETER:  Yes, your Honor.  Good morning,

13        jurors.  My name is Maria Fabricio.

14                     THE COURT:  Maria Fabricio, no relation to the

15        judge, Miss Fabricio is an official court interpreter and

16        she has been sworn to interpret accurately, completely from

17        a language that is not in English.  The court records are in

18        English and often witnesses do come in and testify in a

19        language other than English, and that's why we have official

20        court interpreters.

21                     Now, this witness, I understand, will be

22        testifying in the Spanish language.  I need to explain to

23        the members of the jury that those of you who speak and

24        understand Spanish are required to follow the official court

25        interpreter's interpretation.  What will happen is the

lr-a                          Proceedings

1        question will be asked of the witness in English, the

2        question will be translated to the witness in Spanish, the

3        witness will answer the question in Spanish and then the

4        interpreter will place the official English language

5        interpretation on the court record.  And it's that English

6        language interpretation combined with the question that's

7        the evidence in this case, okay?  So that's the rules for

8        interpreters.

9               Mr. Mendys, do you wish to call your next witness?

10       Go right ahead.

11              MR. MENDYS:  Yes, Judge.  The People call to the

12       stand Miss Argelia Rosario.

13              COURT OFFICER:  Witness entering.

14              (Whereupon, the witness entered the courtroom and

15       took the witness stand.)

16  A R G E L I A   R O S A R I O, a witness called by and on

17  behalf of the People, having been first duly sworn, was examined

18  and testified through the official Spanish interpreter as

19  follows:

20              THE CLERK:  State your name and county of

21       residence.

22              THE WITNESS:  Argelia Rosario.  I live in

23       Allentown, Pennsylvania.

24              THE CLERK:  Very well.  Please be seated.

25              THE COURT:  Okay, Mr. Mendys, you may inquire.

lr-a                    A. Rosario - People - Direct

1              MR. MENDYS:  Thank you, Judge.

2    DIRECT EXAMINATION

3    BY MR. MENDYS:

4        Q    Good afternoon, Miss Rosario.

5        A    Good afternoon.

6        Q    How old are you?

7        A    Twenty-seven.

8        Q    And where are you from originally?

9        A    Santiago, Dominican Republic.

10       Q    And how long have you lived in the United States?

11       A    It's gonna be 13 years.

12       Q    When you moved to the United States, what part were you

13   living in New York?

14              THE COURT:  I'm sorry, is the question when she

15        first came to the United States?

16              MR. MENDYS:  Yes.

17              THE COURT:  Okay.

18       A    No, in Long Island.

19       Q    During your time here have you lived in the Bronx?

20       A    Yes.

21       Q    And currently now where are you living?

22       A    Now?

23       Q    Yes.

24       A    In Allentown, Pennsylvania.

25       Q    Are you married, ma'am?

1      A     Yes.

2      Q     Do you have any kids?

3      A     No.

4      Q     How far did you go in school?

5      A     Eleven.

6      Q     Do you have a job?

7      A     Yes.

8      Q     What do you do for a living?

9      A     During the afternoons I take care of a lady, and in the

10     evenings I work at the discotheque.

11     Q     Now, have you ever been arrested before?

12     A     No.

13     Q     How did you get from Allentown to the Bronx today?

14     A     No sleep and then I took a bus.

15     Q     And how long is the bus ride?

16     A     Two hours and 15 minutes.

17     Q     And the Bronx DA's office is gonna reimburse you for

18     the cost of the bus?

19     A     Yes.

20     Q     I want to ask you about a few people.  Do you know a

21     woman by the name of Esmeraldi Rodriguez?

22     A     Yes.

23     Q     How long have you known her?

24     A     Since we were children.

25     Q     Back in 2012, how would you describe your relationship

lr-a                    A. Rosario - People - Direct

1    with her?

2         A    My bestfriend.

3         Q    When was the last time you've spoken to her?

4         A    I haven't known about her for over a year.

5         Q    Is there a reason why you haven't spoken to her for so

6    long?

7         A    She moved to New Jersey with her husband.

8         Q    Do you know another individual by the name of Yohn

9    Contreras?

10        A    What's his name?

11        Q    Yohn Contreras.

12        A    Yohn Contreras, no.

13        Q    Let's talk about you're here to today about an incident

14   that happened on October 17th of 2012, around midnight.

15        A    Yes.

16        Q    Were you in a cab coming to 2315 Walton Avenue here in

17   the Bronx that night?

18        A    Yes.

19        Q    And who were you with in that cab?

20        A    I was with my friend Esmeraldi Rodriguez and with two

21   of her friends.

22        Q    And were her friends, were they female or were they

23   male?

24        A    Men.

25        Q    Had you ever met either of those individuals prior to

lr-a                    A. Rosario - People - Direct

1    that night?

2        A    No.  Once before I had spoken with one of them, but

3    that night for the first time I saw both of them.

4        Q    The one you had spoken to previously, did you speak on

5    the phone or had you met him in person before that night?

6        A    It was over the phone.

7        Q    Now, that night where were the four of you coming from

8    when you got to 2315 Walton?

9        A    We were -- I had called my brother to go to his place,

10   but he wasn't there so we turned back.  That's it.

11       Q    So did one of the four of you live at that building,

12   2315 Walton?

13       A    Yes.

14       Q    And who was that?

15       A    Esmeraldi.

16       Q    So you left from that location in a cab; is that right?

17            THE COURT:  Left from 2315?

18            MR. MENDYS:  Yes.

19       A    Yes.

20       Q    And you spoke to your brother -- strike that.

21            Did you speak to your brother while you were in the

22   cab?

23       A    Well, we were on the way to my brother's place.

24       Q    In the cab?

25       A    Uh, huh.

lr-a                    A. Rosario - People - Direct


1               THE COURT:  Is that yes?

2               THE WITNESS:  Yes.

3        Q     But you didn't, ultimately you didn't get a chance to

4    speak to your brother?

5        A     Yes.

6        Q     What were your plans that night?  Why were you going to

7    meet your brother?

8        A     We were going to spend time together, to have a beer

9    and spend time together.

10       Q     Had you had anything to drink up till that point?

11       A     No.

12       Q     So, if you could, could you tell the jury what happened

13   once you got back to 2315 Walton Avenue, just briefly?

14       A     Yes.

15       Q     Could you tell the jury what happened?

16       A     When we got off the cab there was a car in front of the

17   taxi.  They got off, first one, yes, and he had a plate outside

18   and he had a hood over, and he put us against the wall and he

19   said police.  Two more people got out of the car and they

20   registered two guys that were with us.  The guy that had the hood

21   with the plate showing outside, he had me against the wall with

22   his hand on top of me.  And the police arrived in a car.  When

23   the guy that was wearing the hoody saw the police car arriving he

24   left and he said, shit, the police.  And the two guys, the two

25   police got him.

1r-a                    A. Rosario - People - Direct

1     Q     Let me ask you some follow-up questions, okay?

2           Where exactly were you and the people you were with

3     when you first saw these three men?

4     A     Can you repeat the question?

5     Q     Sure.  Where exactly were you?  Were you on the

6     sidewalk, were you on the street when you first saw these three

7     individuals?

8     A     I was on the sidewalk.

9     Q     And which -- can you describe those three people, those

10    three men?  What did they look like?

11    A     The one that was wearing the hoody and the plate

12    outside, he's dark colored and tall, strong.  There was one

13    small, white, and like a little --

14          THE INTERPRETER:  Your Honor, may the interpreter

15    ask the witness to clarify?

16          THE COURT:  Of course.

17          THE INTERPRETER:  The interpreter used the word

18    (in Spanish) that could be strong or a little heavy.

19          THE COURT:  You could clarify.

20    A     Like a little heavy.

21    Q     Okay.

22    A     And the other one was white, small and a little heavy.

23    Q     Could you tell if these men, could you tell the

24    nationality of these men, where they were from?

25    A     In my opinion, the one that was wearing the hoody with

lr-a                    A. Rosario - People - Direct

1   the plate outside could have been Hispanic.

2       Q    What about the other two, did you get a good look at

3   their faces?

4       A    No.

5       Q    Can you, could you tell anything about where, whether

6   they were white, black, Hispanic; anything like that?

7       A    I could take a guess that they might have been

8   Hispanic.

9       Q    Now, the dark-skinned one who you indicated was

10  Hispanic, did you see his face?

11      A    I can't remember exactly.  I can't.

12      Q    Did you -- this was the individual with the plate?

13                THE COURT:  Would you like to put -- I'm going to

14          actually sustain my own objection here and I'd like to have

15          you put it in the form of a question.  You're not, -- just

16          ask a question.

17                MR. MENDYS:  Okay.

18      Q    Can you describe the plate that you saw?

19      A    A police plate.

20      Q    What color was it?

21      A    Silver color.

22      Q    Where was he wearing it or how -- I'm sorry, strike

23  that.

24          How was he wearing it?

25      A    He had a Polo shirt, black, and he had a hood over his

lr-a                     A. Rosario - People - Direct

1    head.

2        Q    And how was he wearing the plate that was around -- was

3    the plate around his neck?  Where was it around his body?

4        A    He had it over his clothing.

5        Q    Where specifically was it?  Was it attached to

6    something, some part of his clothing?

7        A    No, it was hanging this way.

8        Q    Indicating on his chest?

9        A    Yes.

10            THE COURT:  Indicating hanging from around his

11        shoulder to his chest.  Is that correct?

12            THE WITNESS:  Yes.

13       Q    Now, you indicated before that someone said police.  Is

14   that right?

15       A    Yes.

16       Q    Do you know which of the three said that?

17       A    The one that was wearing the plate over.

18       Q    Did he say that in English or Spanish?

19       A    In English.

20       Q    Do you understand some English?

21       A    A little, yes.

22       Q    Now, when these three men approached you and the people

23   you were with, did they all come, approach you together or did

24   they come separately?

25       A    One by one.

lr-a                    A. Rosario - People - Direct

1    Q    And who was the first one?

2    A    The one that was wearing the plate outside his clothes.

3    Q    Do you know which one the second one was?

4    A    No, because the last ones got out of the car, like,

5    simultaneously.

6    Q    Now, the man with the plate who said police, was he

7    speaking to anyone in particular or was he speaking to all of you

8    together, if you could tell?

9    A    That I remember, he didn't speak to anybody, directly

10   to anyone in that fashion.

11                  THE COURT:  Can you describe how this man said the

12        word police?  Like, what did he do when he said it?

13                  THE WITNESS:  Like a regular policeman.

14   Q    Did he do anything physically while he said that?

15   A    Did we do it or the guy that said police?

16   Q    The guy that said police, did he do anything to you or

17   the people you were with at the time that he said police?

18   A    No, he separated us.  The two men to one side and the

19   two women to the other side, and he put his hand on my back on

20   this, in this manner.

21                  THE COURT:  I'm sorry, which manner?

22                  THE WITNESS:  Like this.

23                  THE COURT:  Could you turn around so the jury

24        could see?

25                  THE WITNESS:  (Witness complied).

lr-a                    A. Rosario - People - Direct


1              THE COURT:  Indicating that his hand in, that

2         would be in what's called the small of the back just above

3         the waist.

4         Q    Did this man with the plate, did he direct, did he do

5    that to your friends as well or was it just to you?

6         A    Only towards me.

7         Q    Did he direct anyone else up against the wall as he did

8    to you?

9         A    Yes.

10        Q    Did he do that to all the people you were with?  I'm

11   sorry, strike that.

12             Which of your friends did he do that to?

13        A    Can you repeat the question?

14        Q    Sure.  Which of your friends did he direct up against

15   the wall?

16        A    The four of us.

17        Q    And how did he do that?  How did he direct you against

18   the wall, was it physical or was it just with words?

19        A    He did it, he told with his voice but he placed us

20   against the wall and told the other two guys to register us.

21             THE COURT:  To, I'm sorry, to what?

22             THE WITNESS:  To register us.

23        Q    To register, what does that mean?

24        A    Meaning checking out the body.

25        Q    How were they checking out the body?

lr-a                    A. Rosario - People - Direct


1      A      I'm not aware, but what I saw was that they were doing

2    like this.

3      Q      Indicating hands up and down their body?

4      A      Uh, huh.

5                   THE COURT:  Yes or no?

6                   THE WITNESS:  Yes.

7                   THE COURT:  Can I ask, did the witness herself do

8         that with her hands so that the jury can see, because her

9         back's to me, that's all.

10                  THE WITNESS:  Like that.

11                  THE COURT:  Indicating patting up and down from

12        the legs, chest, up and down the body.

13                  THE WITNESS:  Yes.

14     Q      Now, that was done to the two men you were with?

15     A      Yes.

16     Q      And do you know which of the three men did that to the

17   two men you were with?

18     A      No, I don't remember.

19     Q      Okay.  Was it, was it the man with the shield, the

20   plate, did he do that to them?

21     A      No, no because he never moved away from where the two

22   women, we were.  He never moved from there.

23     Q      What did he do to you and Miss Rodriguez?

24     A      He checked us out fast.

25     Q      Can you describe that?  How did he check you out fast,

1    as you said?

2        A    Something similar to what was done to the men.

3        Q    Well, you said it was fast.  Was it quicker than what

4    was done to the men?

5        A    Yes, because he only placed his hands like in our

6    pockets.

7        Q    Your pants pockets or jacket pocket?

8             THE INTERPRETER:  I'm sorry?

9        Q    Was it your pants pocket or your jacket pockets or some

10   other pocket?

11       A    The slacks, the pants.

12       Q    The front pants pockets in the front of your pants?

13       A    The front pockets of the pants.

14       Q    Now, did either of the other two men, did they say

15   anything about being with the police?

16            THE INTERPRETER:  Can you repeat the question for

17    the interpreter?

18            MR. MENDYS:  Sure.

19       Q    Did the other two men, did they say anything about

20   being with the police?

21       A    I was not able to hear anything.

22            (Continued on the next page...)

23

24

25

B mc

A. Rosario - People - Direct

1    Q.   Do you know if you or any of the people you were with

2 had a large sum of money on their person that night?

3    A.   I didn't know that there was a lot amount of money

4 involved.

5    Q.   And when the man with the plate, when he said he was

6 with the police, did you believe him?

7    A.   Yes.

8    Q.   Did you ask for any other type of identification?

9    A.   No.

10   Q.   When the man with the plate approached and said police,

11 can you tell the jury about his demeanor?

12   A.   In the same way a policeman would act when he's going

13 to arrest someone.

14   Q.   Was anything ever taken from you during this incident?

15   A.   No, no.

16   Q.   Did you see anything being taken from any of your

17 friends?

18   A.   No.

19   Q.   Now the person with the plate, was anything blocking

20 his face when you first saw him?

21   A.   No.

22   Q.   Did you see his face?

23   A.   Yes.

24   Q.   Was -- were there street lights?

25   A.   The outside lights of the building.

B mc

A. Rosario - People - Direct

1    Q.    Were you -- do you wear glasses?

2    A.    No.

3    Q.    Can you describe for the jury about how far from you

4    was the person with the plate when you first saw him?

5    A.    When he had me against the wall, at the same distance

6    you and I are from each other right now.

7    Q.    Indicating the interpreter?

8    A.    Yes.

9    Q.    Okay, when you first saw him approaching you, about how

10   far away was he when you first saw him?

11   A.    Like from where he is up to me.

12   Q.    Indicating --

13          THE COURT: I'm sorry, from where when you first

14   saw him?

15          THE WITNESS:  From where he is up to where I am.

16          THE COURT:  Indicating about four feet.

17   Q.   You're referring to the court officer?

18          THE COURT:  I thought she was talking to the

19   screen?

20          THE WITNESS:  From where the court officer is to

21   where I am.

22          THE COURT:  Oh, I'm sorry, approximately eight

23   feet or so, eight to nine feet.

24          MR. MENDYS:  Okay.

25   Q.   Now as you were up against the wall did there come a

B mc

A. Rosario - People - Direct

1  point when the police, the real police came?

2      A.    Yes.

3      Q.    And what did the person with the plate do at that

4  point?

5      A.    He said, "Ah shit, the police."

6      Q.    Did he stay there or did he leave?

7      A.    He left.

8      Q.    Do you know what direction he went?

9      A.    Towards the right.

10     Q.    Now at this point you were standing facing the

11 building?

12     A.    Yes.

13     Q.    Now when each -- when you and each of your friends were

14 placed up against the wall, were you placed up against the wall

15 facing the buildings or facing into the street?

16     A.    We were with our faces towards the building, facing the

17 building.

18     Q.    And did you stay in that position until the police

19 came?

20     A.    When the guy that was wearing the plate left, we turned

21 and we call him because we notice something was happening.

22     Q.    And at what point did you realize that the man with the

23 plate was not a real police officer?

24     A.    When he took off running when the police arrived.

25     Q.    Now did you see -- did you speak to the police at the

B mc

A. Rosario - People - Direct

1  scene that night?

2       A.   Yes, we spoke with the police.

3       Q.   Did you provide the police with a description of the

4  man with the plate?

5       A.   Yes.

6       Q.   What description did you provide to the police?

7       A.   A man -- a tall man, dark man, that was wearing a

8  hoodie and outside he was wearing a police plate.

9       Q.   Did you tell the police anything about his age?

10      A.   No.

11      Q.   Did the police arrest anyone that night?

12      A.   Yes, the other two.

13      Q.   Did you see the police actually arrest them?

14      A.   Yes.

15      Q.   Did you -- did the police -- later that night did the

16  police take you to a precinct?

17      A.   Yes.

18      Q.   And were you interviewed by other detectives as well?

19      A.   Yes.

20      Q.   Now let me direct you to November 22nd of 2012, did you

21  have a conversation with Detective Chris Rodriguez that day?

22      A.   Yes.

23      Q.   And why did he get in touch with you?

24      A.   Because he wanted me to identify one of the guys.

25      Q.   Did you go with Detective Rodriguez to a precinct?

B mc

A. Rosario - People - Direct

1   A.   Yes.

2   Q.   Did you -- and once you got to the precinct, did you

3   eventually see a lineup?

4   A.   Yes.

5   Q.   Did you recognize -- well, did Detective Rodriguez --

6        MR. MENDYS:   Strike that.

7   Q.   Did you recognize anyone in the lineup?

8   A.   Yes.

9   Q.   Do you remember what number it was that you picked out?

10  A.   Number Three.

11  Q.   And where did you recognize him from?

12  A.   That was the person that was wearing the plate outside.

13  Q.   Back on October 17th of 2012?

14  A.   Yes.

15  Q.   Now did Detective Rodriguez have you sign any

16  paperwork?

17  A.   Yes.

18  Q.   Did Detective Rodriguez ever, when you were viewing a

19  lineup, did he ever direct you to anyone in particular in the

20  lineup, did he ever suggest anyone to you in a lineup?

21       THE COURT:   It's a very complicated question for

22       the interpreter, it has multiple levels and the objection I

23       am making is sustained to the form of the question.  Break

24       it up and ask the question in a way that the interpreter can

25       interpret.

B mc

A. Rosario - People - Direct

1    Q.   Did the detective -- when you viewed the lineup, did

2   Detective Rodriguez ever direct you to anyone in particular?

3    A.   No.

4    Q.   Did he ever suggest anyone to you?

5    A.   No.

6    Q.   I'm going to ask you to take a look at the monitor.

7   This is People's 6 in evidence.

8    A.   Okay.

9    Q.   Have you ever seen this photograph before?

10   A.   No.

11   Q.   Do you know what this photograph is?

12   A.   The day I went to recognize the person.

13   Q.   Is this the lineup that you viewed?

14   A.   Yes.

15   Q.   This is People's 7, have you ever seen this photograph?

16   A.   No.

17   Q.   Is this also a photo of a lineup that you saw back in

18   November of 2012?

19             THE INTERPRETER:  May the interpreter have the

20        date repeated?

21             MR. MENDYS:  Sure, November of 2012.

22   A.   Yes.

23   Q.   And this is person number three that you picked out?

24   A.   Yes.

25             THE COURT:  All right, it's a couple of minutes

B mc

Proceedings

1    before one and we're going to take our lunch recess right

2    now and continue after the lunch break.

3             I'm going to ask the witness and the interpreter

4    to step down first while I speak to the jury.  And, ma'am,

5    if you could just wait outside the hall with the interpreter

6    and the D.A. will tell you when to come back this afternoon.

7             (Witness exits the courtroom.)

8             THE COURT:  All right, the witness has left the

9    courtroom.  I just want to make sure you understand we will

10    be continuing this afternoon.  I would like to have this

11    witness on the stand at 2:30 and all the jurors present to

12    be here for continued testimony with this witness this

13    afternoon.

14             We are taking a lunch recess.  You're not to

15    discuss the case with each other.  Keep an open mind, keep

16    all my recess instructions.

17             I'm going to ask Mr. Davis just to remain behind

18    for a minute, and I'll see everyone this afternoon.  Okay.

19    Again, check in at Room 601.

20             (Whereupon, the jurors exit the courtroom.)

21             COURT OFFICER:  Mr. Davis, stay seated.

22             THE COURT:  Okay, so the other jurors have left.

23    Mr. Davis, I asked you to remain behind.  I know that you

24    did call to say that you were going to be late, but we made

25    efforts actually, when you went well beyond that time, to

B mc                                    Proceedings

1    contact you and we learned that the contact number you gave

2    us is actually not your own phone.

3              JUROR DAVIS:  I personally don't have a cell phone

4    number.

5              THE COURT: I'm sorry?

6              JUROR DAVIS:  I personally don't have a cell phone

7    number.

8              THE COURT:  When you came into the courtroom, you

9    had a phone in your presence when I said please turn off all

10   phones, what was that?

11             JUROR DAVIS:  That's -- my phone doesn't have

12   service, I'm only able to use it through Wi-Fi.

13             THE COURT:  But you have a device that allows

14   people to contact you?

15             JUROR DAVIS:  Not the means to call.

16             THE COURT:  So we actually have no way of

17   contacting you?

18             JUROR DAVIS:  Unless you call my home.

19             THE COURT:  Unless what?

20             JUROR DAVIS:  Unless you call my house, excuse me.

21             THE COURT: We did.

22             JUROR DAVIS:  I left already at that time.  I told

23   my mother, I said, "Mom, if the court calls, let them know

24   that I'm on my way."  The trains this morning was crazy.  I

25   live in Castle Hill Avenue.  I had to go to Pelham Bay Park,

B mc

162

Proceedings

1    then wait for it again and then take it to 125th Street.

2              THE COURT:  Well I understand about delays, I

3    understand.  I mean we spoke with your mother.  She said you

4    left at nine o'clock.

5              JUROR DAVIS:  Yes.

6              THE COURT: And you got here at noon.  And I just

7    want to make sure, and we'll talk to the court officers and

8    our clerk, what number we can have that we can contact you

9    if we need to reach you because we don't feel that we have

10   any real good information right now, okay.

11             JUROR DAVIS:  Yes.

12             THE COURT:  All right, so I'll see you this

13   afternoon.  If you could have one of the court officers

14   speak to you.

15             (Juror Davis exits the courtroom.)

16             THE COURT:  Okay, 2:15.

17             (Lunch recess taken.)

18             AFTERNOON SESSION

19             (Whereupon, the following takes place on the

20   record, in open court, in the presence of the Court, Mr.

21   Bonanno and Assistant District Attorney Mendys:)

22             (Argelia Rosario resumes the witness stand and

23   continues her testimony with the aid of an interpreter as

24   follows:)

25             (Whereupon, the jurors enter the courtroom.)

b MC

A. Rosario - People - Direct

1      COURT CLERK:  Let the record reflect that all

2  sworn jurors are present and properly seated.

3      Miss Rosario, you're reminded that you remain

4  under oath.

5      THE WITNESS:  Okay.

6      THE COURT:  All right, good afternoon, members of

7  the jury.  We're ready to continue with direct examination

8  Mr. Mendys.  You may continue your inquiry.

9      MR. MENDYS:  Thank you, Judge.

10 DIRECT EXAMINATION (CONTINUED)

11 BY MR. MENDYS:

12    Q.   Good afternoon, Miss Rosario.

13    A.   Good afternoon.

14    Q.   When we left off, you --

15      MR. MENDYS:  Well strike that.

16    Q.   When the man with the plate approached you on Walton

17 Avenue that night, what did you think was happening?

18    A.   The police was investigating.

19    Q.   Did you have any idea what they could possibly be

20 investigating?

21    A.   No.

22      MR. MENDYS:  I'm going to ask that this be marked

23    4A.

24      THE COURT:  4A for identification?

25      MR. MENDYS:  Yes, and shown to the witness.

b MC

164

A. Rosario - People - Direct

1          THE COURT:  We're going to put a separate sticker

2     that says People's 4A.

3          (Whereupon, the item referred to is marked

4     People's Exhibit Number 4A for identification.)

5          (Exhibit handed to the witness.)

6     Q.   Miss Rosario, prior to coming to court today did you

7 have an opportunity to see what is on that disk?

8     A.   Yes.

9     Q.   And what is on that disk?

10    A.   What took place that day.

11    Q.   It's a video recording?

12    A.   Yes.

13    Q.   And are you on that recording?

14    A.   Yes.

15    Q.   Does it accurately reflect what happened back on

16 October 17th of 2012?

17    A.   Yes.

18    Q.   Is there anything different about it?

19    A.   No.

20         MR. MENDYS:  At this point I would offer it into

21    evidence to show the events that took place prior to what

22    has already been introduced through Officer Mangual.

23         THE COURT: As well as other things subsequent to

24    the officer's arrival that might depict this witness?

25         MR. MENDYS:  Yes, the entirety.

165

b MC

A. Rosario - People - Direct

1          THE COURT:  Any objection?

2          MR. BONANNO:  No objection.

3          THE COURT:  All right, so this is marked into

4     evidence as 4A.  And the offer of proof, members of the

5     jury, is that you are going to see not only what's already

6     in evidence or -- you've already viewed it.  You may see it

7     again, but there are parts before the officer's arrival that

8     he did not witness that are additional to what's in evidence

9     as People's 4, okay.

10          (Whereupon, the item previously marked for

11     identification is received and marked People's Exhibit

12     Number 4A in evidence.)

13          MR. MENDYS:  Let the record reflect this is

14     Channel 02 marked in the top left corner of the video.

15          THE COURT:  CH 02?

16          MR. MENDYS:  CH 02.

17          THE COURT:  Okay.

18          MR. MENDYS:  And the time stamp is 10 -- it reads

19     2012/10/16, time stamp of 23:55:31.

20     Q.   Miss Rosario, I'm going to ask you to approach the

21     monitor so you can point out a couple of things.

22          THE COURT:  All right, what you can't do is block

23     and stand in front, so you need to stand on the side.  And

24     I'm going to ask the interpreter to please stand next to

25     Miss Rosario.  But I want to make sure each and every juror

166

b MC

A. Rosario - People - Direct

1    can see the screen.

2                Can all the jurors see the screen?

3                THE JURORS: Yes.

4                THE COURT:  Okay, fine.

5                (Video playing.)

6                THE COURT:  You've begun the video?

7                MR. MENDYS:  I have.

8                THE COURT:  So you want the witness to describe

9        what's happening at this point?

10   Q.   Miss Rosario, can you identify, I paused it now at

11   23:55:53, do you see yourself on this video on the screen right

12   now?

13   A.   Yes.

14   Q.   If you could just point to yourself, approach the

15   screen and point to yourself?

16               (Witness indicating.)

17               MR. MENDYS:  Okay, indicating the person on the

18        far left.

19               THE COURT:  Towards the top of the screen, on the

20        left side of the screen, the person on the far left, it

21        appears to be the sidewalk.

22   Q.   Is that correct, Miss Rosario?

23   A.   Yes.

24   Q.   And you appear to be wearing a reddish-colored top?

25   A.   Yeah, red.

b MC

A. Rosario - People - Direct

1    Q.   Now what has happened at this point in time?

2              THE COURT:  I'm sorry, this is frozen, what's the

3    question?

4    Q.   What has happened at this point -- at this point in

5    time?

6              THE COURT: What has happened already?

7    Q.   Or what is going on?

8    A.   The other guy was paying the taxi.

9    Q.   And what were your plans, where were you going to be

10   going at this point?

11   A.   At that point we were returning on the way to my

12   brother's.

13   Q.   Were you going back inside of 2315 Walton?

14   A.   Yes.

15             MR. MENDYS:  I'm going to continue playing the

16   video.

17             (Video playing.)

18   Q.   Pausing it at 23:56:21.  Miss Rosario, do you see the

19   person who just walked onto the sidewalk?

20             THE COURT:  On the video?

21   Q.   On the video?

22   A.   Yes.

23   Q.   And who is that person?

24   A.   That's the person that was wearing the plate on the

25   outside.

168

b MC

A. Rosario - People - Direct

1    Q.   And did you see where he came from prior to get --

2         MR. MENDYS:   I'm sorry, let me rephrase the

3    question.

4    Q.   Prior to walking onto the sidewalk where did he come

5    from?

6    A.   From this car.   This car.

7    Q.   Indicating the black car on the bottom right portion of

8    the screen?

9    A.   Yes.

10        THE COURT:   The record should reflect that the car

11   is double parked next to another car next to the curb, the

12   witness has indicated.

13        THE WITNESS: Yes.

14        MR. MENDYS:   I'm continuing to play it.

15        (Video playing.)

16   Q.   I'm pausing it at 23:56:33.  Miss Rosario, what did we

17   just watch here?

18   A.   That he was moving the girl towards the left side.

19                  CONTINUED NEXT PAGE.........

20

21

22

23

24

25

lr-c                        A. Rosario - People - Direct

1       Q      Who is doing that?

2       A      The guy with the, that had the plate on the outside.

3              MR. MENDYS:   I'm continuing to play.  I'm pausing

4        at 23:56:50.

5       Q      Where are you right now on the video?

6       A      Over here.

7              MR. MENDYS:   Let the record reflect the witness is

8        pointing to the left top of the video up against the wall.

9       Q      Were you the person that was furthest to the right of

10   your friends?

11      A      Myself and the other girl.

12      Q      You, between you and the other girl, who was on the

13   end?

14      A      Myself.

15      Q      So your friend was on your left?

16      A      Yes.

17             MR. MENDYS:   I'll continue to play the video.  I'm

18       pausing it at 23:57:30.

19      Q      Miss Rosario, were either the man with the plate or the

20   other two men, were any of them saying anything at this point?

21             THE COURT:   You need to break that up.  You can't

22       ask compound questions like that.

23             MR. MENDYS:   Okay.

24      Q      Was the man with the plate saying anything at this

25   point?

lr-c                    A. Rosario - People - Direct

1      A     No.

2      Q     Aside from saying police, did he say anything else?

3      A     No.

4      Q     What about the individual who you described as heavier,

5   did he say anything?

6      A     Yes.

7      Q     What did he say?

8      A     I don't remember.

9      Q     Was he speaking to you -- who was he speaking to?

10     A     With the guys because he was checking them out.

11     Q     And what about the third individual, did he, was he

12   saying anything?

13     A     No.

14           MR. MENDYS:   I'm playing the video.

15     Q     Miss Rosario, I've paused it at 23:58:21.   What is

16   happening at this point on the video?

17     A     When the guy with the plate saw the police car he said

18   shit, police.   And the other two, they sort of tried to run

19   towards the car.

20     Q     Towards that same black car that you pointed out

21   before?

22     A     Yes.

23     Q     And at this point in the video that car is in the same

24   place?

25     A     Yes.

lr-c                    A. Rosario - People - Direct

1      Q      And just for the record, do you see the police vehicle,
2   the police van in this screenshot?
3      A      Yes.
4      Q      If you could just point to it, please?
5      A      The police van?
6      Q      Yes.
7      A      (Witness complied).
8              MR. MENDYS:  Indicating the middle of the street
9         facing the bottom right portion of the monitor.
10             I'm playing the video.  Okay, I've paused it at,
11        the date stamp is now 2012/10/17.  The time 00:00:01.
12     Q      Miss Rosario, what is going on at this point in the
13   video?
14     A      When the police got out of their car the guys came
15   walking, and the ones that were on the sidewalk were telling the
16   police what was going on.
17     Q      Did you, when you -- you indicated earlier that you
18   spoke to the police; correct?
19     A      Yes, yes.
20     Q      Where did you speak to the police?
21     A      At the precinct.
22             MR. MENDYS:  I'm now gonna switch angles.  This is
23        -- I'm sorry, one second.  There's a marker on the top left
24        CH-01.  The date and timestamp is 2012/10/16, 23:55:32.
25        I've paused it at 23:56:09.

lr-c                    A. Rosario - People - Direct

1      Q    Miss Rosario, do you see yourself on this screen?

2      A    Yes.

3      Q    And if you could just point to yourself?

4      A    (Witness complied).

5           MR. MENDYS:  Indicating the person on the far

6       right closest to the wall on the right side of the screen.

7      Q    Do you see your friend Esmeraldi Rodriguez?

8      A    Yes.

9      Q    If you could point to her?

10     A    (Witness complied).

11          MR. MENDYS:  Indicating the person directly in the

12      middle of the sidewalk, slightly right of the center in the

13      screen.

14     Q    Now, the two men, you had not met them prior to that

15   night; is that correct?

16     A    No.

17     Q    Esmeraldi knew them, yes?

18     A    One of them she knew, yeah.

19     Q    Do you know, as you look at the video do you know which

20   one, which of them it was that she knew?

21     A    I think so.

22     Q    If you could, indicate please?

23     A    (Witness complied).

24          MR. MENDYS:  Indicating the person who exited the

25      cab last and is approaching the sidewalk in between two

1r-c                    A. Rosario - People - Direct

1   parked, parallel parked vehicles, slightly left of the

2   center on the video.

3   Q    And the other male, how was he a part of this group?

4   A    Because he's a friend of the one that Esmeraldi knows.

5          MR. MENDYS:  I'm playing the video now again.  I'm

6   pausing at 23:56:21.

7   Q    Who is the person that just stepped onto the sidewalk?

8   A    The guy that wore the plate.

9          MR. MENDYS:  I'm playing it again.  I'm sorry,

10  that was paused at 23:56:21.  I'm playing it again.  Pausing

11  it at 23:56:54.

12  Q    Where are you on this shot?

13  A    (Witness indicated).

14         MR. MENDYS:  Indicating the person closest to the

15  screen up against the wall to the right, on the right side.

16  Q    Now, the man with the plate, what is he doing right

17  now?

18  A    He's keeping me in place close to the wall.

19  Q    And how is he doing that?

20  A    Putting pressure on me with his, putting pressure on

21  me.

22  Q    On what part of your body?

23  A    (Witness indicated).

24         MR. MENDYS:  Let the record reflect the witness

25  placed her left hand on the small of her back.

1r-c                    A. Rosario - People - Direct

1    Q    Now, you indicated that he was putting pressure on you.

2    A    Yes.

3    Q    Was he pushing you into the wall?

4    A    No, he was only putting pressure.

5    Q    Okay.  And this is the person that you later identified

6    in the line-up?

7    A    Yes.

8              MR. MENDYS:  Continuing to play the video.  I'm

9         stopping the video at 23:58:48.

10   Q    Miss Rosario, you can have a seat again.

11             Miss Rosario, prior to today had you ever seen that

12   video before?

13   A    No.

14   Q    Did you -- before today you've testified in the grand

15   jury; correct?

16   A    Yes.

17             MR. MENDYS:  Nothing else.

18             THE COURT:  Okay.

19             MR. MENDYS:  Thank you.

20             THE COURT:  Cross-examination.

21             MR. BONANNO:  If I might just have a second,

22        Judge? Just a moment.

23             If I may inquire?

24             THE COURT:  Go ahead.

25             MR. BONANNO:  Thank you, your Honor.

lr-c                    A. Rosario - People - Cross

1    CROSS-EXAMINATION

2    BY MR. BONANNO:

3        Q    Good afternoon, Miss Rosario.  How are you?

4        A    Okay.

5        Q    I'm gonna ask you a few questions.  I'm gonna try and

6    be short, but I want to ask you enough questions so I can satisfy

7    my inquiry, okay?

8        A    Okay.

9        Q    You do remember testifying in the grand jury; is that

10   correct?

11       A    Yes.

12       Q    And when you testified in the grand jury, at page 16,

13   KM16, line 3, do you remember being asked this question:

14               "The three people that came towards you, that came

15           towards you and your girlfriend and her boyfriend and the

16           friend, did you know any of the people coming towards you?"

17               THE INTERPRETER:  I'm sorry, repeat that part for

18           the interpreter?

19               MR. BONANNO:  I'll repeat the whole question.

20           That's fine.

21       Q    The question was presented to you:

22               "The three people that came towards you, that came

23   towards you and your girlfriend and her boyfriend and the friend,

24   did you know any of the people coming towards you?"

25               THE COURT:  Do you remember being asked that

lr-c                    A. Rosario - People - Cross

1       question --

2                   THE WITNESS:  From the car?

3                   THE COURT:  -- is the question; right?

4                   MR. BONANNO:  That is the question, Judge.

5                   THE WITNESS:  No, I don't remember.

6       Q    Do you remember giving the answer of no?

7       A    No.

8       Q    Do you remember also being asked the question:

9                   "What, if anything, did they do?"

10      A    Can you repeat?

11      Q    Surely.  There was a question asked of you in the grand

12      jury, and that question was:

13                  "What, if anything, did they do?"

14      A    Yes.

15      Q    Do you remember being asked that question?

16      A    Yes.

17      Q    Do you also remember giving this answer:

18                  "One of them got out with the money, with the

19           shield.  He said to us police.  He put us by the wall and

20           the two guys came over and searched the two guys."

21                  Do you remember giving that answer?

22      A    That way, no.

23      Q    Well, my question to you, Miss Rosario, is, you

24      described the man with the shield in the grand jury as also

25      having money?

lr-c                    A. Rosario - People - Cross

1      A     No.

2      Q     You don't remember giving that testimony?

3      A     No.

4      Q     So there's nothing about the man with the shield and

5   the money that you recognize?

6      A     No.

7      Q     So to the best of your recollection, the man with the

8   shield never had the money?

9      A     Not that I know of.

10     Q     Who called the cab to go to your brother's house?

11     A     Esmeraldi.

12     Q     And you testified that you called your brother while

13  you were in the cab?

14     A     Yes.

15     Q     Was there a reason you didn't call your brother before

16  you got into the cab?

17     A     No.

18     Q     Do you know if Esmeralda knew if any of you had any

19  large amounts of money on you that night?

20              MR. MENDYS:  Objection.

21              THE COURT:  Sustained.

22     Q     Do you know if Esmeralda had asked Mr. Contreras to

23  come to Walton Avenue that night?

24     A     Can you repeat the question?

25     Q     Do you know if Miss Rodriguez had asked Mr. Contreras

lr-c                    A. Rosario - People - Cross

 1   to come to Walton Avenue that night?

 2                   MR. MENDYS:  Objection.

 3                   THE COURT:  Sustained.

 4        Q    Do you know why Mr. Contreras came to Walton Avenue

 5   that night?

 6                   MR. MENDYS:  Objection.

 7                   THE COURT:  Sustained.

 8        Q    When you described the man with the plaque, you

 9   described him as a man wearing a hoody; is that correct?

10        A    Yes.

11        Q    He was dark colored?

12        A    Yes.

13        Q    He was tall?

14        A    Yes.

15        Q    And he was strong?

16        A    Yes.

17        Q    Now, you also described a smaller individual; is that

18   correct?

19        A    Yes.

20        Q    And I believe you described him in Spanish as

21   gorlito(ph); is that correct?

22        A    Yes.

23        Q    Now, does gorlito(ph) have two different meanings in

24   Spanish?

25                   THE COURT:  Well, the objection is sustained.  And

lr-c                    A. Rosario - People - Cross

1    actually, we have -- an English question should be posed in

2    the English language, and I'm not sure, you know, the

3    interpreter is interpreting from Spanish to English, so I

4    would prefer that you would use the interpretation.

5        Q    When the interpreter explained to you that there was

6    maybe two different meanings to the word, the Spanish word --

7               MR. MENDYS:  Objection.

8               THE COURT:  No, no.  Okay, go ahead.  Let me hear

9        the rest of it.

10              MR. BONANNO:  I'm going to rephrase the question,

11       Judge.

12       Q    The interpreter said to you before a word that has two

13   different meanings in Spanish; is that correct?

14              MR. MENDYS:  Objection.

15              THE COURT:  Sustained.

16       Q    Does the word heavy have two different meanings in the

17   Spanish language?

18       A    No.

19       Q    Can it mean strong also?

20       A    What?

21       Q    Can one word in Spanish have two separate meanings?

22              THE COURT:  Are you asking -- the objection is

23       sustained.  I'm not asking -- you're asking the witness,

24       who's testifying through an interpreter, whether one word in

25       Spanish can have a meaning of another word as it's being

1r-c                         A. Rosario - People - Cross

1      translated in Spanish.  This is not a proper way of

2      cross-examining.

3          Q    When the interpreter explained to you before your

4      description of the small guy, how did you describe him?

5          A    A small guy that weighed about 160 pounds, white.

6          Q    And did you describe him in a manner that the

7      interpreter had a question about?

8                    MR. MENDYS:  Objection.

9                    THE COURT:  Sustained.

10                    (Continued on the next page...)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

180

d MC

A. Rosario - People - Cross

1      Q.    When you spoke about the man with the plaque, you said

2   he had a hoodie on, he could have been Hispanic, is that correct?

3      A.    Yes.

4      Q.    You were asked did you get a good look at his face, is

5   that correct?

6      A.    Yes.

7      Q.    Did you ever get a good look at his face?

8      A.    Really, really really, really good, no, but I saw it.

9      Q.    You never got a real good look at his face?

10     A.    Yes.

11     Q.    Isn't it true you also testified in the grand jury --

12            MR. MENDYS:   What page?

13            MR. BONANNO:   Page 16.

14     A.    -- you were asked this question -- and do you remember

15  being asked this question --

16            THE COURT:   Which page?

17            MR. BONANNO:   Page 16.

18            THE COURT:   What date?

19            MR. MENDYS:   Page 16.

20            THE COURT:   No, what date?

21            MR. MENDYS:   The date --

22            MR. BONANNO:   I don't have the date, Judge.

23            THE COURT:   Can we have a short sidebar.

24            (Whereupon, the following takes place on the

25      record, at sidebar, in the presence of Court and Counsel:)

d MC

A. Rosario - People - Cross

1    THE COURT:  You don't have the date of this

2    testimony?

3    MR. MENDYS:  I have the date, November 26th.

4    THE COURT:  November 26th?

5    MR. MENDYS:  November 26, 2012.

6    THE COURT:  No, because did she testify more than

7    once in the grand jury?

8    MR. BONANNO:  No, the other guy did.

9    THE COURT:  This is the date of November 26th,

10   it's just important to have that.

11   MR. BONANNO:  Actually I need that for Contreras

12   too because he testified twice.

13   THE COURT:  Okay, you could return.

14   (Whereupon, the following takes place on the

15   record, in open court, in the presence of the Court,

16   Mr. Bonanno, Assistant District Attorney Mendys and the

17   sworn jurors:)

18   MR. BONANNO:  May I continue, your Honor?

19   THE COURT:  You may.

20   MR. BONANNO:  Thank you.

21   CROSS-EXAMINATION (CONTINUED)

22   BY MR. BONANNO:

23   Q.   Miss Rosario, on November 26th of 2012, you testified

24   in the grand jury, do you remember that?

25   A.   Yes.

182

d MC                    A. Rosario - People - Cross

1    Q.   And do you remember being asked this question --

2                THE COURT:  And giving this answer.

3                MR. BONANNO:  Yes.

4                THE COURT:  Line and page.

5    Q.   Do you remember asking -- being asked this question and

6    giving this answer on Page 16, starting at Line 16:

7                "Did you get a good look at his face?"

8                MR. MENDYS:  Objection to misreading the question.

9                MR. BONANNO:  Excuse me, I apologize.

10               THE COURT:  You're saying it's not accurately

11   being read?

12               MR. BONANNO:  It's inaccurately being read, yes.

13               THE COURT:  Well if that's correct, since I don't

14   have the transcript, the objection is --

15               MR. BONANNO:  I'll correct it.

16               THE COURT:  Read verbatim, line and page, question

17   and answer.

18   Q.   Do you remember being asked this question and giving

19   this answer:

20               "Did you get a look at his face?

21               "ANSWER:  Yes."

22   A.   Yes.

23   Q.   And do you remember being asked this question:

24               "What did he and the other two look like?"

25               And answering this way:

183

A. Rosario - People - Cross

1            "One was kind of heavy, light skin, the other,

2       there was another one, short, dark skin, neither too thin

3       nor too heavy, and the one with the police shield was a

4       little tall with like a gym type of body?"

5                 THE INTERPRETER: Can you repeat?

6       Q.   You remember giving that answer --

7                 THE INTERPRETER:  Can you repeat the last part

8       after the shield?

9                 MR. BONANNO: Sure.

10      Q.   "And the one with the police shield was a little tall

11      with like a gym type of body?"

12                MR. BONANNO: A gym, like gym.

13                THE INTERPRETER:  Oh.

14      A.   Strong, yes.

15      Q.   Do you remember giving that answer?

16      A.   Yes.

17      Q.   And you gave an answer today about the man with the

18      plate as also being dark color, tall and strong, correct?

19      A.   Yes.

20      Q.   But you never said anything about his face?

21                MR. MENDYS:  Objection.

22                THE COURT:  Sustained.

23      Q.   Can you describe anything about his face?

24      A.   No.

25      Q.   Can you describe if he had a big nose or a small nose?

184

d MC

A. Rosario - People - Cross

1    A.    I don't remember.

2    Q.    Do you know if he had bushy eyebrows or thin eyebrows?

3    A.    I don't remember.

4    Q.    Do you remember if he had any scars on his face?

5    A.    No.

6    Q.    Do you remember if he had a moustache?

7    A.    No.

8    Q.    Do you remember if he had a beard?

9    A.    No.

10   Q.    Do you remember if he had an earring in his nose?

11              THE COURT:  Earring in his?

12              MR. BONANNO:  Nose.

13              THE COURT: Nose.

14   A.    No.

15   Q.    Do you remember if he had an earring in his ear?

16   A.    No.

17   Q.    Did you see any jewelry on him at all?

18   A.    No.

19   Q.    Did he have short hair or long hair?

20   A.    I couldn't see that because he had a hoodie on.

21   Q.    And you really couldn't see his face?

22   A.    I didn't see it, but at certain points the light hit

23   his face and I looked at it.

24   Q.    The majority of the time, isn't it true, that the man

25   with the plaque was with you you were facing the building,

185

d MC

A. Rosario - People - Cross

1    weren't you?

2        A.    Yes, yes.

3        Q.    So you never got a chance to really look at his face?

4            MR. MENDYS:  Objection.

5            THE COURT:  Overruled.

6        A.    Can you -- what exactly that you asked?

7        Q.    The majority of the time that the man with the plaque

8    was with you, you were facing the building, isn't that correct?

9        A.    Yes, yes.

10       Q.    And you didn't get a good look at his face while you

11   were looking at the building, did you?

12       A.    At that time I couldn't see his face.

13       Q.    Now you also said in your testimony just now that the

14   man with the plaque took off running, is that correct?

15       A.    Yes, he left walking when he saw the police.

16       Q.    So he walked away?

17       A.    Yes.

18       Q.    He didn't run away like you testified before, is that

19   correct?

20       A.    It's the same thing because when he saw the police, he

21   took off.  He started -- he left.

22       Q.    But he didn't run away?

23       A.    From the spot where he was at, no, but a little

24   further, yes.

25       Q.    You saw him down the block?

d MC

A. Rosario - People - Cross

1    A.    Running.

2    Q.    Did you ever tell that to the police?

3    A.    Yes.

4    Q.    When did you tell that to the police?

5    A.    When they took him to the precinct.

6    Q.    Did they ask you about that at the scene?

7    A.    Yes, they asked me in which direction did he run and I

8    said -- I said first he started walking and then he ran.

9    Q.    And just so I'm clear, you told that to the police only

10   at the precinct?

11   A.    Yes.

12   Q.    None of the policemen at the scene asked you what

13   happened to the third guy?

14              THE INTERPRETER:  Ask you what?

15   Q.    What happened to the third guy?

16   A.    Yes.

17   Q.    And did you tell them then he ran away?

18   A.    That he left in the way I explained to you now.

19   Q.    That he walked away?

20   A.    That he started walking and then he ran.

21   Q.    You also testified that the man with the plate placed

22   his hands in your pockets, I believe in the front pockets of your

23   slacks, is that correct?

24   A.    Yes.

25   Q.    Is that true, ma'am?

d MC

A. Rosario - People - Cross

1        THE COURT:  I'm sorry?

2    Q.   Is that true?

3    A.   Yes.

4    Q.   Did you just watch the video that was played in this

5  courtroom?

6    A.   Yes.

7    Q.   Did you see that man that had you on the wall going

8  into your pants pockets?

9    A.   No, he didn't introduce his hand directly.

10    Q.   So your testimony before was that he had placed his

11  hands in your pockets?

12    A.   Uh-huh, yes.

13    Q.   So is it your testimony that he put his hands in your

14  front pants pockets?

15    A.   I didn't say like that -- specify.  He didn't introduce

16  his hands directly, he touched with his hands.

17    Q.   So he didn't go inside your pockets?

18    A.   No.

19    Q.   Going back to the description that you gave the police,

20  did you ever tell the police how old you thought the fellow was?

21    A.   No.

22        MR. BONANNO:  I'd like to show this witness the

23      arrest photo, I think that's 5.  Do you have it?

24        I'd like to show the witness what's been

25      previously entered in as, I believe it's People's 5.

188

d MC

A. Rosario - People - Cross

1       THE COURT:  This is People's 5?

2       MR. MENDYS:  Yes.

3       THE COURT:  Being shown to the witness.

4       (Exhibit handed to the witness.)

5   A.   He's the one that had the plate on his body.

6   Q.   Well that was the question I was going to ask you.  Is

7   that the person that you saw in the precinct on November 12th of

8   2012?

9       THE COURT:  In the lineup you're talking about?

10  Q.   In the lineup?

11      MR. MENDYS:  November 22nd.

12      MR. BONANNO:  Sorry, my apologies.

13      THE COURT:  Yeah, let's get the --

14      MR. BONANNO:  Date.

15      THE COURT:  Rephrase the question.

16      MR. BONANNO:  Yes.

17  Q.   Is that the person you saw in the police precinct on

18  November 22nd of 2012?

19      THE COURT:  In the lineup?

20  Q.   In the lineup?

21  A.   Yes, yes.

22  Q.   And was he wearing the earring that he's wearing in

23  that photo now?

24      THE COURT:  At what time?

25  Q.   In the lineup?

d MC

A. Rosario - People - Cross

1    A.    I wasn't paying attention to the earring, I was paying

2  attention to the face.

3    Q.    So you're not sure if he was wearing that earring?

4    A.    No.

5    Q.    Do you know if anybody else in that lineup was wearing

6  an earring?

7    A.    No.

8    Q.    I just asked yes or no?

9    A.    No.

10   Q.    But you don't remember if he was wearing that earring

11 in the lineup?

12   A.    No, I don't remember.

13   Q.    When you came to the precinct on November 22nd of 2012,

14 Detective Rodriguez took you there, is that correct?

15   A.    Yes.

16   Q.    What, if anything, happened when he brought you to the

17 precinct?

18   A.    He told me he was taking me because he was going to

19 show me a lineup and he wanted me to observe the lineup because

20 he wanted to see if I could recognize anybody in that lineup.

21   Q.    Where did they bring you when they brought you into the

22 precinct?

23         THE COURT:  Inside the precinct?

24   Q.    Inside the precinct where did they bring you?

25         THE COURT:   When you -- I'm sorry, do you mean

A. Rosario - People - Cross

1    when you first arrived?

2        Q.    When you first came into the precinct, where did you

3    go?

4        A.    They sat me down and he told me -- he said that I

5    should sit down and that later on he was going to take me to a

6    room and that in that room there was going to be someone that he

7    wanted to see if I identify a person that would be in that group.

8        Q.    Do you remember the first room you sat in?

9        A.    Yes.

10       Q.    Were there a lot of people in that room?

11       A.    No.

12       Q.    Were you by yourself in that room?

13       A.    Alone, and with a friend of Rodriguez, with a female --

14   female connotation.

15       Q.    A female what?

16       A.    Connotation.

17            THE INTERPRETER:  Meaning because in Spanish

18       sometimes --

19            THE COURT:  Well, no, no, just the translation,

20       you're not testifying.

21            THE INTERPRETER:  Sorry, your Honor.

22            THE COURT:  This is a translation, wait for the

23       witness to answer and then you can -- did you not understand

24       the response?

25            MR. BONANNO:  You understood connotation?

d MC

A. Rosario - People - Cross

1    THE COURT:  Connotation?

2    THE INTERPRETER:  Connotation was a grammatical

3 way to explain.

4    THE COURT: No, no.

5    THE INTERPRETER:  I'm sorry, your Honor.

6    THE COURT:  The question and answer.  Go ahead.

7 Q. Does that mean there was someone else in the room with

8 you?

9 A. She was outside, sitting with me outside and when I

10 went inside the room --

11    THE COURT:  In the first room you were in was

12 there another person with you in that room?

13    THE WITNESS:  Yes.

14    THE COURT:  Next question.

15 Q. And then you went into a room to look at the lineup, is

16 that correct?

17 A. Yes.

18 Q. And how long did it take you to pick Number Three from

19 the lineup, if you remember?

20 A. I don't remember, but it was something fast.

21 Q. You saw it quickly?

22 A. Yes.

23 Q. What was it that drew you so quickly to Number Three?

24    MR. MENDYS:  I'm going to object.

25    THE COURT:  You're objecting?

d MC

A. Rosario - People - Redirect

1          MR. MENDYS:  Yes.

2          THE COURT: To the form of the question?

3          MR. MENDYS:  Yes, I think it should be rephrased.

4          THE COURT: You can rephrase the question.

5     Q.    Do you recall why you picked Number Three so quickly?

6     A.    Because I saw his face.

7     Q.    You testified before though, Miss Rosario, that when

8  you saw his face, the man with the plate was between eight and

9  nine feet away from you?

10    A.    Uh-huh.

11    Q.    And it was at night, right?  It was at night, correct?

12    A.    Yes.

13    Q.    And then the rest of the time you were up against the

14 wall not looking at his face, is that correct?

15    A.    Yes, yes.

16    Q.    And you couldn't remember any of his facial features,

17 is that correct?

18    A.    Uh-huh, yes.

19          MR. BONANNO:  I have no further questions.

20          THE COURT:  Any redirect?

21          MR. MENDYS:  Very briefly.

22 REDIRECT EXAMINATION

23 BY MR. MENDYS:

24    Q.    Miss Rosario, I just want to clarify a couple of

25 things.  Did you speak to any of the police officers while you

d MC

A. Rosario - People - Redirect

1  were at 2315 Walton Avenue?

2       A.   No.

3       Q.   You didn't speak to any of those police officers?

4       A.   No, the only thing I told them was that the other guy

5  who -- the one that had been holding us, he had left running.

6       Q.   Okay, you said that to the police at 2315 Walton?

7       A.   Yes.

8       Q.   And all other conversations you had with the police

9  were later on?

10       A.   What do you mean?

11       Q.   At the precinct, or at some other time?

12       A.   At the precinct.

13            MR. MENDYS:  Okay, nothing else.

14            THE COURT:  Any recross?

15            MR. BONANNO:  Nothing further.

16            THE COURT:  Miss Rosario, you may step down, thank

17  you.

18            THE WITNESS:  Can I leave now?

19            THE COURT:  Yes.

20            (Witness excused.)

21            THE COURT:  All right, members of the jury, we're

22  going to take a short recess.  Don't discuss the case.  Keep

23  an open mind.  I'll call you back in a few minutes, okay.

24            (Whereupon, the jurors exit the courtroom.)

25            THE COURT:  All right, the jury has left the room.

d MC

194

Proceedings

1          Anything else with the schedule for tomorrow that

2     I should know about?

3          MR. MENDYS:  No, I think we can -- what time are

4     we starting tomorrow?

5          THE COURT:  Well, I mean I was going to say 10:30.

6     I'm going to tell the jury 10:30.

7          MR. MENDYS:  I think that's fine, 10:30 is fine.

8          THE COURT:  If it's a little later than 10:30,

9     that's fine too, but I do have a few matters on and I'll

10    work them around your witness.  But you think the witness is

11    going to be here for quite awhile tomorrow, right?

12         MR. MENDYS:  I think it would be similar to today.

13         THE COURT:  Okay, and this is the witness who the

14    hearing testimony covered the --

15         MR. MENDYS:  Photo array.

16         THE COURT:  -- the photo array ID?

17         MR. MENDYS:  Correct.

18         THE COURT:  Are you going to attempt any other

19    type of in-court identification procedure of this defendant

20    who's not present?  I mean it's up to you, but if there's

21    other -- if there's another procedure that you would like to

22    do, maybe we should discuss it now.

23         MR. MENDYS:  I would probably show her the single

24    photo.

25         THE COURT: The single photo.  Okay, you want to be

d MC

Proceedings

1      heard on that?

2      MR. BONANNO: It's not the photo that was in the

3      photo array, I'm assuming, right? Because clearly the

4      earring, we're talking about the arrest photo.

5      MR. MENDYS: We're talking about what is already

6      in evidence.

7      THE COURT: She can't testify about having seen

8      the photo array. You're not going to show her the photo

9      array --

10     MR. MENDYS: No.

11     THE COURT: -- as if it's the first time she saw

12     it. That actually could be a problem if she said, "Yeah, I

13     saw this on another day." I'm assuming, and maybe I'm

14     incorrect, that you have never shown her the single photo?

15     MR. MENDYS: She was in my office Friday.

16     THE COURT: Okay.

17     MR. MENDYS: I did not show it to her. It was

18     face up on my desk when she came in and she noticed it

19     immediately and it was an inadvertent --

20     THE COURT: Whether it's inadvert or not, okay,

21     that's interesting, prior to that?

22     MR. MENDYS: Prior to that, no.

23     THE COURT: And you asked her no questions about

24     it before she said, "That's the guy?"

25     MR. MENDYS: Correct.

d MC

Proceedings

1    THE COURT:  What you're telling me, it was an

2  inadvertent kind of spontaneous look at the picture.  Was

3  anyone else with you?

4    CONTINUED NEXT PAGE........

1r-e                          Proceedings

1              MR. MENDYS:  An interpreter.

2              THE COURT:  An interpreter, okay.

3              MR. MENDYS:  She speaks some English.  I cannot, I

4      cannot recall whether the interpreter was present at the

5      time when she, when she saw it or not.  I can ask the

6      interpreter.

7              THE COURT:  Now, you have no other plans for any

8      witnesses on Thursday; right?

9              MR. MENDYS:  Correct.  I do have an update on Mr.

10     Contreras.

11             THE COURT:  Go ahead.

12             MR. MENDYS:  My office was in touch with him

13     today.  The plan right now is to fly him in Sunday, Sunday

14     night, so he would be here Monday morning.

15             THE COURT:  Okay, that's the plan, I understand.

16     The reason I was asking is I want to give the jury a

17     heads-up because, since I'd like to tell them now that we're

18     not going to have evidence on Thursday, and that will be an

19     additional day off, and that, as I told them, I expect that

20     the case will wrap up, as far as the evidence, on Monday,

21     and which is what I told them when I picked them, we picked

22     them, and therefore they can make other plans a couple of

23     days ahead of time.  I think jurors appreciate that.

24             So there's no problem with me telling them that?

25             MR. MENDYS:  No.

lr-e                          Proceedings

1              THE COURT:  All right.

2              MR. BONANNO:  Are we still okay to start a little

3        later on Monday?

4              MR. MENDYS:  That's fine with me.

5              MR. BONANNO:  10:30?

6              THE COURT:  And I'll tell them tomorrow what time

7        on Monday.

8              MR. BONANNO:  Okay.

9              THE COURT:  But you want to start at 11:30 Monday?

10             MR. BONANNO:  That would be perfect.

11             THE COURT:  Okay, fine.

12             MR. BONANNO:  Great.

13             THE COURT:  If they're ready, we can bring them

14       out.

15             COURT OFFICER:  Jury entering.

16             (Whereupon, the jury entered the courtroom.)

17             THE CLERK:  Let the record reflect that all sworn

18       jurors are present and properly seated.

19             THE COURT:  Okay.  Good afternoon, again, members

20       of the jury.  All right, that actually concludes the

21       evidence for today.  Now, let me give you the schedule for

22       tomorrow and then the rest of the evidentiary portion of the

23       trial.

24             Tomorrow I'm going to ask you all to be here at 10

25       o'clock in the morning room 601 for continued presentation

lr-e                          Proceedings

1      of evidence by the DA.  Now, we are not going to meet

2      Thursday in addition to Friday, and as I told you when I

3      picked you, or when we did jury selection when I gave you

4      the instructions that the evidentiary portion of the case

5      would conclude no later than Monday, and that is true.  We

6      will finish the evidentiary portion of this case on Monday

7      the 27th.  Whether the case is in your hands that day or the

8      next day, I won't really know until Monday, but the

9      presentation of evidence will conclude on Monday the 27th.

10                 So I wanted to give you a heads-up so you can make

11     plans for Thursday, if you have something you want to do you

12     won't be here Thursday.  We already said we weren't going to

13     be here Friday, and that's it.

14                 So I'll see you tomorrow morning.  Follow my

15     recess instructions, keep an open mind, do not discuss the

16     case and I'll see you tomorrow.

17                 COURT OFFICER:  Jury exiting.

18                 (Whereupon, the jury exited the courtroom.)

19                 THE COURT:  I'll see you tomorrow.

20                 (Whereupon, the case was adjourned to July 22,

21     2015.)

22                 (Continued on the next page...)

23

24

25

```
 1   SUPREME COURT OF THE STATE OF NEW YORK
     BRONX COUNTY : CRIMINAL TERM : PART 98
 2   ---------------------------------------x
     THE PEOPLE OF THE STATE OF NEW YORK
 3
            -against-
 4                                      Indictment. No.
     RICHARD DIAZ,                      3349-2012
 5
                       Defendant.
 6   ---------------------------------------x
                                    265 East 161 Street
 7                                  Bronx, New York 10451
                                    JULY 22, 2015
 8
     B E F O R E:
 9
                THE HONORABLE RALPH FABRIZIO
10              Justice of the Supreme Court

11              (Appearances same as previously noted.)

12                                  LAURA ROSEN
                                    SENIOR COURT REPORTER
13
          *      *      *      *      *      *      *      *
14              (Whereupon, the following took place in open court

15       in the presence of the Court, defense counsel, and the

16       assistant district attorney.)

17              THE CLERK:  Case on trial continued, Richard Diaz.

18       The defendant continues not to be present.

19              Appearances, please.

20              MR. BONANNO:  Good morning, Your Honor.  Pat

21       Bonanno for Mr. Diaz.

22              MR. MENDYS:  Newton Mendys for the office of the

23       district attorney.  Good morning.

24              THE COURT:  Good morning.  It's about 11 o'clock.

25       The final juror, one juror who's late just arrived.  I will
```

lr-a                          Proceedings

1       tell the jury again when they come out that this witness

2       will be testifying again with the Spanish language

3       interpreter.

4               Any record either side wants to make before we

5       proceed?

6               MR. MENDYS:  I don't think so, Judge.

7               MR. BONANNO:  Judge, briefly.

8               As I came up on the elevator, I believe juror Ali

9       was in the crowded elevator with me and my intern.  Everyone

10      got off on one floor, and it wasn't this floor, so I got off

11      too.  And there was no conversation, there was no even eye

12      contact, but then I got stuck in the elevator with him, so.

13              THE COURT:  Thank you for sharing all of that

14      information, and I don't think we have any problems with

15      that.

16              MR. BONANNO:  Thank you.

17              THE COURT:  Before the jury comes out I just want

18      to again ask, any word on Mr. Diaz from either side?

19              MR. BONANNO:  Not from mine.

20              THE COURT:  Or anyone?

21              MR. MENDYS:  No, Judge.

22              MR. BONANNO:  No.

23              THE COURT:  You can bring the jury out.

24              MR. BONANNO:  Actually, there is one issue.  As we

25      left yesterday, is it my understanding that Mr. Mendys is

lr-a                        Proceedings

1    going to attempt to bring in through this witness the arrest
2    photo or --
3                THE COURT:  Bring in this --
4                MR. BONANNO:  Show her the arrest photo and ask if
5    this is the person that was there that night.
6                THE COURT:  That's what he was going to do, yes.
7                MR. BONANNO:  I mean, I would have an objection to
8    that.  I don't know if that's, if that's even allowed, I
9    mean.
10               THE COURT:  Why wouldn't it be allowed?
11               MR. BONANNO:  She's gonna make a photographic
12   identification of the defendant?  I thought only corporeal
13   identifications were allowed.
14               THE COURT:  So then, what you're saying is that
15   any trial in which a defendant chooses to absent themselves
16   from the trial can never be identified in any way because
17   you could literally not have a corporeal identification in
18   court?
19               MR. BONANNO:  Well.
20               THE COURT:  We don't have cyber, we don't have any
21   kind of, you know --
22               MR. BONANNO:  I understand there's an exception
23   carved out when a defendant causes some misconduct from
24   allowing themselves to be corporeally viewed in a line-up
25   and things of that nature, and that allows a photo array to

lr-a                          Proceedings

1    come in.  I don't believe Mr. Mendys can ID him on the photo

2    array, so my objection would be the same.

3             THE COURT:  To what, a photo ID?  So you think

4    it's only admissible by you when you asked the witness

5    yesterday and showed the witness the photograph, the arrest

6    photo and said, do you recognize this person?

7             MR. BONANNO:  But she had had a prior corporeal ID

8    of the defendant in a line-up, where this witness has not.

9             THE COURT:  Mr. Mendys?

10            MR. MENDYS:  Well Judge, in terms, I mean, the

11   photo's in evidence already, number one.  Number two, I mean

12   this is a different situation than a photo array because

13   this is the arrest photo from this incident, so there's no

14   prejudice as to, there's no prejudice that goes along with a

15   photo array in this situation.

16            The other part of it is she never, there was never

17   an identification procedure.  Well, the only identification

18   procedure with her was a photo array, which would permit an

19   in-court identification had Mr. Diaz been here.

20            THE COURT:  And I had a hearing and I determined

21   that that photo array procedure was in no way suggestive of

22   anything, and that the witness would be able to make an

23   in-court identification if she were able to, if Mr. Diaz

24   were here.

25            Do you have any law that you can cite to me, Mr.

lr-a                          Proceedings

1      Bonanno, about why this isn't admissible, a photograph?

2              MR. BONANNO:  There is a Court of Appeals case,

3      Casparus, and I didn't get the cite, I looked at it briefly.

4      I got called out on a late arraignment and I meant to do the

5      research way into the night, but there is an exception that

6      the Court of Appeals carved out for the allowing of an

7      identification of a photo array in court when the defendant

8      is present but does not submit himself to a line-up.

9              So it's caused from the defendant's misconduct at

10     the line-up process.  There wasn't anything that I saw that

11     was on point where the defendant absents himself from the

12     trial itself that allows for an identification through a

13     photograph.

14             THE COURT:  You understand that in preparing a

15     witness for trial, the DA is permitted to show the witness

16     photos in the office and that's not even considered an

17     identification proceeding that can taint any in-court

18     identification.  So what is your proposal for the DA to meet

19     his burden of proving your client's identity?  You opened

20     and you said that the video will not show any faces, which

21     is, you know, I think, a given.

22             You cross-examined the witness yesterday who did

23     ID the defendant in the line-up, and then you're presenting

24     the photograph again identifying, but you cross-examined

25     that witness about that witness's ability to see, and you

lr-a                          Proceedings

1        want the DA not to be able to elicit any evidence to prove

2        your client's identity in this case by any photographic

3        means?  I mean, what are you proposing?

4                  MR. BONANNO:  Well, number one, I don't think it's

5        up to me to have to propose it, it's the People's burden to

6        meet.  What I'm saying is that this specific witness never

7        took part in an independent corporeal identification of the

8        defendant here, whereas the witness yesterday did, and so

9        she did view him in person.  Viewing photographs for ID

10       purposes in court is, per se, inadmissible as I understand

11       it.

12                 THE COURT:  Under what law?  Under what case?

13                 MR. BONANNO:  Under a photo -- you cannot ID just

14       a photo array and then do an in-court identification of the

15       client just for the photo array.

16                 THE COURT:  This is what you're, you are -- I

17       don't know what case you're referring to, and I've never

18       heard of a particular case that says a photo identification

19       is inadmissible in a court of law to prove the identity of

20       anyone, but when the defendant absconds, what other means do

21       the People have to prove that the person who was under

22       arrest is the same person who committed the crime, other

23       than through some visual means like a photograph?

24                 MR. BONANNO:  Judge, again, I understand that it

25       could be carved out as a misconduct of the defendant

lr-a                          Proceedings


1    exception.  I'll respectfully object to that and it will be

2    up to the Court to decide it, but that will be --

3              THE COURT:  I'm sorry, so you think the only

4    objection is where the inability to procure an

5    identification is by the misconduct of the defendant?

6              MR. BONANNO:  As to the cases I read.

7              THE COURT:  How about when the defendant, through

8    misconduct in a way, chooses not to be present in the

9    courtroom and thereby prevents the DA -- this is his own

10   choice.

11             MR. BONANNO:  I understand.

12             THE COURT:  Your client, we don't know where your

13   client is.  There's --

14             MR. BONANNO:  I understand that.

15             THE COURT:  There's a warrant out for his arrest

16   and no one can find him, and you've had conversations with

17   him.  You're the only person who knows a cell phone contact

18   number, which you're not sharing, that the DA can even bring

19   him in.

20             MR. BONANNO:  I don't think I can, Judge, share

21   it.

22             THE COURT:  But this is, you're not sharing that.

23   We're not bringing him here.  So in order for the DA to meet

24   their burden of proof to identify your client, they're

25   proposing that you, they're saying they're going to show him

lr-a                          Proceedings

1      what's already in evidence, which is the arrest photo in

2      this case.

3              MR. BONANNO:  And that's fine, Judge.  I'm just

4      saying that I'm gonna, you know, note my objection when it

5      happens.  And you rule as you chose, you are the court, and

6      I will respectfully object if it's adverse to my, you know,

7      application.

8              THE COURT:  And if you object, will the People be

9      seeking some sort of instruction for me to give the jury

10     about why this is permissible?

11             MR. MENDYS:  Yes.  I don't -- I've heard no basis

12     for an objection.  A photo of a defendant, even if he were

13     to be here, there are rules that allow an arrest photo to

14     come into evidence.  If his appearance has changed or if

15     there are multiple defendants on trial, there are any number

16     of situations where, where a photo can come into evidence,

17     as this photo is, and be shown to the witness.

18             The situation Mr. Bonanno keeps referring to a

19     photo array.  A photo array is not to come before the jury.

20     That is a different situation totally separate and apart

21     from --

22             THE COURT:  The prior photo array.

23             MR. MENDYS:  The prior photo array.

24             THE COURT:  Right.

25             MR. MENDYS:  From an arrest photo from the current

lr-a                    Proceedings

1        incident that is the subject of this trial being shown to a

2        witness, you know, who has, who has, in which a hearing was

3        done on a prior identification procedure.

4                So you know, if he's gonna object without any

5        grounds or basis in law or fact, you know, then I think the

6        jury has a right to understand what's going on and why this

7        is permissible.

8                THE COURT:  Especially since you, yourself, Mr.

9        Bonanno, showed another witness a photograph.  You're,

10       you're --

11               MR. BONANNO:  Judge.

12               THE COURT:  Let me finish.

13               MR. BONANNO:  Yes.

14               THE COURT:  You're constructing some convoluted

15       view that a photo can come in if there's been a prior

16       corporeal identification and so then the witness can be

17       shown any and all photographs, but if there's never been a

18       prior corporeal identification of the particular individual,

19       it can't come in.  Suppose there never was a corporeal

20       identification?  Suppose the witness just comes in and makes

21       an ID and, I mean, I know him, I've seen him, I described

22       him.

23               MR. BONANNO:  I know him, I've seen him, there's

24       nothing here to suggest --

25               THE COURT:  And they show a confirmatory

1    photograph to that witness that, is this the guy you're

2    talking about, yes, which is not even something the People

3    have to give notice of, and then that defendant absconds,

4    then what?

5              MR. BONANNO:  Judge, again, I haven't seen a case

6    directly on point.  The case on point that I saw that allows

7    an in-court identification from photos of a defendant was

8    such that when a defendant was there and refused to submit

9    himself to a line-up that was allowed.  An ID from the jury

10   box -- from the witness box was allowed out of a photo.  And

11   the photo Mr. Mendys is talking about, the arrest photo

12   coming in, I'm not arguing that the arrest photo shouldn't

13   come in, the arrest photo came in through him without my

14   objection because that was an arrest photo.  It was shown to

15   a witness that had witnessed Mr. Diaz in person before.  But

16   to say on that stand that this is the man that held me up

17   against the wall based just on a photo, when she can't even

18   do it from the photo array, that wouldn't be allowed.

19             MR. MENDYS:  I'm happy to move the photo array

20   into evidence.

21             MR. BONANNO:  I'm going to be objecting to that

22   too.  I believe that can't come in.

23             THE COURT:  You're objecting to the DA -- of

24   course the law does not allow the photo array, which is,

25   which is very close in time.  It's like the next day, right,

lr-a                         Proceedings

1       the photo array?  The day after the crime?

2                   MR. MENDYS:  It's either the next day or the same

3       day.

4                   THE COURT:  Yes, it's like within a day of the

5       arrest.

6                   MR. BONANNO:  It's right after the arrest, yes.

7                   THE COURT:  Within a day of the arrest.

8                   MR. BONANNO:  Right.

9                   THE COURT:  The witness views a photo of the

10      defendant in an array and said, that's the guy.  And that,

11      combined, of course, with the co-defendants saying that's

12      the guy forms a probable cause for arresting him in the

13      first place.

14                  MR. BONANNO:  I understand.

15                  THE COURT:  That's not admissible by law.  You

16      can't have a prior, prior photographic identification.  It

17      doesn't say you can't have an in-court photographic

18      identification, especially since it's the arrest photo from

19      this case, not a prior photo that would indicate that he has

20      -- if you were talking about a photograph from a different

21      arrest, well then, yeah, then the jury's going to speculate

22      that he has a record and there can be all sorts of arguments

23      about that, but that doesn't give, that doesn't mean you

24      don't have a right.

25                  They have to prove your client's identity, and the

lr-a                          Proceedings

1       only way they can prove it is by introducing a photograph

2       because he, himself, by his own voluntary actions, decided

3       not to come to court.  And I see no reason in ruling in an

4       in limine motion like this that you're opposing it and you

5       want me to preclude the DA from offering it, that

6       application is denied.

7                    And I will listen to whatever happens, but the DA

8       will be permitted to prove the identity through a prior,

9       through the arrest photo in this case because your client is

10      not present and they have no other means of doing it.

11                   MR. BONANNO:  That's fine.  I respectfully object.

12                   THE COURT:  Bring the jury out.

13                   MR. BONANNO:  Thank you.

14                   COURT OFFICER:  Jury entering.

15                   (Whereupon, the jury entered the courtroom.)

16                   THE CLERK:  The sworn jury is present and properly

17      seated.

18                   THE COURT:  All right.  Good morning, members of

19      the jury.  We're ready to continue with the presentation of

20      evidence by the People.  I want to advise you that the next

21      witness again will be testifying through a Spanish language

22      interpreter.

23                   Can you note your appearance for the record,

24      please?

25                   THE INTERPRETER:  Brenda Hernandez, Spanish

lr-a                        Proceedings

1          Interpreter.

2                  THE COURT:  Miss Hernandez is also an official

3          court interpreter.  They rotate in and out of different

4          courtrooms and she will be the interpreter for this witness.

5                  As I instructed you yesterday, you're required to

6          follow the English language interpretation made by the

7          interpreter on the record.  To the extent that you

8          understand Spanish, it's the English language interpretation

9          that's the record in this case.

10                 Mr. Mendys?

11                 MR. MENDYS:  People call to the stand Miss

12         Esmeraldi Rodriguez.

13                 THE COURT:  All right, we'll call Miss Rodriguez.

14                 COURT OFFICER:  Witness entering.

15                 (Whereupon, the witness entered the courtroom and

16         took the witness stand.)

17   E S M E R A L D I    R O D R I G U E Z, a witness called by

18            and on behalf of the People, having been first duly

19            sworn, was examined and testified through a Spanish

20            language interpreter as follows:

21                 COURT OFFICER:  Have a seat.  In a loud and clear

22         voice state your full name, spelling your last, and your

23         county of residence.

24                 THE WITNESS:  My name is Esmeraldi Rodriguez,

25         R-O-D-R-I-G-U-E-Z, and I live in the Bronx.

lr-a                    E. Rodriguez - People - Direct

1                    THE COURT:  You may inquire.

2                    MR. MENDYS:  Thank you, Judge.

3      DIRECT EXAMINATION

4      BY MR. MENDYS:

5          Q    Good morning, Miss Rodriguez.

6          A    Good morning.

7          Q    How old are you?

8          A    Twenty-eight.

9          Q    And where are you from originally?

10         A    Dominican.

11         Q    When did you come to the United States?

12         A    August 2nd of 2005.

13         Q    Are you married?

14         A    Yes.

15         Q    Do you have any kids?

16         A    Yes, two.

17         Q    When you came to the United States in 2005, where did

18     you live within the United States?

19         A    In the Bronx.

20         Q    And how long did you live there for?

21         A    At that time?

22         Q    For how long?

23         A    About three years.

24         Q    Where else have you lived since you've been in the

25     United States?

lr-a                    E. Rodriguez - People - Direct

1        A     I lived in Manhattan, in Massachusetts and in New

2   Jersey.

3        Q     Do you still have family in the Bronx?

4        A     I do.

5        Q     And as of right now where do you stay?

6              THE COURT:   Well, who do you stay with, without an

7      address.

8        Q     Without an address, yes, who do you stay with?

9        A     I live with my husband in New Jersey.

10       Q     How far did you go in school, Miss Rodriguez?

11       A     High school.

12       Q     And do you work?

13       A     I do.

14       Q     What do you do for a living?

15       A     I'm a home attendant.

16       Q     Have you ever been arrested?

17       A     Never.

18       Q     I want to ask you about some people.  Do you know a

19   woman by the name of Argelia Rosario?

20       A     I do, sir.

21       Q     How long have you known her for?

22       A     More than 15 years.

23       Q     What about a man by the name of Yohn Contreras?

24       A     Yes.

25       Q     How do you know him?

lr-a                    E. Rodriguez - People - Direct


1      A     Through a friend.

2      Q     When did you first meet Mr. Contreras?

3      A     When I was living in Massachusetts.

4      Q     And when was that, approximately?

5      A     About five years.

6      Q     What type of relationship did you have with Mr.

7    Contreras back in October of 2012?

8      A     We were courting each other like boyfriend and

9    girlfriend.

10     Q     And did there come a point when your relationship

11   ended?

12     A     Yes.

13     Q     Why did it end?

14     A     Distance.  Me here and him there.

15     Q     When you say him there, where was he living at that

16   time?

17     A     In Boston.

18     Q     Back then, do you know what Mr. Contreras did for a

19   living?

20     A     He told me in a factory.

21     Q     When was the last time you spoke to Mr. Contreras?

22     A     More than three years.

23     Q     Well, you were boyfriend/girlfriend in October of 2012?

24     A     Yes.

25     Q     When did your relationship end in relation to October

lr-a                        E. Rodriguez - People - Direct

1    2012?

2        A      Two months more.

3        Q      And have you spoken to him since then?

4        A      No, never again.

5        Q      What about a man by the name of Joel Rodriguez, do you

6    know him?

7        A      I do.

8        Q      How did you get to know Mr. Rodriguez?

9        A      When I was living in Boston.

10       Q      And how -- Mr. Rodriguez, is he related to you?  Same

11   last name.

12       A      No, no relation.

13       Q      Did -- how long would you say you've known him for?

14       A      Three years counting, five, six.

15       Q      Five or six years?

16       A      Up-to-date, yes.

17       Q      What was your relationship like with him back in

18   October of 2012?

19       A      Friendship.

20       Q      When was the last time you spoke to him?

21       A      I don't remember that.  Maybe three years.

22       Q      Is Mr. Rodriguez, is he also friends with Mr.

23   Contreras?

24       A      Uh, huh.

25              THE COURT:  Is that yes or no?

lr-a                    E. Rodriguez - People - Direct

1                    THE WITNESS:  Yes.

2        Q     So I want to ask you about events that took place on

3   October 17th of 2012, around midnight, in the area of 2315 Walton

4   Avenue here in the Bronx.  Are you familiar with that location,

5   2315 Walton Avenue?

6        A     Yes, I lived there.

7        Q     You lived there back then in October of 2012?

8        A     Yes.

9        Q     Now, that night who were you with?

10       A     I was with my boyfriend, with Joel Rodriguez and

11   Argelia Rosario.

12       Q     And your boyfriend would be Mr. Contreras?

13       A     Yes, sir.

14       Q     You indicated earlier that Mr. Contreras lived in

15   Massachusetts?

16       A     Correct.

17       Q     Why was he in the Bronx that night?

18       A     He came to see me and he came to see a car that he was

19   thinking of purchasing, something like that.

20       Q     Why -- well, about the car, how did he know about a car

21   that was, that he was thinking about buying?

22       A     I told him.

23       Q     What did you tell him?

24       A     That they were selling a car right behind my home.

25       Q     To your knowledge, did Mr. Contreras, did he need to

1r-a                    E. Rodriguez - People - Direct

1     get a new car?

2          A     He wanted to buy a car.

3          Q     Now, do you remember about when it was that you had

4     told him about the car?  Was it a couple of days before he came

5     or was it longer than that?

6          A     A week before.

7          Q     Now, when did he arrive in the Bronx?

8          A     That same day.

9          Q     That same day, the night leading into October 17th of

10    2012?

11         A     Yes.

12         Q     And did Mr. Contreras come with anyone from

13    Massachusetts?

14         A     Yes, with Joel.

15         Q     When were you intending to show him the car?

16         A     The next day.

17         Q     Do you know whether Mr. Contreras came down with a lot

18    of money to buy the car?

19         A     No.

20         Q     So that night leading into October 17th of 2012 what

21    were you doing?

22         A     At home with my children.

23         Q     And was there a point when you met up with Mr.

24    Contreras and Mr. Rodriguez?

25         A     Yes, when they arrived.

lr-a                     E. Rodriguez - People - Direct

1       Q       And did you also meet up with Miss Rosario?

2       A       Yes, I told her to come.  I wanted her to meet Joel.

3       Q       Did the four of you have plans to do anything that

4    night?

5       A       Yes.

6       Q       What were you going to be doing?

7       A       Socialize, have some drinks, talk.

8       Q       Were you going anywhere in particular?

9       A       First Argelia wanted to go to her brother's home.

10       Q       Did you end up going there?

11       A       No.

12       Q       Why not?

13       A       Because she called him while we were in the car and he

14    said he wasn't home.

15       Q       What kind of car were you in when she made that phone

16    call?

17       A       A taxi.

18       Q       And were you on, you were -- where were you going in

19    the cab?

20       A       To Argelia's brother's house.

21       Q       Now, when she wasn't able to get in touch with her

22    brother, what did the four of you decide to do?

23       A       Come back.

24       Q       And what were your plans upon returning to Walton

25    Avenue?

lr-a                    E. Rodriguez - People - Direct

1      A      Have some drinks at the restaurant that's at the corner

2   of my home.

3      Q      Now prior to getting in a cab that night had you had

4   anything to drink?

5      A      Nothing.

6      Q      So what happened when you got back to Walton Avenue?

7      A      We got out of the cab normally, and when we were about

8   to get together to decide what we were gonna do, I really didn't

9   see where it came from, but from the right-hand side on the 183

10   Street side, a young man comes out, he looked like a policeman,

11   like a detective with a badge on the outside, and the first thing

12   he said is, up against the wall.

13      Q      Did you, had you ever seen this person before?

14      A      Never.

15      Q      You said he looked like a detective.  Was he dressed in

16   a uniform?

17      A      No.

18      Q      Do you remember what he looked like?

19      A      Yes.

20      Q      Can you tell the jury what he looked like?

21      A      Dark skinned, tall.  He looked fit like he exercised.

22   Big eyes.  Very Dominican looking.

23      Q      So he was Hispanic?

24      A      He looked like he was.

25      Q      Did you, do you remember anything about the clothing he

lr-a                    E. Rodriguez - People - Direct

1    was wearing?

2         A    He had jeans, a hoody and the badge on the outside.

3         Q    How was he wearing the badge?

4         A    As a chain.

5         Q    Was it, where was it on his body?

6         A    Here.

7         Q    Indicating hanging from his neck?

8         A    Yes.

9              THE COURT:   And the badge indicating the center of

10        his chest.  Correct?

11             THE WITNESS:  Yes.

12        Q    What color was the badge?

13        A    I didn't notice.  It looked like a police badge.

14        Q    So what did you do -- what happened after he said up

15   against the wall?

16        A    He put me and Argelia up against the wall on the other

17   side where the door of the building is, and the men up against

18   the wall but on the opposite side, and there were two additional

19   people that came.

20        Q    The person with the badge, he put all four are of you

21   up against the wall?

22        A    Yes.

23        Q    Did you believe that he was actually a police officer

24   or a detective?

25        A    Totally.

lr-a                    E. Rodriguez - People - Direct

1      Q     What did you think was going on?

2      A     Honestly, I didn't know.

3      Q     Did you follow his instructions?

4      A     Yes.

5      Q     Did you ever ask for any further type of identification

6  from him?

7      A     No, cause I saw him as a policeman.

8      Q     Now, you mentioned that there were two other people

9  that he was with.

10     A     Yes, sir.

11     Q     What -- do you remember what they looked like?

12     A     One was a little bit on the heavier side, tall, light

13  skinned, and the other person was similar but just shorter.

14     Q     Of these three individuals -- strike that.

15           Did those two people, did they ever say anything?

16     A     I don't recall.

17     Q     Now, of these three individuals that you just

18  described, was there one in particular that you were dealing with

19  or that was speaking that you were dealing with?

20     A     Yes, the one with the badge.

21           (Continued on the next page...)

22

23

24

25

B mc                    E. Rodriguez - People - Direct

1       Q.   So what happened after you were -- the four of you were

2   placed up against the wall?

3       A.   Believe it or not the real cops showed up.

4       Q.   Well before the real cops showed up, what -- did these

5   men do anything?

6       A.   They were frisking the men, not us.

7       Q.   Did anyone ever put hands on you?

8       A.   Yes, the one with the badge.

9       Q.   Can you describe what he did?

10      A.   He pushed me up against the wall.

11      Q.   When he pushed you up again the wall, were you facing

12  the wall?

13      A.   Yes.

14      Q.   And what about your friends, were they also facing the

15  wall?

16               THE COURT:  You mean all three other people?

17               MR. MENDYS:  Yes.

18      A.   Yes.

19      Q.   Can you describe --

20               MR. MENDYS: Well, strike that.

21      Q.   Who was -- who was next to you as you were facing the

22  wall?

23      A.   Argelia.

24      Q.   And what side of you was she on?

25      A.   On my left-hand side.

223

B mc

E. Rodriguez - People - Direct

1    Q.    Was there anyone on your right?

2    A.    No.

3    Q.    Okay.  And where were the men, were they to your left

4  or to your right?

5    A.    On the left.

6    Q.    Past Argelia?

7    A.    Next to Argelia was the door to the building and then

8  the men were on the other side.

9    Q.    Was anything taken from you?

10   A.    No.

11   Q.    Aside from pushing you up against the wall, did the man

12  with the shield touch you at all?

13   A.    No, just my back.

14   Q.    And you indicated that the men were being searched?

15   A.    Yes.

16   Q.    Can you describe how that was happening?

17   A.    Not really clear because my face was up against the

18  wall, I couldn't really see clearly.

19   Q.    How do you know they were being searched?

20   A.    Because when the real cops showed up, my boyfriend said

21  that one of them had taken money out of his pocket.

22   Q.    Did you ever see anything taken from your boyfriend?

23   A.    I couldn't see what they took, but he said.

24   Q.    Okay, but you did not actually see anything removed

25  from him?

B mc

E. Rodriguez - People - Direct

1     A.   Not really.

2     Q.   Did you see anything taken from anybody?

3     A.   No.

4     Q.   When the man with the shield approached you and said,

5  "Police, up against the wall," was he speaking in English or

6  Spanish?

7     A.   In English.

8     Q.   Do you understand some English?

9     A.   I do.

10    Q.   How would you describe his demeanor?

11    A.   Threatening.

12    Q.   While you were up against the wall did any of these

13  three men say anything?

14    A.   They were talking, but I was scared, I didn't

15  understand, I didn't know what was going on.

16    Q.   Do you remember if they were speaking in English or

17  Spanish?

18    A.   In English.

19    Q.   Were they -- do you know if they were speaking to one

20  another or were they speaking to some of you?

21    A.   The two men that were searching the men were talking

22  amongst themselves and to the men.

23    Q.   And to the men?

24    A.   Yes.

25    Q.   Was -- where was the man with the badge when you first

B mc                    E. Rodriguez - People - Direct

1   saw him?

2        A.   He was coming from the street onto the sidewalk.

3        Q.   Can you estimate about how far or how close he was to

4   you at that point?

5        A.   When he was coming?

6        Q.   When you first saw him.

7        A.   How close he was, I would say about where her chair is.

8             THE COURT:   Indicating this woman here, the court

9        reporter?

10            THE WITNESS:   Yes.

11            THE COURT:   So about six, seven feet.   Okay.

12       Q.   And what point did you first notice his face?

13            MR. BONANNO:   Objection.

14            THE COURT:   No, overruled.

15       A.   From that very moment.   The light from the building was

16  directly on him, that's why I noticed he was a cop because the

17  light flashed onto his face, onto the badge, and his attitude.

18       Q.   Was there anything blocking your view of his face?

19       A.   Nothing.

20       Q.   Now at what point -- where was he when he first said,

21  "Police?"

22            THE COURT:   Where was he standing?

23       Q.   Where was he standing?

24       A.   Where this chair is.

25            THE COURT:   Okay, indicating closer by about a

E. Rodriguez - People - Direct

1      foot or so, maybe two feet from where you first observed

2      him.

3                    THE WITNESS:  Correct.

4      Q.   And was he -- in what direction -- did he continue

5      moving at that point?

6      A.   Yes, sir.

7      Q.   In what direction was he moving?

8      A.   Towards us very quickly.

9      Q.   Now you indicated earlier that there was a point when

10     the police came, the real police?

11     A.   Yes.

12     Q.   What happened when the police arrived?

13     A.   The one with the plaque bolted off.

14     Q.   What direction did he go?

15     A.   To the right, towards 184th Street.

16     Q.   And did he -- how was he moving when he left?

17     A.   First he was walking normally and then running.

18     Q.   And what about the other two individuals?

19     A.   They didn't notice.

20     Q.   What happened to them?

21     A.   They stayed doing what they were doing, searching.

22     Q.   And what did the police do when they got there?

23     A.   They stopped there as if they were having a

24     conversation with the men.

25     Q.   The police did?

B mc

E. Rodriguez - People - Direct

1    A.   The ones that were not cops.

2    Q.   Okay.  Okay, I'm sorry, say that again?

3    A.   The ones that were frisking both my boyfriend and my

4 friend, when they see the real cops show up, they're talking to

5 us as if we're friends.

6    Q.   What did the real police do when they arrived?

7    A.   They asked what's going on.  So the officer asked

8 what's going on and he was kind of like, "What's going on," and

9 everyone is like what's going on because supposedly it's the cops

10 that have us up against the wall.  And then we see that the real

11 cops show up, so no one knows what to do.  The cop grabs the

12 other two and starts asking what's going on here.

13    Q.   Did the police ultimately arrest those two men?

14    A.   Yes, they did.

15    Q.   Did you speak to the police on Walton Avenue that

16 night?

17    A.   We did everything.

18    Q.   Did you provide a description of the man with the

19 badge?

20    A.   At the moment, yes.

21    Q.   Do you recall what that description was that you

22 provided to the police?

23    A.   Yes, the same one I just said to you.

24    Q.   If you could just repeat it, please?

25    A.   Yes.  I told them there was a tall man, dark skin,

B mc                              E. Rodriguez - People - Direct

1    stood by us, he had a badge, a police badge and put us up against

2    the wall saying that he was the police and then he ran towards

3    the left-hand side.

4         Q.   Towards the left-hand side?

5         A.   Which is my right side.

6         Q.   Okay, towards 184th Street?

7         A.   Yes, sir.

8         Q.   And in terms of his appearance did you provide any

9    other description to the police that night?

10        A.   Not at the time.

11        Q.   Did there come a point when you spoke to detectives

12   later on?

13        A.   Yes.

14        Q.   At what point did you realize --

15             MR. MENDYS:   Strike that.

16        Q.   You indicated that the man with the badge said,

17   "Police?"

18        A.   Yes.

19        Q.   And you believed that he was a police officer?

20        A.   Totally.

21        Q.   What about the other two, did you believe they were

22   police officers as well?

23        A.   Yes.

24        Q.   What did they do to make you believe that they were

25   also police officers?

B mc                    E. Rodriguez - People - Direct

1      A.    They didn't do anything, they just came with the other

2  guy who had a badge.

3      Q.    What about when they searched your friends, did that

4  make you think that they were police?

5      A.    Of course, they're acting like cops.

6      Q.    At what point did you realize that these three men were

7  not police?

8      A.    When the other ran off.

9      Q.    The man with the badge?

10      A.    Yes, sir.

11      Q.    Okay, I want to show you a picture.  This is People's 5

12  in evidence.  I'm going to put it on the monitor.

13            THE COURT:  People's 5 in evidence being placed on

14       the monitor.

15            MR. BONANNO:  Again, I know we've had a

16       conversation outside the earshot of the jury, I'm going to

17       renew my objection.  I know you ruled on that, but I'm just

18       going to renew my objection.

19            THE COURT: The objection is overruled.

20            MR. BONANNO: Thank you.

21            THE COURT:  People v. Scarola, S-c-a-r-o-l-a, 71

22       NY2d 769, perfectly legal procedure.  At this time you may.

23       This is being -- the witness is being shown People's 5 on

24       the screen.  Go ahead.

25      Q.    Miss Rodriguez, do you recognize that person?

230

B mc

E. Rodriguez - People - Direct

1    A.    Yes, sir.  Yes, I do.

2    Q.    And who is that?

3    A.    The one with the badge.

4    Q.    Have you ever seen this picture before?

5    A.    No.

6    Q.    Didn't you see it Friday?

7    A.    On your desk.

8    Q.    Is that a yes?

9    A.    Yes.  I'm never going to forget that face.

10   Q.    Had you ever seen him prior to that night?

11   A.    Never.

12   Q.    What about the other two, had you ever seen those

13   individuals prior to that night?

14   A.    No, I didn't even really get to see them very well that

15   night.

16   Q.    I'm going to show you what's in evidence as People's 4

17   and 4A.  Did you have an opportunity before coming to court to

18   view a video?

19   A.    Yes.

20   Q.    And that was this past Friday?

21   A.    Yes.

22   Q.    Prior to that Friday -- prior to Friday had you ever

23   seen that video before?

24   A.    Never.

25   Q.    I'm going to be asking you some questions about it.  If

B mc                              E. Rodriguez - People - Direct

1  you could stand up and move next to the video still so the jury

2  can see the video.

3              MR. MENDYS:  Let the record reflect the video is

4        playing CH dash 02, top left, date stamp is 2012/10/16, time

5        stamp 23:55:36.

6              (Video playing.)

7  Q.  Okay, Miss Rodriguez, I'm pausing at 23:56:12.  If you

8  could approach -- well, do you see yourself in this video?

9  A.  Yes.

10 Q.  If you could approach the monitor and just point to

11 yourself, please?

12             (Witness indicating.)

13             MR. MENDYS:  Okay, indicating the top of the

14       screen in the middle of the sidewalk.

15             THE COURT:  On the left side.

16             MR. MENDYS:  On the left side.

17 Q.  And do you see Miss Rosario?

18 A.  Yes, close to the wall.

19 Q.  In what appears to be a red shirt?

20 A.  Red.

21             MR. MENDYS:  Indicating the person closest to the

22       wall on the left side near the top of the screen.

23 Q.  Do you see Mr. Rodriguez?

24 A.  I do.

25 Q.  Could you point to him, please?

B mc

E. Rodriguez - People - Direct

1    A.    This guy.

2              MR. MENDYS:   Indicating in the middle of the

3    sidewalk closer to the camera than Miss Rodriguez in dark

4    clothing.

5    Q.    And do you see Mr. Contreras?

6    A.    Close to me.

7    Q.    Where is he?

8              (Witness indicating.)

9              MR. MENDYS: Okay, indicating the person on the

10   curb near the top of the screen.  The person who is furthest

11   to the right of these four individuals.

12             MR. MENDYS: I'm going to play it again.

13             (Video playing.)

14   Q.    I'm pausing it now at 23:56:21.  Who is that person who

15   just stepped onto the sidewalk?

16   A.    The guy with the badge.

17   Q.    Did you see where he came from?

18   A.    Yes, from 183rd.

19   Q.    183rd would be in what direction on this as we're

20   looking at this camera?

21             THE COURT:   As you're looking at the picture?

22   A.    On the right.

23   Q.    Okay, this is Walton Avenue, correct?

24   A.    It is.

25   Q.    And 183rd would be -- does 183rd intersect with Walton?

B mc

E. Rodriguez - People - Direct

1    A.    So Walton is the Avenue and 183rd is parallel.

2    Q.    183rd is the same direction as Walton?

3    A.    It's on the corner.

4    Q.    Okay, so 183rd crosses Walton.  Now is 183rd -- would

5  183rd be towards the bottom or the top of the screen as we're

6  looking at it now?

7    A.    The bottom.

8    Q.    Okay.  And what street would be closest looking at the

9  top of the screen?

10    A.    184th.

11         MR. MENDYS:  Playing the video again.

12         (Video playing.)

13    Q.    I'm pausing it now at 23:56:50.  Can you describe what

14  we just saw?

15    A.    Yes, the same thing I said.  He came, he says, "Get up

16  against the wall," he puts us up against the wall, he stays with

17  us and the other two go and search the men.

18    Q.    Do you know -- you indicated that you described the two

19  people he was with, the man with the badge was with?

20         THE INTERPRETER:  I'm sorry, one more time?

21         MR. BONANNO:  Strike it, let me start over.

22    Q.    Do you know which of these individuals was searching

23  Mr. Contreras?

24    A.    The tallest one, the fuller one, the bigger one.

25         MR. MENDYS:  I'm playing it again starting at

234

B mc                    E. Rodriguez - People - Direct

1        23:56:50.

2                    (Video playing.)

3        Q.   I'm pausing it at 23:57:50.  Miss Rodriguez, what just

4   happened here?

5        A.   The cops showed up.  You can see the one with the badge

6   notices and he goes off and the other two stay with nothing

7   happened.

8                MR. MENDYS:  I'm going to switch camera angles

9        now.  Okay, let the record reflect this is CH dash 01, which

10       is indicated in the top left.  Date stamp is 2012/10/16,

11       time stamp 23:55:31.

12                    (Video playing.)

13       Q.   Okay, I'm pausing it at 23:56:10.  Miss Rodriguez, do

14   you see yourself in this view?

15       A.   Yes.

16       Q.   If you could just point to yourself, please?

17                    (Witness indicating.)

18                MR. MENDYS:  Indicating slightly right of center

19       in the screen on the center of the sidewalk.

20       Q.   And what about Miss Rosario?

21                    (Witness indicating.)

22                MR. MENDYS:  Indicating the person who's furthest

23       right closest to the wall.

24       Q.   And Mr. Rodriguez?

25                    (Witness indicating.)

235

B mc

E. Rodriguez - People - Direct

1          MR. MENDYS:   Indicating the person who is also in

2     the center of the sidewalk in between the two -- in between

3     the people identified as Miss Rodriguez and Miss Rosario.

4     Q.   And Mr. Contreras?

5               (Witness indicating.)

6          MR. MENDYS:   Indicating the person who is stepping

7     onto the sidewalk from the street in between two cars that

8     are parallel parked.

9               Playing the video.

10              (Video playing.)

11    Q.   And who is that person who just stepped onto the

12    sidewalk?   This is at 23:56:21.

13    A.   The guy with the badge.

14              MR. MENDYS:   Playing the video.

15              (Video playing.)

16    Q.   Pausing it at 23:56:45.   Can you see yourself at this

17    point?

18    A.   Yes.

19    Q.   Where would you be?

20              (Witness indicating.)

21    Q.   Okay, the person we see closest?

22    A.   Argelia.

23    Q.   And you would be second, I guess, next to her?

24    A.   Yes.

25              MR. MENDYS:   Indicating on the wall or close to

236

B mc

E. Rodriguez - People - Direct

1    the wall.

2    Q.    So Argelia was on your right?

3    A.    My left-hand side.

4           THE COURT:  As you were facing the wall?

5           THE WITNESS:  Left, I suppose.

6    Q.    Who is that person that we see right there closest to

7    the camera on the wall?

8    A.    I don't know where the camera is.

9    Q.    No, no, as we're looking at the screen?

10          MR. MENDYS:  May I approach the monitor, Judge?

11          THE COURT:  Sure.

12   Q.    Who is this person right here?

13   A.    Argelia.

14   Q.    I'm pointing to the person on the end.

15          THE COURT:  You're kind of blocking the jurors.

16   Q.    I'm pointing to the person on the end of the group

17   closest to the camera.  And if Argelia was on the end here, were

18   you next to Argelia?

19   A.    Yes.

20   Q.    So Argelia would have been on your right as you're

21   looking at the wall?

22   A.    Yes.

23   Q.    Okay.

24   A.    Yes, it's confusing.

25   Q.    Thank you.

B mc

236a

E. Rodriguez - People - Direct

1    A.   I got confused.

2    Q.   And who was on your -- who was on your left, directly

3    to your left?

4    A.   After the door of the building?

5    Q.   Yes.

6    A.   Rodriguez.

7    Q.   Are you certain of that?

8    A.   I'm not sure.

9             MR. MENDYS:   Okay, I'm playing the video.

10            (Video playing.)

11                 CONTINUED NEXT PAGE........

```
lr-c                    E. Rodriguez - People - Direct
```

1                    MR. MENDYS:  Paused it at 23:57:46.

2       Q    Miss Rodriguez, what just took place?

3       A    The cops arrived.  He notices and he leaves.

4       Q    Miss Rodriguez, have you ever had to testify about this

5   before in court?

6                    THE COURT:  Have you ever testified at any

7        proceeding in this case?

8       Q    About this case?

9       A    Not in court, just at the, you know, at the police

10  precinct.

11                   MR. MENDYS:  I have no further questions.

12                   THE COURT:  Have you testified in a courtroom was

13       the question or under oath in any court?

14                   THE WITNESS:  Never.

15                   THE COURT:  Okay.  Mr. Bonanno?

16                   MR. BONANNO:  Yes, thank you.

17  CROSS-EXAMINATION

18  BY MR. BONANNO:

19      Q    Good afternoon, Miss Rodriguez.

20      A    Good afternoon.

21      Q    I'm going to ask you some questions.  If you don't

22  understand them, let me know, I'll try and rephrase it so you

23  understand them.  Okay?

24      A    That's fine.

25      Q    In October of 2012 you were in a relationship with Mr.

lr-c                    E. Rodriguez - People - Cross

1   Contreras boyfriend/girlfriend; is that correct?

2       A    Yes.

3       Q    And about a week before this incident in October of

4   2012, you had a conversation with him about a car that was

5   available to be purchased?

6       A    Yes.

7       Q    And did you see where that car was?

8       A    Of course I saw where it was.

9       Q    Excuse me?

10      A    Of course I saw where it was.

11      Q    Where was it?

12      A    It was at the gas station that's on Jerome Avenue

13  that's behind where I used to live.

14      Q    And do you remember if you told Mr. Contreras how much

15  the price was on the car?

16      A    No, all I said was that the car was for sale.

17      Q    Do you recall if the price was $6500?

18      A    No.

19      Q    Do you recall having a conversation with Mr. Contreras

20  that you told him you could get the car for $6,000?

21      A    No.

22      Q    Do you recall telling Mr. Contreras to bring $6,000

23  with him to the Bronx?

24      A    No, I didn't know he had money.

25              THE COURT:  Let's get the rest of answer.

lr-c                        E. Rodriguez - People - Cross

1      A     I didn't know he had money.

2            THE COURT:  Okay, next question.

3      Q     That was gonna be my next question.

4            So when he came to the Bronx on October 17, 2012, you

5   had no idea that he had $6,000 on him?

6      A     No.

7      Q     Do you know if he ever bought that car?

8      A     He didn't buy it.  They took his money.

9      Q     The money that he brought to buy the car?

10     A     According to him.

11     Q     But he never told you he had the money on him?

12     A     Never.

13     Q     Do you know an individual by the name of Mr.

14  Melenciano?

15     A     No.

16     Q     Do you know an individual by the name of Mr. Santana?

17     A     No.

18     Q     The two other men that were in the video we just saw,

19  you don't know them?

20     A     I had never seen them.

21     Q     The men that were frisking Mr. Rodriguez and Mr.

22  Contreras?

23     A     Never.

24     Q     When you described just now the man who asked you to

25  get, who told you to get up on the wall, you said it was a young

lr-c                    E. Rodriguez - People - Cross

1    man with a badge who said up against the wall; is that correct?

2         A    Correct.

3         Q    And you also said he was dark skinned, tall, and he was

4    fit like he exercised; is that correct?

5         A    According to appearances, yes.

6         Q    He looked very Dominican; is that correct?

7         A    Very.

8         Q    Does that mean he had a dark complexion?

9         A    Yes, dark Indian complexion.

10        Q    Did he have a big nose?

11        A    I didn't notice his nose.

12        Q    Did he have big lips?

13        A    I saw his big eyes.

14        Q    Now, you described the big eyes today.  Did you ever

15   tell the police on the scene when they asked for a description

16   that he had big eyes?

17        A    On the scene I said the same thing I'm saying here.

18        Q    Do you remember what policeman you told that to?

19        A    If I saw him.

20        Q    Well, did you say it to a uniformed policeman?

21        A    Yes, sir.

22        Q    And do you know if you said it to any other policeman

23   at a precinct?

24        A    Yes.

25        Q    Do you remember?

1r-c                     E. Rodriguez - People - Cross

1       A     A detective.

2       Q     Yes.  Do you remember a Detective Rodriguez?

3       A     I do.

4       Q     Do you remember telling Detective Rodriguez he had big

5    eyes?

6       A     Yes.

7       Q     Do you recall if he wrote that down?

8       A     That I don't recall.

9       Q     Now, when this man with the plaque, and I'm interested

10   about, excuse me, I'm interested about the plaque, how did he

11   show you the plaque?

12      A     Please excuse what I'm gonna say.  It's very clear in

13   the video that he goes like this and he let's it fall, with a

14   chain like a regular policeman.

15      Q     You saw that in the video?

16      A     I saw it now.

17      Q     But at the time what do you recall?

18      A     Exactly what I saw in the video.

19      Q     Did he unzip his jacket?

20      A     No, it was a hoody with no zipper.

21      Q     And he had the hoody up?

22      A     Yes.

23      Q     Did you see if he had sideburns?

24      A     No.

25      Q     Did you see if he had short hair or long hair?

1r-c                    E. Rodriguez - People - Cross

1      A     Yes, he had a cut like, like the gentleman in the

2   purple shirt.

3                    THE COURT:  In the first row?

4                    THE WITNESS:  Yes.

5                    THE COURT:  The man with his hand --

6                    THE WITNESS:  Yes.

7                    THE COURT:  -- on his -- all right.  So that's

8          indicating for the record Alternate No. 1.

9                    His hair was styled like that, which is short

10         cropped hair.  Okay.

11                   THE WITNESS:  Yes.

12     Q     And you saw that when he had his hoody up?

13     A     No, the hoody fell and you can see halfway.

14     Q     When did the hoody fall?

15     A     When he walks towards me he does it very quickly.  That

16   happened so fast, but in slow motion.

17     Q     And where were you facing when the hoody fell?

18     A     In the same direction I say in the same direction all

19   the time, I was frozen in place.

20     Q     You were facing the wall; is that correct?

21     A     No, my face was facing his.  He put me up against the

22   wall.

23     Q     When he walked away and the hoody fell off, where were

24   you facing?

25     A     He put on the hoody when he left, but when he's coming

1r-c                    E. Rodriguez - People - Cross

1    towards us is when the hoody falls off and he goes like this to

2    his badge.  The light was directly on his face, it's impossible

3    for me to forget what he looked like.

4        Q    Do you remember if he was wearing any jewelry that

5    night?

6        A    No, I didn't notice that.

7        Q    Did he have a chain on?

8        A    The police chain.

9        Q    Did he have any earrings on?

10       A    I didn't notice that.

11       Q    Did he have any scars on his face?

12       A    I didn't notice any of that.

13       Q    So the majority of the interaction you had with this

14   fellow was from six to seven feet away directly; is that correct?

15       A    Up until he comes up to me and he put me, he faces me

16   towards the wall about as close as she is to me.

17                 MR. MENDYS:  Indicating the interpreter.

18       Q    Face to face.  You were face to face with his hoody up?

19       A    He didn't have the hoody on.

20       Q    He didn't have the hoody on when he was that close to

21   you?

22                 THE COURT:  Yes or no?

23       A    No.

24       Q    So when he put you up on the wall, his hoody was down?

25       A    It was one of those big heavy thick hoodies and it fell

1r-c                        E. Rodriguez - People - Cross

1   halfway or partial.

2       Q    While he had his hand on you?

3       A    I couldn't see him, my back was towards him.

4       Q    Now, did he ever search you?

5       A    Not me.

6       Q    Did he ever put his hands in Miss Rosario's pockets?

7       A    I didn't see.

8       Q    But he never put his hands inside of your pockets?

9       A    No.

10      Q    Did he ever touch your legs and frisk your legs?

11      A    No.

12      Q    Did he ever say, give me your money?

13      A    No.

14      Q    Did he ever tell the other two fellas that were being

15  frisked to give them, to give up their money?

16      A    No.

17      Q    He never had a conversation with the two other fellas,

18  did he?

19      A    What other conversations is he gonna have if it's cops

20  and we're up against the wall?

21      Q    I'm asking you did he have a conversation with anyone

22  else there?

23      A    No.

24      Q    And you say People's No. 5, which is already in

25  evidence, that you saw this photo the other day on the district

lr-c                      E. Rodriguez - People - Cross

 1   attorney's desk; is that correct?

 2        A    Yes.

 3        Q    The earring that Mr. Diaz is wearing in this photo, was

 4   he wearing that earring that night?

 5        A    No, I didn't notice.

 6        Q    But you had a direct shot at his face because the light

 7   was bright right on his face?

 8        A    Yes.  Can I say something?

 9             THE COURT:  Right now there's no question in front

10        of you.

11        Q    Had he been wearing that earring that night, would you

12   have noticed that?

13             MR. MENDYS:  Objection.

14             THE COURT:  Sustained.  You can't answer the

15        question.

16        Q    Is that a noticeable earring?

17             MR. MENDYS:  Objection.

18             THE COURT:  Sustained.  In the photograph?

19             MR. BONANNO:  Yes.

20             THE COURT:  Do you notice the earring that's in

21        the photo?

22             MR. BONANNO:  That's in the photograph.

23             THE COURT:  Okay.  Do you see the earring in the

24        photograph?

25             THE WITNESS:  Yes, sir.

lr-c                        E. Rodriguez - People - Cross

1     Q     Can you describe the badge that he was wearing?

2     A     Like the one's police officers have.

3     Q     And what color was that?

4     A     I didn't notice.

5     Q     You didn't notice what color it was?

6     A     No, it's a police badge.

7     Q     Was it gold?

8     A     I didn't notice.  It looks like a real police officer's

9  badge.

10    Q     What does a real police officer's badge look like?

11    A     Silver on the inside and golden on the outside.

12    Q     And do you recall now what color it was?

13    A     Well, I'm seeing it now, but at the moment I saw it

14 looked as if he were a cop wearing a real police badge.

15    Q     So Miss Rodriguez, are you testifying from your memory

16 of the incident that night or are you testifying from looking at

17 the video Friday and today?

18                    THE COURT:  About what?

19    Q     About the incident that has occurred on October 17,

20 2012?

21                    THE COURT:  About everything?

22                    MR. BONANNO:  Yes.

23                    THE COURT:  Okay.

24    A     What I recall is exactly what I recall.  There are

25 certain things that I've forgotten, it's been almost four years.

lr-c                    E. Rodriguez - People - Cross

1    And the last thing I want to do is remember, but it happened.

2         Q    But when you describe Mr. -- well, the fella that held

3    you up on the wall, you told the police he was tall, you told him

4    he was dark skinned, you claim now that you told him he had big

5    eyes, but you also said you'll never gonna forget that face?

6         A    Never.

7         Q    But at the time they asked you about his face when it

8    was fresh in your mind, all you could say was he was tall and he

9    was dark skinned.

10        A    Well, I couldn't, I couldn't give a written picture

11   description of him, but I have his face in my memory, I can't

12   forget it.

13        Q    Did you tell that to the police that night?

14        A    I did, just like I remembered him from a photograph the

15   other day.

16        Q    Did you tell the police about the big eyes?

17                  MR. MENDYS:  Asked and answered.

18                  THE COURT:  No, no.  Did you tell the police about

19        the big eyes?

20                  THE WITNESS:  Yes, everything.

21        Q    And it's your answer that you told Detective Rodriguez

22   about the big eyes?

23        A    I just didn't focus on his eyes, I focused on his face,

24   his body and his size.

25                  THE COURT:  No, but the question is, did you tell

1     Detective Rodriguez when you spoke to Detective Rodriguez

2     that the person had big eyes?

3             THE WITNESS:  Yes, I told him that he looked very

4     very Hispanic.

5     Q     And this was at the police precinct?

6     A     Yes.

7             MR. BONANNO:  I have no further questions.

8             THE COURT:  Any redirect?

9             MR. MENDYS:  No.

10            THE COURT:  You may step down, ma'am.  Thank you

11    very much.

12            (Whereupon, the witness was excused.)

13            THE COURT:  We're going to take a short recess,

14    members of the jury.  Do not discuss the case, keep an open

15    mind, keep the recess instructions in mind and I'll call you

16    back shortly.  Okay?

17            COURT OFFICER:  Jury exiting.

18            (Whereupon, the jury exited the courtroom.)

19            THE COURT:  All right.  You know, I'm going to

20    give them -- that's it for the day?

21            MR. MENDYS:  Yes.

22            THE COURT:  I'm going tell them to be here 11

23    o'clock Monday, although we've talked about 11:30.

24            MR. BONANNO:  Thank you, Judge.  What was that

25    cite again, 71 NY2d?

lr-c                             Proceedings

1          THE COURT:   Scarola, S-C-A-R-O-L-A, 71 NY2d 769.

2    A defendant who absconds from trial forfeits his right to

3    challenge an in-court photographic show-up identification

4    procedure, which is what happened here.

5          MR. BONANNO:   Thank you, Judge.

6          THE COURT:   And what I would like to do, but not

7    right now, although we can do it now after the jury leaves,

8    we have sometime, is to talk about a plan B, which is the

9    witness doesn't show up Monday.  So think about the charges,

10   take a few minutes and then we'll call it back in, okay.

11   Requests to charge and things.

12         MR. MENDYS:   Right.

13         THE COURT:   Based on this evidence, all right?

14         MR. MENDYS:   Okay.  Do you want to bring the jury

15   out first, then let them go?

16         THE COURT:   Give them a couple of minutes.  We'll

17   take a couple of minutes too.

18         MR. MENDYS:   Okay, thank you.

19         (Whereupon, there was a brief recess taken.)

20         (Continued on the next page...)

21

22

23

24

25

D mc

250

Proceedings

1          (Whereupon, the following takes place on the

2     record, in open court, in the presence of the Court,

3     Mr. Bonanno and Assistant District Attorney Mendys:)

4          (Whereupon, the jury enters the courtroom and the

5     following takes place:)

6          THE COURT:  All right, continued case on trial.

7     The jury is present.

8          And, members of the jury, that's it for the day.

9     I'm going to excuse you for the rest of the day.  And as I

10    told you yesterday, we won't be meeting tomorrow.  I do

11    currently expect that the evidence will be completed on

12    Monday.  Give you a chance to warm up from our cold

13    courtroom.  But I hope you have a nice break.

14         There's always a temptation to want to know more,

15    visit more, but these rules are very, very important.

16    You're not to visit any scene, you're not to discuss

17    anything about any factual, legal issue about this case with

18    anyone else.  Don't speculate about anything.  Just follow

19    all my recess instructions.  Keep an open mind.  The case is

20    not finished, you haven't heard my instructions and there

21    will be a time for deliberation, okay.

22         So I'm going to ask you to come eleven a.m. on

23    Monday, and again Room 601, and when you're here, we'll

24    proceed.  Okay.  So have a great weekend.

25         (Whereupon, the jurors exit the courtroom.)

D mc                    Proceedings

1          THE COURT:  All right, so the jury has left the

2     courtroom now.  And I know that this is preliminary, but as

3     I said, if there isn't going to be another witness at all, I

4     would like to proceed with summation and charge Monday.  And

5     I understand you currently believe your witness will be

6     arriving in New York on Sunday.

7          MR. MENDYS:  Yes.

8          THE COURT:  If the witness is not here, number

9     one, you should tell Mr. Bonanno.  I will say we're going to

10    come in at 9:30 if there's no witness and hammer out the

11    jury instructions finally if there is no witness.

12    Obviously, if there is a witness, we'll address it after

13    that as well.

14          But let's focus on this indictment and let me ask

15    you what charges, based on what we have now, you would ask

16    to have submitted to the jury?

17          MR. MENDYS:  I have some things that I think I

18    feel fairly certain that I would want.

19          THE COURT:  I'm talking about the crime charges.

20          MR. MENDYS:  I understand.

21          THE COURT:  Go ahead.

22          MR. MENDYS:  The first, I think we have a

23    completed Robbery in the Second Degree as the evidence sits

24    now, so I would ask for that.

25          I would ask for, I think it's count five, Grand

D mc                        Proceedings

1    Larceny in the Fourth Degree under 155.30, Sub 5.

2                Criminal Impersonation in the First Degree.

3                And I'm contemplating possibly an Attempted

4    Robbery in the Second Degree as a lesser included.

5    Essentially the only evidence of a completed robbery, I

6    think, as it stands right now, is the excited utterance.

7                THE COURT:  Hold on a second.

8                (Short pause in the proceedings.)

9                MR. MENDYS:  I think an Attempted Robbery in the

10   Second Degree may be appropriate.  I want to look at the

11   evidence a little bit more, and the law.  But essentially,

12   as it is right now, I think the evidence of a completed

13   robbery is based on the excited utterance that was

14   introduced through Officer Mangual, so I'm on the fence

15   about that, but the other three I feel confident.

16               THE COURT:  So you definitely want count one, you

17   want grand larceny from the person, which you said is count

18   five?

19               MR. MENDYS:  Yes.

20               THE COURT:  And then the felony Criminal

21   Impersonation in the First Degree, is it a felony?

22               MR. MENDYS:  Yes, it's an E felony.

23               THE COURT:  The next to the last count.

24               So now let me ask you, Mr. Bonanno, first of all,

25   about those charges which the D.A. definitely wants to be

D mc
Proceedings

1   given to the jury, do you have any objections at this time

2   based on this evidence to those charges?

3           MR. BONANNO:  I'm not sure how, other than

4   that excited utterance, there's a robbery made out as to

5   Mr. Diaz.

6           THE COURT:  A robbery made out for anybody, or --

7           MR. BONANNO:  Yes, even as to Mr. Contreras.

8           THE COURT:  But you said other than the excited

9   utterance?

10          MR. BONANNO:  Yes.

11          THE COURT:  So are you saying that the excited

12  utterance is not evidence in chief that the jury can

13  consider?

14          MR. BONANNO:  Unfortunately, it is, Judge.

15          THE COURT:  I mean --

16          MR. BONANNO:  But if it's an acting in concert

17  theory under the robbery --

18          THE COURT:  Well, that is the theory.  There's no

19  evidence that Mr. Diaz personally took money, but that

20  people that he was with -- and the theory, looking at the

21  evidence in the light most favorable to the People, he

22  offered material aid to them, that he lined everyone up

23  against the wall, said he was police and set the whole scene

24  up for them to believe the other two were police and

25  whatever happened, happened.  But yeah, there is evidence

D mc

Proceedings

1    brought out and even you brought additional evidence out

2    today from this witness about the money for the car and did

3    he buy the car, and how could he, he said they took his

4    money.  I don't know when that statement was made.  That

5    could have been made not as an excited utterance.  But

6    basically are you objecting to it being charged?

7              MR. BONANNO:  I don't see any legal reason how I

8    can.

9              THE COURT:  So you're not objecting to that.  Are

10   you objecting to grand larceny from the person?

11             MR. BONANNO:  Again, I don't believe I can.

12             THE COURT:  And you're not objecting to Criminal

13   Impersonation in the First Degree?

14             MR. BONANNO:  Based upon what's been presented, I

15   don't believe I can.

16             THE COURT:  Are there any other charges in the

17   indictment that you would wish to have the jury charged on

18   or any lesser charges that you're requesting?

19             MR. BONANNO:  Not at this time, Judge.

20             THE COURT:  Okay.  Well, I don't really want to

21   come back with you tomorrow, not that I would want to.

22   Would you like time to think about other lesser charges?  I

23   mean the other thing is that if Mr. Contreras comes in and

24   testifies in the manner that the District Attorney expects

25   him to testify, the relevance is overall and, of course,

255

D mc

Proceedings

1   whatever cross-examination would happen, would happen.  But

2   he would be expected to say that they took this money out of

3   his pocket and that it was six thousand dollars and that

4   it's the same six thousand dollars the cops found in the

5   other guy's pocket.  And that would only be more support for

6   actual robbery, and then I don't know why there would be a

7   reasonable view of the evidence at that time of an attempt

8   to commit the crime of robbery.  And I'm not sure even now

9   because the District Attorney is thinking about it.

10          MR. MENDYS:  I think my inclination would be to

11   request the attempted robbery.  I think it would be

12   reasonable for a jury to conclude that the money -- if they

13   don't credit the statement and they don't believe that the

14   money that was recovered from Santana was this money, I

15   think it's possible that there is a view --

16          THE COURT:  So what's the reasonable view that

17   there was an attempted robbery rather than a completed

18   robbery?

19          MR. MENDYS:  The fact that they were being

20   searched and frisked and the statement of the defendant that

21   they -- they knew the victim had money, they believed he had

22   three thousand dollars to buy drugs, and he had a shield

23   when they went there.  Essentially there is a view, I think,

24   that they went there to commit this robbery and that

25   possibly there's a view that it wasn't completed.

D mc                          Proceedings

1            THE COURT:  And your view of that?

2            MR. BONANNO:  If I go along with that reasoning,

3    then I think it would be a natural assumption that it wasn't

4    Mr. Contreras's money that was found on Mr. Santana.

5            THE COURT:  So you're objecting to a charge of

6    attempted robbery?

7            MR. BONANNO:  Absolutely.  I don't think that's

8    been shown at all.  I mean, if anything, we have an unlawful

9    imprisonment and a harassment, maybe, putting these people

10   up on the wall and detaining them and then frisking them.

11           If the line of defense that Mr. Goldstein even

12   proposed, this was a drug deal that went bad and they were

13   checking out the supposed purchasers or suppliers for

14   weapons, then it's nothing more than a harassment.

15           THE COURT:  Right, except we don't have Mr.

16   Goldstein or his client or anything, there was no

17   cross-examination of the witnesses who testified about any

18   drug deal or anything.  But you are objecting now, if this

19   were the conclusion of the People's evidence, to an attempt?

20           MR. BONANNO:  To an attempted robbery.

21           THE COURT:  Because you don't believe it makes out

22   anything other than a completed robbery?

23           MR. BONANNO:  I don't believe Mr. Diaz is the man

24   that is identified as the person on the video.

25           THE COURT:  Well, that's a whole separate issue.

D mc

Proceedings

1      MR. BONANNO:  Yes.

2      THE COURT:  That would be a subject which I'm not

3  hearing now --

4      MR. BONANNO:  I understand.

5      THE COURT:  -- of a motion at the close of the

6  People's case or the close of trial, and the close of trial

7  actually.  But he was identified in court by two witnesses

8  as the person who was there and actually there's a statement

9  that he says he was there that's in evidence too.  So it's a

10  question of credibility.

11      MR. BONANNO:  I don't know if the statement says

12  he was there.  It says he knew of the incident, but he never

13  says that he was there.

14      THE COURT:  That he wore a badge and that he got

15  it from the car, something, and he brought it back with him.

16      MR. BONANNO:  I think a close reading of it never

17  says he's actually at the scene.  That he wore a shield, it

18  doesn't mean he wore a shield on the scene that night.

19      THE COURT:  We never heard any evidence about

20  Lappy, you didn't bring out anything about that they

21  were --

22      MR. MENDYS:  Who they were.

23      THE COURT: Who they were.  You said it was an

24  investigation, but you didn't bring any of that out.

25      MR. MENDYS:  I did not.

D mc                          Proceedings

1              THE COURT:  But they went in Lappy's car, and

2       there is a car, and the car is in evidence.

3              MR. MENDYS:  I think it's Homeboy's car.

4              THE COURT: Mr. Melenciano's car.  And that he left

5       and threw the badge away and the man on the screen left and

6       there is no badge recovered.  So -- and the statement it was

7       Homeboy's idea to go to the location and then he says, "When

8       we went, I had a security shield on a beaded chain around my

9       neck."

10             MR. MENDYS:  Further down it says, "The defendant

11      stated when he saw the police drive up, he turned, walked

12      away quickly from the location and threw the shield under a

13      vehicle on Walton Avenue."

14             THE COURT: The thought he's referring to a

15      different incident than, "When I went in a car with Lappy,

16      with a police shield around my neck on Walton Avenue," and

17      this was what he was advised he was under arrest for.  I

18      believe that's in the testimony too.  "I have not and the

19      others have not ever impersonated police officers before."

20      So he never did it before.  He didn't say he did it after,

21      but he threw the badge away so it would be hard to.  And the

22      other two were in custody, assuming he's referring to the

23      other two.

24             I mean look, I'm not sure ID is the -- I mean, yes

25      that's your argument, but his statement, plus the in-court

259

D mc                                  Proceedings

1   witnesses that -- I'm talking about the charges.

2          So you're going to argue to the jury that he's not

3   the person, that he's not there, but that has nothing to do

4   with whether I charge, as elements for the jury to consider,

5   a completed versus an attempted robbery.  So that's why I'm

6   asking you do you believe that viewing the evidence in the

7   light most favorable to the People, that there is any

8   evidence other than a completed robbery?

9          MR. BONANNO:  I can't say definitely, Judge,

10  because we haven't had the person whose money allegedly this

11  is come and testify.  Once that happens, I think I may have

12  a change of mind on that, but at this point I don't think

13  other than Mangual's --

14         THE COURT:  I'm sorry, the person who's money was

15  stolen comes in and says, "I was there, I had six thousand

16  dollars, it was taken out of my pocket by one of the guys

17  who's frisking me.  I saw him at the scene, he was in

18  custody,"  then you would think there's an attempted robbery

19  charge?

20         MR. BONANNO:  No, I thought we're talking about

21  the robbery charge, I'm sorry.

22         THE COURT:  No, we already agreed that I'm

23  charging robbery.

24         MR. BONANNO: Right.

25         THE COURT:  This is all about whether there's an

D mc                          Proceedings

1    attempt to commit the crime of robbery.

2              MR. BONANNO:  I mean if it's anything, Judge, it

3    is a robbery.  The attempted robbery -- I don't see it for

4    an attempted robbery other than if there is something else

5    trying to be taken from these witnesses.

6              THE COURT:  You don't want the lesser offense,

7    that this is the evidence?

8              MR. BONANNO:  Yes.

9              THE COURT:  And you're not going to request it if

10   Mr. Contreras comes in and says they took my money?

11             MR. MENDYS:  Right.

12             THE COURT:  You're not going to request it?

13             MR. MENDYS:  Right.

14             THE COURT:  We can revisit this Monday morning.

15   My inclination is not to charge attempt with the objection

16   raised by the defense that it's either a completed robbery

17   or not, and no one else is asking for any other charges of a

18   lesser degree at this time.

19             You should contact my court attorney tomorrow.

20   She's not here Friday either, but you can email.  Anyway,

21   you can let me know.  Contact my court attorney, and if

22   there's any other things that you think about in terms of

23   charges, that's fine.

24             And on Sunday if he's not here, email Sarah and

25   let me know what to prepare for on Monday.

261

D mc                              Proceedings

 1          MR. MENDYS:  Can I get --

 2          THE COURT:  She'll do that now.  I'll see you

 3     Monday morning, perhaps 9:30.  If your witness comes in,

 4     let's do 11:30, okay.

 5          MR. MENDYS:  Do you want to do anything beyond

 6     the --

 7          THE COURT:  You have other requests?

 8          MR. MENDYS:  Well, I mean --

 9          THE COURT:  You can.

10          MR. MENDYS:  I think it's pretty traditional the

11     things I thought of off the top of my head.  I would ask for

12     an expanded intent charge.

13          THE COURT:  Okay.

14          MR. MENDYS:  And my recollection is that there is

15     some sort of expanded identification, I'm not sure.

16          THE COURT:  For a one-witness ID.

17          MR. MENDYS:  I know there's a one witness plus, I

18     don't know if that's what I'm thinking of.

19          THE COURT:  There are expanded charges on

20     identification.

21          MR. MENDYS:  I mean if it's amenable to the Court,

22     I would be happy to include those in an email as well.

23          THE COURT: Yes, that's fine.

24          MR. MENDYS: Tomorrow, or later today or tomorrow?

25          THE COURT:  Fine.

D mc

261a

Proceedings

1        MR. MENDYS:  Obviously I'll cc Mr. Bonanno.

2        THE COURT:  Yes.

3        MR. MENDYS:  But beyond that I can't think of

4   anything off the top of my head.

5        THE COURT: Okay, anything else you thought of?

6        MR. BONANNO:  Just the standard one, reasonable

7   doubt.

8        THE COURT: Keep in touch, and I'll see you Monday

9   11:30, okay.

10       (Trial adjourned to Monday, July 27 2015.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   SUPREME COURT OF THE STATE OF NEW YORK

 2   COUNTY OF BRONX : CRIMINAL TERM : PART 98

 3   -------------------------------------------x

 4   THE PEOPLE OF THE STATE OF NEW YORK        : Indictment #:
                                                  3349/2012
 5                  - against -                 :

 6   RICHARD DIAZ,                              : Trial Excerpt
                                                  (Testimony)
 7
                        Defendant(s).          :
 8
     -------------------------------------------x
 9                         265 East 161st Street
                           Bronx, New York   10451
10                         July 27, 2015
     B E F O R E,
11           HONORABLE RALPH FABRIZIO, Justice
             (Same appearances as previously noted)
12                       Margaret McGovern,
                         Senior Court Reporter
13           --------------------------

14                  THE CLERK:  Case on trial continued, Richard

15       Diaz.  Defendant is not before the Court, neither is the

16       sworn jury at this time.

17                  Appearances, please.

18                  MR. MENDYS:  Newton Mendys for the office of the

19       district attorney.  Good morning.

20                  MR. BONANNO:  Pat Bonanno for Mr. Diaz.

21                  THE COURT:  Good morning.  I just want to report

22       that Mr. Diaz does not appear to be in custody anywhere,

23       and I'm not aware that he's been apprehended yet on the

24       warrant.  People have any information?

25                  MR. MENDYS:  No.
```

1          THE COURT:  Have you heard from your client --

2          MR. BONANNO:  Nothing further, Judge.

3          THE COURT:  -- or any family members?

4          MR. BONANNO:  From no one.

5          THE COURT:  Okay.  Are there any legal issues or

6    anything that we need to discuss at this moment?

7          MR. MENDYS:  There's one thing I'll mention,

8    although, I don't know it's necessary.

9          Mr. -- I reviewed it in the Grand Jury minutes

10   and I spoke with Mr. Contreras this morning, he reminded of

11   it.  During the course of the crime, he's prepared to

12   testify to the fact that Mr. Melenciano when the -- Mr.

13   Melenciano removed a cell phone from his pocket and when

14   the police arrived on the scene and I think is borne out on

15   the video to some degree, when the police arrived on the

16   scene, Mr. Melenciano hands the phone back to him, to Mr.

17   Contreras.

18         THE COURT:  Hands it back to him?

19         MR. MENDYS:  Correct.  So it's not a charged

20   crime, but it is something -- it is important because

21   that -- it is at that moment Mr. Contreras realized these

22   were not actual police officers.  So my intent was to bring

23   that testimony out.

24         THE COURT:  Who hands the cell phone back to

25   him?

1              MR. MENDYS:  Melenciano, codefendant.

2              THE COURT:  Sorry.  Melenciano, is that the person

3     who takes the money?  That was Santana, correct?

4              MR. MENDYS:  Yes.

5              THE COURT:  The witness is going to testify that

6     Santana took the money?

7              MR. MENDYS:  Correct.

8              THE COURT:  But Melenciano removed a cell phone?

9              MR. MENDYS:  Correct.

10             THE COURT:  And handed it back to him?

11             MR. MENDYS:  Correct.

12             THE COURT:  So how does that make -- how is that

13    relevant to his realization that they're not the real

14    police?

15             MR. MENDYS:  Because even when the police arrived,

16    he believed that the police, the actual police officers,

17    uniformed officers that arrived were there to assist these

18    other officers but once "officers," being the defendants --

19    but once Melenciano handed him the phone, it was at that

20    moment that he began to come to the realization that these

21    were not actual police officers.

22             THE COURT:  There's nothing in the indictment

23    about a phone.

24             MR. MENDYS:  There is no -- robbery charge relates

25    specifically to United States currency.

1              THE COURT:  Right.  Okay.  Mr. Bonanno.

2              MR. BONANNO:  Judge, it appears that the Grand

3    Jury minutes do bear out the fact that not only a cell

4    phone but small amount of money were handed back to Mr.

5    Contreras by Mr. Melenciano.

6              THE COURT:  Sorry.  Cell phone and money were?

7              MR. BONANNO:  Small amount of money, I believe.

8              MR. MENDYS:  He only mentioned the cell phone to

9    me today.

10             THE COURT:  What does it say in the Grand Jury?

11             MR. MENDYS:  Grand Jury minutes do mention small

12   amount of money, unspecified amount of money.

13             MR. BONANNO:  Right.

14             THE COURT:  Wait a minute.  That Melenciano gave

15   him back the phone and money?

16             MR. MENDYS:  Money that was, I'm guessing, kept

17   separate and apart from the $6,000.  What's been described

18   to me is that Santana -- essentially during various points,

19   Santana and Melenciano search and frisk Mr. Contreras, and

20   Mr. Santana recovered the $6,000 from interior jacket

21   pocket.  And Melenciano then looked through his pants

22   pockets and found the phone and, according to the Grand

23   Jury minutes, a small amount of money.

24             MR. BONANNO:  Few dollars, it says.

25             THE COURT:  And you're saying that the video

1    that's in evidence will bear out that Melenciano handed

2    something back to --

3         MR. MENDYS:  I reviewed the video with Mr.

4    Contreras, and there is a point where you see an individual

5    extend a hand or extend something to one of the people

6    against the wall while the police are on scene before

7    Melenciano and Santana heads towards the street.

8         THE COURT:  And that individual who hands it back

9    is the one who is identified by the officer as Melenciano,

10   being taken in custody by an unknown police officer?

11        MR. MENDYS:  Yes.

12        THE COURT:  Right?

13        MR. BONANNO:  Yes.

14        THE COURT:  All right.  Mr. Bonanno, anything you

15   want to say about this?

16        MR. BONANNO:  I believe that's what the Grand Jury

17   articulates.  As I recall, the videotape, I think it does

18   actually show some sort of transaction between them.

19        THE COURT:  Okay.  Fine.  Thank you.

20        (Whereupon, there was a brief pause in the

21   proceedings)

22        MR. MENDYS:  Mr. Contreras provided me with two

23   receipts or, I should say, pay stubs from, one from, I

24   think, some time in 2010 and one from earlier this year in

25   2015.  I redacted his personal information, his address,

Proceedings

1      and provided a copy to Mr. Bonanno.

2                    MR. BONANNO:  I'm in receipt of that, Judge.

3                    THE COURT:  Pay stubs that indicate where he works

4      or worked?

5                    MR. MENDYS:  Indicate that where he works, how

6      much he earns, fact that he pays taxes, all of that is

7      indicated on the pay stub.

8                    THE COURT:  Okay.  I want to ask one thing, also.

9      I'm not going to be charging today.  I received the

10     requests to charge from each of you by e-mail, and they're

11     all included in the charge, either they had been already in

12     the general charge.  I did add the interpreter part that

13     you requested, Mr. Bonanno.

14                   I do want to ask you, Mr. Bonanno, if you want me

15     once again to remind the jury that while Mr. Diaz is not

16     present, he has a right not to be, and they can't hold it

17     against him and also that they cannot draw negative

18     inference because he didn't testify.

19                   MR. BONANNO:  That would be my application, Judge.

20     Thank you.

21                   MR. MENDYS:  I agree.

22                   THE COURT:  I've also included, though not

23     requested, that they're not to speculate about the fact

24     that Mr. Melenciano and Mr. Santana are not here, either.

25     Although there is a charge of acting in concert with both

1    of those individuals, they're not to speculate why they're

2    not here or factor that into any way in the verdict,

3    general charge on that.  No objection to me keeping that

4    charge?

5              MR. MENDYS:  No.

6              MR. BONANNO:  That's fine.

7              THE COURT:  At the moment for the requests for the

8    specific charges, which may change after Mr. Contreras

9    testifies, I'm not sure, Rob Two aided, grand larceny from

10   the person, not an amount, but from the person, and

11   Criminal Impersonation in the First Degree.  And I'm

12   instructing the jury not to consider grand larceny from the

13   person if they convict him of Robbery in the Second Degree,

14   only to consider that count.  If they find him not guilty

15   of robbery and then deliberate on criminal impersonation

16   no matter what.  And that's -- you're in agreement with

17   that?

18             MR. MENDYS:  I am.

19             MR. BONANNO:  That's fine.

20             THE COURT:  Do you anticipate you'll be asking for

21   any dollar amount grand larceny after Mr. Contreras

22   testifies?

23             MR. MENDYS:  I don't think so but --

24             THE COURT:  Do you?

25             MR. BONANNO:  No, Judge.

1          THE COURT:  Because there's two counts, one over

2     3,000, one over one thousand.  So you don't want those

3     submitted?  Okay.

4          MR. MENDYS:  Judge, I may ask for the 3,000 Grand

5     Larceny in the Third Degree.

6          THE COURT:  You may ask for the third degree grand

7     larceny?

8          MR. MENDYS:  Correct.

9          THE COURT:  Over 3,000, Mr. Bonanno.

10         MR. BONANNO:  Are you going to ask for the amount

11    over 3,000?

12         MR. MENDYS:  I may, yes.

13         THE COURT:  Okay.  You may.  And then if that

14    happens, are you requesting any lesser included of that?

15         MR. BONANNO:  That would be my application, yes.

16         THE COURT:  What would you want?

17         MR. BONANNO:  Well, are we going to be able to

18    show it was actually more than 3,000, other than his

19    testimony and voucher?

20         MR. MENDYS:  I think that's the evidence.

21         THE COURT:  How else could you show it?  What else

22    would there be?

23         MR. BONANNO:  So just to get it correct, you would

24    be asking for the person and the amount also for two

25    counts?

1                    THE COURT:  Person is fourth degree, amount is

2         third degree.  It's a higher level of felony.

3                    MR. MENDYS:  Yes.

4                    THE COURT:  And then the lesser would be over a

5         thousand.

6                    MR. BONANNO:  I ask for that amount, that charge.

7                    THE COURT:  You would?

8                    MR. BONANNO:  Sure.

9                    THE COURT:  We'll see what reasonable view of the

10        evidence it would be that, to support that there was over a

11        thousand but not over 3,000.  We have to wait to see.

12                    We can bring the jury out.

13                    THE COURT OFFICER:  Jury entering.

14                    (Whereupon, the jurors enter the courtroom at this

15        time.)

16                    THE CLERK:  Sworn jury is present and properly

17        seated.

18                    THE COURT:  All right.  Good afternoon, members of

19        the jury.  We're ready to continue with the presentation

20        of additional evidence from the DA's office, People's

21        case.

22                    The next witness will, once again, be testifying

23        through a Spanish language interpreter.

24                    Could I ask the interpreter to place your

25        appearance on the record?

mm-a

1                        THE INTERPRETER:  Fred Caleb, C A L E B.

2                        THE COURT:  Good morning.  Now, so once again, you

3          are obligated and you must accept the interpretation into

4          English by the Spanish interpreter.  For those of you who

5          may understand or speak the Spanish language, disregard

6          what you hear in Spanish.  You must rely on the

7          interpretation.

8                        You wish to call your next witness, Mr. Mendys?

9                        MR. MENDYS:  Yes.  People call to the stand Mr.

10         Yohn Contreras.

11                       THE COURT OFFICER:  Witness entering.

12                       (Whereupon, the witness enters the courtroom at

13         this time.)

14                       THE COURT OFFICER:  Raise your right hand.  Place

15         your left hand on the bible.

16              YOHN CONTRERAS, called by and on behalf of the People,

17    having been first duly sworn, was examined and testified as

18    follows:

19                       THE COURT OFFICER:  Please take a seat.  For the

20         record, state your name, spell your first and last name,

21         give your county of residence.

22                       THE WITNESS:  Yohn Contreras, C O N T R E R A S,

23         Lawrence, Massachusetts.

24                       THE COURT:  You may inquire, Mr. Mendys.

25                       MR. MENDYS:  Thank you, Judge.

1    DIRECT EXAMINATION

2    BY MR. MENDYS:

3         Q.   Good afternoon, Mr. Contreras.

4         A.   Good afternoon.

5         Q.   How old are you?

6         A.   34.

7         Q.   Do you have kids?

8         A.   Yes.

9         Q.   How many?

10        A.   Three.

11        Q.   Are you married?

12        A.   Yes.

13        Q.   Where are you from originally?

14        A.   (In English)  Dominican Republic.

15        Q.   When did you come to the United States?

16        A.   June 12th of 2009.

17        Q.   And since 2009, what state have you been living in?

18        A.   In Lawrence.

19        Q.   Lawrence, Massachusetts?

20        A.   Yes.

21        Q.   Do you live there with your wife and kids?

22        A.   Yes.

23        Q.   Do you work?

24        A.   Yes.

25        Q.   What type of work do you do for a living?

1     A.   Demolition.

2     Q.   How long have you worked in demolition?

3     A.   Five years and some three months.

4     Q.   And do you work for a particular company?

5     A.   Yes.

6     Q.   Can you estimate about how many hours a week you work?

7     A.   40, 50, 60.

8     Q.   Have you ever been arrested?

9     A.   Never.

10    Q.   Now, you were in the Dominican Republic until

11    yesterday, correct?

12    A.   Yes.

13    Q.   Why did you go down there?

14    A.   Because they killed my father last year on the road.

15    Yesterday was his anniversary and I wanted to do something for

16    him before he died that he asked for, and I had to do it

17    Thursday, because they needed me here.

18    Q.   Now, you cut your trip short to come back and testify,

19    correct?

20    A.   Yes.

21    Q.   The district attorney's office paid for your flight to

22    come back here?

23    A.   Yes.

24    Q.   The district attorney's office also put you up in a

25    hotel last night, correct?

1      A.   Yes.

2      Q.   Now, you're here to talk about an incident that

3 occurred on October 17th of 2012.  I want to ask you about some

4 people first.

5          Do you know someone by the name of Joel Rodriguez?

6      A.   That was the companion that was with me.

7      Q.   As of 2012, how long had you known Mr. Rodriguez?

8      A.   About three months.

9      Q.   Did you know him up in Massachusetts?

10     A.   Yes.  We lived on the same street.

11     Q.   When was the last time you've spoken to him?

12     A.   After I came here to testify.  They needed both of us,

13 and he never picked up my phone.  I knocked all over his door,

14 and he never opened, and I came alone.

15     Q.   Now, you also -- do you know a woman by the name of

16 Esmeraldi Rodriguez?

17     A.   She was my girlfriend.

18     Q.   When was she your girlfriend?

19     A.   Around that time, before I came here.

20     Q.   Okay.  When did you first meet her in person?

21     A.   The day I came to buy the car she told me about.

22     Q.   That was the first time you ever met her in person?

23     A.   In person, yes.

24     Q.   Had you spoken to her previously?

25     A.   By phone, yes.

1    Q.    And how long had you known or how long have you been

2    having telephone conversations with her?

3    A.    About a little more than a month.

4    Q.    Now, when was the last time you've spoken to her?

5    A.    The day I came, the day of the incident occurred.

6    Q.    Is there any particular reason why your relationship

7    with her ended?

8    A.    Well, in reality, I found it was strange what happened.

9    I'm not saying I blame her, but I don't come much here.  I've

10   only come to New York about three times.  And if she called me

11   and that happened to me, that what happened with the vehicle, I

12   don't have much -- I don't have anything contingent to say that

13   she did this to me or not.

14   Q.    What about a woman by the name of Argelia Rosario?

15   A.    That's a friend of hers.  First time I saw her, too.

16   Q.    You had never met her before?

17   A.    No.

18   Q.    Had you ever spoken to her before?

19   A.    No.

20   Q.    Have you spoken to her since?

21   A.    Neither.

22   Q.    So let me direct you now to October 16th into the 17th

23   of 2012 here in the Bronx, specifically 2315 Walton Avenue.  Why

24   now were you -- well, were you in the Bronx that night?

25   A.    Yes.

1      Q.   Had you ever been here before that night?

2      A.   No.

3      Q.   Why did you come to the Bronx that night?

4      A.   Because she called me, she knew I was looking for a

5  car.  Because my friend Meraldi had a car, a teal Acura.  I had

6  spoken to her about how she saw one at the gasoline station

7  with a for sale sign, and she called me, and I came down that

8  night.

9      Q.   You mentioned she called you.  Who is the "she" you're

10 referring to?

11     A.   Meraldi.

12     Q.   So, when in relation to -- how many days before you

13 came to New York did you have this phone conversation with her

14 about the car?

15     A.   A week.

16     Q.   Now, did she tell you how much the car was or how much

17 -- what the sale price of the car was?

18     A.   6,500.

19     Q.   So what did you do at that point?  Did you decide to

20 come to New York?

21     A.   Yes.  I came with $6,000.

22     Q.   Who did you come with?

23     A.   With Joel.

24     Q.   How did the two of you come to New York?

25     A.   By bus.

1     Q.   Now, you mentioned that you brought $6,000 with you?

2     A.   Yes.

3     Q.   Where did you get that money from?

4     A.   I work, I pay my taxes.  I keep savings club with my

5     wife's aunt.

6     Q.   Okay.  Can you describe that a little bit?

7     A.   About the savings club?

8     Q.   Yes.

9     A.   For example, we have ten people.  We each went to give

10    $300 every week.  I'm in number two, you get number one, weekly

11    and if it's your turn the first week, you pick up $3,000.  Next

12    week, you must pay 300, because you already get paid until we go

13    and to all ten people and then the savings club ends.

14              THE INTERPRETER:  Judge, for the record, sorry,

15         son is a colloquial term --

16              THE COURT:  I don't need this for the record at

17         all.  Please do not -- just translate what the witness

18         said.  If you need to speak to the witness, not for the

19         record.  Okay.  Thank you.

20              THE INTERPRETER:  That's fine, Judge.

21    Q.   So Mr. Contreras, this was a kind of group savings?

22    A.   Uh-huh.

23    Q.   And each of you, all the members of the group would

24    rotate through to take whatever money out of the savings; is

25    that correct?

1     A.   Yes.

2     Q.   And it was through that and your job and your tax

3     return that you came up with this money?

4     A.   Yes, sir.

5     Q.   Now, did anyone know -- did you tell anyone you were

6     bringing $6,000 with you?

7     A.   Meraldi knew.

8          THE COURT:  Esmeraldi Rodriguez?

9          THE WITNESS:  (In English)  Yes.

10          THE COURT:  Si.  Please answer in Spanish.

11          THE WITNESS:  Si.

12     Q.   What about Mr. Joel, did he know, as well?

13     A.   Joel, as well, of course.

14     Q.   So you indicated earlier that you took the bus to New

15     York.

16     A.   Yes.

17     Q.   Do you remember about what time you got to the Bronx?

18     A.   It was about 11 in the evening.

19     Q.   And did you have plans -- well, when were you going to

20     go see the car?

21     A.   Yes.  I came at night since I work for -- until three

22     in the afternoon.  I took the seven o'clock bus.  I came at

23     night to take advantage and also see Esmeraldi in person.  I

24     took advantage of that and went around that night and the next

25     day in the morning, I went to see the car.

 1          Q.   That was your plan?

 2          A.   Yes.

 3          Q.   Now, the money that you brought, going back to the

 4     money for a second, how did you brought -- was it all in

 5     cash?

 6          A.   Yes, sir.

 7          Q.   Do you remember what, if it was all in the same

 8     denominations, same types of bills?

 9          A.   Yes.  There were mostly twenties.  There were fifties

10     but not a lot.

11          Q.   Where were you carrying it with you?

12          A.   Here in my chest, in a jacket. (Indicating)

13               MR. MENDYS:  Let the record reflect the witness

14          with his right --

15               THE COURT:  It was interior?  I didn't see what

16          happened.

17               Could you, Interpreter, again ask the witness to

18          show the jury where the money was?

19               THE WITNESS:  Here, in a jacket with a zipper

20          here.  (Indicating)

21               THE COURT:  Indicating the witness zipped down

22          what appeared to be -- he described as a jacket.  And it

23          would be interior left pocket.  Okay.

24          Q.   Now, Mr. Contreras, the money was inside, was inside

25     your jacket, correct?

Y. Contreras - People - Direct

1      A.   Yes.

2      Q.   Now, the pocket, itself, did that pocket actually have

3  a zipper on it?

4      A.   Yes.

5      Q.   And how was the money bound together, if it was at

6  all?

7      A.   It was flat like this with rubber bands. (Indicating)

8      Q.   Okay.  Were the rubber bands going both ways across the

9  money or just one way?

10      A.   Just one, like this.  (Indicating)

11           MR. MENDYS:  Sorry.  I didn't see that.

12      A.   In just one direction, like I said, going around.

13      Q.   Going around the short way of the money?

14      A.   The short part.

15      Q.   Now, is that where you kept that money throughout your

16  trip?

17      A.   Yes, sir.

18      Q.   So, when you got to New York, you said before you got

19  here around eleven o'clock, did there come a point where you met

20  up with Esmeraldi and her friend?

21      A.   Yes, sir.

22      Q.   And where did you meet her?

23      A.   At Meraldi's house.

24      Q.   Now, you said before your plan was to go out.  Do you

25  remember where you were planning to go?

1        A.   She was the one that was going to take me, because I

2   don't know about here.

3        Q.   So that night, did there come a point in time where you

4   got into a cab?

5        A.   Yes.

6        Q.   Who were you -- who did you get in the cab with?

7        A.   With Joel, Meraldi's friend, Meraldi and me.

8        Q.   So what happened once you got in the cab?

9        A.   We went to a friend of hers that had the phone cut off,

10  phone service cut off, to go to the disco, but she was not

11  there.  We returned to Meraldi's house.  That's where the

12  incident happened.

13       Q.   So you were on your way to meet somebody else?

14       A.   Yes.  We went to get her friend.

15       Q.   But doesn't sound like you met up with that person.

16            THE COURT:  Could you please put these in the form

17       of a question because --

18       A.   No.

19            THE COURT:  -- I don't want you testifying for

20       this witness, please.  That's enough.

21            MR. MENDYS:  Yes, Judge.

22       Q.   Did you end up meeting up with that person?

23       A.   No, she was not in the house.

24       Q.   So where did you go from there?

25       A.   We returned to Meraldi's house.

1    Q.   In the same taxicab?

2    A.   I don't remember if it was the same, but it was in a

3    cab.

4    Q.   Now, what happened when you returned to Esmeraldi's

5    house?

6    A.   Well, when we got out, I was paying for the cab, and

7    three guys stopped in a car, a gold colored car.  They got out.

8    They told us, don't move, police, against the wall.

9         They began to search Joel, then they put me against the

10   wall, and the girls.  They searched us.  The heaviest one took

11   out the $6,000 I had here, smallest took out my cell phone and

12   couple of dollars and then he returned it.  He returned it to me

13   when the true police arrived.  One did not know --

14   Q.   Now, how many people approached you?

15   A.   Three.

16   Q.   And where were you and your friends when they

17   approached you?

18   A.   On the sidewalk.  We were getting off the taxi.

19   Q.   You mentioned that they said police, up against the

20   wall.  Was there one in particular that said that?

21   A.   How can I say since all three were walking for me?  It

22   was all three.

23   Q.   Do you recall who actually spoke the words?

24   A.   I believe it was the one that took flight.

25   Q.   Can you describe what that person looked like?

1    A.    He was about my size.  He was dressed in black.  He

2    looked all form, as if he went to the gym.

3    Q.    Could you tell anything about his race or nationality?

4    A.    He looked Dominican.

5    Q.    Did you see his face?

6    A.    I could not see his face.

7    Q.    Aside from saying that he was police, was there

8    anything else about him that indicated to you that he was the

9    police?

10    A.    Yes.  The one's whose face I did not see had a badge

11    here.  (Indicating)

12              MR. MENDYS:  Indicating around his neck.

13              THE WITNESS:  Uh-huh.  Yes.

14    Q.    Where specifically was it hanging on his person?

15    A.    He had it here, hanging from his throat, from his neck.

16    (Indicating)

17    Q.    Where was the -- can you indicate on your own body

18    where the plaque, the plates --

19              THE COURT:  The badge.

20    Q.    The badge, itself, was.

21    A.    The badge was about here.  It was hanging by a black

22    thread or string.

23              MR. MENDYS:  Witness indicating with his right

24        hand the center of his chest.

25              THE COURT:  Yes.

1      Q.   Now, what you indicated, that there was a heavier

2  person?

3      A.   Yes.  The one that took the money out, took my money

4  out was a little heavier.

5      Q.   Can you further describe him?

6      A.   Tall, full, he walked around wearing a jacket, more or

7  less red and blue, something like that, red and white.

8      Q.   What about could you tell where he was from or what

9  nationality -- strike that.

10           Can you tell what his race or nationality was?

11     A.   Well, that was very surprising and to me, it was

12  Dominican, all three seemed to be Dominican.

13     Q.   How would you describe their skin tone?

14     A.   The one that took the money out of me is more or less

15  my color, like this.  (Indicating)  The shorter one is black,

16  just as, just like the one that left.

17     Q.   So what about the third person, can you describe him?

18           THE COURT:  Sorry.  You need to rephrase your

19       question, because I don't know what third person refers to

20       in the middle of this part of the examination.

21     Q.   Mr. Contreras, you described an individual whose face

22  you did not see who had a badge.

23     A.   That I didn't see his face?  Yes, the one that left,

24  the one that left, I didn't see his face, I just saw his

25  badge.

1    Q.   You also described a heavier individual.

2    A.   Yes, fatter.

3    Q.   Now, can you describe the last of the three?

4    A.   The smaller one, smallest one.

5    Q.   Can you describe him?

6    A.   Short, he was bald and black.  He had the black T-shirt

7    with white.

8    Q.   Now, of these three individuals, who is the first one

9    that you saw?

10   A.   The first one I saw was the black one, the smallest.

11   Q.   What specifically did he do?

12   A.   Don't move, against the wall.  He began to search

13   Joel.

14   Q.   Now, the heavier individual, at what point did you

15   notice him?

16   A.   The heaviest one, I noticed him, he was the one that

17   came towards me against the wall.  He's the one that searched me

18   and took my money out.  Then the short black guy again searched

19   me, the smallest one.

20   Q.   Now, you indicated earlier that the man with the badge

21   came up and said police.

22   A.   Yes, sir.

23   Q.   Did you believe that he was the police?

24   A.   Yes.  I thought they were detectives.

25   Q.   And you also indicated that he told you to get up

 1   against the wall?

 2          A.   Yes, sir.

 3          Q.   Did he or any, either of the other two men actually

 4   physically push you up against the wall?

 5          A.   They grabbed me, and they put me against the wall.

 6          Q.   And your -- were your friends also against the wall?

 7          A.   Yes, sir.

 8          Q.   And how were you -- were you actually facing the wall,

 9   or were you facing away from the wall?

10          A.   Face towards the wall. (Indicating)

11               MR. MENDYS:  Let the record reflect the witness

12          put both of his hands above his arm, above his head.

13          Q.   Your hands were up against the wall above your head?

14          A.   On the wall.  (Indicating)

15               THE COURT:  This was at the time that you were

16          placed against the wall, that was the position you were in;

17          is that correct?

18               THE WITNESS:  Uh-huh.  Like this.  (Indicating)

19               MR. MENDYS:  Indicating the witness placing both

20          of his hands up in the air palms out.

21               THE COURT:  Yes.

22          Q.   Now, the larger -- which of the men were searching

23   you?

24          A.   The fattest one and later, the smallest one searched

25   me, as well.

1      Q.   The fattest one, where was he searching you
2    specifically?
3                THE COURT:  You mean where on his body?
4                MR. MENDYS:  Yes.
5      A.   From the feet upwards, everywhere.
6      Q.   Did he say anything to you?
7      A.   No, he didn't talk, he just searched me.
8      Q.   And the smaller individual, he searched you afterwards;
9    is that correct?
10     A.   Yes.
11     Q.   Where on your body did he search you?
12     A.   He searched here.  He put his hands in my pocket.  He
13   took out my cell phone and about $40 I had here.  And there when
14   the police arrived, he returned it to me.  That's when we began
15   to back up, when they began to back up, we realized they were
16   not police, as well.  And that is when I was telling the police,
17   my money, my money, because I couldn't speak English.  And
18   that's when they went towards them.
19     Q.   You indicated --
20                THE COURT:  See, when you say they went towards
21        them, who are they, and who were they walking toward?
22                THE WITNESS:  The true police were going towards
23        the guys that were searching me.
24     Q.   Where was, where was your phone taken from?
25     A.   From my pockets.

1    Q.    Which pockets?

2    A.    This one, left. (Indicating)

3          THE COURT:  Left pants.  Could you stand up and

4    show, show the jury, please?

5          THE WITNESS:  Here.  Then he took it, and he

6    returned it to me like this.  (Indicating)

7          MR. MENDYS:  Let the record reflect the witness

8    outstretched his left hand.

9    Q.    Mr. Contreras, I want to show you a couple of pictures

10   on the monitor behind you.  Okay?  This is People's Exhibit 1.

11   Do you recognize that individual?

12   A.    That's the one that took my money.

13   Q.    The person you've been describing as the fatter?

14   A.    Yes.

15   Q.    This is Exhibit Number 2.  Do you recognize that

16   person?

17   A.    No.

18   Q.    Okay.  At what point did you see the real police

19   arrive?

20   A.    When the big guy had the money already, but as far as

21   we're concerned, they were all police.

22   Q.    Were you, were they still searching you, were these two

23   men still searching you when the police arrived?

24   A.    Yes.  The one that left saw that the police arrived, he

25   left.  The two that were searching me were back towards the road

1    not seeing the police.

2                    THE COURT:  Are you getting everything?

3                    When the witness is speaking Spanish and

4        interpreter is speaking English at the same time, I don't

5        think the jury can actually hear the interpretation.  I

6        can't hear every word.  I'm going to ask the interpreter

7        and witness slow down so that everybody can hear the words

8        in English.

9                    Can you please instruct the witness with that,

10       please?

11                   THE WITNESS:  Okay.

12                   THE COURT:  All right.

13       Q.   I'll repeat the last question.

14            Were you still being searched when the police arrived?

15       A.   Yes, sir.

16       Q.   Did there come a point in time where you noticed or

17   when you saw anybody leave from Walton Avenue that night?

18       A.   I didn't notice when he left, but yes, one did leave.

19       Q.   How did you realize that he was gone?

20       A.   Because when they arrived, there were three of them.

21   And after the real police arrived, that we turned around and

22   they went to the car, the police only arrested two.

23       Q.   Okay.  So you did not see the other person leave?

24       A.   No, sir, I did not see the moment that he left.

25       Q.   So when the real police -- okay.  So tell me again,

1   tell the jury again when the real police arrived, what happens

2   between you and the smaller individual?

3       A.   The smaller individual returned my cell phone and the

4   $40.

5       Q.   Did he say anything to you?

6       A.   No.

7       Q.   He just handed you your phone and your money?

8       A.   Yes.

9       Q.   When -- now, you indicated you had about $40 in your

10  pocket?

11      A.   Yes, sir.

12      Q.   That was separate from the 6,000 that you brought for

13  the car; is that correct?

14      A.   Correct.

15      Q.   Now, the money that you had for the car you said was in

16  a jacket pocket that was zipped up?

17      A.   Yes, sir.

18      Q.   And you had exactly $6,000 in that pocket?

19      A.   Yes, sir.

20      Q.   Okay.  So what did you do once the police arrived, the

21  real police?

22      A.   Well, I went towards them, and I said my money, my

23  money, they took my money.

24      Q.   And what happened then?

25      A.   The police grabbed them and put the handcuffs on them

1    and heavy guy said speak the truth, that money's mine.

2         Q.   Did you see both of these individuals get arrested?

3         A.   Yes, sir.

4         Q.   Did you -- did the police ever show you the money?

5         A.   No.

6         Q.   Now, at the scene, not at the precinct?

7         A.   No.

8         Q.   Did there come a point where you described to the

9    police the money that you had?

10        A.   Yes.

11        Q.   And did you describe to the police how it was wrapped

12   in the rubber band?

13        A.   Yes, sir.

14        Q.   Were you interviewed by the police that night?

15        A.   Yes.

16        Q.   And did you speak to detectives later on that day?

17        A.   Yes.

18        Q.   Did you ever get to go see that car?

19        A.   No, I couldn't.  How am I going to go?  I don't have no

20   money.

21        Q.   Is there a reason that you were willing to come all the

22   way to the Bronx for a car?

23        A.   Oh, I wanted to meet Esmeraldi.  There was no other.

24        Q.   Were you married at that point?

25        A.   Yes.

1    Q.   Did your wife know about Esmeraldi?

2    A.   No.

3    Q.   At what point -- well, was there a point where you told

4    your wife?

5    A.   Yes, she knows.

6              THE COURT:   Alright.  It's a couple of minutes

7    before one.  We'll take your lunch recess at this time.

8              Members of the jury, follow my recess

9    instructions.  Keep an open mind.  Do not discuss the case.

10   I'll see you about 2:30.  Okay.  Have a good lunch.

11             THE COURT OFFICER:  Jury exiting.

12             (Whereupon, the jurors leave the courtroom at this

13   time.)

14             THE COURT:  Mr. Contreras, you need to come back

15   to testify after lunch, continue.  Okay?

16             THE WITNESS:  Fine, no problem.

17             THE COURT:  We'll see you this afternoon.

18             MR. MENDYS:  Yes.

19             THE COURT:  2:15 for us.

20             (Whereupon, the witness leaves the witness stand)

21             (Whereupon, there is a luncheon recess taken and

22   the case adjourned to 2:15 p.m.)

23                  (Continued on the next page)

24

25

Contreras - People - Direct

1   A F T E R N O O N   S E S S I O N

2                    (Whereupon, the witness takes the stand.)

3                    THE COURT:  Let's bring the jury out.

4                    THE COURT OFFICER:   Jury entering.

5                    (Whereupon, the jury enters the courtroom.)

6                    THE COURT:   Part 99 is back in session. Case on

7        trial continued. The sworn jury is present and properly

8        seated. Defendant is now before the Court. Defense counsel

9        remains the same.

10                   THE COURT: And good afternoon, members of the

11       jury.

12                   THE JURORS: (En masse) Good afternoon.

13                   THE COURT:  We're going to continue with direct

14       examination by Mr. Mendys.

15                   I remind you you're still under oath, Mr.

16       Contreras, okay?

17                   THE WITNESS:   Okay.

18   CONTINUED DIRECT EXAMINATION

19   BY MR. MENDYS:

20       Q    Mr. Contreras, prior to coming to court this morning,

21   did you have an opportunity to view a recording?

22       A    Yes.

23       Q    And had you ever seen that recording before?

24       A    No.

25       Q    I'm going to play for you People's Exhibits 4 and 4A,

1    and I'm going to ask you some questions.

2              MR. MENDYS:  Okay, please let the record reflect

3         that this is CH-02 that is indicated on the top left of the

4         screen, date stamp is 2012, 10/16, time stamp 23:55:31.

5              Now playing the video.

6              (Whereupon, the video is played.)

7              MR. MENDYS:  Okay, please let the record reflect

8         the video is paused at 23:56:12.

9         Q    Mr. Contreras, do you see yourself on the monitor

10   there?

11        A    Yes.

12        Q    I would like you, with the Court's permission, to

13   approach the monitor and point to yourself.

14             THE COURT:  Yes, go ahead, sir.

15             THE WITNESS:  Here.

16             MR. MENDYS:  Indicating the person on the edge of

17        the sidewalk.

18             THE COURT:  At -- on the curb.

19             MR. MENDYS:  On the curb, four people grouped

20        together.

21             THE COURT:  At the top of the photograph on the

22        left, on the sidewalk of the video screen at curb right.

23        Q    And do you see Joel Rodriguez?

24        A    He's here in front.

25        Q    If you can approach again and point?

Contreras - People - Direct

1    A    Here.

2    Q    Just stay there for a second, Mr. Contreras.

3         MR. MENDYS:   Let the record reflect Mr. Contreras

4    indicated a person who's in the middle of the sidewalk on

5    the top left portion closest to the camera as it is

6    recording I suppose.

7    Q    And Esmeraldi, do you see her?

8    A    Yes.

9    Q    If you can point to her?

10   A    Her.

11        MR. MENDYS:   Indicating a person at the top left

12   portion of the screen in the middle of the sidewalk.

13   Q    And one more, I'm sorry --

14        THE COURT:   Closer to who Mr. Contreras identified

15   as himself.

16        MR. MENDYS:   Yes.

17   Q    And, Mr. Contreras, do you see Esmeraldi's friend?

18   A    Yes.

19   Q    If you can point to her, please.

20   A    Her.

21   Q    Thank you, sir.

22        MR. MENDYS:   Indicating a person on the far left

23   portion of the screen near the top standing up against what

24   appears to be the wall.

25        Okay, I'm playing the video.

Contreras - People - Direct

1          (Whereupon, the video is played.)

2          MR. MENDYS:  Pausing 23:56:21.

3      Q    Mr. Contreras, who is the person who just stepped onto

4    the sidewalk there?

5      A    The smallest one.

6      Q    Can you -- and what is it that he did?

7      A    No move, police.

8      Q    Okay. Is this the person that had the shield, the

9    badge?

10     A    No.

11     Q    Okay. When he said those things, don't move, police,

12   was he speaking in English or Spanish?

13     A    In English as I said, no move, police.

14          MR. MENDYS:  I'm going to play this forward.

15          (Whereupon, the video is played.)

16          MR. MENDYS:  Okay, pausing at 23:56:37.

17     Q    Mr. Contreras, who is the person who just stepped onto

18   the sidewalk and is now approaching you and your friends?

19          THE COURT:  Well, in this video that person

20       appears, as you paused the screen this individual who

21       stepped onto the sidewalk appears to be very close to the

22       wall.

23          Can you describe what's going on here?  It would

24       be better if you just described it yourself.

25          THE INTERPRETER:  Is that a question for the DA,

1      Judge?

2                    THE COURT:   Mr. Contreras.

3                    THE WITNESS:   They arrived there.

4                    THE COURT:  No, no, I mean what's going on at this

5      screen.

6                    THE WITNESS:   They arrived, right?  No move, to

7      the wall.

8                    My friend, they put him to the wall, then they go

9      get me, and there they're searching us.

10                   THE COURT:  In this picture?

11                   THE WITNESS:   Yes.

12                   THE COURT: Next question.

13                   MR. MENDYS:   I'm going to play the video.

14                   (Whereupon, the video is played.)

15     A    I'm sorry --

16                   MR. MENDYS:   One second,Mr. Contreras.

17                   Paused 23:56:45.

18     Q    What do you see here, Mr. Contreras?

19     A    The one that he asked me about that if he was the one

20     that had the shield, the badge, it was him, the one that moved

21     towards there, just now.

22     Q    When you say towards there, what are you referring to?

23     A    How so?

24     Q    Do you see the person who had the badge in this screen

25     right now?

1     A    Yes.

2     Q    Can you point to him, please?

3     A    Here.

4     Q    Okay.

5          MR. MENDYS:   Indicating the person on the left

6     near the top of the screen on the left side of the sidewalk

7     but not up against the wall.

8          THE COURT:   Is the person who had the badge

9     standing near someone in this picture, Mr. Contreras?

10         THE WITNESS:   He appears here as to be in front

11    of Meraldi's friend.

12    Q    Okay, and who is the other person who is in this

13    screen, appears to be bent over near the wall?

14    A    That's the short one.

15    Q    Okay. And who is he searching at that point?

16    A    To Joel.

17    Q    Okay.

18         MR. MENDYS:   Playing the video.

19         (Whereupon, the video is played.)

20         MR. MENDYS:   Pausing 23:56:52.

21    Q    What is going on at this point now with you

22    specifically?

23    A    The fat guy is searching me.

24         MR. MENDYS:   Playing again.

25         (Whereupon, the video is played.)

```
 1                     MR. MENDYS:    Pausing 23:57:25.
 2        Q    Can you describe what is going on now in the video?
 3        A    Yes. They're searching us.
 4        Q    Who specifically is searching you?
 5        A    The fat guy.
 6                     MR. MENDYS:    Playing again.
 7                     (Whereupon, the video is played.)
 8        A    That's where he moved towards me.
 9                     MR. MENDYS:    Pausing 23:57:31.
10        Q    Mr. Contreras, who is searching you at this point?
11                     THE INTERPRETER: Who's what?
12        Q    Who's searching you at this point?
13        A    The small one.
14                     (Whereupon, the video is played.)
15                     MR. MENDYS:    Okay, pausing 23:58:07.
16        Q    Mr. Contreras, what's going on now?
17        A    The small one is returning my wallet to me.
18        Q    And -- okay and -- okay.
19                     MR. MENDYS:    Playing again.
20                     (Whereupon, the video is played.)
21                     MR. MENDYS:    Pausing 23:58:15.
22        Q    Mr. Contreras, is there any conversation or --
23                     MR. MENDYS:    Strike that.
24        Q    Are either of those two men saying anything to you or
25   Joel at this point?
```

1    A    I don't remember well. It's been three years.

2         MR. MENDYS:   Playing again.

3         (Whereupon, the video is played.)

4         MR. MENDYS:   Pausing 23:58:30.

5    Q    What can you tell the jury what's happening here?

6    A    There the real police arrived. And that's when I

7  realized they weren't detectives at all, and I came out and I

8  said, my money, my money.

9    Q    Do you see yourself in this screen?

10   A    Yes, right there.

11   Q    If you could approach the screen and point to yourself,

12 please.

13        THE WITNESS:  (Complying.)

14   Q    Okay, thank you.

15        MR. MENDYS:  Indicating the person in the middle

16        of the sidewalk with an outstretched arm in the direction

17        of the street.

18        (Whereupon, the video is played.)

19   Q    Now --

20        MR. MENDYS:   Ending the video.

21   Q    Mr. Contreras, how much -- how much was taken from you,

22 how much money?

23   A    6,000.

24   Q    Exactly?

25   A    Yes.

1    Q    Did you ever get that money back?

2    A    Yes, sir.

3    Q    When was that in relation to when this took place?

4    A    I believe it was a week or two weeks, something like

5    that. I don't remember well.

6    Q    Did you go back to Massachusetts after this happened?

7    A    We spent the night in a hotel here, and the next day

8    the detectives received our statements.

9    Q    Did you go back to Massachusetts after you made the

10   statement to the detectives?

11   A    Yes, sir.

12   Q    Did you have to return to testify before the Grand

13   Jury?

14   A    Yes, sir.

15   Q    And about a month later did you have to return a second

16   time to testify before the Grand Jury again?

17   A    Yes, sir.

18             MR. MENDYS:   Nothing else.

19             THE COURT: Cross examination?

20             MR. BONANNO:   Yes, if I may inquire?

21             THE COURT:  Do you want to turn off the screen?

22             MR. BONANNO:   I don't need it.

23             If I may inquire, Judge?

24             THE COURT:  You may.

25   CROSS EXAMINATION

Contreras - People - Cross

1    BY MR. BONANNO:

2        Q    How are you, Mr. Contreras?

3        A    Fine, thank you.

4        Q    I'm going to ask you some questions. If you don't

5    understand them let me know and I'll try and rephrase it so that

6    you do understand.

7            Thank you for coming in from Massachusetts today.

8            Now, you talked about a third man who had a shield.   Do

9    you remember talking about him?

10       A    Yes, sir.

11       Q    You didn't see his face well, did you?

12       A    No, sir.

13       Q    When you saw him did he have a hoody up?

14       A    Yes.

15       Q    At any time do you remember him putting the hoody down?

16       A    No.

17       Q    You never saw him with the hoody down?

18       A    No, I never saw his face.

19       Q    Was that because the hoody was up?

20       A    Perhaps but when they said don't move, police, what I

21   did was I obeyed and I didn't pay attention to the faces. The

22   one that took the money from me, because he put me face forward

23   like this to the wall and he turned me towards him.

24       Q    But at some point when the man with the hoody stepped

25   onto the sidewalk he approached you ,is that correct, did his

1   hoody ever fall down?

2       A    No.

3       Q    So it was up all the time?

4       A    Yes, sir.

5       Q    Now, I just want to talk to you a little bit about your

6   relationship with Miss Rodriguez. How did you meet Miss

7   Rodriguez?

8       A    Through Joel.

9       Q    Joel introduced you to Miss Rodriguez?

10      A    Yes, by phone.

11      Q    And how many times did you talk with her on the phone

12  before you actually met her?

13      A    About three times.

14      Q    And this incident occurred on October 17th of 2012; is

15  that correct?

16      A    More or less like that. I don't remember well because

17  it's been three years. I never imagined that I would once again

18  testify.

19      Q    I understand. But you did testify before today; is that

20  correct?

21      A    Yes, sir.

22      Q    In fact, you testified in the Grand Jury on October 19,

23  2012; isn't that correct?

24      A    Yes.

25      Q    It was about two days after the incident, correct?

1      A    Yes, I know I testified.

2      Q    And do you remember if someone asked you in the Grand

3   Jury about your girlfriend?

4           THE COURT:  I'm sorry, the question is if someone

5      asked him in the Grand Jury about his girlfriend?

6           MR. BONANNO:   I'll withdraw the question.

7      Q    Do you remember if someone asked you your girlfriend's

8   name in the Grand Jury?

9           THE COURT:  I would like it in the proper form.

10          MR. BONANNO:   I can go through that, Judge, but I

11     would like to see if he recalls independently before I go

12     to the Grand Jury minutes.

13          THE COURT:  All right.

14          MR. BONANNO:   Thank you.

15     Q    Do you remember if someone asked you about your

16  girlfriend?

17     A    Yes, they asked me the same thing I'm being asked now.

18     Q    Do you recall that you couldn't remember her name?

19     A    I remembered it.

20     Q    Do you recall that you had to take out your cell phone

21  to remember her name?

22     A    Okay.

23     Q    Is that true?

24     A    I don't remember.

25     Q    So, I'm going to refresh your recollection then and ask

1   you -- it's the 10/19 transcript -- on page CMC 3, starting line
2   22.
3           Do you remember being asked this question and then
4   answering in this manner:
5               "QUESTION:   Were you with your girlfriend at that
6       date, time and place I just said?"
7               And you answered:
8               "Yes."
9               And the question was:
10              "What was her name?"
11              And you answered:
12              "If I can pull out my cell phone."
13              And then you said:
14              "Her name is Esmeraldi Rodriguez."
15          Do you remember being asked that and answering that?
16      A   Yes, sir.
17      Q   So, you had to pull out your cell phone to remember her
18   name?
19      A   Yes.
20      Q   But you never met her before?
21      A   Yes, because I had just been talking to her for three
22   months.
23      Q   And you never met her before?
24      A   Exactly.
25      Q   When you came to the Bronx you came for the purpose of

1    purchasing a car; is that correct?

2        A    Yes, sir.

3        Q    And do you recall having a conversation with Miss

4    Rodriguez about that car?

5        A    Yes, sir.

6        Q    You talked to her about it?

7        A    By phone.

8        Q    She actually told you that there was a car for sale?

9        A    Yes, sir.

10       Q    Did she tell you what the price was?

11       A    Yes, sir.

12       Q    And she told you it was $6,500?

13       A    Yes, sir.

14       Q    And did she tell you to bring $6,000 because she could

15   get a better price for you?

16       A    She told me it cost 6,500.  I came down with 6,000,

17   because those that ask 6,500 will accept a lower price.

18       Q    Did she know you were bringing $6,000 with you?

19       A    Yes, sir.

20       Q    And Mr. Rodriguez also knew that too?

21       A    Yes, sir.

22       Q    Did you ever show Miss Rodriguez that money?

23       A    No.

24       Q    But she knew you had it with you?

25       A    Yes.

1    Q    So, would she not be telling the truth if she said she

2    didn't know you had the money?

3                MR. MENDYS:   Objection.

4                THE COURT:   Sustained.

5    Q    You mentioned also that you don't go out with Miss

6    Rodriguez any more; is that correct?

7    A    That's correct.

8    Q    And you had said something before about this incident

9    that happened to you, that you didn't want to blame her. What

10   did you mean by that?

11   A    How can I say this?  She knew that I had $6,000. At the

12   moment that I'm mugged the big guy says, talked the truth, that

13   money is mine, that money is mine. The policeman asked him, how

14   much is it?  He tells him 15,000. Then the policeman comes to me

15   very quietly and says, how much is it, and I told him how much

16   it was, and that's why I can't blame her, because if she had

17   been involved in this she would have told them the exact

18   quantity, do you understand?

19   Q    So, who told them $16,000?

20               THE INTERPRETER: Who told them?

21               MR. BONANNO:   16,000.

22   A    No, 15,000.

23   Q    15.

24   A    The one that took the money from me told the police

25   15,000, because he said he was telling me when I told him, my

1    money, would tell the policeman to tell the truth that that

2    money was his. Then the policeman asked him how much was it, and

3    he said 15.

4        Q    So, is it fair to say that you thought at one time Miss

5    Rodriguez had set you up?

6        A    It's like I told you, I can't think of that. I can't

7    run that through my mind. But I felt strange, because why would

8    this happen to me, like something from a movie, I get robbed,

9    the real police show up.

10       Q    And that's why you dumped her?

11            THE INTERPRETER: I'm sorry?

12       Q    Is that why you dumped her?

13       A    Oh, you can imagine. You can imagine the doubts already

14   in there.

15       Q    Now, you also said when you got to the Bronx you got

16   into a cab to go somewhere with Miss Rodriguez, another woman,

17   and Mr. Rodriguez; is that correct?

18       A    Yes, sir.

19       Q    Who called the cab, do you remember?

20       A    I think it was Esmeraldi, I don't remember well, but I

21   think it Meraldi, I think it was her.

22       Q    So, it wasn't a cab that you took on the street?

23       A    No, I don't remember.

24            THE COURT:  Hold on, I know you are trying, but

25       with the interpreter it's very difficult.

1          Please wait for the answer and then ask the next
2     question, okay?
3          MR. BONANNO:   I apologize.
4          THE COURT:   Can I have a read back of what the
5     last question was?
6          (Whereupon, the requested portion is read back.)
7          THE COURT:   Next question.
8     Q    So, do you believe Esmeraldi called a cab?
9          MR. MENDYS:   Objection.
10         THE COURT:   I'm sorry, the objection is to belief?
11         MR. MENDYS:   Yes.
12         THE COURT:   I'll let it stand.
13         Overruled. Go ahead.
14    A    I believe so, because she's the one that knows the
15    area. It was the second time I had come to New York.
16    Q    The car that you got in to, did it have any indication
17    that it was a cab?
18    A    Yes, it was a cab. It had the partition.
19    Q    The partition?
20         Now, you also said that you went to a disco.
21    A    That we were going to go to a discotheque, but we went
22    to get her friend first to go to the disco.
23    Q    Whose friend were you going to see?
24    A    Meraldi's friend.
25    Q    So, it wasn't Miss Rosario's friend?

1    A    Both of their's, because they're all friends, so it's
2    the same thing.
3    Q    You don't know if it was Miss Rosario's brother-in-law
4    or brother, do you?
5    A    How so the brother-in-law?  I said a girlfriend.
6    Q    Oh, it was a girlfriend?
7    A    Yes, we went to pick up a girl.
8    Q    And did somebody make a phone call to that girl?
9    A    At that time her phone service was cut. We went to the
10   house.
11   Q    So, you went to somebody's house, the girl's house?
12   A    Yes.
13   Q    And she wasn't in?
14   A    No.
15   Q    And then you came back to Walton Avenue?
16   A    Yes, we returned to Meraldi.
17   Q    Whose idea was it to come back to Walton Avenue?
18   A    Meraldi.
19   Q    Why didn't you go straight to the disco without the
20   friend?
21   A    I don't know.
22   Q    You never asked?
23   A    (Shaking head in the negative.)
24          THE COURT:  He was shaking his head.
25          Yes or no that you didn't ask?

1                 THE WITNESS:   No.

2      Q   So, Miss Rodriguez called the cab that you got into,

3  you went to Miss Rodriguez's girlfriend's house, and she wasn't

4  there?

5      A   No.

6      Q   And then Miss Rodriguez suggested we go back to Walton

7  Avenue?

8      A   Yes.

9      Q   And that's when this incident occurred?

10     A   Yes, sir.

11     Q   The guy with the shield, with the badge, he was a big

12  guy?

13     A   Yes.

14     Q   Is that all you remember about him?

15     A   That's all I remember.

16     Q   You didn't see him take any property from anybody, did

17  you?

18     A   No.

19           MR. BONANNO:   I have no further questions, Judge.

20           THE COURT:   Any redirect?

21           MR. MENDYS:   None.

22           THE COURT:   Thank you, Mr. Contreras, you may

23     step down. Thank you.

24           (Whereupon, the witness exits the stand.)

25           THE COURT:   Do the People have any additional

Proceedings

1    witnesses to call?

2         MR. MENDYS:   People have no further witnesses.

3         People rest.

4         THE COURT: All right, members of the jury, that

5    concludes the People's case.

6         At this time the Court hears, outside the presence

7    of the jury, some legal applications, and when I'm done

8    with that and call you back in I'll give you further

9    instructions on how to proceed.

10        Again, during this recess do not discuss anything

11   about the case with each other, keep an open mind, keep all

12   my recess instructions.

13        I'll see you as soon as I finish with this legal

14   discussion matter, okay --

15        THE COURT OFFICER:   Jury exiting.

16        (Whereupon, the jury exits the courtroom.)

17        MR. MENDYS:   May I step out and release the

18   witness, then come back?

19        THE COURT:  Yes.

20        (Whereupon, a brief pause in the proceedings was

21   held.)

22        MR. MENDYS:   Thank you, Judge.

23        THE COURT:   Okay, so I'll hear arguments at the

24   close of the People's case.

25        MR. BONANNO:   We move for a trial order of

Proceedings

1    dismissal, People having failed to prove a prima facie

2    case.

3                MR. MENDYS:   We've proven our case. I rely on the

4    record.

5                THE COURT:  Motion denied at the close of the

6    People's case.

7                Okay. Now, we'll give them a couple of minutes,

8    then I'm going to call them out and say, does defense wish

9    to present evidence, and you'll say?

10               MR. BONANNO:  No.

11               THE COURT:  No, okay.

12               So, we can talk now about whether there are any

13   additional requests to charge other than what you have

14   already made.

15               Are you asking for GL, grand larceny third degree?

16               MR. MENDYS:   Yes.

17               THE COURT: Over $3,000?

18               MR. MENDYS:   Yes.

19               THE COURT: So, again, I will submit that in the

20   alternative along with the grand larceny from the first

21   count, only to be considered, one or both of them, if they

22   have not convicted of the robbery.

23               Now, do you have any additional requests for any

24   charges here?

25               MR. BONANNO:   I don't believe I do, Judge.

Proceedings

1           I sent what I intend on submitting.  I can't think
2     of anything that's come up as of today.
3           THE COURT: This morning you mentioned something
4     about lesser includeds.  Are there any you're requesting?
5           MR. BONANNO:   No.  I think we had that
6     discussion.
7           What are you talking about, the attempted robbery?
8           THE COURT: No, no, no, you said grand larceny,
9     lessers of grand larceny of $3,000.
10          The attempts the People did not want and you
11    didn't want, that was last week.
12          MR. BONANNO:   No, I think we'll rest on its
13    either all or nothing.
14          THE COURT:  So, you don't want to request anything
15    else?
16          MR. BONANNO:   No.
17          THE COURT: Fine. Well --
18          MR. MENDYS:   I'm sorry, there's one additional
19    instruction I would like, it's the Fountain Charge for
20    witness preparation.
21          THE COURT:  But what the DA's office refers to as
22    a Fountain Charge, and 99 percent of the Judge's cannot
23    find any charge called the Fountain Charge, the charge that
24    the People do not have to prove their case by any
25    particular type of evidence charge?

Proceedings

1       MR. MENDYS:   I think I was referring to --

2       THE COURT: I'm listening.

3       MR. MENDYS:   I was referring to, in my head I was

4   thinking of a witness prep, witness prep charge.

5       THE COURT:   I have never heard that referred to

6   as a Fountain Charge.

7       That, actually, is a standard charge that the

8   People are allowed to confer with witnesses and view

9   documents, and it happens in every trial.

10      The charge that you are requesting, which is:

11      "You have heard testimony about the prosecutor

12  speaking to witnesses about the case before the witnesses

13  testified at the trial.

14      "The law does not prohibit a prosecutor from

15  speaking to a witness about the case before the witness

16  testifies, nor does it prohibit the prosecutor from

17  reviewing with the witness the questions that will be asked

18  at trial.

19      "You've also heard testimony that witnesses read

20  or reviewed certain materials pertaining to the case before

21  testifying. The law does not prohibit a witness from doing

22  so."

23      Is that the charge that you're requesting, witness

24  pretrial preparation?  Yes or no, because that's the charge

25  that's in here.

Proceedings

1          MR. MENDYS:   Then no.

2          THE COURT:   You don't want me to give that charge?

3          MR. MENDYS:   I do not.

4          THE COURT:   Okay. Do you want me not to give it

5     either?

6          MR. BONANNO:   Fine with me.

7          THE COURT:   That's part of the standard

8     instructions in all cases, but I'll eliminate it, fine.

9          MR. MENDYS:   Then yes, yes, Judge, I will take

10    it.

11         THE COURT:   Well, no, no, you don't have to, I

12    mean --

13         MR. MENDYS: I understand.

14         I will err on the side of caution and I'll request

15    it, yes.

16         THE COURT: Then the charge that I have heard

17    people call a Fountain Charge from the DA's office, what

18    are you referring to as a Fountain Charge?

19         MR. MENDYS:   I think I misstated it, the Fountain

20    charge.

21         I was going to ask the Court for what you were

22    referring to in terms of no particular types of proof or

23    investigative steps.

24         THE COURT:   "when I referred to a reasonable doubt

25    based upon the evidence that was presented or because of

Proceedings

1   the lack of convincing evidence, I'm not telling you that

2   the defendant's guilt must be proven by any particular form

3   or type of evidence. The People are not required to present

4   any particular type of evidence.

5           "I am not inviting you to speculate about what

6   other evidence might have established or not established,

7   had it been offered.

8           "You may not at any time speculate about matters

9   that are not in evidence.

10          "What I mean by lack of convincing evidence is

11  that if you find that without other or additional evidence

12  the evidence that the People have offered fails to

13  establish defendant's guilt beyond a reasonable doubt then

14  there is a lack of convincing evidence and you should find

15  that the People have not met their burden.

16          "On the other hand, if you find that the evidence

17  that was before you does convince you of the defendant's

18  guilt beyond a reasonable doubt then it does not matter

19  what other evidence might have been presented and you

20  should find that the People have met their burden of

21  proof."

22          That's the charge that I give on reasonable doubt,

23  that the People don't have to prove by any particular type

24  of evidence.

25          MR. MENDYS:   Okay.

Proceedings

1      THE COURT:  Okay. All right. Anything else?

2      MR. MENDYS:   Nothing.

3      THE COURT:  Okay. We can bring the jury out

4  whenever they're ready.

5      THE COURT OFFICER:   Ready, Judge?

6      Jury entering.

7      (Whereupon, the jury enters the courtroom.).

8      THE CLERK:   Sworn jury is present and properly

9  seated.

10      THE COURT:  Okay. Does the defense wish to present

11  any evidence at this trial?

12      MR. BONANNO:   Defense rests, Judge.

13      THE COURT:  Okay, the defense rests.

14      That concludes the trial, and so the next steps,

15  as I told you, will be the summations of counsel and my

16  charge to you.

17      They will be tomorrow morning. It's 3:30, we'll

18  never finish all of that in the next hour or so. So, the

19  case will be in your hands tomorrow.

20      I'm going to ask you all to be here by 9:45.

21  There will be no witnesses, no other evidence presented.

22  The case is in and I will give you some preliminary

23  instructions before the summations, then I will give you my

24  final instructions and then you'll deliberate.

25      Anyone have any problem for getting here for 9:45

Proceedings

1  tomorrow?  Okay none of the jurors have said that they do,

2  good.

3       So, we are now at a critical, critical stage. You

4  have heard all of the evidence. You haven't heard the

5  summations and you certainly haven't heard the legal

6  instructions, so it would be wrong for anyone to start

7  thinking about the case or what a verdict might be, what

8  their verdict might be without hearing everything else.

9       So, that's why I tell you to keep an open mind.

10  Also don't discuss anything about this case with anyone

11  else. Keep all those recess instructions, it's very, very

12  important.

13       Tomorrow you will hear the end of the trial, and

14  then it will be your turn to deliberate on the evidence.

15       So, have a pleasant evening, I'll see you tomorrow

16  about 9:45, okay?

17       THE COURT OFFICER:   Jury exiting.

18       (Whereupon, the jury exits the courtroom.)

19       (Whereupon, the daily copy portion of the trial is

20  completed.)

21            *      *      *      *

22  Certified to be a true and accurate transcript of the

23  stenographic minutes taken within.

24  Laura Rosen  Senior Court Reporter

25  *Laura Rosen*

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF BRONX : CRIMINAL TERM : PART 98

------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK          : Indictment #:
                                               3349/2012
              - against -                    :

RICHARD DIAZ,                                : Trial
                                               (Summations &
                                               Charge)

                    Defendant(s).            :

------------------------------------------x          **FILED**

                    265 East 161st Street
                    Bronx, New York   10451       OCT -5 2016
                    July 28, 2015
                                                SUP COURT, APP. DIV.
B E F O R E,                                        FIRST DEPT.
              HONORABLE RALPH FABRIZIO, Justice
              (Same appearances as previously noted)
              Margaret McGovern,
              Senior Court Reporter
              ---------------------------
                    THE CLERK:  Calendar number one, case on trial

continued.  Defendant Richard Diaz is not before the Court

and neither is the sworn jury at this time.

              Appearances.

              THE COURT:  I just vacated a warrant for Mr.

Santana.

              Identify, officer, your appearance again.

              P.O. HORNE:  Officer Horne, shield 2885, Bronx

Warrants.

              THE COURT:  There is another defendant who is

fugitive by the name Richard Diaz.  You have been looking

for him?

Proceedings

1    P.O. HORNE:  No, I haven't but I believe he was in

2    the home with this gentleman when I picked him up.

3    THE COURT:  When you -- you believed he was with

4    -- you saw him there?

5    P.O. HORNE:  What I want to do before he makes a

6    phone call or whatever, that's why I didn't want him to see

7    the photo.  I want to run real quick to pick him up.  I

8    want to make sure he has a warrant.

9    THE COURT:  Did he -- was he still there when you

10   left with this defendant?

11   P.O. HORNE:  When I left, he was laying on the

12   bed.  I believe it's him.  I just looked at the photo.  I

13   want to make sure.  I want a copy of the warrant.

14   THE COURT:  He didn't offer to surrender or

15   anything?

16   P.O. HORNE:  No.

17   THE COURT:  Mr. Bonanno, anything you want to

18   say?

19   MR. BONANNO:  Pat Bonanno for Mr. Richard Diaz.

20   THE COURT:  We are about to start summations and

21   charge on this case.  The jury is about to start

22   deliberating.  I'm not sure if this is even him.  It might

23   be.  I saw you looking at the picture here, but if you

24   believe he was in the same apartment where you found Mr.

25   Santana, you should go do whatever job you need to do

1     and --

2             P.O. HORNE:  I need a copy of the warrant, your

3     Honor.

4             THE COURT:  I guess does the DA have a copy?

5             MR. MENDYS:  I'm looking for one.  I know I was

6     given one.

7             (Whereupon, there was a brief pause in the

8     proceedings)

9             MR. MENDYS:  Judge, I plan to do -- I have a Power

10    Point presentation that I've prepared, and I'm happy to

11    provide a copy to the Court and defense after the defense

12    has summed up.  So once he's done, I would ask for five

13    minutes to make sure I'm set up and --

14            THE COURT:  Sure.  We'll take a break after the

15    defense's summation.  That's fine.

16            MR. MENDYS:  Thank you.

17            (Whereupon, there was a brief pause in the

18    proceedings)

19            THE COURT OFFICER:  Jury entering.

20            (Whereupon, the jurors enter the courtroom at this

21    time.)

22            THE CLERK:  Sworn jury is present and properly

23    seated.

24            THE COURT:  Good morning, everyone.

25            THE JURORS:  Good morning.

1          THE COURT:  Members of the jury, you now are going

2     to hear the summations of the lawyers and following the

3     summations, I will instruct you on the law, and then you'll

4     begin your deliberations.

5          Now, under our law, the defendant, defense

6     counsel, must sum up first, and the prosecutor must follow.

7     The lawyers may not speak to you after that.

8          Now, summations provide each lawyer with an

9     opportunity to review the evidence and to submit for your

10    consideration the facts, the inferences and the conclusions

11    that they contend may properly be drawn from the evidence.

12          If you find that a lawyer has accurately

13    summarized and analyzed the evidence and if you find that

14    the inferences and the conclusions the lawyer asks you to

15    draw from that evidence are reasonable, logical and

16    consistent with that evidence, then you may adopt those

17    inferences and conclusions but bear in mind the following

18    very important points:  First of all, you, members of the

19    jury, are the finders of the fact.  It is up to you and you

20    alone to determine the facts from the evidence that you

21    find to be both truthful and accurate.  Thus, you should

22    remember that whatever the lawyers say and however they say

23    it, what they say is simply argument submitted for your

24    consideration.

25          Second, remember the lawyers are not witnesses in

1   this case.  So if a lawyer asserts as fact something that

2   is not based on the evidence, you must disregard that.

3   Remember, nothing that the lawyers say at any time is

4   evidence.  So nothing that the lawyers say in their

5   summation is evidence.  You have heard the evidence, and

6   you must decide the case on the evidence as you find it and

7   the law as I will explain it to you.

8           Now, during the summations, one lawyer's

9   recollection of the evidence may in good faith differ from

10  the recollection of the other lawyer or from your own

11  recollection.  The lawyers will undoubtedly differ with

12  each other on the conclusions to be drawn from the

13  evidence.  In the end, it is your recollection,

14  understanding and evaluation of the evidence that controls,

15  regardless of what the lawyers have said or will say about

16  the evidence.  As I've told you, you and you alone are the

17  judges of the facts of this case.

18          If during your deliberations you need to have the

19  recollection of the testimony refreshed, you may have any

20  or all or any portion, rather, of the testimony read back

21  to you.

22          Now, remember, under the law, I'm responsible for

23  explaining the law.  That's not the job of the lawyers.  If

24  you think that there is any difference between what the

25  lawyers have said and what I say the law is, your sworn

1   duty as jurors is to follow my instructions on the law as

2   you have all promised me that you would.

3          Finally, if during summations I sustain an

4   objection to a comment of a lawyer, the comment will be

5   stricken from the record, and you must disregard it as if

6   it were never said.

7          If I overrule an objection, the comment will

8   stand.

9          Whether I sustain or overrule an objection or even

10  on my own indicate that a comment must be disregarded, my

11  ruling only indicates that the comment does or does not

12  violate one of the rules of law set down for lawyers to

13  follow during the summation.  It's not an attempt to

14  indicate that I have an opinion about what is being said or

15  whether the defendant is guilty or not guilty.

16         Again, under our law, you and you alone judge what

17  facts, if any, are proven and whether the defendant is

18  guilty or not guilty and not the lawyers.

19         I'm now going to turn to the summations.

20         Mr. Bonanno, you may address the jury.

21         MR. BONANNO:  Thank you.  May it please the Court.

22         Good morning everyone.  We finally made it.  As I

23  told you before when I first had met you and when you were

24  first prospective jurors, I thanked you all for the job

25  that you were about to do.  And I want to thank you again

1    for the job that you have done up until now as sworn

2    jurors, for the job that you're about to do regardless of

3    what your verdict is.

4         You will deliberate on the evidence that you

5    receive during the course of this trial.  You will follow

6    the judge's instructions on how to do that.  And I'm sure

7    you'll come to what is ultimately our goal here, which is a

8    search for the truth.

9         So I want to thank you for your service up until

10   now, and I want to thank you for the service you're about

11   to enter into.  Also, I want to thank the Court and its

12   wonderfully competent staff.  They have overseen the

13   exercise of this most precious American right to the

14   highest standard of the bench, and it's been a pleasure

15   working with them as an attorney in this court.

16        Also, my esteemed colleague, Mr. Mendys, he has

17   represented the People of the State of New York zealously,

18   as he should, as is he sworn to do and as the People

19   deserve.  He, too, will be the first to admit that this,

20   ladies and gentlemen, is a search for the truth, not a

21   search for a conviction or even an acquittal but a search

22   for the truth.

23        Our court officers who are always around but not

24   here right now -- there they are -- they have silently and

25   strongly insured the security and safety of this court and

1    these proceedings.  And the fact that their job goes

2    somewhat unnoticed is a testament to their professionalism,

3    so we thank them.

4          With all due respect to the jury and to the Court,

5    probably the most important person in this courtroom is our

6    court reporter who has faithfully and accurately

7    transcribed every bit of evidence and words that come from

8    the attorneys, from the Court.  And you, ladies and

9    gentlemen of the jury, will find out exactly how important

10    they have been when you ask for some read back or you don't

11    remember what happened.  So we thank everyone to have

12    gotten to this point.

13          And ladies and gentlemen of the jury, the issues

14    here, I respectfully submit, come down to two issues in

15    this case.  Issue one is whether the People have met their

16    heavy burden to establish that the third individual that we

17    saw in the videos was Mr. Richard Diaz.  And the second

18    issue you should decide, that is that Mr. Diaz in that

19    video, is to determine whether the People have shown beyond

20    a reasonable doubt every element of the crimes that he is

21    charged with, that he acted in concert with two other

22    individuals, a Mr. Melenciano and Mr. Santana, to commit

23    the crimes that they are accused of.

24          In reviewing that decision, let's look at the

25    testimony and the evidence that came forward.  We first

1    heard from Police Officer Mangual.

2         And Police Officer Mangual stated that -- he

3    testified in the Grand Jury. He stated in the Grand Jury

4    when he first testified that he came up on the scene of

5    what he saw, four people on the wall and Melenciano and

6    Santana frisking those people. That's what he said in the

7    Grand Jury directly after this incident, fresh in his

8    mind.

9         Three years later, he had an opportunity to review

10   the tape and opportunity to speak to the DA, and he came

11   here, and he testified that when he came up on the scene,

12   he saw four people on the wall and three people frisking

13   those people. He included that third person, the guy with

14   the shield, in that group of people that were frisking.

15   That differed from his Grand Jury testimony.

16        When pressed on cross-examination, he ultimately

17   said he never really saw the third guy, never got a good

18   look at him, never really got to see him. Certainly never

19   got to see a third guy frisking anybody. So he overstated

20   to you originally what he had saw, but he corrected that

21   later on, and he corrected it to his Grand Jury testimony.

22        He also stated that he interviewed witnesses at

23   the scene, all of the witnesses. And part of the witnesses

24   that were there were a Miss Rosario and Miss Rodriguez.

25   The description that he took away from those witnesses was

1    that the third person was a male, dark-skinned with a

2    hoodie and blue jeans.  Never anything about big eyes.  The

3    day of the incident on the scene, fresh in everyone's

4    memory, no description about big eyes.

5         Detective Rodriguez, Chris Rodriguez, came and

6    testified.  And you had an opportunity to judge his

7    credibility and his demeanor and the way he does his job.

8    Seemed like a very, very thorough detective, did a good job

9    in investigating the case, because that's what he did.  He

10   was in the police impersonation unit.  He got this case.

11   And he, ultimately, using all his police resources,

12   developed a lead on a third person, a Mr. Richard Diaz that

13   he felt was the person, that was the third person in that

14   video.  So he did what he had to do.  He put out an I-card,

15   a wanted poster, notifying everyone in the, in the NYPD if

16   you run into this guy, I want to talk to him because he may

17   be an individual that we want in connection with a crime.

18   He did that and ultimately, a Richard Diaz came into the

19   custody and control of the NYPD.

20        And Detective Rodriguez, being the diligent

21   detective that he appeared to be, went out, grabbed one of

22   his eyewitnesses, spoke with that witness and brought them

23   back to a precinct to view a lineup.

24        Now, previous to that, Detective Rodriguez

25   testified that he had spoken to all the witnesses at the

1    precinct directly after the incident.  He spoke with Miss

2    Rodriguez.  And if you recall, Miss Rodriguez said to you

3    that this individual had the guys, had big guys.  Detective

4    Rodriguez never indicated that in his testimony, a

5    detective with that type of detail.

6         And I'm going to ask you to use your common sense,

7    ladies and gentlemen.  He would have noted that as

8    significant pedigree information for you, other officers

9    that were looking for this fellow to say he was a

10   dark-skinned, tall, blue jeans with big eyes.

11        MR. MENDYS:  Objection.  Calls for speculation.

12        THE COURT:  Sustained.

13        MR. BONANNO:  Use your common sense, ladies and

14   gentlemen, to realize that if a witness would have told

15   Detective Rodriguez information that she testified to this

16   jury, that he would have utilized that information.

17        He brought Miss Rosario to the scene of the 108

18   Precinct to look at a lineup of Mr. Diaz, because he was in

19   custody now.  And you saw his arrest photo.  You saw what's

20   in evidence as People's No. 5.  You'll have an opportunity

21   to look at that evidence if you want when you're

22   deliberating.

23        And you'll see that that photograph of Mr. Diaz,

24   he's wearing a very prominent earring in his left ear.

25   Quite noticeable.

1          And there was questions back and forth about how

2     Detective Rodriguez set that lineup up.  And there was

3     questions to the witness as to whether she recalled if

4     other people in the lineup had an earring or jewelry on.

5     Detective Rodriguez said it was standard to ask people to

6     remove all their jewelry from the lineup, but he couldn't

7     specifically remember if Mr. Diaz was wearing that earring

8     in that lineup.  He memorialized the lineup, however, with

9     two separate photos, a straight on photo that when asked

10    can you see the earlobes of everyone in that lineup, he

11    said it was unclear.  The photo wasn't enhanced.  So the

12    earlobes were not noticeable.

13         But curiously, ladies and gentlemen, there was a

14    second photo of that lineup, a photo that was taken from

15    the left side, the left angle, the angle that had Mr. Diaz

16    been wearing that earring in it, the lineup was definitely

17    -- would definitely not have exposed that earring.  You

18    judge it, Ladies and gentlemen.  You take a look at those

19    photos, and you see and make a determination as to whether

20    that lineup was an accurate representation of whether Mr.

21    Diaz was or was not wearing a telltale earring that

22    evening.

23         Detective Ana Bell, she ultimately spoke with Mr.

24    Diaz, and she read him Miranda rights in Spanish, and she

25    also readily admitted that the Spanish language has

1    different dialects and, you know, there's Dominican

2    Spanish, there's Puerto Rican Spanish, there's Argentinian

3    Spanish, Mexican Spanish.

4         She also said in her experience, because she

5    deals with different cultures and different ethnicity

6    around the city she knows how to understand those type of

7    dialects.

8         But when I asked her if Mr. Diaz understood what

9    she was saying to him, she could only say that she believed

10   that he understood it.  She understood what he was saying.

11   The question was did he understand those rights and the

12   rights that he was waiving.  She made him sign the card.

13   He signed that card.

14        She allegedly told her some statement about Lappy

15   and Homeboy and Hombre, a third person now in this mix,

16   about an incident that occurred with $3,000.  But ladies

17   and gentlemen of the jury, Mr. Diaz allegedly never said

18   anything about Mr. Melenciano or Mr. Santana.  And

19   Detective Bell never testified that they were Lappy or

20   Homeboy or Hombre.  We don't know what Mr. Diaz really said

21   to Detective Bell, because she went home that night.

22        She didn't take notes about her interview, and

23   that single mother of two children went home that night,

24   took care of all the crazy duties that a single mom does

25   and came back 24 hours and from her memory wrote this

1    statement about Homeboy, Lappy and Hombre and never showed

2    it to Mr. Diaz that he could approve of it or disapprove of

3    it, but she submitted it as a report to close out her

4    investigation.

5        We also heard from a Miss Rosario.  She was one of

6    the ladies that was up on the wall that you saw in the

7    video.  And she said that she had a brief encounter with

8    this third person from eight to nine feet away.  That's

9    when she saw this fellow with the hoodie, and she described

10   this individual as tall and strong and a gym type of body.

11   But when asked about whether she saw his face, she stated

12   that she never got a really, really, really, really good

13   look at his face.  She testified that most of the

14   interaction she had with that third person she was up

15   against the wall.

16       She never testified his hoodie came down and she

17   was able to see his face.  She testified it was up.  Dark

18   skin.  That's all she could remember.

19       When asked about his facial features, she couldn't

20   describe characteristics of his mouth, of his lips, any

21   facial scars, nothing.  And she certainly didn't say that

22   he had big eyes.

23       She also testified that while she was being held

24   against the wall, this third individual went inside the

25   front of her pocket and searched it.

1        But later on cross-examination, she clarified that

2   and said that that never really happened.

3        When asked about the lineup that she viewed, we

4   showed her the picture of People's 5, the picture of Mr.

5   Diaz in his arrest photo, and asked her whether he was

6   wearing that prominent earring in the lineup, and she

7   couldn't remember.

8        Miss Rodriguez, Esmeraldi Rodriguez, well, she

9   verified that the third guy never put his hand in her

10  pockets.  She also described him as tall, dark skin and

11  thick like he exercised, but she added something extra.

12  She added that he had big eyes, and she said he had a face

13  she would never forget.  She had seen that face in not even

14  24 hours before in the photo number five in the district

15  attorney's office, the one with the prominent earring.

16  That's when she saw that.  Other things she couldn't

17  remember because it was so long ago, but that's a face she

18  could never forget.

19        And I respectfully submit to you, ladies and

20  gentlemen of the jury, there's a reason why, because that

21  face is the face that eviscerates any scintilla of doubt

22  that she was involved somehow in setting up Mr. Contreras

23  for this act that occurred against him.

24        She testified, as Miss Rosario did, that on the

25  night in question, they took a cab to go see and hang out

1    with Miss Rosario's brother to have a few beers, to party.

2    Both Miss Rodriguez said that, both Miss Rosario said that.

3    And then they came back to Walton Avenue.  When they tried

4    to call the brother and he wasn't home, came back to

5    Walton, and that's when Mr. Contreras was accosted and

6    $6,000 was removed from his person by Mr. Melenciano and

7    Mr. Santana.  That's what Miss Rodriguez said.  That's what

8    Miss Rosario said.  Mr. Contreras said something completely

9    different.

10       Miss Rodriguez said she never spoke to Mr.

11   Contreras about this car.  She never told him it was

12   $6,500.  She never told him to bring $6,000.  She didn't

13   know he had this money on him.  She had no idea about this

14   money.

15       Well, she also said that the third guy with the

16   hoodie, she got a great look at his face, because the

17   hoodie came down.  No one else that was there testified to

18   that.

19       And ladies and gentlemen of the jury, you have the

20   video.  Take a good look at that video.  You'll see that

21   that third person removed his hoodie when he walks away

22   from the scene, and that's the only time that hoodie comes

23   down.

24       Mr. Yohn Contreras came in and testified credibly,

25   I submit.  This hard working young man admitted to some of

1    his human indiscretions, going to meet a girl that he never

2    saw before even though he's married.  I give him a lot of

3    credit for that, admitting in some respects that it was a

4    mistake but also admitting that he had a conversation with

5    Miss Rodriguez saying she knew that he was bringing $6,000

6    with him, that that was the first time that he had met her,

7    that unlike the statements of Miss Rosario and Miss

8    Rodriguez, they were going to a discotheque that night,

9    they weren't going to see Miss Rosario's brother.  They

10   weren't going to have beers.

11         Miss Rodriguez was the one who called the cab.  It

12   was Miss Rodriguez's girlfriend they were supposed to go

13   see who wasn't there.  He doesn't know why they didn't go

14   directly to the discotheque.  That was their plan.

15   Instead, Esmeraldi Rodriguez wanted to go back to her house

16   because I respectfully submit to you, ladies and gentlemen,

17   she knew two people would be waiting for Mr. Contreras

18   there to relieve him of $6,000.  That's why she needed to

19   never forget that face, so her face couldn't be involved in

20   these allegations.

21         Mr. Contreras testified that two days after this

22   incident in the Grand Jury he dumped Miss Rodriguez because

23   he finally realized what had happened.  You can imagine how

24   he felt.  I asked him if he felt he had been set up.  And

25   he was quite honestly a gentleman enough not to make that

1    direct accusation, but you could see that he was feeling a

2    little bit foolish for things that had happened to him.

3    Thank God he got the money back ultimately.

4         But you can see, ladies and gentlemen, by using

5    your common sense, that Miss Rosario and Miss Rodriguez

6    identified Mr. Diaz as that third person was just a little

7    bit beyond the scope of credibility, and I ask you to find

8    that respectfully.

9         Ladies and gentlemen of the jury, if, even if you

10   should find and credit the testimony of Miss Rosario and

11   Miss Rodriguez that Richard Diaz is that third person in

12   that video, which I respectfully submit he is not, I'm

13   going to respectfully submit that the People still have not

14   shown you by their heavy burden of proof that he is the

15   individual who also acted in concert to commit the crimes

16   against Mr. Contreras that is he charged with.

17        Clearly, there was a robbery.  Clearly, Mr.

18   Melenciano and Mr. Santana were involved in that robbery.

19        We have heard really nothing of evidence to show

20   that Mr. Diaz assisted in acting in concert to commit the

21   robberies or any of the crimes charged, and we're going to

22   respectfully ask that each and every one of you viewing

23   that evidence, that the People have not proven their case

24   beyond a reasonable doubt do exactly as you promised me and

25   the Court and yourselves that you would do before you

1    became sworn jurors and find Mr. Diaz not guilty.  Thank

2    you.

3              THE COURT:  Thank you, Mr. Bonanno.  We're going

4    to take about a five-minute recess before the People's

5    summation.

6              Do not discuss the case.  Keep an open mind.

7    We'll call you back in about five minutes.

8              THE COURT OFFICER:  Jury exiting.

9              (Whereupon, the jurors leave the courtroom at this

10   time.)

11             (Whereupon, there is a recess taken.)

12             THE COURT OFFICER:  Jury entering.

13             (Whereupon, the jurors enter the courtroom at this

14   time.)

15             THE CLERK:  Sworn jury is present and properly

16   seated.

17             THE COURT:  Good morning again, members of the

18   jury.  We're going to proceed with summations.

19             Mr. Mendys, you may address the jury.

20             MR. MENDYS:  Thank you, Judge.

21             Not with a gun, not with a knife, not with a

22   weapon of any sort.  All it took was a badge, fake badge,

23   and the words police, up against the wall.  That's all

24   that it took for Richard Diaz and his cohorts to convince

25   Yohn Contreras, Esmeraldi Rodriguez, Argelia Rosario and

1   Joel Rodriguez that they were actually real police

2   officers.

3         And they used that threat of an authority, they

4   used the threat of handcuffs, of an arrest, of a criminal

5   prosecution to get what they wanted.  And all they wanted

6   was money, money that they hadn't earned, that wasn't

7   theirs.  That's how simple it was, jurors, a fake badge and

8   the words police.  That's all they needed to commit this

9   crime.

10        As simple as it was for Richard Diaz, Amauri

11  Santana, Jose Melenciano, jurors, I submit to you it's even

12  simpler for you to find Richard Diaz guilty.

13        You know, Mr. Bonanno is a good lawyer but

14  sometimes a defendant is just guilty.

15        The evidence here, I submit, is overwhelming.

16  There's a video.  There are multiple identifications.

17  There is a statement in which, I submit, Richard Diaz

18  places himself at the scene of the crime.  Make no mistake,

19  jurors, identification is not the issue in this case.  In

20  fact, there is no issue.

21        At the end of the day, all of the evidence here is

22  not a coincidence, and it is certainly not, not a

23  reasonable doubt.  Richard Diaz is guilty.

24        So what you heard, you heard from three members of

25  the New York City Police Department and three of the four

1   civilians witnesses who were there.  They came and

2   testified to you regarding the events of October 17th.  And

3   to a lesser degree, you heard about the events of

4   November 22nd, 2012.  I submit to you that regarding the

5   events that took place and what you have to decide, they

6   all testified credibly and believably.

7            On October 17th, 2012, Yohn Contreras met

8   Esmeraldi Rodriguez for the first time.  He came down from

9   Massachusetts to buy a car.  He came with his friend Joel

10  Rodriguez.  He met Esmeraldi and Argelia Rosario, and they

11  had plans to go out.  Their plans fell through, and they

12  ended up back at 2315 Walton Avenue.

13           And when they get out of that car, out of that

14  cab, they're standing on the sidewalk.  And the first man

15  who approached them is Richard Diaz, who was identified by

16  two witnesses as the man with the badge.  He, himself,

17  stated that he had a badge that night.

18           As he approaches them, he says police, up against

19  the wall.  And he guides them with his hand, guides Mr.

20  Rodriguez to the wall, the woman to the wall, and then Mr.

21  Contreras goes to the wall.

22           Once they're up against the wall, then Santana and

23  Melenciano come in, and they start frisking the men while

24  Diaz maintains control of the woman.

25           Jurors, right off the bat, immediately this is

1    what the law refers to as acting in concert with.  The

2    judge is going to give you an instruction about accessorial

3    liability.  I submit this is word for word what you will

4    hear:  When one person engages in conduct which constitutes

5    an offense, robbery, another is criminally liable for such

6    conduct when, acting with the state of mind required for

7    the commission of that offense, he or she solicits,

8    requests, commands, importunes or intentionally aids such

9    person to engage in such conduct.  Now, that's a lot of

10   words.

11          But at the end of the day, what we know is that

12   Richard Diaz, Amauri Santana and Jose Melenciano acted

13   together.  How do we know that?  We know Diaz is the one

14   who had the badge.  He's the one who approaches and says

15   police, up against the wall.  He's the one that gains the

16   compliance of these four people.

17          And as he's standing there and after he gains

18   compliance, Santana and Melenciano go and search the men.

19   And Santana, we know, ultimately finds $6,000 on Yohn

20   Contreras.

21          Jurors, I submit to you that without Richard Diaz,

22   this crime does not even take place.

23          I also submit to you that based on what we've seen

24   in the video and what you heard, he's the ring leader.

25   He's directing the witnesses where to go.  He's directing

1    his codefendants.  He's the one staging this.  All he did

2    was gain compliance, but he is just as responsible for

3    taking that money out of Mr. Contreras' pocket as Amauri

4    Santana as Jose Melenciano is.

5              We know while up against the wall Santana searches

6    Contreras and Melenciano, searches Rodriguez.  We know

7    Santana takes $6,000 from Yohn Contreras.  We know that

8    because Mr. Contreras told us.  And we also know that

9    because the police, Officer Mangual, recovers $6,000 from

10   Amauri Santana.  You heard from three of the four people.

11   Argelia Rosario and Esmeraldi Rodriguez testified

12   specifically regarding Richard Diaz.  They both identified

13   him as the man with the badge who pushed them against the

14   wall.

15              Argelia Rosario testified that she identified him

16   in a lineup a month, a little more than a month after this

17   crime was committed.  And Miss Rodriguez identified him

18   here in court in front of you.

19              Now, Mr. Bonanno made a lot about how Miss Rosario

20   didn't recognize or didn't notice if he had big bushy

21   eyebrows or if he had an earring or any individual

22   descriptive features.

23              Jurors, I submit to you that that is neither here

24   nor there because what matters is when she saw the face

25   again, she remembered it.  When she saw all of his features

1      combined into one face, she said, yeah, that's the guy.

2      Nothing in particular stuck out to her, but his facial

3      features as comprised to form Richard Diaz, that meant

4      something to her, not his eyebrows or his earlobes or his

5      earring, his face as a whole.

6            As you look at me and as I look at you, it is all

7      of those features combined that make an individual's face,

8      and that is what she recognized when she viewed that lineup

9      back on November 22nd, 2012.

10            And I submit to you that is what Esmeraldi

11      Rodriguez recognized when she saw the photo of him,

12      People's Exhibit 5, and said that is a face I will never

13      forget.  That is a face I will never forget, not those eyes

14      I will never forget or those eyebrows I will never forget.

15      That is a face I will never forget.

16            You can hear back, have read back to you whatever

17      testimony you would like.  Don't take my word for it.

18      Don't take Mr. Bonanno's word for it.  Have it read back to

19      you.  Make sure you understand it correctly.

20            So I submit to you that identification, jurors, is

21      not the issue in this case because at the end of the day,

22      when Richard Diaz was arrested, he was interviewed by

23      Detective Bell.  And in this statement, a statement in

24      which he was advised of his rights -- and by the way, he

25      did indicate that he understood his rights.  Detective Bell

1   told you that and he voluntarily of his own free will

2   signed the <u>Miranda</u> form.  He wasn't forced to do anything.

3   He signed the form, and he made a statement.

4           Now, he didn't want to write it down so Detective

5   Bell the next day typed it out.  That's what's before you,

6   not word for word, verbatim, but the gist of it, what we

7   call the sum and substance of the statement.

8           And what we learned from that statement is that

9   Richard Diaz had been friends with Lappy and Homeboy and

10  that Richard Diaz stated that Homeboy and Hombre knew that

11  the victim had money on him, stated that he thought the

12  victim had $3,000 and it was going to be used by the victim

13  to purchase narcotics.

14          He stated that he did not know any of the victims

15  and that it was Homeboy's idea to go to the incident

16  location.

17          He stated that he had a security shield.  The

18  defendant stated he had a security shield around his neck

19  affixed to a beaded chain.  It was described to you by each

20  of the witnesses on the date and time of the incident.  He

21  said he got it as a security guard and kept it in Homeboy's

22  car.

23          He stated when he saw the police drive up, he

24  turned, walked quickly away and threw the shield under a

25  vehicle on Walton Avenue.  It's funny how that matches up

1    with the video that we saw.  Why would that be?  Maybe it's

2    because Richard Diaz was actually giving a statement about

3    what we know, the events from October 17th of 2012.

4          Jurors, this is not complicated.  You have done

5    the hard part.  You've listened to everybody.  This is the

6    easy part.

7          I submit to you Yohn Contreras came here straight

8    off a plane from the Dominican Republic where he was to

9    celebrate his father.  He testified to you about what

10   happened that night, how he came down to visit his

11   girlfriend who he just had a relationship with on the

12   phone.  He met her for the first time.  He brought money to

13   buy a car, because that's what he told her.  She told him

14   that a car was for sale, $6,500.  He brought $6,000.  Of

15   course, that's why he brought that amount of money.  He

16   earned that money.  He worked for it.  He got it from his

17   tax returns and from the commune savings account he had

18   with his family.  That's where he got that money from.

19         He testified, jurors, I submit, in terms of the

20   facts of what we know and what is ultimately at issue in

21   this case consistently with Miss Rodriguez, with Miss

22   Rosario and with the video and with everything else we know

23   about this case.

24         And jurors, I submit to you that he was the

25   victim, that he got duped by someone along the way.

1          Okay.  The only person you didn't hear from was

2     Joel Rodriguez, and you heard why.  You heard Mr. Contreras

3     tell you some of the efforts he went to speak to him and

4     how they no longer talk.  And you heard Detective Rodriguez

5     tell you the steps he went to try and locate him.

6          So as this crime is taking place, you know, in New

7     York, it's often said that people often wonder where are

8     the cops when you need them.  Well, here, they just

9     happened to be right there.  They just happened to roll up

10     on this scene as it's happening.  No one had to make a 911

11     call.  It just happened to be that was the way they were

12     going back to their base for the night, and this is what

13     they come upon.

14          And Officer Mangual told you he actually thought

15     this was actually a legitimate police stop when he first

16     saw it but it was those small details, color of the day,

17     the fact that their pants were hanging low, those things

18     said to him, whoa, something is wrong here.  Something is

19     not right.

20          So they do their job, they get out of the van, and

21     they look into it.  And as he's approaching, he doesn't say

22     a word to Officer Mangual as she's approaching.  Yohn

23     Contreras said they took my money.  And he goes and gets

24     Santana, and what does he find?  He finds a wad of money

25     wrapped up in a rubber band in Santana's left jacket

1   pocket, leaves it there.  Let me figure this out.  Speaks

2   to everybody.  Ultimately vouchers, takes the money,

3   vouchers it as evidence, as arrest evidence.  He arrests

4   Santana.  His partners take Melenciano into custody, and he

5   makes notifications to Internal Affairs, because the police

6   impersonation are pretty neat and tidy.  Right?  As far as

7   the police arrest, not much he really had to do.  He kind

8   of walked up and ended up arresting these two guys.

9          So Detective Rodriguez, the person who is assigned

10   the case from Internal Affairs, the police impersonation

11   unit, this is what he does.

12          And on that same day, same day he gets assigned

13   the case, October 17th, same day it happened, he's got a

14   lead, Richard Diaz.

15          The following day, he submits the I-card telling

16   everyone within NYPD that he wants to speak to Richard

17   Diaz.

18          So on November 22nd, Richard Diaz is taken into

19   custody, and he notifies Argelia Rosario, and she comes to

20   look at a lineup.

21          Now, jurors, you've heard about the earring, but

22   Mr. Bonanno said it to you himself that Detective Rodriguez

23   did his job.  Okay.  He told you his practice is to have

24   people in a lineup remove the jewelry.  Look at the photos

25   for yourself, see if there's an earring.  And jurors, even

1    if you do see an earring, Miss Rosario said that she

2    didn't.  So this whole like earring thing is just -- it's a

3    distraction from what's really important here.  It has

4    nothing to do with anything.  I submit to you it's the

5    defense of a man who's guilty.

6              MR. BONANNO:  Objection.

7              THE COURT:  Objection is sustained.

8              MR. MENDYS:  While the lineup is -- after the

9    lineup is conducted, Detective Bell takes the statement

10   from Richard Diaz.  He puts himself at the scene.  He

11   provides a motive.  He provides intent by the fact he knew

12   this guy had money on him.  The amount was wrong but the

13   fact remains the same that's why they were there.  That's

14   why they were there, to commit this robbery.  Admits that

15   the money was Contreras', says he was there to buy drugs.

16   There's no other evidence of that.  Even if that were to be

17   true, okay, doesn't mean it wasn't Contreras' money,

18   doesn't mean they had a right to it, doesn't mean they

19   could steal it from him.

20              Detective Rodriguez also recovers the video.

21   Playing from 23:55:32, 2012, 10/16.  You see, jurors, the

22   entire incident.  You can look at both of these together.

23   I know you've seen it, I think, four times through various

24   witnesses.  You can look at angles individually, but you

25   see these four people get out of the cab.  You see an

1    individual who has been identified as Richard Diaz with a

2    shield approach and put these people against the wall as if

3    he were a police officer.

4         Jurors, I submit to you this is compelling

5    evidence.  At the very least, I submit that, that without

6    knowing anything about this case, you just saw this, I

7    submit that you would believe that these were actually

8    police officers stopping these people and searching them.

9         Mr. Contreras when he was asked on

10   cross-examination when they said don't move, police, what I

11   did was obey.  He believed they were police.  Miss Rosario

12   believed they were police.  Miss Rodriguez believed that

13   they were the police.  You can see Mr. Rodriguez believed

14   that they were the police.

15        Jurors, that force is the same as a gun or a knife

16   or a weapon of any sort in a robbery.  It is what compelled

17   that shield and the words police is what compelled these

18   four people to obey, to comply.

19        Stopping at 23:58:08.

20        Jurors, when you look at this evidence, you can't

21   help but see so many pieces fit together.  So many pieces

22   are consistent with one another.  This is what we talked

23   about.  How do you determine someone is telling the truth?

24   Some of you said you looked to see how it fits with the

25   story, how it looks to fit with everything else you know.

1     Yohn Contreras said 6,000 was taken, $6,000

2     exactly.

3     What else do we know?  Officer Mangual found

4     $6,000 exactly on Amauri Santana.  Do you think that's a

5     coincidence?  Witness said a third man had a badge and

6     claimed to be the police.  Diaz, Richard Diaz, admitted to

7     having a badge.  He was identified as having a badge.

8     The video shows these defendants and specifically,

9     the person identified as Richard Diaz, gaining compliance,

10    acting like the police.  Witnesses identified Diaz as the

11    man with the badge, as I already said.  He said it with his

12    own words.  He had a badge that night.

13    Jurors, you may have questions about how Richard

14    Diaz, Jose Melenciano, Amauri Santana knew that Yohn

15    Contreras was going to be there with six grand on him.

16    That is reasonable.  It is reasonable to ask that question.

17    It is reasonable to wonder that.  It is not a reasonable

18    doubt as to their guilt or as to Richard Diaz's guilt.  We

19    talked about this in voir dire.

20    I asked someone who I don't think was selected,

21    someone who, unfortunately, their family had been the

22    victim of a burglary, and I asked her, do you know why your

23    apartment was chosen?  She first said money.  That's, of

24    course, the answer, the reason it is here.  That's why this

25    robbery took place.  I asked her, do you know why your

1     apartment in particular was chosen, not your neighbor's?

2     She said, I have no idea.

3          Jurors, it doesn't matter.  It doesn't matter

4     whether Miss Rodriguez, a woman that Yohn Contreras barely

5     knew, duped him.  Maybe she did, maybe she did set it off.

6     Reasonable to think that.  Reasonable to think maybe Joel

7     Rodriguez did the same, could be.

8          But jurors, it's hard to argue that Richard Diaz,

9     Jose Melenciano and Amauri Santana didn't know what was

10    going on that night.

11         But what doesn't matter and what it doesn't change

12    is the fact that Richard Diaz is guilty of these crimes.

13    It doesn't change that what you see on the video.  Whatever

14    the reason and however it came to be, whatever happened

15    beforehand, it doesn't change what you see on the video,

16    and it doesn't change what happened to these people after

17    they got out of that cab.

18         All the elements you're going to hear about --

19    you're not going to hear anything about motive or an

20    explanation for how Diaz, Melenciano and Santana learned

21    about this.  It's not a consideration.

22         So what has been proven, jurors, you're going to

23    get four charges to look at.  First is Robbery in the

24    Second Degree.  One of those elements is that Richard Diaz

25    acted with two others and forcibly stole property.  He's

1  identified as the man with the badge.  $6,000 belonging to

2  Contreras was recovered from Santana.  And the force that I

3  mentioned, couple of times I mention it is because it's

4  that important.  It was his claims of being the police, the

5  fact that these witnesses went against the wall because he

6  said he was the police, because he had a badge.  He got

7  them to submit that Santana and Melenciano searched them.

8  Diaz was aided by another person actually present.

9         Jurors, you see the video for yourself, three

10  people holding four others against the wall, two doing the

11  searching while the person identified as Diaz standing

12  there holding the woman.  Diaz sets the witnesses up, and

13  Melenciano and Santana do the leg work of finding whatever

14  it was they were looking for.

15         Second count is Grand Larceny in the Third Degree,

16  that Diaz, while acting in concert, wrongfully took money,

17  money that belonged to Contreras.  There is no question

18  about that.  $6,000 of his hard earned money.  Diaz

19  admitted that they knew the victim had money on him.

20         Second element, that Diaz did so with intent to

21  the take money for himself.  Why else would this happen?

22  There is no evidence to suggest anything else.

23         The value of the property exceeds $3,000.  That is

24  obvious.  $6,000 is obviously more than $3,000.

25         The third count you'll hear about is Grand Larceny

1    in the Fourth Degree.  Diaz, while acting in concert,

2    wrongfully took money again, once again, belonging to

3    Contreras, and he knew it.  Diaz did so with intent to take

4    money for himself.  It's easy payday, jurors.  It's that

5    simple.  If it's not a crime, why are they impersonating

6    the police?  And the only difference between this and the

7    previous charge is that this property, it does not require

8    a value amount, but it requires that you find that the

9    money was taken from Mr. Contreras's person, on his body.

10   And he told you that he had the money in his interior

11   jacket pocket when Amauri Santana found it.

12           The last charge you're going to be asked to

13   consider is Criminal Impersonation in the First Degree;

14   Richard Diaz, Amauri Santana and Jose Melenciano pretending

15   to be the police.

16           Detective Rodriguez testified to the efforts that

17   he went to to determine that these men never worked for and

18   never even applied to become police officers.  This was

19   authority they had not earned and they did not have; that

20   in doing so, he wore or displayed a badge without

21   authority.  Diaz wore a badge.  He told you so.  He told

22   you he was a security guard.  That's where he got it from.

23   And all the witnesses identified Diaz.  Well, Contreras did

24   not identify Diaz, but he described the person on the video

25   that had been identified by the other witnesses as Diaz

1    with the shield.  And he did so with intent to induce

2    another to submit.  That's the whole point.  The threat of

3    the police is why the witnesses submitted, is why they went

4    against the wall, why they listened, why they did what they

5    were told to do.  And in doing so, Diaz committed or

6    attempted to commit the felony of robbery and grand

7    larceny.  Jurors, that's what this case is.

8            Each of these crimes has not been proven just by

9    one witness.  Multiple witnesses have come before you.  You

10   have seen video.  You have seen multiple identification

11   procedures.  You have heard Diaz's own statement.  This is

12   corroboration.  The witnesses are the foundation of the

13   case but what their testimony is backed up by is everything

14   else that you've heard and you know about.

15           Put all the evidence together, jurors, and this is

16   crystal clear.  This is easy.  I've said it before.  This

17   is an easy decision for you.  The hard part is done.

18   You've sat here diligently and attentively listening to the

19   witnesses, listening to myself, Mr. Bonanno.  That's the

20   hard part.  And now, jurors, you're going to get an

21   opportunity to deliberate.  You've heard from multiple

22   witnesses.  You've seen the video.  At the end of the day,

23   you have witnesses, you have identifications, you have a

24   statement, and you have video surveillance from that night.

25   And all of it equals proof beyond a reasonable doubt that

1        Richard Diaz is guilty.

2                Listen to the evidence.  Go with it, follow the

3        law.  Remember what you promised us at the beginning of

4        this case.  I talked to you about how people are taught to

5        listen to authority.  Richard Diaz, Amauri Santana, Jose

6        Melenciano took advantage of that.  They used authority

7        that they didn't have to force people to submit and to take

8        $6,000 from Yohn Contreras.

9                Well, now the tables have turned because now you

10       have authority, and you have real authority.  You have been

11       chosen, all of you have been chosen as members of this jury

12       because of your fairness, your open-mindedness.  Use your

13       common sense.  Look at the evidence.  Follow the law.  When

14       you deliberate, if you have questions, ask them.  If you

15       want to hear something read back, ask for it.  If you want

16       to see the video, any of the exhibits, ask for it.

17               Jurors, when you deliberate, use your common

18       sense, follow the law.  If you do those things, I'm

19       confident that you will find Richard Diaz guilty.  Thank

20       you for your time everyone.

21               THE COURT:  Thank you, Mr. Mendys.

22               Members of the jury, we'll take one more brief

23       five-minute recess before I give you your instructions on

24       the law.

25               Do not discuss anything about this case.  Keep an

1      open mind.  Keep all my recess instructions.  I'll call you

2      back in about five minutes.

3                  THE COURT OFFICER:  Jury exiting.

4                  (Whereupon, the jurors leave the courtroom at this

5      time.)

6                  MR. BONANNO:  If there could be some corrective

7      type instruction to the jury.  I was concerned with Mr.

8      Mendys' reading the statute and elements of the statute.  I

9      don't know if that was appropriate or inappropriate, but I

10     don't want the jury to be confused that Mr. Mendys is

11     telling them what the law is on robbery and/or criminal

12     impersonation.

13                 THE COURT:  I've already told them that in the

14     instructions pre-summation anticipating that if either of

15     you discussed anything about the law, that it's my reading

16     of the law that would count.  Are you saying that he said

17     something that's not correct --

18                 MR. BONANNO:  No.

19                 THE COURT:  -- about the law?

20                 MR. BONANNO:  That's not what I'm saying, Judge.

21     I just wanted to be reaffirmed that the jurors know that

22     the instruction on the law comes directly from you and I'm

23     sure you may give them additional instruction on that.

24                 THE COURT:  Mr. Mendys?

25                 MR. MENDYS:  Judge, I would echo when you just

1    said and I think it's clear that the law is coming from the

2    Court and not from either of us.  I have no problem if

3    there is additional instruction to that effect somewhere,

4    because it is true, it is accurate, but Mr. Bonanno is not

5    saying I misstated anything, so I don't really know what

6    the issue is.

7              THE COURT:  You know, it's hard to do a summation

8    without referring from a defense point of view what

9    elements the People have failed to prove and that there are

10   elements that they have to prove.  And it's hard from the

11   DA's point of view not to say we have proven every element

12   beyond a reasonable doubt and not say, we have proven

13   force, we have proven acting in concert, we have proven

14   this and you need to prove this.  If I understand, and I

15   will remind them under the law that I'm responsible for

16   explaining the law and not the lawyers.

17             MR. BONANNO:  That's all the corrections.

18             THE COURT:  Sworn duty is to follow my

19   instructions on the law.

20             MR. BONANNO:  That's all I'm asking for, Judge.

21             THE COURT:  Fine.

22             (Whereupon, the item previously referred to is

23   received and marked Court Exhibit Number I for

24   identification.)

25             THE COURT OFFICER:  Jury entering.

1          (Whereupon, the jurors enter the courtroom at this

2     time.)

3          THE CLERK:  Sworn jury is present and properly

4     seated.

5          THE COURT:  All right.  Good afternoon, members of

6     the jury.

7          Now, as I repeatedly told you, under the law I am

8     responsible for explaining the law, not the lawyers, and

9     your sworn duty is follow my instructions on the law, and

10    I'm going to now instruct you.  My instruction will also be

11    divided into three parts.

12         First of all, I'm going to review the general

13    principles of law that apply to this and every criminal

14    trial.

15         Second, I'm going to define the crimes that are

16    charged in this case, explain the law that applies to those

17    definitions and spell out the elements of each of the

18    crimes.  And also, I'm going to give you some instruction

19    about how you are to deliberate on certain counts.

20         In the third part, I will outline the entire

21    process of jury deliberations.

22         Now, I'm not going to summarize the evidence.  If

23    necessary, I may refer to portions to explain the law that

24    relates to that evidence, but my reference to any evidence

25    or my failure to refer to any evidence expresses no opinion

1    about truthfulness, accuracy or importance of any

2    particular evidence.

3          In fact, nothing I've said, no questions I may

4    have asked in the course of this trial were meant to

5    suggest that I have an opinion about this case.  If you

6    form such an impression, put it out of your mind and

7    disregard it.  The level of my voice may change, notations

8    may change.  That's just to help you understand the

9    instructions.  It's not done to communicate any opinion

10    about the evidence.  It's not my responsibility to judge

11    the evidence, that's yours and yours alone.  You're the

12    judges of the facts and you alone are responsible for

13    deciding whether the defendant is guilty or not guilty.

14          And as I told you in your deliberations, you may

15    not consider or speculate about any matters related to

16    sentence or punishment.  If there is a verdict of guilty,

17    it's my responsibility to impose what's an appropriate

18    sentence.

19          Now, when you judge the facts, you are to consider

20    only the evidence.  And the evidence in this case includes

21    the testimony of all the witnesses and the exhibits that

22    were received in evidence.

23          Several witnesses testified in the Spanish

24    language.  A specially trained interpreter provided a

25    translation, and you must accept and rely only on that

1    translation.

2         Now, testimony which was stricken from the record

3    or to which an objection was sustained must be disregarded

4    by you.  The exhibits that were received in evidence are

5    available upon your request for your inspection and

6    consideration during your deliberations.  Exhibits that

7    were just seen during the trial or marked for

8    identification but not received into evidence are not

9    evidence and thus, are not available for your inspection

10   and consideration, but testimony based upon those exhibits

11   that were not received in evidence may be considered by

12   you.  It's just that the physical exhibit, itself, in those

13   instances is not available for you to inspect.

14        Now, in evaluating the evidence, you may consider

15   any fact that is proven and any inference which may be

16   drawn from such fact.

17        To draw an inference means to infer from, to find,

18   to conclude that a fact exists or does not exist based upon

19   proof of some other fact or facts.  An inference must only

20   be drawn from a proven fact or facts and then only if the

21   inference flows naturally, reasonably and logically from

22   the proven fact or facts, not if it is speculative.

23        Therefore, in deciding whether to draw an

24   inference, you must look at and consider all the facts in

25   light of reason, common sense and experience.

1    I'm going to turn now to the fundamental

2    principles of law that apply in all criminal trials.  I've

3    advised you in the past.  I'm giving you the final

4    instructions on it now.  And they are three:  The

5    presumption of innocence, the burden of proof and the

6    requirement of proof beyond a reasonable doubt.

7        Throughout these proceedings, the defendant is

8    presumed to be innocent.  As a result, you must find the

9    defendant not guilty unless on the evidence presented at

10   this trial you conclude that the People have proven the

11   defendant guilty beyond a reasonable doubt.  The defendant

12   is not present in the courtroom.  I remind you that a

13   defendant has a right to be present in the courtroom and

14   the right not to be present for all or any part of a trial.

15   Thus, you are not to speculate about the reasons for the

16   defendant's absence, nor are you to draw any inference for

17   or against the defendant or for or against the People from

18   the defendant's absence.

19       The fact that the defendant did not testify is

20   also not a factor from which any inference unfavorable to

21   the defendant may be drawn.

22       The defendant is not required to prove he's not

23   guilty.  In fact, the defendant is not required to prove or

24   disprove anything.

25       To the contrary, the People have the burden of

1    proving the defendant guilty beyond a reasonable doubt.

2    That means that before you can find the defendant guilty of

3    a crime, the People must prove beyond a reasonable doubt

4    every element of that crime, including that the defendant

5    is the person who committed the crime.  The burden of proof

6    never shifts from the People to the defendant.

7              If the People fail to satisfy their burden of

8    proof, you must find the defendant not guilty.

9              If the People satisfy their burden of proof, you

10   must find the defendant guilty.

11             Now, what does our law mean when it requires proof

12   of guilt beyond a reasonable doubt?  The law uses the term

13   proof beyond a reasonable doubt to tell you how convincing

14   the evidence of guilt must be to permit a verdict of

15   guilty.  The law recognizes that in dealing with human

16   affairs, there are very few things in this world that we

17   know with absolute certainty.  Therefore, the law does not

18   require the People to prove a defendant guilty beyond all

19   possible doubt.

20             On the other hand, it's not sufficient to prove

21   that the defendant is probably guilty.

22             In a criminal case, the proof of guilt must be

23   stronger than that.  It must be beyond a reasonable doubt.

24             A reasonable doubt is an honest doubt of the

25   defendant's guilt for which a reason exists based upon the

1    nature and the quality of the evidence.  A reasonable doubt

2    is an actual doubt.  It's not an imaginary doubt.  It is a

3    doubt that a reasonable person acting in a matter of this

4    importance would be likely to entertain because of the

5    evidence that was presented or because of the lack of

6    convincing evidence.

7         Now, when I refer to a reasonable doubt based upon

8    the evidence that was presented or because of the lack of

9    convincing evidence, I'm not telling you that the

10   defendant's guilt must be proven by any particular form or

11   type of evidence.  The People are not required to present

12   any evidence, particular type of evidence.  I'm not

13   inviting you to speculate about what other evidence might

14   have established or not established had it been offered.

15   You may not at any time speculate about matters that are

16   not in evidence.

17        What I mean by a lack of convincing evidence is

18   that if you find that without other or additional evidence

19   that the evidence the People have offered fails to

20   establishes the defendant's guilt beyond a reasonable

21   doubt, then there is a lack of convincing evidence, and you

22   should find that the People have not met their proof.

23        On the other hand, if you find that the evidence

24   that was before you does convince you of the defendant's

25   guilt beyond a reasonable doubt, then it doesn't matter

1    what other evidence might have been presented, and you

2    should find that the People have met their burden of

3    proof.

4            Proof of guilt beyond a reasonable doubt is proof

5    that leaves you so firmly convinced of the defendant's

6    guilt that you have no reasonable doubt of the existence of

7    any element of any crime or of the defendant's identity as

8    the person who committed that crime.

9            In determining whether or not the People have

10   proven the defendant's guilt beyond a reasonable doubt, you

11   should be guided solely by a full and fair evaluation of

12   the evidence.

13           After carefully evaluating the evidence, each of

14   you must decide whether or not that evidence convinces you

15   beyond a reasonable doubt of the defendant's guilt.

16           Now, whatever your verdict may be, it must not

17   rest upon baseless speculations, nor may it be influenced

18   in any way by a bias, any prejudice, any sympathy or by a

19   desire to bring an end to your deliberations or to avoid an

20   unpleasant duty.

21           If you are not convinced beyond a reasonable doubt

22   that the defendant is guilty of a charged crime, you must

23   find the defendant not guilty of that crime.

24           If you are convinced beyond a reasonable doubt

25   that the defendant is guilty of a charged crime, you must

1    find the defendant guilty of that crime.

2              Now, as judges of the facts, you alone will

3    determine the truthfulness and accuracy of the testimony of

4    each of the witnesses.  You must decide whether a witness

5    told the truth and was accurate or instead, testified

6    falsely or was simply mistaken.

7              You must also decide what importance to give to

8    the testimony that you do accept as truthful and accurate.

9    It is the quality of the testimony that is controlling and

10   not the number of witnesses who testify.

11             If you find that any witness has intentionally

12   testified falsely as to any material fact, you may

13   disregard that witness' entire testimony or you may

14   disregard so much of it is as you find was untruthful and

15   accept so much as you find to have been truthful and

16   accurate.

17             Now, there's no particular formula for evaluating

18   the truthfulness and accuracy of another person's

19   statements or their testimony.  You bring to this process

20   all of your varied experiences and in life, you all

21   frequently decide the truthfulness and accuracy of

22   statements made to you by other people.  Those same factors

23   you use to make those decisions should be used in this case

24   when evaluating testimony.

25             Now, some of the factors that you may wish to

1   consider in evaluating the testimony of a witness are as

2   follows:  Did the witness have an opportunity to see or

3   hear the events about which he or she testified?

4         Did the witness have the ability to recall those

5   events accurately?

6         Was the testimony of the witness plausible and

7   likely to be true, or was it implausible and not likely to

8   be true?

9         Was the testimony of the witness consistent or

10  inconsistent with other testimony or other evidence in the

11  case?

12        Did the manner in which the witness testified

13  reflect upon the truthfulness of that witness' testimony?

14        To what extent, if any, did the witness'

15  background, training and education or experience affect the

16  believability of that witness' testimony?

17        Did the witness have a bias, hostility or some

18  other attitude that affected the truthfulness of that

19  witness' testimony?

20        You may consider whether a witness had or did not

21  have a motive to lie.  If a witness had a motive to lie,

22  you may consider whether and to what extent that motive

23  affected the truthfulness of the witness' testimony.

24        If a witness did not have a motive to lie, you may

25  consider that as well in evaluating the witness'

1   truthfulness.

2           You may consider whether a witness hopes for

3   and/or expects to receive a benefit for testifying.  And if

4   so, you may consider whether and to what extent that

5   affected the truthfulness of the witness' testimony.

6           You may consider whether a witness has any outcome

7   -- sorry.  Any interest in the outcome of the case or

8   whether the witness has no such interest.

9           You are not required to reject the testimony of an

10  interested witness or to accept the testimony of a witness

11  who has no interest in the outcome of the case.  You may,

12  however, consider whether an interest in the outcome or

13  lack of such interest affected the truthfulness of the

14  witness' testimony.

15          You may consider whether a witness made statements

16  at this trial that are inconsistent with each other.

17          You may also consider whether a witness made

18  previous statements that are inconsistent with his or her

19  testimony at the trial.

20          You may consider whether a witness testified to

21  facts here at trial that the witness omitted to state at a

22  prior time and when it would be reasonable and logical for

23  the witness to have stated the fact.

24          In determining whether it would be reasonable and

25  logical for the witness to have stated an omitted fact, you

1    may consider whether the witness' attention was called to

2    the matter and whether the witness was specifically asked

3    about it.

4         If a witness has made such inconsistent statements

5    or omissions, you may consider whether and to what extent

6    they affect the truthfulness or accuracy of the witness'

7    testimony here at this trial.

8         Now, the contents of a prior inconsistent

9    statement are not proof of what happened.

10        You may use evidence of a prior inconsistent

11   statement only to evaluate the truthfulness or accuracy of

12   the witness' testimony here at trial.

13        You may consider whether a witness' testimony is

14   consistent with the testimony of other witnesses or with

15   other evidence in the case.

16        If there were inconsistences by or among the

17   witnesses, you may consider whether they were significant

18   inconsistences related to important facts or instead, were

19   the kind of minor inconsistences that one might expect from

20   multiple witnesses to the same event.

21        Now, in this case you have heard the testimony of

22   police officers.  Testimony of a witness should not be

23   believed solely and simply because the witness is a police

24   officer.

25        At the same time, a witness' testimony should not

1    be disbelieved solely and simply because the witness is a

2    police officer.  You must evaluate a police officer's

3    testimony in the same way you would evaluate the testimony

4    of any other witness.

5             Now, you have heard testimony about the

6    prosecutors speaking to witnesses about the case before the

7    witnesses testified at trial.  The law permits a prosecutor

8    to speak to a witness about the case before the witness

9    testifies and to review with the witness the questions that

10   will or may be asked at trial, including the questions that

11   may be asked on cross-examination.

12            You have also heard testimony that a witness read

13   or reviewed certain materials pertaining to the case before

14   the witness testified at trial.  The law permits a witness

15   to do so.

16            Now, as I've told you, the People have the burden

17   of proving beyond a reasonable doubt not only that a

18   charged crime was committed but that the defendant is the

19   person who committed that crime.

20            Thus, even if you are convinced beyond a

21   reasonable doubt that a charged crime was committed by

22   someone, you cannot convict the defendant of that crime

23   unless you are also convinced beyond a reasonable doubt

24   that he's the person who committed that crime.

25            So you have to evaluate whether the defendant has

1    been correctly identified as the person who committed the

2    charged crimes.

3              In examining the testimony of any witness who

4    identified the defendant as that person, you should

5    determine whether that testimony is both truthful and

6    accurate.

7              With respect to whether the identification is

8    truthful, that is, not deliberately false, you must

9    evaluate the believability of the witnesses who made an

10   identification, and in doing so you may consider the

11   various factors for evaluating the believability of a

12   witness' testimony that I've also listed for you a few

13   moments ago.

14             Now, with respect to whether the identification is

15   accurate, that is, not an honest mistake, you must evaluate

16   the witness' intelligence, capacity for observation,

17   reasoning and memory and determine whether you are

18   satisfied that the witness is a reliable witness who had

19   the ability to observe and remember the person in question.

20             Further, the accuracy of the witness' testimony

21   identifying a person also depends on the opportunity the

22   witness had to observe and remember that person.  Thus, in

23   evaluating the accuracy of identification testimony, you

24   should consider factors such as what were the lighting

25   conditions under which the witness made his or her

1    observation?

2           What was the distance between the witness and the

3    perpetrator?

4           Did the witness have an unobstructed view of the

5    perpetrator?

6           Did the witness have an opportunity to see and

7    remember the facial features, body size, hair, skin color

8    and clothing of the perpetrator?

9           For what period of time did the witness actually

10   observe the perpetrator during that time, and what

11   direction were the witness and perpetrator facing and where

12   was the witness' attention directed?

13          Did the witness have a particular reason to look

14   at and remember the perpetrator?

15          Did the perpetrator have distinctive features that

16   the witness would be likely to notice and remember?

17          Did the witness have an opportunity to give a

18   description of the perpetrator?

19          If so, to what extent did it match or not match

20   the defendant as you find the defendant's appearance to

21   have been on the day in question?

22          What was the mental, physical and emotional state

23   of the witness before, during and after the observation?

24          To what extent, if any, did the -- did that

25   condition affect the witness' ability to observe and

1     accurately remember the perpetrator?

2              When and under what circumstances did the witness

3     identify the defendant?

4              Was the identification of the defendant as the

5     person in question suggested in some way to the witness

6     before the witness identified the defendant, or was the

7     identification free of any such suggestion?

8              Now, that concludes part one of my instructions on

9     the law.  The second part will concern the charged crimes.

10              I'm going to instruct you on the law applicable to

11     four counts which are being considered for your

12     consideration.  They are Robbery in the Second Degree,

13     Grand Larceny in the Third Degree and Grand Larceny in the

14     Fourth Degree and Criminal impersonation in the First

15     Degree.

16              I am going to be giving you instructions not only

17     about the elements of these crimes but also about the

18     manner you will be deliberating on them.

19              I have here a copy of what you'll be taking into

20     the deliberation room with you.  It's called a verdict

21     sheet.  It lists the counts, and it has some instructions

22     about the manner of deliberation on the verdict sheet.

23     I'll be referring to that during my instructions.

24              Now, first of all, for each of the crimes, the

25     defendant is charged under a theory of acting in concert

1    with two other individuals.

2              Our law recognizes that two or more individuals

3    can act jointly to commit a crime and that in certain

4    circumstances, each can be held criminally liable for the

5    acts of the others.  In that situation, those persons can

6    be said to be acting in concert with each other.

7              And the definition is as follows:  When one person

8    engages in conduct which constitutes an offense, another is

9    criminally liable for such conduct when acting with the

10   state of mind required for the commission of that offense

11   he or she solicits, requests, commands, importunes or

12   intentionally aids such person or persons to engage in such

13   conduct.

14             In order for the defendant to be held criminally

15   liable for the conduct of others which constitutes an

16   offense, you must find beyond a reasonable doubt first,

17   that he solicited, requested, commanded, importuned or

18   intentionally aided those persons to engage in that conduct

19   and second, that he did so with the state of mind required

20   for the commission of the offense.

21             If it is proven beyond a reasonable doubt that the

22   defendant is criminally liable for the conduct of another,

23   the extent or the degree of the defendant's participation

24   in the crime does not matter.

25             A defendant proven beyond a reasonable doubt to be

1  criminally liable for the conduct of another in the

2  commission of the crime is as guilty of the crime as if the

3  defendant personally had committed every act constituting

4  the crime.

5      The People have the burden of proving beyond a

6  reasonable doubt that the defendant acted with the state of

7  mind required for the commission of the crime and either

8  personally or by acting in concert with another person

9  committed each of the remaining elements of the crime.

10      Now, your verdict, and I will discuss this again

11  later on in the charge, your verdict on each count that you

12  consider in accordance with my instructions, whether guilty

13  or not guilty, that verdict has to be unanimous.

14      In order to find the defendant guilty, however,

15  you need not be unanimous on whether the defendant

16  committed the crime personally or by acting in concert with

17  another or both.

18      Now, as you know, the People contend that the

19  defendant, acting in concert with two people, Jose

20  Melenciano, and Amauri Santana, who are not here on trial,

21  you must not speculate on the present status of those

22  individuals.  You must not draw any inference from their

23  absence, and you must not allow their absence to influence

24  your verdict.  You are here to determine whether the People

25  have proven beyond a reasonable doubt that the defendant on

1    trial is guilty of a charged crime.

2           Now, the first count that I'm submitting for your

3    consideration is Robbery in the Second Degree.  I'm going

4    to first give you a definition of robbery and then tell

5    you the elements of the crime of Robbery in the Second

6    Degree.

7           Under our law, robbery is the defined as forcible

8    stealing.  Thus, each degree of robbery will include

9    forcible stealing as the first element of that crime.

10          The term forcible stealing has its own special

11   meaning in our law.  And I'll be giving you the meaning of

12   that term by first defining stealing, which the law also

13   calls larceny, and then the term forcible stealing.

14          A person steals property and commits larceny when

15   with the intent to deprive another of property or to

16   appropriate the property to himself or to a third person,

17   such person wrongfully takes, obtains or withholds property

18   from the owner of that property.

19          A person forcibly steals property and commits a

20   robbery when in the course of committing a larceny, such

21   person uses or threatens the immediate use of physical

22   force upon another person for the purpose of meaning with

23   the intent of compelling the owner of such property or

24   another person to deliver up the property or preventing or

25   overcoming resistance to the taking of the property or to

1    prevent or overcoming resistance to the retention of the

2    property immediately after the taking.

3          Now, intent, which is an element, means conscious

4    objective or purpose.  Thus, a person acts with the intent

5    to engage in such conduct when that person's conscious

6    objective or purpose is to do so.  Intent does not require

7    premeditation.  In other words, intent doesn't require

8    advanced planning, nor is it necessary that the intent be

9    in a person's mind or any particular -- for any particular

10   period of time.  Intent can't be formed and need only exist

11   at the very moment the person engages in prohibited conduct

12   or acts or to cause the prohibited result and not at any

13   earlier time.  The question naturally arises how to

14   determine whether or not a defendant had the intent

15   required for the commission of the crime.

16          To make that determination in this case, you must

17   decide if the required intent can be inferred, rather,

18   required intent can be inferred beyond a reasonable doubt

19   from the proven facts.

20          In doing so, you may consider the person's conduct

21   and all of the circumstances surrounding that conduct

22   including but not limited to the following:  What, if

23   anything, did the person do or say?  What result, if any,

24   followed the person's conduct and was that result the

25   natural, necessary and probable consequence of that

1    conduct?  Now, that's the definition of robbery.

2          Now, under our law, a person is guilty of Robbery

3    in the Second Degree when that person forcibly steals

4    property and when that person is aided by another person

5    actually present.  A person is actually present when such

6    person is in a position to render immediate assistance to a

7    person participating in the robbery and is ready, willing

8    and able to do so.  So this is the first count.

9          In order for you to find the defendant guilty of

10   this crime, Robbery in the Second Degree, the People are

11   required to prove from all of the evidence in the case

12   beyond a reasonable doubt both of the following two

13   elements:  Element number one, that on or about

14   October 17th, 2012, in the county of the Bronx, the

15   defendant, Richard Diaz, personally or by acting in concert

16   with another individual or individuals forcibly stole

17   property from Yohn Contreras and second, that the defendant

18   was aided in doing so by another person actually present.

19          Therefore, if you find the People have proven

20   beyond a reasonable doubt both of those elements, you must

21   find the defendant guilty of the crime of Robbery in the

22   Second Degree as it's charged in the first count.

23          On the other hand, if you find that the People

24   have not proven beyond a reasonable doubt either one or

25   both of those elements, you must find the defendant not

1    guilty of the crime of Robbery in the Second Degree as

2    charged in the first count.

3          Second count is Grand Larceny in the Third Degree.

4    Now, I'm going to tell you a manner of instruction --

5    sorry.  Give you manner of deliberation instructions at

6    this time.

7          If you find the defendant guilty of count one,

8    Robbery in the Second Degree, you're not to deliberate on

9    count two, which is Grand Larceny in the Third Degree.

10   You're also not to deliberate on count three, which is

11   Grand Larceny in the Fourth Degree.  Grand Larceny in the

12   Third Degree, Grand Larceny in the Fourth.  Fourth count,

13   Criminal Impersonation in the First Degree.

14         If you find the defendant guilty of robbery, you

15   go to count four and deliberate on that without count --

16   without deliberating on counts two and three.  I have these

17   instructions printed on the verdict sheet, but if you need

18   to be reminded, come back and ask me a question while

19   deliberating.

20         If you find the defendant not guilty of Robbery in

21   the Second Degree, then go to count two, which is Grand

22   Larceny in the Third Degree, and deliberate on that count.

23         So the second count, Grand Larceny in the Third

24   Degree, under our law, a person is guilty of Grand Larceny

25   in the Third Degree when that person steals property and

1     when the value of the property exceeds $3,000.

2            As I told you, a person steals property and

3     commits larceny when with intent to deprive another of

4     property or to appropriate the same to himself or third

5     person such person wrongfully takes, obtains or withholds

6     such property from an owner.

7            Now, I've given you the definition of intent.

8            Property means any money, personal property or

9     thing of value.

10           The value of the property means the market value

11    of the property at the time and place of the crime or if

12    such cannot be satisfactorily ascertained, the cost of

13    replacement of the property within a reasonable time after

14    the crime.

15           Owner means a person having a right to possession

16    of the property superior to that of the person who takes

17    it.

18           Now, as I said, intent means conscious objective

19    or purpose.  I gave a very long definition of intent, and

20    it applies to this crime, as well.  Intent is an element.

21           Thus, a person acts with intent to deprive another

22    of property or to appropriate property to himself or to a

23    third person when such person's conscious objective or

24    purpose is to withhold the property or to cause it to be

25    withheld permanently or to exercise control over the

1    property or to aid a third person to exercise control over

2    it permanently or to dispose of the property, either for

3    the benefit of himself or third person under such

4    circumstances as to render unlikely that an owner will

5    recover such property.

6              A person wrongfully takes, obtains, withholds

7    property from a person when that person takes property

8    without an owner's consent and exercises dominion and

9    control over that property for a period of time, however

10   temporary, in a manner wholly and consistent with the

11   owner's rights.  The exercise of dominion and control of

12   the property includes a requirement that the property be

13   intentionally moved, at least slightly, by the taker.

14             Thus, under our law's definition of larceny, it is

15   not necessary that the owner be in fact deprived of

16   property permanently or that the property be in fact

17   appropriated permanently.  The crime of larceny is complete

18   when a person has an intent to deprive or appropriate the

19   property permanently and that person wrongfully takes the

20   property for any period of time, however temporary.

21             So in order for you to find the defendant guilty

22   of this crime, Grand Larceny in the Third Degree, the

23   People are required to prove from all the evidence in the

24   case beyond a reasonable doubt each of the following three

25   elements:  Element number one, that on or about October 17,

1    2012, in the county of the Bronx, the defendant, Richard

2    Diaz, personally or by acting in concert with another

3    person or persons wrongfully took, obtained or withheld

4    United States currency from its owner.  Second, that the

5    defendant did so with intent to deprive another of the

6    property or to appropriate the property to himself or to a

7    third person and third, that the value of the property

8    exceeded $3,000.

9        Therefore, if you find that the People have proven

10   beyond a reasonable doubt each of those elements, you must

11   find the defendant guilty of the crime of Grand Larceny in

12   the Third Degree as charged in the second count.

13       On the other hand, if you find that the People

14   have not proven beyond a reasonable doubt any one or more

15   of those elements, you must find the defendant not guilty

16   of the crime of Grand Larceny in the Third Degree as

17   charged in this second count.

18       Another instruction on manner of deliberations.

19   If you have deliberated on count two, in accordance with my

20   instructions on when you should deliberate on that count

21   and you found the defendant guilty of count two, skip count

22   three and deliberate on count four.

23       However, if you have, if you have deliberated on

24   count two, in accordance with my prior instructions, and

25   found the defendant not guilty, then you deliberate on

1    count three.

2            Count three charges Grand Larceny in the Fourth

3    Degree.  Under our law, a person is guilty of Grand Larceny

4    in the Fourth Degree when such person steals property and

5    when the property, regardless of its nature and value, is

6    taken from the person of another.

7            I think I gave you all definitions of larceny, and

8    they are all in the previous charge, and they all apply to

9    this.  Steals, property, intent, owner, wrongfully takes.

10            In order for you to find the defendant guilty of

11    this crime, Grand Larceny in the Fourth Degree, the People

12    are required to prove from all the evidence in the case

13    beyond a reasonable doubt each of the following three

14    elements:  Element number one, that on or about October 17,

15    2012, in the county of the Bronx, the defendant, Richard

16    Diaz, personally or by acting in concert with another

17    individual or individuals wrongfully took, obtained or

18    withheld United States currency from its owner.  Second,

19    that the defendant did so with the intent to deprive

20    another of the property or to appropriate the property to

21    himself or to a third person and third, that the property

22    was taken from the person of another.

23            Therefore, if you find that the People have proven

24    beyond a reasonable doubt each of those elements, you must

25    find the defendant guilty of the crime of Grand Larceny in

1    the Fourth Degree, third count.

2              On the other hand, if you find that the People

3    have not proven beyond a reasonable doubt any one or more

4    of those elements, you must find the defendant not guilty

5    of the crime of Grand Larceny in the Fourth Degree as

6    charged in the third count.

7              The fourth and final count which you must

8    deliberate on no matter what is Criminal Impersonation in

9    the First Degree.

10             Under our law, a person is guilty of Criminal

11   Impersonation in the First Degree when he or she knowingly

12   pretends to be a police officer or federal law enforcement

13   officer, wears or displays without authority, any uniform,

14   badge or other insignia or facsimile thereof, by which such

15   police officer or federal law enforcement officer is

16   lawfully distinguished, expresses by words or actions that

17   he or she is acting with the approval or authority of any

18   police department or of any agency that employs federal law

19   enforcement officers and so acts with intent to induce

20   another to submit to such pretended official authority, or

21   otherwise to act in reliance upon said pretense and in the

22   course of such pretense commits or attempts to commit a

23   felony.

24             Now, some of the terms used in this definition

25   have their own special meaning in the law.  I'm first going

1   to define the term knowingly.

2           A person knowingly pretends to be a police officer

3   or federal law enforcement officer when that person wears

4   or displays without authority, any uniform, badge or

5   insignia or facsimile thereof by which such police officer

6   or federal law enforcement officer is lawfully

7   distinguished, expresses by words or actions that he or she

8   is acting with the approval or authority of any police

9   department or any agency that employs federal law

10  enforcement officers when that individual is aware that he

11  or she is doing so.

12          Intent, as I told you, means conscious objective

13  or purpose.  The long definition how to evaluate intent I

14  gave you earlier when I discussed the crime of Robbery in

15  the Second Degree applies here.

16          A person acts with intent to induce another to

17  submit to such pretended official authority or otherwise to

18  act in reliance upon such pretense when that person's

19  conscious objective or purpose is to do so.

20          Now, under our law, Robbery in the Second Degree,

21  Grand Larceny in the Third and Fourth Degree are all

22  felonies.

23          In order for you to find the defendant guilty of

24  this crime, Criminal Impersonation in the First Degree, the

25  People are required to prove from all of the evidence in

1    this case beyond a reasonable doubt each of the following

2    three elements:  Element number one, that on or about

3    October 17th, 2012, in the county of the Bronx, the

4    defendant, Richard Diaz, knowingly pretended to be a police

5    officer or federal law enforcement officer or wore or

6    displayed without authority any uniform, badge, insignia or

7    facsimile thereof by which a police officer or federal law

8    enforcement officer is lawfully distinguished or expressed

9    by words or actions that he was acting with the approval or

10   authority of any police department or any agency that

11   employs federal law enforcement officers.

12        The second element, that the defendant did so with

13   intent to induce another to submit to such pretended

14   official authority or otherwise to act in reliance upon

15   such pretense and third, in the course of such pretense,

16   the defendant committed or attempted to commit one or more

17   of the felonies of Robbery in the Second Degree and Grand

18   Larceny in the Third and Fourth Degrees.

19        Therefore, if you find that the People have proven

20   beyond a reasonable doubt each of those three elements, you

21   must find the defendant is guilty of the crime of Criminal

22   Impersonation in the First Degree in the fourth count.

23        On the other hand, if you find the People have not

24   proven beyond a reasonable doubt any one or more of those

25   elements, you must find the defendant not guilty of the

1    crime of Criminal Impersonation in the First Degree as

2    charged in the fourth count.

3              Now, I've given you the definition of intent where

4    it constitutes an element of a crime.  Let me explain

5    motive and in particular, the difference between motive and

6    intent.

7              Intent means a conscious objective or purpose.

8    Thus, a person commits a criminal act with intent when that

9    person's conscious objective or purpose is to engage in the

10   act which the law forbids or to bring about an unlawful

11   result.

12             Motive, on the other hand, is the reason why a

13   person chooses to engage in criminal conduct.

14             If intent is an element of a charged crime, that

15   element must be proved by the People beyond a reasonable

16   doubt.

17             Motive, however, is not an element of the crimes

18   charged.  Therefore, the People are not required to prove a

19   motive for the commission of charged crimes.  Nevertheless,

20   evidence of a motive or evidence of the lack of motive may

21   be considered by the jury.

22             For example, if you find from the evidence that

23   the defendant had a motive to commit the crime charged,

24   this is a circumstance you may wish to consider as tending

25   to support a finding of guilt.

1          On the other hand, if the proof establishes that

2     the defendant had no motive to commit the crime charged,

3     that's a circumstance you may wish to consider as tending

4     to establish that the defendant is not guilty of the crime

5     charged.

6          Now, that concludes the second part of my

7     instructions on the crimes.

8          Now the third part about deliberations.

9          Your verdict on each count that you consider in

10    accordance with my instructions, whether guilty or not

11    guilty, must be unanimous.  What that means is that each

12    and every juror must agree to do.  To reach a unanimous

13    verdict, you must deliberate with the other jurors.  That

14    means you should discuss the evidence, consult with each

15    other, listen to each other, give each other's views

16    careful consideration and reasoning too when considering

17    the evidence.  And when you deliberate, you should do so

18    with a view towards reaching an agreement, if that can be

19    done, without surrendering individual judgment.

20         Each of you must decide the case for yourself but

21    only after a fair and impartial consideration of the

22    evidence with the other jurors.  You should not surrender

23    an honest view of the evidence simply because you want the

24    trial to end or you are outvoted.

25         At the same time, you should not hesitate to

1    re-examine your views and change your mind if you become

2    convinced that your position is not correct.

3           You may see any or all of the exhibits which were

4    received in evidence.  Simply write me a note telling me

5    which exhibit or exhibits you want to see.

6           You may also have the testimony of any witness

7    read back to you in whole or in part.  If you want a read

8    back, write me a note telling me what testimony you wish to

9    hear.  If you are interested in hearing only a portion of a

10   witness' testimony, please specify in your note which

11   witness and with as much detail as possible which part of

12   the testimony you want to hear.

13          When testimony is read back, of course, questions

14   to which an objection was sustained and material otherwise

15   struck from the record will be not read back.

16          If you have a question on the law, on my legal

17   instructions, write me a note specifying what you want me

18   to review with you.

19          Now, under the law, the first person selected,

20   that's you, Miss Gatson, the jury's foreperson.  During

21   deliberations, the foreperson's opinion and vote are not

22   entitled any more importance than that of any other juror.

23   What we ask the foreperson to do during deliberations is

24   to sign any written note that the jury sends to the Court.

25   You can only communicate with me while you're deliberating

1   by via written note.  The foreperson doesn't have to write

2   the note or even agree with the contents of the note.  We

3   ask the foreperson to sign it, because the foreperson's

4   signature indicates that the writing comes from this jury.

5           Now, when the jury has reached a verdict, guilty

6   or not guilty, the entire jury will be asked to come into

7   the courtroom.  The foreperson will then be asked whether

8   the jury has reached a verdict and if the foreperson says

9   yes, you will be asked what the verdict is for each charged

10  crime considered in accordance with my instructions.  After

11  that, the entire jury will be asked whether that's their

12  verdict, and the entire jury will either answer yes or

13  no.

14          Finally, upon the request of any party, each juror

15  will be asked individually whether the announced verdict is

16  the verdict of that juror and then upon being asked, each

17  juror will individually answer yes or no.

18          Now, as I told you, I'm giving you this verdict

19  sheet.  I have a copy of it but this form that you're

20  taking to the jury room with you, it lists each count

21  submitted by your consideration, manner in which you're to

22  consider those counts and possible verdicts.  Please use

23  this form to record your verdict with an X or check mark in

24  the appropriate place for each count you consider in

25  accordance with my instructions.

1          Now, the sole purpose for my adding additional

2     words is reminding you of the manner of deliberation

3     instructions that I've given for the counts.  It's not

4     meant to substitute for my full instructions on what you

5     have to do.  So if you do have a question, don't hesitate

6     to it put in writing.

7          Finally, there are a few remaining rules which you

8     must observe during the time of deliberations while you are

9     here in the courthouse deliberating on the case.  You are

10    going to be kept together in the jury room.  You may not

11    leave the jury room during deliberations.  Lunch has been

12    ordered.  It will be provided.  You can eat it in the jury

13    room.

14         If you have a beeper, cell phone or other

15    electronic device, please give it to a court officer to

16    hold for you while you're engaged in your deliberations.

17    You are not allowed to have any contact with the outside

18    world by your phones.  And vice versa, we give it back to

19    you when you leave.

20         You must deliberate about the case only when all

21    12 of are you gathered in the jury room.  You must not, for

22    example, be discussing the case as you go to and from the

23    courtroom.  It's important each juror have the opportunity

24    to hear whatever another juror has to say about the case.

25    And that, by law, must only be done when you are all

1    gathered together in the jury room.

2            Thus, if for any reason all 12 of you are not

3    gathered together in the jury room, stop deliberating at

4    that moment and until all 12 are present in the jury

5    room.

6            Now, during your deliberations, you must discuss

7    the case only among yourselves.  You must not discuss the

8    case with anyone else, and that includes a court officer.

9    And you may not permit anyone other than a fellow juror to

10   discuss the case in your presence.

11           If you have a question or a request, as I told

12   you, you must communicate with me by writing a note, which

13   I will give you which you will give to a court officer and

14   then give to me.  We'll give you blank note paper to take

15   back with you.

16           The law requires that you communicate with me in

17   writing, in part, to make sure that there are no

18   misunderstandings about what you are requesting.

19           I should explain that under our law, I'm not

20   permitted to have a conversation about the facts of the

21   case or possible verdict or vote of the jury on any count

22   with any one juror or group of jurors or even with all of

23   the jurors.  Thus, in any note that you send me, don't tell

24   me what the vote of the jury is at that moment on any

25   particular count.

1          We have three alternate jurors.  You are going to

2     be separated from the 12 jurors and put in a different

3     room.  You'll have lunch, too.  You can keep your cell

4     phones and any electronic devices you want to call the

5     outside world with because you, right now, are not

6     deliberating.  But you must not, alternates, discuss the

7     case among yourselves, engage in any kind of deliberations

8     and to the extent that the 12 jurors have become friendly

9     with the alternates, call them, it happens, you can't

10    have contact with them either.  Only right now the 12

11    jurors  who are the first 12 picked are going to be

12    deliberating.

13          Can I ask the attorneys to step up for a minute?

14          (Whereupon, there is a discussion held off the

15    record, at the bench, among the Court, Mr. Bonanno and the

16    Assistant District Attorney.)

17          THE COURT:  Okay.  So that includes my

18    instructions on the law.  I don't know if the lunch is

19    here.  It's on its way.  It will be here.  The 12 jurors

20    should follow one of the officers or more into the

21    deliberations room and then another officer will take care

22    of the alternates.  Okay.

23          And we will be here.  I have to let you know that

24    during the lunch break that we have all the time is from

25    one to 2:15.  Sometimes it's hard to get staff to be here

1    for reading of notes and things, so if you send a note out

2    during this period, we may not get back to you until like

3    2:15.  I want you to know that we haven't forgotten.  I'm

4    going to be here.

5            I leave you to your deliberations.  I wait to hear

6    from you for anything you need.

7            THE COURT OFFICER:  Jury exiting.

8            (Whereupon, the jurors leave the courtroom at this

9    time to commence deliberations.)

10           THE COURT:  Okay.  I called the attorneys up to

11   the bench, which is my usual practice, to ask off the

12   record if there's any exceptions or additions being

13   requested before I ask the jury to retire and both

14   attorneys said?

15           MR. MENDYS:  No exceptions.

16           MR. BONANNO:  No exceptions.

17           THE COURT:  There you go.

18           In terms of the physical evidence, the exhibits,

19   other than the video, if the jury requests to see pictures

20   or any documents that are in evidence, do we need to call

21   you back before we send the physical evidence into the jury

22   room?  Can we have your consent?

23           MR. MENDYS:  Yes.

24           THE COURT:  Only physical evidence.  If it's the

25   video, because of the way it's in evidence, I believe your

1      disk has a lot more on it than just two views.  That's

2      something we have to deal with, perhaps, for the record to

3      make sure it's what numbers are identified in the drop

4      down.  I can't send the disk in with a laptop, because they

5      could be viewing things that are actually not physically in

6      evidence.

7              So we're going to have to do the viewing of the

8      video in the courtroom.  So that we have to do here.  Okay.

9      Just leave your cell phones and leave the physical evidence

10     that you have.  We'll wait for them to --

11             MR. MENDYS:  Do you want me to maintain control of

12     the disk for the videotape or --

13             THE COURT:  Take the disk out of there.  I can't

14     send the disk in to them.  I think they'll understand that.

15     They wouldn't have anything to play it on.  Okay.  And

16     that's it.  Have a good lunch.

17             (Whereupon, there is a luncheon recess taken and

18     the case adjourned to 2:15 p.m.)

19             A F T E R N O O N   S E S S I O N,

20             THE CLERK:  Case on trial continued.  Defendant is

21     not before the Court.  Both counsel remain the same.

22             THE COURT:  I've received two notes.  One just

23     came out a couple of minutes ago, other one was -- it's not

24     timed.  Notes are not numbered by the jury.  They came out

25     in this order.

Proceedings

1      Jury note number one is timed at two o'clock, says

2  the following:  We would like to view both lineup,

3  pictures, all documents signed by Mr. Richard Diaz and both

4  videos taken at the location of the incident.

5      I was hoping we could have responded to that

6  before the second note came out, but then the second note

7  came out and said:  We would like to view Mr. Richard

8  Diaz's mug shot, Detective Ana Bell and Mr. Richard Diaz's

9  interview as stated by Detective Ana Bell in her testimony

10  and actual statement from Detective Ana Bell.

11      Now, as far as note number one is concerned, we

12  did send the jury both pictures.  And the only documents

13  that we were aware of signed by Mr. Diaz was the <u>Miranda</u>

14  card in Spanish, which was sent back, and that was

15  with prior agreement.  Video has to be viewed in the

16  courtroom.

17      I do ask all attorneys -- I did tell the jury that

18  we would be here gathered by 2:15 if they had a question.

19  I asked -- it's now quarter of three and, you know, took a

20  while for us to -- I've been waiting here.

21      MR. BONANNO:  I apologize.  I didn't know you

22  needed us back.  I was available.  I told --

23      THE COURT:  I didn't know where you were.  Where

24  were you?

25      MR. BONANNO:  I was upstairs in the lounge, in the

Proceedings

1   attorney lounge.

2   THE COURT:  Okay.  They sent a note.  Everyone,

3   really, we need to respond to things quickly.

4   MR. BONANNO:  I apologize.

5   THE COURT:  We do have read back.

6   First of all, how would you like me to respond to

7   the notes, each of you?  Do you want me to wait to do the

8   read back and show them the video at the same time?  Do you

9   want me to send the mug shot and the statement in and delay

10  read back we haven't gone over, which will further delay

11  answering note one?

12  MR. MENDYS:  Judge, I think my preference would be

13  to go in order, so show them the video and then we can

14  address and prepare for read back while still in the

15  deliberating room.  In terms of --

16  THE COURT:  You don't want -- you want me not to

17  finish responding to note one, you want to do read back and

18  respond to everything together?

19  MR. MENDYS:  I think in terms of with efficient,

20  with the time, that would make the most sense.

21  THE COURT:  Mr. Bonanno?

22  MR. BONANNO:  Am I correct they already have the

23  lineup pictures and all the documents?

24  THE COURT:  They had them for over half an hour.

25  MR. BONANNO:  I would agree with Mr. Mendys.

1    THE COURT:  They don't have the documents in note

2    number two.  You want me to identify the testimony which

3    you to have read back?  Take out your transcripts and

4    identify it.  We note --

5         (Whereupon, there was a brief pause in the

6    proceedings)

7    MR. MENDYS:  I think we found it.

8    THE COURT:  Have you finished?  I've read the

9    note.  Let me read it into the record again.  Note:  We,

10   the jury, would like to view Mr. Richard Diaz's mug shot.

11   I believe they're asking to view Detective Ana Bell and Mr.

12   Richard Diaz's interview as stated by Detective Ana Bell in

13   her testimony and actual statement from Detective Ana Bell.

14   Since we're not giving them the transcript, you're going to

15   identify the read back of Detective Ana Bell's testimony

16   about her interview with Mr. Diaz?

17   MR. MENDYS:  Yes, Judge, and we have come to an

18   agreement.

19   THE COURT:  And you have those?  Go ahead.  Tell

20   me.  We'll prepare for the read back.

21   MR. MENDYS:  We will begin on Page 114, line 11.

22   THE COURT:  Okay.

23   MR. MENDYS:  End Page 163, line four.

24   THE COURT:  The whole thing?

25   MR. MENDYS:  Yes.

1      THE COURT:  Without anything taken out?

2      MR. MENDYS:  My reading of it, I mean, as the

3  Court I'm sure remembers, her sole purpose in being called

4  was the discussion of the statement.

5      THE COURT:  I'm not asking that, for the reason

6  about testimony, but there's no parts of what you are

7  looking at that the reporter would have to leave out?

8      MR. BONANNO:  There's a brief voir dire in

9  between, brief voir dire with Detective Bell about the

10  signature portion of the _Miranda_.  Other than that, it's

11  about the -- it's about her taking the statement.  In fact,

12  the fact it was in Spanish.

13      THE COURT:  All the things about different

14  dialects, that is related to taking the statement?  Help me

15  with a little understanding of the Spanish language.  130

16  -- is it correct Spanish words have different meanings

17  that's about taking of the statement?  You're agreeing to

18  that?  If you are, we have to leave out Page 131, lines 5

19  through 12 where there was an objection sustained and I

20  asked you to rephrase the question.  And then the next

21  page, of course, you have to eliminate Page 132, line 24

22  through Page 133 --

23      MR. MENDYS:  Line four.

24      THE COURT:  -- line four where there's two

25  objections that were sustained.  Then 136, the redirect --

1          MR. MENDYS:  We ended at line four.

2          THE COURT:  Okay.

3          MR. BONANNO:  Judge, to be clear, it's

4    continuation from line 24 to Page 133 at line four; is that

5    correct?

6          THE COURT:  That's eliminated, yes.

7          MR. BONANNO:  Yes.  Anything else?

8          MR. MENDYS:  In terms of the video, Judge --

9          THE COURT:  They want the whole video.  You play

10   one and then the other.  I'm going to ask you to play --

11   it's all under exhibit what?

12         MR. MENDYS:  4 and 4-A.

13         THE COURT:  Exhibit 4 and 4-A, and you have two

14   views, CH 1 and CH 2.

15         MR. MENDYS:  Correct.

16         THE COURT:  I'm going to ask you to play.  I'm

17   going to play CH 1 first.  When that's finished, I'll note

18   that that's been finished, I'm going to ask you play CH 2.

19   And when that's finished, I'll say that's been complete,

20   then we'll do the read back.

21         We can bring the jury out.

22         THE COURT OFFICER:  Jury entering.

23         (Whereupon, the jurors enter the courtroom at this

24   time.)

25         THE COURT OFFICER:  Alternate jurors entering.

1          (Whereupon, the alternate jurors enter the

2     courtroom at this time.)

3          THE CLERK:  Sworn jury is present and properly

4     seated.

5          THE COURT:  Including the alternate jurors.  All

6     have been returned to the courtroom.

7          I have two notes from the members of the jury, and

8     we're going -- we need to respond to some of this in the

9     courtroom.  I just want to make sure any additional notes,

10    at the top it says juror note number, and there's a line.

11    So we need to keep track of them by your telling us what

12    note it is you're sending.  So I've already put number one

13    and number two in the order that they came out, but the

14    next one will have number three on it, then we mark them as

15    court exhibits on the number with exhibit stickers, but

16    I'm going to do what -- read into the record the first

17    note:

18         We, the jury, would like to view both lineup,

19    pictures, all documents signed by Mr. Richard Diaz, and

20    both videos taken at the location of the incident.

21         We're able to send you physical exhibits.  The

22    videotape we're going to review in the courtroom.  If I can

23    ask the lights to be turned off.  Both videos will be shown

24    to you.  They are People's 4 and 4-A in evidence.  And one

25    view, I think, is CH 1 and the other is CH 2.  We're going

Proceedings

1     to play CH 1 for you.  When that's finished, then we'll

2     play CH 2.  Okay?

3                 (Whereupon, the videotape was played at this

4     time)

5                 THE COURT:  I understand it's now three, nearly

6     3:30, and I need to make a record of what is going on in

7     the courtroom.

8                 CH 1 has been playing for about half an hour now

9     and the jurors have asked to speak to me through a court

10    officer, which I cannot do verbally in the courtroom.  And

11    I have advised you you can only communicate by note.

12                Now, a court officer went in and brought a piece

13    of note paper into the courtroom.  You cannot write a note

14    from there.  All of you have to get together.  You have to

15    be part of the deliberation process.

16                Now, it is my belief and understanding at this

17    time that the jury does or certain members of the jury, at

18    least, wish to write me an additional note for something.

19    And if that is correct, then I will send the 12 jurors back

20    into the jury room, have the alternates wait in the hallway

21    and then when I have another note, we'll discuss this.

22    Okay.  I believe that's what you want to do.  And I can't

23    have any mistakes in communication.  Everything has to be

24    in writing.  I remind you this would be note number three.

25    Okay.  Thank you.

1          THE COURT OFFICER:   Jury exiting.

2          (Whereupon, the jurors leave the courtroom at this

3     time.)

4          THE COURT:   Alternates into the hallway.

5          (Whereupon, the alternate jurors leave the

6     courtroom at this time.)

7          THE COURT:   Mr. Mendys, how much longer is this

8     video, and how long is the other video?  Because I know you

9     didn't play the entire video, but the entire video is in

10    evidence.  And we have never seen most of this during the

11    trial.

12         And what's happening now, I don't know what is, if

13    it's relevant or not, but how long is this video that's in

14    evidence?

15         MR. MENDYS:   Well, the portion at the part where

16    the Court just interjected, I think, or made the record,

17    was the end at least for evidence purposes.

18         THE COURT:   Not for evidence purposes.  It is in

19    evidence.  Part of the problem is, as I said to you, what I

20    would normally have done and what my practice is, if there

21    are videos, I send the jury into the jury room with a

22    laptop that they -- that is stripped down, without any

23    Wi-Fi and whatever is in evidence, they can view, stop,

24    start, whatever they want.  I couldn't do that in this case

25    because you have a DVD that has far more views than what is

1    in evidence.

2            So the physical DVD that was marked into evidence

3    contains things that actually are not in evidence.  And you

4    indicated that to me that you weren't going to play all the

5    videos that I saw during the hearing.  So we're foreclosed

6    from doing that.

7            When the jury sends a note out and says I want, we

8    want to see both videos taken at the location of the

9    incident without any qualifications but I want to see this

10   part or that part, well, then, we have to show them both

11   videos in evidence in their entirety.

12           And you seem to have a video that's going on --

13   you didn't answer my question.  How much longer is CH 1?

14   How much longer would it be playing?  It was close to half

15   an hour.

16           MR. MENDYS:  Well, the answer to that question,

17   the video goes on for another seven minutes, however, when

18   the witnesses testified, they testified as to events and

19   they testified as in regards to the video as to events that

20   they were present for.

21           THE COURT:  Okay.  Let me -- I don't need to hear

22   this.  The rules of evidence are very clear.  You had it

23   marked into evidence.  You didn't limit it, and there was

24   no objection from defense counsel, who these videos were

25   turned over to.  Everybody knows what's on the videos and

Proceedings

1      how long they are.  And parts were played for some

2      witnesses, other parts were played for other witnesses.

3      Let me see what the notes says, because I can pretty much

4      guess what it says.

5              Jury note number three says:  We would no longer

6      like to see video number two.  Now, they don't want to see

7      the other video at all so, you know --

8              MR. MENDYS:  Judge, the other part of it is just,

9      this is for the record, this is a video that has an -- it's

10     a player that cannot be replicated, player with non alter

11     -- take portions out because my preference would be to give

12     the jury a laptop with the disk, as well, because this disk

13     cannot be altered to eliminate parts that are not in

14     evidence.

15             THE COURT:  You can't copy one JPEG?

16             MR. MENDYS:  They're not JPEG files.

17             THE COURT:  Whatever files they are usually, they

18     can be copied, same way you copied them for defense

19     counsel.  There are certainly -- I cannot believe in 2015

20     there is not someone who doesn't know how to download only

21     one video on a DVD that contains 20 videos.  Even I can do

22     that on using no up to date software or fancy software; I

23     just can do it on my computer.  You want to download a

24     picture, here it is.  Eliminate a picture, here it is,

25     however, I'm going to bring the jury out, and what is in

1    evidence and what was introduced into evidence and is very

2    important part of what we do, you put a DVD into evidence.

3    That's what you put.  It was qualified that one part only

4    begins when the officers arrive and that part was only

5    admitted but no end limitation to it.  No end limitation

6    was made on it.  No record was made up until this very

7    moment when we asked -- when the jury sent a note to have

8    the video.  And you didn't even raise this when we said

9    we'll have to play the video in the courtroom.  I didn't

10   even have heads up.  Then we would be looking at things

11   that would be going on for half an hour.

12              So it's really -- let me just mark note number

13   three into evidence as Court Exhibit IV.

14              (Whereupon, the item previously referred to is

15   received and marked Court Exhibit Number IV.)

16              THE COURT:  Okay.  We can bring the jury and

17   alternates back in.  Bring the jury and alternates in, get

18   them back to deliberating.

19              (Whereupon, the jurors enter the courtroom at this

20   time.)

21              THE COURT OFFICER:  Jury entering.

22              (Whereupon, the alternate jurors enter the

23   courtroom at this time.)

24              THE CLERK:  Sworn jury is present and properly

25   seated.

1          THE COURT:  The alternates are here, as well.  I

2     have a jury note through them I'm going to read into the

3     record, because it relates to jury note number one.  It

4     says:  We, the jury, would no longer like to see video two.

5     We're not going to show the second video.

6          I'm now going to get jury note number two which

7     says:  We, the jury, would like to view Mr. Richard Diaz's

8     mug shots, Detective Ana Bell and Mr. Richard Diaz

9     interview as stated by Detective Ana Bell in her testimony

10     and the actual statement from Detective Ana Bell.

11          In discussing with the attorneys and myself, we

12     can certainly give you the mug shot to take back with you.

13     We believe the statement is what Detective Bell typed up

14     that's in evidence.  We'll give that for you to take back

15     into the deliberation room when you return to the

16     deliberations.  We're not allowed to give you the

17     transcript to take into the jury room.  That requires read

18     back from the court reporter.

19          So we have identified the part of the testimony to

20     be read back, and we're going to do that right now.  The

21     reporter will now read into the record the testimony of

22     Detective Ana Bell relating to her interview with Mr.

23     Diaz.

24          (Whereupon, the requested testimony was read back

25     by the court reporter)

1          THE COURT:  All right.  So the read back of the

2     requested testimony is now complete.  You can return to

3     your deliberations.  We will give you the mug shot exhibit

4     as well as the statement that is in evidence, the typed

5     statement by Detective Bell.  Separate the alternates and

6     you can -- we'll be in the courtroom to hear from you

7     whenever you're ready.

8          THE COURT OFFICER:  Jury exiting.

9          (Whereupon, the jurors leave the courtroom at this

10     time.)

11          THE COURT OFFICER:  Alternates exiting.

12          (Whereupon, the alternate jurors leave the

13     courtroom at this time.)

14          (Whereupon, the case is held in recess awaiting

15     the jury's verdict.)

16          THE COURT OFFICER:  Jury entering.

17          (Whereupon, the jurors enter the courtroom at this

18     time.)

19          THE CLERK:  Sworn jury is present and properly

20     seated, including the alternate jurors.

21          THE COURT:  Okay.  Well, it's about ten of five.

22     Members of the jury, today's court session is drawing to a

23     close.  I'm about to excuse you for the day.

24          Now, you must return tomorrow.  I'm asking you all

25     to be here at 9:30.  The main jurors will assemble in the

1      jury room at Room 601.

2               Alternates, the court officers will tell you where

3      to be.

4               Now, as I told you, the deliberations cannot

5      commence or continue until you're altogether.  So please be

6      respectful of your other jurors who are giving up time, and

7      please be here at the time because if most of the jurors

8      are here at 9:30 and someone doesn't show up until 10:30,

9      you have lost an hour where the other jurors would be

10     deliberating.  So please be respectful and be here on time

11     at 9:30.

12              If anyone has a problem with the time -- juror

13     number three is raising your hand.  What's the problem?

14              THE JUROR:  I'm not going to be able to make it at

15     that time in the morning.  I would like --

16              THE COURT:  What's the problem?

17              THE JUROR:  I actually have a court case that I

18     have to deal with.

19              THE COURT:  Did we discuss this before?

20              THE JUROR:  No.  It's relatively new.

21              THE COURT:  Before I excuse the entire jury, I'm

22     going to ask you remain behind, and I'm going to have the

23     alternates in the hall, and I need to discuss this with you

24     outside the presence of the other jurors.

25              Everyone but juror number three should go into the

1    jury deliberation room.

2            Three alternates go into the hallway.

3            (Whereupon, the jurors leave the courtroom at this

4    time.)

5            THE COURT:  Juror number three is the only juror

6    remaining in the courtroom now.

7            So where do you have to go, to be tomorrow?

8            THE JUROR:  If I'm correct, I'm not sure, I think

9    it's about 9:30, around the same time.

10           THE COURT:  Where?

11           THE JUROR:  Criminal court.  I think, this

12   building.

13           THE COURT:  You have a case?

14           THE JUROR:  My girlfriend has a case today.

15           THE COURT:  Your girlfriend?

16           THE JUROR:  Yes.

17           THE COURT:  It's not your case?

18           THE JUROR:  I'm listed as a codefendant.

19           THE COURT:  You've been arrested?

20           THE JUROR:  Yes, sir.

21           THE COURT:  When did this happen?

22           THE JUROR:  During the summertime, during the

23   summertime.  Well, this is summertime.  Early in the

24   summertime.

25           THE COURT:  Since jury selection began?

1          to the clerk, and I didn't get a call back at least for

2          over 30 days.  They said if you don't get call back, you're

3          supposed to call back.  And I was told that if I don't get

4          call back within 30 days, it's dismissed.

5                    THE COURT:  Even if the case was going to be

6          dismissed, the fact that you were arrested --

7                    THE JUROR:  Yes.

8                    THE COURT:  -- was a specific question that was

9          asked to you and all the other prospective jurors.  Whether

10         you or anyone else had any police contact involving an

11         arrest, questioning, that's what the question --

12                   THE JUROR:  I didn't know it was police contact in

13         general, because I believe that I had nothing to do with

14         the case.

15                   THE COURT:  There are a lot of people that asked

16         to speak to me outside the presence of the other jurors.

17         That's number one.  Number two, what are the charges?

18                   THE JUROR:  I think it's menacing if I'm correct

19         like.

20                   THE COURT:  Why is -- your girlfriend is a

21         codefendant?

22                   THE JUROR:  My girlfriend is the -- I'm not going

23         to say the main issue.  My girlfriend admitted to happened

24         when she was there.  I don't know exactly what happened.

25         They're saying I did it.  I was there, and I guess I didn't

Proceedings

1    stop it, maybe I'm getting charged, but I didn't stop it

2    and maybe I did fuel or incite it, because I did speak how

3    I felt.

4              THE COURT:  Sorry.  Your girlfriend was given a

5    desk appearance ticket, as well?

6              THE JUROR:  Yes, sir, and she --

7              THE COURT:  So you were fingerprinted,

8    photographed?

9              THE JUROR:  No.  I was fingerprinted with the

10   electronic thing.

11             THE COURT:  Well, I guess now I have to -- since

12   the whole courtroom has seen the blunder.

13             I didn't ask you to run any files.

14             Defense and prosecution now have a right to know,

15   which I would not have asked them to do.

16             The charge is third degree assault, arrest date

17   was March 25th, not June.  March 25th, 2015.

18             THE JUROR:  Was my first appearance June?

19             THE COURT:  Appearance day, July 29th, last

20   appearance date July 16th, adjourned.  It was on the other

21   day.

22             THE JUROR:  Okay.

23             THE COURT:  You're in AP5.  You've already been

24   arraigned.

25             THE JUROR:  That was just last time, last time.

1          THE COURT:  You have to appear in part AP5 on an

2     active case.

3          THE JUROR:  Then that would be --

4          THE COURT:  On July 29th, which is tomorrow, in

5     this building.

6          THE JUROR:  Yes.

7          THE COURT:  You weren't told that?

8          THE JUROR:  The first case I wasn't told, told if,

9     I'm correct, two or one day before my appearance.  I really

10    didn't know when I had to go when it said was my first

11    appearance.

12         THE COURT:  You do have a court date tomorrow, and

13    you're represented by an attorney.  Who might that attorney

14    be?

15         THE JUROR:  I know she's a woman.  I don't know

16    her name.

17         THE COURT:  She gave you a note when you were in

18    court telling you the next date?

19         THE JUROR:  Yes, sir.

20         THE COURT:  And the part?

21         THE JUROR:  The part, no.

22         THE COURT:  You don't have that with you in your

23    pocket?

24         THE JUROR:  No, I don't think she gave me the part

25    number.

Proceedings

1          THE COURT:  You would have to be given that.

2     There's an order of protection.

3          THE JUROR:  Yes, sir.

4          THE COURT:  Were you given an order of protection?

5          THE JUROR:  Yes.

6          THE COURT:  That has the next date on it.

7          THE JUROR:  No.  Order of protection, doesn't

8     it?

9          THE COURT:  It has expiration date on the bottom.

10    All orders of protection have that.  Well, you are now a

11    deliberating juror, sir, on a case.  And your

12    responsibility is to be here for this jury.

13         THE JUROR:  Yes, sir.

14         THE COURT:  And actually, you were in court last

15    Thursday in the criminal court building to be arraigned.

16         THE JUROR:  Yes, the old court building.

17         THE COURT:  I know which building it is, it's the

18    building across the street.

19         THE JUROR:  Yes.

20         THE COURT:  You were arraigned, nothing was

21    dismissed, nothing was -- it was given a very short

22    adjourned date.  Was bail set on anybody?

23         THE JUROR:  No.  They said they didn't want bail.

24    They said -- I don't know the term exactly.  They said

25    something for alibi, motion for alibi or something along

1    the lines of that.  I don't know.  I wasn't told I was

2    being arraigned or any mention of that.

3              THE COURT:  Well, this issue is much more than

4    scheduling.  Your attorney did not tell you what time to

5    meet her in court?  You don't even know your attorney's

6    name?

7              THE JUROR:  No, I told her.

8              THE COURT:  Do you know what time your case is

9    being called?

10             THE JUROR:  I know it's early in the morning.

11   It's either 9:30, ten.

12             THE COURT:  9:30 is when all parts open up.

13             THE JUROR:  Yes, 9:30.

14             THE COURT:  This judge is in a bit of a conundrum

15   because of your misrepresentation under oath about never

16   having been arrested or knowing else ever been arrested.

17             THE JUROR:  Okay.

18             THE COURT:  That was a lie.  Do you understand you

19   could be prosecuted for juror misconduct?

20             THE JUROR:  I understand.

21             THE COURT:  You understand?

22             THE JUROR:  I understand, your Honor.  I didn't

23   mean to do any misconduct.  I apologize for that before the

24   Court.  And I didn't know it was an issue, time issue, time

25   conflict.

1          THE COURT:  It's not the time right now that's the

2     issue.  If you were going to landlord/tenant court, if you

3     were going to traffic court, if you were going to small

4     claims court, that would be the time question, and I would

5     try to resolve that by calling over to the court and

6     having your case heard, which I do all the time when

7     jurors have cases pending in a civil area or perhaps Family

8     Court.

9          THE JUROR:  Yes.

10          THE COURT:  People have problems in their lives.

11    When you have an arrest, I can't interfere with any of the

12    processes that are going on in that courtroom.  I can't ask

13    anybody to interfere with the processes that are going on

14    in that courtroom.  I wouldn't call to try and have you

15    accommodated in any way in a criminal case.  And that would

16    be by having your case heard so that your other jurors -- I

17    don't even know who your attorney is, nor do you, which I

18    find hard to believe, that attorneys always give their

19    clients a business card when they walk out of the

20    courtroom.

21          THE JUROR:  She did give me.

22          THE COURT:  Every person who is arraigned gets a

23    piece of paper that contains the next date and the part.

24          THE JUROR:  Yes.

25          THE COURT:  You knew the case was on tomorrow but

1    you never got a piece of paper from anyone, you never got a

2    business card?

3              THE JUROR:  I have a business card.

4              THE COURT:  Where is it?

5              THE JUROR:  It's at home.  I don't have it with

6    me.  I forgot her name.

7              THE COURT:  You have a business card?

8              THE JUROR:  I do have a business card from her,

9    but I don't have it on my person.  Would there be anything

10   we can do seeing how my case is in the same building as,

11   you know, this trial?

12             THE COURT:  Well, number one, you are forbidden to

13   discuss with any of the other jurors anything that has been

14   discussed in this courtroom at this time.  Do you

15   understand that?

16             THE JUROR:  Yes, your Honor, I do.

17             THE COURT:  If you violate that order, that's

18   another crime called contempt of court.  I am giving you a

19   directive, as I have given all jurors, not to discuss

20   anything about the case.  I've also told jurors when we

21   have one on one conversations that you're not to discuss

22   with the other jurors what's going on.  And I am

23   specifically directing you that you cannot mention anything

24   about having been arrested, having had any dealings with

25   the police, with your other jurors based on what we have

1    just talked about.  Do you understand that?

2                THE JUROR:  Yes, I do.

3                THE COURT:  Number two, you will be here at 9:30

4    tomorrow morning --

5                THE JUROR:  Yes, sir.

6                THE COURT:  -- sharp in that jury room and join

7    the deliberations tomorrow.  Do you understand that?

8                THE JUROR:  Yes.

9                THE COURT:  You bring your card with you.  You get

10   your card and you call your lawyer and you leave your

11   lawyer a message about what has happened and where you

12   are.

13               THE JUROR:  Okay.  I would just call her, tell her

14   I'm in this courtroom, 620?

15               THE COURT:  You know, sir, I'm not actually, not

16   giving to give you legal advice, I'm giving you

17   instructions.  You call your lawyer, and you tell your

18   lawyer where you are, which is you are on a deliberating

19   jury in this courthouse.  And you let your lawyer know what

20   is going on.  Do you understand that?

21               THE JUROR:  Yes, your Honor.

22               THE COURT:  And let your lawyer handle it.

23               THE JUROR:  Okay.

24               THE COURT:  I cannot emphasize, sir, enough what a

25   major, major problem this is.  I'm going to send you back

1     into the jury room for a minute.  No.  We're going to call

2     the jurors out.  I'll excuse them and decide what I'm going

3     to do.  Attorneys will stay behind for a few minutes.  I'm

4     sure they want to discuss something else.

5             Bring the alternates and rest of the jurors in.

6             THE COURT OFFICER:  Alternate jurors entering.

7             (Whereupon, the alternate jurors enter the

8     courtroom at this time.)

9             THE COURT OFFICER:  Jury entering.

10            (Whereupon, the jurors enter the courtroom at this

11    time.)

12            THE CLERK:  Sworn jury is present and properly

13    seated, including the alternate jurors.

14            THE COURT:  Okay.  So I am actually directing all

15    of you have to be here at 9:30 tomorrow morning, as I

16    stated, and to be respectful of each other, make sure

17    you're all here for deliberations.

18            The law requires that before I excuse you, I

19    review with the rules that you must follow over the course

20    of this particular recess.  They're designed to guarantee

21    the parties a fair trial, and they're generally the same

22    ones you've been required to follow prior to deliberations,

23    throughout the process, the recess rules, but the law

24    requires that I restate them at this time to emphasize

25    their importance.  The reason is that you are in a critical

1    stage.  You are in the process of deliberations, and you're

2    not being sequestered.  That means you're not being kept

3    together overnight where we have greater assurance that you

4    are following the rules.  You're being permitted to go home

5    after deliberations have begun.

6             Now, there may be a greater temptation, for

7    example, to discuss the case with someone else or to go

8    to the scene.  You must resist that temptation.  To

9    discuss the case with someone else or to visit the scene

10   or to discuss with other jurors or alternate jurors

11   things about the case would not only violate my order but

12   would violate the oath that all of you took to respect

13   and  follow each and every one of the rules that I laid

14   out.

15            And the rules are as follows:  Deliberations must

16   be conducted only in the jury room and only when all the

17   jurors are present.  Therefore, all deliberations must now

18   cease, and they do not resume until all of have you

19   returned and are together in the jury room.

20            During this recess, do not converse, either among

21   yourselves or with anyone else, about anything related to

22   this case.  Anything at all.  That includes conversation in

23   person, by social media, by any means whatsoever.  You

24   remain under obligation not to accept, request, agree to

25   accept or discuss with any person receiving or accepting of

1     any payment or benefit in return for supplying any

2     information about the trial.  And you must promptly report

3     directly to me anyone within your knowledge involving any

4     attempt by any person to improperly influence you or any

5     other member of the jury.

6          You must not visit or view the premises or place

7     where the charged crime was allegedly committed or any

8     other premises or place involved in the case.

9          You must not read, view or listen to any accounts

10    or discussions of the case reported by newspapers,

11    television, radio, Internet or any other news media.

12         You must not attempt to research any fact, issue

13    or law related to this case in any way.

14         When I talked about visits, again, I mentioned in

15    instructions, that includes visits by any kind of app,

16    Google maps or anything like that.  So those are the recess

17    deliberation instructions.

18         I hope you all have a pleasant evening, and I will

19    see you tomorrow.

20         THE COURT OFFICER:  Jury exiting.

21         (Whereupon, the jurors leave the courtroom at this

22    time.)

23         THE COURT:  My recollection about this juror, he

24    said he had past contact with the police, that he actually

25    mentioned to us -- all the jurors, by the way, are out of

Proceedings

1    the room but during voir dire, that he had been questioned

2    or stopped by the police in the past but nothing about a

3    pending case.

4                Anyone want to make a record about anything else

5    related to that juror at this time?

6                MR. MENDYS:  Not at this time, Judge.

7                MR. BONANNO:  Not at this time, also, Judge.

8                THE COURT:  I'll see you tomorrow morning at

9    9:30.

10               You should review your notes from voir dire, as

11   well.

12               (Whereupon, Court is recessed and the case

13   adjourned to July 29, 2016 at 9:30 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1    SUPREME COURT OF THE STATE OF NEW YORK

2    COUNTY OF BRONX : CRIMINAL TERM : PART 98

3    ------------------------------------------x

4     THE PEOPLE OF THE STATE OF NEW YORK        :  Indictment #:
                                                     3349/2012
5                     - against -                 :

6     RICHARD DIAZ,                              :  Trial
                                                     (Verdict)
7
                        Defendant(s).            :
8
     ------------------------------------------x
9                     265 East 161st Street
                      Bronx, New York   10451
10                    July 29, 2015
     B E F O R E,
11            HONORABLE RALPH FABRIZIO, Justice
              (Same appearances as previously noted)
12                    Margaret McGovern,
                      Senior Court Reporter
13            --------------------------

14           (Whereupon, the item previously referred to is

15    received and marked Court Exhibit Number V in evidence.)

16           THE CLERK:  Calendar number one, Richard Diaz,

17    case on trial continued.  Defendant is not before the Court

18    and neither is the sworn jury at this time.

19           Appearances.

20           MR. BONANNO:  Pat Bonanno for Mr. Diaz.

21           MR. MENDYS:  Newton Mendys for the office of the

22    district attorney.

23           MR. BONANNO:  Judge, following the issue that was

24    had with juror number four, I believe it was, I was going

25    to inform the Court yesterday after receiving the jury

1     notes it would be my intention that my application would

2     be relieve the alternate jurors at this point.

3          The jurors, having already started their

4     deliberations, and the alternate jurors being sat only by

5     written consent of the defendant, as I read the statute,

6     my research last night didn't uncover anything on point

7     that said a defendant who absents himself from the trial

8     waives that right to consent.  And I look to the Court for

9     that direction, but that would be our application.

10         I don't want it to be a surprise should there be

11    another incident of a juror possibly having to be unsat.

12         THE COURT:  So then you would be saying that

13    although your client is not here, I would have to declare

14    a mistrial and then if he would be apprehended and the DA

15    sought to retry him, there would be no jeopardy, no double

16    jeopardy issue, that he's already been tried?

17         MR. BONANNO:  Under that scenario, yes, however --

18         THE COURT:  Under what scenario?

19         MR. BONANNO:  Under the scenario --

20         THE COURT:  If we had to declare a mistrial if a

21    juror became suddenly unavailable and we only have 11,

22    obviously, we do not proceed with an 11-jury verdict,

23    because that would require the same written consent to

24    waive an entire jury, which the Parker case, of course,

25    doesn't contemplate that when you absent yourself from

1     coming to trial, you waive your right to trial by jury.

2     You don't waive that right.  That's obvious.  Otherwise, we

3     do bench trials for all the defendants who abscond.

4           So the -- so you're saying because your client has

5     not appeared and by his own misconduct has basically

6     forfeited all of his rights to be present during every

7     material aspect of this trial, which I advised him, you're

8     saying that he does not forfeit the right to substitution

9     of an alternate for a sworn juror.  That could never happen

10    under any circumstances?

11          MR. BONANNO:  Judge, what I'm saying is the

12    statute as written, as I read it, requires his written

13    consent in the presence of the foreperson in open court to

14    the seating of an alternate juror once deliberations have

15    begun.  That has clearly happened already.  Deliberations

16    have begun.  They sent out three jury notes.  I don't think

17    that I can of myself even consent to that in his absence

18    and without his authorization.  So I think I just want to

19    put the Court on notice.

20          THE COURT:  How did you pick a jury without his

21    authorization?  How did you present his evidence without

22    his authorization?  Yes.  There's a lot of decisions that

23    are up to you and you alone, but basically, you selected

24    this jury without him, including the alternates.

25          MR. BONANNO:  Those are tactical decisions.

1      Again --

2                  THE COURT:  They're also legal decisions.

3                  MR. BONANNO:  -- I look for the Court's direction.

4                  THE COURT:  Sorry.  What Court's direction?

5                  MR. BONANNO:  I want to give the Court a heads up

6      that would be my intention to not consent.  Of course, you

7      can overrule that and sit the alternate.

8                  THE COURT:  No.  First of all, if you're not going

9      to consent, that's a whole different story.  I could never

10     substitute a sworn juror without consent during

11     deliberations.  That's absolutely correct.

12                 The question becomes whether the defendant has

13     forfeited his right under that statute.

14                 MR. BONANNO:  I understand.  I'm not sure of

15     that.

16                 THE COURT:  To have a sworn juror replaced only

17     upon his written consent once deliberations have begun and

18     you're saying you think the statutory language can't be

19     waived?

20                 MR. BONANNO:  That's my reading of it.  Again, I

21     don't know of any case law or research that I did last

22     night didn't point me in any direction and, again, I would,

23     you know --

24                 THE COURT:  So Mr. Mendys --

25                 MR. BONANNO:  -- be open to any authority in that

1    respect.

2            THE COURT:  Mr. Mendys.

3            MR. MENDYS:  Well, I mean, I think -- I think the

4    first question should be whether Mr. Bonanno, independent

5    of his client, at this point would be willing to consent

6    under any circumstances to seating an alternate.  If the

7    answer is no, then I don't think it matters whether his

8    client is or is not here.

9            THE COURT:  Well, let me just tell you that a

10   number of judges here have been burned by that kind of

11   reaction, that I'm just going to discharge all the

12   alternates and then something happens and there's a change

13   of heart by the defense that may be there would be a -- but

14   you're consenting -- are you consenting to discharging the

15   alternate?

16           MR. MENDYS:  No, I'm not.

17           THE COURT:  If both of you are consenting, the law

18   is clear.

19           MR. MENDYS:  My position is that they are here

20   right now.  It is 9:30 or ten in the morning.  They are

21   here.  Let's keep them for the day and see where we are at

22   the end of the day.  There's no point to sending them home

23   since they have arrived already.

24           THE COURT:  I think that the second question is

25   more appropriate here.  I'm not sure that Mr. Bonanno is

1      saying he would not agree to substitution under any

2      circumstances.  I'm thinking, and maybe I'm wrong, Mr.

3      Bonanno does not believe he has the authority to agree to

4      substitution without his client being present and agreeing

5      to such substitution in writing.

6              MR. BONANNO:  I'm open to the first question that

7      you posed.  I haven't made an absolute decision on whether

8      I would yes or no make that decision, but definitely on

9      issue two, I don't believe I have the authority absent his

10     presence and his written consent.

11             THE COURT:  So what's your position on that?

12             MR. MENDYS:  My position would be that given a

13     situation where the defendant willfully -- there was

14     finding he's willfully absented himself, that in this,

15     without finding a case to support me, but my instinct would

16     be given the rights he has forfeited up to this point, this

17     would be one of those.

18             THE COURT:  Well, the provision is 270.35?

19             MR. BONANNO:  Yes, it is.

20             THE COURT:  270.35 for replacement and discharge

21     of jurors.  First of all, I have no application in front

22     of me from either side to discharge any juror, including

23     the person who came before the Court yesterday and made a

24     record that was made.  This particular statute is rooted

25     in a, based on a constitutional analysis of the defendant's

1   right to a jury of 12, and the first 12 he has a right

2   to.

3           The statute is also cited as authority for the

4   defendant to be able to waive a right to have a 12-person

5   jury.  That has to be in writing and that's there's no

6   authority in the statute for it, but the Court of Appeals

7   has agreed that if a defendant can waive a right to an

8   entire jury, defendant could waive the right to 12-person

9   jury, but this is all based on the statute.  So it does

10  seem to have a constitutional basis under New York State's

11  Constitution.

12          The question is when you don't come to court and

13  you waive all the other constitutional rights, the right to

14  confront a witness, the right to -- I mean, those are all

15  rooted in the constitution.  Can this right be waived?

16  And it's a very important question, because what I said

17  earlier is if for some reason a mistrial is declared

18  because of the absence or the unavailability to have a

19  12-person jury finish the case, and the Court could have

20  substituted with the consent of defense counsel and defense

21  counsel is wrong, that could implicate double jeopardy,

22  then the defendant could never be retried, because the

23  Court could have exercised another option, because jeopardy

24  had attached.  So it's a very, very -- it's not, in my

25  opinion, a black and white issue.

Proceedings

1          And I am not going to discharge the alternates.

2     I'm hoping we do get a verdict with the jury of 12 that we

3     have, but I do not want, at this point, without having any

4     kind of appellate authority on point about this, you know,

5     make a decision that could result in prejudice to either

6     side, and so I will not be discharging these alternates.

7     They'll be inconvenienced, at a minimum.

8          And I'm not saying we're going to substitute them,

9     but I think both of you should go do some research on this,

10    as I will.  Okay?

11         But bottom line is no one is asking me to

12    discharge juror number three.

13              MR. BONANNO:  No.

14              THE COURT:  DA has no additional record to make

15    about what's going on in that case or anything else today

16    about any issue of juror misconduct?

17              MR. MENDYS:  No.

18              THE COURT:  Okay.  That's it.  But I do appreciate

19    the record, Mr. Bonanno, and it is something very

20    important.

21              MR. BONANNO:  I saw it as one of the variables,

22    possibilities.

23              THE COURT:  Thank you.

24              (Whereupon, there was a brief pause in the

25    proceedings)

1      THE CLERK:  Case on trial continued, Richard

2   Diaz.  Defendant is not before the Court.  Counsel remain

3   the same.  Sworn jury is not before the Court at this

4   time.

5      THE COURT:  All right.  So the juror note was

6   received, number four.  Both attorneys have received a

7   copy of the note, as with all other notes.  It says:  "We,

8   the jury, are asking to see additional evidence that was

9   not shown in the presence of the jury as long as it is

10   deemed fit to show us."

11      I also want to say the note says it was sent at

12   11:55 a.m.  It's now 11:06.  I think they meant it to be

13   10:56, since the note basically came out.

14      So I will turn to the attorneys for guidance on

15   how you wish me to respond to this note.  Mr. Bonanno.

16      MR. BONANNO:  I have no idea, Judge.  I don't

17   know what other additional evidence they want shown to the

18   jury.  The evidence that's in is what they're entitled to

19   see.

20      THE COURT:  Well, I'm not sure what's in that

21   wasn't shown to them, that wasn't published to the jury.

22   I'm not sure if there is any evidence that was not

23   published to the jury.  But do we have a list of exhibits

24   that were marked for identification and not admitted?

25      MR. MENDYS:  Judge, nothing was marked just for

1    identification.

2              THE COURT:  Not admitted?

3              MR. MENDYS:  And not admitted.

4              THE COURT:  That's what my notes indicate, also,

5    but I want to make sure I'm correct.  Every piece of

6    evidence, physical evidence, that was marked for

7    identification was admitted into evidence.  I don't know.

8              So they're asking to see additional evidence that

9    was not shown in the presence of the jury.  They are --

10   they are asking for -- is there any other evidence in

11   the case?  Maybe they don't think there's enough evidence

12   here.

13             MR. MENDYS:  Judge, I think -- well, I mean, I'm

14   not going to try -- I try and read these notes, you know,

15   to the letter of them.  I think my recommendation would

16   be to tell them if there are any exhibits that they wish

17   to view, happy to provide them.  If something is not in

18   evidence, it is not something that you can see.

19             THE COURT:  So you want me to give a substantive

20   response.  Mr. Bonnano says I don't understand the note.

21   You're not proposing a substantive response.

22             MR. BONANNO:  Judge, I join in that application.

23   Clearly, the evidence admitted is what they're entitled to

24   see.  I think they have already gotten everything that's

25   been admitted.  I don't think there's anything marked for

1   ID purposes only that is not admitted.  If -- I don't want

2   to be speculative, talking about maybe a photo array, which

3   I don't believe is in evidence.

4                THE COURT:  There were lots of things that are not

5   in evidence.  Things certainly were referred to.

6                MR. MENDYS:  I think everything in evidence was

7   published to them during the course of the trial.

8                THE COURT:  What I'm saying is there was no photo

9   array, I don't believe there was a reference to a photo

10  array during the trial.  So yes, photo array exists, that's

11  correct, but you're not going to say gentleman, absolutely

12  not.  I'm just speculating that, you know, they somehow

13  want to see something that they think they're entitled.

14               What they're entitled to see is, you know, what is

15  in evidence.  I think corrective instruction in that

16  respect is what's needed.

17               Can I have the exhibit list, please.

18               (Whereupon, the document was handed to the

19  Court)

20               THE COURT:  What's Exhibit 3, document?  That's

21  all it says on the list.  What document was admitted into

22  evidence as Exhibit 3?

23               MR. MENDYS:  Voucher.  It was a voucher.

24               THE COURT:  Voucher of the money.  It just says

25  document.  Okay.  All right.

Proceedings

1    So this is what I'm going to tell them, and you
2    tell me if you want me to change any of it:
3          The jury is entitled to see every piece of
4    physical evidence which we call exhibits, and there are ten
5    of them that were admitted into evidence.  If you wish to
6    see all of the exhibits, just write a note and ask.  Two of
7    them are the videos.
8          And if you wish to see all or any part of those
9    videos, you can request that, as well.  No other physical
10   evidence exists.  Well, I don't know if I want to say
11   that.  Anything that's not in evidence cannot -- anything
12   that is not admitted into evidence may not be viewed.  Is
13   that fine?
14        MR. MENDYS:  I agree.  Yes.
15        MR. BONANNO:  Yes.
16        THE COURT:  That's exactly what I'm going to tell
17   them.
18        MR. MENDYS:  Judge, the only thing I may add or
19   suggest adding, given that their language is to see
20   additional evidence, evidence could also refer to
21   testimony.  I would remind them that should they want
22   anything, any testimonial evidence read back, that they
23   direct us as to what they want and that can be done, but
24   they cannot see the transcript.
25        THE COURT:  Mr. Bonanno?

1      MR. BONANNO:  That's fine.

2      THE COURT:  You agree with that?

3      MR. BONANNO:  Yes, Judge.

4      THE COURT:  Okay.  We'll get the alternates.  So

5  I'm going to say the jury is entitled to see every piece of

6  physical evidence.  Exhibits that are, that were admitted

7  into evidence, and there are ten of those.  If you wish to

8  see all of those exhibits, just ask.  Two of them are the

9  videos.  And if you wish to see all or any part of those

10  videos, you can request that, as well.  You can also

11  request a read back of all, any testimonial evidence that

12  was received before the jury.  Anything else that is

13  everything -- anything that is not admitted into evidence

14  is not for their consideration.

15      MR. MENDYS:  I agree.

16      MR. BONANNO:  That's fine.

17      (Whereupon, there was a brief pause in the

18  proceedings)

19      THE COURT OFFICER:  Jurors entering.

20      (Whereupon, the jurors enter the courtroom at this

21  time.)

22      THE CLERK:  Sworn jury is present and properly

23  seated, including the alternate jurors.

24      THE COURT:  Okay.  Good morning, everyone.

25      THE JURORS:  Good morning.

1          THE COURT:  I received juror note number four.  I

2     will read it into the record now:  "We, the jury, are

3     asking to see additional evidence that was not shown in the

4     presence of the jury, as long as it is deemed fit to show

5     us."  Okay.

6          So as I told you, there are two types of evidence

7     in this case, there's testimonial evidence, the testimony

8     of the witnesses, and there are -- there's physical

9     evidence which are exhibits.  The jury is entitled to see

10    every piece of physical evidence that was admitted into

11    evidence.  And there are ten exhibits.  If you wish to see

12    any or all of those exhibits, just write a note and request

13    them.

14         Two of those exhibits, as you're aware, are

15    videotapes that are on a DVD.  If you wish to see any part

16    or all of those videos, send a note.  And you're entitled

17    to view that then, as well.

18         You can also request read back of any portion of

19    testimony that you wish.  That also constitutes evidence.

20    Anything else is not evidence.  There is no other evidence

21    in this case, and anything that is not admitted into

22    evidence is not for your consideration.  Okay.

23         So that's the answer to your note.  And I will

24    await further communication from you.  You may return to

25    your deliberations.

1   THE COURT OFFICER:  Jury exiting.

2   (Whereupon, the jurors leave the courtroom at this

3   time to continue deliberations.)

4   (Whereupon, there is a luncheon recess taken and

5   the case adjourned to 2:15 p.m.)

6   A F T E R N O O N   S E S S I O N,

7   THE CLERK:  Part 98 back in session.  Case on

8   trial continued.  Richard Diaz, defendant, is not before

9   the Court.  Counsel remain the same.  Sworn jury is not

10   before the Court at this time.

11   THE COURT:  All right.  I have juror note number

12   five.  It says:  "We, the jury, have a verdict."  And we're

13   assembling the alternates, and we'll bring the jury out to

14   take the verdict.

15   THE COURT OFFICER:  Alternate jurors entering.

16   (Whereupon, the alternate jurors enter the

17   courtroom at this time.)

18   THE COURT OFFICER:  Jury entering.

19   (Whereupon, the jurors enter the courtroom at this

20   time.)

21   THE CLERK:  Sworn jury is present and properly

22   seated.

23   THE COURT:  All right.  Good afternoon, members of

24   the jury.  I have your note that says "We, the jury, have a

25   verdict."  And I'm going to have our clerk take the verdict

1    now.   I ask the foreperson to please stand.

2                    THE CLERK:   The People State of New York against

3    Richard Diaz.   Members of the jury, have you agreed upon a

4    verdict?

5                    THE FOREPERSON:   Yes.

6                    THE CLERK:   How say you as to count number one,

7    charging the defendant with Robbery in the Second Degree,

8    not guilty or guilty?

9                    THE FOREPERSON:   We find him guilty.

10                   THE CLERK:   How say you as to count number four,

11   charging the defendant with Criminal Impersonation in the

12   First Degree, not guilty or guilty?

13                   THE FOREPERSON:   We find him guilty.

14                   THE CLERK:   Thank you.   The verdict stands

15   recorded.

16                   THE COURT:   Is that the verdict of the entire

17   jury?

18                   THE FOREPERSON:   Yes.

19                   THE COURT:   Would either side wish the jury to be

20   polled?

21                   MR. MENDYS:   No.

22                   MR. BONANNO:   No.

23                   THE COURT:   No.   Okay.   The verdict stands

24   recorded.   We're not polling the jury.

25                   And number one, I want to thank you for your time

1    and attention in this matter.  For those of you, I think

2    most of you, have never been on a jury.  It's not an easy

3    job in a lot of ways.  And when I asked you to be here,

4    you were here.  You paid close attention to all the

5    evidence.  You deliberated.  You did everything that a

6    jury should, and you did it all.

7            So thank you for your time and your service on

8    behalf of myself personally and on behalf of the New York

9    State Office of Court Administration.

10           Now, you've heard me say a million times you can't

11   discuss the case, you can't talk to anybody about the case.

12   That instruction doesn't apply anymore.  You can talk with

13   anyone you want about anything connected with the case,

14   however, you are not required to speak to anyone about

15   anything connected with this case.  So it's your choice

16   from here on in.

17           And I also want to speak to the alternates.  This

18   is always a tough time because alternates sit here, they

19   listen, but I have to let you know if at any time we had a

20   problem and we could not proceed with the 12 jurors, I

21   would have had to declare a mistrial, and you would have

22   had to start all over again.

23           Although you did not get to deliberate, your

24   presence here was not only legally required, but it's

25   always prudent for the Court to select alternate jurors

Proceedings

1    in every case.  So thank you for your service, as

2    well.

3                And the good news is I think it's four or six

4    years you get certificates of your service.  But thank

5    you all for your time and attention.  You are all

6    discharged.

7                THE COURT OFFICER:  Jury exiting.

8                (Whereupon, the jurors leave the courtroom at this

9    time.)

10               THE COURT:  Any applications at the close of

11   trial?  I understand the defendant is not here, but are

12   there any other applications of any legal matter that

13   either side wants to make?

14               MR. MENDYS:  I think, just a sentencing date,

15   Judge.

16               THE COURT:  That's it?

17               MR. BONANNO:  I believe so.

18               THE COURT:  Well, the warrant is still in effect,

19   and I can do sentencing in absentia.  I am going to order a

20   probation report and set a sentencing date then.

21               MR. MENDYS:  I think that's the best way to

22   proceed.

23               THE COURT:  Now, I do have the other defendants

24   coming in on September 11th.  I don't know if you want that

25   date or a different date.

Proceedings

1          MR. MENDYS:  For sentencing?

2          THE COURT:  Yes.  Let's do that date.  It's a

3     Friday.  I don't have a problem.  I'm just saying if the

4     defendant returns on the warrant prior to that date and he

5     needs to be interviewed, it may be adjourned again but,

6     again, we have no word about his whereabouts.

7          I'm assuming that the detective who went out and

8     thought he might have seen him yesterday did not find him,

9     if in fact it was the same person he saw.

10          MR. MENDYS:  I think that's safe to assume.

11          THE COURT:  I think that's safe, too.  But 9/11.

12     Order of protection is extended until the defendant

13     returns, so there's no reason to extend it.

14                    *        *        *        *

15

16

17          Certified to be a true and accurate

18     transcript of the stenographic minutes taken within.

19

20

21          Margaret McGovern
          Senior Court Reporter

22

23

24

25

Proceedings

1  SUPREME COURT OF THE STATE OF NEW YORK
   COUNTY OF BRONX: CRIMINAL TERM:   PART 98
2  ----------------------------------------------------X
   THE PEOPLE OF THE STATE OF NEW YORK,
3
                     -against-              INDICTMENT NO.
4                                           3349-12
5  RICHARD DIAZ,
                                            SENTENCE
6
7                                 Defendant.
   ---------------------------------------------------X
8
                                 265 East 161st Street
9                                Bronx, New York  10451
10                               September 11, 2015
11
                                        **FILED**
12  B E F O R E:
                                        OCT -5 2016
13         HONORABLE RALPH FABRIZIO
           Justice of the Supreme Court   SUP COURT, APP. DIV.
14                                            FIRST DEPT.

15  A P P E A R A N C E S:

16
           ROBERT T. JOHNSON, ESQ.
17         DISTRICT ATTORNEY OF BRONX COUNTY
           BY:   NEWTON MENDYS, ESQ.
18         Assistant District Attorney

19         PAT BONANNO, ESQ.
           Attorney for the defendant
20

21

22
                                 Joan Mooney
23                               Senior Court Reporter

24

25

Proceedings

1              (Whereupon, the following takes place in open

2      court in the presence of the Court, the Assistant District

3      Attorney, Defense counsel, as follows:)

4              THE COURT CLERK:   #3, Richard Diaz.   Defendant is

5      not before the Court.

6              MR. BONANNO:   Good afternoon, Your Honor.   Pat

7      Bonanno for Mr. Diaz.

8              MR. MENDYS:   Newton Mendys, office of the

9      District Attorney.   Good morning still.

10             THE COURT:   Okay, good morning.   And now so

11     Mr. Diaz is not present as he was not during any of the

12     trial.

13             Does anyone have any updates or any information?

14             MR. MENDYS:   I spoke to the detective who was

15     assigned to I guess Mr. Diaz' case in terms of locating him

16     with a warrant squad.

17             He has not had any success at this point.   So he

18     is looking for him, but he has not had any success.

19             THE COURT:   I was just curious from a perspective

20     that, but have you tried to talk to either the

21     co-defendant's attorneys about whether their clients maybe

22     with some incentive to get a better deal would be able to

23     give some information on the whereabouts of Mr. Diaz?

24             MR. MENDYS:   I spoke to Mr. Wilson about that and

25     in the past and that was not fruitful.

Proceedings

1    THE COURT:  Okay, all right.  Well, I mean I just

2    was curious because he is convicted.  He did have a trial,

3    and, you know, he is at large somewhere, maybe not in the

4    United States, but we don't really know that.

5        But, okay, so we do have a probation report.

6        Do you wish to proceed with sentencing

7    in-absentia?

8    MR. MENDYS:  Yes, Judge.

9    THE COURT:  Mr. Bonanno?

10    MR. BONANNO:  Mr. Mendys, number one, I have

11    had -- I sent correspondence to Mr. Diaz, came back and the

12    number that I had had in my file for him was disconnected.

13        I did speak with the probation officer that

14    promulgated the report that the Court has and informed

15    him/her that she too had no success at any of those

16    locations.

17        The phone and the address Mr. Mendys did supply

18    me with some predicate felony information that I think he

19    is prepared to submit to the Court as a matter of good

20    form.

21        I would have to object to Mr. Diaz being

22    sentenced in absentia as a second felony offender.  I

23    believe Mr. Mendys though is prepared to go forward with

24    that.

25    THE COURT:  Your objection is to the if he were

Proceedings

1    not a predicate you would not have an objection. Well, you

2    would have an objection, but it's the objection based on

3    the fact that he is not here?

4              MR. BONANNO:  And his absence.

5              THE COURT:  To challenge the prior felony

6    conviction?

7              MR. BONANNO:  Exactly, Judge.

8              THE COURT:  Yes?

9              MR. MENDYS:  Judge, I have done the research on

10   this matter.

11             THE COURT:  I would love to see it.  Thank you.

12             MR. MENDYS:  I believe these two are the relevant

13   cases which are People v Seppinni, S-E-P-P-I-N-N-I, New

14   York County Supreme Court case, and the second one being

15   People v Santiago, which is a Second Department Appellate

16   Division case.  So I submit copies to Mr. Bonanno.

17             THE COURT:  Let me just ask a question.  And the

18   Santiago case, the Appellate case also cites several cases

19   within that decision, which one of them is the seminal

20   case, but there's a S-E-P-P-I-N-N-I, there's another case

21   called Hooper, I don't know if you have that one.

22             MR. MENDYS:  I do not have Hooper.

23             THE COURT:  But it basically says it's not

24   improper to judge a defendant a second violent felony

25   offender in-absentia not a second violent.  It would be a

Proceedings

1   second felony offender based on a nonviolent predicate if

2   you so adjudicated it.

3           Did he ever appeal that conviction that that's

4   the basis?

5           MR. MENDYS:  For Santiago?

6           THE COURT:  No, no, did Mr. Diaz, to your

7   knowledge, ever appeal that case?

8           MR. MENDYS:  Not to my knowledge.

9           THE COURT:  So you have a second felony offender

10  statement?

11          MR. MENDYS:  Correct.

12          THE COURT:  And the procedure is that you need to

13  file it with the Court and serve it on counsel first.  So

14  you want to do that.

15          MR. MENDYS:  I am prepared to do that.  It's in

16  triplicate form.

17          THE COURT:  No, we need them.

18          (Pause.)

19          THE COURT:  Okay, so I have myself looked at what

20  the People have filed and I have also reviewed some

21  additional records.  This is a New York County conviction

22  and the defendant plead guilty.  The conviction was entered

23  by plea of guilty.

24          Well, I don't know for a fact whether the case

25  was appealed itself.  There is a notation in the CRIMS

Proceedings

1    history of the case, indicating some sort of appeal on

2    November 19, 2013.  But the rap sheet doesn't indicate that

3    there was any conviction that was ever vacated and the

4    defendant received a state prison sentence and which he

5    served and then was on parole and parole, maxed out on

6    parole, this is 2010.

7          And there is no reason to believe that this is no

8    longer a valid conviction.  Court records still indicate

9    that this case is a conviction.  There was never any

10    vacating of plea or sentence.  So I would like the

11    arraignment on the predicate felon, any statement to begin,

12    as we would normally begin it.

13          THE COURT CLERK:  I will address Mr. Bonanno.

14          THE COURT:  The People have filed.

15          THE COURT CLERK:  Of course, Your Honor.

16          The District Attorney of Bronx County has filed a

17    statement specifying that by judgment entered in the

18    Supreme Court, New York County, on May 11, 2007, the

19    defendant was convicted of Criminal Possession of a

20    Controlled Substance in the Third Degree and was sentenced

21    on June 1, 2007.

22          Shall I proceed?

23          THE COURT:  And you received a copy of that

24    report, Mr. Bonanno?

25          MR. BONANNO:  On behalf of Mr. Diaz I have

1   received a copy of that report, yes.

2           THE COURT:  Now, you indicated that you are

3   objecting to the adjudication of Mr. Diaz as a predicate in

4   his absence.

5           Now, of course, I did advise him and I did an

6   entire trial without him.  That he was not only forfeiting

7   his right to go to trial, but forfeiting his right to be

8   present at sentence.

9           What is the basis for your objection to him being

10  adjudicated a predicate felon?

11          MR. BONANNO:  Without the assistance of Mr. Diaz

12  here to actually articulate that he is the person so

13  articulated in the second felony offender statement and

14  that that conviction was constitutionally obtained.  I

15  cannot on his behalf articulate those facts.

16          So based upon his inability to, his absence to

17  state those predicate criteria, I would object.

18          THE COURT:  Well, let's do this one at a time.

19  Whether he is the person named.

20          We did have a Sandoval in this case with your

21  client present, correct?

22          MR. BONANNO:  I believe we did, yes.

23          THE COURT:  And this was a part of the Sandoval

24  application?

25          MR. MENDYS:  Yes.

Proceedings

1    THE COURT:  Did your client ever indicate that he

2    was not the person who was convicted?

3    MR. BONANNO:  I do not recall if he ever objected

4    to that or if that was ever raised.

5    THE COURT:  Well, it wasn't raised before me as

6    an objection to the adjudication or to questioning that he

7    was a predicate.  So no one said it's not him.

8    Mr. Mendys?

9    MR. MENDYS:  I would agree.

10    THE COURT:  So whether it's him or not you have

11    no specific information, and, in fact, when given a chance

12    in a different part of this proceeding to address that

13    particular case, he did not indicate it wasn't him at that

14    time and there is no record of that.

15    The second part of the inquiry is whether this

16    was a constitutionally obtained conviction.

17    Now I know he plead guilty.  I don't know if

18    there was an appeal or not, but even that might not be

19    dispositive certainly because even if the case is affirmed

20    on appealed, the defendant could still mount a collateral

21    challenge at this time.

22    But do you have any reason that you can place on

23    this record specifically, factually, that there is

24    something of -- there's some actual infirmity in this

25    conviction?

Proceedings

1      MR. BONANNO:  I do not have any independent

2    knowledge of that.

3      THE COURT:  Are you objecting to the form of the

4    predicate felony statement that's been filed in anyway?

5      MR. BONANNO:  No.

6      THE COURT:  Okay.  So the DA's office has filed a

7    predicate felon any statement alleging a conviction for a

8    felony within ten years of the crime in this case and

9    certainly even within ten years of this sentencing

10    proceeding.

11      And it is, therefore, in terms of time, it

12    qualifies as a predicate felony for sentencing purposes.

13    The Court doesn't have to do any kind of calculation for

14    tolling or anything.  There is nothing at all incomplete or

15    incorrect or challenged as to the form of the document.

16      And while there is an objection raised, the

17    objection is only based on the fact that the defendant is

18    not present, but the defendant understood he was waving his

19    right to be present for all sorts of things that he has a

20    constitutional right to do and a statutory right to do

21    including jury selection, confronting witnesses, he has not

22    been here of his own volition and cannot be located.

23      I am adjudicating the defendant in-absentia a

24    second felony offender.  He stands convicted of a

25    nonviolent felony and the top count is a violent felony

Proceedings

count in this case, but he is also convicted of the
nonviolent E criminal impersonation.  And he is adjudicated
that status for the purpose of sentencing.

So let's arraign the defendant for sentencing now
in-absentia.  We are going to arraign him for sentencing
now.

THE COURT CLERK:  Before the Court pronounces
sentence on a plea of guilty to --

THE COURT:  On a conviction following trial.

THE COURT CLERK:  I am sorry.  After having been
tried and found guilty of Robbery in the Second Degree and
Criminal Impersonation in the First Degree under indictment
3349 of 2012, the District Attorney and the attorney have
an opportunity to make a statement relevant to sentence.
People?

MR. MENDYS:  Judge, the defendant was convicted
on July 29, 2015, of Robbery in the Second Degree, criminal
impersonation, C violent felony, and B nonviolent felony
respectively.

Those convictions came from a jury and were based
on facts and events that occurred on October 17, 2012,
shortly after midnight in the area of 2315 Walton Avenue
here in the Bronx.  At which point the defendant Mr. Diaz
and two others Mr. Santana, Mr. Melenciano, who have yet to
be tried, approached four individuals on the sidewalk and

Proceedings

1    Mr. Diaz displayed a badge, claimed to be the police and

2    directed that the four individuals go up against the wall.

3            The four people believing the perpetrators to be

4    actual police officers complied. And at which point

5    Mr. Santana searched the main complainant in this case Juan

6    Contreras and Mr. Melenciano searched an individual by the

7    name of Josel Rodriguez, who did not testify at the trial.

8            Mr. Diaz at that point stood by the two women,

9    Argillio Rosario and another, as the two men were searched.

10           While this was taking place a marked police van

11   containing three uniformed police officers drove by and

12   observed this scene. And initially as Police Officer

13   Manuel testified to believed that the defendant and his

14   cohorts were actually police officers.

15           They exited the van in an effort to, or as they

16   continued to watch, Officer Manuel testified that he

17   realized that something was wrong and that these were not

18   police officers.

19           They exited the van and as they did so Mr. Diaz

20   walked away, fleeing the scene, which seems to be a theme

21   in this case, and as they got closer Mr. Santana and

22   Mr. Melenciano also began to walk away.

23           At that point Mr. Canteras yelled out to the

24   police, said they took my money, directed their attention

25   to Santana and Melenciano.

Proceedings

1         Those two individuals were arrested on the scene.

2 And Santana was found to be in possession of $6000 that

3 belonged to Mr. Contreras.

4         Those two were arrested and processed and the

5 case was assigned to Detective Chris Rodriguez from the

6 Internal Affairs Bureau who handles police impersonation

7 cases.

8         Now, that same day he had a suspect for the third

9 individual who would later be known as Richard Diaz.  He

10 was found about a month later based on an I-card that

11 Detective Rodriguez submitted.

12         He was arrested on that I-card and he was taken

13 into custody by Rodriguez.

14         THE COURT:  I just want to -- I am sorry to

15 interrupt, but, in fact, he was identified by Santana as

16 being the accomplice, correct?

17         MR. MENDYS:  He was identified in a lineup.

18         THE COURT:  But before the I-card resulted the

19 police initially determined who he was because one of the

20 accomplices yet to be tried told them the name?

21         MR. MENDYS:  They gave Melenciano, provided a

22 nickname.

23         THE COURT:  It was Melenciano.

24         MR. MENDYS:  And that lead to the identification

25 of Mr. Diaz.

1       THE COURT:  Okay.

2       MR. MENDYS:  The I-card was submitted, he was

3 arrested, and a lineup was conducted in which Mr. Rosario

4 identified him as the person, the perpetrator with a

5 shield.  He then made a statement to Detective Bell in

6 Spanish after he had been read his Miranda Rights, in which

7 he admitted to being at the scene.  He admitted to being

8 with two other individuals.  He named them by nickname and

9 he admitted to having a shield on his person that he had

10 obtained through a job as a security guard.  And he also

11 admitted to throwing his shield away as he fled from the

12 scene.  Among other things.

13     So that is in large part the events in which

14 Richard Diaz' conviction rests.  He is to be sentenced

15 today.  He faces based on his criminal record his

16 adjudication as a second felony offender, he faces a

17 minimum of five years and a maximum of fifteen years on the

18 C violent conviction of Robbery in the Second Degree and up

19 to two to four years indeterminate sentence on the Criminal

20 Impersonation in the First Degree conviction.

21     It's the People's position, Judge, as the Court

22 is well aware sentencing serves a number of purposes, one

23 of which is punishment, one of which can be rehabilitation,

24 one of which is a sentence of justice for the community

25 that has been affected.

Proceedings

1        And it's the People's position that there are a

2   number of aggravating factors in this case that leads this

3   to the conclusion that Mr. Diaz should be sentenced on the

4   higher if not maximum range of what is allowed.

5        The sentencing allows for different types of C

6   violent felony cases, that's where there's a range of five

7   up to fifteen.  Not all C violent felony cases are the

8   same.  And it's the People's position that this is one of

9   the more serious ones.

10        Now, some of the aggravating factors would be

11   that the defendant acted with two other individuals in this

12   case.  Not only did they act together, they acted and

13   pretended to be police officers.  And they did that in

14   order to commit this crime and there's a significant danger

15   to the community.  The community would be greatly affected

16   by people pretending to have authority that they do not

17   have.

18        Whether people like or dislike the police, when

19   someone claims to be a police officer people listen to

20   that.  People take that seriously.  And we saw that here

21   when the three witnesses who testified all said that as

22   soon as Mr. Diaz said police, they believed him, they saw a

23   shield and they believed that he was a police officer.

24   They didn't ask for identification, they didn't ask for

25   further proof.  He wasn't even in a uniform.  He was just a

Proceedings

guy with a shield and they believed that.  That is a

serious matter that needs to be punished accordingly.

Events such as this can lead to a loss of trust,

fear, and potentially even worse, without proper punishment

and that is something that is so aggravating in this case,

that it just, it warrants discussion on its own.

And, you know, in addition to that fact, Mr. Diaz

himself is a nonviolent predicate.  He has been convicted

previously of a felony offense.  He was convicted of

possessing, Criminal Possession of Controlled Substance in

the Third Degree, which is a B nonviolent felony, a

narcotics case obviously.

And in that case, Judge, I have the minutes from

the plea from the sentence, he was convicted of possessing

over two pounds of cocaine with another individual with the

intent to distribute it.  This isn't, you know, something

where he had ten bags and he was going to go sell it.  He

had two pounds of cocaine.  I don't even know what the

value of that would be on the street, but it is

extraordinarily significant.

Throughout this case, throughout from the time of

the crime itself and up through today, Mr. Diaz has ignored

and displayed a lack of an ability to listen to authority,

to take authority seriously or to even have a shred of

respect for the justice system, for the court, for the

Proceedings

1    police officers that he pretended to be.

2              He had this -- I can't even read my own notes.

3    He obtained a shield and used it to commit a crime.  He was

4    ordered to return to court and he deliberately disobeyed

5    that order.  We tried him in-absentia.  He is nowhere to be

6    found at this point a month after the trial.  And he has

7    not been seen since.

8              He has no respect for authority of the justice

9    system, for this Court and even worse he has displayed a

10   willingness to use other people's respect and trust and

11   faith in the justice system against them.

12             And that's exactly what happened in this crime.

13   Using people's faith that when someone says they are police

14   officers, they are a police officer and use that to commit

15   a crime, to take something that didn't belong to him, to

16   take something that someone else had worked hard for.

17             And if we all remember Mr. Contreras testifying

18   that what I took a away from that and I submit what the

19   jury took away from that.  Was that he felt like he had

20   been duped, that someone had pulled something over on him

21   that he had been taken advantage of.  And that is exactly

22   what Mr. Diaz did.

23             Mr. Diaz is young.  He is 32 years old.  You know

24   I think we would all hope that there would be some sense

25   and ability for him to rehabilitate himself and to leave

Proceedings

1   this lifestyle that he had apparently has been leading.

2   But without him here that appears to be a small possibility

3   at this point in time, not to say that it can't happen, but

4   there obviously needs to be a willingness on his own part

5   to do that.

6          And without any, without showing any remorse let

7   alone responsibility for what he has done, taking

8   responsibility for what he has done or facing the

9   consequences of what he has done, it is hard to fathom him

10  having the ability or the wherewith all or the desire to

11  rehabilitate himself at this point in time.  Not to say as

12  I said before that it can't happen in the near future.

13         But given the facts of this case, given the

14  impact on the four people that were searched and

15  Mr. Contreras actually robbed, and given the impact that it

16  has on them, on people they talk to about and the community

17  at large, Mr. Diaz needs to be sentenced accordingly.

18         And it's the People's position, that we are

19  requesting that he be sentenced to fifteen years on the

20  robbery conviction with five years post release

21  supervision.

22         And that he be sentenced to two to four years on

23  the Criminal Impersonation case, which is the maximum.

24         And I cannot in good faith ask for them to be run

25  consecutive, they are part of the same criminal

Proceedings

1  transaction.

2      So I ask that they be run concurrently and I

3  would ask for all four of the witnesses to be granted

4  permanent orders of protection from Mr. Diaz, should he be

5  located and sentence be executed.

6      MR. BONANNO:  Judge, without going through all

7  the particulars of the case and with all due respect to the

8  jury's verdict and the People's case, there was a reason

9  this case was severed out.

10      And the reason was if, in fact, Mr. Diaz was

11  there by his statements, he certainly was not part and

12  parcel to a robbery.  His claims were that, yes, the

13  robbery occurred, he was not the one that engaged in that

14  robbery, whether it was a robbery or not.

15      He does not even know there's allegations afoot

16  that this was some sort of a drug deal gone bad, that's yet

17  to be proven by the two co-defendants who have yet to be

18  tried.

19      But as to his claims here, his claim was when I

20  saw something was going wrong I left the scene.  Knowing

21  that I had passed, knowing that I stood, you know, possibly

22  of being convicted of something higher that was going on,

23  going to help two friends maybe pay back a debt.  Maybe do,

24  you know, a drug deal that went bad.  Don't know.

25      But the fact is that the evidence presented

Proceedings

against him was not overwhelming, Judge.  There was

conflicting testimony between the eyewitnesses who did

identify/didn't identify, the statements he made in a

different dialect other than the Spanish dialect, the

Puerto Rican dialect, the Dominican dialect, those things

are appealable issues understandably, but certainly they

were not overwhelming of his guilt at this incident here.

I ask and again I just like to renew respectfully

my objection to his being adjudicated a second felony

offender in his absence.  It appears that the Seppini case

that was handed by the DA to us requires independent

hearing as to his being sentenced in-absentia.

I know we had a hearing as to his being able to

be tried in-absentia.  I believe that the sentencing

portion also requires an independent hearing in that

respect.

Judge, again, the case in my respectful opinion

to the jury and to the DA and to this Court was not

overwhelming and I believe Mr. Diaz should be seized with

that, with that mercy function of this Court, and that if

the Court is going to sentence him today that that be to

the minimum possible.

THE COURT:  All right.  First, let me just

address the second felony offender adjudication.  My

finding is that the defendant has waived his right

Proceedings

1    personally to challenge his adjudication.

2              I did make findings that this defendant had

3    voluntarily absented himself.  I held a hearing, there has

4    been no indication that this defendant is anywhere to be

5    found.

6              When the warrant squad came in with Mr. Santana,

7    there was a record made that possibly Mr. Diaz might have

8    been in the apartment that day.  I don't know if that's

9    true or not.  That was merely two months ago, that was in

10   July.  And since that time the Police Department, the

11   warrant officer went out to look for him that day, no one

12   has found him.

13             You made a record, phones disconnected.  He is

14   not a United States citizen, likely in possession of a

15   passport from the Dominican Republic.

16             The DA had alerts at all the airports, Customs

17   enforcement, border, no one has been able to find Mr. Diaz,

18   and this is his -- he knew the case was proceeding.  He was

19   advised that he would be forfeiting his right to be present

20   for sentencing if he voluntarily absented himself.

21             As a specific part of my allocution of him, of

22   the things that he would be waiving, and we were actually

23   on trial when he left.  We were on trial.  So he has waived

24   his right to mount any challenge to this predicate

25   conviction.  And should he come back, should he be found,

Proceedings

1   his Appellate rights are what they are.

2            But I am not going to delay it to sentence him

3   because I don't know if I am going to be around when they

4   find him.  You know, who knows where this guy is going to

5   be.  So that's number one.

6            So I am going to make it very clear that I am

7   making that finding that this is a waiver by voluntarily

8   conduct of this defendant to afford himself and avail

9   himself of each and every one of his actual rights to be

10  present at any and all material parts of this criminal

11  proceeding, including not only sentencing, but he was aware

12  he was a predicate felon, this was all on the record during

13  plea negotiations and he understood all of this.

14            Now, in terms of the sentences themselves.  I

15  actually disagree, Mr. Bonanno, I think this was a pretty

16  overwhelming case.  That video or the several views in

17  several videos, once your client is identified he is

18  actually the guy who gets the ball rolling.  He is the

19  person who makes these witnesses believe that they are all

20  police officers, because he is the only one, the only one

21  who has a chain around his neck and dangling from the back

22  chain is the unmistakable police shield.

23            In fact, one of the memorable moments from the

24  trial that I had was the witnesses said I could still see

25  the shield on the video here.  There it is.  Described how

Proceedings

1    it looked, color, where it hung.  He acted like an

2    authority figure.

3             He placed people up against the wall, he prepared

4    them for what was going to follow with his accomplices,

5    Mr. Melenciano and Mr. Santana.  And he claims, well, he

6    didn't come to trial to testify, he didn't make any

7    statements to the Department of Probation.

8             I understand this was your application for

9    severance.  But his claim is he had no clue about anything

10   that was going on that this might have been a drug deal

11   gone bad.  That this might have been people, why is he out

12   there, why is he out there pretending to be a cop.  So

13   convincingly that four people don't even question whether

14   he is or he isn't.

15            That's overwhelming.  Overwhelming.  And what the

16   victim testified to, Mr. Contreras, was he did believe this

17   was a setup, he came to New York with a lot of money.  He

18   came to New York for a specific purpose.  For him to be

19   targeted at that particular time in that particular

20   location with what was absolutely from the video,

21   unmistakably planned, cars pulling up, a cab being directed

22   back to that particular scene, the defendants coming up at

23   that very moment, getting out of the same car with each

24   other, walking to the sidewalk, being there together.

25            Your client escaped because there wasn't enough

1    police power there to go apprehend him.  They were going

2    after the guys who were robbing, he was out of there.  The

3    other guys never really had a chance to flee because they

4    had their backs, this is all on videotape.  He saw the

5    police and he knew, I am out of here, I got to move.  And

6    he was successful.  He got out of there.

7         What happened, one of his accomplices turned him

8    in.  Made it very easy for them to figure out guy number

9    three was because Mr. Melenciano told him who guy number

10   three was and then the witnesses said oh, yes, that is guy

11   number three.  Yeah, that's him.  Guy is seen in the

12   lineup, guy is seen, the photo array that's him.

13        So it's a very strong overwhelming case, all the

14   jury did not hear about that particular identification by

15   Mr. Melenciano.  Everything else, everything else they

16   heard and saw with their own eyes, the money, the conduct,

17   the frisking.  I believe this was quite an overwhelming

18   case.

19        And I do agree that robberies themselves are

20   scary enough for the victims of the crimes.  Who are faced

21   with force, with multiple men coming up with them, not

22   knowing.  And, yes, it's very scary to think they have a

23   gun and a knife, but to threaten that they are the police,

24   to threaten to make them submit to being frisked.

25        And especially in this day and age, let's blame

Proceedings

1    the police, these are rogue police officers.  And you know

2    something, if the police hadn't rolled up there and these

3    people called the police they would have said they were

4    cops.  We are looking for cops.

5            So that is the most aggravating factor for me and

6    the person who performed most like a police officer was

7    Mr. Diaz.  Maybe they would have fought back, maybe they

8    wouldn't have submitted, but the police, we are going to do

9    what the police tell us.  They acted as citizens would act

10   faced with police, they listened, and they listened to

11   their detriment and they were only caught all of them

12   because as the witness said so clearly, you never going to

13   believe this, the real police got there, it was another

14   memorable moment in the trial through the interpreter.

15   Because it sounds unbelieve.  But it's unmistakably true

16   because it's all on video.  Everything that everyone said

17   is on that video.

18           So, I do believe that Mr. Diaz is a very

19   dangerous individual.  A person who would stoop to doing

20   something like this is very dangerous.

21           I do believe that he has a very serious criminal

22   record.  And I do believe that he is not someone who I have

23   any reason to suspect is amenable to any type of

24   rehabilitation whatsoever.

25           I have nothing in front of me showing remorse.  I

Proceedings

1   don't have him.  He chose not to be here.  So he chose to

2   forfeit making those arguments as well to the sentencing

3   judge, me.

4           So for the conviction of Robbery in the Second

5   Degree, the defendant is sentenced as a second felony

6   offender, this is a violent felony conviction, to a period

7   of incarceration of twelve years, determinant, followed by

8   five years post release supervision.

9           For the crime of Criminal Impersonation in the

10  First Degree he is sentenced to a period of incarceration

11  of an indeterminate term as a predicate nonviolent of two

12  to four years in state prison.

13          These sentences do run concurrent with each

14  other.  There are permanent orders of protection for each

15  of the four complaining witnesses or people present at the

16  scene.

17          Mr. Mendys, have you put a dates on those?

18          MR. MENDYS:  I have not put a date on them.

19          THE COURT:  I am glad you haven't because the

20  date will run from whatever date the defendant actually

21  surrenders and is placed in custody.

22          So these orders of protection remain in effect

23  until the warrants are vacated and the sentence is actually

24  executed.

25          I am pronouncing the sentence today, but I cannot

Proceedings

1    execute the sentence today because I don't have the

2    defendant to send to the custody of the State Department of

3    Corrections.

4            I am imposing mandatory surcharges, crime victims

5    assistance fees.  These will be collected from the inmate

6    account when the defendant returns to court.

7            He had already forfeited a substantial amount of

8    money, a $25,000 bond that had been posted in this case.

9    And that money is gone for whoever posted it.

10           And I will also note just as I have in the past,

11   no bail bondsmen has ever come before me, no person who

12   signed on that bond has ever come back to court.  No one

13   has come in to tell me where Mr. Diaz is.

14           And the Warrant Squad, Homeland Security, ICE,

15   everyone should continue looking for him.

16           That's the sentence of the court.  And these

17   proceedings for Mr. Diaz are now closed.  Thank you.

18           MR. BONANNO:  Thank you.

19           (No further proceedings.)

20           Certified to be a true and accurate transcript of

21   the stenographic minutes taken within.

22

23                     _____
                               Joan Mooney

24                          Senior Court Reporter

25